# 13-3565-cv(L)

13-3636-CV(CON), 15-0432-cv(CON), 15-0441-cv(CON), 15-0454-cv(CON), 15-0477-cv(CON),
15-0494-cv(CON), 15-0498-cv(CON), 15-0524-cv(CON), 15-0537-cv(CON), 15-0547-cv(CON),
15-0551-cv(CON), 15-0611-cv(CON), 15-0620-cv(CON), 15-0627-cv(CON), 15-0733-cv(CON),
15-0744-cv(CON), 15-0778-cv(CON), 15-0825-cv(CON), 15-0830-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

Ellen Gelboim, on behalf of herself and all others similarly situated,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

### JOINT APPENDIX
### Volume 1 of 6 (Pages JA1 to JA300)

KAREN L. MORRIS
PATRICK F. MORRIS
MORRIS AND MORRIS LLC
  COUNSELORS AT LAW
4001 Kennett Pike, Suite 300
Wilmington, Delaware 19807
(302) 426-0400

DAVID H. WEINSTEIN
ROBERT S. KITCHENOFF
WEINSTEIN KITCHENOFF & ASHER LLC
1845 Walnut Street, Suite 1100
Philadelphia, Pennsylvania 19103
(215) 545-7200

THOMAS C. GOLDSTEIN
ERIC F. CITRON
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue, Suite 850
Bethesda, Maryland 20814
(202) 362-0636

*Counsel for Plaintiffs-Appellants Ellen Gelboim
and Linda Zacher in Case No. 13-3565*

*(For Continuation of Appearances See Inside Cover)*

Linda Zacher, Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, Schwab U.S. Dollar Liquid Assets Fund, Schwab Money Market Fund, Schwab Value Advantage Money Fund, Schwab Retirement Advantage Money Fund, Schwab Investor Money Fund, Schwab Cash Reserves, Schwab Advisor Cash Reserves, Charles Schwab Bank, N.A., Charles Schwab & Co., Inc., Charles Schwab Corporation, Schwab YieldPlus Fund, Schwab YieldPlus Fund Liquidation Trust, 33-35 Green Pond Road Associates, LLC, on behalf of itself and all others similarly situated, FTC Futures Fund PCC Ltd, on behalf of themselves and all others similarly situated, FTC Futures Fund SICAV, on behalf of themselves and all others similarly situated, Metzler Investment GmbH, on behalf of itself and all others similarly situated, 303030 Trading LLC, Atlantic Trading USA, LLC, Gary Francis, Nathaniel Haynes, Courtyard at Amwell II, LLC, Greenwich Commons II, LLC, Jill Court Associates II, LLC, Maidencreek Ventures II LP, Raritan Commons, LLC, Lawrence W. Gardner, on behalf of themselves and all others similarly situated, Mayor and City Council of Baltimore, City of New Britain Firefighters' and Police Benefit Fund, on behalf of itself and all others similarly situated, Texas Competitive Electric Holdings Company LLC, Guaranty Bank & Trust Company, Individually and on behalf of all others similarly situated, National Credit Union Administration Board, as Liquidating Agent of U.S. Central Federal Credit Union, Western Corporate Federal Credit Union, Members United Corporate Federal Credit Union, Southwest Corporate Federal Credit Union, and Constitution Corporate Federal Credit Union, City of Philadelphia, Pennsylvania Intergovernmental Cooperation Authority, Darby Financial Products, Capital Ventures International, Salix Capital US Inc., Prudential Investment Portfolios 2, FKA Dryden Core Investment Fund, on behalf of Prudential Core Short-Term Bond Fund, Prudential Core Taxable Money Market Fund, City of Riverside, Riverside Public Financing Authority, East Bay Municipal Utility District, County of San Mateo, San Mateo County Joint Powers Financing Authority, City of Richmond, Richmond Joint Powers Financing Authority, Successor Agency to the Richmond Community Redevelopment Agency, County of San Diego, County of Sonoma, David E. Sundstrom, in his official capacity as Treasurer of the county of Sonoma for and on behalf of the Sonoma County Treasury Pool Investment, Regents of the University of California, San Diego Association of Governments, County of Sacramento, The County of Mendocino, City of Houston, Bay Area Toll Authority, Joseph Amabile, Louie Amabile, individually & on behalf of Lue Trading, Inc., Norman Byster, Michael Cahill, Richard Deogracias, individually on behalf of RCD Trading, Inc., Marc Federighi, individually on behalf of MCO Trading, Scott Federighi, individually on behalf of Katsco, Inc., Robert Furlong, individually on behalf of XCOP, Inc., David Cough, Brian Haggerty, individually on behalf of BJH Futures, Inc., David Klusendorf, Ronald Krug, Christopher Lang, John Monckton, Philip Olson, Brett Pankau, David Vecchione, individually on behalf of Vecchione & Associates, Randall Williams, John Henderson, 303 Proprietary Trading LLC, Margery Teller, Nicholas Pesa, Eduardo Restani, Vito Spillone, Prudential Investment Portfolios 2, FKA Dryden Core Investment Fund, on behalf of Prudential Core Short-Term Bond Fund, Prudential Core Taxable Money Market Fund, Salix Capital US Inc., Darby Financial Products, Capital Ventures International, City of Philadelphia, Pennsylvania Intergovernmental Cooperation Authority, FTC Futures Fund PCC Ltd. on behalf of themselves and all others similarly situated, FTC Futures Fund SICAV, on behalf of themselves

and all others similarly situated, Metzler Investment GmbH, on behalf of itself
and all others similarly situated, 303030 Trading LLC, Atlantic Trading USA,
LLC, Gary Francis, Nathaniel Haynes, City of New Britain Firefighters' and
Police Benefit Fund, on behalf of itself and all others similarly situated, Mayor
and City Council of Baltimore, Texas Competitive Electric Holdings Company
LLC, Regents of the University of California, East Bay Municipal Utility District,
San Diego Association of Governments, City of Richmond, Richmond Joint
Powers Financing Authority, Successor Agency to the Richmond Community
Redevelopment Agency, City of Riverside, Riverside Public Financing Authority,
County of Sacramento, County of San Diego, County of San Mateo, County of
Sonoma, David E. Sundstrom, in his official capacity as Treasurer of the county
of Sonoma for and on behalf of Sonoma County Treasury Pool Investment,
City of Houston,

*Plaintiffs-Appellants,*

FTC Capital GMBH, on behalf of themselves and all others similarly situated,
FTC Futures Fund PCC Ltd, on behalf of themselves and all others similarly
situated, FTC Futures Fund SICAV, on behalf of themselves and all others
similarly situated, Carpenters Pension Fund of West Virginia, City of Dania
Beach Police & Firefighters' Retirement System, Individually and on behalf of all
others similarly situated, Ravan Investments, LLC, Mayor and City Council of
Baltimore, Richard Hershey, Jeffrey Laydon, on behalf of himself and all others
similarly situated, Metzler Investment GmbH, on behalf of itself and all others
similarly situated, Roberto E. Calle Gracey, City of New Britain Firefighters' and
Police Benefit Fund, on behalf of itself and all others similarly situated, AVP
Properties, LLC, 303030 Trading LLC, Atlantic Trading USA, LLC, Community
Bank & Trust, Berkshire Bank, Individually and On Behalf of All Others
Similarly Situated, 33-35 Green Pond Road Associates, LLC, on behalf of itself
and all others similarly situated, Elizabeth Lieberman, on behalf of themselves
and all others similarly situated, Todd Augenbaum, on behalf of themselves and
all others similarly situated, Gary Francis, Nathaniel Haynes, Courtyard at
Amwell II, LLC, Greenwich Commons II, LLC, Jill Court Associates II, LLC,
Maidencreek Ventures II LP, Raritan Commons, LLC, Lawrence W. Gardner, on
behalf of themselves and all others similarly situated, Annie Bell Adams, on
behalf of herself and all others similarly situated, Dennis Paul Fobes, on behalf of
himself and all others similarly situated, Leigh E. Fobes, on behalf of herself and
all others similarly situated, Margaret Lambert, on behalf of herself and all others
similarly situated, Betty L. Gunter, on behalf of herself and all others similarly
situated, Government Development Bank for Puerto Rico, Carl A. Payne,
individually, and on behalf of other members of the general public similarly
situated, Kenneth W. Coker, individually, and on behalf of other members of the
general public similarly situated, City of Riverside, Riverside Public Financing
Authority, East Bay Municipal Utility District, County of San Mateo, San Mateo
County Joint Powers Financing Authority, City of Richmond, Richmond Joint
Powers Financing Authority, Successor Agency to the Richmond Community
Redevelopment Agency, County of San Diego, Guaranty Bank & Trust Company,
Individually and on behalf of all others similarly situated, Heather M. Earle, on
behalf of themselves and all others similarly situated, Henryk Malinowski, on
behalf of themselves and all others similarly situated, Linda Carr, on behalf of
themselves and all others similarly situated, Eric Friedman, on behalf of
themselves and all others similarly situated, County of Riverside, Jerry Weglarz,
Nathan Weglarz, on behalf of plaintiffs and a class, Directors Financial Group,

individually and on behalf of all others similarly situated, SEIU Pension Plans Master Trust, individually and on behalf of all others similarly situated, Highlander Realty, LLC, Jeffrey D. Buckley, Federal Home Loan Mortgage Corporation, County of Sonoma, David E. Sundstrom, in his official capacity as Treasurer of the county of Sonoma for and on behalf of the Sonoma County Treasury Pool Investment, Regents of the University of California, San Diego Association of Governments, CEMA Joint Venture, County of Sacramento, City of Philadelphia, Pennsylvania Intergovernmental Cooperation Authority, Principal Funds, Inc., PFI Bond & Mortgage Securities Fund, PFI Bond Market Index Fund, PFI Core Plus Bond I Fund, PFI Diversified Real Asset Fund, PFI Equity Income Fund, PFI Global Diversified Income Fund, PFI Government & High Quality Bond Fund, PFI High Yield Fund, PFI High Yield Fund I, PFI Income Fund, PFI Inflation Protection Fund, PFI Short-Term Income Fund, PFI Money Market Fund, PFI Preferred Securities Fund, Principal Variable Contracts Funds, Inc., PVC Asset Allocation Account, PVC Money Market Account, PVC Balanced Account, PVC Bond & Mortgage Securities Account, PVC Equity Income Account, PVC Government & High Quality Bond Account, PVC Income Account, PVC Short-Term Income Account, Principal Financial Group, Inc., Principal Financial Services, Inc., Principal Life Insurance Company, Principal Capital Interest Only I, LLC, Principal Commercial Funding, LLC, Principal Commercial Funding II, LLC, Principal Real Estate Investors, LLC, Texas Competitive Electric Holdings Company LLC, Salix Capital Ltd.,

*Plaintiffs,*

– v. –

Bank of America Corporation, Barclays Bank Plc., Citibank NA, Credit Suisse Group AG, Deutsche Bank AG, HSBC Holdings plc., J.P. Morgan Chase & Co., Norinchukin Bank, UBS AG, WestLB AG, Rabobank Group, Does 1-10, HBOS PLC, Bank of Tokyo-Mitsubishi UFJ, Ltd, Royal Bank of Canada, Societe Generale, Deutsche Bank Financial LLC, Deutsche Bank Securities Inc., Bank of America, N.A., National Association, JPMorgan Chase & Co., HSBC Bank PLC, WestDeutsche Immobilienbank AG, Citigroup Inc., Cooperatieve Centrale RaiffeisenBoerenleenbank B.A., JPMorgan Chase Bank, National Association, JPMorgan Chase Bank, Barclays Bank PLC, Lloyds Banking Group PLS, HSBC Holding plc, Lloyds Banking Group PLS, JPMorgan Chase Bank N.A., Citigroup, Inc., Citibank N.A., Bank of Tokyo-Mitsubishi UFJ, Ltd., Cooperative Centrale-Raiffeisenboernlenbank B.A., JPMorgan Chase Bank N.A., Royal Bank of Scotland, Plc, Stephanie Nagel, British Bankers' Association, BBA Enterprises, Ltd, BBA Libor, Ltd, Portigon AG, John Does #1-#5, Lloyds TSB Bank plc, National Collegiate Trust, Chase Bank USA, N.A., Credit Suisse Group, AG, Citibank, N.A., UBS Securities LLC, J.P. Morgan Clearing Corp., Bank of America Securities LLC, Bank of Tokyo-Mitsubishi UFJ, JPMorgan & Co., Bank of America N.A., Centrale Raiffeisen-Berenleenbank B.A., UBS AG, Royal Bank of Scotland Group PLC, Societe General, Royal Bank of Canada, Bank of Nova Scotia, Bank of Tokyo Mitsubishi UFJ Ltd., Chase Bank USA, NA, Royal Bank of Scotland, JPMorgan Chase Bank National Association, Royal Bank of Scotland Group Plc.,

*Defendants-Appellees,*

Lloyds Banking Group plc, Credit Agricole, S.A., Royal Bank of Scotland Group PLC, Credit Suisse Group, NA, Barclays Capital Inc., Barclays U.S. Funding LLC, Credit Suisse Securities (USA) LLC, Barclays PLC, Citizens Bank of

Massachusetts, agent of RBS Citizens Bank, NA, RBS Citizens, N.A., FKA Citizens Bank of Massachusetts, RBS Citizens, N.A., incorrectly sued as the Charter One Bank NA, BNP Paribas S.A., Sumitomo Mitsui Banking Corp., Citigroup Global Markets Inc., HSBC Securities (USA) Inc.,

*Defendants.*

---

DAVID KOVEL
KIRBY MCINERNEY LLP
825 Third Avenue, 16th Floor
New York, New York 10022
(212) 371-6600

– and –

CHRISTOPHER LOVELL
LOVELL STEWART HALEBIAN
   JACOBSON LLP
61 Broadway, Suite 501
New York, New York 10006
(212) 608-1900

*Interim Co-Lead Counsel for Exchange-*
   *Based Plaintiffs-Appellants and the*
   *Class in Case No. 15-454*

WILLIAM CHRISTOPHER CARMODY
ARUN SUBRAMANIAN
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, New York 10022
(212) 336-8330

– and –

MARC SELTZER
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067
(310) 789-3100

– and –

MICHAEL D. HAUSFELD
WILLIAM P. BUTTERFIELD
HILARY K. SCHERRER
NATHANIEL C. GIDDINGS
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 540-7200

*Counsel for Plaintiffs-Appellants*
   *Baltimore, New Brítain and TCEH*
   *and Interim Lead Counsel for the*
   *Proposed OTC Plaíntíff Class in*
   *Case No. 15-498*

STEVEN E. FINEMAN
MICHAEL J. MIARMI
LIEFF, CABRASER, HEIMANN
   & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013
(212) 355-9500

– and –

BRENDAN P. GLACKIN
LIEFF, CABRASER, HEIMANN &
   BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
(415) 956-100

*Counsel for Plaintiffs-Appellants The Charles Schwab Corporation, Charles Schwab Bank, N.A., Charles Schwab & Co., Inc., Schwab Money Market Fund, Schwab Value Advantage Money Fund, Schwab Retirement Advantage Money Fund, Schwab Investor Money Fund, Schwab Cash Reserves, Schwab Advisor Cash Reserves, Schwab YieldPlus Fund, Schwab YieldPlus Fund Liquidation Trust, Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund and Schwab U.S. Dollar Liquid Assets Fund in Case No. 15-432 and for Bay Area Toll Authority in Case No. 15-778*

NANCI E. NISHIMURA
MATTHEW K. EDLING
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, California 94010
(650) 697-6000

– and –

ALEXANDER E. BARNETT
COTCHETT, PITRE & McCARTHY, LLP
40 Worth Street, 10th Floor
New York, New York 10013
(212) 201-6820

*Counsel for Plaintiffs-Appellants The Regents of the University of California, East Bay Municipal Utility District, San Diego Association of Governments, City of Richmond, The Richmond Joint Powers Financing Authority, Successor Agency to the Richmond Community Redevelopment Agency, City of Riverside, The Riverside Public Financing Authority, County of Mendocino, County of Sacramento, County of San Diego, County of San Mateo, The San Mateo County Joint Powers Financing Authority, County of Sonoma and David E. Sundstrom, in his official capacity as Treasurer of the County of Sonoma in Case No. 15-733*

RICHARD W. MITHOFF
WARNER V. HOCKER
MITHOFF LAW FIRM
One Allen Center
Penthouse, Suite 3450
Houston, Texas 77002
(713) 654-1122

– and –

NANCI E. NISHIMURA
MATTHEW K. EDLING
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road
Burlingame, California 94010
(650) 697-6000

– and –

ALEXANDER E. BARNETT
COTCHETT, PITRE & MCCARTHY, LLP
40 Worth Street, 10th Floor
New York, New York 10013
(212) 201-6820

*Counsel for Plaintiff-Appellant City of
Houston in Case No. 15-744*

STEIG D. OLSON
DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiffs-Appellants
The City of Philadelphia and
The Pennsylvania Intergovernmental
Cooperation Authority in Case No. 15-
547*

DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
STEIG D. OLSON
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiffs-Appellants
Darby Financial Products and
Capital Ventures International in
Case No. 15-551*

DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
STEIG D. OLSON
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiff-Appellant Salix
Capital US Inc. in Case Nos. 15-611
and 15-620*

DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
STEIG D. OLSON
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiffs-Appellants
Prudential Investment Portfolios 2
on behalf of Prudential Core Short-
Term Bond Fund and Prudential
Core Taxable Money Market Fund
in Case No. 15-627*

DAVID C. FREDERICK
WAN J. KIM
GREGORY G. RAPAWY
ANDREW C. SHEN
KELLOGG, HUBER, HANSEN, TODD,
    EVANS & FIGEL, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900

*Counsel for Plaintiff-Appellant National
Credit Union Administration Board in
Case No. 15-537*

MICHAEL J. GUZMAN
ANDREW C. SHEN
KELLOGG, HUBER, HANSEN, TODD,
    EVANS & FIGEL, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900

– and –

STUART H. MCCLUER
MCCULLEY MCCLUER PLLC
1223 Jackson Avenue East, Suite 200
Oxford, Mississippi 38655
(662) 550-4511

*Counsel for Plaintiff-Appellant Guaranty
Bank & Trust Company in Case No.
15-524*

JEFFREY A. SHOOMAN
LITE DEPALMA GREENBERG, LLC
Two Gateway Center, Suite 1201
Newark, New Jersey 07102
(973) 623-3000

*Counsel for Plaintiff-Appellant 33-35
Green Pond Associates, LLC in Case No.
15-441*

SCOTT P. SCHLESINGER
JEFFREY L. HABERMAN
JONATHAN R. GDANSKI
SCHLESINGER LAW OFFICES, P.A.
1212 SE Third Avenue
Ft. Lauderdale, Florida 33316
(954) 320-9507

*Counsel for Plaintiffs-Appellants
Amabile, et al. in Case No. 15-825*

JASON A. ZWEIG
HAGENS BERMAN SOBOL SHAPIRO LLP
555 Fifth Avenue, Suite 1700
New York, New York 10017
(212) 752-5455

*Counsel for Plaintiffs-Appellants
Courtyard At Amwell, LLC,
Greenwich Commons II, LLC, Jill
Court Associates II, LLC,
Maidencreek Ventures II LP,
Raritan Commons, LLC and
Lawrence W. Gardner in Case No.
15-477*

*In re Libor-Based Financial Instrument Antitrust Litigation*

# JOINT APPENDIX TABLE OF CONTENTS

**Document**                                                                                                              **Page**

## VOLUME I

District Court Dockets ...........................................................................................................JA1

*In re LIBOR-Based Financial Instruments Antitrust Litigation,*
    MDL No. 2262 Docket ...........................................................................................JA1

*Salix Capital US Inc. v. Banc of America Securities LLC, et al.,*
    1:13-cv-004018-NRB Docket.................................................................................JA74

*Amabile v. Bank of America Corp., et al.*
    1:13-cv-01700-NRB Docket...................................................................................JA88

Transcript of March 1, 2012 Hearing
    [Request for gov't. documents]..............................................................................JA94

*City of Baltimore v. Credit Suisse Group AG, et al.* [OTC Plaintiffs]
    Consolidated Amended Complaint (MDL Dkt. No. 130), filed April 30, 2012...........JA97

*Gelboim v. Credit Suisse Group AG*, et al., [Bondholder Plaintiffs]
    First Amended Class Action Complaint
    (MDL Dkt. No. 131), filed April 30, 2012 ...............................................................JA200

*Metzler Investment GmbH, et al. v. Credit Suisse Group AG, et al.*
    [Exchange-Based Plaintiffs] Amended Consolidated
    Class Action Complaint (MDL Dkt. No. 134), filed April 30, 2012 .........................JA289

Notice of Defendants' Motion to Dismiss the Amended Complaints
    (MDL Dkt. No. 165), filed June 29, 2012 .................................................................JA396

Declaration of Robert F. Wise, Jr. in Support of Defendants'
    Motion to Dismiss Plaintiffs' Antitrust Claims
    (MDL Dkt. No. 167), filed June 29, 2012 .................................................................JA404

Exhibit C to Wise Declaration - Rosa M Abrantes-Metz & Albert D. Metz,
    "How Far Can Screens Go in Distinguishing Explicit from Tacit Collusion?
    New Evidence from the Libor Setting," CPI Antitrust Chronicle
    (March 2012) (MDL Dkt. No. 167-3), filed June 29, 2012 ........................................JA406

Transcript of August 8, 2012 Hearing [Hearing re: Barclays documents] ......................JA416

Declaration of Hilary K. Scherrer in Support of Plaintiffs' Joint
    Memorandum of Law in Opposition to Defendants' Motions to Dismiss
    (MDL Dkt. No. 212), filed August 29, 2012 ..............................................................JA421

Exhibit 3 to Scherrer Declaration – Department of Justice
    Non-Prosecution Agreement with Barclays (MDL Dkt. No. 212-1).........................JA424

Exhibit 4 to Scherrer Declaration – CFTC Order
    Regarding Barclays Proceeding (MDL Dkt. No. 212-1) ...........................................JA454

Exhibit 5 to Scherrer Declaration – FSA Final Notice
    to Barclays Bank Plc (MDL Dkt. No. 212-2) ............................................................JA500

Transcript of March 5, 2013 Hearing [Motion to Dismiss argument].............................JA545

Bondholder Plaintiffs' Notice of Motion for Leave to Amend
    (MDL Dkt. No. 327), filed May 17, 2013 .................................................................JA575

Exhibit A to Bondholder Plaintiffs' Motion for Leave to Amend
    [Proposed Amended Complaint] (MDL Dkt. No. 327-1), filed May 17, 2013 ..........JA577

OTC Plaintiffs' Proposed Second Consolidated Amended Complaint,
    attached as Exhibit A to their Memorandum of Law for Leave to
    Amend the Complaint (MDL Dkt. No. 334-1), filed May 17, 2013...........................JA671

Exchange Based Plaintiffs' Proposed Second Amended Consolidated
    Class Action Complaint (MDL Dkt. No. 338-1 and 338-2) attached as
    Exhibits A-1 and A-2 to the Declaration of David E. Kovel in Support
    of Motion for Leave to File Second Amended Complaint, filed May 20, 2013.........JA834

Notice of Errata to the OTC Plaintiffs' Exhibit A to their Memorandum
    of Law in Support of their Motion for Leave to File Proposed Consolidated
    Second Amended Complaint (MDL Dkt. No. 345), filed May 24, 2013 ...................JA980

Transcript of August 8, 2013 Hearing [Leave to Amend argument]................................JA984

OTC Plaintiffs' Second Consolidated Amended Complaint
    (MDL Dkt. No. 406), filed September 10, 2013.......................................................JA1012

Notice of Appeal in *Gelboim v. Credit Suisse Group AG*, (MDL Dkt. No. 409)
    [Bondholder Plaintiffs], filed September 17, 2013..................................................JA1176

Exchange Based Plaintiffs [Corrected] Second Amended Consolidated
    Class Action Complaint (MDL Dkt. No. 438), filed September 20, 2013 ...............JA1179

Notice of Appeal in *Schwab Short-Term Bond Market Fund, et al, v.*
  *Bank of America Corp., et al.* (MDL Dkt. No. 429) [Schwab Plaintiffs],
  filed September 24, 2013 ........................................................................JA1385

*City of Philadelphia v. Bank of America Corp., et al.*
  Second Amended Complaint (MDL Dkt. No. 667), filed October 6, 2014..............JA1390

Notice of Defendants' Motion to Dismiss
  Direct Action Claims (Dkt. No. 743), filed November 5, 2014...............................JA1572

Letter requesting Lift of Stay and Entry of Final Judgment,
  (MDL Dkt. No. 1002), filed January 28, 2015 ........................................................JA1586

Notice of Appeal of Schwab Plaintiffs
  (MDL Dkt. No. 1011), filed February 10, 2015 .....................................................JA1589

Notice of Appeal in 33-35 *Green Pond Road Assoc., LLC v.*
  *Bank of America Corp.*, (MDL Dkt. No. 1014), filed February 11, 2015 ...............JA1596

Notice of Appeal in *Metzler Investment GmbH, et al. v.*
  *Credit Suisse Group AG, et al.* [Exchange-Based Plaintiffs]
  (MDL Dkt. No. 1016), filed February 12. 2015 .....................................................JA1598

Notice of Appeal in *Courtyard at Amwell II, LLC v. Bank of America Corp.*,
  (MDL Dkt. No. 1017), filed February 12, 2015 .....................................................JA1602

Corrected Notice of Appeal in *City of Baltimore v. Credit Suisse Group AG*,
  [OTC Plaintiffs] (MDL Dkt. No. 1019), filed February 13, 2015 ...........................JA1605

Amended Notice of Appeal in *City of Baltimore v. Credit Suisse Group AG*,
  (MDL Dkt. No. 1043), filed February 20, 2015 .....................................................JA1608

Notice of Appeal in *Guaranty Bank & Trust Co. v. Credit Suisse Group AG*,
  (MDL Dkt. No. 1044), filed February 20, 2015 .....................................................JA1611

Notice of Appeal in *National Credit Union Admin. Bd. v. Credit Suisse Group AG*,
  (MDL Dkt. No. 1054), filed on February 24, 2015 ................................................JA1615

Notice of Appeal in *City of Philadelphia v. Bank of America Corp.*,
  (MDL Dkt. No. 1056), filed February 24, 2015 .....................................................JA1619

Notice of Appeal in *Darby Financial Products v. Barclays Bank PLC*
  (MDL Dkt. No. 1057), filed February 24, 2015 .....................................................JA1622

Notice of Appeal in *Salix Capital US Inc. v. Banc of America Securities*,
  (MDL Dkt. No. 1058), filed February 24, 2015 .....................................................JA1625

Amended Notice of Appeal of Exchange-Based Plaintiffs
(MDL Dkt. No. 1063), filed on February 26, 2015 ..................................................JA1628

Notice of Appeal in *Prudential Core Taxable Money Mkt. Fund v.*
*Bank of America Corp.*, (MDL Dkt. No. 1064), filed February 27, 2015 ...............JA1631

Notice of Appeal in *The Regents of the Univ. of California v.*
*Bank of America Corp.*, (MDL Dkt. No. 1098), filed March 10, 2015 ...................JA1634

Notice of Appeal in *City of Houston v. Bank of America Corp.*,
(MDL Dkt. No. 1099), filed March 10, 2015 ...........................................................JA1638

Notice of Appeal in *Bay Area Toll Authority v. Bank of America Corp.*,
(MDL Dkt. No. 1105), filed March 13, 2015 ...........................................................JA1641

Notice of Appeal in *Amabile v. Bank of America Corp.*,
(MDL Dkt. No. 1119), filed March 19, 2015 ...........................................................JA1644

**U.S. District Court**
**Southern District of New York (Foley Square)**
**CIVIL DOCKET FOR CASE #: 1:11-md-02262-NRB**

In Re: Libor-Based Financial Instruments Antitrust
Litigation
Assigned to: Judge Naomi Reice Buchwald
Related Cases: 1:11-cv-05641-NRB
1:11-cv-05640-NRB
1:11-cv-05928-NRB
1:11-cv-05927-NRB
1:11-cv-05931-NRB
1:11-cv-02613-NRB
1:11-cv-05929-NRB
1:11-cv-02883-NRB
1:11-cv-03128-NRB
1:11-cv-03249-NRB
1:11-cv-05930-NRB
1:11-cv-06412-NRB
1:11-cv-06411-NRB
1:11-cv-06409-NRB
1:11-cv-07676-NRB
1:11-cv-07715-NRB
1:12-cv-01025-NRB
1:12-cv-04205-NRB
1:12-cv-05723-NRB
1:12-cv-05822-NRB
1:12-cv-06056-NRB
1:12-cv-06693-NRB
1:12-cv-07461-NRB
1:13-cv-00398-NRB
1:13-cv-00598-NRB
1:13-cv-00597-NRB
1:13-cv-00626-NRB
1:13-cv-00625-NRB
1:13-cv-00627-NRB
1:11-cv-05638-NRB
1:13-cv-00667-NRB
1:15-cv-01334-NRB
1:13-cv-00346-NRB
1:13-cv-00407-NRB

Date Filed: 08/12/2011
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

1:13-cv-01135-NRB
1:13-cv-01198-NRB
1:13-cv-01456-NRB
1:13-cv-01016-NRB
1:13-cv-02297-NRB
1:13-cv-02343-NRB
1:13-cv-03010-NRB
1:13-cv-03952-NRB
1:13-cv-05186-NRB
1:13-cv-05187-NRB
1:13-cv-05221-NRB
1:13-cv-05511-NRB
1:13-cv-05569-NRB
1:13-cv-05616-NRB
1:13-cv-06013-NRB
1:13-cv-06014-NRB
1:13-cv-06020-NRB
1:13-cv-07005-NRB
1:13-cv-07394-NRB
1:13-cv-07720-NRB
1:13-cv-08644-NRB
1:13-cv-08799-NRB
1:14-cv-01757-NRB
1:14-cv-03094-NRB
1:14-cv-04189-NRB
1:14-cv-07720-NRB
1:14-cv-00146-NRB

Cause: 15:1 Antitrust Litigation (Monopolizing Trade)

| Date Filed | # | Docket Text |
|---|---|---|
| 08/12/2011 | 1 | CERTIFIED TRUE COPY OF CONDITIONAL MDL TRANSFER IN ORDER FROM THE MDL PANEL... transferring this action from the United States District Court - that pursuant to 28 U.S.C. 1407, the actions listed on the attached schedule A and pending in the Districts of New York, Illinois, and the same hereby are, transferred to the Southern District of New York, with the consent of that court, assigned to the Honorable Judge Naomi Reice Buchwald, for coordinated or consolidated pretrial proceedings with the actions pending in that district and listed on Schedule A. (Signed by MDL Panel on 8/12/11) (rjm) (Entered: 08/15/2011) |
| 08/12/2011 | | CASES ORIGINATING FROM THE SOUTHERN DISTRICT OF NEW YORK: 1:11-cv-2613 (NRB), 1:11-cv-2883 (NRB), 1:11-cv- |

| | | |
|---|---|---|
| | | 3128 (NRB), 1:11-cv-3249 (NRB). (rjm) (Entered: 08/15/2011) |
| 08/12/2011 | | Case Designated ECF. (rjm) (Entered: 08/15/2011) |
| 11/29/2011 | 66 | ORDER: For the foregoing reasons, we hereby order: (1) that the LIBOR-related class action complaints currently pending before this Court be consolidated for all purposes under Federal Rule of Civil Procedure 42(a), under the following caption: In Re: Libor-Based Financial Instruments Antitrust Litigation, Master File No. 1:11-md-02262-NRB; (2) that the law firms of Hausfeld LLP and Susman and Godfrey LLP are appointed to serve as interim class counsel for the putative class of over-the-counter plaintiffs; (3) that the law firms of Kirby McInerney LLP and Lovell Stewart Halebian Jacobson LLP are appointed to serve as interim class counsel for the putative class of exchange-based plaintiffs; and (4) within 20 days, interim class counsel shall submit to this Court a proposed order to facilitate their representation of the putative classes and to advance the conduct and progress of the litigation. (Signed by Judge Naomi Reice Buchwald on 11/29/2011) Filed In Associated Cases: 1:11-md-02262-NRB et al. Copies Mailed By Chambers. (ae) (Entered: 11/30/2011) |
| 12/15/2011 | 78 | MOTION for Pre-Trial *Order No. 1*. Document filed by Mayor and City Council of Baltimore. (Attachments: # 1 Text of Proposed Order Proposed Pretrial Order No. 1)Filed In Associated Cases: 1:11-md-02262-NRB et al.(Bunche, Ralph) (Entered: 12/15/2011) |
| 12/22/2011 | 90 | PRE-TRIAL ORDER NO. 1: Mayor and City Council of Baltimore v. Bank of America, et al., Case No. 11.Civ. 5450, is designated as the lead action for the Over-the-Counter Plaintiff class actions("Over-the-Counter Plaintiff Action"), as further listed in this Pretrial Order. All filings related to the Over-the-Counter Plaintiff Action must be filed in that docket and in the docket for In re LIBOR-based Financial Instruments Antitrust Litigation, MDL No. 2262. Upon their transfer to the docket for Mayor and City Council of Baltimore v. Bank of America, et al., the Clerk will close the docket for those additional cases. Pursuant to Fed. R. Civ. P. 23(g)(3), the Court designates as Interim Co-Lead Counsel for the Over-the-Counter Plaintiff class, Hausfeld LLP, and Susman Godfrey L.L.P. FTC Capital GmbH, et al. v. Credit Suisse Group AG, et al., Case No. 11 Civ. 2613 is designated as the lead action for the Exchange-Based Plaintiff actions ("Exchange-Based Plaintiff Action"), as further listed in this Pretrial Order. All filings related to the Exchange-Based Plaintiff Action must be filed in that docket and in the docket for In re LIBOR-based Financial Instruments Antitrust Litigation, MDL No. 2262. Upon their transfer to the docket for FTC Capital GmbH, et al. v. Credit Suisse Group AG, et al., the Clerk will close the docket for those additional cases. Pursuant to Fed. R. Civ. P. 23(g)(3), the Court designates as Interim Co-Lead |

| | | |
|---|---|---|
| | | Counsel for the Exchange-Based Plaintiff class, Kirby Mcinerney LLP, and Lovell Stewart Halebian Jacobson LLP. (Signed by Judge Naomi Reice Buchwald on 12/22/2011) (tro) (Entered: 12/23/2011) |
| 12/23/2011 | 94 | AMENDED CLASS ACTION COMPLAINT against Bank of America Corporation, Barclays Bank Plc,, Barclays Capital Inc., Credit Suisse Group AG, Deutsche Bank AG, Deutsche Bank Securities Inc., HSBC Holdings plc., J.P. Morgan Chase & Co., Lloyds Banking Group plc, Royal Bank of Scotland Group plc, The Norinchukin Bank, UBS AG, WestLB AG, Credit Suisse Securities (USA) LLC, Bank Of America Securities LLC, J.P. Morgan Clearing Corp., HSBC Securities (USA) Inc., UBS Securities LLC, Citiigroup Global Markets Inc. with JURY DEMAND.Document filed by Metzler Investment GmbH.(cd) (Entered: 12/29/2011) |
| 03/01/2012 | | Minute Entry for proceedings held before Judge Naomi Reice Buchwald: Status Conference held on 3/1/2012. (lmb) (Entered: 03/06/2012) |
| 03/06/2012 | 115 | ENDORSED LETTER addressed to Judge Naomi Reice Buchwald from Michael D. Hausfeld, Christopher Lovell, William Christopher Carmody, David E. Kovel and Steven E. Fineman. Esqs., dated 2/17/2012 re: Counsels represent the Plaintiffs in the above captioned litigation. We believe that the most efficient way for his litigation to proceed is to require the Defendants to provide Plaintiffs the documents they have already produced to U.S. regulators investing the alleged manipulation of LIBOR. ENDORSEMENT: Application denied for the reasons stated on the record at an in court conference held on March 1, 2012. (Signed by Judge Naomi Reice Buchwald on 3/5/2012) (djc) (Entered: 03/06/2012) |
| 03/12/2012 | 117 | TRANSCRIPT of Proceedings re: Conference held on 3/1/2012 before Judge Naomi Reice Buchwald. Court Reporter/Transcriber: Toni Stanley, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/5/2012. Redacted Transcript Deadline set for 4/16/2012. Release of Transcript Restriction set for 6/14/2012.Filed In Associated Cases: 1:11-md-02262-NRB et al.(McGuirk, Kelly) (Entered: 03/12/2012) |
| 04/30/2012 | 130 | CONSOLIDATED AMENDED COMPLAINT against Bank of Tokyo-Mitsubishi UFJ Ltd, Barclays Bank Plc,, Citibank NA, Credit Suisse Group AG, Deutsche Bank AG, HBOS PLC, HSBC Holdings plc., J.P. Morgan Chase & Co., Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, WestLB AG, Bank of America, N.A., National Association, HSBC |

| | | |
|---|---|---|
| | | Bank PLC, WestDeutsche Immobilienbank AG, Citigroup Inc, Cooperative Centrale Raiffeisen-Boerenleenbank B.A. with JURY DEMAND.Document filed by Mayor and City Council of Baltimore, City of New Britain Firefighters' and Police Benefit Fund.(cd) (ama). (Entered: 05/01/2012) |
| 04/30/2012 | 131 | FIRST AMENDED COMPLAINT against Bank of America Corporation, Bank of Tokyo-Mitsubishi UFJ, Barclays Bank PLC, Citibank NA, Credit Suisse Group AG, Deutsche Bank AG, HSBC Holdings plc., J.P. Morgan Chase & Co., Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, UBS AG, WestLB AG, JPMorgan Chase Bank, National Association, HSBC Bank PLC, WestDeutsche Immobilienbank AG, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. with JURY DEMAND.Document filed by Ellen Gelboim, Linda Zacher.***Also docketed in case number 12-cv-1025. (mro) (ama). (ama). (Entered: 05/01/2012) |
| 04/30/2012 | 134 | CONSOLIDATED AMENDED COMPLAINT against Bank of America Corporation, Bank of America, N.A., Bank of Tokyo-Mitsubishi UFJ Ltd, Barclays Bank Plc,, Citibank NA, Citigroup Inc, Cooperative Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS PLC, HSBC Bank PLC, HSBC Holdings plc., J.P. Morgan Chase & Co., JPMorgan Chase Bank, National Association, Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, WestDeutsche Immobilienbank AG, WestLB AG with JURY DEMAND.Document filed by Metzler Investment GmbH, FTC Futures Fund SICAV, FTC Futures Fund PCC Ltd, Atlantic Trading USA, LLC, 303030 Trading LLC, Gary Francis, Nathaniel Haynes. (mro) (Additional attachment(s) added on 5/16/2012: # 1 Amended Cons. Comp. Part 2, # 2 Amended Cons. Comp. Part 3) (ama). Modified on 8/28/2012 (mro). (Entered: 05/03/2012) |
| 04/30/2012 | 146 | AMENDED COMPLAINT against Bank of America Corporation, Bank of America, N.A., Bank of Tokyo-Mitsubishi UFJ Ltd, Barclays Bank Plc,, Citibank NA, Citigroup Inc, Cooperative Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS PLC, HSBC Bank PLC, HSBC Holdings plc., J.P. Morgan Chase & Co., JPMorgan Chase Bank, National Association, Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, UBS AG, WestDeutsche Immobilienbank AG, WestLB AG with JURY DEMAND.Document filed by Schwab Total Bond Market Fund, Schwab Short-Term Bond Market Fund, Schwab U.S. Dollar Liquid Assets Fund. (also docketed in 11 cv 6409)(cd) (Entered: 05/18/2012) |

| | | |
|---|---|---|
| 04/30/2012 | 147 | AMENDED COMPLAINT against Bank of America Corporation, Bank of America, N.A., Bank of Tokyo-Mitsubishi UFJ Ltd, Barclays Bank Plc,, Citibank NA, Citigroup Inc, Cooperative Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS PLC, HSBC Bank PLC, HSBC Holdings plc., J.P. Morgan Chase & Co., JPMorgan Chase Bank, National Association, Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, UBS AG, WestDeutsche Immobilienbank AG, WestLB AG with JURY DEMAND.Document filed by Schwab Advisor Cash Reserves, Schwab Investor Money Fund, Schwab Cash Reserves, Schwab Value Advantage Money Fund, Schwab Yieldplus Fund Liquidation Trust, Schwab Retirement Advantage Money Fund, Schwab Money Market Fund, Schwab Yieldplus Fund. ( Also docketed in 11 cv 6412)(ft) (ft). (Entered: 05/18/2012) |
| 04/30/2012 | 148 | AMENDED COMPLAINT against Bank of America Corporation, Bank of America, N.A., Barclays Bank plc, Citibank, N.A., Citigroup, Inc., Credit Suisse Group AG, Deutsche Bank AG, HSBC Holdings plc, J.P. Morgan Chase & Co., JPMorgan Chase Bank National Association, Lloyds Banking Group plc, Royal Bank of Scotland Group plc, UBS AG, WestLB AG, Bank of Tokyo-Mitsubishi UFJ Ltd, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., HSBC Bank PLC, HBOS PLC, Royal Bank of Canada, The Norinchukin Bank, WestDeutsche Immobilienbank AG with JURY DEMAND.Document filed by The Charles Schwab Corporation, Charles Schwab Bank, N.A., Charles Schwab & Co., Inc. (Received in the night deposit box on 4/30/2012 at 11:40 pm) ***Also docketed in case number 11-cv-6411. (mro) Modified on 5/18/2012 (mro). (mro). (Entered: 05/18/2012) |
| 05/02/2012 | 133 | NOTICE of Errata to the Baltimore Plaintiffs' Consolidated Amended Complaint (D.E. #130) re: 130 Amended Complaint,,. Document filed by Mayor and City Council of Baltimore. (Agrawal, Suyash) (Entered: 05/02/2012) |
| 06/14/2012 | 151 | ORDER: WHEREAS on June 14, 2012 1 the Court issued an order requiring any plaintiff wishing to be joined with the multi-district litigation ("MDL") as a representative of a new class of plaintiffs to make an application detailing why the existing classes of plaintiffs do not protect it and why inclusion in the MDL would be appropriate; and WHEREAS it is the intent of the Court that the order of June 14, 2012 apply to plaintiff in 12 cv 4205,ORDERED that plaintiff in that action submit it's application within ten (10) days of this Order. (Signed by Judge Naomi Reice Buchwald on 6/14/2012) Copies Mailed By Chambers. (ama) Modified on 6/14/2012 (ama). (Entered: 06/14/2012) |
| 06/14/2012 | 152 | MEMORANDUM AND ORDER: Therefore, any plaintiff seeking to |

| | | |
|---|---|---|
| | | be joined as a representative of a separate class must file with its pleadings an application detailing why the existing classes of plaintiffs do not protect it and why inclusion in the MDL would be appropriate. SO ORDERED. (Signed by Judge Naomi Reice Buchwald on 6/14/2012) (ama) (Entered: 06/14/2012) |
| 06/15/2012 | 153 | NOTICE of ERRATA re: (134 in 1:11-md-02262-NRB) Amended Complaint. Document filed by 303030 Trading, LLC, Atlantic Trading USA, LLC, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. Filed In Associated Cases: 1:11-md-02262-NRB, 1:11-cv-02613-NRB(Kovel, David) (Entered: 06/15/2012) |
| 06/29/2012 | 165 | MOTION to Dismiss *the Amended Complaints*. Document filed by Bank of America Corporation, Bank of Tokyo-Mitsubishi UFJ Ltd, Citibank NA, Credit Suisse Group AG, Deutsche Bank AG, HSBC Holdings plc., J.P. Morgan Chase & Co., Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, WestLB AG, Bank of America Corporation, Bank of Tokyo-Mitsubishi UFJ, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., HSBC Bank PLC, J.P. Morgan Chase & Co., JPMorgan Chase Bank, National Association, Bank of America Corporation, Deutsche Bank AG, HBOS PLC, HSBC Holdings plc, J.P. Morgan Chase & Co., Royal Bank of Scotland Group plc, Bank of America Corporation, Bank of America, N.A., Citigroup Inc, Bank of America Corporation, Bank of America, N.A., Citibank, N.A., Citigroup, Inc., J.P. Morgan Chase & Co., JPMorgan Chase Bank National Association, Royal Bank of Scotland Group plc, CitiGroup Inc., Citibank, N.A., Cooperatieve Centrale Raiffeisen-Boerenleen Bank B.A., JP Morgan Chase & Co., JPMorgan Chase Bank, N.A., Royal Bank of Canada.Filed In Associated Cases: 1:11-md-02262-NRB et al.(Wise, Robert) (Entered: 06/29/2012) |
| 06/29/2012 | 166 | MEMORANDUM OF LAW in Support re: (112 in 1:11-cv-06411-NRB, 25 in 1:12-cv-01025-NRB, 165 in 1:11-md-02262-NRB, 108 in 1:11-cv-06409-NRB, 89 in 1:11-cv-02613-NRB, 118 in 1:11-cv-06412-NRB, 51 in 1:11-cv-05450-NRB) MOTION to Dismiss *the Amended Complaints*.. Document filed by Bank of America Corporation, Bank of Tokyo-Mitsubishi UFJ Ltd, Citibank NA, Credit Suisse Group AG, Deutsche Bank AG, HSBC Holdings plc., J.P. Morgan Chase & Co., Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, WestLB AG, Bank of America Corporation, Bank of Tokyo-Mitsubishi UFJ, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., HSBC Bank PLC, J.P. Morgan Chase & Co., JPMorgan Chase Bank, National Association, Bank of America Corporation, Deutsche Bank AG, HBOS PLC, HSBC Holdings plc, J.P. Morgan Chase & Co., Royal Bank of Scotland Group |

| | | |
|---|---|---|
| | | plc, Bank of America Corporation, Bank of America, N.A., Citigroup Inc, Bank of America Corporation, Bank of America, N.A., Citibank, N.A., Citigroup, Inc., J.P. Morgan Chase & Co., JPMorgan Chase Bank National Association, Royal Bank of Scotland Group plc, CitiGroup Inc., Citibank, N.A., Cooperatieve Centrale Raiffeisen-Boerenleen Bank B.A., JP Morgan Chase & Co., JPMorgan Chase Bank, N.A., The Royal Bank of Scotland Group plc, Royal Bank of Canada. Filed In Associated Cases: 1:11-md-02262-NRB et al.(Wise, Robert) (Entered: 06/29/2012) |
| 06/29/2012 | 167 | DECLARATION of Robert F. Wise, Jr. in Support re: (165 in 1:11-md-02262-NRB, 89 in 1:11-cv-02613-NRB, 118 in 1:11-cv-06412-NRB, 51 in 1:11-cv-05450-NRB, 112 in 1:11-cv-06411-NRB, 25 in 1:12-cv-01025-NRB, 108 in 1:11-cv-06409-NRB) MOTION to Dismiss *the Amended Complaints*.. Document filed by Bank of America Corporation, Bank of Tokyo-Mitsubishi UFJ Ltd, Citibank NA, Credit Suisse Group AG, Deutsche Bank AG, HSBC Holdings plc., J.P. Morgan Chase & Co., Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, WestLB AG, Bank of America Corporation, Bank of Tokyo-Mitsubishi UFJ, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., HSBC Bank PLC, J.P. Morgan Chase & Co., JPMorgan Chase Bank, National Association, Bank of America Corporation, Deutsche Bank AG, HBOS PLC, HSBC Holdings plc, J.P. Morgan Chase & Co., Royal Bank of Scotland Group plc, Bank of America Corporation, Bank of America, N.A., Citigroup Inc, Bank of America Corporation, Bank of America, N.A., Citibank, N.A., Citigroup, Inc., J.P. Morgan Chase & Co., JPMorgan Chase Bank National Association, Royal Bank of Scotland Group plc, CitiGroup Inc., Citibank, N.A., Cooperatieve Centrale Raiffeisen-Boerenleen Bank B.A., JP Morgan Chase & Co., JPMorgan Chase Bank, N.A., The Royal Bank of Scotland Group plc, Royal Bank of Canada. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)Filed In Associated Cases: 1:11-md-02262-NRB et al.(Wise, Robert) (Entered: 06/29/2012) |
| 06/29/2012 | 168 | MEMORANDUM OF LAW in Support re: (165 in 1:11-md-02262-NRB, 89 in 1:11-cv-02613-NRB) MOTION to Dismiss *the Amended Complaints. of the Exchange-Based Plaintiffs' Claims with Attached Exhibit 1*. Document filed by Bank of America Corporation, Bank of Tokyo-Mitsubishi UFJ Ltd, Citibank NA, Credit Suisse Group AG, Deutsche Bank AG, HSBC Holdings plc., J.P. Morgan Chase & Co., Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, WestLB AG, Bank of America Corporation, Bank of America, N.A., Citigroup Inc, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Deutsche Bank AG, HBOS PLC, HSBC Bank PLC, J.P. Morgan Chase & Co., |

| | | |
|---|---|---|
| | | JPMorgan Chase Bank, National Association, Royal Bank of Scotland Group plc. (Attachments: # 1 Exhibit 1)Filed In Associated Cases: 1:11-md-02262-NRB, 1:11-cv-02613-NRB(Wise, Robert) (Entered: 06/29/2012) |
| 06/29/2012 | 169 | MEMORANDUM OF LAW in Support re: (112 in 1:11-cv-06411-NRB, 165 in 1:11-md-02262-NRB, 108 in 1:11-cv-06409-NRB, 118 in 1:11-cv-06412-NRB) MOTION to Dismiss *the Amended Complaints. of the Schwab Plaintiffs' Amended Complaints.* Document filed by Bank of America Corporation, Bank of America, N.A., Bank of Tokyo-Mitsubishi UFJ Ltd, Citibank NA, Citigroup Inc, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS PLC, HSBC Bank PLC, HSBC Holdings plc., J.P. Morgan Chase & Co., JPMorgan Chase Bank, National Association, Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, WestLB AG, Bank of America Corporation, Bank of America, N.A., Citibank, N.A., Citigroup, Inc., HSBC Holdings plc, J.P. Morgan Chase & Co., JPMorgan Chase Bank National Association, Royal Bank of Scotland Group plc, CitiGroup Inc., Citibank, N.A., Cooperatieve Centrale Raiffeisen-Boerenleen Bank B.A., JP Morgan Chase & Co., JPMorgan Chase Bank, N.A., The Royal Bank of Scotland Group plc, Royal Bank of Canada. Filed In Associated Cases: 1:11-md-02262-NRB, 1:11-cv-06409-NRB, 1:11-cv-06411-NRB, 1:11-cv-06412-NRB(Wise, Robert) (Entered: 06/29/2012) |
| 06/29/2012 | 171 | SUPPLEMENTAL MEMORANDUM OF LAW in Support re: 165 MOTION to Dismiss *the Amended Complaints..* Document filed by The Norinchukin Bank. (Stern, Andrew) (Entered: 06/29/2012) |
| 06/29/2012 | 173 | SUPPLEMENTAL MEMORANDUM OF LAW in Support re: (112 in 1:11-cv-06411-NRB, 25 in 1:12-cv-01025-NRB, 165 in 1:11-md-02262-NRB, 108 in 1:11-cv-06409-NRB, 89 in 1:11-cv-02613-NRB, 118 in 1:11-cv-06412-NRB, 51 in 1:11-cv-05450-NRB) MOTION to Dismiss *the Amended Complaints..* Document filed by Bank of Tokyo-Mitsubishi UFJ Ltd. Filed In Associated Cases: 1:11-md-02262-NRB et al.(Libow, Daryl) (Entered: 06/29/2012) |
| 06/29/2012 | 174 | DECLARATION of Christopher M. Viapiano in Support re: (112 in 1:11-cv-06411-NRB, 25 in 1:12-cv-01025-NRB, 165 in 1:11-md-02262-NRB, 108 in 1:11-cv-06409-NRB, 89 in 1:11-cv-02613-NRB, 118 in 1:11-cv-06412-NRB, 51 in 1:11-cv-05450-NRB) MOTION to Dismiss *the Amended Complaints..* Document filed by Bank of Tokyo-Mitsubishi UFJ Ltd. (Attachments: # 1 Exhibit No. 1, # 2 Exhibit No. 2)Filed In Associated Cases: 1:11-md-02262-NRB et al.(Libow, Daryl) (Entered: 06/29/2012) |

| | | |
|---|---|---|
| 06/29/2012 | 175 | SUPPLEMENTAL MEMORANDUM OF LAW in Support re: 165 MOTION to Dismiss *the Amended Complaints*.. Document filed by Credit Suisse Group AG. (Washer, Herbert) (Entered: 06/29/2012) |
| 06/29/2012 | 176 | MOTION to Dismiss. Document filed by Barclays Bank Plc,.(Scott, Jeffrey) (Entered: 06/29/2012) |
| 06/29/2012 | 177 | MEMORANDUM OF LAW in Support re: 176 MOTION to Dismiss.. Document filed by Barclays Bank Plc,. (Scott, Jeffrey) (Entered: 06/29/2012) |
| 06/30/2012 | 178 | MOTION to Dismiss. Document filed by UBS AG, UBS AG.Filed In Associated Cases: 1:11-md-02262-NRB et al.(Sullivan, Peter) (Entered: 06/30/2012) |
| 06/30/2012 | 179 | MEMORANDUM OF LAW in Support re: (58 in 1:11-cv-05450-NRB, 127 in 1:11-cv-06412-NRB, 117 in 1:11-cv-06409-NRB, 32 in 1:12-cv-01025-NRB, 18 in 1:11-cv-07676-NRB, 178 in 1:11-md-02262-NRB, 121 in 1:11-cv-06411-NRB) MOTION to Dismiss.. Document filed by UBS AG, UBS AG. Filed In Associated Cases: 1:11-md-02262-NRB et al.(Sullivan, Peter) (Entered: 06/30/2012) |
| 06/30/2012 | 180 | DECLARATION of Lawrence J. Zweifach in Support re: (32 in 1:12-cv-01025-NRB, 18 in 1:11-cv-07676-NRB, 178 in 1:11-md-02262-NRB, 121 in 1:11-cv-06411-NRB, 58 in 1:11-cv-05450-NRB, 127 in 1:11-cv-06412-NRB, 117 in 1:11-cv-06409-NRB) MOTION to Dismiss.. Document filed by UBS AG, UBS AG. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)Filed In Associated Cases: 1:11-md-02262-NRB et al.(Zweifach, Lawrence) (Entered: 06/30/2012) |
| 07/18/2012 | 187 | MEMORANDUM AND ORDER: Accordingly, we reverse our previous consolidation order pursuant to Rule 42(a) and instead consolidate the class action complaints pending in the MDL for pretrial purposes only. (Signed by Judge Naomi Reice Buchwald on 7/18/2012) Filed In Associated Cases: 1:11-md-02262-NRB et al.(lmb) (Entered: 07/18/2012) |
| 08/08/2012 | | Minute Entry for proceedings held before Judge Naomi Reice Buchwald: Telephone Conference held on 8/8/2012. In re LIBOR: 11 MD 2262 Conference-1 Hour, JOHNSON v. IAC/INTERACTIVE: 11 CV 7909 Telephone Conference 15 Minutes. (pl) (Entered: 08/23/2012) |
| 08/10/2012 | 199 | ENDORSED LETTER addressed to Judge Naomi Reice Buchwald from Michael D. Hausfeld, William C. Carmody, David H. Weinstein, Karen L. Morris, David Kovel, Christopher Lovell, Steven E. Fineman dated 8/1/2012 re: Request that the Court hold a pre-motion conference to address Plaintiffs' intention to move for leave to amend their |

| | | |
|---|---|---|
| | | complaints in light of material new facts regarding Defendants' alleged manipulation of the LondonInterBankOfferedRate("LIBOR")-principally relating to U.S.-Dollar LIBOR-that have surfaced throughout the past month and continue to emerge. In connection with their anticipated motion(s) for leave to amend, Plaintiffs will also request that the Court vacate the existing briefing schedule to Defendants' motions to dismiss filed on June 29, 2012, to which Plaintiffs currently must respond by August 28, 2012. As detailed below, granting Plaintiffs' requests would promote the mutual interest of the Court and all parties to efficiently manage this litigation. ENDORSEMENT: Application denied for the reasons stated on the record on August 8, 2012. See transcript. So ordered. (Signed by Judge Naomi Reice Buchwald on 8/9/2012) (rjm) Modified on 8/14/2012 (tro). (Entered: 08/10/2012) |
| 08/14/2012 | 205 | MEMORANDUM AND ORDER: For the reasons stated at our August 8, 2012 conference, a stay is hereby imposed on any actions not subject to defendants' pending motion to dismiss, filed on June 29, 2012. The stay applies to the four actions already filed that are not subject to the motion, as well as any new actions filed hereafter that fall within the scope of the multi-district litigation. The stay will remain in place until the pending motion to dismiss is resolved. (Signed by Judge Naomi Reice Buchwald on 8/14/2012) Filed In Associated Cases: 1:11-md-02262-NRB, 1:12-cv-05723-NRB, 1:12-cv-05822-NRB, 1:12-cv-06056-NRB(djc) (Entered: 08/14/2012) |
| 08/14/2012 | 206 | PRETRIAL ORDER NO. 2: Consolidation and Coordination of Bondholder Plaintiff Actions I. Ellen Gelboim and Linda Zacher v. Credit Suisse Group AG, et al, Case No. 12 CV 1025 (NRB), is designated as the lead action for all class actions brought on behalf of holders of LIB OR-based debt securities not issued by any Defendant ("Bondholder Plaintiff Action") that may hereafter be filed in or transferred to the Court as related to In re LiBOR-Based Financial Instruments Antitrust Litigation, MDL No. 2262. (Signed by Judge Naomi Reice Buchwald on 8/14/2012) (djc) (Entered: 08/14/2012) |
| 08/28/2012 | 208 | MEMORANDUM OF LAW in Opposition re: 165 MOTION to Dismiss *the Amended Complaints*., 176 MOTION to Dismiss., 178 MOTION to Dismiss. *Opposition of Exchange-Based Plaintiffs*. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Kovel, David) (Entered: 08/28/2012) |
| 08/28/2012 | 209 | DECLARATION of David E. Kovel in Opposition re: 165 MOTION to Dismiss *the Amended Complaints*., 176 MOTION to Dismiss., 178 MOTION to Dismiss.. Document filed by 303030 |

| | | Trading LLC, Atlantic Trading USA, LLC, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit)(Kovel, David) (Entered: 08/28/2012) |
|---|---|---|
| 08/28/2012 | 210 | MEMORANDUM OF LAW in Opposition re: 165 MOTION to Dismiss *the Amended Complaints*., 176 MOTION to Dismiss.. 178 MOTION to Dismiss.. Document filed by Charles Schwab & Co., Inc., Charles Schwab Bank, N.A., Schwab Advisor Cash Reserves, Schwab Cash Reserves, Schwab Investor Money Fund, Schwab Money Market Fund, Schwab Retirement Advantage Money Fund, Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, Schwab U.S. Dollar Liquid Assets Fund, Schwab Value Advantage Money Fund, Schwab Yieldplus Fund, Schwab Yieldplus Fund Liquidation Trust, The Charles Schwab Corporation. (Fineman, Steven) (Entered: 08/28/2012) |
| 08/29/2012 | 211 | MEMORANDUM OF LAW in Opposition re: (165 in 1:11-md-02262-NRB) MOTION to Dismiss *the Amended Complaints*., (176 in 1:11-md-02262-NRB) MOTION to Dismiss., (178 in 1:11-md-02262-NRB) MOTION to Dismiss. *Plaintiffs' Joint Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Antitrust Claims*. Document filed by Charles Schwab & Co., Inc., Charles Schwab Bank, N.A., City of New Britain Firefighters' and Police Benefit Fund, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Ellen Gelboim, Mayor and City Council of Baltimore, Metzler Investment GmbH, Schwab Advisor Cash Reserves, Schwab Cash Reserves, Schwab Investor Money Fund, Schwab Money Market Fund, Schwab Retirement Advantage Money Fund, Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, Schwab U.S. Dollar Liquid Assets Fund, Schwab Value Advantage Money Fund, Schwab Yieldplus Fund, Schwab Yieldplus Fund Liquidation Trust, The Charles Schwab Corporation, Linda Zacher. Filed In Associated Cases: 1:11-md-02262-NRB, 1:12-cv-05723-NRB, 1:12-cv-05822-NRB, 1:12-cv-06056-NRB(Ratway, Hilary) (Entered: 08/29/2012) |
| 08/29/2012 | 212 | DECLARATION of Hilary K. Scherrer in Opposition re: (165 in 1:11-md-02262-NRB) MOTION to Dismiss *the Amended Complaints*., (176 in 1:11-md-02262-NRB) MOTION to Dismiss., (178 in 1:11-md-02262-NRB) MOTION to Dismiss.. Document filed by Charles Schwab & Co., Inc., Charles Schwab Bank, N.A., City of New Britain Firefighters' and Police Benefit Fund, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Ellen Gelboim, Mayor and City Council of Baltimore, Metzler Investment GmbH, |

| | | |
|---|---|---|
| | | Schwab Advisor Cash Reserves, Schwab Cash Reserves, Schwab Investor Money Fund, Schwab Money Market Fund, Schwab Retirement Advantage Money Fund, Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, Schwab U.S. Dollar Liquid Assets Fund, Schwab Value Advantage Money Fund, Schwab Yieldplus Fund, Schwab Yieldplus Fund Liquidation Trust, The Charles Schwab Corporation, Linda Zacher. (Attachments: # 1 Exhibit 1-4, # 2 Exhibit 5, # 3 Exhibit 6-7)Filed In Associated Cases: 1:11-md-02262-NRB, 1:12-cv-05723-NRB, 1:12-cv-05822-NRB, 1:12-cv-06056-NRB(Ratway, Hilary) (Entered: 08/29/2012) |
| 08/29/2012 | 214 | TRANSCRIPT of Proceedings re: CONFERENCE held on 8/8/2012 before Judge Naomi Reice Buchwald. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/24/2012. Redacted Transcript Deadline set for 10/4/2012. Release of Transcript Restriction set for 11/30/2012.Filed In Associated Cases: 1:11-md-02262-NRB, 1:12-cv-05723-NRB, 1:12-cv-05822-NRB, 1:12-cv-06056-NRB(McGuirk, Kelly) (Entered: 08/29/2012) |
| 09/17/2012 | 216 | ENDORSED LETTER addressed to Judge Naomi Reice Buchwald from Joel Kurtzberg dated 9/12/2012 re: Counsel for the defendants request leave to file a single reply of no more than three pages. ENDORSEMENT: Application granted. (Signed by Judge Naomi Reice Buchwald on 9/13/2012) (ft) (Entered: 09/17/2012) |
| 09/19/2012 | 220 | ENDORSED LETTER addressed to Judge Naomi Reice Buchwald from David H. Braff dated 9/17/2012 re: Barclays respectfully requests the Court's permission to submit a reply brief on behalf of Barclays of no more than 20 pages in length. ENDORSEMENT: Application granted. (Signed by Judge Naomi Reice Buchwald on 9/18/2012) (jfe) (Entered: 09/19/2012) |
| 09/27/2012 | 226 | REPLY MEMORANDUM OF LAW in Support re: 165 MOTION to Dismiss *the Amended Complaints. of the Schwab Plaintiffs.* Document filed by Bank of America Corporation, Bank of America, N.A., Bank of Tokyo-Mitsubishi UFJ Ltd, Citibank NA, Citigroup Inc, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS PLC, HSBC Bank PLC, HSBC Holding plc, J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., Lloyds Banking Group plc, Royal Bank of Canada, The Norinchukin Bank, The Royal Bank of Scotland Group PLC, WestDeutsche Immobilienbank AG, WestLB AG. (Wise, Robert) (Entered: 09/27/2012) |

| | | |
|---|---|---|
| 09/27/2012 | 227 | REPLY MEMORANDUM OF LAW in Support re: 165 MOTION to Dismiss *the Amended Complaints. of the Exchange-Based Plaintiffs' Claims*. Document filed by Bank of America Corporation, Bank of America, N.A., Bank of Tokyo-Mitsubishi UFJ Ltd, Citibank NA, Citigroup Inc, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS PLC, HSBC Bank PLC, HSBC Holding plc, J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, WestLB AG. (Wise, Robert) (Entered: 09/27/2012) |
| 09/27/2012 | 228 | REPLY MEMORANDUM OF LAW in Support re: 165 MOTION to Dismiss *the Amended Complaints. of Plaintiffs' Antitrust Claims*. Document filed by Bank of America Corporation, Bank of America, N.A., Bank of Tokyo-Mitsubishi UFJ Ltd, Citibank NA, Citigroup Inc, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS PLC, HSBC Bank PLC, HSBC Holdings plc., J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., Lloyds Banking Group plc, Royal Bank of Canada, The Norinchukin Bank, The Royal Bank of Scotland Group PLC, WestLB AG. (Wise, Robert) (Entered: 09/27/2012) |
| 09/27/2012 | 229 | SUPPLEMENTAL REPLY MEMORANDUM OF LAW in Support re: 165 MOTION to Dismiss *the Amended Complaints.*. Document filed by Bank of Tokyo-Mitsubishi UFJ Ltd, Credit Suisse Group AG. (Washer, Herbert) (Entered: 09/27/2012) |
| 09/27/2012 | 230 | DECLARATION of Robert F. Wise, Jr. in Support re: 165 MOTION to Dismiss *the Amended Complaints.*. Document filed by Bank of America Corporation, Bank of America, N.A., Bank of Tokyo-Mitsubishi UFJ Ltd, Citibank NA, Citigroup Inc, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS PLC, HSBC Bank PLC, HSBC Holdings PLC, J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., Lloyds Banking Group PLC, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, WestLB AG. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Wise, Robert) (Entered: 09/27/2012) |
| 09/27/2012 | 231 | REPLY MEMORANDUM OF LAW in Support re: 176 MOTION to Dismiss.. Document filed by Barclays Bank Plc,. (Scott, Jeffrey) (Entered: 09/27/2012) |
| 09/27/2012 | 232 | REPLY MEMORANDUM OF LAW in Support re: 178 MOTION to Dismiss.. Document filed by UBS AG. (Zweifach, Lawrence) (Entered: 09/27/2012) |
| 02/14/2013 | 260 | ORDER: Oral argument on the pending motions to dismiss shall be held on March 5, 2013, at 10:30 a.m. at the United States Court House, |

| | | |
|---|---|---|
| | | 500 Pearl Street, New York, New York, in Courtroom 21A., ( Oral Argument set for 3/5/2013 at 10:30 AM in Courtroom 21A, 500 Pearl Street, New York, NY 10007 before Judge Naomi Reice Buchwald.) (Signed by Judge Naomi Reice Buchwald on 2/14/2013) Filed In Associated Cases: 1:11-md-02262-NRB et al.(lmb) (Entered: 02/14/2013) |
| 03/05/2013 | | Minute Entry for proceedings held before Judge Naomi Reice Buchwald: Oral Argument held on 3/5/2013 re: 176 MOTION to Dismiss. filed by Barclays Bank Plc,, 178 MOTION to Dismiss. filed by UBS AG. (djc) (Entered: 03/06/2013) |
| 03/25/2013 | 282 | TRANSCRIPT of Proceedings re: CONFERENCE held on 3/1/2012 before Judge Naomi Reice Buchwald. Court Reporter/Transcriber: Toni Stanley, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/18/2013. Redacted Transcript Deadline set for 4/29/2013. Release of Transcript Restriction set for 6/27/2013.Filed In Associated Cases: 1:11-md-02262-NRB et al.(Rodriguez, Somari) (Entered: 03/25/2013) |
| 03/29/2013 | 286 | MEMORANDUM AND ORDER granting in part and denying in part (165) Motion to Dismiss in case 1:11-md-02262-NRB; granting in part and denying in part Motion to Dismiss in case 1:13-cv-00598-NRB; granting in part and denying in part Motion to Dismiss in case 1:13-cv-00597-NRB; granting in part and denying in part Motion to Dismiss in case 1:12-cv-05723-NRB; granting in part and denying in part Motion to Dismiss in case 1:12-cv-05822-NRB; granting in part and denying in part Motion to Dismiss in case 1:12-cv-06056-NRB; granting in part and denying in part Motion to Dismiss in case 1:12-cv-06693-NRB; granting in part and denying in part Motion to Dismiss in case 1:12-cv-07461-NRB; granting in part and denying in part Motion to Dismiss in case 1:13-cv-00398-NRB; granting in part and denying in part Motion to Dismiss in case 1:13-cv-00626-NRB; granting in part and denying in part Motion to Dismiss in case 1:13-cv-00625-NRB; granting in part and denying in part Motion to Dismiss in case 1:13-cv-00627-NRB; granting in part and denying in part Motion to Dismiss in case 1:13-cv-00667-NRB; granting in part and denying in part Motion to Dismiss in case 1:13-cv-00346-NRB; granting in part and denying in part Motion to Dismiss in case 1:13-cv-00407-NRB; granting in part and denying in part Motion to Dismiss in case 1:13-cv-01135-NRB; granting in part and denying in part Motion to Dismiss in case 1:13-cv-01198-NRB; granting in part and denying in part Motion to Dismiss in case 1:13-cv-01456-NRB; granting in part and denying in part Motion to Dismiss in case 1:13-cv-01016-NRB. For the reasons stated above, defendants motions to dismiss are granted in part and denied in part. First, |

defendants motion to dismiss plaintiffs federal antitrust claim is granted. Regardless of whether defendants conduct constituted a violation of the antitrust law "antitrust injury." An antitrust injury is an injury that results from an anticompetitive aspect of defendants conduct. Here, although plaintiffs have alleged that defendants conspired to suppress LIBOR over a nearly three-year-long period and that they were injured as a result, they have not alleged that their injury resulted from any harm to competition. The process by which banks submit LIBOR quotes to the BBA is not itself competitive, and plaintiffs have not alleged that defendants conduct had an anticompetitive effect in any market in which defendants compete. Because plaintiffs have not alleged an antitrustinjury, their federal antitrust claim is dismissed. Second, defendants' motion to dismiss plaintiffs' commodities manipulation claims is granted in part and denied in part. Contrary to defendants' arguments, plaintiffs' claims do not involve an impermissible extraterritorial application of the CEA, and plaintiffs have adequately pleaded their claims. However, certain of plaintiffs' claims are time-barred because numerous articles published in April and May 2008 in prominent national publications placed plaintiffs on notice of their injury. Therefore, plaintiffs commodities manipulation claims based on contracts entered into between August 2007 and May 29, 2008, are time-barred. However, plaintiffs claims based on contracts entered into between April 15, 2009, and May 2010 are not time-barred, and plaintiffs' claims based on contracts entered into between May 30, 2008, and April 14, 2009, may or may not be barred, though we will not dismiss them at this stage. Additionally, because the Barclays settlements broughtto light information that plaintiffs might not previously have been able to learn, we grant plaintiffs leave to move to amend their complaint to include allegations based on such information, provided that any such motion addresses the concerns raised herein and is accompanied by a proposed second amended complaint. Third, defendants' motion to dismiss plaintiffs' RICO claim is granted. For one, the PSLRA bars plaintiffs from bringing a RICO claim based on predicate acts that could have been the subject of a securities fraud action. Here, the predicate acts of mail and wire fraud underlying plaintiffs' RICO claim could have been the subject of a claim for securities fraud. Additionally, RICO applies only domestically, meaning that the alleged enterprise must be a domestic enterprise. However, the enterprise alleged by plaintiffs is based in England. For these reasons, plaintiffs RICO claim is dismissed. Finally, plaintiffs' state-law claims are all dismissed, some with prejudice and some without. Plaintiffs' Cartwright Act claim is dismissed with prejudice for lack of antitrust injury. The exchange-based plaintiffs' New York common law unjust enrichment claim is also dismissed with prejudice, as plaintiffs have not alleged any relationship between them and defendants. With regard to the remaining state-law claims, we

| | | |
|---|---|---|
| | | decline to exercise supplemental jurisdiction and We recognize that it might be unexpected that we are dismissing a substantial portion of plaintiffs claims, given that several of the defendants here have already paid penalties to government regulatory agencies reaching into the billions of dollars. However, these results are not as incongruous as they might seem. Under the statutes invoked here, there are many requirements that private plaintiffs must satisfy, but which government agencies need not. The reason for these differing requirements is that the focuses of public enforcement and private enforcement, even of the same statutes, are not identical. The broad public interests behind the statutes invoked here, such as integrity of the markets and competition, are being addressed by ongoing governmental enforcement. While public enforcement is often supplemented by suits brought by private parties acting as "private attorneys general," those private actions which seek damages and attorneys fees must be examined closely to ensure that the plaintiffs who are suing are the ones properly entitled to recover and that the suit is, in fact, serving the public purposes of the laws being invoked. Therefore, although we are fully cognizant of the settlements that several of the defendants here have entered into with government regulators, we find that only some of the claims that plaintiffs have asserted may properly proceed. (Signed by Judge Naomi Reice Buchwald on 3/29/2013) Filed In Associated Cases: 1:11-md-02262-NRB et al.(tro) (Entered: 03/29/2013) |
| 04/12/2013 | 296 | MOTION for Reconsideration re; 286 Order on Motion to DismissDocument filed by Credit Suisse Group AG, The Bank of Tokyo-Mitsubishi UFJ, Ltd., The Norinchukin Bank.(Libow, Daryl) (Entered: 04/12/2013) |
| 04/12/2013 | 297 | MEMORANDUM OF LAW in Support re: 296 MOTION for Reconsideration re; 286 Order on Motion to DismissMOTION for Reconsideration re; 286 Order on Motion to DismissMOTION for Reconsideration re; 286 Order on Motion to Dismiss. Document filed by Credit Suisse Group AG, The Bank of Tokyo-Mitsubishi UFJ, Ltd., The Norinchukin Bank. (Libow, Daryl) (Entered: 04/12/2013) |
| 04/12/2013 | 349 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 286 Order on Motion to Dismiss. (Attachments: # 1 Internet Citation, # 2 Internet Citation, # 3 Internet Citation, # 4 Internet Citation, # 5 Internet Citation, # 6 Internet Citation) (sj) (Entered: 05/30/2013) |
| 04/29/2013 | 306 | MEMORANDUM OF LAW in Opposition re: 296 MOTION for Reconsideration re; 286 Order on Motion to Dismiss, MOTION for Reconsideration re; 286 Order on Motion to Dismiss, MOTION for Reconsideration re; 286 Order on Motion to Dismiss *Exchange-Based Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion* |

| | | |
|---|---|---|
| | | *for Reconsideration or Reargument.* Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Kovel, David) (Entered: 04/29/2013) |
| 05/03/2013 | 309 | MEMORANDUM: We have received a number of letters since issuing our Memorandum and Order of March 29, 2013 (the "Memorandum and Order"). These letters generally address four topics: (1) plaintiffs' request for leave to amend their amended complaints with regard to antitrust injury; (2) the motion for reconsideration filed by defendants The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU"), Credit Suisse Group AG, and The Norinchukin Bank; (3) requests to lift the stay imposed by our Memorandum and Order of August 14, 2012 by plaintiffs whose cases are subject to the stay; and (4) the exchange-based plaintiffs' request for leave to move for interlocutory appeal of a part of our Memorandum and Order. We will address these topics in turn. Based on the submissions to date, this Court could not enter such a certification. Nonetheless, to give exchange-based plaintiffs a full opportunity to support their position, we will accept a reply submission within two (2) weeks. Furthermore, we will treat the application as a letter motion for section 1292(b) certification and will file all the submissions on the docket when we issue our decision. (Signed by Judge Naomi Reice Buchwald on 5/3/2013) Filed In Associated Cases: 1:11-md-02262-NRB et al.(rsh) Modified on 5/13/2013 (rsh). (Entered: 05/03/2013) |
| 05/07/2013 | 310 | Letter addressed to Judge Naomi Reice Buchwald from William Christopher Carmody and Karen L. Morris dated 4/12/2013 re: We write jointly on behalf of plaintiffs Mayor and City Council of Baltimore and City of New Britain Firefighters' and Police Benefit Fund; and Ellen Gelboim and Linda Zacher. Pursuant to Your Honor's Individual Practices, we respectfully request a pre-motion conference to address the filing of motions for leave to amend the complaints in our respective actions. (sac) Modified on 5/7/2013 (sac). (Entered: 05/07/2013) |
| 05/07/2013 | 311 | Letter addressed to Judge Naomi Reice Buchwald from Christopher Lovell and David E. Kovel dated 4/18/2013 re: After Your Honor's Order, dated March 29, 2013 (Dkt. No. 286), on the motions to dismiss, the Exchange-Based Plaintiffs are in a somewhat different procedural position from the other Plaintiffs. Nonetheless, after consideration, the Exchange-Based Plaintiffs respectfully join in the request made by the other class Plaintiffs for permission to move for leave to amend their complaints with respect to the antitrust claims. (sac) Modified on 5/7/2013 (sac). (Entered: 05/07/2013) |

| | | |
|---|---|---|
| 05/07/2013 | [313](#) | Letter addressed to Judge Naomi Reice Buchwald from Robert F. Wise dated 4/24/2013 re: Defendants respectfully request that the Court deny the OTC and Bondholder Plaintiffs' request as well as deny the Exchange Based Plaintiffs' motion for leave to move to amend in any manner not expressly granted in the Court's Order. (sac) Modified on 5/7/2013 (sac). (Entered: 05/07/2013) |
| 05/07/2013 | [315](#) | Letter addressed to Judge Naomi Reice Buchwald from Karen L. Morris and David H. Weinstein dated 4/30/2013 re: This letter is respectfully submitted on behalf on behalf of the Bondholder Plaintiffs in response to Mr. Wise's letter of April 24, 2013. In his letter, Mr. Wise argues on behalf of the Defendants that the Court should deny the request of the OTC and Bondholder Plaintiffs for leave to file motions for leave to amend their complaints, contending that such motions would be improper and that such amended pleadings would be futile. The Bondholder Plaintiffs respectfully submit that their proposed motion is not improper, and that the appropriate context for Defendants' arguments regarding futility of the proposed amended pleadings would be in briefing in opposition to the proposed motions. (sac) Modified on 5/7/2013 (sac). (Entered: 05/07/2013) |
| 05/07/2013 | [316](#) | Letter addressed to Judge Naomi Reice Buchwald from David E. Kovel, Esq. dated 4/22/2013 re: In accordance with Rule 2.A of Your Honor's Individual Practices, the Exchange-Based Plaintiffs respectfully request leave to file a motion for certification of this Court's March 29, 2013 Order [Dkt. No. 286] for interlocutory appeal pursuant 28 U.S.C. § 1292(b). Such interlocutory appeal would seek review of this controlling legal question: Whether LIB OR is the "commodity underlying" the Eurodollar futures contract within the meaning of Section 22(a)(1)(D) of the Commodity Exchange Act ("CEA"). (rdz) (Entered: 05/07/2013) |
| 05/07/2013 | [317](#) | Letter addressed to Judge Naomi Reice Buchwald from William Christopher Carmody dated 4/30/2013 re: We write on behalf of the OTC plaintiffs in response to defendants' letter dated April 24, 2013. Defendants' opposition to our request for a pre-motion conference is meritless for three reasons stated in this letter. Plaintiffs respectfully submit that their proposed amended complaint will not be futile and that granting leave to amend is consistent with the "permissive standard" for amendment under Fed. R. Civ. P. 15(a)(2). (sac) Modified on 5/7/2013 (sac). (Entered: 05/07/2013) |
| 05/07/2013 | [319](#) | Letter addressed to Judge Naomi Reice Buchwald from Robert F. Wise dated 5/1/2013 re: As liaison counsel for Defendants, we write in response to the Exchange-Based Plaintiffs' letter to the Court dated April 22, 2013, seeking a pre-motion conference to consider their request to file a motion for certification of this Court's March 29, 2013 |

| | | |
|---|---|---|
| | | Order, for interlocutory appeal pursuant to 28 U.S.C. 1292(b). For all of these reasons, the Exchange-Based Plaintiffs' request for leave to file a motion for certification should be denied.(sac) Modified on 5/7/2013 (rdz). (Entered: 05/07/2013) |
| 05/09/2013 | 320 | REPLY MEMORANDUM OF LAW in Support re: 296 MOTION for Reconsideration re; 286 Order on Motion to DismissMOTION for Reconsideration re; 286 Order on Motion to Dismiss, MOTION for Reconsideration re; 286 Order on Motion to Dismiss,. Document filed by Credit Suisse Group AG, The Bank of Tokyo-Mitsubishi UFJ, Ltd., The Norinchukin Bank. (Libow, Daryl) (Entered: 05/09/2013) |
| 05/16/2013 | 325 | TRANSCRIPT of Proceedings re: ORAL ARGUMENT held on 3/5/2013 before Judge Naomi Reice Buchwald. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/10/2013. Redacted Transcript Deadline set for 6/20/2013. Release of Transcript Restriction set for 8/19/2013.Filed In Associated Cases: 1:11-md-02262-NRB et al.(Rodriguez, Somari) (Entered: 05/16/2013) |
| 05/17/2013 | 327 | MOTION for Leave to File Second Amended Complaint. Document filed by Ellen Gelboim, Linda Zacher. (Attachments: # 1 Exhibit A - Bondholder Plaintiffs' Proposed Second Amended Complaint, # 2 Exhibit B-1 - Bondholder Plaintiffs' Proposed Second Amended Complaint - Redline (1 of 2), # 3 Exhibit B-2 - Bondholder Plaintiffs' Proposed Second Amended Complaint - Redline (2 of 2))(Weinstein, David) (Entered: 05/17/2013) |
| 05/17/2013 | 328 | MEMORANDUM OF LAW in Support re: 327 MOTION for Leave to File Second Amended Complaint.. Document filed by Ellen Gelboim, Linda Zacher. (Weinstein, David) (Entered: 05/17/2013) |
| 05/17/2013 | 330 | MOTION for Leave to File Second Amended Complaint *Notice of Exchange-Based Plaintiffs' Motion for Leave to Amend as to Antitrust Claims and File the Second Amended Consolidated Class Action Complaint*. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH.(Kovel, David) (Entered: 05/17/2013) |
| 05/17/2013 | 331 | MEMORANDUM OF LAW in Support re: 330 MOTION for Leave to File Second Amended Complaint *Notice of Exchange-Based Plaintiffs' Motion for Leave to Amend as to Antitrust Claims and File the Second Amended Consolidated Class Action Complaint*.. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital |

| | | |
|---|---|---|
| | | GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Kovel, David) (Entered: 05/17/2013) |
| 05/17/2013 | 332 | DECLARATION of David E. Kovel in Support re: 330 MOTION for Leave to File Second Amended Complaint *Notice of Exchange-Based Plaintiffs' Motion for Leave to Amend as to Antitrust Claims and File the Second Amended Consolidated Class Action Complaint.*. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Attachments: # 1 Exhibit A-1, # 2 Exhibit A-2, # 3 Exhibit A-3, # 4 Exhibit B-1, # 5 Exhibit B-2, # 6 Exhibit B-3)(Kovel, David) (Entered: 05/17/2013) |
| 05/17/2013 | 333 | MOTION to Amend/Correct *Consolidated Second Amended Complaint*. Document filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore.(Carmody, William) (Entered: 05/17/2013) |
| 05/17/2013 | 334 | MEMORANDUM OF LAW in Support re: 333 MOTION to Amend/Correct *Consolidated Second Amended Complaint.*. Document filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore. (Attachments: # 1 Exhibit A - Proposed Consolidated Second Amended Complaint, # 2 Exhibit B - Redline Version of Proposed Consolidated Second Amended Complaint)(Carmody, William) (Entered: 05/17/2013) |
| 05/20/2013 | 335 | REPLY MEMORANDUM OF LAW in Support re: 316 Letter,, *Motion to Certify the March 29, 2013 Order for Interlocutory Appeal*. Document filed by FTC Capital GMBH. (Lovell, Christopher) (Entered: 05/20/2013) |
| 05/20/2013 | 338 | DECLARATION of David E. Kovel in Support re: 330 MOTION for Leave to File Second Amended Complaint *Notice of Exchange-Based Plaintiffs' Motion for Leave to Amend as to Antitrust Claims and File the Second Amended Consolidated Class Action Complaint.*. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Attachments: # 1 Exhibit A-1, # 2 Exhibit A-2, # 3 Exhibit B-1, # 4 Exhibit B-2, # 5 Exhibit B-3)(Kovel, David) (Entered: 05/20/2013) |
| 05/23/2013 | 341 | MOTION for Leave to File Second Amended Complaint *Notice of Exchange-Based Plaintiffs' Motion for Leave to Amend as to Commodity Exchange Act Claims and File the Second Amended Consolidated Class Action Complaint*. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC |

| | | |
|---|---|---|
| | | Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH.(Kovel, David) (Entered: 05/23/2013) |
| 05/23/2013 | 342 | DECLARATION of David E. Kovel in Support re: 341 MOTION for Leave to File Second Amended Complaint *Notice of Exchange-Based Plaintiffs' Motion for Leave to Amend as to Commodity Exchange Act Claims and File the Second Amended Consolidated Class Action Complaint*.. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Attachments: # 1 Exhibit A, # 2 Exhibit B-1, # 3 Exhibit B-2)(Kovel, David) (Entered: 05/23/2013) |
| 05/23/2013 | 343 | MEMORANDUM OF LAW in Support re: 341 MOTION for Leave to File Second Amended Complaint *Notice of Exchange-Based Plaintiffs' Motion for Leave to Amend as to Commodity Exchange Act Claims and File the Second Amended Consolidated Class Action Complaint*.. Document filed by FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Kovel, David) (Entered: 05/23/2013) |
| 05/24/2013 | 345 | NOTICE of of Errata to Baltimore Plaintiffs' Exhibit A to Their Memorandum of Law In Support of Their Motion for Leave to File Proposed Consolidated Second Amended Complaint re: 334Memorandum of Law in Support of Motion,. Document filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore. (Hansen, Drew) (Entered: 05/24/2013) |
| 05/24/2013 | 346 | STIPULATION AND ORDER REGARDING TIME TO RESPOND TO EXCHANGE-BASED PLAINTIFFS' COMPLAINT: The Defendants are not required to answer or otherwise further respond to the Complaint at this time. Exchange-Based Plaintiffs shall have until May 23, 2013 to file their Motion for Leave to Amend together with a proposed second amended complaint. The Defendants shall have until July 1, 2013 to oppose the Motion for Leave to Amend, and the Exchange-Based Plaintiffs shall have until July 22, 2013 to reply in further support of the Motion for Leave to Amend. (Motions due by 5/23/2013, Responses due by 7/1/2013, Replies due by 7/22/2013.) (Signed by Judge Naomi Reice Buchwald on 5/23/2013) (ft) Modified on 5/28/2013 (ft). (Entered: 05/24/2013) |
| 05/24/2013 | 347 | DECLARATION of David E. Kovel in Support re: 341 MOTION for Leave to File Second Amended Complaint *Notice of Exchange-Based Plaintiffs' Motion for Leave to Amend as to Commodity Exchange Act Claims and File the Second Amended Consolidated Class Action Complaint*.. Document filed by 303030 Trading LLC, Atlantic Trading |

| | | |
|---|---|---|
| | | USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Attachments: # 1 Exhibit C-1, # 2 Exhibit C-2)(Kovel, David) (Entered: 05/24/2013) |
| 07/01/2013 | 362 | MEMORANDUM OF LAW in Opposition re: 341 MOTION for Leave to File Second Amended Complaint *Notice of Exchange-Based Plaintiffs' Motion for Leave to Amend as to Commodity Exchange Act Claims and File the Second Amended Consolidated Class Action Complaint. On behalf of all joining Defendants.* Document filed by Barclays PLC. (Scott, Jeffrey) (Entered: 07/01/2013) |
| 07/01/2013 | 363 | DECLARATION of Matthew J. Porpora in Opposition re: 341 MOTION for Leave to File Second Amended Complaint *Notice of Exchange-Based Plaintiffs' Motion for Leave to Amend as to Commodity Exchange Act Claims and File the Second Amended Consolidated Class Action Complaint..* Document filed by Barclays PLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X)(Scott, Jeffrey) (Entered: 07/01/2013) |
| 07/12/2013 | 364 | ENDORSED LETTER addressed to Judge Naomi Reice Buchwald from Christopher Lovell, Esq. and David E. Kovel, Esq. dated 7/10/2013 re: Counsel requests permission to file a reply brief of no more than 17 pages in length in response to Defendants' Opposition to Plaintiffs' Motion For Leave To Amend ("Opposition Brief") [Dkt. No. 362]. ENDORSEMENT: Application granted, but plaintiffs are encouraged (strongly) to keep their papers as short as possible. (Signed by Judge Naomi Reice Buchwald on 7/11/2013) (ft) (Entered: 07/12/2013) |
| 07/19/2013 | 365 | MEMO ENDORSEMENT granting (353) Motion for Leave to File Document in case 1:11-md-02262-NRB; granting (34) Motion for Leave to File Document in case 1:13-cv-01198-NRB. ENDORSEMENT: Motion granted. (Signed by Judge Naomi Reice Buchwald on 7/18/2013) Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-01198-NRB(ft) (Entered: 07/19/2013) |
| 07/22/2013 | 366 | REPLY MEMORANDUM OF LAW in Support re: 341 MOTION for Leave to File Second Amended Complaint *Notice of Exchange-Based Plaintiffs' Motion for Leave to Amend as to Commodity Exchange Act Claims and File the Second Amended Consolidated Class Action Complaint..* Document filed by 303030 Trading LLC, Atlantic Trading |

| | | |
|---|---|---|
| | | USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Kovel, David) (Entered: 07/22/2013) |
| 07/22/2013 | 367 | REPLY AFFIDAVIT of David E. Kovel in Support re: 341 MOTION for Leave to File Second Amended Complaint *Notice of Exchange-Based Plaintiffs' Motion for Leave to Amend as to Commodity Exchange Act Claims and File the Second Amended Consolidated Class Action Complaint.*. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O)(Kovel, David) (Entered: 07/22/2013) |
| 08/02/2013 | 374 | MEMORANDUM OF LAW in Opposition re: 333 MOTION to Amend/Correct *Consolidated Second Amended Complaint.*. Document filed by Bank of America Corporation, Bank of America N.A., Bank of Tokyo-Mitsubishi UFJ Ltd., Barclays PLC, Citibank, N.A., Citigroup, Inc., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HSBC Bank plc, HSBC Holdings plc, J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., Portigon AG, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, UBS AG. (Wise, Robert) (Entered: 08/02/2013) |
| 08/06/2013 | 376 | REPLY MEMORANDUM OF LAW in Support re: 333 MOTION to Amend/Correct *Consolidated Second Amended Complaint.*. Document filed by City of New Britain Firefighters' and Police Benefit Fund. (Subramanian, Arun) (Entered: 08/06/2013) |
| 08/08/2013 | | Minute Entry for proceedings held before Judge Naomi Reice Buchwald: Oral Argument held on 8/8/2013 re: 341 MOTION for Leave to File Second Amended Complaint *Notice of Exchange-Based Plaintiffs' Motion for Leave to Amend as to Commodity Exchange Act Claims and File the Second Amended Consolidated Class Action Complaint.* filed by 303030 Trading LLC, FTC Futures Fund PCC Ltd, Atlantic Trading USA, LLC, Metzler Investment GmbH, Gary Francis, Nathaniel Haynes, FTC Capital GMBH, FTC Futures Fund SICAV, 327 MOTION for Leave to File Second Amended Complaint. filed by Linda Zacher, Ellen Gelboim, 296 MOTION for Reconsideration MOTION for Reconsideration re 286 Order on Motion to Dismiss MOTION for Reconsideration re; 286 Order on Motion to Dismiss filed by The Bank of Tokyo-Mitsubishi UFJ, Ltd., The Norinchukin Bank, Credit Suisse Group AG, 330 MOTION for Leave |

| | | |
|---|---|---|
| | | to File Second Amended Complaint *Notice of Exchange-Based Plaintiffs' Motion for Leave to Amend as to Antitrust Claims and File the Second Amended Consolidated Class Action Complaint*. filed by 303030 Trading LLC, FTC Futures Fund PCC Ltd, Atlantic Trading USA, LLC, Gary Francis, Metzler Investment GmbH, FTC Capital GMBH, Nathaniel Haynes, FTC Futures Fund SICAV,333 MOTION to Amend/Correct *Consolidated Second Amended Complaint* filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore. (cd) (Entered: 08/14/2013) |
| 08/22/2013 | 387 | TRANSCRIPT of Proceedings re: ARGUMENT held on 8/8/2013 before Judge Naomi Reice Buchwald. Court Reporter/Transcriber: Steven Griffing, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/16/2013. Redacted Transcript Deadline set for 9/26/2013. Release of Transcript Restriction set for 11/25/2013.(Rodriguez, Somari) (Entered: 08/22/2013) |
| 08/23/2013 | 389 | MEMORANDUM AND ORDER denying (296) Motion for Reconsideration; denying (327) Motion for Leave to File Document; denying (330) Motion for Leave to File Document; granting in part and denying in part (333) Motion to Amend/Correct ; denying (341) Motion for Leave to File Document in case 1:11-md-02262-NRB. For the reasons stated above, the exchange-based plaintiffs' motion for interlocutory appeal is denied; the OTC, bondholder, and exchange-based plaintiffs' motions to add allegations with respect to antitrust are denied; the exchange-based plaintiffs' motion to add allegations with respect to trader-based manipulation is denied; BT-MU, Credit Suisse, and Norinchukin's motion for reconsideration is denied without prejudice to a similar motion being filed by defendants that addresses the issues raised herein; and, the OTC plaintiffs motion for leave to reassert their unjust enrichment claim and to add a claim for breach of implied covenant of good faith and fair dealing is granted. By September 10, 2013, the OTC plaintiffs and the exchange-based plaintiffs shall each file a second amended complaint that conforms with the rulings herein. If defendants believe that the new complaints are inconsistent with our rulings, they shall inform us by September 20, 2013. Further, if defendants wish to file a motion for reconsideration on grounds similar to those asserted in BT-MUs, Credit Suisse's, and Norinchukin's motion and which addresses the issues we have raised, they must file such a motion by September 20, 2013. Finally, if defendants intend to move for reconsideration of the March 29 Order on statute of limitations grounds or to make a renewed motion to dismiss with regard to "Period 2" claims, they must seek leave to file |

| | | |
|---|---|---|
| | | such a motion by September 20, 2013. This Memorandum and Order resolves docket entry nos. 296, 316, 327, 330, 333, and 341. (Signed by Judge Naomi Reice Buchwald on 8/23/2013) Filed In Associated Cases: 1:11-md-02262-NRB et al.(ft) (Entered: 08/23/2013) |
| 09/04/2013 | 468 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct. (Attachments: # 1 Internet Citation, # 2 Internet Citation, # 3 Internet Citation, # 4 Internet Citation, # 5 Internet Citation, # 6 Internet Citation) (sj) (Entered: 10/16/2013) |
| 09/06/2013 | 396 | MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct,,,. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH.(Kovel, David) (Entered: 09/06/2013) |
| 09/06/2013 | 397 | MEMORANDUM OF LAW in Support re: 396 MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, , MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, , MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct,,. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Kovel, David) (Entered: 09/06/2013) |
| 09/06/2013 | 398 | DECLARATION of David Kovel in Support re: 396 MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct MOTION for Reconsideration re; 389 Order on Motion |

| | | |
|---|---|---|
| | | for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; [389] Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, , MOTION for Reconsideration re; [389] Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; [389] Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; [389] Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, , MOTION for Reconsideration re; [389] Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Attachments: # [1] Exhibit A, # [2] Exhibit B, # [3] Exhibit C)(Kovel, David) (Entered: 09/06/2013) |
| 09/10/2013 | [402] | LETTER addressed to Judge Naomi Reice Buchwald from Christopher Lovell and David Kovell dated September 10, 2013 re: Request for pre-motion conference. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH.(Lovell, Christopher) (Entered: 09/10/2013) |
| 09/10/2013 | [406] | SECOND CONSOLIDATED AMENDED COMPLAINT amending [130] Amended Complaint,, against Bank of America Corporation, Bank of America N.A., Barclays Bank plc, Citibank N.A., Citigroup Inc, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Credit Suisse International, Deutsche Bank AG, HBOS PLC, HSBC Bank plc, HSBC Holdings PLC, JPMorgan Chase Bank National Association, Lloyds Banking Group plc, Royal Bank of Canada, Societe Generale SA, The Bank of Tokyo Mitsubishi UFJ Ltd., The Norinchukin Bank, The Royal Bank of Scotland Group PLC, UBS AG, WestDeutsche Immobilienbank AG, WestLB AG with JURY DEMAND.Document filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore, Texas Competitive Electric Holdings Company LLC. Related document: [130] Amended Complaint,, filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore.(mro) Modified on 9/12/2013 (mro). (Entered: 09/12/2013) |
| 09/10/2013 | [407] | SECOND CONSOLIDATED AMENDED COMPLAINT amending [134] Amended Complaint,,, against Bank of America Corporation, Bank of America N.A., Barclays Bank PLC, Citibank |

| | | |
|---|---|---|
| | | N.A., Citigroup, Inc., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS PLC, HSBC Bank plc, HSBC Holdings plc, JPMorgan Chase & Co, JPMorgan Chase Bank N.A., Lloyds Banking Group PLC, Royal Bank of Canada, Royal Bank of Scotland Group plc, Societe Generale, The Bank of Tokyo Mitsubishi UFJ Ltd., The Norinchukin Bank, UBS AG, WestDeutsche Immobilienbank AG, WestLB AG with JURY DEMAND.Document filed by FTC Futures Fund SICAV, 303030 Trading LLC, Gary Francis, FTC Futures Fund PCC Ltd, Atlantic Trading USA, LLC, Nathaniel Haynes, Metzler Investment GmbH, Lloyds TBS Bank PLC, John Does 1-5. Related document: 134 Amended Complaint. (Received in the night deposit box on 9/10/13 at 8:07 pm) ***Also docketed in 11cv2613.(mro) (sdi). (Main Document 407 replaced on 9/12/2013) (sdi). (Additional attachment(s) added on 9/12/2013: # 1 Second Amended Complaint part 2) (sdi). (Entered: 09/12/2013) |
| 09/11/2013 | 404 | LETTER addressed to Judge Naomi Reice Buchwald from David E. Kovel and Christopher Lovell dated 09/11/2013 re: explanation of amendments included in Exchange-Based Plaintiffs' Second Amended Consolidated Class Action Complaint. Document filed by 303030 Trading LLC, AVP Properties, LLC, Atlantic Trading USA, LLC, Roberto E. Calle Gracey, Carpenters Pension Fund of West Virginia, Charles Schwab & Co., Inc., Charles Schwab Bank, N.A., City of Dania Beach Police & Firefighters' Retirement System, City of New Britain Firefighters' and Police Benefit Fund, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Ellen Gelboim, Nathaniel Haynes, Richard Hershey, Jeffrey Laydon, Mayor and City Council of Baltimore, Metzler Investment GmbH, Ravan Investments, LLC, Schwab Advisor Cash Reserves, Schwab Cash Reserves, Schwab Investor Money Fund, Schwab Money Market Fund, Schwab Retirement Advantage Money Fund, Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, Schwab U.S. Dollar Liquid Assets Fund, Schwab Value Advantage Money Fund, Schwab Yieldplus Fund, Schwab Yieldplus Fund Liquidation Trust, The Charles Schwab Corporation, Linda Zacher.(Kovel, David) (Entered: 09/11/2013) |
| 09/17/2013 | 408 | LETTER addressed to Judge Naomi Reice Buchwald from David E. Kovel and Christopher Lovell dated 09/16/2013 re: Exchange-Based Plaintiffs Corrected Second Amended Consolidated Class Action Complaint. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH.(Kovel, David) (Entered: 09/17/2013) |
| 09/17/2013 | 409 | NOTICE OF APPEAL from (389 in 1:11-md-02262-NRB, 389 in 1:11- |

| | | md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262- |

| | | |
|---|---|---|
| | | NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB, 389 in 1:11-md-02262-NRB) Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct (43 in 1:12-cv-01025-NRB, 43 in 1:12-cv-01025-NRB) Order on Motion to Dismiss, (286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB) Order on Motion to Dismiss (199 in 1:11-md-02262-NRB) Endorsed Letter,,,, (47 in 1:12-cv-01025-NRB) Order, Document filed by Ellen Gelboim, Linda Zacher. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. Filed In Associated Cases: 1:11-md-02262-NRB, 1:12-cv-01025-NRB(Weinstein, David) (Entered: 09/17/2013) |
| 09/17/2013 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (409 in 1:11-md-02262-NRB, 50 in 1:12-cv-01025-NRB) Notice of Appeal. Filed In Associated Cases: 1:11-md-02262-NRB, 1:12-cv-01025-NRB(nd) (Entered: 09/17/2013) |
| 09/18/2013 | 414 | LETTER MOTION for Conference addressed to Judge Naomi Reice Buchwald from William Christopher Carmody dated September 18, 2013. Document filed by Mayor and City Council of Baltimore.Filed In Associated Cases: 1:11-md-02262-NRB et al.(Ard, Seth) (Entered: 09/18/2013) |
| 09/18/2013 | 415 | LETTER addressed to Judge Naomi Reice Buchwald from Christopher Lovell dated September 18, 2013 re: Request for pre-motion conference. Document filed by 303030 Trading LLC, Atlantic Trading |

| | | |
|---|---|---|
| | | USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH.(Lovell, Christopher) (Entered: 09/18/2013) |
| 09/18/2013 | 416 | LETTER addressed to Judge Naomi Reice Buchwald from Christopher Lovell dated September 18, 2013 re: Pre-motion conference. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH.(Lovell, Christopher) (Entered: 09/18/2013) |
| 09/20/2013 | 417 | LETTER addressed to Judge Naomi Reice Buchwald from Jeffrey T. Scott dated September 20, 2013 re: Leave to File Renewed Motion to Dismiss Exchange-Based Plaintiffs' Period 2 CEA Claims. Document filed by Barclays Bank PLC. (Attachments: # 1 Appendix Notice of Defendants' Renewed Motion to Dismiss, # 2 Appendix Memorandum in Support of Motion, # 3Appendix Declaration of Matthew J. Porpora in Support of Motion, # 4 Exhibit Exhibits to Declaration of Matthew J. Porpora)(Scott, Jeffrey) (Entered: 09/20/2013) |
| 09/20/2013 | 418 | MOTION for Reconsideration re; 286 Order on Motion to Dismiss*NOTICE OF MOTION FOR RECONSIDERATION OF MARCH 29, 2013 ORDER ON MOTION TO DISMISS*. Document filed by UBS AG.(Sullivan, Peter) (Entered: 09/20/2013) |
| 09/20/2013 | 419 | MEMORANDUM OF LAW in Support re: 418 MOTION for Reconsideration re; 286 Order on Motion to DismissMOTION for Reconsideration re; 286 Order on Motion to Dismiss MOTION for Reconsideration re; 286 Order on Motion to DismissDocument filed by UBS AG. (Sullivan, Peter) (Entered: 09/20/2013) |
| 09/20/2013 | 420 | SUPPLEMENTAL MEMORANDUM OF LAW in Support re: 418 MOTION for Reconsideration re; 286 Order on Motion to DismissMOTION for Reconsideration re; 286 Order on Motion to DismissMOTION for Reconsideration re; 286 Order on Motion to Dismiss,. Document filed by Credit Suisse Group AG, The Bank of Tokyo-Mitsubishi UFJ, Ltd., The Norinchukin Bank. (Libow, Daryl) (Entered: 09/20/2013) |
| 09/20/2013 | 421 | LETTER addressed to Judge Naomi Reice Buchwald from Robert F. Wise, Jr. dated September 20, 2013 re: Rule 2D. Document filed by Bank Of America Corporation, Bank of America, N.A., Citibank, N.A., Citigroup, Inc., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS plc, HSBC Bank plc, HSBC Holdings plc, JP Morgan Chase & Co., JPMorgan Chase Bank N.A., Lloyds Banking Group plc, Portigon AG, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Bank of Tokyo-Mitsubishi UFJ, Ltd., The Norinchukin Bank.(Wise, Robert) |

| | | (Entered: 09/20/2013) |
|---|---|---|
| 09/20/2013 | 422 | LETTER addressed to Judge Naomi Reice Buchwald from Robert F. Wise, Jr. dated September 20, 2013 re: Second Amended Consolidated Class Action Complaint. Document filed by Bank of America Corporation, Bank of America, N.A., Bank of Tokyo-Mistubishi UFJ, Barclays PLC, Citibank, N.A., Citigroup Inc, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS plc, HSBC Bank plc, HSBC Holdings plc, J.P. Morgan Chase Bank, N.A., JP Morgan Chase & Co., Lloyds Banking Group plc, Portigon AG, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, UBS AG.(Wise, Robert) (Entered: 09/20/2013) |
| 09/23/2013 | 423 | TRANSCRIPT of Proceedings re: MOTION held on 8/8/2013 before Judge Naomi Reice Buchwald. Court Reporter/Transcriber: Steven Griffing, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/18/2013. Redacted Transcript Deadline set for 10/28/2013. Release of Transcript Restriction set for 12/26/2013.(McGuirk, Kelly) (Entered: 09/23/2013) |
| 09/23/2013 | 425 | LETTER addressed to Judge Naomi Reice Buchwald from Steven Wolowitz dated 9/23/2013 re: Stipulation between Exchange-Based Plaintiffs and Societe Generale. Document filed by Societe Generale. (Attachments: # 1 Exhibit)(Wolowitz, Steven) (Entered: 09/23/2013) |
| 09/23/2013 | 426 | LETTER addressed to Judge Naomi Reice Buchwald from Jeffrey T. Scott dated Sept. 23, 2013 re: Rule 2E Letter re: (1) Defendants' Opposition to Exchange-Based Plaintiffs' Reconsideration Motion, and (2) Defendants' Motion to Strike. Document filed by Barclays Bank PLC.(Scott, Jeffrey) (Entered: 09/23/2013) |
| 09/23/2013 | 427 | MEMORANDUM OF LAW in Opposition re: 396 MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, , MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to |

| | | |
|---|---|---|
| | | Amend/Correct, MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct,, , MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct,. Document filed by Barclays Bank PLC. (Scott, Jeffrey) (Entered: 09/23/2013) |
| 09/23/2013 | 428 | MOTION to Strike Document No. 398 *Declaration of David E. Kovel*. Document filed by Barclays Bank PLC.(Scott, Jeffrey) (Entered: 09/23/2013) |
| 09/24/2013 | 429 | JOINT NOTICE OF APPEAL from 286 Order on Motion to DismissDocument filed by Charles Schwab & Co., Inc., Charles Schwab Bank, N.A., Schwab Advisor Cash Reserves, Schwab Cash Reserves, Schwab Investor Money Fund, Schwab Money Market Fund, Schwab Retirement Advantage Money Fund, Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, Schwab U.S. Dollar Liquid Assets Fund, Schwab Value Advantage Money Fund, Schwab Yieldplus Fund, Schwab Yieldplus Fund Liquidation Trust, The Charles Schwab Corporation. Filing fee $ 455.00, receipt number 0208-8902473. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Fineman, Steven) (Entered: 09/24/2013) |
| 09/24/2013 | 430 | LETTER addressed to Judge Naomi Reice Buchwald from Robert F. Wise, Jr. dated September 24, 2013 re: Response to the Exchange-Based Plaintiffs' Letter, dated September 10, 2013. Document filed by Bank Of America Corporation, Bank of America N.A., Bank of Tokyo-Mistsubishi UFJ, Barclays PLC, Citibank, N.A., Citigroup, Inc., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS plc, HSBC Bank plc, HSBC Holdings plc, J.P. Morgan Chase Bank, N.A., JP Morgan Chase & Co., Lloyds Banking Group plc, Portigon AG, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, UBS AG.(Wise, Robert) (Entered: 09/24/2013) |
| 09/25/2013 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 429 Notice of Appeal. (tp) (Entered: 09/25/2013) |
| 09/30/2013 | 432 | STIPULATION AND ORDER: IT IS HEREBY STIPULATED AND AGREED by and between the undersigned counsel for the Exchange-Based Plaintiffs and the undersigned counsel for defendant Societe Generale that: 1. Societe Generale was added as a defendant to Exchange-Based Plaintiffs' Second Amended Consolidated Class Action Complaint, dated September 10, 2013, following the Court's August 23, 2013 memorandum and order granting Exchange-Based |

| | | |
|---|---|---|
| | | Plaintiffs leave to do so. Exchange Based Plaintiffs subsequently filed a [Corrected] Second Amended Consolidated Class Action Complaint, dated September 16, 2013 ("Second Amended Complaint"). 2. Societe Generale's joining in Defendants' Motion for Reconsideration of March 29, 2013 Order on Motion to Dismiss shall be without prejudice to or waiver of Societe Generale's right to seek leave from the Court to file its own motion to dismiss the Second Amended Complaint. 3. Societe Generale's joining in Defendants' Motion for Leave to File Renewed Motion to Dismiss the Exchange-Based Plaintiffs' Period 2 CEA Claims shall be without prejudice to or waiver of Societe Generale's right to seek leave to file its own motion to dismiss the Second Amended Complaint. 4. The parties will endeavor to submit a joint proposed briefing schedule in connection with Societe Generale's anticipated motion for leave to file motion to dismiss the Second Amended Complaint, and/or to otherwise work with the Court to achieve scheduling efficiency in light of the other motions pending in this action. (Signed by Judge Naomi Reice Buchwald on 9/27/2013) (mro) Modified on 9/30/2013 (mro). (Entered: 09/30/2013) |
| 09/30/2013 | 433 | MEMO ENDORSEMENT on re: (408 in 1:11-md-02262-NRB) Letter, filed by 303030 Trading LLC, FTC Futures Fund PCC Ltd, Atlantic Trading USA, LLC, Metzler Investment GmbH, Gary Francis, Nathaniel Haynes, FTC Futures Fund SICAV. ENDORSEMENT: The Corrected Second Amended Complaint may be filed. So ordered. (Signed by Judge Naomi Reice Buchwald on 9/27/2013) (mro) (Entered: 09/30/2013) |
| 09/30/2013 | 434 | LETTER addressed to Judge Naomi Reice Buchwald from William Christopher Carmody dated September 30, 2013 re: repleading antitrust claim. Document filed by Mayor and City Council of Baltimore. (Attachments: # 1 Exhibit A)Filed In Associated Cases: 1:11-md-02262-NRB et al.(Ard, Seth) (Entered: 09/30/2013) |
| 09/30/2013 | 435 | LETTER addressed to Judge Naomi Reice Buchwald from David E. Kovel and Christopher Lovell dated September 30, 2013 re: Defendants' Letter dated September 20, 2013. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH.(Kovel, David) (Entered: 09/30/2013) |
| 09/30/2013 | 438 | CORRECTED SECOND AMENDED COMPLAINT amending 407 Amended Complaint,,,, against Bank of America Corporation, Bank of America N.A., Barklays Bank Plc, Citibank, N.A., Citigroup Inc, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS PLC, HSBC Bank PLC, HSBC Holdings PLC, J.P. Morgan Chase & Co., J.P. |

| | | |
|---|---|---|
| | | Morgan Chase Bank, N.A., John Does 1-5, Lloyds Banking Group PLC, Lloyds TSB Bank PLC, Royal Bank of Canada, Societe Generale, The Bank of Tokyo Mitsubishi UFJ Ltd., The Norinchukin Bank, UBS AG, Royal Bank of Scotland Group PLC, WestDeutsche Immobilienbank AG, WestLB AG with JURY DEMAND.Document filed by FTC Futures Fund SICAV, 303030 Trading LLC, Gary Francis, FTC Futures Fund PCC Ltd, Atlantic Trading USA, LLC, Nathaniel Haynes, Metzler Investment GmbH. Related document: 407 Amended Complaint,,,, filed by 303030 Trading LLC, FTC Futures Fund PCC Ltd, Atlantic Trading USA, LLC, Gary Francis, Metzler Investment GmbH, Nathaniel Haynes, FTC Futures Fund SICAV. (Attachments: # 1 Part 2)(mro) (Entered: 10/03/2013) |
| 10/03/2013 | 439 | REPLY MEMORANDUM OF LAW in Support re: 396 MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, , MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/CorrectMOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct,. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Kovel, David) (Entered: 10/03/2013) |
| 10/04/2013 | 442 | LETTER addressed to Judge Naomi Reice Buchwald from Jeffrey T. Scott dated October 4, 2013 re: Response to Exchange-Based Plaintiffs' Letter dated September 18, 2013. Document filed by Barclays Bank PLC.(Scott, Jeffrey) (Entered: 10/04/2013) |
| 10/04/2013 | 443 | LETTER addressed to Judge Naomi Reice Buchwald from Robert F. Wise, Jr. dated 10/4/13 re: On Behalf of All Defendants in Response to Letters Dated 9/18/13 to your Honor from Counsel for the OTC and Exchange Based Plaintiffs. Document filed by BBA Enterprises, Ltd., BBA Libor, Ltd, BNP Paribas S.A., Bank Of America Corporation, Bank Of America Securities LLC, Bank of America Corp., Bank of |

| | | |
|---|---|---|
| | | America Corporation, Bank of America N.A., Bank of America, N.A., Bank of Nova Scotia, Bank of Tokyo-Mistsubishi UFJ, Bank of Tokyo-Mitsubishi UFJ Ltd, Bank of Tokyo-Mitsubishi UFJ Ltd., Barclays Bank PLC, Barclays Bank Plc,, Barclays Bank Plc., Barclays Bank plc, Barclays Capital Inc., Barclays PLC, Barclays U.S. Funding LLC, Barklays Bank Plc, British Bankers' Association, Centrale Raiffeisen-Berenleenbank B.A., Chase Bank USA, N.A., Chase Bank USA, NA, Citibank N.A., Citibank NA, Citibank, N.A., Citigroup Inc, Citigroup, Inc., Citiigroup Global Markets Inc., Citizens Bank of Massachusetts, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Cooperative Centrale Raiffeisen-Boernleenbank B.A., Cooperative Centrale Raiffeisenboernleenbank B.A., Coperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Argicole, S.A., Credit Suisse Group AG, Credit Suisse Group, AG, Credit Suisse Group, NA, Credit Suisse International, Credit Suisse Securities (USA) LLC, Deutsche Bank AG, Deutsche Bank Financial LLC, Deutsche Bank Securities Inc., Does 1-10, Inclusive, HBOS PLC, HBOS Plc., HSBC Bank PLC, HSBC Bank Plc., HSBC Bank USA, N.A., HSBC Holding plc, HSBC Holdings PLC, HSBC Holdings plc., HSBC Securities (USA) Inc., J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., J.P. Morgan Clearing Corp., JP Morgan Chase & Co., JPMorgan & Co., JPMorgan Chase & Co, JPMorgan Chase & Co., JPMorgan Chase Bank, JPMorgan Chase Bank N.A., JPMorgan Chase Bank National Association, JPMorgan Chase Bank, National Association, John Does 1-5, Lloyds Banking Group PLC, Lloyds Banking Group PLS, Lloyds Banking Group plc., Lloyds TSB Bank PLC, Mr. JPMorgan Chase Bank, N.A., Stephanie Nagel, National Association, National Collegiate Trust, Norinchukin Bank, Portigon AG, RBS Citizens, N.A., RBS Citizens, N.A. (f/k/a Citizens Bank of Massachusetts), Rabobank Group, Royal Bank of Canada, Royal Bank of Scotland, Royal Bank of Scotland Group plc, Societe General, Royal Bank of Canada, Societe Generale, Sumitomo Mitsui Banking Corp., The Bank of Tokyo Mitsubishi UFJ Ltd., The Bank of Tokyo-Mitsubishi UFJ Ltd., The Bank of Tokyo-Mitsubishi UFJ, Ltd., The Norinchukin Bank, The Royal Bank of Canada, The Royal Bank of Scotland Group PLC, The Royal Bank of Scotland Group Plc., The Royal Bank of Scotland Group plc, The Royal Bank of Scotland, Plc, UBS AG, UBS AG, Royal Bank of Scotland Group PLC, UBS Securities LLC, WestDeutsche Immobilienbank AG, WestLB AG.(Wise, Robert) (Entered: 10/04/2013) |
| 10/04/2013 | 444 | LETTER addressed to Judge Naomi Reice Buchwald from Steven Wolowitz dated October 4, 2013 re: Response to Exchange-Based Plaintiffs' Letter dated September 18, 2013. Document filed by Societe Generale.(Wolowitz, Steven) (Entered: 10/04/2013) |
| 10/04/2013 | 445 | LETTER addressed to Judge Naomi Reice Buchwald from Christopher |

| | | |
|---|---|---|
| | | Lovell dated October 4, 2013 re: Reply to Defendants' September 24, 2013 letter from Robert F. Wise to the Court. Document filed by FTC Capital GMBH.Filed In Associated Cases: 1:11-md-02262-NRB et al.(Lovell, Christopher) (Entered: 10/04/2013) |
| 10/07/2013 | 446 | RESPONSE in Opposition to Motion re: 418 MOTION for Reconsideration re; 286 Order on Motion to DismissMOTION for Reconsideration re; 286 Order on Motion to DismissMOTION for Reconsideration re; 286 Order on Motion to Dismiss , ,,,,,,,,,,,,,,,,,,,,,*Exchange-Based Plaintiffs' Response in Opposition to the Bank of Tokyo-Mitsubishi UFJ, Ltd., the Norinchukin Bank, and Credit Suisse Group AG's Supplemental Memorandum of Law in Support of Defendants' Motion for Reconsideration*. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Capital GMBH, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Kovel, David) (Entered: 10/07/2013) |
| 10/07/2013 | 447 | LETTER addressed to Judge Naomi Reice Buchwald from David E. Kovel and Christopher Lovell dated October 7, 2013 re: Letter Response to Dkt. No. 417 - Defendants' Letter Request dated September 20, 2013 to file the Renewed Motion to Dismiss the Exchange-Based Plaintiffs' Period 2 CEA Claims. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH.(Kovel, David) (Entered: 10/07/2013) |
| 10/07/2013 | 448 | MEMORANDUM OF LAW in Opposition re: 418 MOTION for Reconsideration re; 286 Order on Motion to DismissMOTION for Reconsideration re; 286 Order on Motion to DismissMOTION for Reconsideration re; 286 Order on Motion to Dismiss, *Exchange-Based Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Reconsideration of the March 29, 2013 Order on the Motion to Dismiss*. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Kovel, David) (Entered: 10/07/2013) |
| 10/08/2013 | 451 | LETTER addressed to Judge Naomi Reice Buchwald from David E. Kovel and Christopher Lovell dated October 8, 2013 re: Exchange-Based Plaintiffs' Opposition to Defendants' Motion for Reconsideration of Mar. 29, 2013 Order. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH.(Kovel, David) (Entered: 10/08/2013) |
| 10/10/2013 | 457 | LETTER addressed to Judge Naomi Reice Buchwald from William |

| | | |
|---|---|---|
| | | Christopher Carmody dated October 10, 2013 re: Partial Stay and Motion to Dismiss. Document filed by Mayor and City Council of Baltimore. (Attachments: # 1 Exhibit A)Filed In Associated Cases: 1:11-md-02262-NRB et al.(Carmody, William) (Entered: 10/10/2013) |
| 10/10/2013 | 458 | LETTER addressed to Judge Naomi Reice Buchwald from Steven Wolowitz dated 10/10/2013 re: Request for a pre-motion conference pursuant to Individual Practice Rule 2.B.. Document filed by Societe Generale.(Wolowitz, Steven) (Entered: 10/10/2013) |
| 10/10/2013 | 459 | MEMO ENDORSEMENT on re: (436 in 1:11-md-02262-NRB) Notice (Other) filed by JPMorgan Chase Bank N.A., JPMorgan Chase & Co. ENDORSEMENT: So ordered. (Signed by Judge Naomi Reice Buchwald on 10/10/2013) Filed In Associated Cases: 1:11-md-02262-NRB et al. ***Docketed in all member and related cases pursuant to instructions from Chambers. (mro) (Entered: 10/11/2013) |
| 10/15/2013 | 463 | TRANSCRIPT of Proceedings re: MOTION held on 8/8/2013 before Judge Naomi Reice Buchwald. Court Reporter/Transcriber: Steven Griffing, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/8/2013. Redacted Transcript Deadline set for 11/18/2013. Release of Transcript Restriction set for 1/16/2014.(McGuirk, Kelly) (Entered: 10/15/2013) |
| 10/15/2013 | 465 | MEMO ENDORSEMENT on re: (458 in 1:11-md-02262-NRB) Letter filed by Societe Generale, (165 in 1:11-cv-02613-NRB) Letter filed by Societe Generale S.A. ENDORSEMENT: The defendant (Societe Generale) is granted leave to move to dismiss without a pre-motion conference. (Signed by Judge Naomi Reice Buchwald on 10/11/2013) (tro) (Entered: 10/15/2013) |
| 10/15/2013 | 467 | LETTER addressed to Judge Naomi Reice Buchwald from Christopher Lovell dated 10/15/13 re: Charts of U.S. dollar Libor submissions for the dates listed in Docket Number 439 at p. 4 in response to the Court's direction on October 8, 2013. Document filed by FTC Capital GMBH. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Lovell, Christopher) (Entered: 10/15/2013) |
| 10/16/2013 | 469 | LETTER addressed to Judge Naomi Reice Buchwald from Christopher Lovell dated 10/16/13 re: Corrected copy of charts of U.S. dollar Libor submissions for the dates listed in Docket Number 439 at p. 4 in response to the Court's direction on October 8, 2013. Document filed by FTC Capital GMBH. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)Filed In Associated Cases: 1:11-md-02262-NRB et al.(Lovell, Christopher) (Entered: 10/16/2013) |

| | | |
|---|---|---|
| 10/17/2013 | 473 | REPLY MEMORANDUM OF LAW in Support re: 418 MOTION for Reconsideration re; 286 Order on Motion to DismissMOTION for Reconsideration re; 286 Order on Motion to DismissMOTION for Reconsideration re; 286 Order on Motion to Dismiss*REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR RECONSIDERATION OF MARCH 29, 2013 ORDER ON MOTION TO DISMISS*. Document filed by UBS AG. (Sullivan, Peter) (Entered: 10/17/2013) |
| 10/17/2013 | 474 | SUPPLEMENTAL REPLY MEMORANDUM OF LAW in Support re: 418 MOTION for Reconsideration re; 286 Order on Motion to DismissMOTION for Reconsideration re; 286 Order on Motion to Dismiss MOTION for Reconsideration re; 286 Order on Motion to DismissDocument filed by Bank of Tokyo-Mitsubishi UFJ Ltd., Credit Suisse Group AG, Norinchukin Bank. (Libow, Daryl) (Entered: 10/17/2013) |
| 10/18/2013 | 477 | MEMO ENDORSED on re: 472 Letter filed by Barclays Bank PLC. ENDORSEMENT: Application granted. (Signed by Judge Naomi Reice Buchwald on 10/18/2013) (js) (Entered: 10/21/2013) |
| 10/18/2013 | 489 | MEMORANDUM AND ORDER: The application for disclosure of documents that the defendants and their subsidiaries have produced to the CFTC and other governmental agencies related to U.S. dollar LIBOR is denied. (Signed by Judge Naomi Reice Buchwald on 10/17/2013) Filed In Associated Cases: 1:11-md-02262-NRB et al.(ft) (Entered: 10/30/2013) |
| 10/18/2013 | 490 | MEMORANDUM AND ORDER: Pursuant to Fed. R. Civ. P. 54(b), final judgment is entered dismissing the first count of the over-the counter plaintiffs' consolidated amended complaint (Dkt. No. 130) for violation of section 1 of the Sherman Act, and denying leave to replead that claim in a proposed amended complaint (dkt. No. 334-1), for the reasons given in the March 29, 2013 and August 23, 2013 orders of this Court, and it is further ORDERED, pursuant to Fed. R. Civ. P. 54(b), final judgment is entered dismissing the fourth count of the exchange based plaintiffs' amended consolidated class action complaint (Dkt. No. 134) for violation of section 1 of the Sherman Act, and denying leave to replead that claim in a proposed amended complaint (Dkt. No. 332-1), for the reasons given in the March 29, 2013 and August 23, 2013 orders of this Court. (Signed by Judge Naomi Reice Buchwald on 10/17/2013) Filed In Associated Cases: 1:11-md-02262-NRB et al.(ft) (Entered: 10/30/2013) |
| 10/18/2013 | | Transmission to Judgments and Orders Clerk. Transmitted re: (69 in 1:13-cv-07005-NRB, 43 in 1:12-cv-07461-NRB, 54 in 1:12-cv-05723-NRB, 97 in 1:13-cv-02297-NRB, 7 in 1:13-cv-07394-NRB, 44 in 1:13- |

| | | |
|---|---|---|
| | | cv-03952-NRB, 45 in 1:13-cv-00597-NRB, 34 in 1:13-cv-01016-NRB, 54 in 1:13-cv-00407-NRB, 35 in 1:13-cv-01456-NRB, 62 in 1:12-cv-05822-NRB, 490 in 1:11-md-02262-NRB, 55 in 1:12-cv-06056-NRB, 44 in 1:13-cv-00625-NRB, 56 in 1:13-cv-01198-NRB, 49 in 1:13-cv-02343-NRB, 45 in 1:13-cv-03010-NRB, 55 in 1:13-cv-00598-NRB, 26 in 1:13-cv-06020-NRB, 44 in 1:13-cv-00667-NRB, 59 in 1:13-cv-01135-NRB, 24 in 1:13-cv-05616-NRB, 26 in 1:13-cv-06014-NRB, 34 in 1:13-cv-05511-NRB, 43 in 1:13-cv-00627-NRB, 26 in 1:13-cv-05569-NRB, 26 in 1:13-cv-05221-NRB, 52 in 1:13-cv-00346-NRB, 67 in 1:12-cv-01025-NRB, 63 in 1:13-cv-00398-NRB, 26 in 1:13-cv-06013-NRB, 33 in 1:13-cv-05187-NRB, 42 in 1:12-cv-06693-NRB, 43 in 1:13-cv-00626-NRB, 31 in 1:13-cv-05186-NRB) Order to the Judgments and Orders Clerk. Filed In Associated Cases: 1:11-md-02262-NRB et al.(ft) (Entered: 10/30/2013) |
| 10/22/2013 | 479 | REPLY MEMORANDUM OF LAW in Opposition re: 396 MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/CorrectMOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/CorrectMOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct. Document filed by Barclays Bank PLC. (Scott, Jeffrey) (Entered: 10/22/2013) |
| 10/28/2013 | 487 | MEMO ENDORSEMENT on (63 in 1:13-cv-07005-NRB) Letter filed by Schwab Advisor Cash Reserves, Schwab Short-Term Bond Market Fund, Schwab Value Advantage Money Fund, Schwab Retirement Advantage Money Fund, Schwab Total Bond Market Fund, Charles Schwab Corporation, Schwab Yieldplus Fund, Schwab Investor Money Fund, Schwab Cash Reserves, Charles Schwab & Co., Inc., Schwab U.S. Dollar Liquid Assets Fund, Schwab Yieldplus Fund Liquidation Trust, Charles Schwab Bank, N.A., Schwab Money Market Fund. ENDORSEMENT: Application granted. (Signed by Judge Naomi Reice Buchwald on 10/28/2013) Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-07005-NRB(ft) (Entered: 10/29/2013) |

| 10/31/2013 | [491](#) | **Withdrawn pursuant to Order filed 10/31/13, Doc. #492, 11 MD 2262 -** RULE 54(b) CLERK'S JUDGMENT That for the reasons stated in the Court's Memorandum and Order dated October 17, 2013, there is no just reason for delay, pursuant to Fed. R. Civ. P. 54(b), final judgment is entered dismissing the first count of the over-the-counter plaintiffs' consolidated amended complaint for violation of section 1 of the Sherman Act, and denying leave to replead that claim in a proposed amended complaint for the reasons given in the March 29, 2013 and August 23, 2013 orders of this Court, and there is no just reason for delay, pursuant to Fed. R. Civ. P. 54(b), final judgment is entered dismissing the fourth count of the exchange based plaintiffs' amended consolidated class action complaint for violation of section 1 of the Sherman Act, and denying leave to replead that claim in a proposed amended complaint for the reasons given in the March 29, 2013 and August 23, 2013 orders of this Court. (Signed by Clerk of Court Ruby Krajick on 10/31/13) (Attachments: # [1](#) Notice of Right to Appeal)Filed In Associated Cases: 1:11-md-02262-NRB et al.(ml) Modified on 10/31/2013 (ml). Modified on 11/4/2013 (ml). (Entered: 10/31/2013) |
| --- | --- | --- |
| 10/31/2013 | [492](#) | ORDER: WHEREAS, on October 30, 2013 the Court of Appeals, acting sua sponte determined that it lacked jurisdiction over the bondholder and Schwab appeals and dismissed them, it is hereby ORDERED that the October 17, 2013 is withdrawn. (Signed by Judge Naomi Reice Buchwald on 10/31/2013) Filed In Associated Cases: 1:11-md-02262-NRB et al.(ama) (Entered: 10/31/2013) |
| 11/05/2013 | [493](#) | LETTER addressed to Judge Naomi Reice Buchwald from Christopher Lovell and David E. Kovel dated 11/05/2013 re: supplemental information relevant to the Exchange-Based Plaintiffs' motion to amend their operative pleading. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C, # [4](#) Exhibit D)(Kovel, David) (Entered: 11/05/2013) |
| 11/11/2013 | [495](#) | LETTER addressed to Judge Naomi Reice Buchwald from Robert F. Wise, Jr. dated November 11, 2013 re: in response to the Schwab Plaintiffs' supplemental letter brief concerning their motion to remand. Document filed by Bank of America Corporation, Bank of America N.A., Bank of Tokyo-Mitsubishi UFJ Ltd., Citibank N.A., Citigroup, Inc., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS plc, HSBC Holdings plc, J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, Westlb AG.(Wise, Robert) (Entered: 11/11/2013) |

| 11/13/2013 | [497](#) | LETTER addressed to Judge Naomi Reice Buchwald from David R. Gelfand dated November 13, 2013 re: Response to Exchange-Based Plaintiffs Letter, dated November 5, 2013. Document filed by Bank Of America Corporation, Bank of America, N.A., Barclays Bank PLC, Citibank NA, Citigroup, Inc., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS PLC, HSBC Bank PLC, HSBC Holdings PLC, J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., Lloyds Banking Group PLC, Lloyds TSB Bank PLC, Royal Bank of Canada, Royal Bank of Scotland Group plc, Societe Generale, The Bank of Tokyo-Mitsubishi UFJ, Ltd., The Norinchukin Bank, UBS AG, WestDeutsche Immobilienbank AG, WestLB AG.(Gelfand, David) (Entered: 11/13/2013) |
|---|---|---|
| 11/27/2013 | [511](#) | MEMORANDUM AND ORDER: This Order addresses the Exchange-Based Plaintiffs' letter of November 5, 2013, which requested that they be allowed to amend their operative pleading to include information from the Rabobank settlement documents, and the defendants' response of November 13, 2013 opposing the plaintiffs' request. As with the Barclays settlement, we will permit the plaintiffs to rely on facts from the Rabobank settlement in their submissions rather than grant them leave to amend their complaint. Thus, the Court will consider these letters as supplemental briefing on the plaintiffs' September 6, 2013 Motion for Reconsideration of our August 23, 2013 Memorandum and Order, which denied the plaintiffs' motion to include trader-based claims in the Second Amended Class Action Complaint. If either side wants to submit further supplemental briefing, it may submit a memorandum not exceeding seven (7) pages in length. (Signed by Judge Naomi Reice Buchwald on 11/27/2013) Filed In Associated Cases: 1:11-md-02262-NRB et al.(ama) (Entered: 11/27/2013) |
| 12/30/2013 | [520](#) | MEMORANDUM AND ORDER: For the foregoing reasons, the plaintiffs' motions to remand are denied. (Signed by Judge Naomi Reice Buchwald on 12/27/2013) Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-02297-NRB. **Docketed in 11-md-2262 as per Chambers. (mro) (Entered: 12/30/2013) |
| 01/10/2014 | [522](#) | LETTER MOTION for Conference *re 54(b) judgments on antitrust claims* addressed to Judge Naomi Reice Buchwald from William Christopher Carmody dated 01/10/2014. Document filed by Mayor and City Council of Baltimore.(Carmody, William) (Entered: 01/10/2014) |
| 01/10/2014 | [523](#) | SUPPLEMENTAL MEMORANDUM OF LAW in Support re: [396](#) MOTION for Reconsideration re; [389](#) Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; [389](#) Order on Motion for Reconsideration, Order on Motion for |

| | | |
|---|---|---|
| | | Leave to File Document,, Order on Motion to Amend/Correct,, MOTION for Reconsideration re; [389](#) Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, , MOTION for Reconsideration re; [389](#) Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, , MOTION for Reconsideration re; [389](#) Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; [389](#) Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; [389](#) Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Attachments: # [1](#) Exhibit A)(Kovel, David) (Entered: 01/10/2014) |
| 01/13/2014 | [527](#) | MANDATE of USCA (Certified Copy) as to (429 in 1:11-md-02262-NRB) Notice of Appeal,,,, filed by Schwab Advisor Cash Reserves, Schwab Short-Term Bond Market Fund, Schwab Value Advantage Money Fund, The Charles Schwab Corporation, Schwab Retirement Advantage Money Fund, Schwab Total Bond Market Fund, Schwab Yieldplus Fund, Schwab Investor Money Fund, Schwab Cash Reserves, Charles Schwab & Co., Inc., Schwab U.S. Dollar Liquid Assets Fund, Schwab Yieldplus Fund Liquidation Trust, Charles Schwab Bank, N.A., Schwab Money Market Fund, (409 in 1:11-md-02262-NRB, 50 in 1:12-cv-01025-NRB) Notice of Appeal filed by Linda Zacher, Ellen Gelboim USCA Case Number 13-3565(L); 13-3636(con). This Court has determined sua sponte that it lacks jurisdiction over these appeals because a final order has not been issued by the district court as contemplated by 28 U.S.C. § 1291, and the orders appealed from did not dispose of all claims in the consolidated action. *See Coopers & Lybrand v. Livesay,* 437 U.S. 463, 467 (1978); *Houbigant, Inc. v. IMG Fragrance Brands, LLC,* 627 F.3d 497, 498 (2d Cir. 2010) (per curiam). Upon due consideration, it is hereby ORDERED that the appeals are DISMISSED. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 01/13/2014. Filed In Associated Cases: 1:11-md-02262-NRB, 1:12-cv-01025-NRB(nd) (Entered: 01/13/2014) |
| 01/13/2014 | [528](#) | LETTER addressed to Judge Naomi Reice Buchwald from David E. Kovel and Christopher Lovell dated January 13, 2014 re: Rule 2.E.1. Letter for Exchange-Based Plaintiffs' Supplemental Memorandum of Law Regarding Rabobank and in Further Support of Their Motion for |

| | | |
|---|---|---|
| | | Reconsideration of the Courts August 23, 2013 Memorandum and Order. Document filed by 303030 Trading LLC, Atlantic Trading USA, LLC, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH.(Kovel, David) (Entered: 01/13/2014) |
| 01/21/2014 | 533 | LETTER RESPONSE in Opposition to Motion addressed to Judge Naomi Reice Buchwald from Jeffrey T. Scott dated January 21, 2014 re: 522 LETTER MOTION for Conference *re 54(b) judgments on antitrust claims* addressed to Judge Naomi Reice Buchwald from William Christopher Carmody dated 01/10/2014.. Document filed by Barclays Bank PLC. (Scott, Jeffrey) (Entered: 01/21/2014) |
| 01/21/2014 | 534 | SUPPLEMENTAL MEMORANDUM OF LAW in Opposition re: 396 MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct,, MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct, , MOTION for Reconsideration re; 389 Order on Motion for Reconsideration, Order on Motion for Leave to File Document,, Order on Motion to Amend/Correct,. Document filed by Bank of America Corporation, Bank of America, N.A., Barclays Bank PLC, Citibank NA, Citigroup, Inc., Cooperative Centrale Raiffeisen-Boernleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS PLC, HSBC Bank PLC, HSBC Holdings PLC, J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., Lloyds Banking Group PLC, Lloyds TSB Bank PLC, Royal Bank of Canada, Royal Bank of Scotland Group plc, Societe Generale, The Bank of Tokyo-Mitsubishi UFJ, Ltd., The Norinchukin Bank, UBS AG, WestDeutsche Immobilienbank AG, WestLB AG. (Gelfand, David) (Entered: 01/21/2014) |
| 02/25/2014 | 549 | TRANSCRIPT of Proceedings re: ARGUMENT held on 2/4/2014 before Judge Naomi Reice Buchwald. Court Reporter/Transcriber: Karen Gorlaski, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date |

| | | |
|---|---|---|
| | | it may be obtained through PACER. Redaction Request due 3/21/2014. Redacted Transcript Deadline set for 3/31/2014. Release of Transcript Restriction set for 5/30/2014.(Rodriguez, Somari) (Entered: 02/25/2014) |
| 02/25/2014 | 551 | TRANSCRIPT of Proceedings re: ARGUMENT CORRECTED held on 2/4/2014 before Judge Naomi Reice Buchwald. Court Reporter/Transcriber: Karen Gorlaski, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/21/2014. Redacted Transcript Deadline set for 3/31/2014. Release of Transcript Restriction set for 5/30/2014.(Rodriguez, Somari) (Entered: 02/25/2014) |
| 07/02/2014 | 571 | NOTICE: Within the next ten days, the Court will issue a communication addressing issues related to the next steps in this litigation and inviting submissions from the parties. Before receiving our communication, counsel are directed not to make any submissions to the Court. (Signed by Judge Naomi Reice Buchwald on 7/2/2014) Filed In Associated Cases: 1:11-md-02262-NRB et al. ***Docketed in all member and related cases pursuant to instructions from Chambers.(mro) (Entered: 07/03/2014) |
| 07/18/2014 | 572 | LETTER addressed to Counsel from Judge Naomi Reice Buchwald dated 7/17/2014 re: The issuance of our June 23, 2014 Memorandum and Order, which defines the contours of the complaints that we have considered to date, requires that we now address the next steps necessary to move this litigation forward. (tn) (Entered: 07/18/2014) |
| 08/05/2014 | 574 | LETTER addressed to Judge Naomi Reice Buchwald from William C. Carmody dated 08-05-2014 re: Liaison Counsel. Document filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore. (Attachments: # 1 Exhibit Claims Spreadsheet)(Carmody, William) (Entered: 08/05/2014) |
| 08/13/2014 | 593 | LETTER addressed to Judge Naomi Reice Buchwald from Robert F. Wise, Jr. dated August 13, 2014 re: Pre-Motion Letters with respect to Claims in the Stayed Actions. Document filed by All Defendants. (Attachments: # 1 Appendix (Claim by Claim Master List of Actions))(Wise, Robert) (Entered: 08/13/2014) |
| 08/13/2014 | 594 | LETTER addressed to Judge Naomi Reice Buchwald from Robert F. Wise, Jr. dated August 13, 2014 re: Defendants' Proposed Motion to Dismiss. Document filed by All Defendants.(Wise, Robert) (Entered: 08/13/2014) |
| 08/20/2014 | 609 | LETTER addressed to Judge Naomi Reice Buchwald from David R. |

| | | Gelfand dated 8/20/2014 re: Response to the Exchange-Based Plaintiffs' ("Plaintiffs") letter dated August 13, 2014 ("August 13 Letter"). Document filed by Coperatieve Centrale Raiffeisen-Boerenleenbank B.A..(Gelfand, David) (Entered: 08/20/2014) |
|---|---|---|
| 08/20/2014 | 611 | RESPONSE re: 592 LETTER MOTION for Conference addressed to Judge Naomi Reice Buchwald from David E. Kovel, Christopher Lovell dated August 13, 2014. . Document filed by HBOS PLC, Lloyds Banking Group PLC, Lloyds TSB Bank PLC. (Gottridge, Marc) (Entered: 08/20/2014) |
| 08/20/2014 | 612 | RESPONSE re: (593 in 1:11-md-02262-NRB) Letter, . Document filed by National Credit Union Administration Board. Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-07394-NRB(Shen, Andrew) (Entered: 08/20/2014) |
| 08/20/2014 | 619 | LETTER addressed to Judge Naomi Reice Buchwald from Steven Fineman dated August 20, 2014 re: Response to Defendants' August 13, 2014 Letters Regarding Their Anticipated Motions to Dismiss. Document filed by Bay Area Toll Authority, Charles Schwab & Co., Inc., Charles Schwab Bank, N.A., Charles Schwab Corporation, Schwab Advisor Cash Reserves, Schwab Cash Reserves, Schwab Investor Money Fund, Schwab Money Market Fund, Schwab Retirement Advantage Money Fund, Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, Schwab U.S. Dollar Liquid Assets Fund, Schwab Value Advantage Money Fund, Schwab Yieldplus Fund, Schwab Yieldplus Fund Liquidation Trust.Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-07005-NRB, 1:14-cv-03094-NRB(Fineman, Steven) (Entered: 08/20/2014) |
| 08/20/2014 | 621 | LETTER addressed to Judge Naomi Reice Buchwald from Daniel L. Brockett dated August 20, 2014 re: Defendants' Pre-Motion Letters with respect to Claims in the Stayed Actions.. Document filed by The City of Philadelphia, The Pennsylvania Intergovernmental Cooperation Authority.(Brockett, Daniel) (Entered: 08/20/2014) |
| 08/20/2014 | 622 | LETTER addressed to Judge Naomi Reice Buchwald from Alexander Barnett dated 8/20/2014 re: Filed pursuant to the Court's letter of July 17, 2014 (Docket No. 572) and in response to the letters of Defendants filed on August 13, 2014. (Docket Nos. 593-598). Document filed by City of Richmond, City of Riverside, County of Sacramento, County of San Diego, County of San Mateo, County of Sonoma, East Bay Municipal Utility District, San Diego Association of Governments, San Mateo Couty Joint Powers Financing Authority, Successor Agency to the Richmond Community Redevelopment Agency, David E. Sundstrom, The Regents of the University of California, The Richmond Joint Powers Financing Authority, The Riverside Public Financing |

| | | |
|---|---|---|
| | | Authority, County of Mendocino, City of Houston.(Barnett, Alexander) (Entered: 08/20/2014) |
| 08/20/2014 | 623 | LETTER addressed to Judge Naomi Reice Buchwald from Daniel L. Brockett dated August 20, 2014 re: Defendants' Pre-Motion Letters with respect to Claims in the Stayed Actions. Document filed by Darby Financial Products.(Brockett, Daniel) (Entered: 08/20/2014) |
| 08/20/2014 | 624 | LETTER addressed to Judge Naomi Reice Buchwald from Daniel L. Brockett dated August 20, 2014 re: Defendants' Pre-Motion Letters with respect to Claims in the Stayed Actions. Document filed by PRUDENTIAL CORE TAXABLE MONEY MARKET FUND, PRUDENTIAL INVESTMENT PORTFOLIOS 2.(Brockett, Daniel) (Entered: 08/20/2014) |
| 08/20/2014 | 625 | LETTER addressed to Judge Naomi Reice Buchwald from Daniel L. Brockett dated August 20, 2014 re: Defendants' Pre-Motion Letters with respect to Claims in the Stayed Actions. Document filed by Salix Capital US Inc..(Brockett, Daniel) (Entered: 08/20/2014) |
| 08/20/2014 | 626 | LETTER addressed to Judge Naomi Reice Buchwald from William Carmody dated 8/20/2014 re: Defendants August 13, 2014 Pre-Motion Letters Regarding the Previously Stayed Class Cases. Document filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Carmody, William) (Entered: 08/20/2014) |
| 08/20/2014 | 627 | LETTER addressed to Judge Naomi Reice Buchwald from William Carmody dated 8/20/2014 re: Defendants August 13, 2014 Pre-Motion Letters Regarding the OTC Case and Request to Amend to Add Parties. Document filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore. (Attachments: # 1 Proposed LIBOR Third Consolidated Amended Complaint Part 1, # 2 Proposed LIBOR Third Consolidated Amended Complaint Part 2, # 3 Proposed LIBOR Third Consolidated Amended Complaint Part 3)(Carmody, William) (Entered: 08/20/2014) |
| 10/06/2014 | 662 | FIRST AMENDED COMPLAINT amending 406 Amended Complaint,,, against Bank of America Corporation, Bank of America National Association, Bank of Tokyo-Mitsubishi UFJ Ltd., Barclays Bank PLC, Barclays Capital Inc., Citibank, N.A., Citigroup Financial Products, Inc., Citigroup, Inc., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Credit Suisse International, HBOS PLC, HSBC Bank USA, N.A., HSBC Holdings PLC, JPMorgan Chase & Co., JPMorgan Chase Bank N.A., Lloyds Banking Group PLC, Norinchukin Bank, Rabobank Group, Societe Generale, The Royal Bank of Canada, The Royal Bank of Scotland |

| | | |
|---|---|---|
| | | Group PLC, UBS AG, WestDeutsche Immobilienbank AG, WestLB AG, CITI SWAPCO INC. with JURY DEMAND.Document filed by National Credit Union Administration Board. Related document: 406 Amended Complaint,,, filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore, Texas Competitive Electric Holdings Company LLC. (Attachments: # 1 Appendix Appendices A-D Swaps, # 2 Exhibit 1, Part 1--Members United-BOA Master Agmt, # 3 Exhibit 1, Part 2--Members United-BOA Master Agmt, # 4 Exhibit 2--Members United-JPMorgan Master Agmt, # 5 Exhibit 3--Southwest-Citigroup Master Agmt, # 6 Exhibit 4--WesCorp-BoA Master Agmt, # 7 Exhibit 5--WesCorp-Barclays Master Agmt, # 8 Exhibit 6--WesCorp-Deutsche Bank Master Agmt, # 9 Exhibit 7--WesCorp-HSBC Master Agmt, # 10 Exhibit 8--WesCorp-JP Morgan Master Agmt, # 11 Exhibit 9--WesCorp-RBS Master Agmt, # 12 Exhibit 10--WesCorp-UBS Master Agmt, # 13 Exhibit 11-WesCorp-Swapco Master Agmt, # 14 Exhibit 12--US Central-BOA Master Agmt, # 15 Exhibit 13, Part 1--US Central-Barclays Master Agmt, # 16 Exhibit 13, Part 2--US Central-Barclays Master Agmt, #17 Exhibit 14, Part 1--US Central-Deutsche Bank Master Agmt, # 18 Exhibit 14, Part 2--US Central-Deutsche Bank Master Agmt, # 19 Exhibit 15, Part 1--US Central-JPMorgan Master Agmt, # 20 Exhibit 15, Part 2--US Central-JPMorgan Master Agmt, # 21 Exhibit 16--US Central-Rabobank Master Agmt, # 22 Exhibit 17--US Central-RBS Master Agmt, # 23 Exhibit 18--US Central-UBS AG Master Agmt)(Shen, Andrew) (Entered: 10/06/2014) |
| 10/06/2014 | 664 | AMENDED COMPLAINT amending 130 Amended Complaint,, against BBA Enterprises, Ltd., BBA Libor, Ltd., Bank Of America Corporation, Bank of America, N.A., Barclays Bank PLC, Barclays Capital Inc., British Bankers' Association, Chase Bank USA, N.A., Citibank, N.A., Citigroup, Inc., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse AG, Credit Suisse Group AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, Deutsche Bank AG, Deutsche Bank Securities Inc., J.P. Morgan Bank Dublin PLC, J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., Lloyds Banking Group PLC, Royal Bank of Canada, The Royal Bank of Scotland Group PLC, The Royal Bank of Scotland PLC, UBS AG, UBS Securities LLC, Citigroup Global Markets, Inc., J.P. Morgan Securities, LLC, Merrill Lynch Capital Services, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., RBS Securities, Inc. with JURY DEMAND.Document filed by Principal Life Insurance Company, Principal Financial Group, Inc., Principal Financial Services, Inc.. Related document: 130 Amended Complaint,, filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore. (Attachments: # 1 Exhibit A)(Slaughter, Stacey) (Entered: 10/06/2014) |

| 10/06/2014 | [665](#) | AMENDED COMPLAINT amending [130](#) Amended Complaint,, against BBA Enterprises, Ltd., BBA Libor, Ltd., Bank Of America Corporation, Bank of America, N.A., Barclays Bank PLC, Barclays Capital Inc., British Bankers' Association, Citibank, N.A., Citigroup Global Markets, Inc., Citigroup, Inc., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse AG, Credit Suisse Group AG, Credit Suisse Securities (USA) LLC, Deutsche Bank AG, Deutsche Bank Securities Inc., HBOS PLC, J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., J.P. Morgan Securities, LLC, Lloyds Bank PLC (formerly known as Lloyds TSB Bank PLC), Lloyds Banking Group PLC, Merrill Lynch, Pierce, Fenner & Smith, Inc., RBS Securities, Inc., Royal Bank of Canada, The Royal Bank of Scotland Group PLC, The Royal Bank of Scotland PLC, UBS AG, UBS Securities LLC with JURY DEMAND.Document filed by PVC Income Account, PFI Bond & Mortgage Securities Fund, PFI Core Plus Bond I Fund, PVC Balanced Account, PFI Short-Term Income Fund, PFI Money Market Fund, PVC Government & High Quality Bond Account, PFI Bond Market Index Fund, PFI Income Fund, PFI Global Diversified Income Fund, PFI Equity Income Fund, Principal Funds, Inc., PFI High Yield Fund I, PFI High Yield Fund, PVC Equity Income Account, PVC Money Market Account, PVC Short-Term Income Account, PVC Asset Allocation Account, PFI Preferred Securities Fund, PFI Diversified Real Asset Fund, PVC Bond & Mortgage Securities Account, PFI Inflation Protection Fund, Principal Variable Contracts Funds, Inc., PFI Government & High Quality Bond Fund. Related document: [130](#)Amended Complaint,, filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore. (Attachments: # [1](#) Exhibit A)(Slaughter, Stacey) (Entered: 10/06/2014) |
|---|---|---|
| 10/06/2014 | [666](#) | AMENDED COMPLAINT amending [406](#) Amended Complaint,,, against Barclays Bank plc, Deutsche Bank AG, J.P. Morgan Bank Dublin PLC, JP Morgan Chase & Co., JPMorgan Chase Bank N.A., The Royal Bank of Scotland plc, UBS AG, UBS Limited with JURY DEMAND.Document filed by Capital Ventures International, Darby Financial Products. Related document: [406](#)Amended Complaint,,, filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore, Texas Competitive Electric Holdings Company LLC. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C, # [4](#) Exhibit D, # [5](#) Exhibit E, # [6](#) Exhibit F, # [7](#) Exhibit G, # [8](#) Exhibit H)(Brockett, Daniel) (Entered: 10/06/2014) |
| 10/06/2014 | [667](#) | SECOND AMENDED COMPLAINT amending [406](#) Amended Complaint,,, against Bank Of America Corporation, Bank of America, N.A., Barclays Bank PLC, Citibank N.A., Citigroup Financial Products, Inc., Citigroup Inc, Credit Suisse AG, Deutsche Bank AG, J.P. Morgan |

| | | |
|---|---|---|
| | | Chase & Co., J.P. Morgan Chase Bank, N.A., Royal Bank of Canada, Royal Bank of Scotland, UBS AG with JURY DEMAND.Document filed by The Pennsylvania Intergovernmental Cooperation Authority, The City of Philadelphia. Related document: 406 Amended Complaint,,, filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore, Texas Competitive Electric Holdings Company LLC. (Attachments: # 1 Exhibit Exhibits A-E)(Olson, Steig) (Entered: 10/06/2014) |
| 10/06/2014 | 668 | SECOND AMENDED COMPLAINT amending 406 Amended Complaint,,, against Bank of America Corp., Bank of America, N.A., Barclays Bank plc, Barclays Capital Inc., Citibank, N.A., Citigroup Inc., Citiigroup Global Markets Inc., Credit Suisse AG, Credit Suisse Group AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, Deutsche Bank AG, Deutsche Bank Securities Inc., J.P. Morgan Securities, LLC, JPMorgan Chase & Co., JPMorgan Chase Bank N.A., Merrill Lynch, Pierce, Fenner & Smith, Inc., The Royal Bank of Scotland plc, UBS AG, Citigroup Global Markets Limited with JURY DEMAND.Document filed by Salix Capital US Inc.. Related document: 406 Amended Complaint,,, filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore, Texas Competitive Electric Holdings Company LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M)(Brockett, Daniel) (Entered: 10/06/2014) |
| 10/06/2014 | 669 | AMENDED COMPLAINT amending 406 Amended Complaint,,, against Bank Of America Corporation, Bank of America, N.A., Barclays Bank plc, Barclays Capital Inc., Barclays PLC, Citibank, N.A., Citigroup Inc., Citiigroup Global Markets Inc., Credit Suisse (USA) Inc., Credit Suisse AG, Credit Suisse Group AG, Credit Suisse Securities (USA) LLC, Deutsche Bank AG, HSBC Bank plc, HSBC Holdings plc, HSBC Securities (USA) Inc., J.P. Morgan Securities, LLC, JPMorgan Chase & Co, JPMorgan Chase Bank N.A., Merrill Lynch, Pierce, Fenner & Smith, Inc., RBC Capital Markets, LLC, RBS Securities, Inc., Royal Bank of Canada, The Royal Bank of Scotland plc, UBS AG, UBS Securities LLC, Citigroup Funding Inc., HSBC Finance Corp., HSBC USA Inc. with JURY DEMAND.Document filed by PRUDENTIAL INVESTMENT PORTFOLIOS 2. Related document: 406 Amended Complaint,,, filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore, Texas Competitive Electric Holdings Company LLC. (Attachments: # 1 Appendix A, # 2 Exhibit A, # 3 Exhibit B, #4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G)(Brockett, Daniel) (Entered: 10/06/2014) |

| 10/06/2014 | [672](#) | AMENDED COMPLAINT amending [148](#) Amended Complaint,,, against Bank of America Corp., Bank of America, N.A., Bank of Tokyo-Mistsubishi UFJ, Barclays Bank PLC, Centrale Raiffeisen-Berenleenbank B.A., Citibank, N.A., Citigroup Inc., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS plc, HSBC Bank PLC, HSBC Holding plc, J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., Lloyds Banking Group PLC, Norinchukin Bank, Portigon/WestLB AG, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Royal Bank of Scotland Group plc, UBS AG, WestDeutsche Immobilienbank AG with JURY DEMAND.Document filed by Schwab Advisor Cash Reserves, Schwab Value Advantage Money Fund, Schwab Money Market Fund, Charles Schwab & Co., Inc., Charles Schwab Bank, N.A., Schwab U.S. Dollar Liquid Assets Fund, Schwab Retirement Advantage Money Fund, Schwab Investor Money Fund, Schwab Yieldplus Fund Liquidation Trust, The Charles Schwab Corporation, Schwab Cash Reserves, Schwab Total Bond Market Fund, Schwab Short-Term Bond Market Fund, Schwab Yieldplus Fund. Related document: [148](#) Amended Complaint,,, filed by Charles Schwab & Co., Inc..(Fineman, Steven) (Entered: 10/06/2014) |
| 10/08/2014 | [683](#) | ORDER. It is hereby ORDERED that the City of Philadelphia's amended complaint of October 7, 2014, be deemed timely, and that the Regents of the University of California (and related plaintiffs) and the City of Houston have leave to re-file their amended complaints on or before October 9, 2014. (Amended Pleadings due by 10/9/2014.) (Signed by Judge Naomi Reice Buchwald on 10/8/2014) Filed In Associated Cases: 1:11-md-02262-NRB et al. (All cases as per Chambers) (rjm) (Entered: 10/08/2014) |
| 10/08/2014 | [684](#) | FIRST AMENDED COMPLAINT amending [670](#) Amended Complaintagainst Bank Of America Corporation, Bank of America, N.A., Bank of Tokyo-Mitsubishi UFJ Ltd, Barclays Bank PLC, Citibank, N.A., Citigroup, Inc., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS PLC, HSBC Bank PLC, HSBC Holdings PLC, JPMorgan Chase & Co., JPMorgan Chase Bank N.A., Lloyds Banking Group PLC, Portigon AG, Royal Bank of Canada, Societe Generale, The Norinchukin Bank, The Royal Bank of Scotland Group PLC, UBS AG, WestDeutsche Immobilienbank AG with JURY DEMAND.Document filed by County of San Mateo, East Bay Municipal Utility District, The Riverside Public Financing Authority, City of Richmond, The Richmond Joint Powers Financing Authority, County of Sonoma, County of Mendocino, Successor Agency to the Richmond Community Redevelopment Agency, San Diego Association of Governments, City of Riverside, County of San Diego, David E. Sundstrom, County of |

| | | |
|---|---|---|
| | | Sacramento, San Mateo Couty Joint Powers Financing Authority, The Regents of the University of California. Related document: 670 Amended Complaintfiled by County of Sacramento, County of San Diego, San Diego Association of Governments, The Richmond Joint Powers Financing Authority, City of Riverside, County of Sonoma, Successor Agency to the Richmond Community Redevelopment Agency, City of Richmond, County of San Mateo, San Mateo Couty Joint Powers Financing Authority, The Riverside Public Financing Authority, County of Mendocino, David E. Sundstrom, The Regents of the University of California. (Attachments: # 1 Exhibit Exhibits 1-5, # 2 Exhibit Exhibits 6-10, # 3 2014-10-08 Order Granting Leave to Re-File Amended Complaint)(Nishimura, Nanci) (Entered: 10/08/2014) |
| 10/08/2014 | 685 | FIRST AMENDED COMPLAINT amending 671 Amended Complaintagainst Bank Of America Corporation, Bank of America, N.A., Bank of Tokyo-Mitsubishi UFJ Ltd., Barclays Bank plc, Citibank, N.A., Citigroup, Inc., Coperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse AG, Deutsche Bank AG, HBOS plc, HSBC Bank plc, HSBC Holdings plc, J.P. Morgan Chase Bank, N.A., JP Morgan Chase & Co., Lloyds Banking Group plc, Portigon AG, Royal Bank of Canada, Societe Generale, The Norinchukin Bank, The Royal Bank of Scotland plc, UBS AG, WestDeutsche Immobilienbank AG with JURY DEMAND.Document filed by City of Houston. Related document: 671 Amended Complaintfiled by City of Houston. (Attachments: # 1 Exhibit Exhibits 1-5, # 2 Exhibit Exhibits 6-10, # 3 2014-10-08 Order Granting Leave to Re-File Amended Complaint)(Nishimura, Nanci) (Entered: 10/08/2014) |
| 10/24/2014 | 700 | MOTION to Amend/Correct 662 Amended Complaint,,,,,,,, *Case Caption*. Document filed by National Credit Union Administration Board. (Attachments: # 1 Exhibit A, Corrected Caption)(Shen, Andrew) (Entered: 10/24/2014) |
| 10/27/2014 | | Minute Entry for proceedings held before Judge Naomi Reice Buchwald: Settlement Conference was held on 10/27/2014. (sc) Modified on 10/30/2014 (mro). (Entered: 10/29/2014) |
| 11/05/2014 | 743 | MOTION to Dismiss *Direct Action Claims*. Document filed by BBA Enterprises, Ltd., BBA Libor, Ltd., Banc of America Securities LLC, Bank of America Corporation, Bank of America, N.A., Barclays Bank plc, Barclays Capital Inc., Barclays PLC, British Bankers Association, CITI SWAPCO INC., Chase Bank USA, N.A., Citibank, N.A., Citigroup Financial Products, Inc., Citigroup Funding Inc., Citigroup Global Markets Limited, Citigroup Global Markets, Inc., Citigroup, Inc., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse (USA) Inc., Credit Suisse AG, Credit Suisse Group AG, Credit |

| | | Suisse International, Credit Suisse Securities (USA) LLC, Deutsche Bank AG, Deutsche Bank Securities Inc., HBOS plc, HSBC Bank USA, N.A., HSBC Bank plc, HSBC Finance Corp., HSBC Holdings plc, HSBC Securities (USA) Inc., HSBC USA Inc., J.P. Morgan Bank Dublin PLC, J.P. Morgan Markets Ltd., J.P. Morgan Securities, LLC, JPMorgan Chase & Co., JPMorgan Chase Bank N.A., Lloyds Bank PLC (formerly known as Lloyds TSB Bank PLC), Lloyds Banking Group plc, Merrill Lynch & Co., Merrill Lynch Capital Services, Inc., Merrill Lynch International Bank, Ltd., Merrill Lynch, Pierce, Fenner & Smith, Inc., Portigon AG, RBC Capital Markets, LLC, RBS Citizens, N.A., RBS Securities, Inc., Royal Bank of Canada, Societe Generale, The Bank of Tokyo-Mitsubishi UFJ, Ltd., The Hongkong and Shanghai Banking Corporation, Ltd., The Norinchukin Bank, The Royal Bank of Scotland Group plc, The Royal Bank of Scotland plc, UBS AG, UBS Securities LLC, WestDeutsche Immobilienbank AG. (Attachments: # 1 Appendix)(Wise, Robert) (Entered: 11/05/2014) |
|---|---|---|
| 11/05/2014 | 746 | JOINT MEMORANDUM OF LAW in Support re: 743 MOTION to Dismiss *Direct Action Claims. Covered by Prior Rulings*. Document filed by BBA Enterprises, Ltd., BBA Libor, Ltd., Banc of America Securities LLC, Bank of America Corporation, Bank of America, N.A., Barclays Bank plc, Barclays Capital Inc., Barclays PLC, Bear Stearns Capital Markets, Inc., British Bankers' Association, CITI SWAPCO INC., Chase Bank USA, N.A., Citibank, N.A., Citigroup Financial Products, Inc., Citigroup Funding Inc., Citigroup Global Markets Limited, Citigroup Global Markets, Inc., Citigroup, Inc., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse (USA) Inc., Credit Suisse AG, Credit Suisse Group AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, Deutsche Bank AG, Deutsche Bank Securities Inc., HBOS plc, HSBC Bank Plc., HSBC Bank USA, N.A., HSBC Finance Corp., HSBC Holdings plc, HSBC Securities (USA) Inc., HSBC USA Inc., J.P. Morgan Bank Dublin PLC, J.P. Morgan Markets Ltd., J.P. Morgan Securities, LLC, JP Morgan Chase & Co., JPMorgan Chase Bank N.A., Lloyds Bank PLC (formerly known as Lloyds TSB Bank PLC), Lloyds Banking Group plc, Merrill Lynch & Co., Merrill Lynch Capital Services, Inc., Merrill Lynch International Bank, Ltd., Merrill Lynch, Pierce, Fenner & Smith, Inc., Portigon AG, RBC Capital Markets, LLC, RBS Citizens, N.A., RBS Securities, Inc., Royal Bank of Canada, Societe Generale, The Bank of Tokyo-Mitsubishi UFJ, Ltd., The Hongkong and Shanghai Banking Corporation, Ltd., The Norinchukin Bank, The Royal Bank of Scotland Group plc, The Royal Bank of Scotland plc, UBS AG, UBS Securities LLC, WestDeutsche Immobilienbank AG. (Wise, Robert) (Entered: 11/05/2014) |
| 12/08/2014 | 877 | JOINT MEMORANDUM OF LAW in Opposition re: 741 MOTION to |

| | | |
|---|---|---|
| | | Dismiss *Direct Action Claims*., [743](#) MOTION to Dismiss *Direct Action Claims*. . Document filed by The Federal Deposit Insurance Corporation as Receiver, The Federal Home Loan Mortgage Corporation. (Leveridge, Richard) (Entered: 12/08/2014) |
| 12/23/2014 | [921](#) | REPLY MEMORANDUM OF LAW in Support re: (97 in 1:13-cv-05221-NRB) MOTION to Dismiss *Direct Action Claims*., (40 in 1:14-cv-04189-NRB) MOTION to Dismiss *Direct Action Claims*., (61 in 1:13-cv-05511-NRB) MOTION to Dismiss *Direct Action Claims*., (64 in 1:14-cv-01757-NRB) MOTION to Dismiss *Direct Action Claims*., (57 in 1:14-cv-03094-NRB) MOTION to Dismiss *Direct Action Claims*., (67 in 1:13-cv-06020-NRB) MOTION to Dismiss *Direct Action Claims*., (104 in 1:13-cv-05187-NRB) MOTION to Dismiss *Direct Action Claims*., (87 in 1:13-cv-06014-NRB) MOTION to Dismiss *Direct Action Claims*., (87 in 1:13-cv-06013-NRB) MOTION to Dismiss *Direct Action Claims*., (128 in 1:13-cv-07005-NRB) MOTION to Dismiss *Direct Action Claims*., (98 in 1:13-cv-05616-NRB) MOTION to Dismiss *Direct Action Claims*., (76 in 1:13-cv-07394-NRB) MOTION to Dismiss *Direct Action Claims*., (68 in 1:13-cv-07720-NRB) MOTION to Dismiss *Direct Action Claims*., (104 in 1:13-cv-05186-NRB) MOTION to Dismiss *Direct Action Claims*., (113 in 1:13-cv-00627-NRB) MOTION to Dismiss *Direct Action Claims*., (108 in 1:13-cv-03952-NRB) MOTION to Dismiss *Direct Action Claims*., (50 in 1:13-cv-08799-NRB) MOTION to Dismiss *Direct Action Claims*., (77 in 1:13-cv-08644-NRB) MOTION to Dismiss *Direct Action Claims*., (114 in 1:13-cv-00667-NRB) MOTION to Dismiss *Direct Action Claims*., (114 in 1:13-cv-00626-NRB) MOTION to Dismiss *Direct Action Claims*., (96 in 1:13-cv-05569-NRB) MOTION to Dismiss *Direct Action Claims*., (743 in 1:11-md-02262-NRB) MOTION to Dismiss *Direct Action Claims*., (114 in 1:13-cv-00625-NRB) MOTION to Dismiss *Direct Action Claims*., (115 in 1:13-cv-00597-NRB) MOTION to Dismiss *Direct Action Claims*., (153 in 1:13-cv-02297-NRB) MOTION to Dismiss *Direct Action Claims*. . Document filed by Credit Suisse (USA) Inc., Bank of America, N.A., BBA Enterprises, Ltd., BBA Libor, Ltd., Banc of America Securities LLC, Bank Of America Corporation, Barclays Bank plc, Barclays Capital Inc., Barclays PLC, Bear Stearns Capital Markets, Inc., British Bankers' Association, Chase Bank USA, N.A., Citi Swapco Inc., Citibank N.A., Citigroup Financial Products, Inc., Citigroup Funding Inc., Citigroup Global Markets Limited, Citigroup Global Markets, Inc., Citigroup Inc., Citizens Bank, N.A., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse AG, Credit Suisse Group AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, Deutsche Bank AG, Deutsche Bank Securities Inc., HBOS plc, HSBC Bank USA, N.A., HSBC Bank plc, HSBC Finance Corp., HSBC Holding plc, HSBC Securities (USA) Inc., HSBC USA Inc., J.P. |

| | | |
|---|---|---|
| | | Morgan Bank Dublin PLC, J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., J.P. Morgan Markets Ltd., J.P. Morgan Securities, LLC, Lloyds Bank PLC (formerly known as Lloyds TSB Bank PLC), Lloyds Banking Group PLC, Merrill Lynch & Co., Merrill Lynch Capital Services, Inc., Merrill Lynch International Bank, Ltd., Merrill Lynch, Pierce, Fenner & Smith, Inc., Portigon AG, RBC Capital Markets, LLC, RBS Securities, Inc., Royal Bank of Canada, Societe Generale, The Bank of Tokyo-Mitsubishi UFJ Ltd., The Hongkong and Shanghai Banking Corporation, Ltd., The Norinchukin Bank, The Royal Bank of Scotland Group plc, The Royal Bank of Scotland plc, UBS AG, UBS Securities LLC, WestDeutsche Immobilienbank AG. Filed In Associated Cases: 1:11-md-02262-NRB et al.(Wise, Robert) (Entered: 12/23/2014) |
| 12/24/2014 | 928 | ORDER DISMISSING CERTAIN DEFENDANTS, ADDING CERTAIN DEFENDANTS AND AMENDING CAPTIONS. It is hereby ORDERED, pursuant to Rules 15(a)(2), 20(a)(2) and 21 of the Federal Rules of Civil Procedure, that: All claims asserted by Freddie Mac in Case No. 13-cv-3952 and by the FDIC-R in Case No. 14-cv-1757 against the following defendants (collectively, the "Dismissed Defendants") shall be, and hereby are, dismissed without prejudice, subject to the terms of this Order: a. HBOS plc; b. HSBC Holdings plc; and c. Credit Suisse Group AG. The following entities (the "Added Defendants") shall be, and hereby are, added as defendants in place and instead of the Dismissed Defendants listed in paragraph 1(a), (b) and (c) of this Order, respectively: a. Bank of Scotland pic; b. HSBC Bank plc; and c. Credit Suisse AG. The caption in case no. 13-cv-3952 shall be, and hereby is, amended to read as stated on Exhibit A hereto, and the caption in case no. 14-cv-1757 shall be, and hereby is, amended to read as stated on Exhibit B hereto, and as further set forth herein.granting (909) Motion to Substitute Party. Bank of Scotland plc, HSBC Bank Plc, and Credit Suisse Group AG added. Credit Suisse Group AG, Credit Suisse Group, AG, Creidt Suisse Group AG, HBOS plc, HSBC Holding plc, HSBC Holdings plc., Credit Suisse Group AG terminated in case 1:11-md-02262-NRB; granting (139) Motion to Substitute Party. Bank of Scotland plc, HSBC Bank Plc, and Credit Suisse Group AG added. Credit Suisse Group AG, Credit Suisse Group, AG, Creidt Suisse Group AG, HBOS plc, HSBC Holding plc, HSBC Holdings plc., Credit Suisse Group AG in case 1:13-cv-03952-NRB; granting (97) Motion to Substitute Party. Bank of Scotland plc, HSBC Bank Plc, and Credit Suisse Group AG added. Credit Suisse Group AG, Credit Suisse Group, AG, Creidt Suisse Group AG, HBOS plc, HSBC Holding plc, HSBC Holdings plc., Credit Suisse Group AG terminated in case 1:14-cv-01757-NRB. (Signed by Judge Naomi Reice Buchwald on 12/23/2014) Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-03952-NRB, 1:14-cv-01757-NRB (rjm) (Entered: 12/24/2014) |

| | | |
|---|---|---|
| 12/24/2014 | 929 | ORDER: Counsel are directed to appear for oral argument on the pending motions to dismiss non-class actions on January 28, 2015, at 10:00 A.M., at the United States Court House, 500 Pearl Street, New York, New York, in Courtroom 21A. IT IS SO ORDERED. Oral Argument set for 1/28/2015 at 10:00 AM in Courtroom 21A, 500 Pearl Street, New York, NY 10007 before Judge Naomi Reice Buchwald. (Signed by Judge Naomi Reice Buchwald on 12/24/2014) Filed In Associated Cases: 1:11-md-02262-NRB et al.(ajs) (Entered: 12/24/2014) |
| 01/23/2015 | 996 | LETTER addressed to Judge Naomi Reice Buchwald from William C. Carmody dated 1/23/2015 re: Request for Entry of Final Judgment on Antitrust Claims Under Rule 54(b). Document filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore.(Carmody, William) (Entered: 01/23/2015) |
| 01/27/2015 | 1001 | LETTER MOTION for Conference addressed to Judge Naomi Reice Buchwald from Christopher Lovell and David E. Kovel dated January 27, 2015. Document filed by 303030 Trading, LLC, Atlantic Trading USA, LLC, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH, 303030 Trading LLC, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. (Attachments: # 1 Exhibit A)Filed In Associated Cases: 1:11-md-02262-NRB, 1:11-cv-02613-NRB(Kovel, David) (Entered: 01/27/2015) |
| 01/28/2015 | 1002 | LETTER addressed to Judge Naomi Reice Buchwald from William C. Carmody dated 1/28/2015 re: Supreme Court's Decision in Gelboim v. Bank of America. Document filed by City of New Britain Firefighters' and Police Benefit Fund, Mayor and City Council of Baltimore.(Carmody, William) (Entered: 01/28/2015) |
| 02/04/2015 | 1007 | LETTER addressed to Judge Naomi Reice Buchwald from David R. Gelfand dated 2/4/2015 re: Response to Exchange-Based Plaintiffs' letter dated January 27, 2015 (ECF No. 1001). Document filed by Bank of America Corporation, Bank of America, N.A., Citibank NA, Citigroup, Inc., Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS PLC, HSBC Bank PLC, HSBC Holdings PLC, J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., Lloyds Banking Group PLC, Lloyds TSB Bank PLC, Royal Bank of Canada, Royal Bank of Scotland Group plc, Societe Generale, The Bank of Tokyo-Mitsubishi UFJ, Ltd., The Norinchukin Bank, UBS AG, WestDeutsche Immobilienbank AG, WestLB AG.(Gelfand, David) (Entered: 02/04/2015) |
| 02/05/2015 | 1008 | ORDER. For the reasons expressed in our Orders of March 29, 2013 (ECF No. 286), August 23, 2013 (ECF No. 389), and October 17, 2013 |

| | | |
|---|---|---|
| | | (ECF No. 490), and in open court on this date, these requests are granted as to the OTC plaintiffs, Exchange-Based Plaintiffs, and plaintiffs in 33-35 Green Pond Road, Courtyard at Amwell II, and Guaranty Bank & Trust. These requests are denied as to plaintiffs in LACERA and County of Riverside, as those cases do not raise claims under the Sherman Act. See Compl. paragraphs 127-133, LACERA, No. 13 cv 398, ECF No. 1; Compl. paragraphs 128 134, Cnty. Of Riverside, No. 13-cv-1135, ECF No. 1. The Clerk of Court is respectfully requested: to enter final judgments against plaintiffs in 33-35 Green Pond and Courtyard at Amwell II, and to close those cases; and to enter partial judgments pursuant to Rule 54(b) as to claim 1 of the OTC Plaintiffs' operative complaint, MDL ECF No. 406; claim 5 of the Exchange-Based Plaintiffs' operative complaint, MDL ECF No. 407; and claim 1 of the complaint in Guaranty Bank & Trust, No. 13-cv-346, ECF No. 1. (Signed by Judge Naomi Reice Buchwald on 2/5/2015) Filed In Associated Cases: 1:11-md-02262-NRB et al. (rjm) (Entered: 02/06/2015) |
| 02/05/2015 | | Transmission to Judgments and Orders Clerk. Transmitted re: 1008 Order to the Judgments and Orders Clerk. (rjm) (Entered: 02/06/2015) |
| 02/10/2015 | 1011 | NOTICE OF APPEAL from (133 in 1:11-cv-06409-NRB, 138 in 1:11-cv-06411-NRB, 143 in 1:11-cv-06412-NRB) Order,,,,,,,,,,,,,,,,,, (286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB) Order on Motion to DismissDocument filed by Charles Schwab & Co., Inc., Charles Schwab Bank, N.A., Charles Schwab Corporation, Schwab Advisor Cash Reserves, Schwab Cash Reserves, Schwab Investor Money Fund, Schwab Money Market Fund, Schwab Retirement Advantage Money Fund, Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, Schwab U.S. Dollar Liquid Assets Fund, Schwab Value Advantage Money Fund, Schwab Yieldplus Fund, Schwab Yieldplus Fund Liquidation Trust. Filing fee $ 505.00, receipt number 0208-10587373. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. Filed In Associated Cases: 1:11-md-02262-NRB, 1:11-cv-06409-NRB, 1:11-cv-06411-NRB, 1:11-cv-06412-NRB(Fineman, Steven) (Entered: 02/10/2015) |
| 02/10/2015 | 1012 | LETTER addressed to Judge Naomi Reice Buchwald from Brendan P. |

| | | Glackin dated 02/10/2015 re: Second Circuit ruling on the Schwab Plaintiffs' motion to recall the mandate and reinstate their appeal. Document filed by Charles Schwab & Co., Inc., Charles Schwab Bank, N.A., Schwab Advisor Cash Reserves, Schwab Cash Reserves, Schwab Investor Money Fund, Schwab Money Market Fund, Schwab Retirement Advantage Money Fund, Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, Schwab U.S. Dollar Liquid Assets Fund, Schwab Value Advantage Money Fund, Schwab Yieldplus Fund, Schwab Yieldplus Fund Liquidation Trust, The Charles Schwab Corporation.Filed In Associated Cases: 1:11-md-02262-NRB, 1:11-cv-06409-NRB, 1:11-cv-06411-NRB, 1:11-cv-06412-NRB(Glackin, Brendan) (Entered: 02/10/2015) |
|---|---|---|
| 02/11/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (1011 in 1:11-md-02262-NRB, 161 in 1:11-cv-06409-NRB, 172 in 1:11-cv-06412-NRB, 167 in 1:11-cv-06411-NRB) Notice of Appeal. Filed In Associated Cases: 1:11-md-02262-NRB, 1:11-cv-06409-NRB, 1:11-cv-06411-NRB, 1:11-cv-06412-NRB. (tp) (Entered: 02/11/2015) |
| 02/11/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for (1011 in 1:11-md-02262-NRB, 172 in 1:11-cv-06412-NRB, 161 in 1:11-cv-06409-NRB, 167 in 1:11-cv-06411-NRB) Notice of Appeal, filed by Schwab Advisor Cash Reserves, Schwab Short-Term Bond Market Fund, Schwab Value Advantage Money Fund, Schwab Retirement Advantage Money Fund, Schwab Total Bond Market Fund, Charles Schwab Corporation, Schwab Yieldplus Fund, Schwab Investor Money Fund, Schwab Cash Reserves, Charles Schwab & Co., Inc., Schwab U.S. Dollar Liquid Assets Fund, Schwab Yieldplus Fund Liquidation Trust, Charles Schwab Bank, N.A., Schwab Money Market Fund were transmitted to the U.S. Court of Appeals. Filed In Associated Cases: 1:11-md-02262-NRB, 1:11-cv-06409-NRB, 1:11-cv-06411-NRB, 1:11-cv-06412-NRB(tp) (Entered: 02/11/2015) |
| 02/11/2015 | 1013 | CLERK'S JUDGMENT: That for the reasons stated in the Court's Order dated February 5, 2015, the requests as to the OTC Plaintiffs, Exchange-Based Plaintiffs, and plaintiffs in 33-35 Green Pond Road, Courtyard at Amwell II, and Guaranty Bank & Trust are granted; the requests as to plaintiffs in LACERA and County of Riverside, as those cases do not raise claims under the Sherman Act, are denied; accordingly, final judgment is entered against plaintiffs in 33-35 Green Pond and Courtyard at Amwell II, and those cases are closed; there is no just reason for delay pursuant to Fed. R. Civ. P. 54(b), partial judgment is entered in favor of the Defendants as to claim I of the OTC Plaintiffs' operative complaint, MDL ECF No. 406 and claim 5 of the Exchange-Based Plaintiffs' operative complaint in Guaranty Bank & |

| | | |
|---|---|---|
| | | Trust, No. 13-cv-346, ECF No. 1. (Signed by Clerk of Court Ruby Krajick on 2/11/2015) (Attachments: # 1 Notice of Right to Appeal, # 2 Notice of Right to Appeal)Filed In Associated Cases: 1:11-md-02262-NRB et al.(dt) (Entered: 02/11/2015) |
| 02/11/2015 | 1014 | NOTICE OF APPEAL from (92 in 1:12-cv-05822-NRB) Clerk's Judgment,,,, (286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 31 in 1:12-cv-05822-NRB, 31 in 1:12-cv-05822-NRB, 31 in 1:12-cv-05822-NRB, 31 in 1:12-cv-05822-NRB, 31 in 1:12-cv-05822-NRB, 31 in 1:12-cv-05822-NRB, 31 in 1:12-cv-05822-NRB, 31 in 1:12-cv-05822-NRB, 31 in 1:12-cv-05822-NRB, 31 in 1:12-cv-05822-NRB, 31 in 1:12-cv-05822-NRB, 31 in 1:12-cv-05822-NRB, 31 in 1:12-cv-05822-NRB, 31 in 1:12-cv-05822-NRB, 31 in 1:12-cv-05822-NRB, 31 in 1:12-cv-05822-NRB) Order on Motion to DismissDocument filed by 33-35 Green Pond Road Associates, LLC. Filing fee $ 505.00. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. Filed In Associated Cases: 1:11-md-02262-NRB, 1:12-cv-05822-NRB(Shooman, Jeffrey) (Entered: 02/11/2015) |
| 02/12/2015 | 1016 | NOTICE OF APPEAL from (1008 in 1:11-md-02262-NRB, 249 in 1:11-cv-02613-NRB) Order,,,, (1013 in 1:11-md-02262-NRB, 250 in 1:11-cv-02613-NRB) Clerk's Judgment,,,,. Document filed by 303030 Trading, LLC, Atlantic Trading USA, LLC, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH, 303030 Trading LLC, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. Filing fee $ 505.00, receipt number 0208-10593292. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. Filed In Associated Cases: 1:11-md-02262-NRB, 1:11-cv-02613-NRB(Kovel, David) (Entered: 02/12/2015) |
| 02/12/2015 | 1017 | NOTICE OF APPEAL from (71 in 1:12-cv-06693-NRB, 1008 in 1:11-md-02262-NRB) Order,,,, (13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 |

| | | |
|---|---|---|
| | | in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 13 in 1:12-cv-06693-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB, 286 in 1:11-md-02262-NRB) Order on Motion to Dismiss. Document filed by Courtyard at Amwell II, LLC, Lawrence W. Gardner, Greenwich Commons II, LLC, Jill Court Associates II, LLC, Maidencreek Ventures II LP, Raritan Commons, LLC. Filing fee $ 505.00, receipt number 0208-10593301. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. Filed In Associated Cases: 1:11-md-02262-NRB, 1:12-cv-06693-NRB(Zweig, Jason) (Entered: 02/12/2015) |
| 02/12/2015 | 1018 | LETTER addressed to Judge Naomi Reice Buchwald from Richard J. Leveridge dated February 12, 2015 re: Fed. R. Civ. P. 54(b) Issues. Document filed by Direct Action Plaintiffs. (Attachments: # 1 Exhibit A)(Leveridge, Richard) (Entered: 02/12/2015) |
| 02/13/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (1014 in 1:11-md-02262-NRB, 93 in 1:12-cv-05822-NRB) Notice of Appeal. Filed In Associated Cases: 1:11-md-02262-NRB, 1:12-cv-05822-NRB. (tp) (Entered: 02/13/2015) |
| 02/13/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for (1014 in 1:11-md-02262-NRB, 93 in 1:12-cv-05822-NRB) Notice of Appeal, filed by 33-35 Green Pond Road Associates, LLC were transmitted to the U.S. Court of Appeals. Filed In Associated Cases: 1:11-md-02262-NRB, 1:12-cv-05822-NRB. (tp) (Entered: 02/13/2015) |
| 02/13/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (127 in 1:13-cv-07394-NRB, 164 in 1:11-cv-06409-NRB, 121 in 1:13-cv-06013-NRB, 72 in 1:11-cv-03128-NRB, 152 in 1:13-cv-05186-NRB, 101 in 1:13-cv-01135-NRB, 160 in 1:13-cv-00625-NRB, 84 in 1:12-cv-06056-NRB, 96 in 1:11-cv-05638-NRB, 69 in 1:11-cv-05927-NRB, 36 in 1:14-cv-07720-NRB, 98 in 1:12-cv-01025-NRB, 122 in 1:13-cv-00598-NRB, 145 in 1:13-cv-05569-NRB, 97 in 1:13-cv-01198-NRB, 251 in 1:11-cv-02613-NRB, 88 in 1:11-cv-05640-NRB, 145 in 1:13-cv-05221-NRB, 70 in 1:13-cv-08799-NRB, 173 in 1:13-cv-07005-NRB, 154 in 1:13-cv-03952-NRB, 69 in 1:13-cv-01456-NRB, 123 in 1:12-cv-05723-NRB, 73 in 1:11-cv-02883-NRB, 73 in 1:12-cv-06693-NRB, 113 in 1:14-cv-03094-NRB, |

| | | |
|---|---|---|
| | | 51 in 1:11-cv-07715-NRB, 88 in 1:13-cv-02343-NRB, 53 in 1:11-cv-07676-NRB, 102 in 1:11-cv-05641-NRB, 94 in 1:13-cv-00398-NRB, 121 in 1:13-cv-06014-NRB, 94 in 1:13-cv-00407-NRB, 78 in 1:11-cv-05931-NRB, 94 in 1:12-cv-05822-NRB, 73 in 1:12-cv-07461-NRB, 104 in 1:13-cv-01016-NRB, 64 in 1:11-cv-05930-NRB, 174 in 1:11-cv-06412-NRB, 75 in 1:11-cv-05928-NRB, 159 in 1:13-cv-00627-NRB, 155 in 1:13-cv-05616-NRB, 169 in 1:11-cv-06411-NRB, 125 in 1:13-cv-08644-NRB, 81 in 1:13-cv-03010-NRB, 74 in 1:11-cv-05929-NRB, 193 in 1:13-cv-02297-NRB, 59 in 1:12-cv-04205-NRB, 1015 in 1:11-md-02262-NRB, 73 in 1:11-cv-03249-NRB, 159 in 1:13-cv-00626-NRB, 69 in 1:14-cv-04189-NRB, 97 in 1:13-cv-06020-NRB, 160 in 1:13-cv-00667-NRB, 88 in 1:13-cv-00346-NRB, 161 in 1:13-cv-00597-NRB, 152 in 1:13-cv-05187-NRB, 96 in 1:13-cv-07720-NRB, 79 in 1:13-cv-05511-NRB, 113 in 1:14-cv-01757-NRB) Notice of Appeal. Filed In Associated Cases: 1:11-md-02262-NRB et al. (tp) (Entered: 02/13/2015) |
| 02/13/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (252 in 1:11-cv-02613-NRB, 1016 in 1:11-md-02262-NRB) Notice of Appeal. Filed In Associated Cases: 1:11-md-02262-NRB, 1:11-cv-02613-NRB. (tp) (Entered: 02/13/2015) |
| 02/13/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for (252 in 1:11-cv-02613-NRB, 1016 in 1:11-md-02262-NRB) Notice of Appeal, filed by 303030 Trading, LLC, 303030 Trading, LLC, FTC Futures Fund PCC Ltd, Atlantic Trading USA, LLC, Metzler Investment GmbH, Gary Francis, Nathaniel Haynes, FTC Futures Fund SICAV were transmitted to the U.S. Court of Appeals. Filed In Associated Cases: 1:11-md-02262-NRB, 1:11-cv-02613-NRB. (tp) (Entered: 02/13/2015) |
| 02/13/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (74 in 1:12-cv-06693-NRB, 1017 in 1:11-md-02262-NRB) Notice of Appeal. Filed In Associated Cases: 1:11-md-02262-NRB, 1:12-cv-06693-NRB. (tp) (Entered: 02/13/2015) |
| 02/13/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for (74 in 1:12-cv-06693-NRB, 1017 in 1:11-md-02262-NRB) Notice of Appeal, filed by Lawrence W. Gardner, Raritan Commons, LLC, Courtyard at Amwell II, LLC, Maidencreek Ventures II LP, Jill Court Associates II, LLC, Greenwich Commons II, LLC were transmitted to the U.S. Court of Appeals. Filed In Associated Cases: 1:11-md-02262-NRB, 1:12-cv-06693-NRB. (tp) (Entered: 02/13/2015) |
| 02/13/2015 | 1019 | CORRECTED NOTICE OF APPEAL re: (127 in 1:13-cv-07394-NRB, 164 in 1:11-cv-06409-NRB, 152 in 1:13-cv-05186-NRB, 160 in 1:13- |

| | | |
|---|---|---|
| | | cv-00625-NRB, 96 in 1:11-cv-05638-NRB, 69 in 1:11-cv-05927-NRB, 145 in 1:13-cv-05569-NRB, 97 in 1:13-cv-01198-NRB, 251 in 1:11-cv-02613-NRB, 145 in 1:13-cv-05221-NRB, 173 in 1:13-cv-07005-NRB, 154 in 1:13-cv-03952-NRB, 73 in 1:12-cv-06693-NRB, 88 in 1:13-cv-02343-NRB, 94 in 1:13-cv-00398-NRB, 94 in 1:12-cv-05822-NRB, 155 in 1:13-cv-05616-NRB, 169 in 1:11-cv-06411-NRB, 125 in 1:13-cv-08644-NRB, 81 in 1:13-cv-03010-NRB, 59 in 1:12-cv-04205-NRB, 1015 in 1:11-md-02262-NRB, 159 in 1:13-cv-00626-NRB, 69 in 1:14-cv-04189-NRB, 88 in 1:13-cv-00346-NRB, 161 in 1:13-cv-00597-NRB, 152 in 1:13-cv-05187-NRB, 79 in 1:13-cv-05511-NRB, 113 in 1:14-cv-01757-NRB, 121 in 1:13-cv-06013-NRB, 72 in 1:11-cv-03128-NRB, 101 in 1:13-cv-01135-NRB, 84 in 1:12-cv-06056-NRB, 36 in 1:14-cv-07720-NRB, 98 in 1:12-cv-01025-NRB, 122 in 1:13-cv-00598-NRB, 88 in 1:11-cv-05640-NRB, 70 in 1:13-cv-08799-NRB, 69 in 1:13-cv-01456-NRB, 123 in 1:12-cv-05723-NRB, 73 in 1:11-cv-02883-NRB, 113 in 1:14-cv-03094-NRB, 51 in 1:11-cv-07715-NRB, 53 in 1:11-cv-07676-NRB, 102 in 1:11-cv-05641-NRB, 121 in 1:13-cv-06014-NRB, 94 in 1:13-cv-00407-NRB, 78 in 1:11-cv-05931-NRB, 73 in 1:12-cv-07461-NRB, 104 in 1:13-cv-01016-NRB, 64 in 1:11-cv-05930-NRB, 174 in 1:11-cv-06412-NRB, 75 in 1:11-cv-05928-NRB, 159 in 1:13-cv-00627-NRB, 74 in 1:11-cv-05929-NRB, 193 in 1:13-cv-02297-NRB, 73 in 1:11-cv-03249-NRB, 97 in 1:13-cv-06020-NRB, 160 in 1:13-cv-00667-NRB, 96 in 1:13-cv-07720-NRB) Notice of Appeal, (71 in 1:12-cv-06693-NRB, 1008 in 1:11-md-02262-NRB, 99 in 1:13-cv-01135-NRB, 86 in 1:13-cv-00346-NRB, 249 in 1:11-cv-02613-NRB, 92 in 1:13-cv-00398-NRB, 91 in 1:12-cv-05822-NRB) Order,,,, (250 in 1:11-cv-02613-NRB) Clerk's Judgment,,,,, Document filed by Mayor and City Council of Baltimore. Filed In Associated Cases: 1:11-md-02262-NRB et al.(Carmody, William) (Entered: 02/13/2015) |
| 02/13/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (95 in 1:13-cv-00407-NRB, 174 in 1:13-cv-07005-NRB, 80 in 1:13-cv-05511-NRB, 99 in 1:12-cv-01025-NRB, 162 in 1:13-cv-00597-NRB, 123 in 1:13-cv-00598-NRB, 75 in 1:11-cv-03128-NRB, 70 in 1:11-cv-05927-NRB, 165 in 1:11-cv-06409-NRB, 153 in 1:13-cv-05187-NRB, 114 in 1:14-cv-03094-NRB, 65 in 1:11-cv-05930-NRB, 54 in 1:11-cv-07715-NRB, 89 in 1:13-cv-00346-NRB, 126 in 1:13-cv-08644-NRB, 156 in 1:13-cv-05616-NRB, 128 in 1:13-cv-07394-NRB, 102 in 1:13-cv-01135-NRB, 76 in 1:11-cv-02883-NRB, 170 in 1:11-cv-06411-NRB, 54 in 1:11-cv-07676-NRB, 122 in 1:13-cv-06013-NRB, 153 in 1:13-cv-05186-NRB, 71 in 1:13-cv-08799-NRB, 105 in 1:13-cv-01016-NRB, 161 in 1:13-cv-00667-NRB, 114 in 1:14-cv-01757-NRB, 194 in 1:13-cv-02297-NRB, 97 in 1:13-cv-07720-NRB, 1019 in 1:11-md-02262-NRB, 160 in 1:13-cv-00627-NRB, 160 in 1:13-cv-00626-NRB, 97 in 1:11-cv-05638-NRB, 89 in 1:11-cv- |

| | | |
|---|---|---|
| | | 05640-NRB, 146 in 1:13-cv-05221-NRB, 161 in 1:13-cv-00625-NRB, 75 in 1:12-cv-06693-NRB, 95 in 1:12-cv-05822-NRB, 37 in 1:14-cv-07720-NRB, 74 in 1:12-cv-07461-NRB, 76 in 1:11-cv-05928-NRB, 82 in 1:13-cv-03010-NRB, 85 in 1:12-cv-06056-NRB, 122 in 1:13-cv-06014-NRB, 79 in 1:11-cv-05931-NRB, 60 in 1:12-cv-04205-NRB, 98 in 1:13-cv-01198-NRB, 70 in 1:14-cv-04189-NRB, 76 in 1:11-cv-03249-NRB, 146 in 1:13-cv-05569-NRB, 155 in 1:13-cv-03952-NRB, 95 in 1:13-cv-00398-NRB, 103 in 1:11-cv-05641-NRB, 124 in 1:12-cv-05723-NRB, 98 in 1:13-cv-06020-NRB, 89 in 1:13-cv-02343-NRB, 175 in 1:11-cv-06412-NRB, 75 in 1:11-cv-05929-NRB, 253 in 1:11-cv-02613-NRB, 70 in 1:13-cv-01456-NRB) Corrected Notice of Appeal. Filed In Associated Cases: 1:11-md-02262-NRB et al. (tp) (Entered: 02/13/2015) |
| 02/13/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for (174 in 1:13-cv-07005-NRB, 99 in 1:12-cv-01025-NRB, 75 in 1:11-cv-03128-NRB, 153 in 1:13-cv-05187-NRB, 114 in 1:14-cv-03094-NRB, 156 in 1:13-cv-05616-NRB, 128 in 1:13-cv-07394-NRB, 76 in 1:11-cv-02883-NRB, 170 in 1:11-cv-06411-NRB, 54 in 1:11-cv-07676-NRB, 153 in 1:13-cv-05186-NRB, 105 in 1:13-cv-01016-NRB, 161 in 1:13-cv-00667-NRB, 114 in 1:14-cv-01757-NRB, 97 in 1:13-cv-07720-NRB, 1019 in 1:11-md-02262-NRB, 160 in 1:13-cv-00626-NRB, 89 in 1:11-cv-05640-NRB, 161 in 1:13-cv-00625-NRB, 75 in 1:12-cv-06693-NRB, 37 in 1:14-cv-07720-NRB, 76 in 1:11-cv-05928-NRB, 82 in 1:13-cv-03010-NRB, 60 in 1:12-cv-04205-NRB, 70 in 1:14-cv-04189-NRB, 95 in 1:13-cv-00398-NRB, 98 in 1:13-cv-06020-NRB, 89 in 1:13-cv-02343-NRB, 175 in 1:11-cv-06412-NRB, 75 in 1:11-cv-05929-NRB, 253 in 1:11-cv-02613-NRB, 70 in 1:13-cv-01456-NRB, 95 in 1:13-cv-00407-NRB, 80 in 1:13-cv-05511-NRB, 123 in 1:13-cv-00598-NRB, 162 in 1:13-cv-00597-NRB, 70 in 1:11-cv-05927-NRB, 165 in 1:11-cv-06409-NRB, 65 in 1:11-cv-05930-NRB, 54 in 1:11-cv-07715-NRB, 89 in 1:13-cv-00346-NRB, 126 in 1:13-cv-08644-NRB, 102 in 1:13-cv-01135-NRB, 122 in 1:13-cv-06013-NRB, 71 in 1:13-cv-08799-NRB, 194 in 1:13-cv-02297-NRB, 160 in 1:13-cv-00627-NRB, 97 in 1:11-cv-05638-NRB, 146 in 1:13-cv-05221-NRB, 95 in 1:13-cv-05822-NRB, 74 in 1:12-cv-07461-NRB, 85 in 1:12-cv-06056-NRB, 79 in 1:11-cv-05931-NRB, 122 in 1:13-cv-06014-NRB, 98 in 1:13-cv-01198-NRB, 76 in 1:11-cv-03249-NRB, 155 in 1:13-cv-03952-NRB, 146 in 1:13-cv-05569-NRB, 103 in 1:11-cv-05641-NRB, 124 in 1:12-cv-05723-NRB) Corrected Notice of Appeal, filed by Mayor and City Council of Baltimore were transmitted to the U.S. Court of Appeals. Filed In Associated Cases: 1:11-md-02262-NRB et al. (tp) (Entered: 02/13/2015) |
| 02/13/2015 | [1023](#) | ORDER: Individual plaintiffs in eighteen cases (see appendix) have requested the entry of partial judgment in order to allow them to |

| | | |
|---|---|---|
| | | participate in the pending appeal from final judgment in Gelboim v. Credit Suisse Group AG, No. 12-cv-1025. See Leveridge Letter, MDL ECF No. 1018. For the reasons expressed in the Orders of March 29, 2013 (MDL ECF No. 286), August 23, 2013 (MDL ECF No. 389), October 17, 2013 (MDL ECF No. 490), and February 5, 2015 (MDL ECF No. 1008), and in open court on February 5, 2015, these requests are granted. The Clerk of Court is respectfully requested to enter partial judgments pursuant to Rule 54(b) as to the Sherman Act claims listed in the appendix. (Signed by Judge Loretta A. Preska on 2/13/2015) (kgo) (Main Document 1023 replaced on 2/20/2015) (rjm). (Entered: 02/17/2015) |
| 02/13/2015 | | Transmission to Judgments and Orders Clerk. Transmitted re: (71 in 1:14-cv-04189-NRB) Order, to the Judgments and Orders Clerk. Filed In Associated Cases: 1:11-md-02262-NRB et al.(kgo) (Entered: 02/17/2015) |
| 02/17/2015 | 1024 | CLERK'S CORRECTED JUDGMENT: That for the reasons stated in the Court's Order dated February 5, 2015, the requests as to the OTC Plaintiffs, Exchange-Based Plaintiffs, and plaintiffs in 33-35 Green Pond Road, Courtyard at Amwell II, and Guaranty Bank & Trust are granted; the requests as to plaintiffs in LACERA and County of Riverside, as those cases do not raise claims under the Sherman Act, are denied; accordingly, final judgment is entered against plaintiffs in 33-35 Green Pond and Courtyard as Amwell II, and those cases are closed; there is no just reason for delay pursuant to Fed. R. Civ. P. 54(b), partial judgment is entered in favor of the Defendants as to claim I of the OTC Plaintiffs' operative complaint, MDL ECF No. 406; claim 5 of the Exchange-Based Plaintiffs' operative complaint, MDL ECF No. 407; and claim 1 of the complaint in Guaranty Bank & Trust, No. 13-cv-346, ECF No. 1. (Signed by Clerk of Court Ruby Krajick on 2/17/2015) (Attachments: # 1 Notice of Right to Appeal, # 2 Notice of Right to Appeal)Filed In Associated Cases: 1:11-md-02262-NRB et al.(dt) (Entered: 02/17/2015) |
| 02/20/2015 | 1043 | AMENDED NOTICE OF APPEAL re: (174 in 1:13-cv-07005-NRB, 99 in 1:12-cv-01025-NRB, 75 in 1:11-cv-03128-NRB, 153 in 1:13-cv-05187-NRB, 114 in 1:14-cv-03094-NRB, 156 in 1:13-cv-05616-NRB, 128 in 1:13-cv-07394-NRB, 76 in 1:11-cv-02883-NRB, 170 in 1:11-cv-06411-NRB, 54 in 1:11-cv-07676-NRB, 153 in 1:13-cv-05186-NRB, 105 in 1:13-cv-01016-NRB, 161 in 1:13-cv-00667-NRB, 114 in 1:14-cv-01757-NRB, 97 in 1:13-cv-07720-NRB, 1019 in 1:11-md-02262-NRB, 160 in 1:13-cv-00626-NRB, 89 in 1:11-cv-05640-NRB, 161 in 1:13-cv-00625-NRB, 75 in 1:12-cv-06693-NRB, 37 in 1:14-cv-07720-NRB, 76 in 1:11-cv-05928-NRB, 82 in 1:13-cv-03010-NRB, 60 in 1:12-cv-04205-NRB, 70 in 1:14-cv-04189-NRB, 95 in 1:13-cv-00398-NRB, 98 in 1:13-cv-06020-NRB, 89 in 1:13-cv-02343-NRB, 175 in |

| | | |
|---|---|---|
| | | 1:11-cv-06412-NRB, 75 in 1:11-cv-05929-NRB, 253 in 1:11-cv-02613-NRB, 70 in 1:13-cv-01456-NRB, 95 in 1:13-cv-00407-NRB, 80 in 1:13-cv-05511-NRB, 162 in 1:13-cv-00597-NRB, 123 in 1:13-cv-00598-NRB, 70 in 1:11-cv-05927-NRB, 165 in 1:11-cv-06409-NRB, 65 in 1:11-cv-05930-NRB, 54 in 1:11-cv-07715-NRB, 89 in 1:13-cv-00346-NRB, 126 in 1:13-cv-08644-NRB, 102 in 1:13-cv-01135-NRB, 122 in 1:13-cv-06013-NRB, 71 in 1:13-cv-08799-NRB, 194 in 1:13-cv-02297-NRB, 160 in 1:13-cv-00627-NRB, 97 in 1:11-cv-05638-NRB, 146 in 1:13-cv-05221-NRB, 95 in 1:12-cv-05822-NRB, 74 in 1:12-cv-07461-NRB, 85 in 1:12-cv-06056-NRB, 122 in 1:13-cv-06014-NRB, 79 in 1:11-cv-05931-NRB, 98 in 1:13-cv-01198-NRB, 76 in 1:11-cv-03249-NRB, 146 in 1:13-cv-05569-NRB, 155 in 1:13-cv-03952-NRB, 103 in 1:11-cv-05641-NRB, 124 in 1:12-cv-05723-NRB) Corrected Notice of Appeal,,,,,,, (1024 in 1:11-md-02262-NRB, 96 in 1:13-cv-00398-NRB, 90 in 1:13-cv-00346-NRB, 96 in 1:12-cv-05822-NRB, 254 in 1:11-cv-02613-NRB, 76 in 1:12-cv-06693-NRB, 104 in 1:13-cv-01135-NRB) Clerk's Judgment,,,,. Document filed by Mayor and City Council of Baltimore. Filed In Associated Cases: 1:11-md-02262-NRB et al.(Carmody, William) (Entered: 02/20/2015) |
| 02/20/2015 | 1044 | NOTICE OF INTERLOCUTORY APPEAL from (1024 in 1:11-md-02262-NRB) Clerk's Judgment,,,,. Document filed by Guaranty Bank & Trust Company. Filing fee $ 505.00, receipt number 0208-10619416. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-00346-NRB(Shen, Andrew) (Entered: 02/20/2015) |
| 02/23/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (56 in 1:11-cv-07715-NRB, 129 in 1:13-cv-08644-NRB, 106 in 1:13-cv-01016-NRB, 72 in 1:14-cv-04189-NRB, 98 in 1:11-cv-05638-NRB, 38 in 1:14-cv-07720-NRB, 195 in 1:13-cv-02297-NRB, 73 in 1:13-cv-08799-NRB, 165 in 1:13-cv-00597-NRB, 166 in 1:11-cv-06409-NRB, 91 in 1:13-cv-00346-NRB, 104 in 1:11-cv-05641-NRB, 100 in 1:13-cv-06020-NRB, 164 in 1:13-cv-00625-NRB, 97 in 1:12-cv-05822-NRB, 156 in 1:13-cv-05186-NRB, 80 in 1:11-cv-05931-NRB, 86 in 1:12-cv-06056-NRB, 164 in 1:13-cv-00667-NRB, 163 in 1:13-cv-00627-NRB, 116 in 1:14-cv-01757-NRB, 83 in 1:13-cv-03010-NRB, 78 in 1:11-cv-02883-NRB, 163 in 1:13-cv-00626-NRB, 90 in 1:13-cv-02343-NRB, 61 in 1:12-cv-04205-NRB, 96 in 1:13-cv-00407-NRB, 125 in 1:12-cv-05723-NRB, 76 in 1:11-cv-05929-NRB, 71 in 1:11-cv-05927-NRB, 75 in 1:12-cv-07461-NRB, 130 in 1:13-cv-07394-NRB, 100 in 1:12-cv-01025-NRB, 126 in 1:13-cv-06014-NRB, 159 in 1:13-cv-05616-NRB, 77 in 1:11-cv-03128-NRB, 97 in 1:13-cv-00398-NRB, 66 in 1:11-cv-05930-NRB, 156 in 1:13-cv-05187-NRB, 157 in 1:13-cv-03952-NRB, 77 in 1:11-cv-05928-NRB, 77 in 1:12-cv-06693-NRB, 55 in 1:11-cv-07676-NRB, 90 in 1:11-cv-05640-NRB, 81 |

| | | |
|---|---|---|
| | | in 1:13-cv-05511-NRB, 176 in 1:11-cv-06412-NRB, 105 in 1:13-cv-01135-NRB, 98 in 1:13-cv-07720-NRB, 116 in 1:14-cv-03094-NRB, 149 in 1:13-cv-05569-NRB, 99 in 1:13-cv-01198-NRB, 149 in 1:13-cv-05221-NRB, 1043 in 1:11-md-02262-NRB, 140 in 1:13-cv-00598-NRB, 171 in 1:11-cv-06411-NRB, 126 in 1:13-cv-06013-NRB, 71 in 1:13-cv-01456-NRB, 175 in 1:13-cv-07005-NRB, 78 in 1:11-cv-03249-NRB, 271 in 1:11-cv-02613-NRB) Amended Notice of Appeal. Filed In Associated Cases: 1:11-md-02262-NRB et al. (tp) (Entered: 02/23/2015) |
| 02/23/2015 | | First Supplemental ROA Sent to USCA (Electronic File). Certified Supplemental Indexed record on Appeal Electronic Files for (56 in 1:11-cv-07715-NRB, 106 in 1:13-cv-01016-NRB, 38 in 1:14-cv-07720-NRB, 195 in 1:13-cv-02297-NRB, 73 in 1:13-cv-08799-NRB, 166 in 1:11-cv-06409-NRB, 91 in 1:13-cv-00346-NRB, 164 in 1:13-cv-00625-NRB, 156 in 1:13-cv-05186-NRB, 116 in 1:14-cv-01757-NRB, 76 in 1:11-cv-05929-NRB, 71 in 1:11-cv-05927-NRB, 75 in 1:12-cv-07461-NRB, 130 in 1:13-cv-07394-NRB, 100 in 1:12-cv-01025-NRB, 126 in 1:13-cv-06014-NRB, 159 in 1:13-cv-05616-NRB, 77 in 1:13-cv-03128-NRB, 66 in 1:11-cv-05930-NRB, 156 in 1:13-cv-05187-NRB, 157 in 1:13-cv-03952-NRB, 77 in 1:11-cv-05928-NRB, 90 in 1:11-cv-05640-NRB, 81 in 1:13-cv-05511-NRB, 176 in 1:11-cv-06412-NRB, 105 in 1:13-cv-01135-NRB, 116 in 1:14-cv-03094-NRB, 149 in 1:13-cv-05569-NRB, 99 in 1:13-cv-01198-NRB, 149 in 1:13-cv-05221-NRB, 78 in 1:11-cv-03249-NRB, 129 in 1:13-cv-08644-NRB, 72 in 1:14-cv-04189-NRB, 98 in 1:11-cv-05638-NRB, 165 in 1:13-cv-00597-NRB, 104 in 1:11-cv-05641-NRB, 100 in 1:13-cv-06020-NRB, 97 in 1:12-cv-05822-NRB, 80 in 1:11-cv-05931-NRB, 86 in 1:12-cv-06056-NRB, 164 in 1:13-cv-00667-NRB, 163 in 1:13-cv-00627-NRB, 83 in 1:13-cv-03010-NRB, 78 in 1:11-cv-02883-NRB, 163 in 1:13-cv-00626-NRB, 90 in 1:13-cv-02343-NRB, 61 in 1:12-cv-04205-NRB, 125 in 1:12-cv-05723-NRB, 96 in 1:13-cv-00407-NRB, 97 in 1:13-cv-00398-NRB, 77 in 1:12-cv-06693-NRB, 55 in 1:11-cv-07676-NRB, 98 in 1:13-cv-07720-NRB, 1043 in 1:11-md-02262-NRB, 140 in 1:13-cv-00598-NRB, 171 in 1:11-cv-06411-NRB, 126 in 1:13-cv-06013-NRB, 71 in 1:13-cv-01456-NRB, 175 in 1:13-cv-07005-NRB, 271 in 1:11-cv-02613-NRB) Amended Notice of Appeal, filed by Mayor and City Council of Baltimore were transmitted to the U.S. Court of Appeals. Filed In Associated Cases: 1:11-md-02262-NRB et al. (tp) (Entered: 02/23/2015) |
| 02/23/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (1044 in 1:11-md-02262-NRB, 92 in 1:13-cv-00346-NRB) Notice of Interlocutory Appeal. Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-00346-NRB. (tp) (Entered: 02/23/2015) |

| 02/23/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for (92 in 1:13-cv-00346-NRB, 1044 in 1:11-md-02262-NRB) Notice of Interlocutory Appeal, filed by Guaranty Bank & Trust Company were transmitted to the U.S. Court of Appeals. Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-00346-NRB. (tp) (Entered: 02/23/2015) |
|---|---|---|
| 02/23/2015 | 1047 | TRANSCRIPT of Proceedings re: ARGUMENT held on 2/5/2015 before Judge Naomi Reice Buchwald. Court Reporter/Transcriber: Denise Richards, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/19/2015. Redacted Transcript Deadline set for 3/30/2015. Release of Transcript Restriction set for 5/29/2015.(Rodriguez, Somari) (Entered: 02/23/2015) |
| 02/23/2015 | 1053 | CLERK'S PARTIAL JUDGMENT: That for the reasons stated in the Court's Order dated February 13, 2015, the requests are granted; there is no just reason for delay pursuant to Fed. R. Civ. P. 54(b), partial judgment is entered in favor of the Defendants as to the Sherman Act claims listed in the appendix. (Signed by Clerk of Court Ruby Krajick on 2/23/2015) (Attachments: # 1 Notice of Right to Appeal, # 2 Notice of Right to Appeal)Filed In Associated Cases: 1:11-md-02262-NRB et al.(dt) (Entered: 02/24/2015) |
| 02/24/2015 | 1054 | NOTICE OF INTERLOCUTORY APPEAL from (1053 in 1:11-md-02262-NRB) Clerk's Judgment,,. Document filed by National Credit Union Administration Board. Filing fee $ 505.00, receipt number 0208-10628963. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-07394-NRB(Frederick, David) (Entered: 02/24/2015) |
| 02/24/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (1054 in 1:11-md-02262-NRB, 133 in 1:13-cv-07394-NRB) Notice of Interlocutory Appeal. Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-07394-NRB. (tp) (Entered: 02/24/2015) |
| 02/24/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for (1054 in 1:11-md-02262-NRB, 133 in 1:13-cv-07394-NRB) Notice of Interlocutory Appeal, filed by National Credit Union Administration Board were transmitted to the U.S. Court of Appeals. Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-07394-NRB. (tp) (Entered: 02/24/2015) |
| 02/24/2015 | 1056 | NOTICE OF INTERLOCUTORY APPEAL from (1053 in 1:11-md-02262-NRB, 101 in 1:13-cv-06020-NRB) Clerk's Judgment,,. |

| | | |
|---|---|---|
| | | Document filed by The City of Philadelphia, The Pennsylvania Intergovernmental Cooperation Authority. Filing fee $ 505.00, receipt number 0208-10630468. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-06020-NRB(Waldman, Jacob) (Entered: 02/24/2015) |
| 02/24/2015 | 1057 | NOTICE OF INTERLOCUTORY APPEAL from (74 in 1:13-cv-08799-NRB, 1053 in 1:11-md-02262-NRB) Clerk's Judgment,,. Document filed by Capital Ventures International, Darby Financial Products. Filing fee $ 505.00, receipt number 0208-10630529. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-08799-NRB(Waldman, Jacob) (Entered: 02/24/2015) |
| 02/24/2015 | 1058 | NOTICE OF INTERLOCUTORY APPEAL from 1053 Clerk's Judgment,,. Document filed by Salix Capital US Inc.. Filing fee $ 505.00, receipt number 0208-10630604. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Waldman, Jacob) (Entered: 02/24/2015) |
| 02/25/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (102 in 1:13-cv-06020-NRB, 1056 in 1:11-md-02262-NRB) Notice of Interlocutory Appeal. Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-06020-NRB. (tp) (Entered: 02/25/2015) |
| 02/25/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for (102 in 1:13-cv-06020-NRB, 1056 in 1:11-md-02262-NRB) Notice of Interlocutory Appeal, filed by THE CITY OF PHILADELPHIA, The Pennsylvania Intergovernmental Cooperation Authority, THE PENNSYLVANIA INTERGOVERNMENTAL COOPERATION AUTHORITY, The City of Philadelphia were transmitted to the U.S. Court of Appeals. Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-06020-NRB. (tp) (Entered: 02/25/2015) |
| 02/25/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (1057 in 1:11-md-02262-NRB, 75 in 1:13-cv-08799-NRB) Notice of Interlocutory Appeal. Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-08799-NRB. (tp) (Entered: 02/25/2015) |
| 02/25/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for (1057 in 1:11-md-02262-NRB, 75 in 1:13-cv-08799-NRB) Notice of Interlocutory Appeal, filed by Darby Financial Products, Capital Ventures International were transmitted to the U.S. Court of Appeals. Filed In Associated Cases: |

| | | |
|---|---|---|
| | | 1:11-md-02262-NRB, 1:13-cv-08799-NRB. (tp) (Entered: 02/25/2015) |
| 02/25/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 1058 Notice of Interlocutory Appeal. (tp) (Entered: 02/25/2015) |
| 02/25/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 1059 Letter, filed by Barclays Capital Inc., Barclays PLC, Barclays Bank plc, 1058Notice of Interlocutory Appeal, filed by Salix Capital US Inc. were transmitted to the U.S. Court of Appeals. (tp) (Entered: 02/25/2015) |
| 02/26/2015 | 1063 | AMENDED NOTICE OF APPEAL re: (252 in 1:11-cv-02613-NRB, 1016 in 1:11-md-02262-NRB) Notice of Appeal,, (1024 in 1:11-md-02262-NRB, 254 in 1:11-cv-02613-NRB) Clerk's Judgment,,,,. Document filed by 303030 Trading, LLC, Atlantic Trading USA, LLC, FTC Futures Fund PCC Ltd, FTC Futures Fund SICAV, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH, 303030 Trading LLC, Gary Francis, Nathaniel Haynes, Metzler Investment GmbH. Filed In Associated Cases: 1:11-md-02262-NRB, 1:11-cv-02613-NRB(Kovel, David) (Entered: 02/26/2015) |
| 02/26/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (1063 in 1:11-md-02262-NRB, 274 in 1:11-cv-02613-NRB) Amended Notice of Appeal. Filed In Associated Cases: 1:11-md-02262-NRB, 1:11-cv-02613-NRB. (tp) (Entered: 02/26/2015) |
| 02/27/2015 | 1064 | NOTICE OF INTERLOCUTORY APPEAL from ( 1053 in 1:11-md-02262-NRB, 73 in 1:14-cv-04189-NRB) Clerk's Judgment,,. Document filed by PRUDENTIAL CORE TAXABLE MONEY MARKET FUND, PRUDENTIAL INVESTMENT PORTFOLIOS 2. Filing fee $ 505.00, receipt number 0208-10641697. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. Filed In Associated Cases: 1:11-md-02262-NRB, 1:14-cv-04189-NRB(Waldman, Jacob) . (Entered: 02/27/2015) |
| 02/27/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (76 in 1:14-cv-04189-NRB, 1064 in 1:11-md-02262-NRB) Notice of Interlocutory Appeal,. Filed In Associated Cases: 1:11-md-02262-NRB, 1:14-cv-04189-NRB(nd) (Entered: 02/27/2015) |
| 02/27/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for (76 in 1:14-cv-04189-NRB, 1064 in 1:11-md-02262-NRB) Notice of Interlocutory Appeal, filed by PRUDENTIAL INVESTMENT PORTFOLIOS 2, PRUDENTIAL CORE TAXABLE MONEY MARKET FUND were |

| | | |
|---|---|---|
| | | transmitted to the U.S. Court of Appeals. Filed In Associated Cases: 1:11-md-02262-NRB, 1:14-cv-04189-NRB(nd) (Entered: 02/27/2015) |
| 03/10/2015 | 1098 | NOTICE OF INTERLOCUTORY APPEAL from (1053 in 1:11-md-02262-NRB) Clerk's Judgment,,. Document filed by City of Riverside, The Riverside Public Financing Authority, City of Richmond, County of Mendocino, County of Sacramento, County of San Diego, County of San Mateo, County of Sonoma, East Bay Municipal Utility District, San Diego Association of Governments, San Mateo Couty Joint Powers Financing Authority, Successor Agency to the Richmond Community Redevelopment Agency, David E. Sundstrom, The Regents of the University of California, The Richmond Joint Powers Financing Authority, County of Mendocino, David E. Sundstrom. Filing fee $ 505.00, receipt number 0208-10682971. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. Filed In Associated Cases: 1:11-md-02262-NRB et al.(Nishimura, Nanci) (Entered: 03/10/2015) |
| 03/10/2015 | 1099 | NOTICE OF INTERLOCUTORY APPEAL from (1053 in 1:11-md-02262-NRB) Clerk's Judgment,,. Document filed by City of Houston. Filing fee $ 505.00, receipt number 0208-10683061. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-05616-NRB(Nishimura, Nanci) (Entered: 03/10/2015) |
| 03/10/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (168 in 1:13-cv-00667-NRB, 133 in 1:13-cv-08644-NRB, 153 in 1:13-cv-05221-NRB, 160 in 1:13-cv-05186-NRB, 1098 in 1:11-md-02262-NRB, 167 in 1:13-cv-00627-NRB, 153 in 1:13-cv-05569-NRB, 169 in 1:13-cv-00597-NRB, 168 in 1:13-cv-00625-NRB, 167 in 1:13-cv-00626-NRB, 160 in 1:13-cv-05187-NRB) Notice of Interlocutory Appeal. Filed In Associated Cases: 1:11-md-02262-NRB et al. (tp) (Entered: 03/10/2015) |
| 03/10/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for (168 in 1:13-cv-00667-NRB, 133 in 1:13-cv-08644-NRB, 153 in 1:13-cv-05221-NRB, 160 in 1:13-cv-05186-NRB, 1098 in 1:11-md-02262-NRB, 167 in 1:13-cv-00627-NRB, 153 in 1:13-cv-05569-NRB, 169 in 1:13-cv-00597-NRB, 168 in 1:13-cv-00625-NRB, 167 in 1:13-cv-00626-NRB, 160 in 1:13-cv-05187-NRB) Notice of Interlocutory Appeal, filed by County of Sacramento, County of San Diego, San Diego Association of Governments, The Richmond Joint Powers Financing Authority, City of Riverside, County of Sonoma, Successor Agency to the Richmond Community Redevelopment Agency, City of Richmond, County of San Mateo, San Mateo Couty Joint Powers Financing Authority, The Riverside Public Financing Authority, County of Mendocino, David E. |

| | | |
|---|---|---|
| | | Sundstrom, East Bay Municipal Utility District, The Regents of the University of California were transmitted to the U.S. Court of Appeals. Filed In Associated Cases: 1:11-md-02262-NRB et al.(tp) (Entered: 03/10/2015) |
| 03/10/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (1099 in 1:11-md-02262-NRB, 163 in 1:13-cv-05616-NRB) Notice of Interlocutory Appeal. Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-05616-NRB. (tp) (Entered: 03/10/2015) |
| 03/10/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for (1099 in 1:11-md-02262-NRB, 163 in 1:13-cv-05616-NRB) Notice of Interlocutory Appeal, filed by City of Houston, City Of Houston, (1100 in 1:11-md-02262-NRB, 1100 in 1:11-md-02262-NRB) Order, Set Deadlines, (1101 in 1:11-md-02262-NRB) Endorsed Letter, were transmitted to the U.S. Court of Appeals. Filed In Associated Cases: 1:11-md-02262-NRB, 1:13-cv-05616-NRB. (tp) (Entered: 03/10/2015) |
| 03/12/2015 | 1103 | LETTER addressed to Judge Naomi Reice Buchwald from Jeffrey L. Haberman dated March 12, 2015 re: Feb. 5, 2015 Hearing. Document filed by 303 Proprietary Trading LLC, Joseph Amabile, Louie Amabile, Norman Byster, Michael Cahill, Richard Deogracias, Marc Federighi, Scott Federighi, Robert Furlong, David Gough, Brian Haggerty, John Henderson, David Klusendorf, Ronald Krug, Christopher John Monckton, Philip Olson, Brett Pankau, Nicholas Pesa, Eduardo Restani, Margery Teller, David Vecchione, Randall Williams.(Haberman, Jeffrey) (Entered: 03/12/2015) |
| 03/13/2015 | 1105 | NOTICE OF INTERLOCUTORY APPEAL from (1053 in 1:11-md-02262-NRB) Clerk's Judgment. Document filed by Bay Area Toll Authority. Filing fee $ 505.00, receipt number 0208-10699545. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. Filed In Associated Cases: 1:11-md-02262-NRB, 1:14-cv-03094-NRB(Fineman, Steven) (Entered: 03/13/2015) |
| 03/16/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: (1105 in 1:11-md-02262-NRB, 120 in 1:14-cv-03094-NRB) Notice of Interlocutory Appeal. Filed In Associated Cases: 1:11-md-02262-NRB, 1:14-cv-03094-NRB. (tp) (Entered: 03/16/2015) |
| 03/16/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for (1105 in 1:11-md-02262-NRB, 120 in 1:14-cv-03094-NRB) Notice of Interlocutory Appeal, filed by Bay Area Toll Authority were transmitted to the U.S. Court of Appeals. Filed In Associated Cases: 1:11-md-02262-NRB, 1:14-cv-03094-NRB. |

| | | |
|---|---|---|
| | | (tp) (Entered: 03/16/2015) |
| 03/19/2015 | 1119 | NOTICE OF INTERLOCUTORY APPEAL from 1053 Clerk's Judgment,,. Document filed by 303 Proprietary Trading LLC, Joseph Amabile, Louie Amabile, Norman Byster, Michael Cahill, Richard Deogracias, Marc Federighi, Scott Federighi, Robert Furlong, David Gough, Brian Haggerty, John Henderson, David Klusendorf, Ronald Krug, Christopher Lang, John Monckton, Philip Olson, Brett Pankau, Nicholas Pesa, Eduardo Restani, Margery Teller, David Vecchione, Randall Williams. Filing fee $ 505.00. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Haberman, Jeffrey) (Entered: 03/19/2015) |
| 03/19/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 1119 Notice of Interlocutory Appeal,,. (nd) (Entered: 03/19/2015) |
| 03/19/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 1119 Notice of Interlocutory Appeal,, filed by 303 Proprietary Trading LLC, Randall Williams, John Henderson, Nicholas Pesa, michael cahill, Scott Federighi, David Klusendorf, Brian Haggerty, Norman Byster, David Vecchione, Joseph Amabile, Robert Furlong, Christopher Lang, Richard Deogracias, Ronald Krug, Philip Olson, John Monckton, Michael Cahill, David Gough, norman byster, Louie Amabile, Marc Federighi, Eduardo Restani, Margery Teller, Brett Pankau were transmitted to the U.S. Court of Appeals. (nd) (Entered: 03/19/2015) |
| 03/26/2015 | 1120 | LETTER addressed to Judge Naomi Reice Buchwald from Jeffrey L. Haberman dated March 26, 2015 re: In Reply to Defendants' March 19, 2015 Letter. Document filed by 303 Proprietary Trading LLC, Joseph Amabile, Louie Amabile, Norman Byster, Michael Cahill, Richard Deogracias, Marc Federighi, Scott Federighi, Robert Furlong, David Gough, Brian Haggerty, John Henderson, David Klusendorf, Ronald Krug, Christopher Lang, John Monckton, Philip Olson, Nicholas Pesa, Eduardo Restani, Margery Teller, David Vecchione, Randall Williams.(Haberman, Jeffrey) (Entered: 03/26/2015) |
| 04/01/2015 | 1121 | ORDER of USCA (Certified Copy) as to (409 in 1:11-md-02262-NRB, 50 in 1:12-cv-01025-NRB) Notice of Appeal filed by Linda Zacher, Ellen Gelboim USCA Case Number 13-3565. By order dated February 23, 2015, this Court reinstated the above-referenced case restoring jurisdiction to this Court. The mandate in this case is hereby recalled. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Order: 04/01/2015. Certified: 04/01/2015. Filed In Associated Cases: 1:11-md-02262-NRB, 1:12-cv-01025-NRB(nd) (Entered: 04/01/2015) |

| | | |
|---|---|---|
| | | |

## PACER Service Center

### Transaction Receipt

| 04/08/2015 13:58:32 | | | |
|---|---|---|---|
| **PACER Login:** | kitchenoff:2662476:0 | **Client Code:** | LIBOR |
| **Description:** | Docket Report | **Search Criteria:** | 1:11-md-02262-NRB |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

Salix Capital US Inc. et al v. Banc of America Securities LLC et al

Assigned to: Judge Naomi Reice Buchwald

Related Case: 1:11-cv-02613-NRB

Case in other court: State Court-Supreme, 651823-13

Cause: 28:1441nr Notice of Removal

Date Filed: 06/12/2013
Jury Demand: Both
Nature of Suit: 430 Banks and Banking
Jurisdiction: Federal Question

**Plaintiff**

**Salix Capital US Inc.**                 represented by    **Daniel Lawrence Brockett**
Quinn Emanuel
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 872-9800
Fax: 212 849 7100
Email: danbrockett@quinnemanuel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Paul Cunningham**
Quinn Emanuel
51 Madison Avenue, 22nd Floor
New York, NY 10010
212 849-7102
Fax: 212 849-7100
Email:
danielcunningham@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Jeremy Daniel Andersen**
Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP(CA)
865 South Figueroa Street, 10th Flr.
Los Angeles, CA 90017
(213) 443-3000
Email:
jeremyandersen@quinnemanuel.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steig Olson**
Quinn Emanuel
51 Madison Avenue, 22nd Floor

New York, NY 10010
(212) 849-7000
Fax: (212) 849-7100
Email: steigolson@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Banc of America Securities LLC**   represented by   **Arthur J. Burke**
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
(212)-450-4000
Fax: (212)-450-3352
Email: arthur.burke@dpw.com
*ATTORNEY TO BE NOTICED*

**Paul Steel Mishkin**
Davis Polk & Wardwell L.L.P.
450 Lexington Avenue
New York, NY 10017
(212)-450-4292
Fax: (212)-450-3292
Email: paul.mishkin@dpw.com
*ATTORNEY TO BE NOTICED*

**Robert Frank Wise , Jr**
Davis Polk & Wardwell L.L.P.
450 Lexington Avenue
New York, NY 10017
212-450-4000
Fax: 212-450-3512
Email: rwise@dpw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bank of America Corporation**   represented by   **Arthur J. Burke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul Steel Mishkin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert Frank Wise , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bank of America, National Association**   represented by   **Arthur J. Burke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul Steel Mishkin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert Frank Wise , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Barclays Bank PLC**   represented by   **Jonathan David Schiller**
Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-23002388x
Fax: (212) 446-2350
Email: jschiller@bsfllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Harold Braff**
Sullivan and Cromwell, LLP(NYC)
125 Broad Street
New York, NY 10004
212-558-4705
Fax: 212-558-3333
Email: braffd@sullcrom.com
*ATTORNEY TO BE NOTICED*

**Jeffrey T. Scott**
Sullivan and Cromwell, LLP(NYC)
125 Broad Street
New York, NY 10004
(212)-558-3082
Fax: (212)-558-3588
Email: scottj@sullcrom.com
*ATTORNEY TO BE NOTICED*

**Leigh Mager Nathanson**
Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2365
Fax: (212) 446-2350
Email: lnathanson@bsfllp.com
*ATTORNEY TO BE NOTICED*

**Matthew Scott Fitzwater**
Sullivan & Cromwell, LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
Fax: 212 558 3588
Email: fitzwater@sullcrom.com
*TERMINATED: 01/16/2014*

**Matthew Joseph Porpora**
Sullivan & Cromwell, LLP(NYC)
125 Broad Street
New York, NY 10004
(212) 558-4000 x4028
Fax: (212) 558-3326
Email: porporam@sullcrom.com
*ATTORNEY TO BE NOTICED*

**Michael Brille**
Boies, Schiller & Flexner LLP (D.C.)
5301 Wisconsin Avenue, NW
Suite 800
Washington, DC 20015
202 237 9608
Fax: 202 237 6131
Email: mbrille@bsfllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Yvonne Susan Quinn**
Sullivan & Cromwell, LLP(NYC)
125 Broad Street
New York, NY 10004
(212)-558-3736
Fax: (212)-558-3362
Email: quinny@sullcrom.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Barclays Capital Inc.**  represented by  **Jonathan David Schiller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Harold Braff**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey T. Scott**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Leigh Mager Nathanson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Scott Fitzwater**
(See above for address)
*TERMINATED: 01/16/2014*

**Matthew Joseph Porpora**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Brille**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Yvonne Susan Quinn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Citibank NA**  represented by  **Andrew Arthur Ruffino**
Covington & Burling LLP(NYC)
620 Eighth Avenue
New York, NY 10018-1405
212-841-1000
Fax: 212-841-1010
Email: aruffino@cov.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Citigroup Global Markets Ltd.**    represented by   **Andrew Arthur Ruffino**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Citigroup, Inc.**    represented by   **Andrew Arthur Ruffino**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Credit Suisse Group AG**    represented by   **Elai E. Katz**
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005
(212) 701-3000
Fax: (212) 269-5420
Email: ekatz@cahill.com
*ATTORNEY TO BE NOTICED*

**Herbert Scott Washer**
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005
(212)-701-3000
Fax: (212)-269-5420
Email: hwasher@cahill.com
*ATTORNEY TO BE NOTICED*

**Joel Laurence Kurtzberg**
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005
212-701-3000
Fax: 212-269-5420
Email: JKurtzberg@cahill.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Credit Suisse International**    represented by   **Elai E. Katz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Herbert Scott Washer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Joel Laurence Kurtzberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Credit Suisse Securities (USA)**     represented by     **Elai E. Katz**
**LLC**                                                    (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Herbert Scott Washer**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Joel Laurence Kurtzberg**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**Deutsche Bank AG**     represented by     **Andrew Corydon Finch**
                                            Paul Weiss Rifkind Wharton & Garrison
                                            LLP
                                            1285 Ave. of The Americas
                                            New York, NY 10019
                                            (212)-373-3640
                                            Fax: (212)-492-0460
                                            Email: afinch@paulweiss.com
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **Moses Silverman**
                                            Paul, Weiss, Rifkind, Wharton &
                                            Garrison LLP (NY)
                                            1285 Avenue of the Americas
                                            New York, NY 10019
                                            212.373.3355
                                            Fax: 212.492.0355
                                            Email: msilverman@paulweiss.com
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **Ankush Khardori**
                                            Paul, Weiss, Rifkind, Wharton &
                                            Garrison LLP (NY)
                                            1285 Avenue of the Americas
                                            New York, NY 10019
                                            (212)-373-3421

Fax: (212)-492-0421
Email: akhardori@paulweiss.com
*ATTORNEY TO BE NOTICED*

**Jessica Lillian Brach**
Paul, Weiss, Rifkind, Wharton &
Garrison LLP (NY)
1285 Avenue of the Americas
New York, NY 10019
(212)-373-3113
Fax: (212)-492-0113
Email: jbrach@paulweiss.com
*ATTORNEY TO BE NOTICED*

**Noam Lerer**
Paul, Weiss, Rifkind, Wharton &
Garrison LLP (NY)
1285 Avenue of the Americas
New York, NY 10019
212-373-3579
Fax: 212-492-0579
Email: nlerer@paulweiss.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Deutsche Bank Securities, Inc.**   represented by   **Andrew Corydon Finch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Moses Silverman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ankush Khardori**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JP Morgan Chase & Co.**   represented by   **Paul Christopher Gluckow**
Simpson Thacher & Bartlett LLP (NY)
425 Lexington Avenue
New York, NY 10017
(212)-455-2653
Fax: (212)-455-2502

Email: pgluckow@stblaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas C. Rice**
Simpson Thacher & Bartlett LLP (NY)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
Fax: (212) 455-2502
Email: trice@stblaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Omari Largos Royter Mason**
Simpson Thacher & Bartlett LLP
425 Lexington Ave
New York, NY 10017
(607)-342-8752
Fax: (212)-455-2502
Email: omason@stblaw.com
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

| | | |
|---|---|---|
| **JP Morgan Chase Bank, N.A.** | represented by | **Paul Christopher Gluckow** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas C. Rice**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Omari Largos Royter Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

| | | |
|---|---|---|
| **J.P. Morgan Securities LLC**<br>*formerly known as*<br>J.P. Morgan Securities Inc. | represented by | **Paul Christopher Gluckow** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas C. Rice**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Omari Largos Royter Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Royal Bank of Scotland Group PLC** | represented by | **Robert G. Houck** |

Clifford Chance US, LLP (NYC)
31 West 52nd Street
New York, NY 10019
(212)-878-3224
Fax: (212)-878-8375
Email: robert.houck@cliffordchance.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan Schoenfeld**
Wilmer Cutler Pickering Hale & Dorr
LLP (NYC)
7 World Trade Center
New York, NY 10007
(212) 937-7294
Fax: (212) 230-8888
Email: alan.schoenfeld@wilmerhale.com
*ATTORNEY TO BE NOTICED*

**Alejandra de Urioste**
Clifford Chance US, LLP (NYC)
31 West 52nd Street
New York, NY 10019
(212) 878-3446
Fax: (212) 878-8375
Email:
alejandra.deurioste@cliffordchance.com
*ATTORNEY TO BE NOTICED*

**David Sapir Lesser**
Wilmer Cutler Pickering Hale & Dorr
LLP (NYC)
7 World Trade Center
New York, NY 10007
212-230-8851
Fax: 212-230-8888
Email: david.lesser@wilmer.com

*ATTORNEY TO BE NOTICED*

**Fraser Lee Hunter , Jr**
Wilmer, Cutler, Hale & Dorr, L.L.P. (NYC)
7 Wold Trade Center
New York, NY 10007
212-230-8882
Fax: 212-230-8888
Email: fraser.hunter@wilmerhale.com
*ATTORNEY TO BE NOTICED*

**James Drew Miller**
Clifford Chance US, LLP (NYC)
31 West 52nd Street
New York, NY 10019
(212)-878-8254
Fax: (212)-878-8375
Email: jim.miller@cliffordchance.com
*ATTORNEY TO BE NOTICED*

**Jamie Stephen Dycus**
Wilmer Cutler Pickering Hale and Dorr LLP (NYC)
7 World Trade Center
250 Greenwich St.
New York, NY 10007
(212) 230-8800
Fax: (212) 230-8888
Email: jamie.dycus@wilmerhale.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**UBS AG**                    represented by

**Peter Sullivan**
Gibson, Dunn & Crutcher, LLP (NY)
200 Park Avenue, 48th Floor
New York, NY 10166
(212)-351-5370
Fax: (212)-351-6370
Email: psullivan@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lawrence Jay Zweifach**
Gibson, Dunn & Crutcher, LLP (NY)
200 Park Avenue, 48th Floor

New York, NY 10166
(212) 351-4000
Fax: (212) 351-4035
Email: lzweifach@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Rachel Alden Lavery**
Gibson, Dunn & Crutcher, LLP (NY)
200 Park Avenue, 48th Floor
New York, NY 10166
(212)-351-4000
Fax: (212)-351-4035
Email: rlavery@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Royal Bank of Scotland PLC**          represented by          **Robert G. Houck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan Schoenfeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alejandra de Urioste**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Sapir Lesser**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Fraser Lee Hunter , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Drew Miller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jamie Stephen Dycus**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/12/2013 | 1 | NOTICE OF REMOVAL from Supreme Court, County of New York. Case Number: 651823-13. (Filing Fee $ 350.00, Receipt Number 465401069600).Document filed by Bank of America, National Association, Bank of America Corporation, Banc of America Securities LLC. (Attachments: # 1 Exhibit A)(msa) Modified on 6/14/2013 (msa). (Entered: 06/14/2013) |
| 06/12/2013 |  | CASE REFERRED TO Judge Naomi Reice Buchwald as possibly similar to 1:11-cv-2613. (msa) (Entered: 06/14/2013) |
| 06/19/2013 |  | CASE ACCEPTED AS RELATED. Create association to 1:11-cv-02613-NRB. Notice of Assignment to follow. (pgu) (Entered: 06/19/2013) |
| 06/19/2013 | 3 | NOTICE OF CASE ASSIGNMENT to Judge Naomi Reice Buchwald. Judge Unassigned is no longer assigned to the case. (pgu) (Entered: 06/19/2013) |
| 06/19/2013 |  | Magistrate Judge Gabriel W. Gorenstein is so designated. (pgu) (Entered: 06/19/2013) |
| 06/27/2013 | 27 | AMENDED COMPLAINT against Banc of America Securities LLC, Bank of America Corporation, Bank of America, National Association, Barclays Bank PLC, Barclays Capital Inc., Citigroup Global Markets Ltd., Citigroup, Inc., Credit Suisse Group AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, Deutsche Bank AG, Deutsche Bank Securities, Inc., J.P. Morgan Securities LLC, JP Morgan Chase & Co., JP Morgan Chase Bank, N.A., Royal Bank of Scotland Group PLC, UBS AG with JURY DEMAND.Document filed by Salix Capital US Inc..(js) (Entered: 07/02/2013) |
| 10/08/2014 | 69 | SECOND AMENDED COMPLAINT amending 68 Amended Complaint,, against Banc of America Securities LLC, Bank of America Corporation, Bank of America, National Association, Barclays Bank PLC, Barclays Capital Inc., Citibank NA, Citigroup Global Markets Ltd., Citigroup, Inc., Credit Suisse Group AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, Deutsche Bank AG, Deutsche Bank Securities, Inc., J.P. Morgan Securities LLC, JP Morgan Chase & Co., JP Morgan Chase Bank, N.A., Royal Bank of Scotland PLC, UBS AG with JURY DEMAND.Document filed by Salix Capital US Inc.. Related document: 68 Amended Complaint,, filed by Salix Capital US Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, #5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M)(Brockett, Daniel) (Entered: 10/08/2014) |

| 02/13/2015 | 97 | ORDER: Individual plaintiffs in eighteen cases (see appendix) have requested the entry of partial judgment in order to allow them to participate in the pending appeal from final judgment in Gelboim v. Credit Suisse Group AG, No. 12-cv-1025. See Leveridge Letter, MDL ECF No. 1018. For the reasons expressed in the Orders of March 29, 2013 (MDL ECF No. 286), August 23, 2013 (MDL ECF No. 389), October 17, 2013 (MDL ECF No. 490), and February 5, 2015 (MDL ECF No. 1008), and in open court on February 5, 2015, these requests are granted. The Clerk of Court is respectfully requested to enter partial judgments pursuant to Rule 54(b) as to the Sherman Act claims listed in the appendix. (Signed by Judge Loretta A. Preska on 2/13/2015) (kgo) (Main Document 97 replaced on 2/20/2015) (rjm). (Entered: 02/17/2015) |
|---|---|---|
| 02/23/2015 | 98 | CLERK'S PARTIAL JUDGMENT: That for the reasons stated in the Court's Order dated February 13, 2015, the requests are granted; there is no just reason for delay pursuant to Fed. R. Civ. P. 54(b), partial judgment is entered in favor of the Defendants as to the Sherman Act claims listed in the appendix. (Signed by Clerk of Court Ruby Krajick on 2/23/2015) (Attachments: # 1 Notice of Right to Appeal, # 2 Notice of Right to Appeal)(dt) Modified on 3/19/2015 (dt). (Entered: 02/24/2015) |
| 02/24/2015 | 99 | NOTICE OF INTERLOCUTORY APPEAL from 98 Clerk's Judgment,. Document filed by Salix Capital US Inc.. Filing fee $ 505.00, receipt number 0208-10631044. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Waldman, Jacob) (Entered: 02/24/2015) |
| 02/25/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 99 Notice of Interlocutory Appeal. (tp) (Entered: 02/25/2015) |
| 02/25/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 99 Notice of Interlocutory Appeal, filed by Salix Capital US Inc., 100 Letter, filed by Barclays Capital Inc., Barclays Bank PLC, Barclays PLC were transmitted to the U.S. Court of Appeals. (tp) (Entered: 02/25/2015) |

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:13-cv-01700-NRB

Amabile et al v. Bank of America Corporation et al
Assigned to: Judge Naomi Reice Buchwald
Related Case: 1:11-cv-02613-NRB
Cause: 28:1337sc Sherman-Clayton Act

Date Filed: 03/13/2013
Jury Demand: Plaintiff
Nature of Suit: 850
Securities/Commodities
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 03/13/2013 | 1 | COMPLAINT against Bank of America Corporation, Bank of Tokyo-Mitsubishi UFJ, Ltd., Barclays Bank Plc,, Citibank NA, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS Plc, HSBC Holdings plc, J.P. Morgan Chase & Co., Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, UBS AG, WestLB AG. (Filing Fee $ 350.00, Receipt Number not indicated)Document filed by Philip Olson, David Klusendorf, Louie Amabile(individually), Joseph Amabile, Ronald Krug, Randall Williams, David Cough, John Monckton, Scott Federighi, Brett Pankau, David Vecchione, Richard Deogracias, Louie Amabile(on behalf of Lue Trading, Inc.), Robert Furlong, Brian Haggerty, Marc Federighi, Norman Byster, Christopher Lang, Michael Cahill.(laq) (Additional attachment(s) added on 5/2/2013: # 1 cmp part 2, # 2 cmp part 3, # 3 cmp part 4) (mqu). (Entered: 03/14/2013) |
| 03/13/2013 | | CASE REFERRED TO Judge Naomi Reice Buchwald as possibly related to 1:11-cv-2613. (laq) (Entered: 03/14/2013) |
| 03/13/2013 | | Case Designated ECF. (laq) (Entered: 03/14/2013) |
| 03/25/2013 | | CASE ACCEPTED AS RELATED. Create association to 1:11-cv-02613-NRB. Notice of Assignment to follow. (pgu) (Entered: 03/25/2013) |
| 03/25/2013 | 7 | NOTICE OF CASE ASSIGNMENT to Judge Naomi Reice Buchwald. Judge Unassigned is no longer assigned to the case. (pgu) (Entered: 03/25/2013) |
| 03/25/2013 | | Magistrate Judge Gabriel W. Gorenstein is so designated. (pgu) (Entered: 03/25/2013) |
| 08/20/2014 | 10 | LETTER addressed to Judge Naomi Reice Buchwald from Jeffrey L. Haberman dated August 20, 2014 re: Amabile et. al.. Document filed |

| | | by Joseph Amabile.(Haberman, Jeffrey) (Entered: 08/20/2014) |
|---|---|---|
| 10/07/2014 | 12 | FIRST AMENDED COMPLAINT amending 1 Complaint,,, against Bank of America Corporation, Bank of Tokyo-Mitsubishi UFJ, Ltd., Barclays Bank Plc,, Citibank NA, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS Plc, HSBC Holdings plc, J.P. Morgan Chase & Co., Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, UBS AG, WestLB AG with JURY DEMAND.Document filed by Philip Olson, David Klusendorf, Louie Amabile(individually), Joseph Amabile, Ronald Krug, Randall Williams, David Cough, John Monckton, Scott Federighi, Brett Pankau, David Vecchione, Richard Deogracias, Robert Furlong, Brian Haggerty, Marc Federighi, Norman Byster, Christopher Lang, Michael Cahill, John Henderson, 303 Proprietary Trading LLC, Margery Teller, Nicholas Pesa, Eduardo Restani. Related document: 1 Complaint,,, filed by Randall Williams, David Cough, Scott Federighi, David Klusendorf, Brian Haggerty, Norman Byster, David Vecchione, Louie Amabile, Joseph Amabile, Robert Furlong, Richard Deogracias, Ronald Krug, Philip Olson, John Monckton, Michael Cahill, Marc Federighi, Christopher Lang, Brett Pankau. (Attachments: # 1 Compl. Part 2, # 2 Compl. Part 3, # 3 Compl. Part 4, # 4 Compl. Part 5, # 5 Compl. Part 6, # 6 Compl. Part 7, # 7 Exhibit A, # 8 Exhibit B)(Haberman, Jeffrey) (Entered: 10/07/2014) |
| 11/05/2014 | 45 | MOTION to Dismiss *Direct Action Claims*. Document filed by Bank of America Corporation, Bank of Tokyo-Mitsubishi UFJ, Ltd., Barclays Bank Plc,, Citibank NA, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS Plc, HSBC Holdings plc, J.P. Morgan Chase & Co., JPMorgan Chase Bank, N.A., Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, UBS AG. (Attachments: # 1 Appendix)(Wise, Robert) (Entered: 11/05/2014) |
| 11/05/2014 | 46 | JOINT MEMORANDUM OF LAW in Support re: 45 MOTION to Dismiss *Direct Action Claims*. *Covered by Prior Rulings*. Document filed by Bank of America Corporation, Bank of Tokyo-Mitsubishi UFJ, Ltd., Barclays Bank Plc,, Citibank NA, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS Plc, HSBC Holdings plc, J.P. Morgan Chase & Co., JPMorgan Chase Bank, N.A., Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, UBS AG. (Wise, Robert) (Entered: 11/05/2014) |
| 11/05/2014 | 47 | JOINT MEMORANDUM OF LAW in Support re: 45 MOTION to Dismiss *Direct Action Claims*. *for lack of personal jurisdiction*. |

| | | |
|---|---|---|
| | | Document filed by Bank of Tokyo-Mitsubishi UFJ, Ltd., Credit Suisse Group AG, Deutsche Bank AG, HBOS Plc, HSBC Holdings plc, Lloyds Banking Group plc, Royal Bank of Canada, HSBC Bank PLC, The Norinchukin Bank, RBS Group, Portigon AG. (Attachments: # 1 Appendix 1, # 2 Appendix 2)(Kurtzberg, Joel) (Entered: 11/05/2014) |
| 11/06/2014 | 48 | DECLARATION of Dominick Sabella in Support re: 45 MOTION to Dismiss *Direct Action Claims*.. Document filed by Bank of Tokyo-Mitsubishi UFJ, Ltd.. (Kurtzberg, Joel) (Entered: 11/06/2014) |
| 11/06/2014 | 49 | DECLARATION of Pierre Schreiber in Support re: 45 MOTION to Dismiss *Direct Action Claims*.. Document filed by Credit Suisse Group AG. (Kurtzberg, Joel) (Entered: 11/06/2014) |
| 11/06/2014 | 50 | DECLARATION of Allison Cambria in Support re: 45 MOTION to Dismiss *Direct Action Claims*.. Document filed by Deutsche Bank AG. (Kurtzberg, Joel) (Entered: 11/06/2014) |
| 11/06/2014 | 51 | DECLARATION of Kevin McKendry in Support re: 45 MOTION to Dismiss *Direct Action Claims*.. Document filed by HBOS Plc. (Kurtzberg, Joel) (Entered: 11/06/2014) |
| 11/06/2014 | 52 | DECLARATION of Elaine Williams in Support re: 45 MOTION to Dismiss *Direct Action Claims*.. Document filed by HSBC Holdings plc. (Kurtzberg, Joel) (Entered: 11/06/2014) |
| 11/06/2014 | 53 | DECLARATION of Gavin Francis in Support re: 45 MOTION to Dismiss *Direct Action Claims*.. Document filed by HSBC Bank PLC. (Kurtzberg, Joel) (Entered: 11/06/2014) |
| 11/06/2014 | 54 | DECLARATION of Nicola Black in Support re: 45 MOTION to Dismiss *Direct Action Claims*.. Document filed by HSBC Bank PLC. (Kurtzberg, Joel) (Entered: 11/06/2014) |
| 11/06/2014 | 55 | DECLARATION of Osamu Takashima in Support re: 45 MOTION to Dismiss *Direct Action Claims*.. Document filed by The Norinchukin Bank. (Kurtzberg, Joel) (Entered: 11/06/2014) |
| 11/06/2014 | 56 | DECLARATION of Dr. Frank Borstelmann in Support re: 45 MOTION to Dismiss *Direct Action Claims*.. Document filed by Portigon AG. (Kurtzberg, Joel) (Entered: 11/06/2014) |
| 11/06/2014 | 57 | DECLARATION of Ralph Desena in Support re: 45 MOTION to Dismiss *Direct Action Claims*.. Document filed by Royal Bank of Canada. (Kurtzberg, Joel) (Entered: 11/06/2014) |
| 11/06/2014 | 58 | DECLARATION of William Gougherty in Support re: 45 MOTION to Dismiss *Direct Action Claims*.. Document filed by Royal Bank of Scotland Group plc. (Kurtzberg, Joel) (Entered: 11/06/2014) |

| | | |
|---|---|---|
| 12/03/2014 | 78 | ORDER. We deny plaintiffs' motion (ECF No. 857 in No. 11 MDL 2262), and we direct plaintiffs to submit briefs whose total page count shall be at most 225 pages. Targeted and organized point-by-point collective responses would clearly be of the greatest benefit to the Court and the parties. IT IS SO ORDERED. (Signed by Judge Naomi Reice Buchwald on 12/2/2014) Re Order entry #863 in 11md2262. Docket in all cases listed in appendix, as per Chambers. (rjm) Modified on 12/3/2014 (rjm). (Entered: 12/03/2014) |
| 12/23/2014 | 79 | REPLY MEMORANDUM OF LAW in Support re: 45 MOTION to Dismiss *Direct Action Claims*. . Document filed by Bank of America Corporation, Bank of Tokyo-Mitsubishi UFJ, Ltd., Barclays Bank Plc,, Citibank NA, Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse Group AG, Deutsche Bank AG, HBOS Plc, HSBC Holdings plc, J.P. Morgan Chase & Co., JPMorgan Chase Bank, N.A., Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland Group plc, The Norinchukin Bank, UBS AG. (Wise, Robert) (Entered: 12/23/2014) |
| 12/23/2014 | 80 | REPLY MEMORANDUM OF LAW in Support re: 45 MOTION to Dismiss *Direct Action Claims*. *(Jointly filed)*. Document filed by Bank of Tokyo-Mitsubishi UFJ, Ltd., Credit Suisse Group AG, Deutsche Bank AG, HBOS Plc, HSBC Bank PLC, HSBC Holdings plc, Lloyds Banking Group plc, Portigon AG, RBS Group, Royal Bank of Canada, The Norinchukin Bank. (Attachments: #1 Appendix #3, # 2 Appendix #4)(Kurtzberg, Joel) (Entered: 12/23/2014) |
| 02/13/2015 | 83 | ORDER: Individual plaintiffs in eighteen cases (see appendix) have requested the entry of partial judgment in order to allow them to participate in the pending appeal from final judgment in Gelboim v. Credit Suisse Group AG, No. 12-cv-1025. See Leveridge Letter, MDL ECF No. 1018. For the reasons expressed in the Orders of March 29, 2013 (MDL ECF No. 286), August 23, 2013 (MDL ECF No. 389), October 17, 2013 (MDL ECF No. 490), and February 5, 2015 (MDL ECF No. 1008), and in open court on February 5, 2015, these requests are granted. The Clerk of Court is respectfully requested to enter partial judgments pursuant to Rule 54(b) as to the Sherman Act claims listed in the appendix. (Signed by Judge Loretta A. Preska on 2/13/2015) (kgo) (Main Document 83 replaced on 2/20/2015) (rjm). (Entered: 02/17/2015) |
| 02/13/2015 | | Transmission to Judgments and Orders Clerk. Transmitted re: 83 Order, to the Judgments and Orders Clerk. (kgo) (Entered: 02/17/2015) |
| 02/23/2015 | 84 | CLERK'S PARTIAL JUDGMENT: That for the reasons stated in the Court's Order dated February 13, 2015, the requests are granted; there |

| | | |
|---|---|---|
| | | is no just reason for delay pursuant to Fed. R. Civ. P. 54(b), partial judgment is entered in favor of the Defendants as to the Sherman Act claims listed in the appendix. (Signed by Clerk of Court Ruby Krajick on 2/23/2015) (Attachments: # 1 Notice of Right to Appeal, # 2 Notice of Right to Appeal)(dt) (Entered: 02/24/2015) |
| 03/19/2015 | 86 | NOTICE OF INTERLOCUTORY APPEAL from 84 Clerk's Judgment,. Document filed by 303 Proprietary Trading LLC, Joseph Amabile, Louie Amabile(individually), Norman Byster, Michael Cahill, David Cough, Richard Deogracias, Marc Federighi, Scott Federighi, Robert Furlong, Brian Haggerty, John Henderson, David Klusendorf, Ronald Krug, Christopher Lang, John Monckton, Philip Olson, Brett Pankau, Nicholas Pesa, Eduardo Restani, Margery Teller, David Vecchione, Randall Williams. Filing fee $ 505.00. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Haberman, Jeffrey) (Entered: 03/19/2015) |
| 03/19/2015 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 86 Notice of Interlocutory Appeal,,. (nd) (Entered: 03/19/2015) |
| 03/19/2015 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 86 Notice of Interlocutory Appeal,, filed by 303 Proprietary Trading LLC, Randall Williams, John Henderson, Nicholas Pesa, David Cough, Scott Federighi, David Klusendorf, Brian Haggerty, Norman Byster, David Vecchione, Louie Amabile, Joseph Amabile, Robert Furlong, Richard Deogracias, Ronald Krug, Philip Olson, John Monckton, Michael Cahill, Marc Federighi, Eduardo Restani, Christopher Lang, Margery Teller, Brett Pankau were transmitted to the U.S. Court of Appeals. (nd) (Entered: 03/19/2015) |
| 03/20/2015 | 87 | LETTER addressed to Judge Naomi Reice Buchwald from Marc J. Gottridge dated 3/19/2015 re: In Response to Plaintiffs' Letter of 3/12/2015 (11 MDL 2262 ECF No. 1103).. Document filed by HBOS plc, Lloyds Bank PLC (formerly known as Lloyds TSB Bank PLC), Lloyds Banking Group plc.(Gottridge, Marc) (Entered: 03/20/2015) |
| 03/26/2015 | 88 | LETTER addressed to Judge Naomi Reice Buchwald from Jeffrey L. Haberman dated March 26, 2015 re: In Reply to Defendants' March 19, 2015 Letter. Document filed by 303 Proprietary Trading LLC, Joseph Amabile, Louie Amabile(individually), Norman Byster, Michael Cahill, David Cough, Richard Deogracias, Marc Federighi, Scott Federighi, Robert Furlong, Brian Haggerty, John Henderson, David Klusendorf, Ronald Krug, Christopher Lang, John Monckton, Philip Olson, Brett Pankau, Nicholas Pesa, Eduardo Restani, Margery Teller, David Vecchione, Randall Williams.(Haberman, Jeffrey) |

| | | (Entered: 03/26/2015) |
|---|---|---|

<table>
<tr><td colspan="4" align="center">**PACER Service Center**</td></tr>
<tr><td colspan="4" align="center">**Transaction Receipt**</td></tr>
<tr><td colspan="4" align="center">04/13/2015 16:13:29</td></tr>
<tr><td>**PACER Login:**</td><td>kitchenoff:2662476:0</td><td>**Client Code:**</td><td>LIBOR</td></tr>
<tr><td>**Description:**</td><td>Docket Report</td><td>**Search Criteria:**</td><td>1:13-cv-01700-NRB</td></tr>
<tr><td>**Billable Pages:**</td><td>21</td><td>**Cost:**</td><td>2.10</td></tr>
</table>

C314LIBC
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  In Re LIBOR-Based Financial          11MD2262(NRB)
3  Instruments Antitrust Litigation
4
4  ------------------------------x
5
5                                        New York, N.Y.
6                                        March 1, 2012
6                                        2:45 p.m.
7  Before:
7
8              HON. NAOMI REICE BUCHWALD
8
9                                   District Judge
9
10                    APPEARANCES
10
11  HAUSFELD
11       Attorneys for Over-the Counter Plaintiffs
12  WILLIAM P. BUTTERFIELD
12
13  SUSMAN GODFREY
13       Attorneys for Over-the Counter Plaintiffs
14  ARUN SUBRAMANIAN
14
15  KIRBY McINERNEY
15       Attorneys for Exchange-Based Plaintiffs
16  DAVID E. KOVEL
16
17  LOVELL STEWART HALEBIAN
17       Attorneys for Exchange-Based Plaintiffs
18  CHRISTOPHER LOVELL
18
19  LIEFF CABRASER HEIMANN & BERNSTEIN
19       Attorneys for Schwab Plaintiffs
20  STEVEN E. FINEMAN
20  BRENDAN GLACKIN
21
21  WEINSTEIN KITCHENOFF & ASHER
22       Attorneys for Gelboim Plaintiff
22  DAVID H. WEINSTEIN
23
23  MORRIS & MORRIS
24       Attorneys for Gelboim Plaintiff
24  PATRICK F. MORRIS
25
             SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

C314LIBC
1                    APPEARANCES
1                    (Continued)
2
2  DAVIS POLK & WARDELL
3       Attorneys for Defendant Bank of America
3  ROBERT F. WISE JR.
4
4  SULLIVAN & CROMWELL
5       Attorneys for Defendant Barclays Bank
5  JEFFREY T. SCOTT
6  YVONNE S. QUINN
6
7  COVINGTON & BURLING
7       Attorneys for Defendant Citibank
8  ALAN M. WISEMAN
8  ANDREW RUFFINO
9
9  SHEARMAN & STERLING
10       Attorneys for Defendant Credit Suisse Group
10  HERBERT WASHER
11
11  PAUL WEISS RIFKIND WHARTON & GARRISON
12       Attorneys for Defendant Deutsche Bank
12  MOSES SILVERMAN
13
13  LOCKE LORD
14       Attorneys for Defendant HSBC Holdings
14  GREGORY CASAMENTO
15
15  SIMPSON THACHER & BARTLETT
16       Attorneys for Defendant JP Morgan Chase
16  THOMAS C. RICE
17  JUAN A. ARTEAGA
17
18  HOGAN LOVELLS
18       Attorneys for Defendants Lloyds Banking Group, Lloyds TSB
19       Bank, HBOS (except in 11CV6409, 11CV6411, 11CV6412)
19  MARC J. GOTTRIDGE
20  ERIC STOCK
20
21  FLEMMING ZULACK WILLIAMSON ZAUDERER
21       Attorneys for Defendants Lloyds Banking Group, Lloyds TSB
22       Bank (11CV6409, 11CV6411, 11CV6412 only)
22  RICHARD A. WILLIAMSON
23
23  CLIFFORD CHANCE
24       Attorneys for Defendant Royal Bank of Scotland Group
24  ROBERT G. HOUCK
25  ALEJANDRA de URIOSTE
25
             SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

C314LIBC
1                    APPEARANCES
1                    (Continued)
2
2  SIDLEY AUSTIN
3       Attorneys for Defendant Norinchukin Bank
3  ALAN M. UNGER
4  ANDREW W. STERN
4
5  HUGHES HUBBARD
5       Attorneys for Defendant WestLB AG
6  ETHAN E. LITWIN
6  MORGAN J. STECHER
7
7  KATTEN MUCHIN ROSENMAN
8       Attorneys for Defendant Royal Bank of Canada
8  CHRISTIAN T. KEMNITZ
9
9  MAYER BROWN
10       Attorneys for Defendant Societe Generale
10  STEVEN WOLOWITZ
11
11  MILBANK TWEED HADLEY & McCLOY
12       Attorneys for Defendant Cooperatieve Centrale
12       Raiffeisen-Boerenleenbank
13  MELANIE WESTOVER
13
14  GIBSON DUNN & CRUTCHER
14       Attorneys for Defendant UBS
15  PETER SULLIVAN
16  LAWRENCE ZWEIFACH
16

17

18

19

20

21

22

23

24

25
             SOUTHERN DISTRICT REPORTERS, P.C.

                      (212) 805-0300

C314LIBC
1          (Case called)
2          THE COURT:  Good afternoon.  From my perspective,
3  there are three subjects for this conference this afternoon.
4  One is the plaintiffs' application for premotion access to the
5  documents produced by the defendants to the U.S. regulatory
6  agencies.  The second topic is what to do with the newly filed
7  Gelboim complaint.  The third is our schedule going forward.
8          Is it fair for me to conclude that the parties have
9  essentially stated their positions in the exchange of letters
10  concerning the disclosure of documents previously produced to
11  the Department of Justice and other agencies.
12          MR. BUTTERFIELD:  On behalf of plaintiffs, that's fair
13  for you to conclude, although we are here to assist the court
14  with oral argument if you deem it necessary.
15          MR. WISE:  Just speaking for the defendants generally,
16  I think we are prepared to stand on the papers.
17          THE COURT:  As you are probably not surprised to know,
18  I have carefully considered the letters from the parties as
19  well as the letter that I received and you guys received from
20  the Department of Justice.  I am going to deny the plaintiffs'
21  request for several reasons.
22          First, under Rule 11, the plaintiffs are required to
23  have a good faith belief that they have a claim before they
24  file a lawsuit.  It's black letter law that lawsuits are not to
25  be filed in search of lawsuits.
             SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

**JA94**

C314LIBC

1    In this case, if the government finds wrongdoing, the
2    plaintiffs will get an enormous litigation benefit from that.
3    To me it is simply too much to have them piggyback on the
4    government's investigation at this stage.  It is quite clear
5    from the Department of Justice's letter that they would have
6    serious problems with my granting the request.
7    Also, I am persuaded by the defendants that the
8    production would not be cost-free, given the scope of the
9    issues and investigations involved and, moreover, as a matter
10   of policy, ordering the relief requested would in my view
11   inhibit the fullest response to government requests for
12   information, a result that I don't think is consistent with
13   public interest.
14   So for those reasons, the request is denied.
15   We also have the Gelboim complaint I think.
16   THE COURT:  As I think you are aware, Mr. Weinstein
17   filed on behalf of a class of plaintiffs, a complaint which he
18   seeks to have consolidated with the consolidated case we are
19   here on.  Mr. Weinstein, before I get to the parties' opinions
20   on this, I need a little education from you.
21   I am finding it difficult to get a handle on the scope
22   of this class that you are proposing to represent and I guess
23   that's particularly, I don't know if it's particularly so, but
24   I am also curious because if I remember the complaint
25   correctly, there was no description of what debt security the

C314LIBC

1    plaintiff had actually bought.
2    MR. WEINSTEIN:  We are talking about a corporate bond,
3    your Honor.
4    THE COURT:  In what company did Ms. Gelboim buy a
5    bond.
6    MR. WEINSTEIN:  General Electric.
7    THE COURT:  Do you have any concept of the number of
8    debt offerings for Fortune 500 companies, which I guess might
9    change over slightly over time but I am not sure, for which
10   interest was paid at any time between January 1, 2006 and
11   December 31, 2010.  What are we talking about.
12   MR. WEINSTEIN:  We have experts who are reviewing the
13   records right now.  We have to differentiate.  We are not
14   talking about every corporate bond that was issued.  We are
15   only talking about variable-rate corporate bonds.  Of course,
16   many corporate bonds that were outstanding during that period
17   of time are fixed-rate bonds.  So we are talking about those
18   Fortune 500 companies that issued LIBOR-linked variable-rate
19   bonds that were underwritten by one or another of the banks
20   that are here.
21   THE COURT:  Again, do you have any idea; did you do
22   any of this research before you filed the complaint; do you
23   have some concept of how many instruments we are talking about.
24   MR. WEINSTEIN:  We started the research but we have
25   not completed it and I don't have a number for your Honor.

C314LIBC

1    THE COURT:  Bigger than a bread box.
2    MR. WEINSTEIN:  Yes, definitely bigger than a bread
3    box.
4    THE COURT:  What are we talking about; is it hundreds,
5    thousands.  I have no idea.
6    MR. WEINSTEIN:  We don't know for sure.  We believe
7    it's measured in thousands, yes.
8    THE COURT:  In a five-year period, the Fortune 500
9    companies issued thousands of debt instruments linked to LIBOR.
10   MR. WEINSTEIN:  We believe so; it's certainly in the
11   hundreds and we believe it's in the thousands.
12   THE COURT:  Maybe the next question would be, would it
13   be fair to assume that they are short-term debt.
14   MR. WEINSTEIN:  No, not necessarily.  They are
15   variable-rate bonds that could be long-term bonds.  Typically
16   they would be --
17   THE COURT:  Is there a typical length to these
18   instruments; there is overnight borrowing.
19   MR. WEINSTEIN:  We are not talking about overnight
20   borrowing.  We are talking about corporations that issued
21   long-term financing bonds.  For some corporations, long-term
22   borrowing can be three years; for others it could be ten years.
23   I am not in a position to say that there is any one typical
24   duration.  But these are typically bonds that pay interest
25   every quarter or every six months.

C314LIBC

1    THE COURT:  So they are not 30-day notes; we are
2    talking yearly, instruments that have a maturity of at least a
3    year.
4    MR. WEINSTEIN:  I believe that's correct, yes.
5    THE COURT:  You still believe that there are thousands
6    of these.
7    MR. WEINSTEIN:  A lot of companies, your Honor, yes.
8    THE COURT:  Let me ask plaintiffs' counsel if you have
9    any views on whether I ought to accept the Gelboim case as
10   related.
11   MR. BUTTERFIELD:  Your Honor, on behalf of the
12   over-the-counter plaintiffs, we believe it's related.  We don't
13   think that the Gelboim class would fall into our class.
14   THE COURT:  It should then be in your view joined to
15   our case but as a separate class, subclass.
16   MR. BUTTERFIELD:  I believe that's correct, your
17   Honor.
18   THE COURT:  Mr. Kovel.
19   MR. KOVEL:  Your Honor, for the on-exchange
20   plaintiffs, our understanding is that, as a threshold matter,
21   none of these products are traded on exchanges, certainly not a
22   commodities exchange.  So we also don't believe that the
23   products have anything to do with our class.  We do see the
24   allegations and they relate to the suppression of LIBOR, which
25   is what's alleged in our complaint right now.

C314LIBC

1       THE COURT:  Anybody else on plaintiffs' side.

2       MR. LOVELL:  Your Honor, I would just say that it's

3 probably not a subclass; it's probably a separates class.  We

4 wouldn't be under the same umbrella as they are.

5       THE COURT:  I didn't mean to say something different.

6 So then we would have exchange-based, over-the-counter, and

7 this corporate-bond group.

8       MR. LOVELL:  Yes, your Honor.

9       THE COURT:  Did the defendants have any views.

10      MR. WISE:  I think the only thing the defense group

11 has been able to agree on is we certainly think it's related;

12 it ought to be before your Honor.  As to how it's organized and

13 how these classes are defined, we don't even have consolidated

14 amended complaints yet, so it's unclear to us where it fits.

15 That's really for the plaintiffs.

16      THE COURT:  I guess I am stuck with it.

17      All right.  I think it's really time for us to get a

18 consolidated amended complaint and figure out a schedule for

19 what I assume is going to be a motion to dismiss, at least if

20 this follows the pattern of most cases.  Can I get a proposal

21 on plaintiffs' side.

22      MR. BUTTERFIELD:  First of all, your Honor, we would

23 propose that plaintiffs file a consolidated amended complaint,

24 so there is an over-the-counter group which we believe should

25 file separately from the exchange group which should file

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

C314LIBC

1 separately from Mr. Weinstein's plaintiffs, and separately

2 obviously from the Schwab plaintiffs.  We've discussed it among

3 plaintiffs' counsel and would propose that we file a

4 consolidated amended complaint within 60 days, if that's

5 acceptable to the court.

6       THE COURT:  Do you really need 60 days.

7       MR. BUTTERFIELD:  There are a lot of moving parts,

8 your Honor, and then there are more news stories coming to

9 light every day.  I think the more time we have to work with

10 those, the more facts we can assert into the complaint.

11      THE COURT:  That assumes you believe what you read.

12 OK.  On the defense side, assume that there is a complaint

13 filed, I think I counted out 60 days earlier today for

14 something and it came out to April 30, assume we have a

15 complaint on April 30, what's the schedule.

16      MR. WISE:  Your Honor, we tried to coordinate before

17 we came here today expecting your Honor might ask that

18 question.  There are I think around 16 different banks involved

19 here.  So while we would normally like to respond as quickly as

20 possible, recognizing that we will have to coordinate and have

21 this reviewed by quite a number of different defendants, we

22 would ask for 60 days to file our motion or motions.

23      THE COURT:  So then by the end of June.

24      MR. WISE:  Yes, your Honor.

25      THE COURT:  Shall we try to plan for an answering

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

C314LIBC

1 time.

2       MR. BUTTERFIELD:  Your Honor, may we seek 60 days,

3 with the court's permission.  With respect, we are going to

4 face difference motions to dismiss from defendants.

5       THE COURT:  I will give you 60 days and the defendants

6 30 days to respond but that's it.  Then you are cutting into my

7 six-month motion time.  All right.  Now I guess we really

8 should face up to a question which is am I going to get 16

9 motions to dismiss.  That's not going to make me happy.

10      MR. WISE:  Your Honor, we will certainly try to

11 coordinate and file common briefs.  Without having seen the

12 complaints, it's a little hard to say whether there may be a

13 few defendants who feel that they are in a special position and

14 may seek to file supplemental papers if they have a particular

15 problem that's not covered by the group.  But certainly the

16 common issues, we expect that will be the bulk, we would file a

17 joint brief or briefs.

18      THE COURT:  That raises a question.  Is there defense

19 counsel that we can sort of impose on to write to via a letter

20 which you will then blast email off to everybody else.

21      Mr. Wise, you sort of stepped up; I don't want to

22 impose it on you but --

23      MR. WISE:  Your Honor, we obviously, I think everybody

24 kind of would like to be in the back of the room here in this

25 case, but certainly for the convenience of the court, we can

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

C314LIBC

1 certainly volunteer that.

2       THE COURT:  Something we send to you, you forward it

3 on by email.

4       MR. WISE:  We will certainly serve as a communications

5 hub for the court.

6       THE COURT:  We appreciate that.

7       Is there anything else anyone wants to talk about.

8       MR. LOVELL:  Your Honor, does your Honor have page

9 limits.

10      THE COURT:  I sure do.

11      MR. LOVELL:  Is this the type of case, your Honor,

12 where you might consider an enlargement.

13      THE COURT:  I would.  I will probably let you go up to

14 40 on your main briefs and 20 on the reply.

15      Anything else.

16      MR. LOVELL:  Thank you, your Honor.

17         -  -  -

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 |
| THIS DOCUMENT RELATES TO: | Master File No. 1:11-md-2262-NRB <br> ECF Case |
| MAYOR AND CITY COUNCIL OF BALTIMORE and CITY OF NEW BRITAIN FIREFIGHTERS' AND POLICE BENEFIT FUND, on behalf of themselves and all others similarly situated <br><br> Plaintiffs, <br><br> v. <br><br> CREDIT SUISSE GROUP AG, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., JP MORGAN CHASE & CO., JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, HSBC HOLDINGS PLC, HSBC BANK PLC, BARCLAYS BANK PLC LLOYDS BANKING GROUP PLC, WESTLB AG, WESTDEUTSCHE IMMOBILIENBANK AG, UBS AG, THE ROYAL BANK OF SCOTLAND GROUP PLC, DEUTSCHE BANK AG, CITIBANK NA, CITIGROUP INC., COÖPERATIEVE CENTRALE RAIFFEISEN BOERENLEENBANK B.A., THE NORINCHU.K.IN BANK, THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., HBOS PLC, and ROYAL BANK OF CANADA, <br><br> Defendants. | **CONSOLIDATED AMENDED COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

1.      Plaintiffs Mayor and City Council of Baltimore and City of New Britain

Firefighters' and Police Benefit Fund (collectively, the "Baltimore Plaintiffs"), on behalf of

themselves and all others similarly situated, by their counsel, assert claims for violations of

federal antitrust law against the Defendants identified below (collectively, "Defendants") arising from their manipulation of the London InterBank Offered Rate ("LIBOR") from on or before August 9, 2007 through at least February 2009 (the "Class Period").

2.      The Baltimore Plaintiffs' claims are made on information and belief (except as to allegations specifically pertaining to the Baltimore Plaintiffs and their counsel, which are made on personal knowledge) based on the investigation conducted by and under the supervision of the Baltimore Plaintiffs' counsel.  That investigation included reviewing and analyzing information concerning Defendants and LIBOR that the Baltimore Plaintiffs (through their counsel) obtained from, among other sources:  (i) analyses by consulting experts engaged by plaintiffs in these coordinated proceedings; (ii) publicly available press releases, news articles, and other media reports (whether disseminated in print or by electronic media); (iii) filings Defendants made with the United States Securities and Exchange Commission ("SEC"); (iv) court documents submitted in LIBOR-related proceedings in Canada, Singapore, and Japan; and (v) scholarly literature concerning the potential manipulation of LIBOR during the Class Period. Additionally, pursuant to the Antitrust Criminal Penalty Enhancement and Reform Act (Pub. L. No. 108-237, tit. II, 118 Stat. 661, 665, extended by Pub. L. No. 111-190, 124 Stat. 1275), the conditional leniency applicant to the United States Department of Justice has commenced providing  cooperation  to the Baltimore Plaintiffs and is expected to continue doing so.  Those sources collectively support the Baltimore Plaintiffs' allegations that Defendants collusively and systematically suppressed LIBOR during the Class Period so that the interest rates on LIBOR-based instruments that the Baltimore Plaintiffs purchased during that time were lower than they otherwise would have been absent Defendants' misconduct.

3.      Except as alleged in this Complaint, neither the Baltimore Plaintiffs nor other

members of the public have access to the underlying facts relating to Defendants' improper

activities.  Rather, that information lies exclusively within the possession and control of

Defendants and other insiders, which prevents the Baltimore Plaintiffs from further detailing

Defendants' misconduct.  Moreover, numerous pending government investigations—both

domestically and abroad, including by the United States Department of Justice ("DOJ"), the

Commodity Futures Trading Commission ("CFTC"), and the SEC—concerning potential LIBOR

manipulation could yield information from Defendants' internal records or personnel that bears

significantly on the Baltimore Plaintiffs' claims.  Indeed, as one news report observed in

detailing U.S. regulators' ongoing investigation, "[i]nternal bank emails may prove to be key

evidence . . . because of the difficulty in proving that banks reported borrowing costs for LIBOR

at one rate and obtained funding at another."[1]  The Baltimore Plaintiffs thus believe further

evidentiary support for their allegations will come to light after a reasonable opportunity for

discovery.

## NATURE OF THE ACTION

4.      This case arises from a global conspiracy to manipulate LIBOR—the reference

point for determining interest rates for trillions of dollars in financial instruments worldwide—by

a cadre of prominent financial institutions.

5.      Defendants, the banks that comprised the U.S. dollar LIBOR panel during the

Class Period (as defined below), were motivated to suppress LIBOR for two primary reasons.

First, well aware that the interest rate a bank pays (or expects to pay) on its debt is widely, if not

universally, viewed as embodying the market's assessment of the risk associated with that bank,

Defendants understated their borrowing costs (thereby suppressing LIBOR) to portray

[1] David Enrich, Carrick Mollenkamp & Jean Eaglesham, "U.S. Libor Probe Includes BofA, Citi,
UBS," *MarketWatch*, March 17, 2011.

themselves as economically healthier than they actually were.  Second, artificially suppressing LIBOR allowed Defendants to pay lower interest rates on LIBOR-based financial instruments that Defendants sold to investors, including the Baltimore Plaintiffs, during the Class Period.

6.      Throughout the Class Period, Defendants conspired to, and did, manipulate LIBOR by misreporting the actual interest rates at which they expected they could borrow funds—*i.e.,* their true costs of borrowing—on a daily basis. By acting together and in concert to knowingly understate their true borrowing costs, Defendants caused LIBOR to be calculated or suppressed artificially low, reaping hundreds of millions, if not billions, of dollars in ill-gotten gains.

7.      Investigations regarding LIBOR are ongoing in the United States, Switzerland, Japan, United Kingdom, Canada, the European Union, and Singapore by ten different governmental agencies, including the DOJ, the SEC, and the CFTC.  Additionally, numerous employees, including supervisors, traders, and brokers, from various financial institutions have been accused of improper conduct related to LIBOR.

8.      Defendants' manipulation of LIBOR allowed them to pay unduly low interest rates to investors, including Baltimore Plaintiffs, on LIBOR-based financial instruments during the Class Period.  Accordingly, the Baltimore Plaintiffs seek relief for the damages they have suffered as a result of Defendants' violations of federal law.  Baltimore Plaintiffs assert claims under the Sherman Act, 15 U.S.C. §§ 1, *et seq.* and the Clayton Act, 15 U.S.C. §§ 12, *et seq.*

## JURISDICTION AND VENUE

9.      This action arises under Section 1 of the Sherman Act, 15 U.S.C., § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

10.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

11.      Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d). One or more of the Defendants resided, transacted business, were found, or had agents in the District, a substantial part of the events giving rise to Plaintiff's claims arose in the District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## THE PARTIES

### Plaintiffs

12.      Plaintiff Mayor and City Council of Baltimore ("Baltimore") is an independent city in the State of Maryland. During the Class Period, Baltimore purchased hundreds of millions of dollars in interest rate swaps directly from at least one Defendant in which the rate of return was tied to LIBOR and was injured as a result of Defendants' anticompetitive conduct.

13.      Plaintiff City of New Britain Firefighters' and Police Benefit Fund ("New Britain") is a pension fund located in Connecticut with the mission of providing retirement benefits to the city's employees and their spouses. During the Class Period, New Britain purchased tens of millions of dollars in interest rate swaps directly from at least one Defendant in which the rate of return was tied to LIBOR and was injured as a result of Defendants' anticompetitive conduct.

### Defendants

14.      Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.  Defendant Bank of America, N.A.—a federally-chartered national banking association headquartered in Charlotte, North Carolina—is an indirect, wholly-owned subsidiary of Defendant Bank of America Corporation.  Defendants Bank of America Corporation and Bank of America, N.A. are referenced collectively in this Complaint as "Bank

of America."

15.     Defendant Bank of Tokyo-Mitsubishi UFJ Ltd. ("BTMU") is a Japanese company headquartered in Tokyo, Japan.

16.     Defendant Barclays Bank plc ("Barclays") is a British public limited company headquartered in London, England.

17.     Defendant Citigroup, Inc. is a Delaware corporation headquartered in New York, New York.  Defendant Citibank, N.A.—a federally-chartered national banking association headquartered in New York, New York—is a wholly-owned subsidiary of Defendant Citigroup, Inc.  Defendants Citigroup, Inc. and Citibank, N.A. are referenced collectively in this Complaint as "Citibank."

18.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider headquartered in Utrecht, the Netherlands.

19.     Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in Zurich, Switzerland.

20.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.

21.     Defendant HSBC Holdings plc is a United Kingdom public limited company headquartered in London, England.  Defendant HSBC Bank plc—a United Kingdom public limited company headquartered in London, England—is a wholly-owned subsidiary of Defendant HSBC Holdings plc.  Defendants HSBC Holdings plc and HSBC Bank plc are referenced collectively in this Complaint as "HSBC."

22.     Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered in New York, New York.  Defendant JPMorgan Chase Bank, National Association—a federally-

chartered national banking association headquartered in New York, New York—is a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.  Defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, National Association are referenced together in this Complaint as "JPMorgan Chase."

23.     Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company headquartered in London, England.  Defendant Lloyds was formed in 2009 through the acquisition of Defendant HBOS plc ("HBOS")—a United Kingdom banking and insurance company headquartered in Edinburgh, Scotland—by Lloyds TSB Bank plc.

24.     Defendant Royal Bank of Canada ("RBC") is a Canada company headquartered in Toronto, Canada.

25.     Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan.

26.     Defendant The Royal Bank of Scotland Group plc ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland.

27.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland.

28.     Defendant WestLB AG is a German joint stock company headquartered in Dusseldorf, Germany.  Defendant Westdeutsche ImmobilienBank AG—a German company headquartered in Mainz, Germany—is a wholly-owned subsidiary of WestLB AG.  Defendants WestLB AG and Westdeutsche ImmobilienBank AG are referenced together in this Complaint as "WestLB."

29.     Defendants Bank of America, BTMU, Barclays, Citibank, Rabobank, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, Lloyds, HBOS, RBC, Norinchukin, RBS,

UBS, and WestLB (collectively, "Defendants") were members of the BBA's USD-LIBOR panel during the Class Period.

## UNNAMED CO-CONSPIRATORS

30.     Various other entities and individuals not named as Defendants in this Complaint participated as co-conspirators in the acts complained of and performed acts and made statements that aided and abetted and furthered the unlawful conduct alleged herein.

## DEFINITIONS

31.     LIBOR-Based Instruments are Derivative Instruments and Non-Derivative Instruments. LIBOR-Based Instruments may be indexed to one or more LIBOR currencies (*i.e.*, USD-LIBOR, Yen-LIBOR, and Euro-LIBOR). Only LIBOR-Based Instruments that were sold in over-the-counter transactions are at issue in the Baltimore Plaintiffs' Complaint.

32.     Derivative Instruments include but are not limited to asset swaps, collateralized debt obligations, credit default swaps, forward rate agreements, inflation swaps, interest rate swaps, total return swaps, and options.

(a)     Asset Swaps are a type of over-the-counter derivative in which one investor exchanges the cash flows of an asset or pool of assets for a different cash flow. This is done without affecting the underlying investment position. For instance, if a Defendant wanted to own a particular Euro-denominated fixed rate issue, but preferred to receive a floating rate US dollar cash flow, the Defendant could purchase the Euro-denominated bond and then enter into asset swap with another bank or investor to receive US Dollar LIBOR payments (+/- spread) in return for paying a fixed rate coupon in Euros to the bank or investor. Asset Swaps can be indexed to LIBOR.

(b)     Collateralized Debt Obligations ("CDOs") are a type of structured asset

backed security ("ABS"). ABSs are derivatives and are sold in over-the-counter transactions. CDOs have multiple tranches, or levels of risk, and are issued by "special purpose entities." They are collateralized by debt obligations including bonds and loans. Each tranche offers a varying degree of risk and return so as to meet investor demand. Interest and principal payments are made in order of seniority, so that junior tranches offer higher coupon payments (and interest rates) or lower prices to compensate for additional default risk; in general, "senior" tranches are considered the safest securities. In some cases, investors utilize leverage and hope to profit from the excess of the spread offered by the senior tranche and their cost of borrowing. This is because senior tranches pay a spread above LIBOR despite their AAA-ratings. CDOs can be indexed to LIBOR.

        (c)      Credit Default Swaps ("CDSs") are a type of over-the-counter, credit-based derivative whereby the seller of the CDSs compensates the buyer of the CDS only if the underlying loan goes into default or has another "credit event." The buyer of the CDS makes a series of payments (the CDS "fee" or "spread") to the seller and, in exchange, receives a payoff if the loan defaults. In the event of default, the buyer of the CDS receives compensation (usually the face value of the loan), and the seller of the CDS takes possession of the defaulted loan. However, anyone can purchase a CDS, even buyers who do not hold the loan instrument and who have no direct insurable interest in the loan (these are called "naked" CDSs).

        (d)      Forward Rate Agreements ("FRAs") are a type of over-the-counter derivative based on a "forward contract." The contract sets the rate of interest or the currency exchange rate to paid or received on an obligation beginning at a future start date. The contract will determine the rates to be used along with the termination date and notional value. On this type of agreement, it is only the differential that is paid on the notional amount of the contract. It

is paid on the effective date. The reference rate is fixed one or two days before the effective date, dependent on the market convention for the particular currency. An FRA differs from a swap in that a payment is only made once at maturity. FRAs can be indexed to LIBOR.

(e)     Inflation Swaps are a type of over-the-counter derivative used to transfer inflation risk from one party to another through an exchange of cash flows. In an inflation swap, one party pays a fixed rate on a notional principal amount, while the other party pays a floating rate linked to an inflation index. The party paying the floating rate pays the inflation adjusted rate multiplied by the notional principal amount. Inflation Swaps can be indexed to LIBOR.

(f)     Interest Rate Swaps are a type of over-the-counter derivative in which two parties agree to exchange interest rate cash flows, based on a specified notional amount from a fixed rate to a floating rate (or vice-versa) or from one floating rate to another. These are highly liquid financial derivatives. Interest rate swaps are commonly used for both hedging and speculating. In an interest rate swap, each party agrees to pay either a fixed or floating rate denominated in a particular currency to the other party. The fixed or floating rate is multiplied by a notional principal amount. This notional amount is typically not exchanged between counterparties, but is used only for calculating the size of cash flows to be exchanged. Interest Rate Swaps can be indexed to LIBOR.

(g)     Total Return Swaps are a type of over-the-counter derivative based on financial contracts that transfer both the credit and market risk of an underlying asset. These derivatives allow one contracting party to derive the economic benefit of owning an asset without putting that asset on its balance sheet; the other contracting party, which retains the underlying asset on its balance sheet, is, in effect, buying protection against loss on that asset's value. Total Return Swaps can be indexed to LIBOR.

(h)     Options are a type of over-the-counter derivative based on a contract between two parties for a future transaction on an asset. The other Derivative Instruments, defined above, can serve as the asset for an Option; an Option on a swap is commonly referred to as a "swaption". The buyer of an option gains the right, but not the obligation, to engage in that future transaction (buy or sell) while the seller of the option is obligated to fulfill the future transaction.  In general, the option's price is the difference between the asset's reference price and the value of the underlying asset (*i.e.*, a stock, bond, currency contract, or futures contract) plus a spread. Thus, where the underlying asset is indexed to LIBOR, the Option's price is impacted by LIBOR.

33.     Non-derivative instruments include but are not limited to floating rate notes. Floating rate notes evidence an amount of money owed to the buyer from the seller. The interest rate on floating rate notes is adjusted at contractually-set intervals and is based on a variable rate index, such as LIBOR. Thus, floating rate notes can be indexed to LIBOR.

## CLASS ACTION ALLEGATIONS

34.     The Baltimore Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated. The "Class" is defined as:

> All persons or entities (other than Defendants and their employees, affiliates, parents, and subsidiaries) that purchased in the United States, directly from a Defendant, a financial instrument that paid interest indexed to LIBOR ("LIBOR-Based Instrument") any time during the period August 2007 through May 2010 (the "Class Period").

35.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at this time, the Baltimore Plaintiffs are informed and believe that at least thousands of geographically dispersed Class members purchased

LIBOR-Based Derivatives directly from Defendants during the Class Period.

36.    The Baltimore Plaintiffs' claims are typical of the claims of the other members of the Class. The Baltimore Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the antitrust laws as alleged herein.

37.    The Baltimore Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

38.    Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether Defendants conspired with others to artificially suppress LIBOR in violation of the Sherman Act;

(b)    Whether Defendants' conduct had an anticompetitive and manipulative effect on LIBOR during the Class Period;

(c)    Whether Defendants' conduct negatively affected the rates of return of LIBOR-Based Instruments purchased directly from the Defendants during the Class Period; an

(d)    The appropriate measure of damages for the injury sustained by the Baltimore Plaintiffs and other members of the Class as a result of Defendants' unlawful activities.

39.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The

prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

40.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. The Baltimore Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## FACTUAL ALLEGATIONS

41.     As discussed in more detail below, the British Bankers' Association ("BBA") rate-setting cartel, described below, provides the means through which Defendants could manipulate LIBOR; banks were motivated to manipulate LIBOR to hide their precarious financial conditions and to financially benefit from a manipulated LIBOR; there is economic evidence that LIBOR was manipulated and could not have been so manipulated in the absence of a conspiracy; there are governmental investigations worldwide regarding LIBOR manipulation; there are news reports that LIBOR was manipulated; and there are admissions of manipulation with respect to yen LIBOR.  The foregoing factors evidence a worldwide conspiracy regarding LIBOR manipulation.

### A.     LIBOR Is Administered By The BBA Rate-Setting Cartel

42.     The BBA describes itself on its website as "the leading trade association for the

U.K. banking and financial services sector. We speak for over 200 member banks from 60 countries on the full range of U.K. and international banking issues."[2] The Defendants are among the member banks of the BBA. As the BBA itself concedes, it is not a regulatory body and has no regulatory function.[3]  Its activities are not overseen by any U.K. or foreign regulatory agency. It is governed by a board of member banks that meets four times each year. The board is composed of senior executives from twelve banks, including Barclays Bank plc, Citibank NA, Credit Suisse, Deutsche Bank AG, HSBC Bank plc, J.P. Morgan Europe Ltd., and the Royal Bank of Scotland plc.[4] "This is a quaint, insider club which is clearly not fit for the 21st century," said Richard Werner, a finance professor at the University of Southampton, England.[5]

43.     Commencing in January of 1986, the BBA began disseminating LIBOR, initially in three currencies: U.S. dollars, Japanese Yen, and pound sterling; LIBOR is now disseminated for ten currencies: the foregoing three, the Australian dollar, the Canadian dollar, the New Zealand dollar, the Danish krone, the Euro, the Swiss Franc, and the Swedish krone.

44.     LIBOR is a daily benchmark interest rate at which designated contributor panel banks predict they can borrow unsecured funds from other banks in the London wholesale money market for fifteen different maturities ranging from overnight to one year. As "the primary benchmark for short term interest rates globally,"[6] LIBOR has occupied (and continues to occupy) a crucial role in the operation of financial markets.  For example, market participants

---

[2] http://www.bba.org.uk/about-us, last accessed on April 30, 2012.

[3] http://www.bba.org.uk/blog/article/bba-repeats-commitment-to-bba-libor, last accessed on April 30, 2012

[4] http://www.bba.org.uk/about-us, last accessed on April 30, 2012.

[5] http://www.bloomberg.com/news/2012-02-21/ubs-turning-whistleblower-in-libor-probe-pressures-rivals.html, last accessed on April 30, 2012.
[6] http://www.bbalibor.com/bbalibor-explained/the-basics, last accessed on April 19, 2012.

commonly set the interest rate on floating-rate notes as a spread against LIBOR (*e.g.*, "LIBOR + [X] bps")[7] and use LIBOR as a basis to determine the correct rate of return on short-term fixed-rate notes (by comparing the offered rate to LIBOR).

45.     LIBOR thus affects the pricing of trillions of dollars' worth of financial transactions.  In a May 21, 2009 press release, the BBA called LIBOR "the world's most important number."[8]  Accordingly, it is well-established among market participants that confidence in LIBOR "matters, because the rate system plays a vital role in the economy."[9] Moreover, given the vast universe of financial instruments LIBOR impacts, "even a small manipulation" of the rate "could potentially distort capital allocations all over the world."[10]

46.     LIBOR is set by the BBA and its member banks. Each of the ten aforementioned currencies is overseen by a separate LIBOR panel created by the BBA.  During the Class Period, designated contributing panels ranged in size from eight banks for Australian dollar, Swedish krona, Danish krone, and New Zealand dollar panels to sixteen banks for U.S. dollar, pound sterling, Euro, and Japanese yen panels. There is substantial overlap in membership among the panels. For example, during the Class Period, nine of the sixteen banks that served on the U.S. dollar also served on the Japanese yen, Swiss franc and Euro LIBOR panels.[11]  Similarly,

---

[7] The term "bps" stands for basis points.  100 basis points equal 1%.

[8]  http://www.bbalibor.com/news-releases/bba-libor-the-worlds-most-important-number-now-tweets-daily.

[9] Carrik Mollenkamp and Mark Whitehouse, "Study Casts Doubt on Key Rate --- WSJ Analysis Suggests Banks May Have Reported Flawed Interest Data for Libor," *The Wall Street Journal*, May 29, 2008.

[10] Rosa M. Abrantes-Metz and Albert D. Metz, "How Far Can Screens Go in Distinguishing Explicit from Tacit Collusion?  New Evidence from the Libor Setting," *CPI Antitrust Chronicle*, March 2012.

[11]  Those banks are Bank of Tokyo, Barclays, Citibank, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds, Rabobank, RBS, and UBS

thirteen banks participated on both the dollar and yen LIBOR panels[12] and eleven banks participated on both the U.S. dollar and Swiss franc LIBOR panels.[13]  It is a requirement of membership of a LIBOR contributor panel that the bank is regulated and authorized to trade on the London money market.  As the BBA recently told Bloomberg: "As all contributor banks are regulated, they are responsible to their regulators, rather than us."[14]

47.     According to the BBA's "LIBOR Governance and Scrutiny" report issued in 2008,[15] "[t]he BBA employs a full time manager to supervise on a day-to-day basis all aspects of LIBOR calculation and dissemination to the marketplace. The LIBOR manager works with a team of professionals both in-house and externally to ensure all processes operate to the highest standards."  As the report goes on to explain, "Thomson Reuters...act as the 'designated distributor' of BBA LIBOR rates.  All contributions to the LIBOR rate-setting process are collected by Thomson Reuters, who currently perform checking procedures, supervised by the LIBOR manager, on all the submissions before running the calculation and distributing the fixes."

48.     During the Class Period, the BBA established LIBOR based on the rates that designated banks for each currency would have to pay for an unsecured loan for each designated

---

[12] Those banks are Bank of America, Bank of Tokyo, Barclays, Citibank, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds, Rabobank, RBS, Société Générale (beginning in 2009), UBS, and West LB.

[13] Those banks are Bank of Tokyo, Barclays, Citibank, Credit Suisse, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds, Rabobank, RBS, and UBS.

[14] http://www.bba.org.uk/blog/article/bba-repeats-commitment-to-bba-libor, last accessed on April 30, 2012.

[15] http://www.bbalibor.com/news-releases/libor-gets-enhanced-governance-and-scrutiny-procedures, last accessed on April 30, 2012.

maturity period.[16]  Every day, the banks responded to the BBA's question:  "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"  On its website, the BBA explains "a bank will know what its credit and liquidity risk profile is from rates at which it has dealt and can construct a curve to predict accurately the correct rate for currencies or maturities in which it has not been active."  The banks informed the BBA of their costs of borrowing funds at different maturity dates (*e.g.*, one month, three months, six months).  Contributed rates are ranked in descending order and the arithmetic mean of only the middle two quartiles is used to formulate the resulting BBA LIBOR calculation for that particular currency and maturity.[17]  Thomson Reuters then publishes LIBOR, also reporting the quotes on which the BBA based its LIBOR calculation.  "Libor has always been a lie, because it represents what banks would pay for funds rather than what they are actually paying," said Peter Hahn, a finance professor at London's Cass Business School and a former managing director at Citigroup.  "People who have an incentive to make money from mispriced markets are able to misprice those markets, and that is a serious control problem."[18]

49.     No regulatory agency oversees the setting of LIBOR by the BBA and its members. The resultant rates are not filed with, or subject to the approval of, any regulatory agency. The BBA has been quoted as saying it "calculates and produces BBA Libor at the request of our members for the good of the market."[19]

---

[16] http://www.bbalibor.com/bbalibor-explained/the-basics, last accessed on April 30, 2012.

[17] http://www.bbalibor.com/technical-aspects/setting-bbalibor, last accessed March 30, 2012.

[18] http://www.bloomberg.com/news/2012-02-21/ubs-turning-whistleblower-in-libor-probe-pressures-rivals.html, last accessed on April 30, 2012.

[19] http://www.businessweek.com/news/2012-03-06/libor-links-deleted-as-bank-group-backs-away-from-tarnished-rate, last accessed on April 30, 2012.

50.     The BBA's activities in setting LIBOR for various currencies reflect a global rate-setting cartel. As one commentator has noted, "LIBOR is not a real market rate of interest and is instead set by a cartel of mostly foreign banks operating in London with little or no oversight and no transparency. . . . The Wall Street Journal reported that the BBA is hesitant to change how LIBOR is calculated because it is worried about legal liability which is not a surprise. If the BBA admits that LIBOR isn't a market rate but a cartel rate that was established through price fixing, it will be subject to global lawsuits resulting from fraudulent behavior and misrepresentations. The likelihood of the BBA reforming itself, providing transparency and giving up its cartel monopoly is very low given the astronomical liability that will result."[20] Indeed, the BBA directly profits from the usage of LIBOR. Since 2009, it has operated BBA LIBOR, Ltd., which earns revenue from licensing the rate.

51.     Throughout the Class Period, Defendants conspired to suppress LIBOR below the levels at which it would have been set had Defendants accurately reported their borrowing costs to the BBA.  The Baltimore Plaintiffs' allegations that Defendants suppressed LIBOR are supported by: (i) Defendants' powerful incentives to mask their true borrowing costs and to reap unjustified revenues by setting artificially low interest rates on LIBOR-based financial instruments the Baltimore Plaintiffs and other investors purchased; (ii) an independent analysis by the Baltimore Plaintiffs' consulting experts, comparing LIBOR panel banks' daily individual quotes with the banks' probability of default, as measured by Kamakura Risk Information Services, as well as LIBOR-related analyses by consulting experts in these coordinated proceedings have engaged; (iii) publicly available economic analyses, by prominent academics and other commentators, of LIBOR's behavior during the Class Period compared with other

---

[20] http://www.thesunshinereport.net/marksunshine/?p=36, lat accessed April 30, 2012.

well-accepted, contemporaneous measures of Defendants' borrowing costs, as well as the

notable tendency of Defendants' daily submitted LIBOR quotes to "bunch" near the bottom

quartile of the collection of reported rates used to determine LIBOR; and (iv) revelations in

connection with the numerous domestic and foreign governmental investigations into potential

manipulation of USD-LIBOR and LIBOR for other currencies, most prominently Yen-LIBOR.

      **B.**    Defendants Possess Financial Incentives to Suppress LIBOR.

      52.    Defendants each had substantial financial incentives to manipulate LIBOR.  First,

Defendants were motivated, particularly given investors' serious concerns over the stability of

the market in the wake of the financial crisis that emerged in 2007, to understate their borrowing

costs—and thus the level of risk associated with the banks.  Moreover, because no one bank

would want to stand out as bearing a higher degree of risk than its fellow banks, each Defendant

shared a powerful incentive to collude with its co-Defendants to ensure it was not the "odd man

out."  Indeed, analysts at Citigroup Global Markets—a subsidiary of Defendant Citigroup—

acknowledged in an April 10, 2008 report:

> [T]he most obvious explanation for LIBOR being set so low is the
> prevailing fear of being perceived as a weak hand in this fragile
> market environment.  If a bank is not held to transact at its posted
> LIBOR level, there is little incentive for it to post a rate that is
> more reflective of real lending levels, let alone one higher than its
> competitors.  Because all LIBOR postings are publicly disclosed,
> any bank posting a high LIBOR level runs the risk of being
> perceived as needing funding.  With markets in such a fragile state,
> this kind of perception could have dangerous consequences.[21]

Strategists at entities affiliated with other Defendants likewise confirmed that banks suppressed

LIBOR.  Echoing Peng's sentiment, William Porter, credit strategist at Credit Suisse, said in

April 2008 that he believed the three-month USD-LIBOR was 0.4 percentage points below

---

[21] Scott Peng, Chintan (Monty) Gandhi, & Alexander Tyo, "Special Topic:  Is LIBOR Broken?,"
April 10, 2008.

where it should be.[22]  And the next month, Tim Bond, head of asset-allocation research of Barclays Capital—a subsidiary of Defendant Barclays—observed that banks routinely misstated borrowing costs to the BBA to avoid the perception that they faced difficulty raising funds as credit markets seized up.[23]

53.  Second, by artificially suppressing LIBOR, Defendants paid lower interest rates on LIBOR-based financial instruments they sold to investors, including the Baltimore Plaintiffs, during the Class Period.  Illustrating Defendants' motive to artificially suppress LIBOR, in 2009 Citibank reported it would make $936 million in net interest revenue if rates would fall by 25 bps per quarter over the next year and $1.935 billion if they fell 1% instantaneously.  JPMorgan Chase likewise reported significant exposure to interest rates in 2009:  The bank stated that if interest rates increased by 1%, it would lose over $500 million.  HSBC and Lloyds also estimated they would earn hundreds of millions of additional dollars in 2008-2009 in response to lower interest rates and would lose comparable amounts in response to higher rates.  These banks collectively earned billions in net interest revenues during the Class Period.

54.  Defendants thus possessed reputational and financial incentives to manipulate LIBOR—which, as detailed below, they did.

**C.**  **Independent Analyses By The Plaintiffs' Consulting Experts Strongly Indicate Defendants Artificially Suppressed LIBOR During The Class Period.**

55.  The consulting experts in these coordinated proceedings have measured LIBOR against other recognized benchmarks for determining banks' borrowing costs.  Employing well-

---

[22] Carrick Mollenkamp, "Libor Surges After Scrutiny Does, Too," *The Wall Street Journal*, April 18, 2008.

[23] Gavin Finch and Elliott Gotkine, "Libor Banks Misstated Rates, Bond at Barclays Says," *Bloomberg*, May 29, 2008.

reasoned methodologies, these experts have demonstrated that Defendants artificially suppressed LIBOR during the Class Period.  Despite any minor discrepancies in the analyses, the experts' common conclusion is clear:  During the Class Period, LIBOR did not appropriately correspond with other measures of Defendants' borrowing costs, as indicated by:  (i) the difference between Defendants' respective LIBOR quotes and their probabilities of default, and (ii) the spread between LIBOR and Eurodollar Deposit rates.

56.    Additional independent expert analysis performed in connection with these proceedings indicates Libor suppression.  At one date during the Class Period, when the BBA announced it would investigate the reporting of LIBOR, members of the LIBOR panel increased their rates in unison despite the lack of any market reason.  Logically, the Defendants collectively feared that their LIBOR suppression would be uncovered.  Bolstering this point is that since October 2011, when the European Commission raided most or all of Defendants in connection with the LIBOR probe, reported LIBOR has returned to its historic norm compared with the overall Eurodollar deposit market."

**1.    <u>An Independent Analysis By Consulting Experts—Showing The Discrepancy Between Defendants' LIBOR Quotes And Their Respective Probabilities Of Default—Provides Strong Evidence of LIBOR Suppression During The Class Period.</u>**

57.    Assessing the likelihood that LIBOR was suppressed during the Class Period, the Plaintiffs' expert consultants compared USD-LIBOR panel members' quotes from 2007 through 2008 to the daily default probability estimates for each of those banks—as determined, and updated daily for each maturity (term), by Kamakura Risk Information Services ("KRIS").[24] The study focused on identifying any periods of severe discrepancy between each bank's

---

[24] KRIS did not have PDs for Defendants WestLB, Rabobank, or Norinchukin, because those companies were not publicly traded.  This PD analysis therefore does not include those banks.

probabilities of default ("PDs") and the LIBOR quotes the bank submitted to the BBA.

58.    The KRIS reduced-form model estimates each bank's default risk on a daily basis by analyzing each bank's equity and bond prices, accounting information, and general economic conditions, such as the level of interest rates, unemployment rates, inflation rates, etc.  On its website, KRIS states it "provides a full term structure of default for both corporate and sovereign credit names based upon a multiple models approach" and its default probabilities "are updated daily and cover more than 29,000 companies in 36 countries."[25]

59.    PD provides a measure of a bank's credit (default) risk exposure, essentially the likelihood that the bank will default within a specified time period.  PD can be estimated using statistical models, whereas LIBOR is a rate of return required by investors lending short-term funds to the bank.  A finding of a statistically significant negative correlation coefficient between daily LIBOR quotes and PDs for a given bank over a given term period violates the fundamental relationship between risk and return that is the cornerstone of finance.  That is, investors require a higher required rate of return as a premium for taking on additional risk exposure.  This results in a positive relationship (correlation) between risk and return.  An increase in the bank's PD indicates that the risk of default has increased, thereby causing investors to require a higher rate of return for loans to the bank—which should correspond with a higher LIBOR quote.

60.    Accordingly, a finding of a statistically significant negative coefficient (of any size) between a bank's daily LIBOR quotes and its PDs shows that increases in PDs correspond with decreases in LIBOR quotes—which violates fundamental finance theory.  This would indicate that banks are suppressing their LIBOR quotes to avoid revealing the higher rates that reflect their true (higher) probabilities of default.  In other words, any finding of negative,

---

[25] *See* http://www.kris-online.com/, last accessed on April 23, 2012.

statistically significant correlation coefficients between a bank's PDs and its LIBOR quotes suggests LIBOR suppression by the bank over the analysis period.

61.   The magnitude of the correlation coefficient is impacted by the volatility of both PD and LIBOR for each bank during the time period.  Thus, for example, if a bank has high volatility in its PDs, the absolute value of the correlation coefficient will tend to be lower (*i.e.*, less negative) as compared to an identical bank with low PD volatility.  However, both may be equally engaged in LIBOR suppression if their correlation coefficients are statistically significant and negative.

62.   The Plaintiffs' consulting experts used the KRIS database to test whether, for the period under study, each bank's daily sealed LIBOR quote correlates with the bank's estimated PD that day for the same maturity term (provided by KRIS).  For example, the consultants examined the correlation between Bank of America's sealed quote for three-month LIBOR on each date with the three-month PD for Bank of America, as provided by the KRIS database on that same day.  As explained above, standard finance theory implies that a positive correlation between a bank's PD and its LIBOR quote should exist—*i.e.*, as the bank's default risk (PD) increases, its borrowing rate (LIBOR quote) should increase, and *vice versa*.  That is, using the above example, standard finance theory predicts a positive correlation between Bank of America's three-month PD and its three-month LIBOR quote.  A finding of either a zero or negative correlation between a bank's PD and its LIBOR quote indicates the latter does not reflect the bank's default-risk probability, which evidences LIBOR suppression.  A negative correlation means the two values have an inverse relationship; as one goes up, the other tends to go down.  A statistically significant negative correlation between a bank's LIBOR quote and its PD is consistent with the bank's reducing its LIBOR quote in order to mask its higher risk

exposure during a period of financial crisis, such as during the 2007-2008 period.  By submitting an artificially low LIBOR quote, the bank sends a false signal that it is less risky than it truly is.

63.     The Plaintiffs' consulting experts found suppression over the 2007-2008 period for one-month, three-month, six-month, and 12-month LIBOR.

64.     The LIBOR quotes for all the reporting banks (except HSBC) during 2007 were *negatively correlated* with their daily updated PDs (for the same maturity term) to a statistically significant degree.  For example, the correlation between Bank of America's daily LIBOR quotes and its daily PDs, for example, was negative and statistically significant at a very high level for the one-month, three-month, six-month and 12-month terms, *i.e.*, between -0.5857 and -0.6093.[26]  In other words, the data indicate that, contrary to fundamental finance theory, the higher a panel bank's PD was, the *lower* its LIBOR quote was.

65.     Performing the same analysis with respect to the LIBOR panel banks' daily LIBOR quotes and PDs during 2008, the Plaintiffs' expert consultants found that for all of the banks, the submitted LIBOR quotes were negatively correlated with their PDs at the one-month and three-month maturities.  Indeed, all of the banks were submitting unduly low LIBOR quotes at all maturities from August 9, 2007 until September 12, 2008, with only one exception: from September 15 through December 31, 2008, the period following the Lehman bankruptcy.

66.     The following graphs illustrate the findings of this expert analysis—which demonstrates a striking negative correlation between USD-LIBOR panel banks' LIBOR quotes and PDs during 2007 and 2008, indicating they severely depressed LIBOR during that time.

---

[26] Correlation coefficients range from a value of -1 to 1.  A correlation coefficient of -0.50, for example, would imply that a 1% increase in PD would result in a 50-basis point decline in the bank's LIBOR quote.

**Graph 1: Correlation Coefficients  Between Each Bank's Daily LIBOR Bid and Probability of Default (PD), One-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph 2: Correlation Coefficients  Between Each Bank's Daily LIBOR Bid and Probability of Default (PD), Three-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph 3: Correlation Coefficients Between Each Bank's Daily LIBOR Bid and Probability of Default (PD), Six-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph 4: Correlation Coefficients Between Each Bank's Daily LIBOR Bid and Probability of Default (PD), Twelve-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph 5: Correlation Coefficients Between Each Bank's Daily LIBOR Bid and Probability of Default (PD), 9 August 2007 – 12 September 2008 Period**



(Note: PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph 6: Correlation Coefficients Between Each Bank's Daily LIBOR Bid and Probability of Default (PD), 15 September 2008 – 31 December 2008 Period**



(Note: PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**2.**   The Discrepancy Between Libor And The Federal Reserve Eurodollar Deposit Rate During The Class Period Suggests Defendants Collusively Suppressed Libor

67.   As demonstrated by the work of an independent consulting expert retained by counsel in these actions, analysis of the Eurodollar market strongly supports that Defendants suppressed their LIBOR quotes and colluded to suppress reported LIBOR.  Moreover, this analysis further supports that Defendants colluded to control the amount of suppression over the Class Period.

68.   The U.S. Federal Reserve prepares and publishes Eurodollar deposit rates for banks (the "Federal Reserve Eurodollar Deposit Rate").  These Eurodollar deposit rates are analogous to LIBOR in that they reflect the rates at which banks in the London Eurodollar money market lend U.S. dollars to one another, just as LIBOR is intended to reflect rates at which panel banks in the London interbank market lend U.S. dollars to one another. The Federal Reserve obtains its data from Bloomberg and the ICAP brokerage company.[27]   Bloomberg Eurodollar deposit rate is similar to BBA's LIBOR except that the sampling is not limited to the 16 banks chosen by BBA.  ICAP is a large broker-dealer in London in Eurodollar deposits.[28] ICAP surveys its client banks and updates its Eurodollar deposit rates about 9:30 each morning.

69.   While Defendants could  have access to the ICAP Eurodollar deposit rates prior to

[27] See http://federalreserve.gov/releases/h15/data.htm, footnote 8, last accessed on April 23, 2012.

[28] "ICAP is the world's premier voice and electronic interdealer broker and the source of global market information and commentary for professionals in the international financial markets. The Group is active in the wholesale markets in interest rates, credit, energy, foreign exchange and equity derivatives. ICAP has an average daily transaction volume in excess of $1.5 trillion, more than 60% of which is electronic. ICAP plc was added to the FTSE 100 Index on 30 June 2006. For more information go to www.icap.com."  See http://www.icapenergy.com/company/ (last accessed April 30, 2012)

submitting their individual LIBOR quotes at 11:00 each day, they would not — absent collusion — have access to other bank LIBOR quotes, which are confidential until submitted.  Thus, even within the context of a suppressed LIBOR, absent collusion, individual panel banks would not know what quote other panel banks intended to submit relative to the Federal Reserve Eurodollar Deposit Rate.

70.     The consulting expert determined that because of the nature of the relationship between the Federal Reserve Eurodollar Deposit Rate and LIBOR (detailed below), it would be unusual even for one bank to submit a LIBOR bid below the Federal Reserve's Eurodollar Deposit Rate.  For all Defendants to submit bids below the Federal Reserve Eurodollar Deposit Rate would be extremely unusual, and is strong evidence of collusion among the banks.

71.     Economic and statistical analysis strongly supports the use of the Federal Reserve Eurodollar Deposit rate as a benchmark for measuring the validity of LIBOR as reported by the panel banks.  To measure how well the Federal Reserve Eurodollar Deposit Rate and LIBOR move together, for the purposes of this analysis, the difference between the two rates, the "Spread," is calculated as follows:  Spread = BBA LIBOR – Federal Reserve Eurodollar Deposit Rate.

72.     Since both LIBOR and the Federal Reserve Eurodollar Deposit Rate measure the lending cost to banks of Eurodollar deposits, important market and financial fundamentals, such as day-to-day changes in monetary policy, market risk and interest rates, as well as risk factors facing the banks generally (collectively "Market Fundamentals"), should be reflected similarly on both variables, and therefore should not affect the Spread.  The BBA's LIBOR panel is intended to reflect the Eurodollar deposit market in London.  By focusing on the Spread, the model therefore should be able to factor out normal and expected co-movements in banks'

LIBOR quotes that arise from changes in Market Fundamentals.

73.    To analyze how well the Federal Reserve Eurodollar Deposit Rate captures changes in Market Fundamentals and absorbs variations in LIBOR that are driven by such fundamentals, consulting experts used regression analysis to measure the day-to-day changes in the Spread against changes in the T-Bill rate and the commercial paper rate.  The evidence from these regressions strongly supports that day-to-day changes in the Federal Reserve Eurodollar Deposit Rate effectively capture day-to-day movements in LIBOR caused by Market Fundamentals.  Thus, once the Federal Reserve Eurodollar Deposit Rate is subtracted to arrive at the Spread, remaining movements in LIBOR reflected in the Spread would be unrelated to movements in Market Fundamentals.

74.    Because Market Fundamentals are fully captured by the Spread, absent manipulation, the Spread should always be zero or close to zero.  Thus, as more fully discussed below, negative Spreads provide a strong basis to conclude that Defendants suppressed and colluded to artificially suppress LIBOR.[29]

75.    Figures 1 and 2 show the relationship between LIBOR, the Federal Reserve Eurodollar Deposit Rate, and the Spread beginning in 2000 and ending in mid 2012.  As can be seen, between January 5, 2000 and around August 7, 2007, Federal Reserve's Eurodollar Deposit Rate tracked LIBOR very closely and the Spread remained positive and very close to zero.  This finding indicates that the Spread effectively captures shared risks of the banks sampled by BBA and by Bloomberg and ICAP.  The validity of this finding is bolstered by the fact that the Spread

---

[29] It is important to note that to the extent panel banks submitting LIBOR quotes submit suppressed rates to the BBA, and these suppressed rates are also considered by Bloomberg or ICAP, then the resultant Federal Reserve Eurodollar Deposit rate would also be understated by the same suppression.  Consequently, the Spread computed above could even understate the true magnitude of the suppression.

remained very close to zero in the face of multiple major financial dislocations, including the

bursting of the dot-com bubble in 2000, the terrorist attacks of September 2001, and the 2001

U.S. economic recession.  Likewise, the unusual downward movements in the Spread starting in

August 2007 strongly evidences that LIBOR was being manipulated and suppressed during this

period.[30]

---

[30] The Spread only became consistently positive around the end of October 2011, just after the
European Commission raided banks in connection with LIBOR.





76.     Figure 3 shows the Spread between 3-month maturity BBA LIBOR and the Federal Reserve Eurodollar Deposit rate (3-month maturity BBA LIBOR – Federal Reserve Eurodollar Deposit rate), from January 2006 through early April 2012.



77.     The shorter period between January 3, 2006 and August 7, 2007 demonstrated above contains 393 trading days.  In this sub-period, there were only 3 days when the Spread was negative.  Furthermore, the magnitude of these negative Spreads were also very small:  -0.9 basis point on June 14, 2006, -0.5 basis point on July 27, 2006 and -0.2 basis point on November 2, 2006.[31]  This finding again strongly supports that the Federal Reserve Eurodollar Deposit Rate serves as a good benchmark to control for Market Fundamentals that determine LIBOR.  The average magnitude of the Spread during this period equaled less than one basis point.   This finding also strongly supports that the risks of the banks sampled by BBA and Bloomberg and

---

[31]  One basis point is one-hundredth of a percentage point.

ICAP were similar.

78.     By August 2007, however, the Spread began to move into negative territory.
During the early part of August 2007, the Federal Reserve Eurodollar Deposit Rate stayed
around 5.36%.  On August 8, the Federal Reserve Eurodollar Deposit Rate increased by 5 basis
points to 5.41%, while BBA LIBOR did not keep pace.  The Spread turned negative 3 basis
points on August 8, 2007.  The Spread remained mostly negative after August 7 so that by
August 15, 2007, the trailing 10-day moving-average of the Spread also turned negative.  By
August 31, 2007, the Federal Reserve Eurodollar Deposit rate kept increasing to 5.78%, while
LIBOR was lagging.  The negative Spread on August 31 grew to -16 basis points.

79.     The Spread remained negative over the next year.  Between August 31, 2007 and
September 15, 2008, the Spread remained negative on 234 of the 255 days, or 91.7% of the days.
The magnitude of the negative Spread averaged about -12 basis points.  During this
approximately one year period, the negative Spread exceeded -25 basis points on 18 days.

80.     A big shock to LIBOR (and the Spread) came just after Lehman Brothers filed for
bankruptcy on September 15, 2008, leading to significantly increased concerns about the health
of all banks.  The increased concerns about the health of the banks were reflected in substantial
increases in the Federal Reserve Eurodollar Deposit Rate.  On September 15, 2008, the Federal
Reserve Eurodollar Deposit Rate equaled 3.0%, increasing to 3.2%, 3.75%, and 5% on
September 16, 17 and 18, respectively.  By September 30, the Federal Reserve Eurodollar
Deposit Rate doubled to 6%.

81.     In spite of increased risks and worries about the banks after the Lehman
bankruptcy filing, LIBOR did not keep pace with the Federal Reserve Eurodollar Deposit Rate
during this period of heightened concerns, causing the Spread to become more negative.  On

September 16, 2008, the negative Spread nearly doubled to -32 basis points.  The next day, on September 17, the negative Spread doubled again reaching -69 basis points.  On September 18, the negative Spread more than doubled once again reaching -180 basis points.  Finally, on September 30, 2008, the negative Spread reached -195 basis points.

82.     Thus, between September 15, 2008 and September 30, 2008, the Federal Reserve Eurodollar Deposit Rate increased by 300 basis points to reflect increasing concerns about the banks, while LIBOR increased by  less than one-half, or by 123 basis points during the same period.  This diversion in the behavior of the two rates strongly supports the finding that Defendants intensified their collusive suppression of the LIBOR, and did so to understate their borrowing costs in the face of increasing concerns about the health of the banks.

83.     The Spread remained negative for more than one and a half years following the Lehman filing, until May 17, 2010.  As concerns about banks' financial health eased, so did the magnitude of the suppression of LIBOR.  As stated earlier, Federal Reserve's Eurodollar Deposit Rate reached 6% on September 30, 2008.  With the easing of the financial crisis, Federal Reserve's Eurodollar Deposit Rate fell to 0.45% on May 17, 2010.  The average suppression of LIBOR between October 1, 2008 and May 17, 2010 equaled negative 38 basis points.  The Spread finally turned positive for the first time during the post-Lehman period on May 17, 2010. Following this date, the Spread again became negative, with the magnitude of the Spread averaging around -10 basis points.  The dramatic period of negative Spread during the Class Period, following years of uniform behavior between each individual Defendant Bank's LIBOR quote and the Federal Reserve Eurodollar Deposit Rate, is also graphically demonstrated by Figures 4 to 19 below on a bank by bank basis. Every Spread during the period August 8, 2007 to May 17, 2010 is statistically significant at the extremely high 99% confidence level.































84.     As the following chart demonstrates, the average Spread for each of the individual Defendants was uniformly negative throughout the entire Class Period, strongly supporting that each of these banks was suppressing its LIBOR quotes, and colluding to suppress reported LIBOR.

| **BANK NAME** | **Average Spread between August 8, 2007 through May 17, 2010** |
|---|---|
| 1. Bank of Tokyo-Mitsb. | -25 basis points |
| 2. Bank of America | -30 basis points |
| 3. Barclays | -25 basis points |
| 4. Citi | -32 basis points |
| 5. CSFB | -27 basis points |
| 6. Deutsche Bank | -31 basis points |
| 7. HBOS | -29 basis points |
| 8. HSBC | -32 basis points |
| 9. JP Morgan Chase | -35 basis points |
| 10. Lloyds | -30 basis points |

| 11. Norin Bank | -25 basis points |
| 12. Rabo Bank | -32 basis points |
| 13. Royal Bank of Canada | -28 basis points |
| 14. Royal Bank of Scotland | -26 basis points |
| 15. UBS | -29 basis points |
| 16. West | -35 basis points |

85.     Moreover, as set forth in the following chart, during the critical two week period following the bankruptcy of Lehman Brothers, each of Defendants dramatically increased its collusive suppression of LIBOR.

| **BANK NAME** | **Average Spread between September 16, 2008 and September 30, 2008** |
|---|---|
| 1. Bank of Tokyo-Mitsb. | -120 basis points |
| 2. Bank of America | -144 basis points |
| 3. Barclays | -87 basis points |
| 4. Citi | -142 basis points |
| 5. CS | -122 basis points |
| 6. Deutsche Bank | -129 basis points |
| 7. HBOS | -110 basis points |
| 8. HSBC | -141 basis points |
| 9. JP Morgan Chase | -153 basis points |
| 10. Lloyds | -146 basis points |
| 11. Norin Bank | -126 basis points |
| 12. Rabo Bank | -143 basis points |
| 13. Royal Bank of Canada | -140 basis points |
| 14. Royal Bank of Scotland | -140 basis points |
| 15. UBS | -141 basis points |
| 16. West | -138 basis points |

86.     Every Spread during the period from September 16, 2008 to September 30, 2008 is statistically significant at the extremely high 99% confidence level.

87.     Plaintiffs' consulting expert finds the results reflected in these two tables to be powerful and statistically significant evidence of Defendants' collusive suppression of LIBOR during the Class Period.

88.     As detailed above, analysis based on well accepted statistical methodologies strongly supports that suppression of LIBOR occurred during the Class Period, accomplished through the collusive conduct of Defendants.  The sustained period during which the Federal Reserve Eurodollar Deposit – LIBOR Spread fell and remained starkly negative, as seen in Figure 2 above, accounting as it does for Market Fundamentals, is not plausibly achievable absent collusion among Defendants.  The intensified suppression from September 16, 2008 to September 30, 2008 (following the Lehman bankruptcy), in defiance of economic expectations, provides further powerful support for the suppression of LIBOR achieved through collusion by Defendants.  Because no Defendant Bank – absent collusive conduct – could know what LIBOR quote another panel bank actually intended to submit prior to those numbers being made public after 11:00 each morning, the fact that all Defendants submitted LIBOR quotes below the Federal Reserve Eurodollar Deposit Rate over the Class Period further strongly supports the participation of each Defendant Bank in the suppressive and collusive scheme.

   **D.**     Empirical Analyses By Academics And Other Commentators Further Indicate LIBOR Suppression Occurred.

89.     In addition to the independent expert work detailed above, publicly available analyses by academics and other commentators likewise support the Baltimore Plaintiffs' allegations.  While those studies used various comparative benchmarks and did not employ uniform methodologies, they collectively indicate LIBOR was artificially suppressed during the Class Period.

   **1.**     **The discrepancy between Defendants' reported LIBOR quotes and their CDS spreads indicates the banks misrepresented their borrowing costs to the BBA.**

90.     One economic indicator that Defendants suppressed USD-LIBOR during the Class Period is the variance between their LIBOR quotes and their contemporaneous cost of

buying default insurance—*i.e.*, a credit-default swap ("CDS")—on debt they issued during that period.

91.     The spread serves as a measure of the perceived risk of default by the entity issuing the underlying bond or receiving the loan—the greater the risk of default the underlying bond or loan bears, the greater the CDS spread.  In the case of a CDS for which the underlying instrument consists of an interbank loan where a USD-LIBOR panel bank is the borrower, the greater the perceived risk the panel bank will default on the loan, the higher the applicable CDS spread, as this higher spread represents the cost of insuring against the increased risk of a default on the underlying loan.

92.     As one commentator has observed, "The cost of bank default insurance has generally been positively correlated with LIBOR.  That is, in times when banks were thought to be healthy, both the cost of bank insurance and LIBOR decreased or remained low, but when banks were thought to be in poor condition, both increased."[32]  During the Class Period, however, those historically-correlated indicia of banks' borrowing costs diverged significantly.

93.     That discrepancy was detailed in a May 29, 2008 *Wall Street Journal* article reporting the results of a study it had commissioned.  The *Journal*'s analysis indicated numerous banks caused LIBOR, "which is supposed to reflect the average rate at which banks lend to each other," to "act as if the banking system was doing better than it was at critical junctures in the financial crisis."[33]  The *Journal* found that beginning in January 2008, "the two measures began to diverge, with reported LIBOR rates failing to reflect rising default-insurance costs."

94.     The *Journal* observed that the widest gaps existed with respect to the LIBOR

[32] Justin Wong, "LIBOR Left in Limbo; A Call for More Reform," 13 *North Carolina Banking Institute* 365, 371 (2009) (footnotes omitted).
[33] *See* Carrick Mollenkamp and Mark Whitehouse, "Study Casts Doubt on Key Rate --- WSJ Analysis Suggests Banks May Have Reported Flawed Interest Data for Libor."

quotes of Defendants Citibank, WestLB, HBOS, JPMorgan Chase, and UBS.  According to the *Journal*'s analysis, Citibank's LIBOR quotes differed the most from what the CDS market suggested the bank's borrowing cost was.  On average, the rates at which Citibank reported it could borrow dollars for three months (*i.e.*, its three-month LIBOR quote) were about 87 basis points *lower* than the rates calculated using CDS data.  WestLB, HBOS, JPMorgan Chase, and UBS likewise exhibited significant LIBOR-CDS discrepancies—of 70, 57, 43, and 42 basis points, respectively—while Defendants Credit Suisse, Deutsche Bank, Barclays, HSBC, Lloyds, and RBS each exhibited discrepancies of about 30 basis points.  The study's authors concluded "one possible explanation for this gap is that banks understated their borrowing rates."

95.     Citing another example of suspicious conduct, the *Journal* observed that on the afternoon of March 10, 2008, investors in the CDS market were betting that WestLB—hit especially hard by the credit crisis—was nearly twice as likely to renege on its debts as Credit Suisse, which was perceived to be in better shape, yet the next morning the two banks submitted identical LIBOR quotes.

96.     Additionally, having compared the banks' LIBOR quotes to their actual costs of borrowing in the commercial-paper market, the *Journal* reported, for example, that in mid-April 2008, UBS paid 2.85% to borrow dollars for three months, but on April 16, 2008, the bank quoted a borrowing cost of 2.73% to the BBA.

97.     The *Journal* further noted an uncanny equivalence between the LIBOR panel banks' quotes:  the three-month borrowing rates the banks reported remained within a range of only 0.06 of a percentage point, even though at the time their CDS insurance costs (premiums) varied far more widely, reflecting the market's differing views as to the banks' creditworthiness.  According to Stanford University professor Darrell Duffie, with whom the authors of the *Journal*

article consulted, the unity of the banks' LIBOR quotes was "far too similar to be believed."

98.     David Juran, a statistics professor at Columbia University who reviewed the *Journal*'s methodology, similarly concluded that the *Journal's* calculations demonstrate "very convincingly" that reported LIBOR is lower, to a statistically significant degree, than what the market thinks it should be.

99.     Calculating an alternate borrowing rate incorporating CDS spreads, the *Journal* estimated that misreporting of LIBOR had a $45 billion effect on the market, representing the amount borrowers (the banks) did not pay to lenders (investors in debt instruments issued by the banks) that they would otherwise have had to pay.

100.    According to the *Journal*, three independent academics, including Professor Duffie, reviewed its methodology and findings, at the paper's request.  All three deemed the *Journal*'s approach "reasonable."

101.    Further economic analysis supports the correlation seen in the *Journal*'s report. A study by Connan Snider and Thomas Youle—of the economics departments at UCLA and the University of Minnesota, respectively—released in April 2010 concluded LIBOR did not accurately reflect average bank borrowing costs, its "ostensible target."[34]  Noting that "[i]n a competitive interbank lending market, banks' borrowing costs should be significantly related to their perceived credit risk," Snider and Youle posited that if LIBOR quotes "express true, competitively determined borrowing costs," they should "be related to measures of credit risks, such as the cost of default insurance."  According to Snider and Youle's analysis, however, quotes provided by USD-LIBOR panel banks in fact deviated from their costs of borrowing as reflected in CDS spreads.

---

[34] Connan Snider and Thomas Youle, "Does the LIBOR reflect banks' borrowing costs?", April 2, 2010.

102.    Comparing, for example, the 12-month USD-LIBOR quotes from Citigroup and Bank of Tokyo together with each banks' corresponding one-year senior CDS spreads, Snider and Youle observed (as illustrated in the graph below) "that while Citigroup has a substantially higher CDS spread than [Bank of Tokyo], it submits a slightly lower Libor quote."  Accordingly, the authors explain, while the CDS spreads "suggest that the market perceives Citigroup as riskier than [Bank of Tokyo], as it is more expensive to insure against the event of Citigroup's default," the banks' LIBOR quotes "tell the opposite story."



103.    Snider and Youle further noted the level of Citigroup's CDS spreads relative to its Snider and Youle further noted the level of Citigroup's CDS spreads relative to its LIBOR quotes was "puzzling."  The authors explained, "Given that purchasing credit protection for a loan makes the loan risk free, one would expect [the] difference between the loan rate and the CDS spread to roughly equal the risk free rate.  This corresponds to the idea that a loan's interest rate contains a credit premium, here measured by the CDS spread."  But the authors observed

that Citigroup's quote was often "significantly below its CDS spread," implying "there were interbank lenders willing to lend to Citigroup at rates which, after purchasing credit protection, would earn them *a guaranteed 5 percent loss*." (Emphasis added). That discrepancy contravenes basic rules of economics and finance, thus indicating Citibank misreports its borrowing costs to the BBA.

### 2.   Cross-currency discrepancies in Defendants' LIBOR quotes indicate they suppressed USD-LIBOR.

104.   Defendants' LIBOR quotes also displayed inexplicable "cross-currency rank reversals." That is, as detailed in Snider and Youle's paper referenced above, at least some Defendants reported lower rates on USD-LIBOR than did other panel members but, for other currencies, provided higher rates than did those same fellow banks. Both BAC and BTMU, for instance, quoted rates for USD-LIBOR and Yen-LIBOR during the period under study, yet BAC quoted a lower rate than BTMU for USD-LIBOR and a *higher* rate than BTMU for Yen-LIBOR. Other Defendants included in Snider and Youle's analysis—Barclays, Citigroup, and JPMorgan Chase—displayed similar anomalies across currencies, as the graphs below illustrate. Citigroup, for example, often reported rates at the top of the Yen-LIBOR scale while simultaneously quoting rates at the bottom of the USD-LIBOR scale. Because, Snider and Youle explain, "the same bank is participating in each currency," the credit risk "is the same for loans in either currency"; thus these "rank reversals" demonstrate that differences in the banks' LIBOR quotes "are not primarily due to differences in credit risk, something we would expect of their true borrowing costs."









### 3.   The frequency with which at least certain Defendants' LIBOR quotes "bunched" around the fourth-lowest quote of the day suggests manipulation.

105.   During the Class Period, the rates reported by certain Defendants—in particular, Citibank, BAC, and JPMorgan Chase—also demonstrated suspicious "bunching" around the fourth lowest quote submitted by the 16 banks to the BBA.  Indeed, Citibank's and BAC's quotes often tended to be identical to the fourth-lowest quote for the day.  Because the LIBOR calculation involved excluding the lowest (and highest) four reported rates every day, bunching around the fourth-lowest rate suggests Defendants collectively depressed LIBOR by reporting the lowest possible rates that would not be excluded from the calculation of LIBOR on a given day.

106.   Bunching among Defendants' respective LIBOR quotes indicates the banks intended to report the same or similar rates, notwithstanding the banks' differing financial conditions, which, as detailed above, reasonably should have resulted in differing LIBOR quotes.  Those discrepancies suggest Defendants colluded to suppress LIBOR.

107.   The following charts show the frequency with which the USD-LIBOR quotes submitted by Defendants Citigroup, BAC, and JPMorgan Chase fell within a given percentage rate from the fourth-lowest quote.  A negative difference means the reporting bank was below the fourth-lowest quote, and therefore its rate was not included in the daily LIBOR calculation, while zero difference means that the bank reported the fourth-lowest quote on a given day (either by itself or tied with other reporting banks).[35]

---

[35] In the event of a tie between two or more banks, one of the banks' quotes, selected at random, was discarded.







108.    According to Snider and Youle, the fact that observed bunching occurred around the pivotal fourth-lowest reported rate reflected the reporting banks' intention to ensure the lowest borrowing rates were included in the calculation of USD-LIBOR (which includes only the fifth-lowest through the twelfth-lowest quotes).

109.    In other words, banks that bunched their quotes around the fourth-lowest submission helped ensure the maximum downward manipulation of the resulting rate. Furthermore, that a panel bank reported one of the four lowest quotes (*i.e.*, quotes excluded from the ultimate LIBOR calculation) does not mean the bank did not also participate in the collusion.

110.    Further demonstrating the aberrant nature of the observed bunching around the fourth-lowest quote, Snider and Youle noted "the intraday distribution of *other* measures of bank borrowing costs do not exhibit this bunching pattern."  (Emphasis added).

111.    Additionally, Snider and Youle detailed a discrepancy between USD-LIBOR panel banks' LIBOR quotes and their CDS spreads.  The authors found that "with the intra-day variation of both Libor quotes and CDS spreads increasing from their historical levels," the CDS

spreads' intra-day variation "grew considerably larger than that of Libor quotes."[36]

112.    Snider and Youle further observed that—as the graphs below, embodying a composite of all the banks, illustrate—during the Class Period Defendants' quotes tended to "bunch" around the fourth-lowest quote much more commonly than those banks' CDS spreads "bunched" around the fourth-lowest spread.  The authors concluded, "If banks were truthfully quoting their costs, . . . we would expect these distributions to be similar."



113.    Given the method by which the BBA calculates LIBOR—discarding the highest and lowest reported rates and averaging the remainder—that strong concentration around the fourth-lowest rate is exactly what would occur if a number of banks sought in concert to depress LIBOR.

[36] Snider and Youle, "Does the LIBOR reflect banks' borrowing costs?"

4.      **That LIBOR diverged from its historical relationship with the Federal Reserve auction rate indicates suppression occurred.**

114.    A comparison between LIBOR and the Federal Reserve auction rate further suggests Defendants artificially suppressed LIBOR during the Class Period.  An April 16, 2008 *Wall Street Journal* article, for example, noted the Federal Reserve had recently auctioned off $50 billion in one-month loans to banks for an average annualized interest rate of 2.82%—10 basis points higher than the comparable USD-LIBOR.  That differential would make no economic sense if the reported LIBOR was accurate, the *Journal* observed:  "Because banks put up securities as collateral for the Fed loans, they should get them for a lower rate than Libor, which is riskier because it involves no collateral."

115.    A subsequent *Journal* article raised further concerns about LIBOR's accuracy based on the comparison of one-month LIBOR with the rate for the 28-day Federal Reserve auction.[37]  According to the *Journal*, because the Federal Reserve requires collateral:

> [B]anks should be able to pay a lower interest rate [to the Fed] than they do when they borrow from each other [*e.g.*, as ostensibly measured by LIBOR] because those loans are unsecured.  It is the same reason why rates for a mortgage, which is secured by a house, are lower than those for credit cards, where the borrower doesn't put up any collateral. In other words, the rate for the Fed auction should be lower than Libor.

To the contrary, though, two days before the *Journal* article (September 22, 2008), the rate for the 28-day Fed facility was 3.75%—much higher than one-month USD-LIBOR, which was 3.18% that day[38] and 3.21% the next day.

---

[37] Carrick Mollenkamp, "Libor's Accuracy Becomes Issue Again," *The Wall Street Journal*, September 24, 2008.

[38] The *Journal* initially reported the one-month USD-LIBOR rate for that day as 3.19% but later noted the correct figure.

### 5.   LIBOR's divergence from its historical correlation to overnight index swaps also suggests it was artificially suppressed during the Class Period.

116.   Yet another measure of LIBOR's aberrant behavior with respect to other measures of banks' borrowing costs during the Class Period is its observed deviation from the overnight-index swap ("OIS") rate.  In his academic article analyzing LIBOR data for the period of the second half of 2007 and 2008, Justin Wong observed that between 2001 and July 2007, when the global credit crisis began, the spread between LIBOR and the OIS rate "averaged eleven basis points."[39]  By July 2008, on the other hand, that gap approached 100 basis points, a figure significantly higher than the spread from a year prior, and by October 2008, "it peaked at 366 basis points."  While the spread "receded somewhat in November 2008 to 209 basis points," that was still "far above the pre-crisis level."  Wong's analysis provides further support for Plaintiffs' allegations that Defendants suppressed LIBOR.

### 6.   Additional data suggest LIBOR may have been manipulated as early as August 2006.

117.   As the empirical evidence in support of LIBOR manipulation continues to develop, at least some of the data point to possible manipulation as early as August 2006.  In a recent paper, Rosa Abrantes-Metz (of NYU Stern School of Business's Global Economics Group) and Albert Metz (of Moody's Investors Service) compared one-month LIBOR against the Fed Funds effective rate and the one-month Treasury Bill ("T-Bill") rate.[40]  Studying the period of early August 2006 through early August 2007, the authors observed the level of one-month LIBOR was "virtually constant," while the Fed Funds effective rate and the one-month T-

---

[39] Justin T. Wong, "LIBOR Left in Limbo; A Call for More Reform," *North Carolina Banking Institute*, Vol. 13 p. 365-84 (Feb. 22, 2009).
[40] Rosa M. Abrantes-Metz and Albert D. Metz, "How Far Can Screens Go in Distinguishing Explicit from Tacit Collusion?  New Evidence from the Libor Setting."

Bill rate did "not present such striking stability."  Spurred by that "highly anomalous" discrepancy, Abrantes-Metz and Metz examined the LIBOR panel members' individual quotes, which showed that during the studied period, the middle eight quotes used to set LIBOR each day were "essentially identical day in and day out"—another "highly anomalous" finding.

118.    The authors concluded that "explicit collusion" presented "the most likely explanation" for this anomalous behavior.  They explained that because LIBOR quotes are submitted sealed, "the likelihood of banks moving simultaneously to the same value from one day to the next without explicit coordination is extremely low, particularly given that their idiosyncrasies would not imply completely identical quotes under a non-cooperative outcome." They further opined "it is difficult to attribute it to tacit collusion or strategic learning, since the change is abrupt, the quotes are submitted sealed, and the quotes themselves sometimes change from one day to the next in an identical fashion."

119.    Abrantes-Metz and Sofia B. Villas-Boas (of UC-Berkeley's Department of Agricultural & Resource Economics) used another methodology—Benford second-digit reference distribution—to track the daily, one-month LIBOR over the period 2005-2008.[41] Based on this analysis, the authors found that for sustained periods in 2006 and 2007, the empirical standard-deviation distribution differed significantly from the Benford reference distribution for nearly all banks submitting quotes.  The authors also observed large deviations from Benford for a sustained period in 2008.

120.    Those studies indicate at least a possibility that Defendants' suppression of LIBOR goes back even further than August 2007.

---

[41] Rosa M. Abrantes-Metz and Sofia B. Villas-Boas, "Tracking the Libor Rate," July 2010.

**7.      Expert Analysis Performed In Connection With These Proceedings Indicates LIBOR's Increase Following Expressions of Concern Over LIBOR's Viability Resulted from Defendants' Reaction to Events Unrelated to Market Factors.**

121.    On April 17, 2008, the day after *The Wall Street Journal* initially reported on LIBOR's anomalous behavior and the BBA stated it would conduct an inquiry concerning LIBOR, there was a sudden jump in USD-LIBOR—the three-month borrowing rate hit 2.8175% that day, about eight basis points more than the previous day's rate of 2.735%.

122.    Suspiciously, reported LIBOR for other currencies fell or remained relatively flat at the time USD-LIBOR rose, a sign that the latter was susceptible to manipulation.

123.    A consulting expert engaged by the Plaintiffs in these coordinated proceedings conducted an analysis of the change in LIBOR on the single date of April 17, 2008.  The analysis tested the hypothesis that if banks did not manipulate LIBOR, there would be no systematic changes in LIBOR expected on April 17, 2008 relative to typical changes on other days between January 5, 2000 to May 13, 2011, whereas if banks did manipulate LIBOR—and were responding to *The Wall Street Journal* article and BBA announcement—the reporting banks would be likely to reduce or abandon the manipulation immediately in response to these events.  An immediate reduction in LIBOR manipulation would result in an increase in LIBOR quotes by the member banks on April 17, 2008.

124.    To conduct the analysis, the consulting expert ran a regression using the daily changes in LIBOR.  Table 1 below shows the studies' results.  As discussed above, LIBOR increased on April 17, 2008 at a statistically significant level.  Moreover, the increase in composite LIBOR as well as of 11 of the 16 bank quotes were statistically significant.  These findings were consistent with the hypothesis that the banks manipulated and suppressed LIBOR.

| Table 1 | | | |
|---|---|---|---|
| **Changes in LIBOR on April 17, 2008 in Percentage Points*** | | | |
| **Dependent variable** | **Average change during non-suppression days** | **Change in the dependent variable on April 17, 2008 relative to non-suppression days' average** | **Statistical Significance at the 1-5% level of the April 17, 2008 move** |
| **1** BBA LIBOR | -0.000371 | 0.0909* | 5% |
| **2** HSBC LIBOR | 0.000154 | 0.1273** | 1% |
| **3** JPMC LIBOR | -0.000333 | 0.0872* | 5% |
| **4** BARCLAYS LIBOR | -0.000333 | 0.1072* | 5% |
| **5** WEST LB LIBOR | -0.000314 | 0.0971* | 5% |
| **6** RBS LIBOR | -0.000352 | 0.0921* | 5% |
| **7** RABOBANK LIBOR | -0.000364 | 0.0872* | 5% |
| **8** CITI LIBOR | -0.000344 | 0.1022* | 5% |
| **9** RBC LIBOR | 0.002067 | 0.1021* | 5% |
| **10** UBS LIBOR | -0.000777 | 0.1021* | 5% |
| **11** NORIN LIBOR | -0.00038 | 0.0971* | 5% |
| **12** HBOS LIBOR | 0.002467 | 0.1111* | 5% |

Statistical significance is assessed using a AR(3) model for the residuals

* While not shown here, an additional dummy variable is used to control for changes during the Relevent Period of August 8, 2007 to May 17, 2010.

125.    An alternative hypothesis is that, in addition to reacting to the *Journal*, other confounding effects that are related to the risk of the banking sector or overall Market Fundamentals could have emerged on April 16, 2008 and April 17, 2008.  This alternative hypothesis also predicts an increase in LIBOR.  To test this alternative hypothesis, instead of looking at daily changes in LIBOR quotes, it is possible to examine daily changes in the difference between banks' LIBOR quotes and the Federal Reserve Eurodollar Deposit Rate (the "Spread").  If risk-related factors or Market Fundamentals played a role, they would affect both the banks' LIBOR quotes as well as the Federal Reserve's Eurodollar Deposit Rate.  Thus, if this hypothesis is correct, one should not see any changes to the Spread on April 17, 2008, since these two effects should cancel out.  However, if there were no risk-related news and only a reaction to *The Wall Street Journal* article and the BBA announcement played a major role, then only LIBOR would be affected, leaving Federal Reserve's Eurodollar Deposit Rate mostly unaffected.  In this case, the Spread would again be expected to increase.

126.    The test of this alternative hypothesis showed that the Spreads of all 16 panel banks increased on April 17, 2008, and, as shown in Table 2 below, 11 of the 16 changes were statistically significant at levels ranging from 1% to 5%.  Once again, these finding were consistent with the manipulation hypothesis and inconsistent with the hypothesis that other risk factors explained the April 17, 2008 shock to LIBOR.

| Table 2 |
| --- |
| **Changes in Spread (BBA LIBOR – Federal Reserve's Eurodollar Deposit Rate) on April 17, 2008 in Percentage Points\*** |

| | Dependent variable | Average change in Spread during non-suppression days | Change in the dependent variable on April 17, 2008 relative to non-suppression days' average | Statistical Significance at the 1-5% level of the April 17, 2008 move |
|---|---|---|---|---|
| 1 | BBA LIBOR Spread | -0.000078 | 0.0838 | 5% |
| 2 | HSBC LIBOR Spread | 0.000508 | 0.1205 | 1% |
| 3 | JPMC LIBOR Spread | -0.000103 | 0.0803* | 5% |
| 4 | BARCLAYS LIBOR Spread | -0.000067 | 0.1002** | 1% |
| 5 | RBS LIBOR Spread | -0.0001 | 0.0851* | 5% |
| 6 | TOKYO LIBOR Spread | -0.000092 | 0.0797* | 5% |
| 7 | CITI LIBOR Spread | -0.00012 | 0.0953* | 5% |
| 8 | CS LIBOR Spread | -0.000224 | 0.07* | 5% |
| 9 | RBC LIBOR Spread | -0.000135 | 0.0951* | 5% |
| 10 | UBS LIBOR Spread | -0.000172 | 0.095* | 5% |
| 11 | NORIN LIBOR Spread | -0.000179 | 0.0903** | 1% |
| 12 | HBOS LIBOR Spread | 0 | 0.1007* | 5% |

Statistical significance is assessed using a AR(3) model for the residuals
* While not shown here, an additional dummy variable is used to control for changes during the Relevent Period of August 8, 2007 to May 17, 2010.

127.    The conclusions of this study are consistent with the contemporaneous views

expressed by high-level employees of various Defendant panel banks recounted above.

**E.**   That At Least Some Defendants Faced Dire Financial Circumstances During the Class Period Further Renders Their Unduly Low LIBOR Quotes Striking.

128.   The independent economic analyses performed in connection with these proceedings, whose findings are corroborated by the publicly available scholarly work detailed above, strongly indicate Defendants' LIBOR quotes during the Class Period did not appropriately reflect those banks' actual borrowing costs at that time—and, indeed, that Defendants *collectively* suppressed LIBOR.  Further illustrating the striking discrepancy between Defendants' submissions to the BBA and their actual borrowing costs, during 2008 and 2009 at least some of those banks' LIBOR quotes were too low in light of the dire financial circumstances the banks faced, as described in numerous news articles from the Class Period.

**1.**   Citigroup

129.   On November 21, 2008, *The Wall Street Journal* reported that Citigroup executives "began weighing the possibility of auctioning off pieces of the financial giant or even selling the company outright" after the company faced a plunging stock price.  The article noted Citigroup executives and directors "rushing to bolster the confidence of investors, clients and employees" in response to uncertainty about Citigroup's exposure to risk concerning mortgage-related holdings.[42]  Similarly, On November 24, 2008, *CNNMoney* observed:

> If you combine opaque structured-finance products with current fair-value accounting rules, almost none of the big banks are solvent because that system equates solvency with asset liquidity. So at this moment Citi isn't solvent. Some argue that liquidity, not solvency, is the problem.  But in the end it doesn't matter.  Fear will drive illiquidity to such a point that Citi could be rendered

[42] *See* http://online.wsj.com/article/SB122722907151946371.html?mod=testMod

insolvent under the current fair-value accounting system.[43]

130.    On January 20, 2009, *Bloomberg* reported that Citigroup "posted an $8.29 billion fourth-quarter loss, completing its worst year, and plans to split in two under Chief Executive Officer Vikram Pandit's plan to rebuild a capital base eroded by the credit crisis.  The article further stated, "***The problems of Citi, Bank of America and others suggest the system is bankrupt***." (Emphasis added).[44]

**2.    RBS, Lloyds, and HBOS**

131.    An April 23, 2008 analyst report from Société Générale concluded, with respect to RBS's financial condition in the midst of its attempt to raise capital:

> Given the magnitude and change in direction in a mere eight weeks, we believe that management credibility has been tarnished. We also remain unconvinced that the capital being raised is in support of growth rather than merely to rebase and recapitalise a bank that overstretched itself at the wrong point in the cycle in its pursuit of an overpriced asset.
>
> *            *            *
>
> [I]n our eyes, RBS has not presented a rock solid business case that warrants investor support and the bank has left itself almost no capital headroom to support further material deterioration in either its assets or its major operating environments. We believe £16bn (7% core tier I ratio) would have provided a solid capital buffer.

The analysts also opined, "[W]e are not of the belief that all of RBS' problems are convincingly behind it."  They further explained, "When faced with the facts and the events leading up to yesterday's request for a £12bn capital injection, we believe shareholders are being asked to invest further in order to address an expensive mishap in H2 07 rather than capitalise on growth opportunities."

---

[43] *See* http://money.cnn.com/2008/11/21/news/companies/benner_citi.fortune/

[44] *See* http://www.bloomberg.com/apps/news?pid=21070001&sid=aS0yBnMR3USk

132.    On October 14, 2008, *The Herald Scotland* reported a £37 billion injection of state capital into three leading banks, including RBS and HBOS.  The article observed, "Without such near-nationalisations, . . . Royal Bank of Scotland and HBOS, would almost certainly have suffered a run on their remaining reserves and been plunged into insolvency.  Their share prices could scarcely have taken much more of their recent hammering."[45]

133.    On December 12, 2008, *Bloomberg* reported that shareholders approved HBOS's takeover by Lloyds TSB Group plc following bad-loan charges in 2008 rising to £5 billion and an increase in corporate delinquencies.  The article also quoted analysts characterizing HBOS's loan portfolio as "'generally of a lower quality than its peers.'"  *Bloomberg* further observed that HBOS suffered substantial losses on its bond investments, which totaled £2.2 billion, and losses on investments increased from £100 million to £800 million for the year.[46]

134.    A January 20, 2009, analyst report from Société Générale stated:  "We would note that given the 67% drop in the share price following [RBS]'s announcements yesterday [relating to capital restructuring due to greater-than-expected credit-market related write downs and bad debt impairments in Q4], the loss of confidence in the bank's ability to continue to operate as a private sector player and concern over the potential ineffectiveness of the Asset Protection Scheme may prompt the U.K. government to fully nationalise the bank.  In this instance, the shares could have very limited value, if at all."[47]

135.    On March 7, 2009, *Bloomberg* reported that Lloyds "will cede control to [the

---

[45] *See* http://www.heraldscotland.com/reckless-banks-brought-this-financial-firestorm-down-upon-their-own-heads-1.891981.

[46] *See* http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a4BTqdgwhPTc&refer=uk.

[47] *See* January 20, 2009 Société Générale analyst report on Royal Bank of Scotland titled "Little value left for shareholders."

British Government] in return for state guarantees covering 260 billion pounds ($367 billion) of risky assets." The article further observed that in September 2008, Lloyds agreed to buy HBOS for roughly £7.7 billion as the British Government sought to prevent HBOS from collapsing after credit markets froze. The HBOS loan book was described as "more toxic than anyone ever dreamed."[48]

136. On November 24, 2009, *Bloomberg* reported the Bank of England provided £62 billion ($102 billion) of "taxpayer-backed emergency financing" to RBS and HBOS at the height of the financial crisis in October 2008 and that "[t]he [financing] operations were kept secret until now to prevent unnerving markets." The Bank's Deputy Governor Paul Tucker was quoted as stating in evidence to the Treasury Committee in London that "'[h]ad we not done it, the cycle would have been a lot worse…[and that] [t]his was tough stuff, a classic lender of last resort operation.'"[49]

**3.** <u>WestLB</u>

137. A September 9, 2008 article in *Spiegel Online* reported WestLB was "heavily hit as a result of the US sub-prime crisis and the resulting credit crunch. Ill-advised speculation resulted in a 2007 loss of €1.6 billion -- leading the bank to the very brink of insolvency." The article reported that in early 2008, a special investment vehicle was set by WestLB's primary shareholders to "guarantee €5 billion worth of risky investments." The European Commissioner approved the public guarantee but demanded that the bank be "completely restructured to avoid falling afoul of competition regulations." The European Commissioner for Competition later warned that if WestLB did not significantly improve its restructuring package, Brussels would

---

[48] *See* http://www.businessday.com.au/business/lloyds-the-latest-uk-bank-to-be-rescued-20090308-8sfd.html.

[49] *See* http://www.bloomberg.com/apps/news?pid=21070001&sid=a9MjQj6MNTeA

not approve the public assistance that European Union had already provided to the bank. Further, if that occurred, WestLB would have to pay back €12 billion to the EU.[50]

138.    On November 24, 2009, *Bloomberg* reported that BNP Paribas SA said "[i]nvestors should buy the euro [ ] on speculation that capital will need to be repatriated to support German bank WestLB AG."  Furthermore, two German regional savings bank groups that hold a majority stake in WestLB were "prepared to let the Dusseldorf-based lender become insolvent" and that "the prospect of insolvency may force state-owned banks and savings banks outside North Rhine-Westphalia, WestLB's home state, to contribute to capital injections." Moreover, WestLB needed "as much as 5 billion euros ($7.5 billion) in capital and may be shut by Nov. 30 unless a solution for its capital needs can be found."[51]

F.    Defendants' Improper Activities Have Incited Governmental Investigations Legal Proceedings and Disciplinary Action Worldwide.

139.    As described in more detail below, investigations regarding LIBOR are ongoing in the United States, Switzerland, Japan, United Kingdom, Canada, the European Union, and Singapore by nine different governmental agencies, including the DOJ, the SEC, and the CFTC. Indeed, on February 27, 2012, the DOJ represented to the Court overseeing these multidistrict proceedings that the Justice Department "is conducting a criminal investigation into alleged manipulation of certain benchmark interest rates, including LIBORs of several currencies."  The investigation represents an unprecedented joint investigation by both the criminal and antitrust divisions of the DOJ.

---

[50] *See* Anne Seith, Germany's WestLB under Attack from Brussels, SPIEGEL ONLINE, Sept. 9, 2008, http://www.spiegel.de/international/business/0,1518,druck-577142,00.html.

[51] See Matthew Brown, BNP Says Buy Euro on Speculation WestLB to Be Rescued (Update 1), BLOOMBERG, Nov. 24, 2009, http://www.bloomberg.com/apps/news?pid=21070001&sid=aI9ZPZShrjWI.

140.    Authorities are attempting to determine, among other things, "whether banks whose funding costs were rising as the financial crisis intensified tried to mask that trend by submitting artificially low readings of their daily borrowing costs."[52]   Though the proceedings are ongoing, several Defendants have admitted that regulators—including the DOJ, SEC, and CFTC—have targeted them in seeking information about potential misconduct.

141.    Moreover, documents submitted in connection with legal proceedings in Canada and Singapore reveal that at least certain Defendants misreported their borrowing costs to artificially suppress Yen-LIBOR.

>        1.    News reports and Defendants' regulatory filings indicate U.S. government and foreign regulatory bodies are engaged in expansive investigations of possible LIBOR manipulation.

142.    The first public revelation regarding government investigations into possible LIBOR manipulation occurred on March 15, 2011, when UBS disclosed in a Form 20-F (annual report) filed with the SEC that the bank had "received subpoenas" from the SEC, the CFTC, and the DOJ "in connection with investigations regarding submissions to the [BBA]."   UBS stated it understood "that the investigations focus on whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR rates at certain times."   The bank further disclosed that it had "received an order to provide information to the Japan Financial Supervisory Agency concerning similar matters."   UBS stated it was "conducting an internal review" and was "cooperating with the investigations."

143.    On March 16, 2011, the *Financial Times* reported that UBS, BAC, Citigroup, and Barclays received subpoenas from U.S. regulators "probing the setting of" USD-LIBOR "between 2006 and 2008."   The *Times* further noted investigators had "demanded information

[52] David Enrich, Carrick Mollenkamp, & Jean Eaglesham, "U.S. Libor Probe Includes BofA, Citi, UBS." The Wall Street Journal, March 18, 2011

from" WestLB, and that the previous fall, "all 16 members of the committee that helped the [BBA] set the dollar Libor rate during 2006-08 received informal requests for information."[53]

144.    The same day, *MarketWatch* similarly reported "[m]ultiple U.S. and European banks, which provide borrowing costs to calculate Libor every day, have been contacted by investigators," including the DOJ, the SEC, and the CFTC.[54]

145.    The next day, *Bloomberg* reported that Barclays and Citigroup had received subpoenas from U.S. regulators and that Defendants WestLB, Lloyds, and BAC had been contacted by regulators.  The article specified BAC had received subpoenas from the SEC and the DOJ.[55]

146.    On March 23, 2011, *Bloomberg* revealed that Citigroup Inc., Deutsche Bank, BAC, and JPMorgan Chase were asked by U.S. regulators "to make employees available to testify as witnesses" in connection with the regulators' ongoing investigation.[56]

147.    The next day, the *Financial Times* reported that Defendant Barclays was "emerging as a key focus of the US and U.K. regulatory probe into alleged rigging of [LIBOR]." According to the *Times*, investigators were "probing whether communications between the bank's traders and its treasury arm," which helps set LIBOR, "violated 'Chinese wall' rules that prevent information-sharing between different parts of the bank."  The *Times* further stated

---

[53] Brooke Masters, Patrick Jenkins & Justin Baer, "Banks served subpoenas in Libor case," FT.com, available at http://www.ft.com/cms/s/0/52958d66-501f-11e0-9ad1-00144feab49a.html#axzz1sJNEDIiI, last accessed on April 17, 2012.

[54] Carrick Mollenkamp and David Enrich, "Banks Probed in Libor Manipulation Case," *MarketWatch*, March 16, 2011.

[55] Gavin Finch and Jon Menon, "Barclays, Citigroup Said to Be Subpoenaed in Libor Probe," *Bloomberg*, March 17, 2011.

[56] Joshua Gallu and Donal Griffin, "Libor Probe Spurs Witness Call-up at Citigroup, Deutsche Bank," *Bloomberg*, March 23, 2011.

investigators were "said to be looking at whether there was any improper influence on Barclays' submissions" during 2006-2008 for the BBA's daily survey used to set LIBOR.[57]

148.    Additional information regarding the regulatory probes emerged during the next few months, including revelations about other banks' possible—or actual—misconduct.

149.    In an "Interim Management Statement" filed on April 27, 2011, for example, Barclays stated it was "cooperating with" the investigations by the U.K. Financial Services Authority, the CFTC, the SEC, and the DOJ "relating to certain past submissions made by Barclays to the [BBA], which sets LIBOR rates."

150.    RBS similarly disclosed, in a Form 6-K filed with the SEC on May 6, 2011, the bank was "co-operating with" the investigations being conducted by the CFTC, the SEC, and the European Commission "into the submission of various LIBOR rates by relevant panel banks."

151.    Soon after, on May 16, 2011, Lloyds disclosed that it too "had received requests for information as part of the Libor investigation and that it was co-operating with regulators, including the [CFTC] and the European Commission."[58]  Britain's *Daily Telegraph* further reported that Defendant HBOS, which merged with Lloyds TSB in January 2009 to form Lloyds Banking Group, "was the main target given its near collapse in late 2008 as it lost access to wholesale funding markets."

152.    On May 23, 2011, the *Telegraph* reported that the Federal Bureau of Investigation ("FBI") was working with regulators in connection with the LIBOR investigations, and the FBI's British counterpart, the Serious Fraud Office, "revealed it is also taking an active interest."

[57] Brooke Masters and Megan Murphy, "Barclays at centre of Libor inquiry," FT.com, March 24, 2011, available at http://www.ft.com/intl/cms/s/0/1c3228f6-5646-11e0-82aa-00144feab49a.html#axzz1sJNEDIiI, last accessed on April 17, 2012.

[58] Harry Wilson, "Lloyds Banking Group in Libor investigation," *The Daily Telegraph*, May 17, 2011.

153.    In a Form 6-K filed with the SEC on July 26, 2011, UBS disclosed that it had

"been granted conditional leniency or conditional immunity from authorities in certain

jurisdictions, including the Antitrust Division of the DOJ, in connection with potential antitrust

or competition law violations related to submissions for Yen LIBOR and Euroyen TIBOR

(Tokyo Interbank Offered Rate)."  Accordingly, the company continued, it would "not be subject

to prosecutions, fines or other sanctions for antitrust or competition law violations in connection

with the matters [UBS] reported to those authorities, subject to [UBS's] continuing cooperation."

The conditional leniency UBS received derives from the Antitrust Criminal Penalties

Enhancement and Reform Act and the DOJ's Corporate Leniency Policy, under which the DOJ

only grants leniency to corporations reporting *actual illegal activity*.  UBS later disclosed (on

February 7, 2012) that the Swiss Competition Commission had granted the bank conditional

immunity regarding submissions for Yen LIBOR, TIBOR, and Swiss franc LIBOR.

154.    Similar to the other Defendants discussed above, HSBC, in an interim report filed

on August 1, 2011, disclosed that it and/or its subsidiaries had "received requests" from various

regulators to provide information and were "cooperating with their enquiries."

155.    On or about the same day, Barclays—which several months earlier had referenced

its "cooperation" with governmental entities investigating potential misconduct relating to

LIBOR—specified the investigations involved "submissions made by Barclays" and other

LIBOR panel members.  Barclays further stated it was engaged in discussions with those

authorities about potential resolution of these matters before proceedings are brought against the

bank.

156.    On September 7, 2011, the *Financial Times* reported that as part of their LIBOR

investigation, the DOJ and the CFTC—in assessing whether banks violated the Commodity

Exchange Act, which can result in criminal liability—were examining "whether traders placed

bets on future yen and dollar rates and colluded with bank treasury departments, who help set the

Libor index, to move the rates in their direction," as well as "whether some banks lowballed their

Libor submissions to make themselves appear stronger."[59]

157.    On October 19, 2011, *The Wall Street Journal* reported that the European

Commission "seized documents from several major banks" the previous day, "marking the

escalation of a worldwide law-enforcement probe" regarding the Euro Interbank Offered Rate, or

Euribor—a benchmark, set by more than 40 banks, used to determine interest rates on trillions of

euros' worth of euro-denominated loans and debt instruments.  The Euribor inquiry, the *Journal*

explained, constitutes "an offshoot" of the broader LIBOR investigation that had been ongoing

for more than a year.  According to the *Journal*, while the list of financial firms raided by the

European Commission was not available, people familiar with the situation had counted "a large

French bank and a large German bank" among the targets, and the coordinated raids "occurred in

London and other European cities."

158.    On October 31, 2011, the *Financial News* observed that "[a]n investigation into

price fixing, first ordered by the [SEC] in 2008, focused on whether banks, including UBS,

Citigroup, and Bank of America, had been quoting deliberately low rates."[60]

159.    On December 9, 2011, *Law360* reported that the Japanese Securities and

Exchange Surveillance Commission ("SESC") alleged that Citigroup Global Markets Japan Inc.

and UBS Securities Japan Ltd. "employed staffers who attempted to influence" TIBOR "to gain

---

[59] Brooke Masters and Kara Scannell, "Libor inquiry looks at criminal angle," FT.com,
September 7, 2011, available at http://www.ft.com/cms/s/0/c8ed4248-d962-11e0-b52f-
00144feabdc0.html#axzz1sRxAdyPS, last accessed on April 18, 2012.

[60] Tom Osborn, "Is Libor in its death throes?" *Financial News*, October 31, 2011.

advantage on derivative trades." The SESC recommended that the Japanese prime minister and the head of Japan's Financial Services Agency ("JFSA") take action against the companies. The Commission specified that Citigroup's head of G-10 rates and a Citigroup trader, as well as a UBS trader, were involved in the misconduct, further stating, "[t]he actions of Director A and Trader B are acknowledged to be seriously unjust and malicious, and could undermine the fairness of the markets." Moreover, the Commission added, "[i]n spite of recognizing these actions, the president and CEO . . . who was also responsible for the G-10 rates, overlooked these actions and the company did not take appropriate measures, therefore, the company's internal control system is acknowledged to have a serious problem."[61] *Law360* reported that the SESC released "a similar statement" about UBS's alleged conduct.

160.    Citigroup and UBS did not deny the SESC's findings. A Citigroup spokesperson stated, "Citigroup Global Markets Japan takes the matter very seriously and sincerely apologizes to clients and all parties concerned for the issues that led to the recommendation. The company has started working diligently to address the issues raised." A UBS spokesperson similarly stated the bank was taking the findings "very seriously" and had been "working closely with" the SESC and the JFSA "to ensure all issues are fully addressed and resolved." She added, "We have taken appropriate personnel action against the employee involved in the conduct at issue."

161.    Citigroup later disclosed that on December 16, 2011, the JFSA took administrative action against Citigroup Global Markets Japan, Inc. ("CGMJ") for, among other things, certain communications made by two CGMJ traders about the Euroyen Tokyo InterBank Offered Rate ("TIBOR"). The JFSA issued a business improvement order and suspended CGMJ's trading in derivatives related to Yen-LIBOR, as well as Euroyen and Yen-TIBOR from

[61] Juan Carlos Rodriguez, "Japan Accuses Citi, UBS Of Market Trickery," *Law360*, December 9, 2011.

January 10 to January 23, 2012.  On the same day, the JFSA also took administrative action

against Citibank Japan Ltd. for conduct arising out of Citibank Japan's retail business and also

noted that the communications made by the CGMJ traders to employees of Citibank Japan about

Euroyen TIBOR had not been properly reported to Citibank Japan's management team.

      162.    UBS likewise recently revealed further details regarding the Japanese regulators'

findings and the resulting disciplinary action.  Specifically, the bank announced that on

December 16, 2011, the JFSA commenced an administrative action against UBS Securities Japan

Ltd. ("UBS Securities Japan") based on findings by the SESC that:

> (i) a trader of UBS Securities Japan engaged in inappropriate
> conduct relating to Euroyen TIBOR and Yen LIBOR, including
> approaching UBS AG, Tokyo Branch, and other banks to ask them
> to submit TIBOR rates taking into account requests from the trader
> for the purpose of benefiting trading positions; and (ii) serious
> problems in the internal controls of UBS Securities Japan resulted
> in its failure to detect this conduct.

Based on those findings, the JFSA "issued a Business Suspension Order requiring UBS

Securities Japan to suspend trading in derivatives transactions related to Yen LIBOR and

Euroyen TIBOR" from January 10 to January 16, 2012 (excluding transactions required to

perform existing contracts).  The JFSA also issued a "Business Improvement Order" requiring

UBS Securities Japan to enhance "compliance with its legal and regulatory obligations" and to

establish a "control framework" designed to prevent similar improper conduct.

      163.    *The Wall Street Journal* has since cited people familiar with the UBS matter as

identifying the trader as Thomas Hayes, who joined UBS Securities Japan in 2006 "and traded

products linked to the pricing of short-term yen-denominated borrowings"; he worked at UBS

for about three years.[62]

---

[62] Jean Eaglesham, Atsuko Fukase, & Sam Holmes, "Rate Probe Keys On Traders: Investigators

164.    In the same article, the *Journal* more broadly reported that investigators in the U.S. and foreign LIBOR probes "are focusing on a small number of traders suspected of trying to influence other bank employees to manipulate the rates."

165.    Other news accounts in recent months have confirmed—based at least in part on information from people familiar with the ongoing investigations—that investigators are examining potential improper collusion by traders and bankers to manipulate LIBOR or other rates.  On February 3, 2012, for instance, Credit Suisse disclosed that the Swiss Competition Commission commenced an investigation involving twelve banks and certain other financial intermediaries, including Credit Suisse, concerning alleged collusive behavior among traders to affect the bid ask spread for derivatives tied to the LIBOR and TIBOR reference rates fixed with respect to certain currencies, and collusive agreements to influence these rates.

166.    Additionally, on February 14, 2012, *Bloomberg* reported that two people with knowledge of the ongoing LIBOR probe said global regulators "have exposed flaws in banks' internal controls that may have allowed traders to manipulate interest rates around the world." The same people, who were not identified by name (as they were not authorized to speak publicly about those matters), stated investigators also had "received e-mail evidence of potential collusion" between firms setting LIBOR.  Those sources further noted Britain's Financial Services Authority was "probing whether banks' proprietary-trading desks exploited information they had about the direction of Libor to trade interest-rate derivatives, potentially defrauding their firms' counterparties."[63]

Suspect Employees at Some Banks Tried to Manipulate Rates," *The Wall Street Journal*, February 7, 2012.

[63] Lindsay Fortado and Joshua Gallu, "Libor Probe Said to Expose Collusion, Lack of Internal Controls," *Bloomberg*, February 14, 2012.

167.    *Bloomberg* further reported that RBS had "dismissed at least four employees in connection with the probes," and Citigroup and Deutsche Bank "also have dismissed, put on leave or suspended traders as part of the investigations."

168.    *Bloomberg* also reported that European Union antitrust regulators are also investigating whether banks effectively formed a global cartel and coordinated how to report borrowing costs between 2006 and 2008.

169.    In March 2012, the Monetary Authority of Singapore disclosed that it has been approached by regulators in other countries to help in investigations over the possible manipulation of interbank interest rates.[64]

170.    *Bloomberg* interviewed money-market traders in March 2012, who said that staff responsible for panel banks' LIBOR submissions "regularly discussed where to set the measure with traders sitting near them, interdealer brokers, and counterparts at rival banks."[65] "The talks became common practice after money markets froze in 2007. . . . Traders interviewed said there were no rules stopping talks between employees, or guidelines on how the rate should be set." The "BBA says only a bank's Treasurer or other nominated individual can make a submission, but a trader at one firm [told Bloomberg] that a large number of employees had access to the software used to make the bank's submissions and could overwrite other's figures." *The Telegraph* reported that "senior bankers privately admit it is easy for banks to fix Libor at rates that are favorable to their own interests, as the task of setting the rate is often undertaken by relatively junior employees."[66]

---

[64] *Business Times*, March 9, 2012.

[65] Liam Vaughan, Gavin Finch and Jesse Westbrook, "Life as Libor Traders Knew It Seen as Abusive," *Bloomberg*, March 2, 2012.

[66] Jamie Dunkley and Harry Wilson, "UBS accused of manipulating Libor," *The Telegraph*, March 15, 2011.

171.     According to the *Daily Mail*, investigations by the SEC, Britain's Financial Services Authority, the Swiss Competition Commission, and regulators in Japan focus on three concerns:  First, whether banks artificially suppressed LIBOR during the financial crisis, making banks appear more secure than they actually were; second, whether bankers setting LIBOR leaked their data to traders before officially submitting the banks' LIBOR quotes to the BBA; third, whether traders at the banks, and at other organizations (such as hedge funds), may have tried to influence LIBOR by making suggestions or demands on the bankers providing LIBOR quotes.

          **2.**     Evidence disclosed to date in the Canadian and Singapore proceedings confirms that certain Defendants conspired to manipulate Yen-LIBOR as part of the global conspiracy.

**Canadian Action**

172.     In the Canadian action, Brian Elliott, a Competition Law Officer in the Criminal Matters Branch of the Competition Bureau, submitted an affidavit in May 2011 (the "May 2011 Elliott Affidavit") in support of "an Ex Parte Application for Orders to Produce Records Pursuant to Section 11 of the Competition Act and for Sealing Orders" in the Court of Ontario, Superior Court of Justice, East Region.  Specifically, the May 2011 Elliott Affidavit sought orders requiring HSBC Bank Canada, Royal Bank of Scotland N.V., Canada Branch, Deutsche Bank, J.P. Morgan Bank Canada, and Citibank Canada (referenced collectively in the Affidavit as the "Participant Banks") to produce documents in connection with an inquiry concerning whether those banks conspired to "enhance unreasonably the price of interest rate derivatives from 2007 to March 11, 2010; to prevent or lessen, unduly, competition in the purchase, sale or supply of interest derivatives from 2007 to March 11, 2010; to restrain or injure competition unduly from 2007 to March 11, 2010; and to fix, maintain, increase or control the price for the

supply of interest rate derivatives from March 12, 2010 to June 25, 2010."

173.    The May 2011 Elliott Affidavit further states the Competition Bureau "became aware of this matter" after one of the banks (referenced in the affidavit as the "Cooperating Party") "approached the Bureau pursuant to the Immunity Program" and, in connection with that bank's application for immunity, its counsel "orally proffered information on the Alleged Offences" to officers of the Competition Bureau on numerous occasions in April and May 2011. Furthermore, according to the Affidavit, counsel for the Cooperating Party "stated that they have conducted an internal investigation of the Cooperating Party that included interviews of employees of the Cooperating Party who had knowledge of or participated in the conduct in question, as well as a review of relevant internal documents." The Affidavit also notes that on May 17, 2011, counsel for the Cooperating Party provided the Competition Bureau with "electronic records," which Elliot "believe[s] to be records of some of the communications involving the Cooperating Party that were read out as part of the orally proffered information by counsel for the Cooperating Party." The press has reported that UBS was the "Cooperating Party" referred to in the Elliott Affidavits.

174.    The Affidavit recounted that, the Cooperating Party's counsel, during the Class Period the Participant Banks—at times "facilitated" by "Cash Brokers"—"entered into agreements to submit artificially high or artificially low London Inter-Bank Offered Rate ('LIBOR') submissions in order to impact the Yen LIBOR interest rates published by the [BBA]." Those entities engaged in that misconduct to "adjust[] the prices of financial instruments that use Yen LIBOR rates as a basis." The Affidavit further states the Cooperating Party's counsel "indicated the Participant Banks submitted rates consistent with the agreements and were able to move Yen LIBOR rates to the overall net benefit of the Participants."

175.    More specifically, counsel proffered that, during the Class Period, the Participant Banks "communicated with each other and through the Cash Brokers to form agreements to fix the setting of Yen LIBOR," which "was done for the purpose of benefiting trading positions, held by the Participant Banks, on IRDs [interest rate derivatives]."  By manipulating Yen LIBOR, the Affidavit continues, "the Participant Banks affected all IRDs that use Yen LIBOR as a basis for their price."  The misconduct was carried out "through e-mails and Bloomberg instant messages between IRD traders at the Participant Banks and employees of Cash Brokers (who had influence in the setting of Yen LIBOR rates)."  The Affidavit details:

> IRD traders at the Participant Banks communicated with each other their desire to see a higher or lower Yen LIBOR to aid their trading position(s).  These requests for changes in Yen LIBOR were often initiated by one trader and subsequently acknowledged by the trader to whom the communication was sent.  The information provided by counsel for the Cooperating Party showed that the traders at Participant Banks would indicate their intention to, or that they had already done so, communicate internally to their colleagues who were involved in submitting rates for Yen LIBOR.  The traders would then communicate to each other confirming that the agreed up rates were submitted.  However, not all attempts to affect LIBOR submissions were successful.

> The Cash Brokers were asked by IRD traders at the Participant Banks to use their influence with Yen LIBOR submitters to affect what rates were submitted by other Yen LIBOR panel banks, including the Participant Banks.

176.    The Affidavit indicates the Cooperating Party's counsel further proffered that at least one of the Cooperating Party's IRD traders ("Trader A" or "Trader B") communicated with an IRD trader at HSBC, Deutsche Bank, RBS, JPMorgan (two traders), and Citibank.  In that regard, the Affidavit specifies:

> Trader A communicated his trading positions, his desire for a certain movement in Yen LIBOR and instructions for the HSBC trader to get HSBC to make Yen LIBOR submissions consistent with his wishes.  Attempts through the HSBC trader to influence Yen LIBOR were not always successful.    Trader A also

communicated his desire for a certain movement in the Yen LIBOR rate with the Cash Brokers. He instructed them to influence the Yen LIBOR submitters of HSBC. The Cash Brokers acknowledged making these attempts.

Trader A communicated his trading positions, his desire for certain movement in Yen LIBOR and asked for the Deutsche IRD trader's assistance to get Deutsche to make Yen LIBOR submissions consistent with his wishes. The Deutsche IRD trader also shared his trading positions with Trader A. The Deutsche IRD trader acknowledged these requests. Trader A also aligned his trading positions with the Deutsche IRD trader to align their interests in respect of Yen LIBOR. The Deutsche IRD trader communicated with Trader A considerably during the period of time, mentioned previously, when Trader A told a Cash Broker of a plan involving the Cooperating Party, HSBC and Deutsche to change Yen LIBOR in a staggered and coordinated fashion by the Cooperating Party, HSBC and Deutsche. Not all attempts to change the LIBOR rate were successful.

Trader A explained to RBS IRD trader who his collusive contacts were and how he had and was going to manipulate Yen LIBOR. Trader A also communicated his trading positions, his desire for certain movement in Yen LIBOR and gave instructions for the RBS IRD trader to get RBS to make Yen LIBOR submissions consistent with Trader A's wishes. The RBS IRD trader acknowledged these communications and confirmed that he would follow through. Trader A and the RBS IRD trader also entered into transactions that aligned their trading interest in regards to Yen LIBOR. Trader A also communicated to another RBS IRD trader his trading positions, his desire for a certain movement in Yen LIBOR and instructions to get RBS to make Yen LIBOR submissions consistent with his wishes. The second RBS IRD trader agreed to do this.

Trader A communicated his trading positions, his desire for a certain movement in Yen LIBOR and gave instructions for them [two JPM IRD traders] to get JPMorgan to make Yen LIBOR submissions consistent with his wishes. Trader A also asked if the IRD traders at JPMorgan required certain Yen LIBOR submissions to aid their trading positions. The JPMorgan IRD traders acknowledged these requests and said that they would act on them. On another occasion, one of the JPMorgan IRD traders asked Trader A for a certain Yen LIBOR submission, which Trader A agreed to help with. Trader A admitted to an IRD trader at RBS that he colluded with IRD traders at JPMorgan.

> Trader B of the Cooperating Party communicated with an IRD trader at Citi.  They discussed their trading positions, advanced knowledge of Yen LIBOR submissions by their banks and others, and aligned their trading positions.  They also acknowledged efforts to get their banks to submit the rates they wanted.

177.   On May 18, 2011, the Ontario Superior Court signed the orders directing the production of the records sought by the May 2011 Elliott Affidavit.  But, to the Baltimore Plaintiffs' knowledge, the Affidavit was not publicly available until February 2012.

178.   Elliott submitted another affidavit in June 2011 (the "June 2011 Elliott Affidavit"), which sought an order requiring ICAP Capital Markets (Canada) Inc., believed to be one of the "Cash Brokers" referenced in the May 2011 Elliott Affidavit, to "produce records in the possession of its affiliates, ICAP PLC and ICAP New Zealand Ltd."  The June 2011 Elliott Affidavit primarily detailed communications between "Trader A" (an IRD trader) of the previously-referenced "Cooperating Party" and an ICAP broker (referenced in the June 2011 Elliott Affidavit as "Broker X") during the Class Period.

179.   The Affidavit specifies that Trader A "discussed his current trading positions with Broker X and where he would like to see various maturities of Yen LIBOR move."  Trader A "asked Broker X for Yen LIBOR submissions that were advantageous to Trader A's trading positions," and Broker X, in turn, "acknowledged these requests and advised Trader A about his efforts to make them happen."  The Affidavit further states:

> Counsel for the Cooperating Party has proffered that the expectation was for Broker X, directly or through other brokers at ICAP, to influence the Yen LIBOR submissions of Panel Banks. Broker X communicated to Trader A his efforts to get brokers at ICAP in London to influence Yen LIBOR Panel Banks in line with Trader A's requests.  The efforts of Broker X included contacting a broker at ICAP in London who issued daily LIBOR expectations to the market.  Trader A also communicated to Broker X his dealings with traders at other Participant Banks and a broker at another Cash Broker.  Not all efforts to influence Yen LIBOR panel banks were successful.  Broker X had additional discussions around the

setting of Yen LIBOR with another trader of the Cooperating Party ("Trader B").

180.    On June 14, 2011, the Ontario Superior Court issued an order allowing the document requests concerning ICAP.

**Singapore Proceedings**

181.    More information about the collusive behavior of Yen LIBOR panel banks was revealed in a Singapore wrongful termination lawsuit. In a pending legal action in Singapore's High Court, Tan Chi Min, former head of delta trading for RBS's global banking and markets division in Singapore (who worked for RBS from August 12, 2006 to November 9, 2011), alleges in his Writ of Summons and Statement of Claim that the bank condoned collusion between its traders and LIBOR rate-setters to set LIBOR at levels to maximize profits.  In the same filing, Tan stated RBS commenced an internal probe following inquiries by European and U.S. authorities about potential LIBOR manipulation.

182.    Tan—whom RBS terminated, asserting he engaged in "gross misconduct"— alleges that RBS's internal investigations "were intended to create the impression that such conduct was the conduct not of the defendant itself but the conduct of specific employees who the defendant has sought to make scapegoats through summary dismissals." Tan asserted RBS's rate setters took "into account the views of various employees before submitting a rate to the appropriate rate setting body."  Tan further alleges that it was "part of his responsibilities to provide input and submit requests to the rate setter and there is no regulation, policy, guideline or law that he has infringed in doing this," and that "it was common practice among [RBS]'s senior employees to make requests to [RBS]'s rate setters as to the appropriate LIBOR rate."  Those requests, Tan specified, "were made by, among others, Neil Danziger, Jezri Mohideen (a senior manager), Robert Brennan (a senior manager), Kevin Liddy (a senior manager) and Jeremy

Martin," and the practice "was known to other members of [RBS]'s senior management including Scott Nygaard, Todd Morakis and Lee Knight." Tan added that RBS employees "also took requests from clients (such as Brevan Howard) in relation to the fixing of LIBOR."

183.    In his complaint, however, Tan alleged that he could not have influenced the rate on his own.  He also stated it was "common practice" among RBS's senior employees to make requests as to the appropriate LIBOR quote.

184.    Indeed, in responding to Tan's allegations, RBS admitted he had tried to improperly influence RBS rate-setters from 2007 to 2011 to submit LIBOR quotes at levels that would benefit him.

185.    In subsequent filings with the Singapore High Court, Tan claims that RBS "interest-rate traders were seated with one of the main rate setters in its London office to share information, and discussed rates on conference calls," according to *Businessweek*.[67] Tan also claims that RBS's head of compliance sent an email to Tan's manager indicating that it was acceptable for a trader to request specific swap-offer rates from rate setters. According to *Businessweek*, Tan also asserts in his filing that he was told by his manager that "the practice of requesting to change the rate Libor is common in every rate setting environment in the banking industry."

        **3.**    <u>Numerous employees from various financial institutions, including employees of Defendants and their affiliates, have been accused of improper conduct related to LIBOR.</u>

186.    Other individuals employed by the Defendants and their affiliates who have engaged in the illegal communications and conduct among Defendants to report artificially low LIBOR quotes include, but are not limited to, the following. These individuals were not

---

[67] Andrea Tan, "RBS rate Traders Sat With Libor Setter, Fired Banker Says," *Businessweek*, March 27, 2012.

randomly selected from Defendants but are people who have been identified by the press or government agencies as the targets of the world-wide government investigations.

(a)     Yvan Ducrot was the Co-head of UBS's rates business. According to an article in *Citywire*, he was suspended by UBS in connection with international probes.[68]

(b)     Holger Seger was the global head of short-term interest rates trading at UBS. According to an article in *Citywire*, Mr. Seger was suspended by UBS in connection with international probes and left his position at UBS in April 2012.[69]

(c)     Paul White was the principal rate-setter for Yen-LIBOR for RBS. According to an article in *Businessweek*, Mr. White was fired by UBS in November 2011 in connection with the circumstances brought to light by the Singapore lawsuit.[70]

(d)     Tan Chi Min was the head of short-term interest rate trading for Yen and the head of Delta One trading at RBS. In his Singapore lawsuit, Mr. Tan alleges that RBS fired him " because he tried to improperly influence the bank's rate setters from 2007 to 2011 to persuade them to offer Libor submissions that would benefit his trading positions."[71]

(e)     Sim Suh Ting was the executive director and head of regulatory risk & compliance for South East Asia. According to the Singapore lawsuit, Mr. Ting "[S]ent an internal e-mail to Robert Brennan and Todd Morakis 'to the effect that it was acceptable for a trader to request the SOR rate setters that the SOR be set at a specific level.'"[72]

(f)     Todd Morakis was the managing director at RBS. According to the

---

[68] http://citywire.co.uk/new-model-adviser/ubs-suspends-traders-amid-libor-probe/a567164
[69] *Id.*
[70] http://www.businessweek.com/news/2012-03-27/rbs-rate-traders-sat-with-libor-setter-fired-employee-tan-says.
[71] *Id.*
[72] *Id.*

Singapore lawsuit, Mr. Morakis "orally confirmed to [Tan] round October [2011] that 'the practice of requesting to change the rate Libor is common in every rate setting environment in the banking industry.'" [73]

        (g)    <u>Thomas Hayes</u> was a derivatives trader for Citibank. According to an article in the *Financial Times*, Mr. Hayes "attempted to pressure colleagues and employees at other banks involved in the rate-setting process for the Tokyo Interbank Offered Rate, or Tibor.'" [74]

        (h)    <u>Christopher Cecere</u> was the head of G10 trading and sales for Asia at Citibank. The Japanese FSA found that Mr. Cecere "and another Citigroup trader engaged in 'seriously unjust and malicious' conduct by asking bankers to alter data they submitted while setting a benchmark Japanese lending rate." [75]

        (i)    <u>Brent Davies</u> was a sterling trader at RBS in London. According to an article in *Businessweek*, Mr. Davies was named in Canadian Competition Law Officer Brian Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen LIBOR.  According to the affidavit, Trader A explained to Mr. Davies who his collusive contacts were and how he had and was going to manipulate Yen LIBOR.  Trader A also communicated his trading positions, his desire for certain movement in Yen LIBOR and gave instructions for Mr. Davies trader to get RBS to make Yen LIBOR submissions consistent with Trader A's wishes.  Mr. Davies  trader acknowledged these communications and confirmed that he would follow through.  Trader A and Mr. Davies also entered into transactions that aligned

---

[73] *Id.*

[74] http://www.ft.com/intl/cms/s/0/7089ffda-534a-11e1-aafd-00144feabdc0.html#axzz1qWqNwPlz

[75] http://www.businessweek.com/news/2012-02-16/ex-citigroup-trader-denies-wrongdoing-in-tibor-probe.html

their trading interest in regards to Yen LIBOR.[76]

(j)      Will Hall was a derivatives trader at RBS in London. He was named in Canadian Competition Law Officer Brian Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen LIBOR. According to the affidavit, Trader A communicated to Mr. Hall his trading positions, his desire for a certain movement in Yen LIBOR and instructions to get RBS to make Yen LIBOR submissions consistent with his wishes, and Mr. Hall agreed to do this.[77]

(k)      Paul Glands was a derivatives trader with JP Morgan. He was named in Canadian Competition Law Officer Brian Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen LIBOR. According to the affidavit, Trader A communicated to Mr. Glands his trading positions, his desire for a certain movement in Yen LIBOR and instructions to get JP Morgan to make Yen LIBOR submissions consistent with his wishes, and Mr. Glands agreed to do so.[78]

(l)      Stewart Wiley was a derivatives trader with JP Morgan. He was named in Canadian Competition Law Officer Brian Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen LIBOR. According to the affidavit, Trader A communicated to Mr. Wiley his trading positions, his desire for a certain movement in Yen LIBOR and instructions to get JP Morgan to make Yen LIBOR submissions consistent with his wishes, and Mr. Wiley agreed to do so.[79]

(m)      Guillaume Adolph was a derivatives trader at Deutsche Bank. He was

---

[76] Brian Elliott's May 18, 2011 Affidavit, Ontario Superior Court.
[77] *Id.*
[78] *Id.*
[79] *Id.*

named in Canadian Competition Law Officer Brian Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen LIBOR. According to the affidavit, Trader A communicated to Mr. Adolph his trading positions, his desire for a certain movement in Yen LIBOR and instructions to get JP Morgan to make Yen LIBOR submissions consistent with his wishes, and Mr. Adolph agreed to do so.[80]

        (n)      Peter O'Leary was a derivatives trader at HSBC. He was named in Canadian Competition Law Officer Brian Elliott's May 18, 2011 affidavit as one of the traders believed to be involved in the manipulation of Yen LIBOR. According to the affidavit, Mr. O'Leary was instructed by Trader A at UBS "to get HSBC to make Yen LIBOR submissions consistent with his wishes." [81]

        (o)      Andrew Hamilton is a former investment advisor at RBS in London. According to an article in *Bloomberg*, Mr. Hamilton was dismissed by RBS on October 21, 2011 and now is listed as inactive on the U.K. Financial Services Authority's register of people approved to work in the industry. [82]

        (p)      Neil Danzinger is a former trader at RBS in London. According to an article in *Bloomberg*, Mr. Danzinger was dismissed by RBS on October 21, 2011 and now is listed as inactive on the U.K. Financial Services Authority's register of people approved to work in the industry. [83]

---

[80] *Id*.

[81] *Id*.

[82] http://www.bloomberg.com/news/2012-02-09/rbs-said-to-dismiss-4-bankers-as-libor-probe-widens-to-brokers.html

[83] *Id*.

(q)   <u>Brian McAppin</u> was Citigroup's brokerage head in Japan. According to an article in the *Wall Street Journal*, the Japanese investigation found that he "overlooked" alleged attempts by the two traders to influence interest rates despite "recognizing these actions."[84]

## <u>THE DISCOVERY RULE, FRAUDULENT CONCEALMENT, AND TOLLING OF THE STATUTE OF LIMITATIONS.</u>

187.   The Baltimore Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence that they were injured by any LIBOR manipulation, much less who caused that injury until, at the very earliest, March 15, 2011, when the government investigations into the Defendants were revealed to the public for the first time.

188.   Before the government investigations into the Defendants' alleged misconduct was revealed for the first time on May 15, 2011, Baltimore Plaintiffs could not have stated facts plausibly suggesting a concerted and conspiratorial effort to under-report LIBOR.

### A.   <u>The Unlawful Activity Was Inherently Self-Concealing.</u>

189.   The Defendants conspired to share their interest rate information and falsely report interest rate information to the BBA and Reuters. Their purpose was to depress USD-LIBOR to artificially low levels and thereby manipulate the price for Eurodollar futures and other exchange-based contracts.

190.   By its very nature, the Defendants' alleged misconduct was self-concealing. <u>First</u>, the Defendants' actual or realistic interest rates were not public information, making any comparison to the rates they published to the BBA, and in turn Reuters, and any discernment of discrepancies an impossibility. <u>Second</u>, the Defendants' internal communications and communications among each other were not public information, rendering impossible any

[84] http://online.wsj.com/article/SB10001424052970203315804577207212704268678.html.

ascertainment of the specific misconduct of individual Defendants' or the conspiracy.  Third, the

Defendants' trades on the exchanges or in the markets for LIBOR products were not public

information, making it impossible to discern that they were using their false LIBOR reports to

cause artificial prices and engage in manipulative trading.

191.    As a result of the self-concealing nature of the Defendants' collusive scheme, no

person of ordinary intelligence would previously have discovered their conspiracy to manipulate

LIBOR or the manipulative trades to the detriment of Baltimore Plaintiffs and the Class.

**B.**    In Addition To Engaging In Inherently Self-Concealing Misconduct, The Defendants Engaged In A Concerted Media Strategy Of Affirmatively Providing Plausible (But False) Alternative Explanations For The (In Actuality) Manipulated LIBOR.

192.    In late Spring 2008, the media began to engage in *speculation* that the LIBOR

banks were under-reporting their LIBOR quotes.

193.    In any event, the Defendants engaged in a media strategy that had the effect of

diffusing speculation and further concealing their conduct. In particular, the Defendants provided

affirmative, public assurances that there were innocent, plausible explanations for the divergence

in LIBOR quotes that were the subject of media speculation.  Because of Defendants' affirmative

statements plaintiff's continuing ignorance as to their claims was not a result of a lack of due

diligence.

194.    On April 21, 2008, Dominic Konstam of Credit Suisse affirmatively stated that

the low LIBOR quotes were attributable to the fact that U.S. banks, such as Citibank and JP

Morgan, had access to large customer deposits and borrowing from the Federal Reserve and did

not need more expensive loans from other banks.  "Banks are hoarding cash because funding

from the asset-backed commercial paper market has fallen sharply while money market funds are

lending on a short term basis and are restricting their supply."[85]  This alternative explanation had the effect of diffusing any speculation that the Defendants were engaged in a manipulation of LIBOR.

195.    On April 21, 2008, Jeffrey Rosenberg, head of credit strategy at Bank of America Securities, echoed Mr. Konstam's misrepresentation. Mr. Rosenberg affirmatively misrepresented that LIBOR's divergence was the result of systemic conditions rather than active manipulation, explaining that the BBA approach "works when both overall bank risk is low and the dispersion of risks across banks is small … [however, that] is clearly not the case currently."[86]

196.    In an April 28, 2008 interview with *The Financial Times* Credit Suisse's Dominic Konstam continued to reinforce LIBOR's reliability.  "Libor has been a barometer of the need for banks to raise capital.  The main problem with LIBOR is the capital strains facing banks … Initially there was some confusion that LIBOR itself was the problem, with talk of the rate being manipulated and not representative of the true cost of borrowing."[87]

197.    On May 16, 2008, in response to a media inquiry, JP Morgan affirmatively misrepresented that "[t]he Libor interbank rate-setting process is not broken, and recent rate volatility can be blamed largely on reluctance among banks to lend to each other amid the current credit crunch."[88]  "Everyone is funding at a similar level," said Terry Belton of JP

---

[85] Gillian Tett & Michael Mackenzie, "Doubts Over Libor Widen," FT.com, available at http://www.ft.com/cms/s/0/d1d9a792-0fbd-11dd-8871-0000779fd2ac.html#axzz1szdS58jE, last accessed on April 24, 2012.

[86] *Id.*

[87] Michael Mackenzie, "Talk of quick fix recedes as Libor gap fails to close," FT.com, available at http://www.ft.com/intl/cms/s/0/3da27a46-5d05-11dd-8d38-000077b07658.html#axzz1szdS58jE, last accessed on April 24, 2012.

[88] Kirsten Donovan, Jamie McGeever, Jennifer Ablan, Richard Leong & John Parry, "European, U.S.

Morgan, "but when credit conditions worsen and we have periods like this of unprecedented turmoil, the reality is there is not a single borrowing rate."  This alternative explanation had the effect of diffusing any speculation that the Defendants were engaged in a manipulation of LIBOR.

198.    That very same day, Colin Withers of Citigroup assured the public that LIBOR remained reliable.  "We need to let the dust settle, markets stabilize and then have a review.  But the measures we are using are historic -- up to 30 to 40 years old."[89]

199.    In May 2008, *The Wall Street Journal* asked various Defendants to comment on the media speculation concerning divergence in LIBOR quotes. Rather than declining or refusing to comment, the Defendants made affirmative representations designed to further conceal their wrongdoing.  On May 29, 2008, Citibank affirmatively claimed innocence and stated that it continued to "submit [its] Libor rates at levels that accurately reflect our perception of the market." HBOS similarly denied the *Journal's* allegations, asserting that its rate quotes were a "genuine and realistic" indication of its borrowing costs.[90]

C.    The BBA's Public Statements Also Had The Effect Of Concealing The Defendants' Misconduct.

200.    In addition, throughout 2008, the BBA engaged in affirmative acts that deffused any speculation that LIBOR had been or was being manipulated.  Although the BBA announced on April 17, 2008 that it would push forward its annual review of the LIBOR rate-setting

bankers work on Libor problems," reuters.com, available at http://in.reuters.com/article/2008/05/16/markets-rates-bba-idINL162110020080516, last accessed on April 24, 2012.

[89] *Id.*

[90] Carrick Mollencamp & Mark Whitehouse, "Study Casts Doubt on Key Rate," *The Wall Street Journal*, May 29, 2008.

process, seemingly in response to media speculation concerning rate manipulation, a BBA

spokesman affirmatively stated that the review was a "relatively simple auditing process to check

that the figures are consistent."[91]   Indeed, the same BBA spokesman assured the public that the

BBA did not believe "the data we collect is anything other than accurate."[92]

201.    LIBOR increased exponentially in the days following the BBA's announcement.

The BBA admitted that banks "were likely to have reconsidered the information they supplied

for use in setting Libor."   However, on April 18, 2008, the BBA continued to affirmatively

assert that rate quotes submitted prior to the BBA's announcement were more the result of

"concerns about difficult market place conditions than questions about credibility."[93]

202.    Much like the Defendants, the BBA also made affirmative, public assurances that

there were innocent, plausible explanations for the divergence in LIBOR quotes that were the

subject of media speculation.  By way of example:

(a)     On May 13, 2008, Angela Knight, CEO of the BBA, explained to

bloomberg.com that the BBA audit was needed to determine if the divergence was the result of

"difficult markets" or was "giving the right answer, just one that people don't want to hear."  Ms.

Knight stressed that rate swings were "hardly surprising" given credit markets.[94]

---

[91] Allistair Barr, "BBA to start Libor review earlier as rate spikes," MarketWatch.com, available at http://articles.marketwatch.com/2008-04-17/news/30791717_1_lending-rates-interest-rates-libor, last accessed on April 25, 2012.

[92] Jessica Mortimer, "U.K.'s BBA confirms bringing forward Libor review but denies issues of credibility," lse.co.uk, available at http://www.lse.co.uk/FinanceNews.asp?ArticleCode=0ojr2utyp0yw3y2&ArticleHeadline=U.K.s_BBA_confirms_bringing_forward_Libor_review_but_denies_issues_of_credibility, last accessed on April 25, 2012.

[93] Peter Taylor, "Dollar Libor soars as banks rethink their borrowing rates," *The Daily Telegraph*, April 18, 2008.

[94] Ben Livesey & Gavin Finch, "Libor Set for Overhaul as Credibility Is Doubted (Update1)," bloomberg.com, available at http://www.bloomberg.com/apps/news?pid=newsarchive&sid=az3eSerjPuDA&refer=home, last accessed

(b)      On September 16, 2008, the BBA explained that the "Libor overnight rate recognizes that, in the current uncertain market, banks are looking to their own liquidity as the priority … This is particularly reflected in the US Dollar because of the well-known world wide shortage of this currency."[95]

203.    The BBA also attempted to defuse speculation premised on LIBOR's divergence from the default insurance market.  The BBA stated that LIBOR was reliable, and that the financial crisis had caused many indicators to act in unusual ways. On May 29, 2008, a spokesman for the BBA stated that there was "no indication" that the default insurance market provided a picture of banks' borrowing costs more accurate than that provided by LIBOR.[96]

204.    In sum, the BBA's alternative explanations, in conjunction with the Defendants' affirmative representations and the inherently self-concealing nature of the conduct at issue, made it impossible for Baltimore Plaintiffs to state facts setting forth a plausible manipulation claim before the public announcement of government investigations.

### E.    The Truth Was Not Revealed For The First Time Until March 15, 2011

205.    The truth was not revealed until March 15, 2011, when UBS released its annual report 20-F stating that it had received subpoenas from the Department of Justice, the SEC, the

on April 25, 2012.

---

[95]Michael Mackenzie & David Oakley, "Banks make their own liquidity a priority," FT.com, available at http://www.ft.com/cms/s/0/20d62052-8424-11dd-bf00-000077b07658.html#axzz1t4N9ezuQ, last accessed on April 25, 2012.

[96]Michael Mackenzie, "Talk of quick fix recedes as Libor gap fails to close," FT.com, available at http://www.ft.com/intl/cms/s/0/3da27a46-5d05-11dd-8d38-000077b07658.html#axzz1szdS58jE, last accessed on April 24, 2012.

CFTC, as well as an information request from the Japanese Financial Supervisory Agency, all relating to its interest rate submissions to the BBA. UBS described the focus of the investigation as "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR at certain times."

206.     In addition, on March 16, 2011, the *Financial Times* reported that "[a]ll the panel members are believed to have received at least an informal request for information—an earlier stage in an investigation process before a subpoena."[97]

207.     In the weeks and months that followed, the extent of the Defendants' collusive scheme to manipulate the value of USD-LIBOR was publicly revealed for the first time.  A steady stream of media reports revealed that a number of domestic and foreign regulatory and enforcement agencies had begun to investigate the Defendants, finally indicating to the public that the Defendants had indeed conspired to manipulate USD-LIBOR.  By way of example:

(a)     On March 23, 2011, *Bloomberg* revealed that Citigroup Inc., Deutsche Bank, BAC, and JPMorgan Chase were asked by U.S. regulators "to make employees available to testify as witnesses" in connection with the regulators' ongoing investigation.[98]

(b)     The next day, the *Financial Times* reported that Defendant Barclays was "emerging as a key focus of the US and U.K. regulatory probe into alleged rigging of [LIBOR]."  According to the Times, investigators were "probing whether communications between the bank's traders and its treasury arm," which helps set LIBOR, "violated 'Chinese wall' rules that prevent information-sharing between different parts of the bank."  The *Times*

---

[97] Brooke Masters, Patrick Jenkins & Justin Baer, "Big banks investigated over Libor," FT.com, available at http://www.ft.com/intl/cms/s/0/ab563882-4f08-11e0-9c25-00144feab49a.html#axzz1szdS58jE, last accessed on April 24, 2012.

[98] Joshua Gallu and Donal Griffin, "Libor Probe Spurs Witness Call-up at Citigroup, Deutsche Bank," *Bloomberg*, March 23, 2011.

further stated investigators were "said to be looking at whether there was any improper influence

on Barclays' submissions" during 2006-2008 for the BBA's daily survey used to set LIBOR.[99]

> (c)     On May 23, 2011, the *Telegraph* reported that the Federal Bureau of
>
> Investigation ("FBI") was working with regulators in connection with the LIBOR investigations,
>
> and the FBI's British counterpart, the Serious Fraud Office, "revealed it is also taking an active
>
> interest."

> (d)     On October 19, 2011, *The Wall Street Journal* reported that the European
>
> Commission "seized documents from several major banks" the previous day, "marking the
>
> escalation of a worldwide law-enforcement probe" regarding the Euro Interbank Offered Rate, or
>
> Euribor—a benchmark, set by more than 40 banks, used to determine interest rates on trillions of
>
> euros' worth of euro-denominated loans and debt instruments.  The Euribor inquiry, *The Wall*
>
> *Street Journal* explained, constitutes "an offshoot" of the broader LIBOR investigation that had
>
> been ongoing for more than a year.

208.    Moreover, while the governments' investigations became public information in

March 2011, the facts necessary to plausibly state claims for conspiracy and manipulation have

become available as the Defendants' improper motive finally became apparent.  For example, as

discussed above, affidavits filed in a Canadian regulatory proceeding investigating Yen-LIBOR

revealed that traders with the Canadian subsidiaries and/or affiliates of Defendants routinely

discussed trading strategies, expected LIBOR quotes, and other confidential business information

in an attempt to manipulate the value of Yen-LIBOR and commodities whose value is based

directly on that measure.

---

[99] Brooke Masters and Megan Murphy, "Barclays at centre of Libor inquiry," FT.com, March 24, 2011, available at http://www.ft.com/intl/cms/s/0/1c3228f6-5646-11e0-82aa-00144feab49a.html#axzz1sJNEDIiI, last accessed on April 17, 2012.

209.     It is noteworthy that, in stark contrast to their earlier media campaign of offering innocent (but false) explanations for their LIBOR quotes, the Defendants began simply declining to comment to the media. For example, after March 15, 2011, representatives of Deutsche Bank, Bank of America, Citigroup, Credit Suisse, JP Morgan, Barclays and Lloyds have specifically declined to comment in response to inquiries concerning whether the Defendants colluded to artificially reduce LIBOR.

210.     Likewise, in stark contrast to its 2008 conclusions that LIBOR was reliable, in February 2011 the BBA expanded the Panel of banks that contribute to U.S. dollar LIBOR from sixteen to twenty members.

211.     The Baltimore Plaintiffs and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until the government investigations became public on March 15, 2011.

212.     Because the Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, the Baltimore Plaintiffs and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure on March 15, 2011.

213.     Because of the Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by the Baltimore Plaintiffs or members of the Class has been tolled during the period of such fraudulent concealment.

**E.     Other Tolling Principles.**

214.     In addition, any applicable statute of limitations affecting or limiting the rights of action by the Baltimore Plaintiffs or members of the Class has been tolled by the filing of other class actions against the Defendants, commencing in April 2011.

215.    The Defendants are equitably estopped to assert that any otherwise applicable period of limitations has run.

216.    The Defendants' conduct as alleged herein constitutes a continuing violation of law. The Baltimore Plaintiffs and members of the Class bring this action within two years of the end of such continuing violation.

## DEFENDANTS' ANTITRUST VIOLATIONS

217.    During the Class Period, as explained above, Defendants and their co-conspirators engaged in a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, maintain, suppress and stabilize LIBOR and thus the prices and rates of return on LIBOR-Based Derivatives sold by them.

218.    In formulating and effectuating the contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to fix, maintain, suppress and otherwise make artificial the price of LIBOR-Based Derivatives. These activities included the following:

(a)    Defendants participated in meetings and/or conversations to unlawfully discuss their reporting of their borrowing rates to Thomson Reuters for calculation of the daily LIBOR;

(b)    Defendants agreed during those meetings and conversations to unlawfully report their borrowing rates to Reuters for calculation of LIBOR in order to drive down LIBOR and otherwise to depress or make artificial LIBOR;

(c)    Defendants signaled to one another their intention to depress or otherwise make artificial LIBOR and colluded with one another in achieving this unlawful and anticompetitive purpose; and

(d)      Pursuant to such an unlawful conspiracy in restraint of trade, Defendants knowingly and collusively traded in order to depress or otherwise make artificial the price of LIBOR-Based Instruments.

## ALLEGATIONS OF ANTITRUST INJURY TO THE BALTIMORE PLAINTIFFS AND THE CLASS

219.    Defendants' anticompetitive conduct had severe adverse consequences on competition in that The Baltimore Plaintiffs and other members of the Class who traded in LIBOR-Based Derivatives during the Class Period were trading at artificially determined prices that were made artificial as a result of Defendants' unlawful conduct. As a consequence thereof, The Baltimore Plaintiffs and the Class suffered financial losses and were, therefore, injured in their business or property.

## FIRST CLAIM FOR RELIEF
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

220.    The Baltimore Plaintiffs incorporate by reference the preceding allegations.

221.    Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

222.    During the Class Period, Defendants controlled what LIBOR quote would be reported and therefore controlled the rates of return on LIBOR-Based Derivatives sold by them.

223.    The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and stabilized LIBOR and thus the prices and rates of return on LIBOR-Based Derivatives sold by them. Defendants' conspiracy is a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade

and commerce.

224.    Defendants' conspiracy, and resulting impact on the market for LIBOR-Based

Derivatives, occurred in or affected interstate and foreign commerce.

225.    As a proximate result of Defendants' unlawful conduct, the Baltimore Plaintiffs

and members of the Class have suffered injury to their business or property.

226.    The Baltimore Plaintiffs and members of the Class are each entitled to treble

damages for the violations of the Sherman Act alleged herein.

### SECOND CLAIM FOR RELIEF
### UNJUST ENRICHMENT AND RESTITUTION

227.    The Baltimore Plaintiffs incorporate by reference the preceding allegations.

228.    It would be inequitable for Defendants to be permitted to retain the benefit which

Defendants obtained from their manipulative acts and at the expense of the Baltimore Plaintiffs

and members of the Class.

229.    The Baltimore Plaintiffs and members of the Class are entitled to the

establishment of a constructive trust impressed on the benefits to Defendants from their unjust

enrichment and inequitable conduct.

230.    Alternatively or additionally each Defendant should pay restitution or its own

unjust enrichment to the Baltimore Plaintiffs and members of the Class.

### RELIEF SOUGHT

Accordingly, the Baltimore Plaintiffs demands relief as follows:

A.      That the Court determine that this action may be maintained as a class action

under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that the Baltimore Plaintiffs be

appointed as class representative, and that the Baltimore Plaintiffs' counsel be appointed as counsel for the Class;

B.      That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

C.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

D.      That the Baltimore Plaintiffs and the Class recover damages, as provided under federal antitrust laws, and that a joint and several judgment in favor of the Baltimore Plaintiffs and the Class be entered against Defendants in an amount to be trebled in accordance with such laws;

E.      That the Baltimore Plaintiffs and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

F.      That the Court direct such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, the Baltimore Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated:  April 30, 2012   Respectfully submitted,


     /s/ Arun Subramanian_____
     Arun Subramanian
     William Christopher Carmody
     Suyash Agrawal
     SUSMAN GODFREY L.L.P.
     560 Lexington Avenue, 15th Floor
     New York, New York 10022
     Telephone: (212) 336-8330
     Facsimile:  (212) 336-8340
     Email: asubramanian@SusmanGodfrey.com
     Email: sagrawal@SusmanGodfrey.com

     Marc M. Seltzer
     SUSMAN GODFREY L.L.P.
     1901 Avenue of the Stars, Suite 950
     Los Angeles, CA 90067
     Telephone:  (310) 789-3100
     Facsimile:  (310) 789-3150
     Email: MSeltzer@SusmanGodfrey.com

     Michael D. Hausfeld
     William P. Butterfield
     Hilary K. Scherrer
     Nathaniel C. Giddings
     HAUSFELD LLP
     1700 K St. NW, Suite 650
     Washington, D.C. 20006
     Telephone: (202) 540-7200
     Facsimile:  (202) 540-7201
     Email: mhausfeld@hausfeldllp.com
     Email: wbutterfield@hausfeldllp.com
     Email: hscherrer@hausfeldllp.com
     Email: ngiddings@hausfeldllp.com

     *Interim Lead Counsel for the Baltimore Plaintiffs*
     *and the Proposed Class*

     Max R. Schwartz (MS2517)
     Donald A. Broggi
     SCOTT+SCOTT LLP
     500 Fifth Avenue, 40th Floor
     New York, NY 10110
     Telephone: (212) 223-6444

Facsimile: (212) 223-6334
Email: mschwartz@scott-scott.com
 Email: dbroggi@scott-scott.com

Christopher M. Burke
SCOTT+SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
Email: cburke@scott-scott.com

*Additional Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | ) ) ) ) | MDL No. 2262 |
| THIS DOCUMENT RELATES TO: Case No. 12 CV 1025 (NRB) | ) ) ) ) ) | |
| ELLEN GELBOIM and LINDA ZACHER, individually for themselves and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| -against- | ) ) | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| CREDIT SUISSE GROUP AG, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., JP MORGAN CHASE & CO., JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, HSBC HOLDINGS PLC, HSBC BANK PLC, BARCLAYS BANK PLC, LLOYDS BANKING GROUP PLC, WESTLB AG, WESTDEUTSCHE IMMOBILIENBANK AG, UBS AG, THE ROYAL BANK OF SCOTLAND GROUP PLC, DEUTSCHE BANK AG, CITIBANK NA, CITIGROUP INC., COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., THE NORINCHUKIN BANK, THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., and ROYAL BANK OF CANADA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** **ECF Case** |
| Defendants. | ) ) ) | |

1.      Plaintiffs Ellen Gelboim and Linda Zacher ("Plaintiffs"), by their undersigned attorneys, bring this action against Defendants based on the Defendants' conspiracy to manipulate the London Interbank Offered Rate ("Libor") in violation of the Sherman Act, 15 U.S.C. § 1.

Plaintiffs bring this action for themselves and on behalf of all others who owned (including bene-ficially in "street name") any U.S. dollar-denominated debt security (a) that was assigned a unique identification number by the CUSIP[1] system; (b) on which interest was payable at any time between August 2007 and May 2010 (the "Class Period"); and (c) where that interest was payable at a rate expressly linked to the U.S. Dollar Libor rate ("US$ LIBOR" or simply "LI-BOR"[2]).  These debt securities are collectively referred to herein as the "Relevant LIBOR-Based Debt Securities."  Excluded from "Relevant LIBOR-Based Debt Securities" and the Class are debt securities issued by any Defendant as obligor.

2.      Plaintiffs' claims are made on information and belief (except as to allegations specifically pertaining to  themselves and their own actions, which are made on personal knowledge) based on the investigation conducted by and under the supervision of Plaintiffs' counsel.  That investigation included reviewing and analyzing information concerning Defend-ants and LIBOR, which Plaintiffs (through their counsel) obtained from, among other sources: (i) analyses by consulting experts engaged by plaintiffs in these coordinated proceedings; (ii) publicly available press releases, news articles, and other media reports (whether disseminat-ed in print or by electronic media); (iii) filings Defendants made to the United States Securities and Exchange Commission ("SEC"); (iv) court documents submitted in Libor-related proceed-ings in Canada, Singapore, and Japan; and (v) scholarly literature concerning the potential ma-nipulation of LIBOR during the Class Period.  Those sources collectively support  Plaintiffs' al-legations that Defendants collusively and systematically suppressed LIBOR during the Class Pe-riod, so that the interest rates on Relevant LIBOR-Based Debt Securities purchased during the

---

[1] "CUSIP" stands for Committee on Uniform Securities Identification Procedures.
[2] As used herein, "US$ LIBOR" or "LIBOR" refers to the U.S. Dollar Libor rate, whereas "Li-bor" refers to all Libor rates, generally.

Class Period  were lower than they otherwise would have been absent Defendants' misconduct.

3.      Except as alleged in this Complaint, neither Plaintiffs, other Class members, nor other members of the public have access to the underlying facts relating to Defendants' improper activities.  Rather, that information lies exclusively within the possession and control of Defendants and other insiders, which prevents Plaintiffs from further detailing Defendants' misconduct. Moreover, numerous pending government investigations—both domestically and abroad, including by the United States Department of Justice ("DOJ"), the Commodity Futures Trading Commission ("CFTC"), and the SEC—concerning potential LIBOR manipulation could yield information from Defendants' internal records or personnel that bears significantly on the Plaintiffs' claims.  Indeed, as one news report observed in detailing U.S. regulators' ongoing investigation, "[i]nternal bank emails may prove to be key evidence . . . because of the difficulty in proving that banks reported borrowing costs for Libor at one rate and obtained funding at another."[3] Plaintiffs thus believe further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

## SUMMARY OF THE CLAIM

4.      This case arises from the manipulation of LIBOR for the U.S. dollar[4]—the reference point for determining interest rates for trillions of dollars in financial instruments—by a cadre of prominent financial institutions.  Defendants perpetrated a scheme to depress LIBOR for two primary reasons.  First, well aware that the interest rate a bank pays (or expects to pay) on its debt is widely, if not universally, viewed as embodying the market's assessment of the risk asso-

---

[3] David Enrich, Carrick Mollenkamp & Jean Eaglesham, "U.S. Libor Probe Includes BofA, Citi, UBS," *MarketWatch*, March 17, 2011.
[4] While the term "LIBOR" generally encompasses rates with respect to numerous currencies (which are separately referred to as, for example, US$ LIBOR or Yen-LIBOR), for convenience Plaintiffs use the term "LIBOR" to refer to US$ LIBOR.

ciated with the bank, Defendants understated their borrowing costs to the BBA (thereby sup-

pressing LIBOR) to portray themselves as economically healthier than they actually were—of

particular importance given investors' trepidation in light of the widespread market turmoil of

the past few years.  Indeed, in an April 10, 2008 report, analysts at Citigroup Global Markets Inc.

(a subsidiary of Defendant Citigroup) posited the "liquidity crisis" had "created a situation where

LIBOR at times no longer represents the level at which banks extend loans to others"; specifical-

ly, the analysts concluded LIBOR "may understate actual interbank lending costs by 20-30bp

[basis points]."[5]  Second, artificially suppressing LIBOR allowed Defendants to pay lower inter-

est rates on LIBOR-based financial instruments that Defendants sold to investors during the

Class Period.

     5.     Each business day, Thomson Reuters calculates LIBOR—a set of reference or

benchmark interest rates priced to different ranges of maturity, from overnight to one year—on

behalf of the British Bankers' Association ("BBA"), which first began setting LIBOR on January

1, 1986.  As the BBA itself has acknowledged, it is not a regulatory body and has no regulatory

function.[6]  Its activities are not overseen by any U.K. or foreign regulatory agency. It is governed

by a board of member banks that meets four times each year. The board is composed of senior

executives from twelve banks, including Barclays Bank plc, Citibank NA, Credit Suisse,

Deutsche Bank AG, HSBC Bank plc, J.P. Morgan Europe Ltd., and the Royal Bank of Scotland

plc.[7]

     6.     Each of the ten currencies for which daily Libor are reported is overseen by a

---

[5] Scott Peng, Chintan (Monty) Gandhi, & Alexander Tyo, "Special Topic:  Is LIBOR Broken?",
April 10, 2008 (published by Citigroup Global Markets Inc.)
[6] http://www.bba.org.uk/blog/article/bba-repeats-commitment-to-bba-libor, last accessed on
April 30, 2012
[7] http://www.bba.org.uk/about-us, last accessed on April 30, 2012.

separate LIBOR panel created by the BBA.  During the Class Period, designated contributing panels ranged in size from eight banks for Australian dollar, Swedish krona, Danish krone, and New Zealand dollar panels to sixteen banks for U.S. dollar, pound sterling, Euro, and Japanese yen panels. There is substantial overlap in membership among the panels. For example, during the Class Period, nine of the sixteen banks that served on the U.S. dollar panel also served on the Japanese yen, Swiss franc and Euro LIBOR panels.[8]  Similarly, thirteen banks participated on both the dollar and yen LIBOR panels[9] and eleven banks participated on both the U.S. dollar and Swiss franc LIBOR panels.[10]

      7.      During most of the Class Period, the BBA calculated LIBOR based on the rates the 16 banks who sat on the US$ LIBOR panel ("Panel Banks") reported as their costs of borrowing.[11]  Every day, the banks responded to the BBA's question:  "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"[12] On its website, the BBA explains "a bank will know what its

---

[8]  Those banks are Bank of Tokyo, Barclays, Citibank, Deutsche Bank, HSBC, JP Morgan, Lloyds, Rabobank, RBS, and UBS.

[9] Those banks are Bank of America, Bank of Tokyo, Barclays, Citibank, Deutsche Bank, HSBC, JP Morgan, Lloyds, Rabobank, RBS, Société Générale (beginning in 2009), UBS, and West.

[10] Those banks are Bank of Tokyo, Barclays, Citibank, Credit Suisse, Deutsche, Bank HSBC, JP Morgan, Lloyds, Rabobank, RBS, and UBS.

[11] On February 9, 2009, Société Générale replaced Defendant HBOS on the BBA's US$ LIBOR panel.  In February 2011, in response to concerns about possible LIBOR manipulation, the BBA added four more banks to the panel.  On August 1, 2011, Defendant West, at its request, was removed from the panel.  As of December 2011, the US$ LIBOR panel consisted of 18 banks.

[12]  The composition of the LIBOR panel is intended to reflect the constituency of the London interbank money market for U.S. Dollars. The LIBOR definition is amplified as follows:

    a.  The rate at which each bank submits must be formed from that bank's perception of its cost of unsecured funds in the London interbank market. This will be based on the cost of funds not covered by any governmental guarantee scheme.

    b.  Contributions must represent rates at which a bank would be offered funds in the London interbank market.

credit and liquidity risk profile is from rates at which it has dealt and can construct a curve to

predict accurately the correct rate for currencies or maturities in which it has not been active."

The banks informed the BBA of their costs of borrowing funds at different maturity dates (e.g.,

one month, three months, six months).  The BBA discarded the upper four and lower four quotes

and set LIBOR by calculating the mean value of the remaining middle eight quotes, known as an

"inter-quartile" methodology.  Thomson Reuters then published LIBOR, also reporting the

quotes on which the BBA based its LIBOR calculation.

        8.        LIBOR is "the primary benchmark for short term interest rates globally,"[13] and

has occupied (and continues to occupy) a crucial role in the operation of financial markets.  For

example, market participants commonly set the interest rate on floating-rate notes as a spread

against LIBOR (e.g., "LIBOR + [X] bps")[14] and use LIBOR as a basis to determine the correct

rate of return on short-term fixed-rate notes (by comparing the offered rate to LIBOR).  Addi-

tionally, the pricing and settlement of Eurodollar futures and options—the most actively traded

interest-rate futures contracts on the Chicago Mercantile Exchange—are based on the three-

month LIBOR.  LIBOR thus affects the pricing of trillions of dollars' worth of financial transac-

tions, rendering it, in the BBA's own words, "the world's most important number."[15]

        9.        Accordingly, it is well-established among market participants that, as *The Wall*

---

    c.  Contributions must be for the specific currency concerned and not the cost of producing
       the currency by borrowing in a different currency and obtaining the required currency via
       the foreign exchange markets.
    d.  The rates must be submitted by members of staff at a bank with primary responsibility for
       management of a bank's cash, rather than a bank's derivative book.
    e.  The definition of "funds" is: unsecured interbank cash or cash raised through primary is-
       suance of interbank Certificates of Deposit.

[13] http://www.bbalibor.com/bbalibor-explained/the-basics, last accessed on April 19, 2012.

[14] The term "bps" stands for basis points.  100 basis points equal 1%.

[15] BBA press release, "BBA LIBOR: the world's most important number now tweets daily,"
May 21, 2009, available at http://www.bbalibor.com/news-releases/bba-libor-the-worlds-most-
important-number-now-tweets-daily, last accessed on April 28, 2012.

*Street Journal* has observed, confidence in LIBOR "matters, because the rate system plays a vital role in the economy."[16]  Moreover, given the vast universe of financial instruments LIBOR impacts, "even a small manipulation" of the rate "could potentially distort capital allocations all over the world."[17]

10.     Throughout the Class Period, Defendants betrayed investors' confidence in LIBOR, as these financial institutions conspired to, and did, manipulate LIBOR by underreporting to the BBA the actual interest rates at which the Defendants expected they could borrow funds—i.e., their true costs of borrowing—on a daily basis.  The BBA then relied on the false information Defendants provided to set LIBOR.  By acting together and in concert to knowingly understate their true borrowing costs, Defendants caused LIBOR to be set artificially low.

11.     Defendants' manipulation of LIBOR allowed them to pay unduly low interest rates to lenders on LIBOR-based financial instruments outstanding during the Class Period.  Investors—who until recently had no reason to suspect Defendants' knowing suppression of LIBOR—justifiably believed the financial instruments they were purchasing derived from a rate that was based on US$ LIBOR panel members' honest and reasonable assessments of their borrowing costs.  To the contrary, Defendants—in the debt-instrument context, the borrowers—surreptitiously bilked investors—the lenders—of their rightful rates of return on their investments, reaping hundreds of millions, if not billions, of dollars in ill-gotten gains.  Moreover, by understating their true borrowing costs, Defendants provided a false or misleading impression of their financial strength to investors and the rest of the market.

---

[16] Carrick Mollenkamp and Mark Whitehouse, "Study Casts Doubt on Key Rate --- WSJ Analysis Suggests Banks May Have Reported Flawed Interest Data for Libor," *The Wall Street Journal*, May 29, 2008.

[17] Rosa M. Abrantes-Metz and Albert D. Metz, "How Far Can Screens Go in Distinguishing Explicit from Tacit Collusion?  New Evidence from the Libor Setting," *CPI Antitrust Chronicle*, March 2012.

12.     During the Class Period, Plaintiffs and Class members owned in excess of $500 billion of LIBOR-based instruments, which paid artificially low returns due to Defendants' suppression of LIBOR.

13.     Plaintiffs now seek relief for the damages they and Class members have suffered as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

14.     Plaintiffs and the members of the Class suffered damages by, *inter alia*, receiving manipulated and artificially depressed amounts of interest on Relevant LIBOR-Based Debt Securities they owned during the Class Period.

PARTIES

**A.    PLAINTIFFS**

15.     Plaintiff Ellen Gelboim ("Gelboim"), a resident of New York, New York, is the sole beneficiary of her Individual Retirement Account that during the Class Period owned a CUSIP number-bearing Relevant LIBOR-Based Debt Security issued by General Electric Capital Corporation and received artificially depressed amounts of interest on the security as the result of Defendants' unlawful conduct.

16.     Plaintiff Linda Zacher, a resident of Bryn Mawr, Pennsylvania, is the sole beneficiary of her late husband's Individual Retirement Account that during the Class Period owned a CUSIP number-bearing Relevant LIBOR-Based Debt Security issued by the State of Israel and received artificially depressed amounts of interest on the security as the result of Defendants' unlawful conduct.

**B.    DEFENDANTS**

17.     Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.  Defendant Bank of America, N.A. is a federally chartered

national banking association headquartered in Charlotte, North Carolina and an indirect, wholly owned subsidiary of Defendant Bank of America Corporation.  Defendant Bank of America Corporation and Bank of America, N.A. are hereinafter referred to collectively as "Bank of America."  At all relevant times, Bank of America was a Panel Bank.

18.     Defendant Barclays Bank plc ("Barclays") is a United Kingdom public limited company headquartered in London, England.  At all relevant times, Barclays was a Panel Bank.

19.     Defendant Citigroup Inc. is a Delaware corporation headquartered in New York, New York.  Defendant Citibank NA is a federally chartered national banking association head-quartered in New York, New York and a wholly owned subsidiary of Defendant Citigroup Inc. Defendant Citigroup Inc. and Defendant Citibank NA are hereinafter referred to collectively as "Citibank." At all relevant times, Citibank was a Panel Bank.

20.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider with its headquarters in Utrecht, the Netherlands. At all relevant times, Rabobank was a Panel Bank.

21.     Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company head-quartered in offices in Zurich, Switzerland.  At all relevant times, Credit Suisse was a Panel Bank.

22.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.  At all relevant times, Deutsche Bank was a Panel Bank.

23.     Defendant HSBC Holdings plc is a United Kingdom public limited company headquartered in London, England.  Defendant HSBC Bank plc is a United Kingdom public lim-ited company headquartered in London, England and a wholly owned subsidiary of Defendant

HSBC Holdings plc.  Defendant HSBC Holdings plc and  Defendant HSBC Bank plc are herein-after referred to collectively as "HSBC."  At all relevant times, HSBC was a Panel Bank.

24.     Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered in New York, New York.  Defendant JPMorgan Chase Bank, National Association, is a federally chartered national banking association headquartered in New York, New York and a wholly owned subsidiary of Defendant J.P. Morgan Chase & Co.   Defendant JPMorgan Chase & Co. and Defendant JPMorgan Chase Bank, National Association are hereinafter referred to collec-tively as "JPMorgan."  At all relevant times, JPMorgan was a Panel Bank.

25.     Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company headquartered in London, England.  Lloyds was formed in 2009 through the acquisition of HBOS plc ("HBOS") by Lloyds TSB Bank plc ("Lloyds TSB").  At all relevant times, HBOS, Lloyds TSB, or Lloyds was a Panel Bank.

26.     Defendant Royal Bank of Canada ("RBC") is the largest financial institution in Canada, and is headquartered in Toronto, Canada.  At all relevant times, RBC was a Panel Bank.

27.     Defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("Bank of Tokyo") is a Jap-anese subsidiary of Mitsubishi UFJ Financial Group, Inc., and is headquartered in Tokyo, Japan. At all relevant times, Bank of Tokyo was a Panel Bank.

28.     Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan.  At all relevant times, Norinchukin was a Panel Bank.

29.     Defendant The Royal Bank of Scotland Group plc ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland.  At all relevant times, RBS was a Panel Bank.

30.     Defendant UBS, AG ("UBS") is a Swiss company based in Basel and Zurich,

Switzerland.  At all relevant times, UBS was a Panel Bank.

31.    Defendant WestLB AG is a German joint stock company headquartered in Dusseldorf, Germany.  Defendant Westdeutsche ImmobilienBank AG is a German company headquartered in Mainz and wholly owned subsidiary of  WestLB AG.   Defendant WestLB AG and Defendant Westdeutsche ImmobilienBank AG are hereinafter referred to collectively as "West."  At all relevant times, West was a Panel Bank.

32.    Various other entities and individuals not named as defendants in this Complaint participated as co-conspirators in the acts complained of, and performed acts and made statements which were in furtherance of the unlawful conduct alleged herein.

## JURISDICTION AND VENUE

33.    This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

34.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 4 of the Clayton Act.

35.    Venue is proper in the Southern District of New York pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 139l(b), (c), and (d).  One or more of the Defendants reside, transact business, are found, or have agents in the District, a substantial part of the events giving rise to Plaintiff's claims arose in the District, and a substantial portion of affected interstate trade and commerce described herein has been carried out in this District.

## SUBSTANTIVE ALLEGATIONS

### A.    EURODOLLAR ANALYSIS SUPPORTS COLLUSION DURING THE CLASS PERIOD.

36.    As demonstrated by the work of an independent consulting expert retained by counsel in these actions, analysis of the Eurodollar market strongly supports that the Defendants

11

suppressed their LIBOR quotes and colluded to suppress reported LIBOR rates.  Moreover, this analysis further supports that Defendants colluded to control the amount of suppression over the Class Period.

37.     The U.S. Federal Reserve prepares and publishes Eurodollar deposit rates for banks (the "Federal Reserve Eurodollar Deposit Rate").  These Eurodollar deposit rates are analogous to LIBOR in that they reflect the rates at which banks in the London Eurodollar money market lend U.S. dollars to one another, just as LIBOR is intended to reflect rates at which panel banks in the London interbank market lend U.S. dollars to one another. The Federal Reserve obtains its data from Bloomberg and the ICAP brokerage company.[18]   Bloomberg Eurodollar deposit rate is similar to BBA's LIBOR except that the sampling is not limited to the 16 banks chosen by BBA.  ICAP is a large broker-dealer in London in Eurodollar deposits.[19]   ICAP surveys its client banks and updates its Eurodollar deposit rates about 9:30 AM each morning.

38.     While the Defendants could  have access to the ICAP Eurodollar deposit rates prior to submitting their individual LIBOR quotes at 11:00 each day, they would not — absent collusion — have access to other bank LIBOR quotes, which are confidential until submitted. Thus, even within the context of a suppressed LIBOR, absent collusion, individual panel banks would not know what quote other panel banks intended to submit relative to the Federal Reserve Eurodollar Deposit Rate.

39.     The consulting expert determined that because of the nature of the relationship be-

---

[18] See http://federalreserve.gov/releases/h15/data.htm, footnote 8.  Last visited on April 23, 2012.
[19] 'ICAP is the world's leading voice and electronic interdealer broker and the source of global market information and commentary for professionals in the international financial markets. The Group is active in the wholesale markets in interest rates, credit, commodities, foreign exchange and equity derivatives. ICAP has an average daily transaction volume in excess of $1.5 trillion, more than 60% of which is electronic. ICAP plc was added to the FTSE 100 Index on 30 June 2006. For more information go to www.icap.com.'

tween the Federal Reserve Eurodollar Deposit Rate and LIBOR (detailed below), it would be unusual even for one bank to submit a LIBOR bid below the Federal Reserve Eurodollar Deposit Rate.  For all Defendants to submit bids below the Federal Reserve Eurodollar Deposit Rate would be extremely unusual, and strongly supports evidence of collusion among the banks.

40.     Economic and statistical analysis strongly supports the use of the Federal Reserve Eurodollar Deposit rate as a benchmark for measuring the validity of LIBOR as reported by the panel banks.  To measure how well the Federal Reserve Eurodollar Deposit Rate and LIBOR move together, for the purposes of this analysis, the difference between the two rates, the "Spread," is calculated as follows:  Spread = BBA LIBOR – Federal Reserve Eurodollar Deposit Rate.

41.     Since both LIBOR and the Federal Reserve Eurodollar Deposit Rate measure the lending cost to banks of Eurodollar deposits, important market and financial fundamentals, such as day-to-day changes in monetary policy, market risk and interest rates, as well as risk factors facing the banks generally (collectively "Market Fundamentals"), should be reflected similarly on both variables, and therefore should not affect the Spread.  The BBA's LIBOR panel is intended to reflect the Eurodollar deposit market in London.  By focusing on the Spread, the model therefore should be able to factor out normal and expected co-movements in banks' LIBOR quotes that arise from changes in Market Fundamentals.

42.     To analyze how well the Federal Reserve Eurodollar Deposit Rate captures changes in Market Fundamentals and absorbs variations in LIBOR that are driven by such fundamentals, consulting experts used regression analysis to measure the day-to-day changes in the Spread against changes in the T-Bill rate and the commercial paper rate.  The evidence from these regressions strongly supports that day-to-day changes in the Federal Reserve Eurodollar De-

posit Rate effectively capture day-to-day movements in LIBOR caused by Market Fundamentals. Thus, once the Federal Reserve Eurodollar Deposit Rate is subtracted to arrive at the Spread, remaining movements in LIBOR reflected in the Spread would be unrelated to movements in Market Fundamentals.

43.     Because Market Fundamentals are fully captured by the Spread, absent manipulation, the Spread should always be zero or close to zero. Thus, as more fully discussed below, negative Spreads provide a strong basis to conclude that the Defendants suppressed and colluded to artificially suppress LIBOR.[20]

44.     Figures 1 and 2 show the relationship between LIBOR, the Federal Reserve Eurodollar Deposit Rate, and the Spread beginning in 2000 and ending in mid 2012. As can be seen, between January 5, 2000 and around August 7, 2007, Federal Reserve's Eurodollar Deposit Rate tracked LIBOR very closely and the Spread remained positive and very close to zero. This finding indicates that the Spread effectively captures shared risks of the banks sampled by BBA and by Bloomberg and ICAP. The validity of this finding is bolstered by the fact that the Spread remained very close to zero in the face of multiple major financial dislocations, including the bursting of the dot-com bubble in 2000, the terrorist attacks of September 2001, and the 2001 U.S. economic recession. Likewise, the unusual downward movements in the Spread starting in August 2007 strongly evidences that LIBOR was being manipulated and suppressed during this period.[21]

---

[20] It is important to note that to the extent panel banks submitting LIBOR quotes submit suppressed rates to the BBA, and these suppressed rates are also considered by Bloomberg or ICAP, then the resultant Federal Reserve Eurodollar Deposit rate would also be understated by the same suppression. Consequently, the Spread computed above could even understate the true magnitude of the suppression.

[21] The Spread only became consistently positive around the end of October 2011, just after the European Commission raided banks in connection with LIBOR.





45.     Figure 3 shows the Spread between 3-month maturity BBA LIBOR and the Federal Reserve Eurodollar Deposit rate (3-month maturity BBA LIBOR – Federal Reserve Eurodollar Deposit rate), from January 2006 through early April 2012.



46.     The shorter period between January 3, 2006 and August 7, 2007 demonstrated above contains 393 trading days.  In this sub-period, there were only 3 days when the Spread was negative.  Furthermore, the magnitude of these negative Spreads were also very small, equaling -0.9 basis point on June 14, 2006, -0.5 basis point on July 27, 2006 and -0.2 basis point on November 2, 2006.[22]  This finding again strongly supports that the Federal Reserve Eurodollar Deposit Rate serves as a good benchmark to control for Market Fundamentals that determine LIBOR.  The average magnitude of the Spread during this period equaled less than one basis point.  This finding also strongly supports that the risks of the banks sampled by BBA and Bloomberg and ICAP were similar.

---

[22]  One basis point is one-hundredth of a percentage point.

47.    By August 2007, however, the Spread began to move into negative territory.  During the early part of August 2007, the Federal Reserve Eurodollar Deposit Rate stayed around 5.36%.  On August 8, the Federal Reserve Eurodollar Deposit Rate increased by 5 basis points to 5.41%, while BBA LIBOR did not keep pace.  The Spread turned negative 3 basis points on August 8, 2007.  The Spread remained mostly negative after August 7 so that by August 15, 2007, the trailing 10-day moving-average of the Spread also turned negative.  By August 31, 2007, the Federal Reserve Eurodollar Deposit rate kept increasing to 5.78%, while LIBOR was lagging.  The negative Spread on August 31 grew to -16 basis points.

48.    The Spread remained negative over the next year.  Between August 31, 2007 and September 15, 2008, the Spread remained negative on 234 of the 255 days, or 91.7% of the days.  The magnitude of the negative Spread averaged about -12 basis points.  During this approximately one year period, the negative Spread exceeded -25 basis points on 18 days.

49.    A big shock to LIBOR (and the Spread) came just after Lehman Brothers filed for bankruptcy on September 15, 2008, leading to significantly increased concerns about the health of all banks.  The increased concerns about the health of the banks were reflected in substantial increases in the Federal Reserve Eurodollar Deposit Rate.  On September 15, 2008, the Federal Reserve Eurodollar Deposit Rate equaled 3.0%, increasing to 3.2%, 3.75%, and 5% on September 16, 17 and 18, respectively.  By September 30, the Federal Reserve Eurodollar Deposit Rate doubled to 6%.

50.    In spite of increased risks and worries about the banks after the Lehman bankruptcy filing, LIBOR did not keep pace with the Federal Reserve Eurodollar Deposit Rate during this period of heightened concerns, causing the Spread to become more negative.  On September 16, 2008, the negative Spread nearly doubled to -32 basis points.  The next day, on September

17, the negative Spread doubled again reaching -69 basis points.  On September 18, the negative Spread more than doubled once again reaching -180 basis points.  Finally, on September 30, 2008, the negative Spread reached -195 basis points.

51.     Thus, between September 15, 2008 and September 30, 2008, the Federal Reserve Eurodollar Deposit Rate increased by 300 basis points to reflect increasing concerns about the banks, while LIBOR increased by  less than one-half, or by 123 basis points during the same period.  This diversion in the behavior of the two rates strongly supports the finding that the Defendants intensified their collusive suppression of LIBOR, and did so to understate their borrowing costs in the face of increasing concerns about the health of the banks.

52.     The Spread remained negative for more than one and a half years following the Lehman filing, until May 17, 2010.  As concerns about banks' financial health eased, so did the magnitude of the suppression of LIBOR.  As stated earlier, the Federal Reserve Eurodollar Deposit Rate reached 6% on September 30, 2008.  With the easing of the financial crisis, the Federal Reserve Eurodollar Deposit Rate fell to 0.45% on May 17, 2010.  The average suppression of the LIBOR rate between October 1, 2008 and May 17, 2010 equaled negative 38 basis points. The Spread finally turned positive for the first time during the post-Lehman period on May 17, 2010.  Following this date, the Spread again became negative, with the magnitude of the Spread averaging around -10 basis points.  The dramatic period of negative Spread during the Class Period, following years of uniform behavior between each individual Defendant Bank's LIBOR quote and the Federal Reserve Eurodollar Deposit Rate, is also graphically demonstrated by Figures 4 to 19 below on a bank by bank basis. Every Spread during the period August 8, 2007 to May 17, 2010 is statistically significant at the extremely high 99% confidence level.



Figure 4: HSBC LIBOR - Federal Reserve Eurodollar Spread in Percentage Points



Figure 5: JPMorganChase LIBOR - Federal Reserve Eurodollar Spread in Percentage Points

20















Figure 12: Bank of Tokyo LIBOR - Federal Reserve Eurodollar Spread in Percentage Points



Figure 13: Citi LIBOR - Federal Reserve Eurodollar Spread in Percentage Points

24

**JA223**









26

JA225





53.    As the following chart demonstrates, the average Spread for each of the individual

Defendants was uniformly negative throughout the entire Class Period, strongly supporting that each of these banks was suppressing its LIBOR quotes, and colluding to suppress reported LIBOR rates.

| BANK NAME | Average Spread between August 8, 2007 through May 17, 2010 |
|---|---|
| 1. Bank of Tokyo | -25 basis points |
| 2. Bank of America | -30 basis points |
| 3. Barclays | -25 basis points |
| 4. Citi | -32 basis points |
| 5. Credit Suisse | -27 basis points |
| 6. Deutsche Bank | -31 basis points |
| 7. HBOS | -29 basis points |
| 8. HSBC | -32 basis points |
| 9. JP Morgan | -35 basis points |
| 10. Lloyds | -30 basis points |
| 11. Norinchukin | -25 basis points |
| 12. RaboBank | -32 basis points |
| 13. Royal Bank of Canada | -28 basis points |
| 14. Royal Bank of Scotland | -26 basis points |
| 15. UBS | -29 basis points |
| 16. West | -35 basis points |

54.     Moreover, as set forth in the following chart, during the critical two week period following the bankruptcy of Lehman Brothers, each of the Defendants dramatically increased its collusive suppression of LIBOR.

28

| BANK NAME | Average Spread between September 16, 2008 and September 30, 2008 |
|---|---|
| 1. Bank of Tokyo | -120 basis points |
| 2. Bank of America | -144 basis points |
| 3. Barclays | -87 basis points |
| 4. Citi | -142 basis points |
| 5. Credit Suisse | -122 basis points |
| 6. Deutsche Bank | -129 basis points |
| 7. HBOS | -110 basis points |
| 8. HSBC | -141 basis points |
| 9. JP Morgan | -153 basis points |
| 10. Lloyds | -146 basis points |
| 11. Norinchukin | -126 basis points |
| 12. RaboBank | -143 basis points |
| 13. Royal Bank of Canada | -140 basis points |
| 14. Royal Bank of Scotland | -140 basis points |
| 15. UBS | -141 basis points |
| 16. West | -138 basis points |

55.    Every Spread during the period from September 16, 2008 to September 30, 2008 is statistically significant at the extremely high 99% confidence level.

56.    Plaintiffs' consulting expert finds the results reflected in these two tables to be powerful and statistically significant evidence of the Defendants' collusive suppression of LI-BOR during the Class Period.

57.     As detailed above, analysis based on well accepted statistical methodologies strongly supports that suppression of LIBOR occurred during the Class Period, accomplished through the collusive conduct of the Defendants.  The sustained period during which the Federal Reserve Eurodollar Deposit – LIBOR Spread fell and remained starkly negative, as seen in Figure 2 above, accounting as it does for Market Fundamentals, is not plausibly achievable absent collusion among Defendants.  The intensified suppression from September 16, 2008 to September 30, 2008 (following the Lehman bankruptcy), in defiance of economic expectations, provides further powerful support for the suppression of LIBOR achieved through collusion by the Defendants.  Because no Defendant Bank – absent collusive conduct – could know what LIBOR quote another panel bank actually intended to submit prior to those numbers being made public after 11:00 in the morning, the fact that all Defendants submitted LIBOR quotes below the Federal Reserve Eurodollar Deposit Rate over the Class Period further strongly supports the participation of each Defendant Bank in the suppressive and collusive scheme.

## B.      PROBABILITY OF DEFAULT ANALYSIS SUPPORTS COLLUSION DURING THE CLASS PERIOD.

58.     Assessing the likelihood that LIBOR was suppressed during the Class Period, the Schwab Plaintiffs' expert consultants compared US$ LIBOR panel members' quotes from 2007 through 2008 to the daily default probability estimates for each of those banks—as determined, and updated daily for each maturity (term), by Kamakura Risk Information Services ("KRIS").[23] The study focused on identifying any periods of severe discrepancy between each bank's probabilities of default ("PDs") and the LIBOR quotes the bank submitted to the BBA.

59.     The KRIS reduced-form model estimates each bank's default risk on a daily basis by analyzing each bank's equity and bond prices, accounting information, and general economic

---

[23] KRIS did not have PDs for Defendants West, Rabobank, or Norinchukin, because those companies were not publicly traded.  This PD analysis therefore does not include those banks.

conditions, such as the level of interest rates, unemployment rates, inflation rates, etc.  On its website, KRIS states it "provides a full term structure of default for both corporate and sovereign credit names based upon a multiple models approach" and its default probabilities "are updated daily and cover more than 29,000 companies in 36 countries."[24]

60.     PD provides a measure of a bank's credit (default) risk exposure, essentially the likelihood that the bank will default within a specified time period.  PD can be estimated using statistical models, whereas LIBOR is a rate of return required by investors lending short-term funds to the bank.  A finding of a statistically significant negative correlation coefficient between daily LIBOR quotes and PDs for a given bank over a given term period violates the fundamental relationship between risk and return that is the cornerstone of finance.  That is, investors require a higher required rate of return as a premium for taking on additional risk exposure.  This results in a positive relationship (correlation) between risk and return.  An increase in the bank's PD indicates that the risk of default has increased, thereby causing investors to require a higher rate of return for loans to the bank—which should correspond with a higher LIBOR quote.

61.     Accordingly, a finding of a statistically significant negative coefficient (of any size) between a bank's daily LIBOR quotes and its PDs shows that increases in PDs correspond with decreases in LIBOR quotes—which violates fundamental finance theory.  This would indicate that banks are suppressing their LIBOR quotes to avoid revealing the higher rates that reflect their true (higher) probabilities of default.  In other words, any finding of negative, statistically significant correlation coefficients between a bank's PDs and its LIBOR quotes suggests LIBOR suppression by the bank over the analysis period.

62.     The magnitude of the correlation coefficient is impacted by the volatility of both

---

[24] *See* http://www.kris-online.com/, last accessed on April 23, 2012.

PD and LIBOR for each bank during the time period.  Thus, for example, if a bank has high volatility in its PDs, the absolute value of the correlation coefficient will tend to be lower (i.e., less negative) as compared to an identical bank with low PD volatility.  However, both may be equally engaged in LIBOR suppression if their correlation coefficients are statistically significant and negative.

63.     The Schwab Plaintiffs' consulting experts used the KRIS database to test whether, for the period under study, each bank's daily sealed LIBOR quote correlates with the bank's estimated PD that day for the same maturity term (provided by KRIS).  For example, the consultants examined the correlation between Bank of America's sealed quote for three-month LIBOR on each date with the three-month PD for Bank of America, as provided by the KRIS database on that same day.  As explained above, standard finance theory implies that a positive correlation between a bank's PD and its LIBOR quote should exist—i.e., as the bank's default risk (PD) increases, its borrowing rate (LIBOR quote) should increase, and *vice versa*.  That is, using the above example, standard finance theory  predicts a positive correlation between Bank of America's three-month PD and its three-month LIBOR quote.  A finding of either a zero or negative correlation between a bank's PD and its LIBOR quote indicates the latter does not reflect the bank's default-risk probability, which evidences LIBOR suppression.  A negative correlation means the two values have an inverse relationship; as one goes up, the other tends to go down. A statistically significant negative correlation between a bank's LIBOR quote and its PD is consistent with the bank's reducing its LIBOR quote in order to mask its higher risk exposure during a period of financial crisis, such as during the 2007-2008 period.  By submitting an artificially low LIBOR quote, the bank sends a false signal that it is less risky than it truly is.

64.     The Schwab Plaintiffs' consulting experts found suppression over the 2007-2008

period for one-month, three-month, six-month, and 12-month LIBOR.

65.     The LIBOR quotes for all the reporting banks (except HSBC) during 2007 were *negatively correlated* with their daily updated PDs (for the same maturity term) to a statistically significant degree.  For example, the correlation between Bank of America's daily LIBOR quotes and its daily PDs, for example, was negative and statistically significant at a very high level for the one-month, three-month, six-month and 12-month terms, i.e., between -0.5857 and -0.6093.[25]  In other words, the data indicate that, contrary to fundamental finance theory, the higher a Panel Bank's PD was, the *lower* its LIBOR quote was.

66.     Performing the same analysis with respect to the LIBOR panel banks' daily LIBOR quotes and PDs during 2008, the expert consultants found that for all of the banks, the submitted LIBOR quotes were negatively correlated with their PDs at the one-month and three-month maturities.  Indeed, all of the banks were submitting unduly low LIBOR quotes at all maturities during the time period from August 9, 2007 until September 12, 2008, and, with only one exception, from September 15 through December 31, 2008, the period following the Lehman bankruptcy.

67.     The following graphs illustrate the findings of this expert analysis—which demonstrates a striking negative correlation between US$ LIBOR panel banks' LIBOR quotes and PDs during 2007 and 2008, indicating they severely depressed LIBOR during that time.

---

[25] Correlation coefficients range from a value of -1 to 1.  A correlation coefficient of -0.50, for example, would imply that a 1% increase in PD would result in a 50-basis point decline in the bank's LIBOR quote.

**<u>Graph 1</u>**

**Correlation Coefficients**
**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)**
**One-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

34

**JA233**

**Graph 2**

**Correlation Coefficients
Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)
Three-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**JA234**

**Graph 3**

**Correlation Coefficients
Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)
Six-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph 4**

**Correlation Coefficients**
**Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)**
**Twelve-Month Term**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

37

**JA236**

**Graph 5**

**Correlation Coefficients
Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)
9 August 2007 – 12 September 2008 Period**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

**Graph 6**

**Correlation Coefficients
Between Each Bank's Daily LIBOR Bid and Probability of Default (PD)
15 September 2008 – 31 December 2008 Period**



(Note:  PDs are estimated daily using the reduced form model of Kamakura Risk Information Services.)

## C.   DEFENDANTS POSSESSED STRONG FINANCIAL MOTIVES TO SUPPRESS LIBOR.

68.   Defendants each had substantial financial incentives to suppress LIBOR.  First,

Defendants were motivated, particularly given investors' serious concerns over the stability of

the market in the wake of the financial crisis that emerged in 2007, to understate their borrowing

costs—and thus the level of risk associated with the banks.  Moreover, because no one bank

would want to stand out as bearing a higher degree of risk than its fellow banks, each Defendant

shared a powerful incentive to collude with the other Defendants to ensure it was not the "odd

man out."  Indeed, analysts at Citigroup Global Markets—a subsidiary of Defendant Citigroup—

acknowledged in an April 10, 2008 report:

> [T]he most obvious explanation for LIBOR being set so low is the
> prevailing fear of being perceived as a weak hand in this fragile
> market environment.  If a bank is not held to transact at its posted
> LIBOR level, there is little incentive for it to post a rate that is
> more reflective of real lending levels, let alone one higher than its
> competitors.  Because all LIBOR postings are publicly disclosed,
> any bank posting a high LIBOR level runs the risk of being per-
> ceived as needing funding.  With markets in such a fragile state,
> this kind of perception could have dangerous consequences.[26]

Strategists at entities affiliated with other Defendants likewise confirmed that banks suppressed

LIBOR.  Echoing the sentiment of the above analysts, William Porter, credit strategist at De-

fendant Credit Suisse, said in April 2008 that he believed the three-month LIBOR was 0.4 per-

centage points—or 40 basis points—below where it should be.[27]  And the next month, Tim

Bond, head of asset-allocation research of Barclays Capital—a subsidiary of Defendant Bar-

clays—observed that banks routinely misstated borrowing costs to the BBA to avoid the percep-

tion that they faced difficulty raising funds as credit markets seized up.[28]  Bond explained that

when the Barclays treasurer resolved to "quote the right rates," Barclays faced "a series of media

articles saying that we were having difficulty financing."

      69.    Second, by artificially suppressing LIBOR, Defendants paid lower interest rates

on LIBOR-based financial instruments they sold to investors during the Class Period.  Illustrat-

ing Defendants' motive to artificially depress LIBOR, in 2009 Citibank reported it would make

$936 million in net interest revenue if rates would fall by 25 bps per quarter over the next year

---

[26] Scott Peng, Chintan (Monty) Gandhi, & Alexander Tyo, "Special Topic:  Is LIBOR Broken?,"
April 10, 2008.
[27] Carrick Mollenkamp, "Libor Surges After Scrutiny Does, Too," *The Wall Street Journal*, April
18, 2008.
[28] Gavin Finch and Elliott Gotkine, "Libor Banks Misstated Rates, Bond at Barclays Says,"
*Bloomberg*, May 29, 2008.

and $1.935 billion if they fell 1% instantaneously.  JPMorgan Chase likewise reported significant

exposure to interest rates in 2009:  The bank stated that if interest rates increased by 1%, it would

lose over $500 million.  HSBC and Lloyds also estimated they would earn hundreds of millions

of additional dollars in 2008-2009 in response to lower interest rates and would lose comparable

amounts in response to higher rates.  These banks collectively earned billions in net interest rev-

enues during the Class Period.

   70. Defendants thus possessed reputational and financial incentives to manipulate

LIBOR—which, as detailed below, they did.

   **D.** **EMPIRICAL ANALYSES BY ACADEMICS AND OTHER**
     **COMMENTATORS FURTHER INDICATE LIBOR SUPPRESSION**
     **OCCURRED.**

   71. In addition to the independent expert work detailed above, publicly available

analyses by academics and other commentators likewise support Plaintiffs' allegations.  While

those studies used various comparative benchmarks and did not employ uniform methodologies,

they collectively indicate LIBOR was artificially suppressed during the Class Period.

     **1.** **The discrepancy between Defendants' reported LIBOR quotes and**
       **their CDS spreads indicates the banks misrepresented their**
       **borrowing costs to the BBA.**

   72. One economic indicator that Defendants suppressed LIBOR during the Class Pe-

riod is the variance between their LIBOR quotes and their contemporaneous cost of buying de-

fault insurance—i.e., a credit-default swap ("CDS")—on debt they issued during that period.  A

CDS—"the most common form of credit derivative, *i.e.*, [a] contract which transfers credit risk

from a protection buyer to a credit protection seller"[29]—constitutes an agreement by which one

party, the protection buyer, seeks financial protection in the event of a default on an underlying

---

[29] *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 171-72
(2d Cir. 2004) (alteration in original) (citation and internal quotation marks omitted).

credit instrument (typically a bond or loan).  Typically, a CDS buyer makes a series of payments (often referred to as the CDS "fee" or "spread") to the CDS seller in exchange for a payment if the underlying credit instrument experiences an adverse credit event.

73.      The spread serves as a measure of the perceived risk of default by the entity issuing the underlying bond or receiving the loan—the greater the risk of default the underlying bond or loan bears, the greater the CDS spread.  In the case of a CDS for which the underlying instrument consists of an interbank loan where a LIBOR panel bank is the borrower, the greater the perceived risk the panel bank will default on the loan, the higher the applicable CDS spread, as this higher spread represents the cost of insuring against the increased risk of a default on the underlying loan.

74.      As one commentator has observed, "The cost of bank default insurance has generally been positively correlated with LIBOR.  That is, in times when banks were thought to be healthy, both the cost of bank insurance and LIBOR decreased or remained low, but when banks were thought to be in poor condition, both increased."[30]  During the Class Period, however, those historically-correlated indicia of banks' borrowing costs diverged significantly.

75.      That discrepancy was detailed in a May 29, 2008 *Wall Street Journal* article reporting the results of a study it had commissioned.  The *Journal*'s analysis indicated numerous banks had caused LIBOR, "which is supposed to reflect the average rate at which banks lend to each other," to "act as if the banking system was doing better than it was at critical junctures in the financial crisis."[31]  The *Journal* found that beginning in January 2008, "the two measures began to diverge, with reported LIBOR rates failing to reflect rising default-insurance costs."

---

[30] Justin Wong, "LIBOR Left in Limbo; A Call for More Reform," 13 *North Carolina Banking Institute* 365, 371 (2009) (footnotes omitted).

[31] *See* Carrick Mollenkamp and Mark Whitehouse, "Study Casts Doubt on Key Rate --- WSJ Analysis Suggests Banks May Have Reported Flawed Interest Data for Libor."

76.    The *Journal* observed that the widest gaps existed with respect to the LIBOR quotes of Defendants Citibank, West, JPMorgan, and UBS, as well as HBOS.  According to the *Journal*'s analysis, Citibank's LIBOR rates differed the most from what the CDS market suggested the bank's borrowing cost was.  On average, the rates at which Citibank reported it could borrow dollars for three months (i.e., its three-month LIBOR rates) were about 87 basis points *lower* than the rates calculated using CDS data.  West, HBOS, JPMorgan, and UBS likewise exhibited significant LIBOR-CDS discrepancies—of 70, 57, 43, and 42 basis points, respectively—while Defendants Credit Suisse, Deutsche Bank, Barclays, HSBC, Lloyds, and RBS each exhibited discrepancies of about 30 basis points.  The study's authors concluded "one possible explanation for this gap is that banks understated their borrowing rates."

77.    Citing another example of suspicious conduct, the *Journal* observed that on the afternoon of March 10, 2008, investors in the CDS market were betting that West—hit especially hard by the credit crisis—was nearly twice as likely to renege on its debts as Credit Suisse, which was perceived to be in better shape, yet the next morning the two banks submitted identical LIBOR quotes.

78.    Additionally, having compared the banks' LIBOR quotes to their actual costs of borrowing in the commercial-paper market, the *Journal* reported, for example, that in mid-April 2008, UBS paid 2.85% to borrow dollars for three months, but on April 16, 2008, the bank quoted a borrowing cost of 2.73% to the BBA.

79.    The *Journal* further noted an uncanny equivalence between the LIBOR panel banks' quotes:  the three-month borrowing rates the banks reported remained within a range of only 0.06 of a percentage point, even though at the time their CDS insurance costs varied far more widely, reflecting the market's differing views as to the banks' creditworthiness.

43

According to Stanford University professor Darrell Duffie, with whom the authors of the *Journal* article consulted, the unity of the banks' LIBOR quotes was "far too similar to be believed."

80.     David Juran, a statistics professor at Columbia University who reviewed the *Journal*'s methodology, similarly concluded that the *Journal's* calculations demonstrate "very convincingly" that reported LIBOR rates are lower, to a statistically significant degree, than what the market thinks they should be.

81.     Calculating an alternate borrowing rate incorporating CDS spreads, the *Journal* estimated that underreporting of LIBOR had a $45 billion effect on the market, representing the amount borrowers (the banks) did not pay to lenders (investors in debt instruments issued by the banks) that they would otherwise have had to pay.

82.     According to the *Journal*, three independent academics, including Professor Duffie, reviewed its methodology and findings, at the paper's request.  All three deemed the *Journal*'s approach "reasonable."

83.     Further economic analysis supports the correlation seen in the *Journal*'s report.  A study by Connan Snider and Thomas Youle—of the economics departments at UCLA and the University of Minnesota, respectively—released in April 2010 concluded LIBOR did not accurately reflect average bank borrowing costs, its "ostensible target."[32]  Noting that "[i]n a competitive interbank lending market, banks' borrowing costs should be significantly related to their perceived credit risk," Snider and Youle posited that if LIBOR quotes "express true, competitively determined borrowing costs," they should "be related to measures of credit risks, such as the cost of default insurance."  According to Snider and Youle's analysis, however, quotes provided by US$ LIBOR panel banks in fact deviated from their costs of borrowing as reflected in

---

[32] Connan Snider and Thomas Youle, "Does the LIBOR reflect banks' borrowing costs?", April 2, 2010.

CDS spreads.

84.    Comparing, for example, the 12-month US$ LIBOR quotes from Citigroup and Bank of Tokyo together with each bank's corresponding one-year senior CDS spreads, Snider and Youle observed (as illustrated in the graph below) "that while Citigroup has a substantially higher CDS spread than [Bank of Tokyo], it submits a slightly lower Libor quote."  Accordingly, the authors explain, while the CDS spreads "suggest that the market perceives Citigroup as riskier than [Bank of Tokyo], as it is more expensive to insure against the event of Citigroup's default," the banks' LIBOR quotes "tell the opposite story."



85.    Snider and Youle further noted the level of Citigroup's CDS spreads relative to its LIBOR quotes was "puzzling."  The authors explained, "Given that purchasing credit protection for a loan makes the loan risk free, one would expect [the] difference between the loan rate and the CDS spread to roughly equal the risk free rate.  This corresponds to the idea that a loan's interest rate contains a credit premium, here measured by the CDS spread."  But the authors ob-

45

served that Citigroup's quote was often "significantly below its CDS spread," implying "there were interbank lenders willing to lend to Citigroup at rates which, after purchasing credit protection, would earn them *a guaranteed 5 percent loss*." (Emphasis added). That discrepancy contravenes basic rules of economics and finance, thus indicating Citibank underreported its borrowing costs to the BBA.

2.   **Cross-currency discrepancies in Defendants' LIBOR quotes indicate they suppressed LIBOR.**

86.    Defendants' LIBOR quotes also displayed inexplicable "cross-currency rank reversals." That is, as detailed in Snider and Youle's paper referenced above, at least some Defendants reported lower rates on LIBOR than did other panel members but, for other currencies, provided higher rates than did those same fellow banks. Both Bank of America and Bank of Tokyo, for instance, quoted rates for LIBOR and Yen-LIBOR during the period under study, yet Bank of America quoted a lower rate than Bank of Tokyo for LIBOR and a *higher* rate than Bank of Tokyo for Yen-LIBOR. Other Defendants included in Snider and Youle's analysis—Barclays, Citigroup, and JPMorgan—displayed similar anomalies across currencies, as the graphs below illustrate. Citigroup, for example, often reported rates at the top of the Yen-LIBOR scale while simultaneously quoting rates at the bottom of the LIBOR scale.

46



87.     Snider and Youle explain that because "the same bank is participating in each cur-

rency," the credit risk "is the same for loans in either currency"; thus these "rank reversals"

demonstrate that differences in the banks' LIBOR quotes "are not primarily due to differences in

credit risk, something we would expect of their true borrowing costs."  Cross-currency rank re-

versals are inconsistent with the notion that LIBOR quotes reflect each panel bank's singular

"credit and liquidity risk profile."

### 3.     The frequency with which at least certain Defendants' LIBOR quotes "bunched" around the fourth-lowest quote of the day suggests manipulation.

88.     During the Class Period, the rates reported by certain Defendants—in particular,

Citibank, Bank of America, and JPMorgan—also demonstrated suspicious "bunching" around

the fourth lowest quote submitted by the 16 banks to the BBA.  Indeed, Citibank's and Bank of

America's quotes often tended to be identical to the fourth-lowest quote for the day.  Because the

LIBOR calculation involved excluding the lowest (and highest) four reported rates every day, bunching around the fourth-lowest rate suggests Defendants collectively depressed LIBOR by reporting the lowest possible rates that would not be excluded from the calculation of LIBOR on a given day.

89.     Bunching among Defendants' respective LIBOR quotes indicates the banks intended to report the same or similar rates, notwithstanding the banks' differing financial conditions, which, as detailed above, reasonably should have resulted in differing LIBOR quotes. Those discrepancies suggest Defendants colluded to suppress LIBOR.

90.     The following charts show the frequency with which the LIBOR quotes submitted by Defendants Citigroup, Bank of America, and JPMorgan fell within a given percentage rate from the fourth-lowest quote.  A negative difference means the reporting bank was below the fourth-lowest quote, and therefore its rate was not included in the daily LIBOR calculation, while zero difference means that the bank reported the fourth-lowest quote on a given day (either by itself or tied with other reporting banks).[33]

---

[33] In the event of a tie between two or more banks, one of the banks' quotes, selected at random, was discarded.





**JA248**



91.     According to Snider and Youle, the fact that observed bunching occurred around the pivotal fourth-lowest reported rate reflected the reporting banks' intention to ensure the lowest borrowing rates were included in the calculation of LIBOR (which includes only the fifth-lowest through the twelfth-lowest quotes).

92.     In other words, banks that bunched their quotes around the fourth-lowest submission helped ensure the maximum downward manipulation of the resulting rate.  Furthermore, that a panel bank reported one of the four lowest quotes (i.e., quotes excluded from the ultimate LIBOR calculation) does not mean the bank did not also participate in the collusion.

93.      Further demonstrating the aberrant nature of the observed bunching around the fourth-lowest quote, Snider and Youle noted "the intraday distribution of *other* measures of bank borrowing costs do not exhibit this bunching pattern."  (Emphasis added).

94.     Additionally, Snider and Youle detailed a discrepancy between LIBOR panel banks' LIBOR quotes and their CDS spreads.  The authors found that  "with the intra-day variation of both Libor quotes and CDS spreads increasing from their historical levels," the CDS

spreads' intra-day variation "grew considerably larger than that of Libor quotes."[34]

95.    Snider and Youle further observed that—as the graphs below, embodying a composite of all the banks, illustrate—during the Class Period Defendants' quotes tended to "bunch" around the fourth-lowest quote much more commonly than those banks' CDS spreads "bunched" around the fourth-lowest spread.  The authors concluded, "If banks were truthfully quoting their costs, . . . we would expect these distributions to be similar."



96.    Given the method by which the BBA calculates LIBOR—discarding the highest and lowest reported rates and averaging the remainder—that strong concentration around the fourth-lowest rate is exactly what would occur if a number of banks sought in concert to depress LIBOR.

97.    The Bank for International Settlements ("BIS"), a Swiss-based international or-

---

[34] Snider and Youle, "Does the LIBOR reflect banks' borrowing costs?"

ganization that "serve[s] central banks in their pursuit of monetary and financial stability," similarly reported in a study of interbank lending rates that LIBOR quotes were artificially uniform during the second half of 2007.  The BIS study cited LIBOR "market participants" who argued that "the rates quoted and paid by banks on their interbank borrowing tended to vary more than usual (and by more than what appears in the Libor panel) during the turbulence."

### 4.  That LIBOR diverged from its historical relationship with the Federal Reserve auction rate indicates suppression occurred.

98.    A comparison between LIBOR and the Federal Reserve auction rate further suggests Defendants artificially suppressed LIBOR during the Class Period.  An April 16, 2008 *Wall Street Journal* article, for example, noted the Federal Reserve had recently auctioned off $50 billion in one-month loans to banks for an average annualized interest rate of 2.82%—10 basis points higher than the comparable LIBOR rate.  That differential would make no economic sense if the reported LIBOR rate was accurate, the *Journal* observed:  "Because banks put up securities as collateral for the Fed loans, they should get them for a lower rate than Libor, which is riskier because it involves no collateral."

99.    A subsequent *Journal* article raised further concerns about LIBOR's accuracy based on the comparison of one-month LIBOR with the rate for the 28-day Federal Reserve auction.[35]  According to the *Journal*, because the Federal Reserve requires collateral:

> banks should be able to pay a lower interest rate [to the Fed] than they do when they borrow from each other [e.g., as ostensibly measured by LIBOR] because those loans are unsecured.  It is the same reason why rates for a mortgage, which is secured by a house, are lower than those for credit cards, where the borrower doesn't put up any collateral. In other words, the rate for the Fed auction should be lower than Libor.

To the contrary, though, two days before the *Journal* article (September 22, 2008), the

---

[35] Carrick Mollenkamp, "Libor's Accuracy Becomes Issue Again," *The Wall Street Journal*, September 24, 2008.

rate for the 28-day Fed facility was 3.75%—much higher than one-month LIBOR, which was 3.18% that day[36] and 3.21% the next day.

### 5. LIBOR's divergence from its historical correlation to overnight index swaps also suggests it was artificially suppressed during the Class Period.

100.     Yet another example of LIBOR's aberrant behavior with respect to other measures of banks' borrowing costs during the Class Period is its observed deviation from the overnight-index swap ("OIS") rate.  In his academic article analyzing LIBOR data for the second half of 2007 and 2008, Justin Wong observed that between 2001 and July 2007, when the global credit crisis began, the spread between LIBOR and the OIS rate "averaged eleven basis points."[37] By July 2008, that gap "approached 100 basis points, a figure significantly higher than the spread from a year prior," and by October 2008, "it peaked at 366 basis points."  While the spread "receded somewhat in November 2008 to 209 basis points," that was still "far above the pre-crisis level."  Wong's analysis provides further support for Plaintiffs' allegations that Defendants suppressed LIBOR.

### 6. Additional data suggest LIBOR may have been manipulated as early as August 2006.

101.     As the empirical evidence in support of LIBOR manipulation continues to develop, at least some of the data point to possible manipulation as early as August 2006.  In a recent paper, Rosa Abrantes-Metz (of NYU Stern School of Business's Global Economics Group) and Albert Metz (of Moody's Investors Service) compared one-month LIBOR against the Fed Funds

---

[36] The *Journal* initially reported the one-month USD-LIBOR rate for that day as 3.19% but later noted the correct figure.
[37] Justin Wong, "LIBOR Left in Limbo; A Call for More Reform."

effective rate and the one-month Treasury Bill ("T-Bill") rate.[38]  Studying the period of early August 2006 through early August 2007, the authors observed the level of one-month LIBOR was "virtually constant," while the Fed Funds effective rate and the one-month T-Bill rate did "not present such striking stability."  Spurred by that "highly anomalous" discrepancy, Abrantes-Metz and Metz examined the LIBOR panel members' individual quotes, which showed that during the studied period, the middle eight quotes used to set LIBOR each day were "essentially identical day in and day out"—another "highly anomalous" finding.

102.    The authors concluded that "explicit collusion" presented "the most likely explanation" for this anomalous behavior.  They explained that because LIBOR quotes are submitted sealed, "the likelihood of banks moving simultaneously to the same value from one day to the next without explicit coordination is extremely low, particularly given that their idiosyncrasies would not imply completely identical quotes under a non-cooperative outcome."  They further opined "it is difficult to attribute it to tacit collusion or strategic learning, since the change is abrupt, the quotes are submitted sealed, and the quotes themselves sometimes change from one day to the next in an identical fashion."

103.    Abrantes-Metz and Sofia B. Villas-Boas (of UC-Berkeley's Department of Agricultural & Resource Economics) used another methodology—Benford second-digit reference distribution—to track the daily one-month LIBOR rate over the period 2005-2008.[39]  Based on this analysis, the authors found that for sustained periods in 2006 and 2007, the empirical standard-deviation distribution differed significantly from the Benford reference distribution for nearly all banks submitting quotes.  The authors also observed large deviations from Benford for a

---

[38] Rosa M. Abrantes-Metz and Albert D. Metz, "How Far Can Screens Go in Distinguishing Explicit from Tacit Collusion?  New Evidence from the Libor Setting."
[39] Rosa M. Abrantes-Metz and Sofia B. Villas-Boas, "Tracking the Libor Rate," July 2010.

sustained period in 2008.

104.     Those studies indicate at least a possibility that Defendants' suppression of LI-

BOR goes back even farther than August 2007.

       **7.**    **Expert Analysis Performed In Connection With These Proceedings
Indicates LIBOR's Increase Following Expressions of Concern Over
LIBOR's Viability Resulted from Defendants' Reaction to Events
Unrelated to Market Factors.**

105.     On April 17, 2008, the day after *The Wall Street Journal* initially reported on LI-

BOR's anomalous behavior and the BBA stated it would conduct an inquiry concerning LIBOR,

there was a sudden jump in USD-LIBOR—the three-month borrowing rate hit 2.8175% that day,

about eight basis points more than the previous day's rate of 2.735%.

106.     Suspiciously, reported LIBOR rates for other currencies fell or remained relative-

ly flat at the time USD-LIBOR rose, a sign that the latter was susceptible to manipulation.

107.     A consulting expert engaged by other plaintiffs in these coordinated proceedings

has conducted an analysis of the change in LIBOR on the single date of April 17, 2008.  The

analysis tested the hypothesis that if banks did not manipulate LIBOR, there would be no sys-

tematic changes in LIBOR expected on April 17, 2008 relative to typical changes on other days

between January 5, 2000 to May 13, 2011, whereas if banks did manipulate LIBOR—and were

responding to *The Wall Street Journal* article and BBA announcement—the reporting banks

would be likely to reduce or abandon the manipulation immediately in response to these events.

An immediate reduction in LIBOR manipulation would result in an increase in LIBOR quotes by

the member banks on April 17, 2008.

108.     To conduct the analysis, the consulting expert ran a regression using the daily

changes in LIBOR.  Table 1 below shows the studies' results.  As discussed above, LIBOR in-

creased on April 17, 2008 at a statistically significant level.  Moreover, the increase in composite

LIBOR as well as of the 11 of the 16 bank quotes were statistically significant.  These findings were consistent with the hypothesis that the banks manipulated and suppressed LIBOR.

**Table 1**

**Changes in LIBOR on April 17, 2008 in Percentage Points***

|  | Dependent variable | Average change during non-suppression days | Change in the dependent variable on April 17, 2008 relative to non-suppression days' average | Statistical Significance at the 1-5% level of the April 17, 2008 move |
|---|---|---|---|---|
| 1 | BBA LIBOR | -0.000371 | 0.0909* | 5% |
| 2 | HSBC LIBOR | 0.000154 | 0.1273** | 1% |
| 3 | JPMC LIBOR | -0.000333 | 0.0872* | 5% |
| 4 | BARCLAYS LIBOR | -0.000333 | 0.1072* | 5% |
| 5 | WEST LB LIBOR | -0.000314 | 0.0971* | 5% |
| 6 | RBS LIBOR | -0.000352 | 0.0921* | 5% |
| 7 | RABOBANK LIBOR | -0.000364 | 0.0872* | 5% |
| 8 | CITI LIBOR | -0.000344 | 0.1022* | 5% |
| 9 | RBC LIBOR | 0.002067 | 0.1021* | 5% |
| 10 | UBS LIBOR | -0.000777 | 0.1021* | 5% |
| 11 | NORIN LIBOR | -0.00038 | 0.0971* | 5% |
| 12 | HBOS LIBOR | 0.002467 | 0.1111* | 5% |

Statistical significance is assessed using a AR(3) model for the residuals

* While not shown here, an additional dummy variable is used to control for changes during the Relevent Period of August 8, 2007 to May 17, 2010.

109.     An alternative hypothesis is that, in addition to reacting to the *Journal*, other confounding effects that are related to the risk of the banking sector or overall Market Fundamentals could have emerged on April 16, 2008 and April 17, 2008.  This alternative hypothesis also predicts an increase in LIBOR.  To test this alternative hypothesis, instead of looking at daily changes in LIBOR quotes, it is possible to examine daily changes in the difference between banks' LIBOR quotes and the Federal Reserve Eurodollar Deposit Rate (the "Spread").  If risk-related factors or Market Fundamentals played a role, they would affect both the banks' LIBOR quotes as well as the Federal Reserve's Eurodollar Deposit Rate.  Thus, if this hypothesis is correct, one should not see any changes to the Spread on April 17, 2008, since these two effects should cancel out.  However, if there were no risk-related news and only a reaction to *The Wall Street Journal* article and the BBA announcement played a major role, then only LIBOR would be affected, leaving Federal Reserve's Eurodollar Deposit Rate mostly unaffected.  In this case, the Spread would again be expected to increase.

110.     The test of this alternative hypothesis showed that the Spreads of all 16 panel banks increased on April 17, 2008 and, as shown in Table 2 below, 11 of the 16 changes were statistically significant at levels ranging from 1% to 5%.  Once again, these findings were consistent with the manipulation hypothesis and inconsistent with the hypothesis that other risk factors explained the April 17, 2008 shock to the LIBOR rate.

**Table 2**

**Changes in Spread (BBA LIBOR – Federal Reserve's Eurodollar Deposit Rate) on April 17, 2008 in Percentage Points***

| | Dependent variable | Average change in Spread during non-suppression days | Change in the dependent variable on April 17, 2008 relative to non-suppression days' average | Statistical Significance at the 1-5% level of the April 17, 2008 move |
|---|---|---|---|---|
| 1 | BBA LIBOR Spread | -0.000078 | 0.0838 | 5% |
| 2 | HSBC LIBOR Spread | 0.000508 | 0.1205 | 1% |
| 3 | JPMC LIBOR Spread | -0.000103 | 0.0803* | 5% |
| 4 | BARCLAYS LIBOR Spread | -0.000067 | 0.1002** | 1% |
| 5 | RBS LIBOR Spread | -0.0001 | 0.0851* | 5% |
| 6 | TOKYO LIBOR Spread | -0.000092 | 0.0797* | 5% |
| 7 | CITI LIBOR Spread | -0.00012 | 0.0953* | 5% |
| 8 | CS LIBOR Spread | -0.000224 | 0.07* | 5% |
| 9 | RBC LIBOR Spread | -0.000135 | 0.0951* | 5% |
| 10 | UBS LIBOR Spread | -0.000172 | 0.095* | 5% |
| 11 | NORIN LIBOR Spread | -0.000179 | 0.0903** | 1% |
| 12 | HBOS LIBOR Spread | 0 | 0.1007* | 5% |

Statistical significance is assessed using a AR(3) model for the residuals
\* While not shown here, an additional dummy variable is used to control for changes during
the Relevent Period of August 8, 2007 to May 17, 2010.

111.     The conclusions of this study are consistent with the contemporaneous views ex-

pressed by high-level employees of various Defendant panel banks recounted above.

**E.     THAT AT LEAST SOME DEFENDANTS FACED DIRE FINANCIAL
CIRCUMSTANCES DURING THE CLASS PERIOD FURTHER
RENDERS THEIR UNDULY LOW LIBOR QUOTES STRIKING.**

112.     The independent economic analyses performed in connection with these proceed-

ings, whose findings are corroborated by the publicly available scholarly work detailed above,

strongly indicate Defendants' LIBOR quotes during the Class Period did not appropriately reflect

those banks' actual borrowing costs at that time—and, indeed, that Defendants *collectively* sup-

pressed LIBOR.  Further illustrating the striking discrepancy between Defendants' submissions

to the BBA and their actual borrowing costs, during 2008 and 2009 at least some of those banks'

LIBOR quotes were too low in light of the dire financial circumstances the banks faced, which

were described in numerous news articles from the Class Period.

**1.     Citigroup**

113.     On November 21, 2008, *The Wall Street Journal* reported that Citigroup execu-

tives "began weighing the possibility of auctioning off pieces of the financial giant or even sell-

ing the company outright" after the company faced a plunging stock price.  The article noted

Citigroup executives and directors "rushing to bolster the confidence of investors, clients and

employees" in response to uncertainty about Citigroup's exposure to risk concerning mortgage-

related holdings.[40]  Similarly, on November 24, 2008, *CNNMoney* observed:

> If you combine opaque structured-finance products with current
> fair-value accounting rules, almost none of the big banks are sol-
> vent because that system equates solvency with asset liquidity.  So

---

[40] *See* http://online.wsj.com/article/SB122722907151946371.html?mod=testMod

at this moment Citi isn't solvent. Some argue that liquidity, not
solvency, is the problem.  But in the end it doesn't matter.  Fear
will drive illiquidity to such a point that Citi could be rendered in-
solvent under the current fair-value accounting system.[41]

114.    On January 20, 2009, *Bloomberg* reported that Citigroup "posted an $8.29 billion

fourth-quarter loss, completing its worst year, and plans to split in two under Chief Executive

Officer Vikram Pandit's plan to rebuild a capital base eroded by the credit crisis.  The article fur-

ther stated, "*The problems of Citi, Bank of America and others suggest the system is bankrupt*."

(Emphasis added).[42]

### 2.    RBS, Lloyds, and HBOS

115.     An April 23, 2008 analyst report from Société Générale reported, with respect to

RBS's financial condition in the midst of its attempt to raise capital:

> Given the magnitude and change in direction in a mere eight
> weeks, we believe that management credibility has been tarnished.
> We also remain unconvinced that the capital being raised is in sup-
> port of growth rather than merely to rebase and recapitalise a bank
> that overstretched itself at the wrong point in the cycle in its pur-
> suit of an overpriced asset.
>
> *            *            *
>
> [I]n our eyes, RBS has not presented a rock solid business case that
> warrants investor support and the bank has left itself almost no
> capital headroom to support further material deterioration in either
> its assets or its major operating environments. We believe £16bn
> (7% core tier I ratio) would have provided a solid capital buffer.

The analysts also opined, "[W]e are not of the belief that all of RBS' problems are convincingly

behind it."  They further explained, "When faced with the facts and the events leading up to yes-

terday's request for a £12bn capital injection, we believe shareholders are being asked to invest

further in order to address an expensive mishap in H2 07 rather than capitalise on growth oppor-

---

[41] *See* http://money.cnn.com/2008/11/21/news/companies/benner_citi.fortune/

[42] *See* http://www.bloomberg.com/apps/news?pid=21070001&sid=aS0yBnMR3USk

tunities."

116.     On October 14, 2008, *Herald Scotland* reported a £37 billion injection of state capital into three leading banks, including RBS and HBOS.  The article observed, "Without such near-nationalisations, . . . Royal Bank of Scotland and HBOS, would almost certainly have suffered a run on their remaining reserves and been plunged into insolvency.  Their share prices could scarcely have taken much more of their recent hammering."[43]

117.     On December 12, 2008, *Bloomberg* reported that shareholders approved HBOS's takeover by Lloyds TSB Group plc following bad-loan charges in 2008 rising to £5 billion and an increase in corporate delinquencies.  The article also quoted analysts characterizing HBOS's loan portfolio as "'generally of a lower quality than its peers.'"  *Bloomberg* further observed that HBOS suffered substantial losses on its bond investments, which totaled £2.2 billion, and losses on investments increased from £100 million to £800 million for the year.[44]

116.     A January 20, 2009 analyst report from Société Générale stated:  "We would note that given the 67% drop in the share price following [RBS]'s announcements yesterday [relating to capital restructuring due to greater-than-expected credit-market related write downs and bad debt impairments in Q4], the loss of confidence in the bank's ability to continue to operate as a private sector player and concern over the potential ineffectiveness of the Asset Protection Scheme may prompt the UK government to fully nationalise the bank.  In this instance, the shares could have very limited value, if at all."[45]

117.     On March 9, 2009, *Bloomberg* reported that Lloyds "will cede control to the Brit-

---

[43] *See* http://www.heraldscotland.com/reckless-banks-brought-this-financial-firestorm-down-upon-their-own-heads-1.891981.

[44] *See* http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a4BTqdgwhPTc&refer=uk.

[45] *See* January 20, 2009 Société Générale analyst report on Royal Bank of Scotland titled "Little value left for shareholders."

ish Government in return for state guarantees covering £260 billion ($A572 billion of risky assets)."  The article further observed that in September 2008, Lloyds agreed to buy HBOS for roughly £7.5 billion as the British Government sought to prevent HBOS from collapsing after credit markets froze.  The HBOS loan book was described as "more toxic than anyone ever dreamed."[46]

118.     On November 24, 2009, *Bloomberg* reported the Bank of England provided £62 billion ($102 billion) of "taxpayer-backed emergency financing" to RBS and HBOS at the height of the financial crisis in October 2008 and that "[t]he [financing] operations were kept secret until now to prevent unnerving markets."  The Bank's Deputy Governor Paul Tucker was quoted as stating in evidence to the Treasury Committee in London that "'[h]ad we not done it, the cycle would have been a lot worse…[and that] [t]his was tough stuff, a classic lender of last resort operation.'"[47]

### 3.     <u>West</u>

119.     A September 9, 2008 article in *Spiegel Online* reported West was "heavily hit as a result of the US sub-prime crisis and the resulting credit crunch.  Ill-advised speculation resulted in a 2007 loss of €1.6 billion — leading the bank to the very brink of insolvency."  The article reported that in early 2008, a special investment vehicle was set by West's primary shareholders to "guarantee €5 billion worth of risky investments."  The European Commissioner approved the public guarantee but demanded that the bank be "completely restructured to avoid failing afoul of competition regulations."  The European Commissioner for Competition later warned that if West did not significantly improve its restructuring package, Brussels would not approve the public assistance that European Union had already provided to the bank.  Further, if

---

[46] *See* http://www.businessday.com.au/business/lloyds-the-latest-uk-bank-to-be-rescued-20090308-8sfd.html.

[47] *See* http://www.bloomberg.com/apps/news?pid=21070001&sid=a9MjQj6MNTeA

that occurred, West would have to pay back €12 billion to the EU.[48]

120.    On November 24, 2009, *Bloomberg* reported that BNP Paribas SA said "[i]nvestors should buy the euro [ ] on speculation that capital will need to be repatriated to support German bank WestLB AG."  Furthermore, two German regional savings bank groups that hold a majority stake in West were "prepared to let the Dusseldorf-based lender become insolvent" and that "the prospect of insolvency may force state-owned banks and savings banks outside North Rhine-Westphalia, West's home state, to contribute to capital injections."  Moreover, West needed "as much as 5 billion euros ($7.5 billion) in capital and may be shut by Nov. 30 unless a solution for its capital needs can be found."[49]

## F.    DEFENDANTS' IMPROPER ACTIVITIES HAVE INCITED NUMEROUS GOVERNMENTAL INVESTIGATIONS LEGAL PROCEEDINGS AND DISCIPLINARY ACTION WORLDWIDE.

121.    As described in more detail below, investigations regarding LIBOR are ongoing in the United States, Switzerland, Japan, United Kingdom, Canada, the European Union, and Singapore by nine different governmental agencies, including the DOJ, the SEC, and the CFTC.

122.    Indeed, on February 27, 2012, the DOJ represented to the Court overseeing these multidistrict proceedings that the Justice Department "is conducting a criminal investigation into alleged manipulation of certain benchmark interest rates, including LIBORs of several currencies."  The investigation represents an unprecedented joint investigation by both the criminal and antitrust divisions of the DOJ.

123.    Authorities are attempting to determine, among other things, "whether banks whose funding costs were rising as the financial crisis intensified tried to mask that trend by

---

[48] *See* Anne Seith, *Germany's WestLB under Attack from Brussels*, SPIEGEL ONLINE, Sept. 9, 2008, http://www.spiegel.de/international/business/0,1518,druck-577142,00.html.
[49] See Matthew Brown, *BNP Says Buy Euro on Speculation WestLB to Be Rescued (Update 1)*, BLOOMBERG, Nov. 24, 2009, http://www.bloomberg.com/apps/news?pid=21070001&sid=aI9ZPZShrjWI.

submitting artificially low readings of their daily borrowing costs."[50]  Though the proceedings

are ongoing, several Defendants have admitted that regulators—including the DOJ, SEC, and

CFTC—have targeted them in seeking information about potential misconduct.

124.     Moreover, documents submitted in connection with legal proceedings in Canada

and Singapore reveal that at least certain Defendants underreported their borrowing costs to arti-

ficially suppress Yen-LIBOR.

### 1.     News reports and Defendants' regulatory filings indicate U.S. government and foreign regulatory bodies are engaged in expansive investigations of possible LIBOR manipulation.

125.     The first public revelation regarding government investigations into possible

LIBOR manipulation occurred on March 15, 2011, when UBS disclosed in a Form 20-F (annual

report) filed with the SEC that the bank had "received subpoenas" from the SEC, the CFTC, and

the DOJ "in connection with investigations regarding submissions to the [BBA]."  UBS stated it

understood "that the investigations focus on whether there were improper attempts by UBS, ei-

ther acting on its own or together with others, to manipulate LIBOR rates at certain times."  The

bank further disclosed that it had "received an order to provide information to the Japan Finan-

cial Supervisory Agency concerning similar matters."  UBS stated it was "conducting an internal

review" and was "cooperating with the investigations."

126.     On March 16, 2011, the *Financial Times* reported that UBS, Bank of America,

Citigroup, and Barclays received subpoenas from U.S. regulators "probing the setting of" LI-

BOR "between 2006 and 2008."  The *Times* further noted investigators had "demanded infor-

mation from" West, and that the previous fall, "all 16 members of the committee that helped the

---

[50] David Enrich, Carrick Mollenkamp, & Jean Eaglesham, "U.S. Libor Probe Includes BofA, Citi, UBS." The Wall Street Journal, March 18, 2011

[BBA] set the dollar Libor rate during 2006-08 received informal requests for information."[51]

127.     The same day, *MarketWatch* similarly reported "[m]ultiple U.S. and European banks, which provide borrowing costs to calculate Libor every day, have been contacted by investigators," including the DOJ, the SEC, and the CFTC.[52]

128.     The next day, *Bloomberg* reported that Barclays and Citigroup had received subpoenas from U.S. regulators and that Defendants West, Lloyds, and Bank of America had been contacted by regulators.  The article specified Bank of America had received subpoenas from the SEC and the DOJ.[53]

129.     On March 23, 2011, *Bloomberg* revealed that Citigroup Inc., Deutsche Bank, Bank of America, and JPMorgan Chase were asked by U.S. regulators "to make employees available to testify as witnesses" in connection with the regulators' ongoing investigation.[54]

130.     The next day, the *Financial Times* reported that Defendant Barclays was "emerging as a key focus of the US and UK regulatory probe into alleged rigging of [LIBOR]." According to the *Times*, investigators were "probing whether communications between the bank's traders and its treasury arm," which helps set LIBOR, "violated 'Chinese wall' rules that prevent information-sharing between different parts of the bank."  The *Times* further stated investigators were "said to be looking at whether there was any improper influence on Barclays'

---

[51] Brooke Masters, Patrick Jenkins & Justin Baer, "Banks served subpoenas in Libor case," FT.com, available at http://www.ft.com/cms/s/0/52958d66-501f-11e0-9ad1-00144feab49a.html#axzz1sJNEDiiI, last accessed on April 17, 2012.

[52] Carrick Mollenkamp and David Enrich, "Banks Probed in Libor Manipulation Case," *MarketWatch*, March 16, 2011.

[53] Gavin Finch and Jon Menon, "Barclays, Citigroup Said to Be Subpoenaed in Libor Probe," *Bloomberg*, March 17, 2011.

[54] Joshua Gallu and Donal Griffin, "Libor Probe Spurs Witness Call-up at Citigroup, Deutsche Bank," *Bloomberg*, March 23, 2011.

submissions" during 2006-2008 for the BBA's daily survey used to set LIBOR.[55]

131.    Additional information regarding the regulatory probes emerged during the next few months, including revelations about other banks' possible—or actual—misconduct.

132.    In an "Interim Management Statement" filed on April 27, 2011, for example, Barclays stated it was "cooperating with" the investigations by the UK Financial Services Authority, the CFTC, the SEC, and the DOJ "relating to certain past submissions made by Barclays to the [BBA], which sets LIBOR rates."

133.    RBS similarly disclosed, in a Form 6-K filed with the SEC on May 6, 2011, the bank was "co-operating with" the investigations being conducted by the CFTC, the SEC, and the European Commission "into the submission of various LIBOR rates by relevant panel banks."

134.    Soon after, on May 16, 2011, Lloyds disclosed that it too "had received requests for information as part of the Libor investigation and that it was co-operating with regulators, including the [CFTC] and the European Commission."[56]  Britain's *Daily Telegraph* further reported that HBOS, which merged with Lloyds TSB in January 2009 to form Lloyds Banking Group, "was the main target given its near collapse in late 2008 as it lost access to wholesale funding markets."

135.    On May 23, 2011, the *Telegraph* reported that the Federal Bureau of Investigation ("FBI") was working with regulators in connection with the LIBOR investigations, and the FBI's British counterpart, the Serious Fraud Office, "revealed it is also taking an active interest."

136.    In a Form 6-K filed with the SEC on July 26, 2011, UBS disclosed that it had

---

[55] Brooke Masters and Megan Murphy, "Barclays at centre of Libor inquiry," FT.com, March 24, 2011, available at http://www.ft.com/intl/cms/s/0/1c3228f6-5646-11e0-82aa-00144feab49a.html#axzz1sJNEDIiI, last accessed on April 17, 2012.

[56] Harry Wilson, "Lloyds Banking Group in Libor investigation," *The Daily Telegraph*, May 17, 2011.

"been granted conditional leniency or conditional immunity from authorities in certain jurisdic-

tions, including the Antitrust Division of the DOJ, in connection with potential antitrust or com-

petition law violations related to submissions for Yen LIBOR and Euroyen TIBOR (Tokyo In-

terbank Offered Rate)."  Accordingly, the company continued, it would "not be subject to prose-

cutions, fines or other sanctions for antitrust or competition law violations in connection with the

matters [UBS] reported to those authorities, subject to [UBS's] continuing cooperation."  The

conditional leniency UBS received derives from the Antitrust Criminal Penalties Enhancement

and Reform Act and the DOJ's Corporate Leniency Policy, under which the DOJ only grants le-

niency to corporations reporting *actual illegal activity*.  UBS later disclosed (on February 7,

2012) that the Swiss Competition Commission had granted the bank conditional immunity re-

garding submissions for Yen LIBOR, TIBOR, and Swiss franc LIBOR.

137.    Similar to the other Defendants discussed above, HSBC, in an interim report

filed on August 1, 2011, disclosed that it and/or its subsidiaries had "received requests" from

various regulators to provide information and were "cooperating with their enquiries."

138.    On or about the same day, Barclays—which several months earlier had refer-

enced its "cooperation" with governmental entities investigating potential misconduct relating to

LIBOR—specified the investigations involved "submissions made by Barclays" and other LI-

BOR panel members.  Barclays further stated it was engaged in discussions with those authori-

ties about potential resolution of these matters before proceedings are brought against the bank.

139.    On September 7, 2011, the *Financial Times* reported that as part of their LIBOR

investigation, the DOJ and the CFTC—in assessing whether banks violated the Commodity Ex-

change Act, which can result in criminal liability—were examining "whether traders placed bets

on future yen and dollar rates and colluded with bank treasury departments, who help set the Li-

bor index, to move the rates in their direction," as well as "whether some banks lowballed their Libor submissions to make themselves appear stronger."[57]

140.     On October 19, 2011, *The Wall Street Journal* reported that the European Commission "seized documents from several major banks" the previous day, "marking the escalation of a worldwide law-enforcement probe" regarding the Euro Interbank Offered Rate, or Euribor—a benchmark, set by more than 40 banks, used to determine interest rates on trillions of euros' worth of euro-denominated loans and debt instruments.  The Euribor inquiry, the *Journal* explained, constitutes "an offshoot" of the broader LIBOR investigation that had been ongoing for more than a year.  According to the *Journal*, while the list of financial firms raided by the European Commission was not available, people familiar with the situation had counted "a large French bank and a large German bank" among the targets, and the coordinated raids "occurred in London and other European cities."

141.     On October 31, 2011, the *Financial News* observed that "[a]n investigation into price fixing, first ordered by the [SEC] in 2008, focused on whether banks, including UBS, Citigroup, and Bank of America, had been quoting deliberately low rates."[58]

142.     On December 9, 2011, *Law360* reported that the Japanese Securities and Exchange Surveillance Commission ("SESC") alleged that Citigroup Global Markets Japan Inc. and UBS Securities Japan Ltd. "employed staffers who attempted to influence" TIBOR "to gain advantage on derivative trades."  The SESC recommended that the Japanese prime minister and the head of Japan's Financial Services Agency ("JFSA") take action against the companies.  The Commission specified that Citigroup's head of G-10 rates and a Citigroup trader, as well as a

---

[57] Brooke Masters and Kara Scannell, "Libor inquiry looks at criminal angle," FT.com, September 7, 2011, available at http://www.ft.com/cms/s/0/c8ed4248-d962-11e0-b52f-00144feabdc0.html#axzz1sRxAdyPS, last accessed on April 18, 2012.
[58] Tom Osborn, "Is Libor in its death throes?", *Financial News*, October 31, 2011.

UBS trader, were involved in the misconduct, further stating, "[t]he actions of Director A and Trader B are acknowledged to be seriously unjust and malicious, and could undermine the fairness of the markets."  Moreover, the Commission added, "[i]n spite of recognizing these actions, the president and CEO . . . who was also responsible for the G-10 rates, overlooked these actions and the company did not take appropriate measures, therefore, the company's internal control system is acknowledged to have a serious problem."[59] *Law360* reported that the SESC released "a similar statement" about UBS's alleged conduct.

143.     Citigroup and UBS did not deny the SESC's findings.  A Citigroup spokesperson stated, "Citigroup Global Markets Japan takes the matter very seriously and sincerely apologizes to clients and all parties concerned for the issues that led to the recommendation.  The company has started working diligently to address the issues raised."  A UBS spokesperson similarly stated the bank was taking the findings "very seriously" and had been "working closely with" the SESC and the JFSA "to ensure all issues are fully addressed and resolved."  She added, "We have taken appropriate personnel action against the employee involved in the conduct at issue."

144.     Citigroup later disclosed that on December 16, 2011, the JFSA took administrative action against Citigroup Global Markets Japan, Inc. ("CGMJ") for, among other things, certain communications made by two CGMJ traders about the Euroyen Tokyo InterBank Offered Rate ("TIBOR").  The JFSA issued a business improvement order and suspended CGMJ's trading in derivatives related to Yen-LIBOR, as well as Euroyen and Yen-TIBOR from January 10 to January 23, 2012.  On the same day, the JFSA also took administrative action against Citibank Japan Ltd. for conduct arising out of Citibank Japan's retail business and also noted that the

---

[59] Juan Carlos Rodriguez, "Japan Accuses Citi, UBS Of Market Trickery," *Law360*, December 9, 2011.

communications made by the CGMJ traders to employees of Citibank Japan about Euroyen

TIBOR had not been properly reported to Citibank Japan's management team.

145.     UBS likewise recently revealed further details regarding the Japanese regulators'

findings and the resulting disciplinary action.  Specifically, the bank announced that on Decem-

ber 16, 2011, the JFSA commenced an administrative action against UBS Securities Japan Ltd.

("UBS Securities Japan") based on findings by the SESC that:

> (i) a trader of UBS Securities Japan engaged in inappropriate con-
> duct relating to Euroyen TIBOR and Yen LIBOR, including ap-
> proaching UBS AG, Tokyo Branch, and other banks to ask them
> to submit TIBOR rates taking into account requests from the trader
> for the purpose of benefiting trading positions; and (ii) serious
> problems in the internal controls of UBS Securities Japan resulted
> in its failure to detect this conduct.

Based on those findings, the JFSA "issued a Business Suspension Order requiring UBS Securi-

ties Japan to suspend trading in derivatives transactions related to Yen LIBOR and Euroyen

TIBOR" from January 10 to January 16, 2012 (excluding transactions required to perform exist-

ing contracts).  The JFSA also issued a "Business Improvement Order" requiring UBS Securities

Japan to enhance "compliance with its legal and regulatory obligations" and to establish a "con-

trol framework" designed to prevent similar improper conduct.

146.     Other news accounts in recent months have confirmed—based at least in part on

information from people familiar with the ongoing investigations—that investigators are examin-

ing potential improper collusion by traders and bankers to manipulate LIBOR or other rates.  On

February 3, 2012, for instance, Credit Suisse disclosed that the Swiss Competition Commission

commenced an investigation involving twelve banks and certain other financial intermediaries,

including Credit Suisse, concerning alleged collusive behavior among traders to affect the bid-

ask spread for derivatives tied to the LIBOR and TIBOR reference rates fixed with respect to

certain currencies, and collusive agreements to influence these rates.

147.     Additionally, on February 14, 2012, *Bloomberg* reported that two people with knowledge of the ongoing LIBOR probe said global regulators "have exposed flaws in banks' internal controls that may have allowed traders to manipulate interest rates around the world." The same people, who were not identified by name (as they were not authorized to speak publicly about those matters), stated investigators also had "received e-mail evidence of potential collusion" between firms setting LIBOR.  Those sources further noted Britain's Financial Services Authority was "probing whether banks' proprietary-trading desks exploited information they had about the direction of Libor to trade interest-rate derivatives, potentially defrauding their firms' counterparties."[60]

148.     *Bloomberg* further reported that RBS had "dismissed at least four employees in connection with the probes," and Citigroup and Deutsche Bank "also have dismissed, put on leave or suspended traders as part of the investigations."

149.     *Bloomberg* also reported that European Union antitrust regulators are also investigating whether banks effectively formed a global cartel and coordinated how to report borrowing costs between 2006 and 2008.

150.     In March 2012, the Monetary Authority of Singapore disclosed that it has been approached by regulators in other countries to help in investigations over the possible manipulation of interbank interest rates.[61]

151.     According to the *Daily Mail*, investigations by the SEC, Britain's Financial Services Authority, the Swiss Competition Commission, and regulators in Japan focus on three concerns:  First, whether banks artificially suppressed LIBOR during the financial crisis, making

---

[60] Lindsay Fortado and Joshua Gallu, "Libor Probe Said to Expose Collusion, Lack of Internal Controls," *Bloomberg*, February 14, 2012.
[61] *Business Times*, March 9, 2012.

banks appear more secure than they actually were; second, whether bankers setting LIBOR

leaked their data to traders before officially submitting the banks' LIBOR quotes to the BBA;

third, whether traders at the banks, and at other organizations (such as hedge funds), may have

tried to influence LIBOR by making suggestions or demands on the bankers providing LIBOR

quotes.

### 2. Evidence that Defendants manipulated Yen-LIBOR further demonstrates the plausibility of Plaintiffs' allegations that Defendants suppressed LIBOR.

#### a. Canadian Action

152.    Brian Elliott, a Competition Law Officer in the Criminal Matters Branch of the

Canadian Competition Bureau, submitted an affidavit in May 2011 (the "May 2011 Elliott Affi-

davit") in support of "an Ex Parte Application for Orders to Produce Records Pursuant to Section

11 of the Competition Act and for Sealing Orders" in the Court of Ontario, Superior Court of

Justice, East Region.  Specifically, the May 2011 Elliott Affidavit sought orders requiring HSBC

Bank Canada, Royal Bank of Scotland N.V., Canada Branch, Deutsche Bank, J.P. Morgan Bank

Canada, and Citibank Canada (referenced collectively in the Affidavit as the "Participant

Banks") to produce documents in connection with an inquiry concerning whether those banks

conspired to "enhance unreasonably the price of interest rate derivatives from 2007 to March 11,

2010; to prevent or lessen, unduly, competition in the purchase, sale or supply of interest deriva-

tives from 2007 to March 11, 2010; to restrain or injure competition unduly from 2007 to March

11, 2010; and to fix, maintain, increase or control the price for the supply of interest rate deriva-

tives from March 12, 2010 to June 25, 2010."

153.    The May 2011 Elliott Affidavit further states the Competition Bureau "became

aware of this matter" after one of the banks (referenced in the affidavit as the "Cooperating Par-

ty") "approached the Bureau pursuant to the Immunity Program" and, in connection with that

bank's application for immunity, its counsel "orally proffered information on the Alleged Of-fences" to officers of the Competition Bureau on numerous occasions in April and May 2011. Furthermore, according to the Affidavit, counsel for the Cooperating Party "stated that they have conducted an internal investigation of the Cooperating Party that included interviews of employ-ees of the Cooperating Party who had knowledge of or participated in the conduct in question, as well as a review of relevant internal documents."  The Affidavit also notes that on May 17, 2011, counsel for the Cooperating Party provided the Competition Bureau with "electronic records," which Elliot "believe[s] to be records of some of the communications involving the Cooperating Party that were read out as part of the orally proffered information by counsel for the Cooperat-ing Party."

154.     The Affidavit recounted that, according to the Cooperating Party's counsel, the Participant Banks—at pertinent times "facilitated" by "Cash Brokers"—"entered into agreements to submit artificially high or artificially low London Inter-Bank Offered Rate ('LIBOR') submis-sions in order to impact the Yen LIBOR interest rates published by the [BBA]."  Those entities engaged in that misconduct to "adjust[] the prices of financial instruments that use Yen LIBOR rates as a basis."  The Affidavit further states the Cooperating Party's counsel "indicated the Par-ticipant Banks submitted rates consistent with the agreements and were able to move Yen LI-BOR rates to the overall net benefit of the Participants."

155.     More specifically, counsel proffered that  the Participant Banks "communicated with each other and through the Cash Brokers to form agreements to fix the setting of Yen LI-BOR," which "was done for the purpose of benefiting trading positions, held by the Participant Banks, on IRDs [interest rate derivatives]."  By manipulating Yen LIBOR, the Affidavit contin-ues, "the Participant Banks affected all IRDs that use Yen LIBOR as a basis for their price."  The

73

misconduct was carried out "through e-mails and Bloomberg instant messages between IRD traders at the Participant Banks and employees of Cash Brokers (who had influence in the setting of Yen LIBOR rates)."  The Affidavit details:

> IRD traders at the Participant Banks communicated with each other their desire to see a higher or lower Yen LIBOR to aid their trading position(s).  These requests for changes in Yen LIBOR were often initiated by one trader and subsequently acknowledged by the trader to whom the communication was sent.  The information provided by counsel for the Cooperating Party showed that the traders at Participant Banks would indicate their intention to, or that they had already done so, communicate internally to their colleagues who were involved in submitting rates for Yen LIBOR.  The traders would then communicate to each other confirming that the agreed up rates were submitted.  However, not all attempts to affect LIBOR submissions were successful.
>
> The Cash Brokers were asked by IRD traders at the Participant Banks to use their influence with Yen LIBOR submitters to affect what rates were submitted by other Yen LIBOR panel banks, including the Participant Banks.

156.     The Affidavit indicates the Cooperating Party's counsel further proffered that at least one of the Cooperating Party's IRD traders ("Trader A" or "Trader B") communicated with an IRD trader at HSBC, Deutsche Bank, RBS, JPMorgan (two traders), and Citibank.  In that regard, the Affidavit specifies:

> Trader A communicated his trading positions, his desire for a certain movement in Yen LIBOR and instructions for the HSBC trader to get HSBC to make Yen LIBOR submissions consistent with his wishes.  Attempts through the HSBC trader to influence Yen LIBOR were not always successful.  Trader A also communicated his desire for a certain movement in the Yen LIBOR rate with the Cash Brokers.  He instructed them to influence the Yen LIBOR submitters of HSBC.  The Cash Brokers acknowledged making these attempts.
>
> *        *        *
>
> Trader A communicated his trading positions, his desire for certain movement in Yen LIBOR and asked for the Deutsche IRD trader's assistance to get Deutsche to make Yen LIBOR submissions con-

sistent with his wishes.  The Deutsche IRD trader also shared his
trading positions with Trader A.  The Deutsche IRD trader
acknowledged these requests.  Trader A also aligned his trading
positions with the Deutsche IRD trader to align their interests in
respect of Yen LIBOR.  The Deutsche IRD trader communicated
with Trader A considerably during the period of time, mentioned
previously, when Trader A told a Cash Broker of a plan involving
the Cooperating Party, HSBC and Deutsche to change Yen LIBOR
in a staggered and coordinated fashion by the Cooperating Party,
HSBC and Deutsche.  Not all attempts to change the LIBOR rate
were successful.

*      *      *

Trader A explained to RBS IRD trader who his collusive contacts
were and how he had and was going to manipulate Yen LIBOR.
Trader A also communicated his trading positions, his desire for
certain movement in Yen LIBOR and gave instructions for the
RBS IRD trader to get RBS to make Yen LIBOR submissions con-
sistent with Trader A's wishes.  The RBS IRD trader acknowl-
edged these communications and confirmed that he would follow
through.  Trader A and the RBS IRD trader also entered into trans-
actions that aligned their trading interest in regards to Yen LIBOR.
Trader A also communicated to another RBS IRD trader his trad-
ing positions, his desire for a certain movement in Yen LIBOR and
instructions to get RBS to make Yen LIBOR submissions con-
sistent with his wishes.  The second RBS IRD trader agreed to do
this.

*      *      *

Trader A communicated his trading positions, his desire for a cer-
tain movement in Yen LIBOR and gave instructions for them [two
JPM IRD traders] to get JPMorgan to make Yen LIBOR submis-
sions consistent with his wishes.  Trader A also asked if the IRD
traders at JPMorgan required certain Yen LIBOR submissions to
aid their trading positions.  The JPMorgan IRD traders acknowl-
edged these requests and said that they would act on them.  On an-
other occasion, one of the JPMorgan IRD traders asked Trader A
for a certain Yen LIBOR submission, which Trader A agreed to
help with.  Trader A admitted to an IRD trader at RBS that he col-
luded with IRD traders at JPMorgan.

*      *      *

Trader B of the Cooperating Party communicated with an IRD
trader at Citi.  They discussed their trading positions, advanced

knowledge of Yen LIBOR submissions by their banks and others, and aligned their trading positions. They also acknowledged efforts to get their banks to submit the rates they wanted.

157.    On May 18, 2011, the Ontario Superior Court signed the orders directing the production of the records sought by the May 2011 Elliott Affidavit. But to Plaintiffs'' knowledge, the Affidavit was not publicly available until February 2012.

158.    Elliott submitted another affidavit in June 2011 (the "June 2011 Elliott Affidavit"), which sought an order requiring ICAP Capital Markets (Canada) Inc., believed to be one of the "Cash Brokers" referenced in the May 2011 Elliott Affidavit, to "produce records in the possession of its affiliates, ICAP PLC and ICAP New Zealand Ltd." The June 2011 Elliott Affidavit primarily detailed communications between "Trader A" (an IRD trader) of the previously-referenced "Cooperating Party" and an ICAP broker (referenced in the June 2011 Elliott Affidavit as "Broker X") during the Class Period.

159.    The Affidavit specifies that Trader A "discussed his current trading positions with Broker X and where he would like to see various maturities of Yen LIBOR move." Trader A "asked Broker X for Yen LIBOR submissions that were advantageous to Trader A's trading positions," and Broker X, in turn, "acknowledged these requests and advised Trader A about his efforts to make them happen." The Affidavit further states:

> Counsel for the Cooperating Party has proffered that the expectation was for Broker X, directly or through other brokers at ICAP, to influence the Yen LIBOR submissions of Panel Banks. Broker X communicated to Trader A his efforts to get brokers at ICAP in London to influence Yen LIBOR Panel Banks in line with Trader A's requests. The efforts of Broker X included contacting a broker at ICAP in London who issued daily LIBOR expectations to the market. Trader A also communicated to Broker X his dealings with traders at other Participant Banks and a broker at another Cash Broker. Not all efforts to influence Yen LIBOR panel banks were successful. Broker X had additional discussions around the setting of Yen LIBOR with another trader of the Cooperating Party ("Trader B").

76

160.     On June 14, 2011, the Ontario Superior Court issued an order allowing the document requests concerning ICAP.

161.     The press has reported that UBS was the "Cooperating Party" referred to in the Elliott Affidavits.

### b.     <u>Singapore Proceedings</u>

162.     In a pending legal action in Singapore's High Court, Tan Chi Min, former head of delta trading for RBS's global banking and markets division in Singapore (who worked for RBS from August 12, 2006 to November 9, 2011), alleges in his Writ of Summons and Statement of Claim that the bank condoned collusion between its traders and LIBOR rate-setters to set LIBOR at levels to maximize profits.  In the same filing, Tan stated RBS commenced an internal probe following inquiries by European and U.S. authorities about potential LIBOR manipulation.

163.     Tan—whom RBS terminated, asserting he engaged in "gross misconduct"—alleges that RBS's internal investigations "were intended to create the impression that such conduct was the conduct not of the defendant itself but the conduct of specific employees who the defendant has sought to make scapegoats through summary dismissals."  Tan further alleges that it was "part of his responsibilities to provide input and submit requests to the rate setter and there is no regulation, policy, guideline or law that he has infringed in doing this," and that "it was common practice among [RBS]'s senior employees to make requests to [RBS]'s rate setters as to the appropriate LIBOR rate."  Those requests, Tan specified, "were made by, among others, Neil Danziger, Jezri Mohideen (a senior manager), Robert Brennan (a senior manager), Kevin Liddy (a senior manager) and Jeremy Martin," and the practice "was known to other members of [RBS]'s senior management including Scott Nygaard, Todd Morakis and Lee Knight."  Tan added that RBS employees "also took requests from clients (such as Brevan Howard) in relation to

the fixing of LIBOR."

164.    Indeed, in responding to Tan's allegations, RBS admitted he had tried to improperly influence RBS rate-setters from 2007 to 2011 to submit LIBOR rates at levels that would benefit him.

165.    In his complaint, however, Tan alleged that he could not have influenced the rate on his own.  He also stated it was "common practice" among RBS's senior employees to make requests as to the appropriate LIBOR rate.

### DEFENDANTS' UNDERWRITING OF RELEVANT LIBOR-BASED DEBT SECURITIES DURING THE CLASS PERIOD

166.    One or more of Defendants, exclusively or with others, directly or through affiliated corporate entities, acted as underwriters of Relevant LIBOR-Based Debt Securities.  In their role as underwriters, such Defendants were responsible for, *inter alia*, initially purchasing the debt securities from their respective issuers, and then re-selling the securities in private or public transactions.

167.    As underwriters of Relevant LIBOR-Based Debt Securities, Defendants were intimately familiar with all major terms and conditions of the Relevant LIBOR-Based Debt Securities, including the fact that the interest rates to be paid on the securities were directly tied to the LIBOR rate.

### INTERSTATE COMMERCE AND ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

168.    An essential component in the pricing of debt transactions is the interest rate to be paid.

169.    At all relevant times, LIBOR was a key benchmark for determining the applicable interest rate, and hence the pricing, of many debt transactions in the United States.

170.    Many hundreds of billions of dollars or more of debt transactions are entered in-

to each year in interstate commerce in the United States.

171.    During the Class Period, there were outstanding more than 5,200 Relevant LI-BOR-Based Debt Securities issued in the United States by corporate, state and municipal, and foreign sovereign issuers with an outstanding face value as January 1, 2008 of in excess of $500 Billion.

172.    Hundreds of millions of dollars of interest, determined by reference to LIBOR as the benchmark, are paid each year in interstate commerce in the United States.

173.    By suppressing LIBOR rates, Defendants effectively reduced the amount of interest paid each year on debt obligations in interstate commerce in the United States.

174.    Thus, Defendants' unlawful conduct had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

175.    At all relevant times, Defendants knew that LIBOR was and is a key benchmark for determining the applicable interest rate of debt securities and other obligations in the United States and that, by suppressing LIBOR rates, Defendants would effectively reduce the amount of interest paid on such debt securities and obligations in the United States.

176.    Indeed, both before and during the Class Period, some of Defendants directly or indirectly through affiliated entities underwrote millions of dollars' worth of Relevant LIBOR-Based Debt Securities, knowing that such securities had been or would be sold in interstate commerce in the United States and that the interest payments thereunder would be made in interstate commerce.

177.    By conspiring to suppress the LIBOR rates, Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce, within the United States.

178.     Defendants' unlawful conduct had a direct and adverse impact on competition in the United States in that, absent Defendants' collusion, LIBOR rates would have been higher, more money would have been paid as interest in U.S. interstate commerce, and Plaintiffs and the members of the Class would have earned more interest.

179.     As a direct result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered injury to their business or property.

**PLAINTIFFS DID NOT KNOW, NOR COULD THEY REASONABLY HAVE KNOWN, ABOUT DEFENDANTS' UNLAWFUL CONDUCT UNTIL AT LEAST MARCH 2011**

180.     Before UBS's March 15, 2011 announcement that it had been subpoenaed in connection with the U.S. government's investigation into possible LIBOR manipulation, Plaintiffs had not discovered, and could not with reasonable diligence have discovered, facts indicating Defendants were engaging in misconduct that caused LIBOR to be artificially depressed during the Class Period.

181.     Moreover, though some market participants voiced concerns in late 2007-early 2008 that LIBOR did not reflect banks' true borrowing costs, those concerns were quickly—though, it now turns out, wrongly—dismissed.

**A.     DEFENDANTS' UNLAWFUL ACTIVITIES WERE INHERENTLY SELF-CONCEALING.**

182.     Defendants conspired to share information regarding their LIBOR quotes and to misrepresent their borrowing costs to the BBA.  In so doing, Defendants aimed to—and did—depress LIBOR to artificially low levels, which allowed them to pay unduly low interest rates on LIBOR-based financial instruments they or others issued or sold to investors.

183.     Defendants' misconduct was, by its very nature, self-concealing.  Defendants could not expect to suppress LIBOR if the BBA, or the general public, knew that they were col-

luding to report artificial, depressed borrowing rates.  Defendants' conspiracy could only succeed by preventing the public from knowing what they were doing.

184.    In addition, the facts surrounding the Defendants' operations were internal to them.  First, those banks' actual or reasonably expected costs of borrowing were not publicly disclosed, rendering it impossible for Plaintiffs and others outside the banks to discern (without sophisticated expert analysis) any discrepancies between Defendants' publicly disclosed LIBOR quotes and other measures of those banks' actual or reasonably expected borrowing costs.  Second, communications within and among the Defendants likewise were not publicly available, which further precluded Plaintiffs from discovering Defendants' misconduct, even with reasonable diligence.

185.    As a result of the self-concealing nature of Defendants' collusive scheme, no person of ordinary intelligence would have discovered, or with reasonable diligence could have discovered before March 15, 2011, facts indicating Defendants were unlawfully suppressing LIBOR during the Class Period.

### B.    THE BBA AND DEFENDANTS DEFLECTED CONCERNS RAISED BY SOME MARKET OBSERVERS AND PARTICIPANTS IN LATE 2007 AND EARLY 2008 ABOUT LIBOR'S ACCURACY.

186.    Beginning in or about November 2007 and continuing sporadically into early 2008, concerns arose that the members of the LIBOR panel might be understating their true costs of borrowing, thus causing LIBOR to be set artificially low.

187.    In response to those concerns, the BBA conducted an inquiry regarding LIBOR.

188.    Notably, shortly after the BBA announced its investigation in April 2008, the LIBOR panel banks raised their reported rates, causing LIBOR to log its biggest increase since August 2007.  The banks, including the LIBOR Panel Defendants, thus falsely and misleadingly signaled that any improper reporting of false rates that may have previously occurred had ended.

189.    Subsequently, the BBA reported (wrongly) that LIBOR had not been manipulated, thus providing further (incorrect) assurance to Plaintiffs and the public that the concerns expressed by some market participants were unfounded.

190.    Moreover, Defendants engaged in a media strategy that diffused the speculation that had arisen concerning LIBOR—and further concealed their conduct. On April 21, 2008, for instance, Dominic Konstam of Credit Suisse affirmatively stated the low LIBOR rates were attributable to the fact that U.S. banks, such as Citibank and JPMorgan, had access to large customer deposits and borrowing from the Federal Reserve and did not need more expensive loans from other banks: "Banks are hoarding cash because funding from the asset-backed commercial paper market has fallen sharply while money market funds are lending on a short term basis and are restricting their supply."[62]

191.    In an April 28, 2008 interview with the *Financial Times*, Konstam continued to defend LIBOR's reliability:

> Libor has been a barometer of the need for banks to raise capital. The main problem with Libor is the capital strains facing banks … Initially there was some confusion that Libor itself was the problem, with talk of the rate being manipulated and not representative of the true cost of borrowing.[63]

192.    On May 16, 2008, in response to a media inquiry, JPMorgan commented, "[t]he Libor interbank rate-setting process is not broken, and recent rate volatility can be blamed largely on reluctance among banks to lend to each other amid the current credit crunch."[64]

---

[62] Gillian Tett & Michael Mackenzie, "Doubts Over Libor Widen," FT.com, available at http://www.ft.com/cms/s/0/d1d9a792-0fbd-11dd-8871-0000779fd2ac.html#axzz1szdS58jE, last accessed on April 24, 2012.

[63] Michael Mackenzie, "Talk of quick fix recedes as Libor gap fails to close," FT.com, available at http://www.ft.com/intl/cms/s/0/3da27a46-5d05-11dd-8d38-000077b07658.html#axzz1szdS58jE, last accessed on April 24, 2012.

[64] Kirsten Donovan, Jamie McGeever, Jennifer Ablan, Richard Leong & John Parry, "European, U.S. bankers work on Libor problems," reuters.com, available at

193.     The same day, Colin Withers of Citigroup assured the public that LIBOR remained reliable, emphasizing "the measures we are using are historic -- up to 30 to 40 years old."[65]

194.     And in May 2008, *The Wall Street Journal* asked numerous Defendants to comment on the media speculation concerning aberrations in LIBOR.  Rather than declining or refusing to comment, those Defendants made affirmative representations designed to further conceal their wrongdoing.  On May 29, 2008, for instance, Citibank affirmatively claimed innocence and stated it continued to "submit [its] Libor rates at levels that accurately reflect [its] perception of the market."  HBOS similarly asserted its LIBOR quotes constituted a "genuine and realistic" indication of the bank's borrowing costs.[66]

### C.     PLAINTIFFS CERTAINLY COULD NOT HAVE KNOWN OR REASONABLY DISCOVERED—UNTIL AT LEAST MARCH 2011—FACTS SUGGESTING DEFENDANTS *KNOWINGLY COLLUDED* TO SUPPRESS LIBOR.

195.     Notwithstanding the smattering of statements in late 2007-early 2008 questioning LIBOR's viability, Plaintiffs had no reason to suspect—at least until the existence of government investigations was revealed in March 2011—that Defendants were *knowingly colluding* to suppress LIBOR.  Indeed, as a result of Defendants' secret conspiracy—and their fraudulent concealment of relevant information—no facts arose before March 2011 to put Plaintiffs on inquiry notice that a conspiracy to manipulate LIBOR existed.

196.     Due to the Defendants' fraudulent concealment, any statute of limitations affecting or limiting the rights of action by Plaintiffs or members of the Class was tolled until March 15, 2011.

---

http://in.reuters.com/article/2008/05/16/markets-rates-bba-idINL162110020080516, last accessed on April 24, 2012.
[65] *Id.*
[66] Carrick Mollenkamp & Mark Whitehouse, "Study Casts Doubt on Key Rate."

197.    The Defendants are equitably estopped from asserting that any otherwise applicable period of limitations has run.

## CLASS ACTION ALLEGATIONS

198.    Plaintiffs bring this action for themselves individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all others who owned (including beneficially in "street name") any of the Relevant LIBOR-Based Debt Securities during the Class Period. Excluded from "Relevant LIBOR-Based Debt Securities" and the Class are debt securities issued by any Defendant as obligor.

199.    The Class is so numerous that the joinder of all members is impracticable.  During the Class Period there were outstanding more than 5,200 Relevant LIBOR-Based Debt Securities issued by corporate, state and municipal, and foreign sovereign issuers with an outstanding face value in excess of $500 Billion.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that there are at least thousands of geographically dispersed Class members who suffered injury, inter alia, by receiving less interest pursuant to their Relevant LIBOR-Based Debt Securities during the Class Period.

200.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as alleged herein.  Defendants' wrongful conduct in violation of the antitrust laws directly caused the injuries and damages of each member of the Class.

201.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

202.    Common questions of law and fact exist as to all members of the Class, which

common questions predominate over any questions affecting only individual members of the Class.  Among the questions of law and fact common to the Class are:

a.   whether Defendants conspired with others to depress artificially LIBOR rates in violation of the Sherman Act;

b.   whether Defendants' conduct had an anticompetitive and manipulative effect on LIBOR during the Class Period;

c.   whether Defendants' conduct had a direct, substantial, reasonably foreseeable, and adverse impact upon interstate commerce in the United States during the Class Period;

d.   whether Defendants' conduct depressed the amounts of interest Plaintiffs and the members of the Class earned on their Relevant LIBOR-Based Debt Securities during the Class Period; and

e.   the appropriate measure of damages for the injury sustained by Plaintiffs and the members of the Class as a result of Defendants' unlawful activities.

203.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, will achieve substantial economies of time, effort, and expense, and will assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

204.     The interest of members of the Class in individually controlling the prosecution

85

of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through a representative is not objectionable. The amounts at stake for individual Class members, while substantial in the aggregate, are not necessarily great enough to enable each of them to maintain a separate suit against Defendants. Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

### CLAIM FOR RELIEF
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT

205.    Plaintiffs incorporate by reference and reallege the preceding allegations, as though fully set forth herein.

206.    The Defendants and their unnamed co-conspirators entered into and engaged in a continuing conspiracy, agreement, understanding, or concerted action in unreasonable restraint of interstate trade and commerce in the United States in violation of Section 1 of the Sherman Act.

207.    During the Class Period, the Defendants combined, conspired, and agreed to fix, maintain, and depress the LIBOR rates. Through their positions on the US$ LIBOR panel, Defendants could and did control what LIBOR rates would be reported, and thus controlled the amounts of interest paid on the Relevant LIBOR-Based Debt Securities.

208.    In furtherance of the conspiracy, Defendants fixed, maintained, depressed and stabilized LIBOR, a key component in determining the amounts of interest paid on Relevant LIBOR-Based Debt Securities. Accordingly, Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act.

209.    Defendants' conspiracy, and its resulting impact on the amounts of interest paid on Relevant LIBOR-Based Debt Securities, occurred in or affected interstate commerce.

210.    As a direct, reasonably foreseeable, and substantial result of Defendants' unlaw-

ful conduct, Plaintiffs and members of the Class have suffered injury to their business or property.

211.     Pursuant to Section 4 of the Clayton Act, Plaintiffs and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

## RELIEF SOUGHT

Accordingly, Plaintiffs demand judgment against Defendants and each of them as follows:

A.     Determining that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, with Plaintiffs as class representatives and Plaintiffs' counsel as counsel for the Class;

B.     Adjudging that Defendants have violated Section 1 of the Sherman Act;

C.     Awarding to Plaintiffs and the Class three-fold the damages to be proved at trial;

E.     Awarding to Plaintiffs and the Class their costs of the suit, including reasonable attorneys' fees; and

F.     Affording to Plaintiffs and the Class such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial of all issues triable by a jury.

Dated: April 30, 2012

Karen L. Morris (Bar No. 1939701)
Patrick F. Morris
R. Michael Lindsey
MORRIS AND MORRIS LLC
    COUNSELORS AT LAW
4001 Kennett Pike, Suite 300
Wilmington, DE  19807
Tele: (302) 426-0400
Fax:  (302) 426-0406
Email: kmorris@morrisandmorrislaw.com
       pmorris@morrisandmorrislaw.com
       rmlindsey@morrisandmorrislaw.com

David H. Weinstein
Steven A. Asher
Robert S. Kitchenoff
Jeremy S. Spiegel
WEINSTEIN KITCHENOFF & ASHER LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA  19103
Tele: (215) 545-7200
Fax:  (215) 545-6535
Email: weinstein@wka-law.com
       asher@wka-law.com
       kitchenoff@wka-law.com
       spiegel@wka-law.com

## CERTIFICATE OF SERVICE

I hereby certify that, pending the service of the foregoing First Amended Class Action Complaint through the Court's ECF system, I am this date serving by electronic mail a copy of the foregoing First Amended Class Action Complaint upon counsel for all defendants who have appeared, as follows:

| Defendants | Counsel |
| --- | --- |
| Credit Suisse Group, AG | Shearman & Sterling (Herb Washer) |
| Bank of America Corporation | Davis Polk (Robert Wise) |
| J.P. Morgan Chase & Co. | Simpson Thatcher (Tom Rice/Juan Arteaga) |
| HSBC Holdings PLC | Locke Lord (Ed DeYoung) |
| Barclays Bank PLC | Sullivan & Cromwell (D. Braff) |
| Lloyds Banking Group PLC | Hogan Lovells (Marc Gottridge) |
| WestLB AG | Hughes Hubbard & Reed (Ethan Litwin) |
| UBS AG | Gibson Dunn & Crutcher (Peter Sullivan) |
| The Royal Bank of Scotland Group PLC | Clifford Chance (Rob Houck) |
| Deutsche Bank AG | Paul Weiss (Moses Silverman) |
| Citibank NA | Covington & Burling (Alan Wiseman/Andrew Ruffino) |
| Rabobank Group | Milbank (D. Gelfand, S. Murphy, M. Westover) |
| The Norinchukin Bank | Sidley & Austin (Andrew Stern) |
| Societe Generale | Mayer Brown (Steve Wolowitz) |
| Royal Bank of Canada | Katten (Arthur Hahn) |

Dated: April 30, 2012

_David H. Weinstein_
David H. Weinstein

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262, 11 Civ. 2613 |
| THIS DOCUMENT RELATES TO: EXCHANGE-BASED PLAINTIFF ACTION | ECF Case<br><br>**AMENDED CONSOLIDATED<br>CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

     1.     Plaintiffs Metzler Investment GmbH, FTC Futures Fund SICAV, FTC Futures Fund PCC Ltd., Atlantic Trading USA, LLC, 303030 Trading LLC, Gary Francis, and  Nathanial Haynes ("Plaintiffs"), by their undersigned attorneys, bring this action against defendants identified below (collectively, "Defendants") pursuant to the Commodity Exchange Act, as amended, 7 U.S.C. §§ 1, *et seq.* (the "CEA"),  the Sherman Act, 15 U.S.C. § 1, and common law on behalf of itself and all others who transacted in Eurodollar futures contracts and options on futures contracts on the Chicago Mercantile Exchange ("CME") between August 2007 and May 2010 (the "Class Period").[1]

## SUMMARY OF ALLEGATIONS

     2.     LIBOR is a reference interest rate used as the basis for the pricing of fixed income futures, options, swaps and other derivative products traded on the CME and the Chicago Board of Trade ("CBOT").  This action arises from Defendants' unlawful and intentional misreporting and manipulation of – as well as their combination, agreement and conspiracy to fix – LIBOR rates and to restrain trade in the market for LIBOR-based derivatives during the respective Class

---

[1] Plaintiffs have delineated the Class Period based on currently available information, including the independent analysis performed by consulting experts Plaintiffs have retained, as well as analyses undertaken by experts retained by other plaintiffs in these coordinated proceedings.  As detailed later in the Complaint, those analyses indicate Defendants manipulated LIBOR as of at least August 8, 2007 and continued their manipulation through at least May 17, 2010.

Period in violation of Sections 2(a)(1)(B), 4s(h), 9(a)(2) and 22(a) of the CEA, the Sherman Act, 15 U.S.C. § 1, and common law.

3.     Plaintiffs' claims are made on information and belief (except as to allegations specifically pertaining to Plaintiffs and their counsel, which are made on personal knowledge) based on the investigation conducted by and under the supervision of Plaintiffs' counsel.  That investigation included reviewing and analyzing information concerning Defendants and LIBOR, which Plaintiffs (through their counsel) obtained from, among other sources:  (i) analyses by consulting experts engaged by Plaintiffs and other plaintiffs in these coordinated proceedings; (ii) publicly available press releases, news articles, and other media reports (whether disseminated in print or by electronic media); (iii) filings Defendants made to the United States Securities and Exchange Commission ("SEC"); (iv) court documents submitted in LIBOR-related proceedings in Canada, Singapore, and Japan; and (v) scholarly literature concerning the potential manipulation of LIBOR during the Class Period.  These sources collectively support Plaintiffs' allegations that Defendants collusively and systematically manipulated LIBOR rates and restrained trade in the market for LIBOR-based derivatives during the Class Period.

4.     Except as alleged in this Complaint, neither Plaintiffs nor other members of the public have access to the underlying facts relating to Defendants' improper activities.  Rather, that information lies exclusively within the possession and control of Defendants and other insiders, which prevents Plaintiffs from further detailing Defendants' misconduct.  Moreover, numerous pending government investigations—both domestically and abroad, including by the DOJ, the Commodity Futures Trading Commission ("CFTC"), and the SEC—concerning potential LIBOR manipulation could yield information from Defendants' internal records or personnel that bears significantly on Plaintiffs' claims.  Indeed, as one news report observed in detailing U.S. regulators' ongoing investigation, "[i]nternal bank emails may prove to be key evidence . . . because of the difficulty in proving that banks reported borrowing costs for LIBOR

at one rate and obtained funding at another."[2]  Plaintiffs thus believe further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

5.      This case arises from the manipulation of LIBOR for the U.S. dollar ("USD-LIBOR" or simply "LIBOR")[3] - the reference point for determining interest rates for trillions of dollars in financial instruments - by a cadre of prominent financial institutions.  Defendants perpetrated a scheme to depress LIBOR for two primary reasons.  First, well aware that the interest rate a bank pays (or expects to pay) on its debt is widely, if not universally, viewed as embodying the market's assessment of the risk associated with the bank, Defendants understated their borrowing costs to the British Bankers' Association ("BBA") (thereby suppressing LIBOR) to portray themselves as economically healthier than they actually were—of particular importance given investors' trepidation in light of the widespread market turmoil of the past few years.  Indeed, in an April 10, 2008 report, analysts at Defendant Citigroup Global Markets Inc. posited the "liquidity crisis" had "created a situation where LIBOR at times no longer represents the level at which banks extend loans to others"; specifically, the analysts concluded LIBOR "may understate actual interbank lending costs by 20-30bp [basis points]."[4]  Second, artificially suppressing LIBOR allowed Defendants to pay lower interest rates on LIBOR-based financial instruments that Defendants sold to investors, and otherwise affect the price for LIBOR-based derivatives like Eurodollar futures.

6.      Each business day, Thomson Reuters calculates LIBOR—a set of reference or benchmark interest rates priced to different ranges of maturity, from overnight to one year—on

---

[2] David Enrich, Carrick Mollenkamp & Jean Eaglesham, "U.S. Libor Probe Includes BofA, Citi, UBS," *MarketWatch*, March 17, 2011.

[3] While the term "LIBOR" generally encompasses rates with respect to numerous currencies (which are separately referred to as, for example, USD-LIBOR or Yen-LIBOR), for convenience Plaintiffs use the term "LIBOR" to reference USD-LIBOR.

[4] Scott Peng, Chintan (Monty) Gandhi, & Alexander Tyo, "Special Topic:  Is LIBOR Broken?", April 10, 2008 (published by Citigroup Global Markets Inc.)

behalf of the BBA, which first began setting LIBOR on January 1, 1986.  During most of the Class Period, the BBA established LIBOR based on the rates that 16 major banks, including Defendants, would have to pay for an unsecured loan for each designated maturity period.[5] Every day, the banks responded to the BBA's question:  "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?"  On its website, the BBA explains "a bank will know what its credit and liquidity risk profile is from rates at which it has dealt and can construct a curve to predict accurately the correct rate for currencies or maturities in which it has not been active."  The banks informed the BBA of their costs of borrowing funds at different maturity dates (*e.g.*, one month, three months, six months).  The BBA discarded the upper four and lower four quotes and set LIBOR by calculating the mean value of the remaining middle eight quotes, known as an "inter-quartile" methodology.  Thomson Reuters then published LIBOR, also reporting the quotes on which the BBA based its LIBOR calculation.

7.      The composition of the LIBOR panel is intended to reflect the constituency of the London interbank money market for U.S. Dollars.  The LIBOR definition is amplified as follows:

• The rate at which each bank submits must be formed from that bank's perception of its cost of unsecured funds in the London interbank market.  This will be based on the cost of funds not covered by any governmental guarantee scheme.

• Contributions must represent rates at which a bank would be offered funds in the London interbank market.

• Contributions must be for the specific currency concerned and not the cost of producing the currency by borrowing in a different currency and obtaining the required

---

[5] On February 9, 2009, Société Générale replaced Defendant HBOS on the BBA's USD-LIBOR panel.  In February 2011, in response to concerns about possible LIBOR manipulation, the BBA added four more banks to the panel.  On August 1, 2011, Defendant WestLB, at its request, was removed from the panel.  As of December 2011, the USD-LIBOR panel consisted of 18 banks.

currency via the foreign exchange markets.

- The rates must be submitted by members of staff at a bank with primary responsibility for management of a bank's cash, rather than a bank's derivative book.

- The definition of "funds" is: unsecured interbank cash or cash raised through primary issuance of interbank Certificates of Deposit.

8.      The BBA describes itself on its website as "the leading trade association for the UK banking and financial services sector", claiming that it "speak[s] for over 200 member banks from 60 countries on the full range of UK and international banking issues."[6] The Defendants are among the member banks of the BBA.  As the BBA itself concedes, it is not a regulatory body and has no regulatory function.[7]  Its activities are not overseen by any U.K. or foreign regulatory agency. It is governed by a board of member banks that meets four times each year. The board is composed of senior executives from twelve banks, including Barclays Bank plc, Citibank NA, Credit Suisse, Deutsche Bank AG, HSBC Bank plc, J.P. Morgan Europe Ltd., and the Royal Bank of Scotland plc.[8]

9.      No regulatory agency oversees the setting of LIBOR rates by the BBA and its members. The resultant rates are not filed with, or subject to the approval of, any regulatory agency. As the BBA has been quoted as saying it "calculates and produces BBA Libor at the request of our members for the good of the market."[9]

10.     LIBOR is set by the BBA and its member banks. Each of the ten currencies (namely U.S. Dollars, Japanese Yen, pound sterling, the Australian dollar, the Canadian dollar, the New Zealand dollar, the Danish krone, the Euro, the Swiss Franc and the Swedish krone) is overseen by a separate LIBOR panel created by the BBA.  During the Class Period, designated

---

[6] http://www.bba.org.uk/about-us, last accessed on April 30, 2012.

[7] http://www.bba.org.uk/blog/article/bba-repeats-commitment-to-bba-libor, last accessed on April 30, 2012

[8] http://www.bba.org.uk/about-us, last accessed on April 30, 2012.

[9] *See* http://www.businessweek.com/news/2012-03-06/libor-links-deleted-as-bank-group-backs-away-from-tarnished-rate, last accessed on April 30, 2012.

contributing panels ranged in size from eight banks for Australian dollar, Swedish krona, Danish krone, and New Zealand dollar panels to sixteen banks for U.S. dollar, pound sterling, Euro, and Japanese yen panels. There is substantial overlap in membership among the panels. For example, during the Class Period, nine of the sixteen banks that served on the U.S. dollar also served on the Japanese yen, Swiss franc and Euro LIBOR panels.[10] Similarly, thirteen banks participated on both the dollar and yen LIBOR panels[11] and eleven banks participated on both the U.S. dollar and Swiss franc LIBOR panels.[12] It is a requirement of membership of a LIBOR contributor panel that the bank is regulated and authorized to trade on the London money market. As the BBA recently told Bloomberg: "As all contributor banks are regulated, they are responsible to their regulators, rather than us."[13]

      11.     As "the primary benchmark for short term interest rates globally,"[14] LIBOR has occupied (and continues to occupy) a crucial role in the operation of financial markets. For example, market participants commonly set the interest rate on floating-rate notes as a spread against LIBOR (*e.g.*, "LIBOR + [X] bps")[15] and use LIBOR as a basis to determine the correct rate of return on short-term fixed-rate notes (by comparing the offered rate to LIBOR). Additionally, the pricing and settlement of Eurodollar futures and options—the most actively traded interest-rate futures contracts on the Chicago Mercantile Exchange—are based on the three-month LIBOR. LIBOR thus affects the pricing of trillions of dollars' worth of financial

---

[10] Those banks are Bank of Tokyo, Barclays, Citibank, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds, Rabobank, RBS, and UBS

[11] Those banks are Bank of America, Bank of Tokyo, Barclays, Citibank, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds, Rabobank, RBS, Société Générale (beginning in 2009), UBS, and West LB.

[12] Those banks are Bank of Tokyo, Barclays, Citibank, Credit Suisse, Deutsche Bank, HSBC, JP Morgan Chase, Lloyds, Rabobank, RBS, and UBS.

[13] http://www.bba.org.uk/blog/article/bba-repeats-commitment-to-bba-libor, last accessed on April 30, 2012.

[14] *See* http://www.bbalibor.com/bbalibor-explained/the-basics, last accessed on April 19, 2012.

[15] The term "bps" stands for basis points. 100 basis points equal 1%.

transactions, rendering it, in the BBA's own words, "the world's most important number."[16]

12.     Accordingly, it is well-established among market participants that, as *The Wall Street Journal* has observed, confidence in LIBOR "matters, because the rate system plays a vital role in the economy."[17]  Moreover, given the vast universe of financial instruments LIBOR impacts, "even a small manipulation" of the rate "could potentially distort capital allocations all over the world."[18]

13.     Throughout the Class Period, Defendants betrayed investors' confidence in LIBOR, as these financial institutions conspired to, and did, manipulate LIBOR by underreporting to the BBA the actual interest rates at which the Defendant banks expected they could borrow unsecured funds in the London interbank market – *i.e.*, their true costs of borrowing – on a daily basis.  The BBA then relied on the false information Defendants provided to set LIBOR.  By acting together and in concert to knowingly understate their true borrowing costs, Defendants caused LIBOR to be set artificially low.

14.     Defendants' manipulation of LIBOR allowed them to pay unduly low interest rates to investors, on LIBOR-based financial instruments offered during the Class Period. Investors—who until recently had no reason to suspect Defendants' knowing suppression of LIBOR—justifiably believed the financial instruments they were purchasing derived from a rate that was based on USD-LIBOR panel members' honest and reasonable assessments of their borrowing costs.  To the contrary, Defendants—in the debt-instrument context, the borrowers— surreptitiously bilked investors—the lenders—of their rightful rates of return on their

---

[16] BBA press release, "BBA LIBOR: the world's most important number now tweets daily," May 21, 2009, available at http://www.bbalibor.com/news-releases/bba-libor-the-worlds-most-important-number-now-tweets-daily, last accessed on April 28, 2012.

[17] Carrick Mollenkamp and Mark Whitehouse, "Study Casts Doubt on Key Rate --- WSJ Analysis Suggests Banks May Have Reported Flawed Interest Data for Libor,"  *The Wall Street Journal*, May 29, 2008.

[18] Rosa M. Abrantes-Metz and Albert D. Metz, "How Far Can Screens Go in Distinguishing Explicit from Tacit Collusion?  New Evidence from the Libor Setting," *CPI Antitrust Chronicle*, March 2012.

investments, reaping hundreds of millions, if not billions, of dollars in ill-gotten gains.  They also affected the LIBOR-based derivative market – in products like Eurodollar futures.  Defendants' affiliates actively traded in these markets, including and especially in the Eurodollar futures market on the CME.  Moreover, by understating their true borrowing costs, Defendants provided a false or misleading impression of their financial strength to investors and the rest of the market.

15.     Defendants' manipulation depressed returns on various types of financial instruments, including notes Defendants issued to raise capital during the Class Period.  In addition to floating-rate notes, whose interest rates are specifically set as a variable amount over LIBOR, market participants use LIBOR as the starting point for negotiating rates of return on short-term fixed-rate instruments, such as fixed-rate notes maturing in one year or less.  Thus, by suppressing LIBOR, Defendants ensured that artificially low interest rates would attach to fixed-rate and variable notes.

16.     Plaintiffs now seek relief for the damages they have suffered as a result of Defendants' violations of federal and state law.

## JURISDICTION AND VENUE

17.     This action arises under Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and common law, respectively.

18.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), and 28 U.S.C. §§ 1331 and 1337.  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceed $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

19.     Venue is proper in the Southern District of New York, pursuant to, among other statutes, Section 22 of the CEA, 7 U.S.C. § 25(c), 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c)

and (d).  Each of the Defendants transacted business in the Southern District of New York and a part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

**THE PARTIES**

**Plaintiffs**

20.      Plaintiff Metzler Investment GmbH ("Metzler") is a fund company that launches and manages investment funds under German law. The range of funds includes various types of securities, money market, and derivative funds, as well as general and specialized investment funds.  Metzler manages assets totaling approximately €47 billion and is based in Frankfurt, Germany.  Its funds traded on-exchange based products tied to LIBOR such as Eurodollar futures and were harmed as a consequence of Defendants' unlawful conduct.

21.      Plaintiff FTC Futures Fund SICAV ("FTC SICAV"), a fund based in Luxembourg, traded on-exchange based products tied to LIBOR such as Eurodollar futures and was harmed as a consequence of Defendants' unlawful conduct.

22.      Plaintiff FTC Futures Fund PCC Ltd. ("FTC PCC"), a fund of FTC Capital based in Gibraltar, traded on-exchange based products tied to LIBOR such as Eurodollar futures and was harmed as a consequence of Defendants' unlawful conduct.

23.      Plaintiff Atlantic Trading USA, LLC ("Atlantic") is an Illinois limited liability company with its principal place of business in Chicago, Illinois. Atlantic Trading USA, LLC traded on-exchange based products tied to LIBOR such as Eurodollar futures and was harmed as a consequence of Defendants' unlawful conduct.

24.      Plaintiff 303030 Trading LLC ("303030") is an Illinois limited liability corporation with its principal place of business in Lake County, Illinois. 303030 traded on-exchange based products tied to LIBOR such as Eurodollar futures and were harmed as a consequence of Defendants' unlawful conduct.

25.      Plaintiff Gary Francis ("Francis") is a resident of Chicago, Illinois.  Plaintiff Francis traded on-exchange based products tied to LIBOR such as Eurodollar futures and was

harmed as a consequence of Defendants' unlawful conduct.

26.     Plaintiff Nathanial Haynes ("Haynes") is a resident of Chicago, Illinois. Plaintiff Haynes traded on-exchange based products tied to LIBOR such as Eurodollar futures and was harmed as a consequence of Defendants' unlawful conduct.

**Defendants**

27.     Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.  Defendant Bank of America, N.A. is a federally chartered national banking association headquartered in Charlotte, North Carolina and an indirect, wholly owned subsidiary of Defendant Bank of America Corporation.  Defendant Bank of America Corporation and Bank of America, N.A. are hereinafter referred to collectively as "BAC")

28.     Defendant Barclays Bank plc ("Barclays") is a British public limited company headquartered in London, England.

29.     Defendant Citibank, N.A. ("Citibank") is federally chartered national banking association headquartered in New York, New York and a wholly owned subsidiary of Defendant Citigroup, Inc. ("Citigroup").  Defendant Citigroup is a Delaware corporation headquartered in New York, New York.

30.     Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in Zurich, Switzerland.

31.     Defendant J.P. Morgan Chase & Co. ("JPMorgan Chase") is a Delaware financial holding company headquartered in New York, New York.  Defendant J.P. Morgan Chase Bank, National Association, is a federally chartered national banking association headquartered in New York, New York and a wholly owned subsidiary of Defendant JPMorgan Chase.

32.     Defendant HSBC Holdings plc ("HSBC") is a British public limited company headquartered in London, England.  Defendant HSBC Bank plc is a United Kingdom public limited company headquartered in London, England and a wholly owned subsidiary of

Defendant HSBC.

33.     Defendant Lloyds Banking Group plc ("Lloyds") is a British public limited company headquartered in London, England.  Lloyds was formed in 2009 through the acquisition of Defendant HBOS plc ("HBOS") by Lloyds TSB Bank plc.

34.     Defendant WestLB AG ("WestLB") is a German joint stock company headquartered in Dusseldorf, Germany.  Defendant Westdeutsche ImmobilienBank AG is a German company headquartered in Mainz and wholly owned subsidiary of Defendant WestLB.

35.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland.

36.     Defendant Royal Bank of Scotland Group plc ("RBS") is a British public limited company headquartered in Edinburgh, Scotland.

37.     Defendant Deutsche Bank, AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.

38.     Defendant Royal Bank of Canada ("RBC") is a Canada company headquartered in Toronto, Canada.

39.     Defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("Bank of Toyko" or "BTMU") is a Japan company headquartered in Tokyo, Japan.

40.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider with its headquarters in Utrecht, the Netherlands.

41.     Defendant The Norinchukin Bank ("Norinchukin" or "Norin") is a Japanese cooperative bank headquartered in Tokyo, Japan.

42.     During the Class Period, Defendants BAC, Credit Suisse, JPMorgan Chase, HSBC, Barclays, Lloyds, HBOS, WestLB, RBS, UBS, Deutsche Bank, Citibank, Royal Bank of Canada, Rabobank, BTMU and Norinchukin were members of the BBA's USD-LIBOR panel. Additionally, Citigroup, which controlled Citibank and reaped significant financial benefit from the suppression of LIBOR, actively participated in the conspiracy.

**AGENTS AND UNNAMED CO-CONSPIRATORS**

43.     During the Class Period, the following subsidiaries or other affiliates of Defendants joined and furthered the conspiracy by trading LIBOR-based financial instruments such as Eurodollar futures contracts at manipulated prices not reflecting fundamental supply and demand, to the direct benefit of Defendants: (i) Credit Suisse Securities (USA) LLC; (ii) Bank of America Securities LLC; (iii) J.P. Morgan Clearing Corp.; (iv) J.P. Morgan Futures, Inc.; (v) HSBC Securities (USA); (vi) Barclays Capital Inc.; (vii) UBS Securities LLC; (viii) RBS Securities Inc.; (ix) Deutsche Bank Securities; and (x) Citigroup Global Markets Inc.

44.     In addition to the above entities' participation in selling LIBOR-based financial instruments to Plaintiffs during the Class Period, investigations regarding Defendants' manipulation of Yen-LIBOR (detailed below) have revealed that securities-dealer subsidiaries of Yen-LIBOR panel members, including Defendant UBS, participated in manipulating Yen-LIBOR during the Class Period.  In light of those facts, Plaintiffs have reason to believe the dealer entities identified above materially aided or contributed to the manipulation of USD-LIBOR.

**DEFENDANTS SUPPRESSED LIBOR DURING THE CLASS PERIOD**

45.     Throughout the Class Period, Defendants conspired to suppress LIBOR below the levels it would have been set had Defendants accurately reported their borrowing costs to the BBA.  Plaintiffs' allegations that Defendants suppressed LIBOR are supported by (i) Defendants' powerful incentives to mask their true borrowing costs and to reap unjustified revenues by setting artificially low interest rates on LIBOR-based financial instruments that investors purchased; (ii) an independent analysis by other plaintiffs' consulting experts, comparing LIBOR panel banks' daily individual quotes with the banks' probability of default, as measured by Kamakura Risk Information Services, as well as by Plaintiffs' consulting experts conducting analyses of the spread between LIBOR as reported and the Federal Reserve Eurodollar Deposit Rate; (iii) publicly available economic analyses, by prominent academics and other commentators, of LIBOR's behavior during the Class Period compared with other well-