# 13-3565-cv(L)

13-3636-CV(CON), 15-0432-cv(CON), 15-0441-cv(CON), 15-0454-cv(CON), 15-0477-cv(CON), 15-0494-cv(CON), 15-0498-cv(CON), 15-0524-cv(CON), 15-0537-cv(CON), 15-0547-cv(CON), 15-0551-cv(CON), 15-0611-cv(CON), 15-0620-cv(CON), 15-0627-cv(CON), 15-0733-cv(CON), 15-0744-cv(CON), 15-0778-cv(CON), 15-0825-cv(CON), 15-0830-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

———————————

Ellen Gelboim, on behalf of herself and all others similarly situated,

*(For Continuation of Caption See Inside Cover)*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume 6 of 6 (Pages JA1501 to JA1645)

KAREN L. MORRIS
PATRICK F. MORRIS
MORRIS AND MORRIS LLC
  COUNSELORS AT LAW
4001 Kennett Pike, Suite 300
Wilmington, Delaware 19807
(302) 426-0400

DAVID H. WEINSTEIN
ROBERT S. KITCHENOFF
WEINSTEIN KITCHENOFF & ASHER LLC
1845 Walnut Street, Suite 1100
Philadelphia, Pennsylvania 19103
(215) 545-7200

THOMAS C. GOLDSTEIN
ERIC F. CITRON
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue, Suite 850
Bethesda, Maryland 20814
(202) 362-0636

*Counsel for Plaintiffs-Appellants Ellen Gelboim
and Linda Zacher in Case No. 13-3565*

*(For Continuation of Appearances See Inside Cover)*

Linda Zacher, Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund, Schwab U.S. Dollar Liquid Assets Fund, Schwab Money Market Fund, Schwab Value Advantage Money Fund, Schwab Retirement Advantage Money Fund, Schwab Investor Money Fund, Schwab Cash Reserves, Schwab Advisor Cash Reserves, Charles Schwab Bank, N.A., Charles Schwab & Co., Inc., Charles Schwab Corporation, Schwab YieldPlus Fund, Schwab YieldPlus Fund Liquidation Trust, 33-35 Green Pond Road Associates, LLC, on behalf of itself and all others similarly situated, FTC Futures Fund PCC Ltd, on behalf of themselves and all others similarly situated, FTC Futures Fund SICAV, on behalf of themselves and all others similarly situated, Metzler Investment GmbH, on behalf of itself and all others similarly situated, 303030 Trading LLC, Atlantic Trading USA, LLC, Gary Francis, Nathaniel Haynes, Courtyard at Amwell II, LLC, Greenwich Commons II, LLC, Jill Court Associates II, LLC, Maidencreek Ventures II LP, Raritan Commons, LLC, Lawrence W. Gardner, on behalf of themselves and all others similarly situated, Mayor and City Council of Baltimore, City of New Britain Firefighters' and Police Benefit Fund, on behalf of itself and all others similarly situated, Texas Competitive Electric Holdings Company LLC, Guaranty Bank & Trust Company, Individually and on behalf of all others similarly situated, National Credit Union Administration Board, as Liquidating Agent of U.S. Central Federal Credit Union, Western Corporate Federal Credit Union, Members United Corporate Federal Credit Union, Southwest Corporate Federal Credit Union, and Constitution Corporate Federal Credit Union, City of Philadelphia, Pennsylvania Intergovernmental Cooperation Authority, Darby Financial Products, Capital Ventures International, Salix Capital US Inc., Prudential Investment Portfolios 2, FKA Dryden Core Investment Fund, on behalf of Prudential Core Short-Term Bond Fund, Prudential Core Taxable Money Market Fund, City of Riverside, Riverside Public Financing Authority, East Bay Municipal Utility District, County of San Mateo, San Mateo County Joint Powers Financing Authority, City of Richmond, Richmond Joint Powers Financing Authority, Successor Agency to the Richmond Community Redevelopment Agency, County of San Diego, County of Sonoma, David E. Sundstrom, in his official capacity as Treasurer of the county of Sonoma for and on behalf of the Sonoma County Treasury Pool Investment, Regents of the University of California, San Diego Association of Governments, County of Sacramento, The County of Mendocino, City of Houston, Bay Area Toll Authority, Joseph Amabile, Louie Amabile, individually & on behalf of Lue Trading, Inc., Norman Byster, Michael Cahill, Richard Deogracias, individually on behalf of RCD Trading, Inc., Marc Federighi, individually on behalf of MCO Trading, Scott Federighi, individually on behalf of Katsco, Inc., Robert Furlong, individually on behalf of XCOP, Inc., David Cough, Brian Haggerty, individually on behalf of BJH Futures, Inc., David Klusendorf, Ronald Krug, Christopher Lang, John Monckton, Philip Olson, Brett Pankau, David Vecchione, individually on behalf of Vecchione & Associates, Randall Williams, John Henderson, 303 Proprietary Trading LLC, Margery Teller, Nicholas Pesa, Eduardo Restani, Vito Spillone, Prudential Investment Portfolios 2, FKA Dryden Core Investment Fund, on behalf of Prudential Core Short-Term Bond Fund, Prudential Core Taxable Money Market Fund, Salix Capital US Inc., Darby Financial Products, Capital Ventures International, City of Philadelphia, Pennsylvania Intergovernmental Cooperation Authority, FTC Futures Fund PCC Ltd. on behalf of themselves and all others similarly situated, FTC Futures Fund SICAV, on behalf of themselves

and all others similarly situated, Metzler Investment GmbH, on behalf of itself
and all others similarly situated, 303030 Trading LLC, Atlantic Trading USA,
LLC, Gary Francis, Nathaniel Haynes, City of New Britain Firefighters' and
Police Benefit Fund, on behalf of itself and all others similarly situated, Mayor
and City Council of Baltimore, Texas Competitive Electric Holdings Company
LLC, Regents of the University of California, East Bay Municipal Utility District,
San Diego Association of Governments, City of Richmond, Richmond Joint
Powers Financing Authority, Successor Agency to the Richmond Community
Redevelopment Agency, City of Riverside, Riverside Public Financing Authority,
County of Sacramento, County of San Diego, County of San Mateo, County of
Sonoma, David E. Sundstrom, in his official capacity as Treasurer of the county
of Sonoma for and on behalf of Sonoma County Treasury Pool Investment,
City of Houston,

*Plaintiffs-Appellants,*

FTC Capital GMBH, on behalf of themselves and all others similarly situated,
FTC Futures Fund PCC Ltd, on behalf of themselves and all others similarly
situated, FTC Futures Fund SICAV, on behalf of themselves and all others
similarly situated, Carpenters Pension Fund of West Virginia, City of Dania
Beach Police & Firefighters' Retirement System, Individually and on behalf of all
others similarly situated, Ravan Investments, LLC, Mayor and City Council of
Baltimore, Richard Hershey, Jeffrey Laydon, on behalf of himself and all others
similarly situated, Metzler Investment GmbH, on behalf of itself and all others
similarly situated, Roberto E. Calle Gracey, City of New Britain Firefighters' and
Police Benefit Fund, on behalf of itself and all others similarly situated, AVP
Properties, LLC, 303030 Trading LLC, Atlantic Trading USA, LLC, Community
Bank & Trust, Berkshire Bank, Individually and On Behalf of All Others
Similarly Situated, 33-35 Green Pond Road Associates, LLC, on behalf of itself
and all others similarly situated, Elizabeth Lieberman, on behalf of themselves
and all others similarly situated, Todd Augenbaum, on behalf of themselves and
all others similarly situated, Gary Francis, Nathaniel Haynes, Courtyard at
Amwell II, LLC, Greenwich Commons II, LLC, Jill Court Associates II, LLC,
Maidencreek Ventures II LP, Raritan Commons, LLC, Lawrence W. Gardner, on
behalf of themselves and all others similarly situated, Annie Bell Adams, on
behalf of herself and all others similarly situated, Dennis Paul Fobes, on behalf of
himself and all others similarly situated, Leigh E. Fobes, on behalf of herself and
all others similarly situated, Margaret Lambert, on behalf of herself and all others
similarly situated, Betty L. Gunter, on behalf of herself and all others similarly
situated, Government Development Bank for Puerto Rico, Carl A. Payne,
individually, and on behalf of other members of the general public similarly
situated, Kenneth W. Coker, individually, and on behalf of other members of the
general public similarly situated, City of Riverside, Riverside Public Financing
Authority, East Bay Municipal Utility District, County of San Mateo, San Mateo
County Joint Powers Financing Authority, City of Richmond, Richmond Joint
Powers Financing Authority, Successor Agency to the Richmond Community
Redevelopment Agency, County of San Diego, Guaranty Bank & Trust Company,
Individually and on behalf of all others similarly situated, Heather M. Earle, on
behalf of themselves and all others similarly situated, Henryk Malinowski, on
behalf of themselves and all others similarly situated, Linda Carr, on behalf of
themselves and all others similarly situated, Eric Friedman, on behalf of
themselves and all others similarly situated, County of Riverside, Jerry Weglarz,
Nathan Weglarz, on behalf of plaintiffs and a class, Directors Financial Group,

individually and on behalf of all others similarly situated, SEIU Pension Plans Master Trust, individually and on behalf of all others similarly situated, Highlander Realty, LLC, Jeffrey D. Buckley, Federal Home Loan Mortgage Corporation, County of Sonoma, David E. Sundstrom, in his official capacity as Treasurer of the county of Sonoma for and on behalf of the Sonoma County Treasury Pool Investment, Regents of the University of California, San Diego Association of Governments, CEMA Joint Venture, County of Sacramento, City of Philadelphia, Pennsylvania Intergovernmental Cooperation Authority, Principal Funds, Inc., PFI Bond & Mortgage Securities Fund, PFI Bond Market Index Fund, PFI Core Plus Bond I Fund, PFI Diversified Real Asset Fund, PFI Equity Income Fund, PFI Global Diversified Income Fund, PFI Government & High Quality Bond Fund, PFI High Yield Fund, PFI High Yield Fund I, PFI Income Fund, PFI Inflation Protection Fund, PFI Short-Term Income Fund, PFI Money Market Fund, PFI Preferred Securities Fund, Principal Variable Contracts Funds, Inc., PVC Asset Allocation Account, PVC Money Market Account, PVC Balanced Account, PVC Bond & Mortgage Securities Account, PVC Equity Income Account, PVC Government & High Quality Bond Account, PVC Income Account, PVC Short-Term Income Account, Principal Financial Group, Inc., Principal Financial Services, Inc., Principal Life Insurance Company, Principal Capital Interest Only I, LLC, Principal Commercial Funding, LLC, Principal Commercial Funding II, LLC, Principal Real Estate Investors, LLC, Texas Competitive Electric Holdings Company LLC, Salix Capital Ltd.,

*Plaintiffs,*

− v. −

Bank of America Corporation, Barclays Bank Plc., Citibank NA, Credit Suisse Group AG, Deutsche Bank AG, HSBC Holdings plc., J.P. Morgan Chase & Co., Norinchukin Bank, UBS AG, WestLB AG, Rabobank Group, Does 1-10, HBOS PLC, Bank of Tokyo-Mitsubishi UFJ, Ltd, Royal Bank of Canada, Societe Generale, Deutsche Bank Financial LLC, Deutsche Bank Securities Inc., Bank of America, N.A., National Association, JPMorgan Chase & Co., HSBC Bank PLC, WestDeutsche Immobilienbank AG, Citigroup Inc., Cooperatieve Centrale RaiffeisenBoerenleenbank B.A., JPMorgan Chase Bank, National Association, JPMorgan Chase Bank, Barclays Bank PLC, Lloyds Banking Group PLS, HSBC Holding plc, Lloyds Banking Group PLS, JPMorgan Chase Bank N.A., Citigroup, Inc., Citibank N.A., Bank of Tokyo-Mitsubishi UFJ, Ltd., Cooperative Centrale-Raiffeisenboernlenbank B.A., JPMorgan Chase Bank N.A., Royal Bank of Scotland, Plc, Stephanie Nagel, British Bankers' Association, BBA Enterprises, Ltd, BBA Libor, Ltd, Portigon AG, John Does #1-#5, Lloyds TSB Bank plc, National Collegiate Trust, Chase Bank USA, N.A., Credit Suisse Group, AG, Citibank, N.A., UBS Securities LLC, J.P. Morgan Clearing Corp., Bank of America Securities LLC, Bank of Tokyo-Mitsubishi UFJ, JPMorgan & Co., Bank of America N.A., Centrale Raiffeisen-Berenleenbank B.A., UBS AG, Royal Bank of Scotland Group PLC, Societe General, Royal Bank of Canada, Bank of Nova Scotia, Bank of Tokyo Mitsubishi UFJ Ltd., Chase Bank USA, NA, Royal Bank of Scotland, JPMorgan Chase Bank National Association, Royal Bank of Scotland Group Plc.,

*Defendants-Appellees,*

Lloyds Banking Group plc, Credit Agricole, S.A., Royal Bank of Scotland Group PLC, Credit Suisse Group, NA, Barclays Capital Inc., Barclays U.S. Funding LLC, Credit Suisse Securities (USA) LLC, Barclays PLC, Citizens Bank of

Massachusetts, agent of RBS Citizens Bank, NA, RBS Citizens, N.A., FKA Citizens Bank of Massachusetts, RBS Citizens, N.A., incorrectly sued as the Charter One Bank NA, BNP Paribas S.A., Sumitomo Mitsui Banking Corp., Citigroup Global Markets Inc., HSBC Securities (USA) Inc.,

*Defendants.*

---

DAVID KOVEL
KIRBY MCINERNEY LLP
825 Third Avenue, 16th Floor
New York, New York 10022
(212) 371-6600

– and –

CHRISTOPHER LOVELL
LOVELL STEWART HALEBIAN
     JACOBSON LLP
61 Broadway, Suite 501
New York, New York 10006
(212) 608-1900

*Interim Co-Lead Counsel for Exchange-
     Based Plaintiffs-Appellants and the
     Class in Case No. 15-454*

WILLIAM CHRISTOPHER CARMODY
ARUN SUBRAMANIAN
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, New York 10022
(212) 336-8330

– and –

MARC SELTZER
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067
(310) 789-3100

– and –

MICHAEL D. HAUSFELD
WILLIAM P. BUTTERFIELD
HILARY K. SCHERRER
NATHANIEL C. GIDDINGS
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 540-7200

*Counsel for Plaintiffs-Appellants
     Baltimore, New Brítain and TCEH
     and Interim Lead Counsel for the
     Proposed OTC Plaíntíff Class in
     Case No. 15-498*

STEVEN E. FINEMAN
MICHAEL J. MIARMI
LIEFF, CABRASER, HEIMANN
    & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013
(212) 355-9500

– and –

BRENDAN P. GLACKIN
LIEFF, CABRASER, HEIMANN &
    BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
(415) 956-100

*Counsel for Plaintiffs-Appellants The
    Charles Schwab Corporation, Charles
    Schwab Bank, N.A., Charles Schwab
    & Co., Inc., Schwab Money Market
    Fund, Schwab Value Advantage
    Money Fund, Schwab Retirement
    Advantage Money Fund, Schwab
    Investor Money Fund, Schwab Cash
    Reserves, Schwab Advisor Cash
    Reserves, Schwab YieldPlus Fund,
    Schwab YieldPlus Fund Liquidation
    Trust, Schwab Short-Term Bond
    Market Fund, Schwab Total Bond
    Market Fund and Schwab U.S. Dollar
    Liquid Assets Fund in Case No. 15-
    432 and for Bay Area Toll Authority in
    Case No. 15-778*

NANCI E. NISHIMURA
MATTHEW K. EDLING
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road
Burlingame, California 94010
(650) 697-6000

– and –

ALEXANDER E. BARNETT
COTCHETT, PITRE & MCCARTHY, LLP
40 Worth Street, 10th Floor
New York, New York 10013
(212) 201-6820

*Counsel for Plaintiffs-Appellants The
    Regents of the University of
    California, East Bay Municipal
    Utility District, San Diego
    Association of Governments, City of
    Richmond, The Richmond Joint
    Powers Financing Authority,
    Successor Agency to the Richmond
    Community Redevelopment Agency,
    City of Riverside, The Riverside
    Public Financing Authority, County
    of Mendocino, County of
    Sacramento, County of San Diego,
    County of San Mateo, The San
    Mateo County Joint Powers
    Financing Authority, County of
    Sonoma and David E. Sundstrom, in
    his official capacity as Treasurer of
    the County of Sonoma in Case No.
    15-733*

RICHARD W. MITHOFF
WARNER V. HOCKER
MITHOFF LAW FIRM
One Allen Center
Penthouse, Suite 3450
Houston, Texas 77002
(713) 654-1122

– and –

NANCI E. NISHIMURA
MATTHEW K. EDLING
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road
Burlingame, California 94010
(650) 697-6000

– and –

ALEXANDER E. BARNETT
COTCHETT, PITRE & MCCARTHY, LLP
40 Worth Street, 10th Floor
New York, New York 10013
(212) 201-6820

*Counsel for Plaintiff-Appellant City of
Houston in Case No. 15-744*

STEIG D. OLSON
DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiffs-Appellants
The City of Philadelphia and
The Pennsylvania Intergovernmental
Cooperation Authority in Case No. 15-
547*

DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
STEIG D. OLSON
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiffs-Appellants
Darby Financial Products and
Capital Ventures International in
Case No. 15-551*

DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
STEIG D. OLSON
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiff-Appellant Salix
Capital US Inc. in Case Nos. 15-611
and 15-620*

DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
STEIG D. OLSON
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiffs-Appellants
Prudential Investment Portfolios 2
on behalf of Prudential Core Short-
Term Bond Fund and Prudential
Core Taxable Money Market Fund
in Case No. 15-627*

DAVID C. FREDERICK
WAN J. KIM
GREGORY G. RAPAWY
ANDREW C. SHEN
KELLOGG, HUBER, HANSEN, TODD,
    EVANS & FIGEL, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900

*Counsel for Plaintiff-Appellant National
Credit Union Administration Board in
Case No. 15-537*

MICHAEL J. GUZMAN
ANDREW C. SHEN
KELLOGG, HUBER, HANSEN, TODD,
    EVANS & FIGEL, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900

– and –

STUART H. MCCLUER
MCCULLEY MCCLUER PLLC
1223 Jackson Avenue East, Suite 200
Oxford, Mississippi 38655
(662) 550-4511

*Counsel for Plaintiff-Appellant Guaranty
Bank & Trust Company in Case No.
15-524*

JEFFREY A. SHOOMAN
LITE DEPALMA GREENBERG, LLC
Two Gateway Center, Suite 1201
Newark, New Jersey 07102
(973) 623-3000

*Counsel for Plaintiff-Appellant 33-35
Green Pond Associates, LLC in Case No.
15-441*

SCOTT P. SCHLESINGER
JEFFREY L. HABERMAN
JONATHAN R. GDANSKI
SCHLESINGER LAW OFFICES, P.A.
1212 SE Third Avenue
Ft. Lauderdale, Florida 33316
(954) 320-9507

*Counsel for Plaintiffs-Appellants
Amabile, et al. in Case No. 15-825*

JASON A. ZWEIG
HAGENS BERMAN SOBOL SHAPIRO LLP
555 Fifth Avenue, Suite 1700
New York, New York 10017
(212) 752-5455

*Counsel for Plaintiffs-Appellants
Courtyard At Amwell, LLC,
Greenwich Commons II, LLC, Jill
Court Associates II, LLC,
Maidencreek Ventures II LP,
Raritan Commons, LLC and
Lawrence W. Gardner in Case No.
15-477*

***In re Libor-Based Financial Instrument Antitrust Litigation***

# JOINT APPENDIX TABLE OF CONTENTS

**Document**                                                                   **Page**

## VOLUME I

District Court Dockets ................................................................. JA1

   *In re LIBOR-Based Financial Instruments Antitrust Litigation,*
      MDL No. 2262 Docket ......................................................... JA1

   *Salix Capital US Inc. v. Banc of America Securities LLC, et al.,*
      1:13-cv-004018-NRB Docket ............................................... JA74

   *Amabile v. Bank of America Corp., et al.*
      1:13-cv-01700-NRB Docket ................................................ JA88

Transcript of March 1, 2012 Hearing
      [Request for gov't. documents] ............................................. JA94

*City of Baltimore v. Credit Suisse Group AG, et al.* [OTC Plaintiffs]
      Consolidated Amended Complaint (MDL Dkt. No. 130), filed April 30, 2012 ........... JA97

*Gelboim v. Credit Suisse Group AG,* et al., [Bondholder Plaintiffs]
      First Amended Class Action Complaint
      (MDL Dkt. No. 131), filed April 30, 2012 ............................... JA200

*Metzler Investment GmbH, et al. v. Credit Suisse Group AG, et al.*
      [Exchange-Based Plaintiffs] Amended Consolidated
      Class Action Complaint (MDL Dkt. No. 134), filed April 30, 2012 ......... JA289

Notice of Defendants' Motion to Dismiss the Amended Complaints
      (MDL Dkt. No. 165), filed June 29, 2012 ................................ JA396

Declaration of Robert F. Wise, Jr. in Support of Defendants'
      Motion to Dismiss Plaintiffs' Antitrust Claims
      (MDL Dkt. No. 167), filed June 29, 2012 ................................ JA404

Exhibit C to Wise Declaration - Rosa M Abrantes-Metz & Albert D. Metz,
      "How Far Can Screens Go in Distinguishing Explicit from Tacit Collusion?
      New Evidence from the Libor Setting," CPI Antitrust Chronicle
      (March 2012) (MDL Dkt. No. 167-3), filed June 29, 2012 ................. JA406

Transcript of August 8, 2012 Hearing [Hearing re: Barclays documents] ....................... JA416

Declaration of Hilary K. Scherrer in Support of Plaintiffs' Joint
    Memorandum of Law in Opposition to Defendants' Motions to Dismiss
    (MDL Dkt. No. 212), filed August 29, 2012 ............................................................. JA421

Exhibit 3 to Scherrer Declaration – Department of Justice
    Non-Prosecution Agreement with Barclays (MDL Dkt. No. 212-1) .......................... JA424

Exhibit 4 to Scherrer Declaration – CFTC Order
    Regarding Barclays Proceeding (MDL Dkt. No. 212-1) ............................................ JA454

Exhibit 5 to Scherrer Declaration – FSA Final Notice
    to Barclays Bank Plc (MDL Dkt. No. 212-2) ............................................................ JA500

Transcript of March 5, 2013 Hearing [Motion to Dismiss argument] .............................. JA545

Bondholder Plaintiffs' Notice of Motion for Leave to Amend
    (MDL Dkt. No. 327), filed May 17, 2013 ................................................................. JA575

Exhibit A to Bondholder Plaintiffs' Motion for Leave to Amend
    [Proposed Amended Complaint] (MDL Dkt. No. 327-1), filed May 17, 2013 .......... JA577

OTC Plaintiffs' Proposed Second Consolidated Amended Complaint,
    attached as Exhibit A to their Memorandum of Law for Leave to
    Amend the Complaint (MDL Dkt. No. 334-1), filed May 17, 2013 .......................... JA671

Exchange Based Plaintiffs' Proposed Second Amended Consolidated
    Class Action Complaint (MDL Dkt. No. 338-1 and 338-2) attached as
    Exhibits A-1 and A-2 to the Declaration of David E. Kovel in Support
    of Motion for Leave to File Second Amended Complaint, filed May 20, 2013 ......... JA834

Notice of Errata to the OTC Plaintiffs' Exhibit A to their Memorandum
    of Law in Support of their Motion for Leave to File Proposed Consolidated
    Second Amended Complaint (MDL Dkt. No. 345), filed May 24, 2013 ................... JA980

Transcript of August 8, 2013 Hearing [Leave to Amend argument] ................................ JA984

OTC Plaintiffs' Second Consolidated Amended Complaint
    (MDL Dkt. No. 406), filed September 10, 2013 ....................................................... JA1012

Notice of Appeal in *Gelboim v. Credit Suisse Group AG*, (MDL Dkt. No. 409)
    [Bondholder Plaintiffs], filed September 17, 2013 .................................................... JA1176

Exchange Based Plaintiffs [Corrected] Second Amended Consolidated
    Class Action Complaint (MDL Dkt. No. 438), filed September 20, 2013 ............... JA1179

Notice of Appeal in *Schwab Short-Term Bond Market Fund, et al, v. Bank of America Corp., et al.* (MDL Dkt. No. 429) [Schwab Plaintiffs], filed September 24, 2013 .......................................................................... JA1385

*City of Philadelphia v. Bank of America Corp., et al.* Second Amended Complaint (MDL Dkt. No. 667), filed October 6, 2014 ............. JA1390

Notice of Defendants' Motion to Dismiss Direct Action Claims (Dkt. No. 743), filed November 5, 2014 ............................... JA1572

Letter requesting Lift of Stay and Entry of Final Judgment, (MDL Dkt. No. 1002), filed January 28, 2015 ........................................ JA1586

Notice of Appeal of Schwab Plaintiffs (MDL Dkt. No. 1011), filed February 10, 2015 .................................... JA1589

Notice of Appeal in 33-35 *Green Pond Road Assoc., LLC v. Bank of America Corp.*, (MDL Dkt. No. 1014), filed February 11, 2015 ............... JA1596

Notice of Appeal in *Metzler Investment GmbH, et al. v. Credit Suisse Group AG, et al.* [Exchange-Based Plaintiffs] (MDL Dkt. No. 1016), filed February 12. 2015 .................................... JA1598

Notice of Appeal in *Courtyard at Amwell II, LLC v. Bank of America Corp.*, (MDL Dkt. No. 1017), filed February 12, 2015 ......................... JA1602

Corrected Notice of Appeal in *City of Baltimore v. Credit Suisse Group AG*, [OTC Plaintiffs] (MDL Dkt. No. 1019), filed February 13, 2015 ........................... JA1605

Amended Notice of Appeal in *City of Baltimore v. Credit Suisse Group AG*, (MDL Dkt. No. 1043), filed February 20, 2015 .................................... JA1608

Notice of Appeal in *Guaranty Bank & Trust Co. v. Credit Suisse Group AG*, (MDL Dkt. No. 1044), filed February 20, 2015 .................................... JA1611

Notice of Appeal in *National Credit Union Admin. Bd. v. Credit Suisse Group AG*, (MDL Dkt. No. 1054), filed on February 24, 2015 ................................. JA1615

Notice of Appeal in *City of Philadelphia v. Bank of America Corp.*, (MDL Dkt. No. 1056), filed February 24, 2015 .................................... JA1619

Notice of Appeal in *Darby Financial Products v. Barclays Bank PLC* (MDL Dkt. No. 1057), filed February 24, 2015 .................................... JA1622

Notice of Appeal in *Salix Capital US Inc. v. Banc of America Securities*, (MDL Dkt. No. 1058), filed February 24, 2015 .................................... JA1625

Amended Notice of Appeal of Exchange-Based Plaintiffs
(MDL Dkt. No. 1063), filed on February 26, 2015 .................................................JA1628

Notice of Appeal in *Prudential Core Taxable Money Mkt. Fund v.*
*Bank of America Corp.*, (MDL Dkt. No. 1064), filed February 27, 2015 ...............JA1631

Notice of Appeal in *The Regents of the Univ. of California v.*
*Bank of America Corp.*, (MDL Dkt. No. 1098), filed March 10, 2015 ...................JA1634

Notice of Appeal in *City of Houston v. Bank of America Corp.*,
(MDL Dkt. No. 1099), filed March 10, 2015 ...........................................................JA1638

Notice of Appeal in *Bay Area Toll Authority v. Bank of America Corp.*,
(MDL Dkt. No. 1105), filed March 13, 2015 ...........................................................JA1641

Notice of Appeal in *Amabile v. Bank of America Corp.*,
(MDL Dkt. No. 1119), filed March 19, 2015 ...........................................................JA1644

accurately reflect interbank borrowing costs and did not conform to the Libor definition but rather was artificially suppressed by Defendants' conduct.  Specifically, due to Defendants' misconduct, Plaintiffs received artificially lowered floating-rate payments based on amounts fixed by Defendants.

286.    In addition, for each of its swaps that Plaintiffs terminated, the City of Philadelphia and PICA made inflated payments due to Libor forward curves determined based on then-prevailing suppressed USD Libor rates.  Defendants thus acted in bad faith to deprive Plaintiffs of the benefit of their bargain.

287.    While the amount each panel bank subjectively expected to pay to borrow U.S. dollars in the London Interbank Market on a given day, and what rate each bank did, in fact, pay, are facts uniquely in Defendants' possession, the overall, consistent suppression of Libor by each panel bank, Libor's material divergence from other benchmarks that it should have tracked, and Defendants' own statements all demonstrate their intentional manipulation.

**C.    Defendants Breached the Terms of Their Swap Contracts**

288.    The terms of Plaintiffs' swap contracts with Defendants are set forth in the Exhibits and are also summarized in the Counts below.  The contractual relationships between Plaintiffs and each relevant Defendant followed the same pattern.  The swaps in particular were documented under ISDA Master Agreements.

289.    ISDA Master Agreements are market-standard agreements that provide a common set of terms to be used in a series of swaps between two parties.[85]  The parties may customize the

---

[85]    As documented in Exhibits B-D, the Schedules to the ISDA Master Agreement with Defendant Citi specified that New York law would govern while the Schedules to the ISDA Master Agreements with Defendants JPMorgan and RBC specified that Pennsylvania law would govern.

ISDA Master Agreement through use of a Schedule, which contains elections, additions, and amendments.  While the ISDA Master Agreement sets the general terms of a relationship, a Confirmation is used to document a particular transaction.  The Confirmation supplements and forms part of the ISDA Master Agreement between the two parties.

290.    Confirmations for the interest rate swaps involved here (detailed in the Exhibits) provided that the banks were to pay the "Floating Amount," calculated by a "Calculation Agent" with reference to 3-month USD Libor.  Either the Confirmations or the Schedules to the ISDA Master Agreements involved here specified that each relevant Defendant would act as "Calculation Agent" for its interest rate swaps with Plaintiffs.  As that term was defined, the Calculation Agent was to calculate its floating-rate payments "in good faith and in a commercially reasonable manner."  Defendants breached such terms, and others, in each of their respective agreements when floating payments were calculated not based on Libor as properly calculated, but based on knowingly manipulated and suppressed Libor rates.

291.    The ISDA Master Agreements also have a term requiring that each party "comply in all material respects with all applicable laws . . . to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement."  Defendants breached such terms, and others, in each of their respective agreements when they violated numerous laws by manipulating, and colluding to manipulate, Libor.  For example, on June 27, 2012, the DOJ stated that "[f]or years, traders at Barclays encouraged the manipulation of LIBOR and EURIBOR submissions in order to benefit their financial positions; and, in the midst of the financial crisis, Barclays management directed that U.S. Dollar LIBOR submissions be artificially lowered.  For this illegal conduct, Barclays is paying a steep price."

292.    UBS entered into a non-prosecution agreement with the DOJ while its subsidiary, UBS Securities Japan Co. Ltd., pleaded guilty to felony wire fraud for manipulating JPY Libor and Tibor.  In addition, two senior UBS traders—Tom Hayes and Roger Darin—were charged in a criminal complaint alleging conspiracy and antitrust violations based on the same misconduct. According to Assistant Attorney General Lanny A. Breuer, "[t]he scheme alleged is epic in scale."  Breuer added that the "agreement by UBS Japan to plead guilty, the charges against individual alleged perpetrators of these crimes, and our agreement recognizing the steps being taken by UBS AG to right itself demonstrate the Justice Department's determination to hold accountable those in the financial marketplace who break the law."

293.    Similarly, RBS Securities Japan Limited, pleaded guilty to felony wire fraud based on its manipulation of JPY Libor.  As part of a deferred prosecution agreement, the DOJ also filed a criminal information charging RBS with wire fraud and antitrust violations for its role in manipulating JPY and CHF Libor.  As discussed above, UBS and RBS engaged in the same misconduct with respect to USD Libor, and thus broke numerous laws due to their manipulation of USD Libor as well.

294.    Each relevant Defendant's conduct also breached its implied duty of good faith and fair dealing that is a part of its contractual relationships with the City of Philadelphia and PICA.  The Libor suppression allowed Defendants to reap windfall profits, first calculating and then paying artificially low floating rates substantially below the fixed rates owed by Plaintiffs. Finally, Defendants committed fraud-by-omission, by entering into swaps in which they would make payments based on USD Libor and then making lower payments than it should have, without disclosing that USD Libor was being and would continue to be manipulated and suppressed.

**D.**     **Defendants' Collusion Harmed Competition and Caused Antitrust Injury to The City of Philadelphia and PICA**

295.     Plaintiffs suffered antitrust injury as a result of the anticompetitive aspects of Defendants' conduct.

296.     Defendants are direct competitors and separate, profit maximizing entities, that are expected to act unilaterally in the marketplace as independent centers of decision making— all for the benefit of consumers.  Defendants are expected to compete in the market, including by competing to offer more attractive terms to investors.

297.     Pursuant to their agreement, however, Defendants restrained themselves from acting independently in favor of concerted action intended to maximize their financial interests in a way they could not have achieved unilaterally.  Defendants' agreement jointly to restrain their conduct was intended to, and had the effect of, tampering with price structures in the market, including by directly affecting the payments due, and net payments due, under the swaps at issue in this matter.  Defendants knew that their conduct would have the immediate effect of inflating the payments they would receive from investors on existing financial instruments while decreasing the payments their counterparties would receive.  Rather than competing, Defendants chose to work together—and to jointly keep their scheme secret—to inflate prices and reap profits they could not otherwise have achieved.

298.     Absent collusion it would have been in the unilateral self-interest of an individual bank to report that the other banks were artificially suppressing their Libor submissions, once the bank learned what was occurring, and not to engage in that behavior itself.  As a result of Defendants' conspiracy, however, this did not occur, and the City of Philadelphia, PICA, and other investors suffered significant financial losses as a result.

299.    Defendants are direct, horizontal competitors with respect to the sale of Libor-based instruments, and Libor is a central component of the price of such instruments.  Thus, Defendants' anticompetitive conduct had severe adverse consequences on competition in that Plaintiffs' payments under the swaps were directly affected by Defendants' horizontal price-fixing and their failure to compete.  As a result, the City of Philadelphia and PICA were injured in its business and property in the form of significant financial losses.

300.    As the DOJ charged RBS on April 12, 2013, and RBS admitted, by colluding to fix Libor, Defendants conspired to fix the price of Libor-based instruments, which was a conspiracy "in unreasonable restraint of interstate and foreign commerce":

> From at least as early as 2007 through at least 2010, **_Defendant THE ROYAL BANK OF SCOTLAND PLC, through its employees, and its co-conspirators, engaged in a combination and conspiracy in unreasonable restraint of interstate and foreign commerce_**.  The aforesaid combination and conspiracy consisted of an agreement, understanding and concert of action among the Defendant and its coconspirators, the substantial terms of which were to fix the price of Yen LIBOR-based derivative products by fixing Yen LIBOR, a key component of the price thereof, on certain occasions.

> In violation of Title 15, United States Code, Section 1.

RBS Information (Apr. 12, 2013) (emphasis added).

301.    The DOJ also charged a former UBS employee, Thomas Hayes, with violating the Sherman Act by conspiring to fix JPY Libor as a component of price of Libor-based instruments. *See* Hayes-Darin Complaint at 3 ("The aforesaid combination and conspiracy consisted of an agreement, understanding, and concert of action among HAYES and his co-conspirators, the substantial terms of which were to fix Yen LIBOR, a key price component of Yen LIBOR-based derivative products.").

302.    Defendants used Libor as the floating component of price on trillions of dollars of financial instruments.  Defendants' collusive manipulation of Libor therefore directly affected a

component of the price of these instruments.  Thus, after entering into the interest rate swaps in question from Defendants, Plaintiffs performed under instruments whose value was reduced by Defendants' collusive suppression of a component of their price.

303.    As noted above, the DOJ charged RBS with price-fixing in violation of the Sherman Act and RBS admitted to the underlying facts.  By letter dated March 22, 2013, the Department of Justice notified entities that entered into transactions with RBS that they may be victims of and may have been harmed by an antitrust violation by RBS, explaining:

> RBS and RBSSJ [RBS Securities Japan Limited] admit that certain RBS and RBSSJ traders attempted to manipulate and manipulated certain Yen and Swiss Franc LIBOR fixings on certain dates from 2006 through 2010 to benefit their trading positions in derivatives contracts to the detriment of counterparties to those contracts. ***RBS also admitted that certain traders conspired to fix prices*** in connection with Yen LIBOR from 2007 through 2010.  To the extent RBS or RBSSJ traders were successful in manipulating Yen and/or Swiss Franc LIBOR, ***other parties to derivatives contracts, mortgages, loans, and/or credit cards that were tied to manipulated LIBOR rates also may have been harmed***.

The DOJ's actions reflect the fact that Defendants' misconduct was the type of which the antitrust laws were designed to prohibit and may have harmed those persons who entered transactions at the fixed price.

304.    Thus, the City of Philadelphia and PICA paid more, received less, or both, on financial instruments tied to Libor than they would have absent a conspiracy among horizontal competitors to fix prices.  Due to that conspiracy, the City and PICA also paid much more than they should have when they terminated the swaps.  This harm is the result of a naked restraint of trade that lies at the most fundamental concerns of the antitrust laws.

305.    Defendants' collusion also restrained competition as to the benchmark in floating-rate financial products.  In a free and competitive market, Defendants would have competed

vigorously as to the benchmark used to calculate the floating component of price on various financial products to provide the best and most competitive products to their customers.

306.    As noted by this Court, "LIBOR is a proxy for the interbank lending market; indeed, it is precisely because LIBOR was thought to accurately represent prevailing interest rates in that market that it was so widely utilized as a benchmark in financial instruments." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 692 (S.D.N.Y. 2013).  But because of Defendants' collusion, Libor no longer accurately reflected the competitively determined outcomes of the interbank lending market during the Relevant Period.  Knowing that their collusion meant that Libor no longer served the function it was supposed to serve, Defendants in a competitive market would have competed to use alternative benchmarks that more accurately and reliably reflected actual competitive forces in the market.

307.    Defendants, however, did not do this because they wanted to preserve the centrality of Libor rather than some other benchmark precisely because Defendants controlled Libor and could collude to manipulate it for their own ends.  According to a press report, in November 2008, in response to complaints about Libor manipulation, the BBA "drew up plans to license Libor to an independent third party that would pay a fee to administer the rate instead of the BBA."[86]

308.    This proposal was rejected by Defendants because "when BBA staffers pitched the idea to industry executives, they got the impression that the big banks—which paid most of the BBA's bills through their membership fees—wanted Libor kept in-house so that they could

---

[86]   David Enrich & Max Colchester, *Before Scandal, Clash over Control of Libor*, Wall St. J., Sept. 12, 2012.

continue to influence it, according to people familiar with the talks."[87]  By restraining

competition as to the benchmark used to calculate the floating component of price, Defendants

were able to maintain the dominance of Libor—a benchmark that they controlled and could

collusively manipulate for their own ends, whether to generate profits for their trading books, to

bolster their reputations in times of financial stress, or some other end.

309.    Competitive market forces should have eliminated the use of Libor financial

instruments.  But that did not happen.  Instead, Libor remained the dominant benchmark for

financial instruments sold by Defendants during the Relevant Period, including the interest rate

swaps at issue, due to their collusion.

310.    Defendants' conduct also restrained competition as to creditworthiness given that

Libor submissions reflect perceived creditworthiness.  As the DOJ explained, and UBS admitted:

> Because a bank's LIBOR contributions, even if they are not based entirely on actual
> money market transactions, should correspond to the cost at which the bank perceives
> that it can borrow funds in the relevant market, a bank's LIBOR contributions may be
> viewed as an indicator of a bank's creditworthiness.  If a bank's LIBOR contributions
> are relatively high, those submissions could suggest that the bank is paying more than
> others to borrow funds.  Thus, a bank could be perceived to be experiencing financial
> difficulties because lenders were charging higher rates to that bank.

UBS SOF ¶ 99.

311.    Libor reflected the creditworthiness of all large banks by acting as a measure of

the stress faced by the financial system as a whole.  As the BBA stated: "BBA LIBOR rates are

calculated daily from the rates at which banks will agree to lend each other money, so it is

---

[87]  *Id.*

accepted as an accurate barometer of how global markets are reacting to prevailing market conditions."[88]

312.    In a competitive market, Defendants would compete with their peers, including other panel banks and all market participants, as to their perceived creditworthiness.  Greater perceived creditworthiness benefits a bank in many ways, including in the market for Libor-based instruments.  Similarly, weak perceived creditworthiness can lead to lower ratings, collateral calls, and other negative actions.

313.    Defendants who could truthfully post lower Libor submissions would have had a competitive advantage over Defendants who could not truthfully post lower Libor submissions because of Libor's importance as an indicator of a bank's creditworthiness.  In a free and competitive market, then, each Defendant would have competed to appear more creditworthy than other panel banks through the posting of lower truthful Libor submissions, and the stronger banks would not have tolerated artificially low Libor submissions from the weaker banks.

314.    During the Relevant Period, however, Defendants restrained competition among the banks for the best market perception of their creditworthiness.  Instead of competing with each other to post the lowest but accurate Libor submissions, they conspired to post artificially low Libor submissions as a "pack," which reduced the differences between their relative creditworthiness.

315.    The more creditworthy banks did not force the less creditworthy banks to post accurate Libor submissions so that the less creditworthy banks could be revealed as weaker, permitting the stronger banks to take their business.  Instead, the stronger banks acceded to the

---

[88]    BBA, *Understanding BBA Libor—a briefing by the British Bankers' Association*, http://www.bbalibor.com/download/1191.

weaker banks' making of falsely low Libor submissions and lowered their own Libor submissions as well.  The stronger banks did so because the artificially low Libor enabled them to reap huge trading profits.  By lowering their own Libor submissions, the stronger banks reduced the reputational costs caused by other banks suppressing Libor quotes.

316.    The restraint of competition as to creditworthiness harmed Plaintiffs by enabling the collusive suppression that occurred.  Had Defendants competed vigorously over their creditworthiness by striving to make the lowest but accurate Libor submissions relative to the competition, the suppression conspiracy could never have happened in the first place.

317.    In addition to being a naked and *per se* unlawful restraint of trade, Defendants' conspiracy was also anticompetitive under the rule of reason.

318.    During the Relevant Period, there were markets for the sale of Libor-based instruments, including for the interest rate swaps at issue.  Defendants have market power in the market for interest rate swaps.  As panel banks for USD Libor, Defendants had the ability to control and exercised control over USD Libor.

319.    Defendants' control over Libor meant that they were able to suppress Libor and cause the payments made under the interest rate swaps to be higher than they should have been as a result of Defendants' failure to compete, as well as to cause the other injuries and anticompetitive effects identified above.  Defendants' ability to cause supracompetitive payments in the swaps market demonstrates their market power.  In addition, Defendants' agreement to exchange confidential, pre-publication Libor quotes also caused supracompetitive payments in the swaps market, and the other injuries and anticompetitive effects identified above.

## V.     **PLAINTIFFS' CLAIMS ARE TIMELY.**

### A.     **No Limitations Period Could Begin Until Defendants' Last Bad Act**

320.     Defendants' misconduct occurred and continued on a daily basis with each false submission to the BBA.  Each false submission artificially lowered Libor, reducing the Libor-based payments to which Plaintiffs were entitled under the swaps.  Because Libor remained suppressed when Plaintiffs terminated the swaps, they were forced to pay inflated termination fees.  Plaintiffs would not have been harmed to the extent they were, had Defendants' wrongs been only a few isolated acts.  Rather, it was the sustained suppression of Libor over a multi-year period that inflicted heavy losses on Plaintiffs.

321.     The acts of manipulation described herein were not carried out by individuals, but through a conspiracy between and amongst, among others, the panel banks.  Such collusion was necessary because of the way Libor is calculated and has been confirmed by government investigations, as discussed above.  Collusion was also necessary in that it kept the panel banks from engaging in a race to the bottom, and instead allowed them to agree upon a level of suppression that would maintain a façade of reliability for Libor as a benchmark.  Defendants committed numerous overt acts in furtherance of their conspiracy, including making false submissions to the BBA and actively concealing their misconduct by, among other things, making false or misleading public statements concerning Libor.

322.     These facts require the tolling of any otherwise-applicable statute of limitations until, at the very earliest, the occurrence of Defendants' last bad act.  In actuality, however, any statutes of limitations applicable to Plaintiffs' claims did not begin to run until much later.  In addition, the applicability of a statute of limitations to state instrumentalities, including PICA, is limited by the doctrine of *nullum tempus occurrit regi* and similar common law doctrines and statutory provisions.

**B.     No Limitations Period Could Begin Until the Termination of the Swaps**

323.     Each of the swaps was a continuing contract under which Plaintiffs and Defendants were required to exchange periodic Libor-linked payments over a period of months or years, until the expiration or early termination.  Thus Defendants' continuous suppression of Libor over a period of years generated a continuing and accumulating shortfall between the amount of Libor-linked payments owed to, and actually paid to, Plaintiffs.

324.     These facts require the tolling of any otherwise-applicable statute of limitations until, at the very earliest, the termination of the swaps.

**C.     Inquiry Notice, Equitable Tolling, and Fraudulent Concealment**

325.     In actuality, however, any statutes of limitations applicable to Plaintiffs' claims did not begin to run until much later.[89]  This is because during the Relevant Period, Defendants effectively, affirmatively, and fraudulently concealed their wrongful acts from Plaintiffs and the public.  Plaintiffs did not know, nor could it reasonably have known, facts indicating that Defendants were engaging in intentional misconduct that caused Libor to be artificially depressed until, at the earliest June 2012, when the settlements with Barclays were made public.

**1.     Defendants' wrongful conduct was self-concealing**

326.     Defendants' conspiracy to share information about, and to coordinate, their individual Libor submissions and to misrepresent their borrowing costs to the BBA was, by its very nature, self-concealing, and Defendants made every effort to ensure it remained concealed.  Defendants' efforts to suppress Libor only worked as long as they did because they were and remained hidden.

---

[89]  *See also* ¶ 321.

327.     Regulators have emphasized the secretive nature of Defendants' conspiracy.  In its findings against UBS, for example, the FSA stated that:  "[t]he misconduct was extensive and widespread" and included "an unquantifiable number of oral requests, which by their nature would not be documented."[90]  In fact, traders were strongly encouraged to make their requests verbally, as at UBS, where a submitter who received an internal transmission of a written request complained to the trader's manager that such requests should not be made in writing.  UBS SOF ¶ 38.  For this same reason, Rabobank grouped submitters on the same desks as traders—so that oral requests to manipulate Libor could be made more easily.  Rabobank CFTC Order at 2-3.

328.     In addition, Defendants' Libor submissions were not made based on objective metrics observable to market participants.  This fact, combined with the general opacity of the interbank loan market *and* with the highly confusing and unreliable condition of the market during the height of the financial crisis during 2008, made the self-concealing nature of Defendants' scheme all the more pronounced.  As a result of these factors, no reasonable investor would have had any reason to conclude that any discrepancies between Libor and other measures of Defendants' borrowing costs were due to Defendants' intentional efforts, rather than market disruption or other factors.

## 2.     Defendants actively concealed their misconduct and deflected any and all concerns that were sporadically raised

329.     Defendants also engaged in affirmative acts to conceal their misconduct.  As a result, even extremely sophisticated market participants were unaware that this misconduct was occurring.  As noted at the outset of this Complaint, the former Chairman of the United States

---

[90]   Financial Services Authority, FSA/PN/116/2012, *UBS Fined £160 Million for Significant Failings in Relation to LIBOR and EURIBOR* (Dec. 19, 2012), available at http://www.fsa.gov.uk/library/communication/pr/2012/116.shtml.

Federal Reserve, Alan Greenspan, has commented:  "Through all of my experience, what I never contemplated was that there were bankers who would purposely misrepresent facts to banking authorities.  You were honor-bound to report accurately, and it never entered my mind that, aside from a fringe element, it would be otherwise."

330.    Defendants, in conjunction with the BBA, actively denied the existence of a conspiracy and engaged in a campaign of misinformation to mask the widespread, systematic suppression that was occurring.  On August 10, 2007, for instance, the BBA issued a press release explaining that "[c]entral banks (such as the Bank of England, the US Federal Reserve and the European Central Bank) may fix official base rates monthly, but BBA LIBOR reflects the actual rate at which banks borrow money from each other."[91]

331.    On November 29, 2007, a Barclays manager contacted a representative of the BBA to advise that USD "LIBORs are being set lower than where they ought to be" and informed the BBA that this issue applied to all of Defendants.  The Barclays manager stated that Defendants were submitting rates that were too low because "banks are afraid to stick their heads above the parapet and post higher numbers because of what happened to [Barclays] when [Barclays] did.  You get shot at."  The Barclays manager identified certain other Defendants that were submitting Libor rates lower than where those banks could actually borrow funds.  In order to protect its members, however, the BBA kept this information from the public.  It was only released much later, in connection with Barclays' settlement agreements.

332.    The BBA's Foreign Exchange and Money Markets Committee—which was responsible for the functioning and development of Libor and counted certain of Defendants among its members—likewise covered up Defendants' fraudulent and collusive scheme.  UBS's

---

[91] BBA, *Key Facts About BBA LIBOR* (Aug. 10, 2007).

representative on the Foreign Exchange and Money Markets Committee in 2009, for instance, knew that Libor was being rigged but directed employees to "be careful" not to expose Defendants' wrongdoing.  On May 19, 2008, the Committee held a meeting, although it officially refused to confirm that fact.[92]  According to Bank of England Deputy Governor Paul Tucker, who spoke to Angela Knight of the BBA, the meeting was intended as a "working level pre meeting," but nonetheless the BBA was inclined to conclude that "no change [was] needed substantively, although some recognition of perceptions problem."[93]

333.    Indeed, on June 6, 2008, the *New York Times* reported that the BBA determined at its May 30, 2008 meeting that "there would be no immediate change to the process used to determine [Libor]," but instead "all the trade body would commit to was strengthening its oversight of Libor—saying it would give more details in due course."[94]  On May 31, 2008, Angela Knight confirmed the results of the meeting for Paul Tucker, explaining that "we merely confirmed existing panels and then said we would be giving details of strengthened governance in due course."[95]  The same day, Bank of England Governor Mervyn King informed Tucker and Michael Cross, another Bank of England official, that he believed BBA's general intent to "strengthen[] the oversight of BBA Libor" was a "wholly inadequate" response.[96]

---

[92] E-mail from Angela Knight to Paul Tucker (dated May 21, 2008).

[93] E-mail from Paul Tucker to Michael Cross et al. (dated May 28, 2008).

[94] New York Times, *INTERNATIONAL: Libor Process* (June 6, 2008), available at http://www.nytimes.com/2008/06/06/news/06iht-6oxan-LIBOR.13532018.html.

[95] E-mail from Angela Knight to Paul Tucker (dated May 31, 2008).

[96] E-mail to "Governors - GPS" with handwritten notes (dated May 31, 2008).  *See also* Jesse Westbook and Gavin Finch, *BOE Wanted Its Name Off Libor Review Over Governance Issues*, Bloomberg (July 20, 2012), available at http://www.bloomberg.com/news/2012-07-20/boe-didn-t-want-its-name-on-libor-review-over-governance-issues.html ("King had said in a note dated May 31 that the BBA's initial proposals seemed 'wholly inadequate.'").

334.   On June 5, 2008, Cross sent an e-mail noting that he "sent comments to the BBA . . . (1) urging them to consult on governance and policing and (2) asking them to remove direct and indirect references to the Bank of England from" a forthcoming consultation document.[97] On June 26, 2008, King told Tucker he should "'impress' on the BBA the 'need for greater energy' on the Libor review."[98]

335.   Because UBS and other Defendants made a concerted effort to hide their misconduct from regulators and the public, the FSA concluded that the "routine and widespread manipulation of the submissions was not detected by Compliance or by Group Internal Audit," despite five audits of the relevant business area during the Relevant Period.

336.   Defendants also concealed their misconduct from regulators through outright falsehoods.  For example, on March 5, 2008, the FSA asked Barclays what it was paying for funding in certain tenors and currencies.  A Barclays manager stated internally that he did not want to disclose that Barclays was borrowing USD "way over LIBOR" and would rather indicate that it was paying a rate equal to Libor.  A Barclays submitter agreed that if he responded with "the honest truth" it might open a "can of worms."  Barclays responded to the FSA that it was paying for twelve-month USD at Libor "flat," which was false.

337.   Even when regulators began to uncover evidence that Defendants were falsifying their Libor submissions, they did not immediately reveal that information to the public.  On April 11, 2008, for instance, a Barclays employee told an employee of the New York Federal Reserve that he was aware Defendants were making Libor submissions lower than what they were

---

[97] E-mail from Michael Cross to Bill Dudley et al. (dated June 5, 2008).

[98] Westbrook and Finch, *BOE Wanted Its Name Off Libor Review Over Governance Issues*.

actually paying and that "the ones that need the cash most put in the lowest, lowest rates."[99]  The

Barclays employee said that Barclays could not borrow money at the rates submitted by other

Defendants and that "if we can't borrow money at that rate . . . [t]hen no one else could really . . .

. I mean we, you-you know we speak to everyone that everyone else does so . . . [u]m, yeah it's,

it's quite, quite an uncomfortable feeling, and . . . I don't know if at some stage LIBORs will

correct themselves."  This information was not publicly disclosed until July 2012.[100]

      338.    Similarly, on October 10, 2008, a Barclays employee privately reported to the

New York Federal Reserve that its USD Libor submissions were "unrealistic."[101]  And on

October 24, 2008, another Barclays employee privately reported to the New York Federal

Reserve that USD Libor rates were "absolute rubbish," citing submissions by WestLB and

Deutsche Bank as being artificially low.[102]  The employee stated he was aware of banks that

were making Libor submissions that were below what they actually paid to borrow funds.

Again, none of this was revealed to the public until recently.

      339.    In a pair of internal audit reports released in March 2013, the FSA confirmed that

it actively monitored Libor and regularly communicated with the panel banks about their Libor

---

[99] New York Federal Reserve Bank, Unofficial Transcript, ID09274211, at 7 (Apr. 11, 2008), available at http://www.newyorkfed.org/newsevents/news/markets/2012/libor/April_11_2008_transcript.pdf.

[100] In its recent decision in *Carpenters Pension Trust Fund of St. Louis v. Barclays plc et al.*, 13-2678 (2d Cir. Apr. 25, 2014), the Second Circuit noted Barclays' concession at oral argument that Barclays' June 27, 2012 public disclosure of its settlements with regulators "was the (first) occasion that Barclays disclosed its false 2007-2009 submission rates." *Id.* at 13-14.

[101] New York Federal Reserve Bank, Unofficial Transcript of Telephone Call, BARC-MAY6-000091-97, at 95 (Oct. 10, 2008), available at http://www.newyorkfed.org/newsevents/news/markets/2012/libor/October_10_2008_transcript.pdf.

[102] New York Federal Reserve Bank, Unofficial Transcript of Telephone Call, BARC-MAY6-00098-100, at 000098, 000100 (Oct. 24, 2008), available at http://www.newyorkfed.org/newsevents/news/markets/2012/libor/October_24_2008_transcript.pdf.

submissions throughout the 2007 to 2009 period.[103]   During that time, the FSA amassed tens of

thousands of emails and other documents relating to the Libor submission process.  While the

vast majority of those documents were not publically available at the time, the FSA kept itself

apprised of the *Wall Street Journal* and *Bloomberg* articles from April and May 2008, as well

other public documents.[104]

340.   Despite this abundance of contemporaneous information, the FSA took no action

regarding Libor until years later.  The FSA did not even announce a formal investigation into the

rate-fixing process until May of 2010.[105]   And the results of the investigation, and the subsequent

enforcement actions by the FSA and other regulators, were not known to the public until 2012,

when the Barclays, UBS, and other settlements were finally revealed.

341.   That the FSA and other regulators did not become fully aware of the Defendants'

intentional misconduct until many years after the fact further confirms that investors like

Plaintiff, who did not have access to the FSA's volumes of non-public information—stood no

chance of gaining such knowledge.  Not only did Defendants and the BBA hide the fact that

Libor was being artificially manipulated, but they also actively misled investors and the public

by making false representations about the integrity of the Libor fixing process.  In 2008, the

BBA's "LIBOR Governance and Scrutiny" report stated that "[t]he BBA employs a full time

---

[103]   Internal Audit Report, A review of the extent of awareness within the FSA of inappropriate LIBOR submissions (March 2013) ("FSA Internal Audit Report"), available at http://www.fsa.gov.uk/static/pubs/other/ia-libor.pdf; FSA Internal Audit report, A review of the extent of awareness within the FSA of inappropriate LIBOR submissions, Management Response (March 2013) ("FSA Management Response"), available at http://www.fca.org.uk/static/documents/fsa-ia-libor-management-response.pdf.

[104]   *See* FSA Internal Audit Report at 45-46, 50, 53-54, 56-61, 63, and 72.

[105]   *See* Transcript, House of Commons, Oral Evidence Taken Before the Treasury Committee, July 16, 2012 at Q1085 (MDL No. 2262 Dkt. No. 209-8).

manager to supervise on a day-to-day basis all aspects of LIBOR calculation and dissemination to the marketplace.  The LIBOR manager works with a team of professionals both in-house and externally to ensure all processes operate to the highest standards."[106]  The report further explained that "Thomson Reuters . . . act[s] as the 'designated distributor' of BBA LIBOR rates. All contributions to the LIBOR rate-setting process are collected by Thomson Reuters, who currently perform[s] checking procedures, supervised by the LIBOR manager, on all the submissions before running the calculation and distributing the fixes."  Investors like Plaintiffs had no reason to disbelieve assurances by the BBA that Libor was not being manipulated.

342.    Defendants also engaged in a media campaign, characterized by the BBA as an "offensive," that was designed to avoid public scrutiny of their Libor submissions, particularly after a report was published in the *Wall Street Journal* in April 2008 questioning the accuracy of Libor at that time.

343.    On April 18, 2008, for instance, BBA director John Ewan denied that the rise in Libor after publication of the *Wall Street Journal* article was in any way related to increased scrutiny.  Instead, Ewan stated that he was "pretty confident" the jump in Libor rates "has been an effect of the market moving. . . . It's another stage in the evolution of this extremely strained market that we've been seeing since August last year."[107]

344.    On April 21, 2008, Dominic Konstam of Credit Suisse affirmatively stated that low Libor rates were attributable to the fact that U.S. banks, such as Citi and JPMorgan, had access to large customer deposits and borrowing from the Federal Reserve and did not need more

---

[106] BBA, *LIBOR Governance and Scrutiny* (Dec. 18, 2008), available at http://www.bbalibor.com/download/4025.

[107] Alistair Barr, *Libor Rate Jumps Again as Banking Group Accelerates Reviews*, MarketWatch (Apr. 18, 2008).

expensive loans from other banks:  "Banks are hoarding cash because funding from the asset-backed commercial paper market has fallen sharply while money market funds are lending on a short term basis and are restricting their supply."  Similarly, Jeffrey Rosenberg, head of credit strategy at Banc of America Securities, stated that variations in Libor were the result of the way Libor is calculated by the BBA.  Specifically, he said that the BBA approach "works when both overall bank risk is low and the dispersion of risks across banks is small . . . [which] is clearly not the case currently."  Through statements such as this, Defendants provided then-credible alternative explanations for low Libor rates (such as cash hoarding) that were plausible to investors.

345.    In an April 28, 2008 interview with the *Financial Times*, Konstam continued to defend Libor's reliability:  "Libor has been a barometer of the need for banks to raise capital. The main problem with Libor is the capital strains facing banks. . . . Initially there was some confusion that Libor itself was the problem, with talk of the rate being manipulated and not representative of the true cost of borrowing."  As a result of these statements, Credit Suisse misled investors to believe that low Libor rates were a function of readily available alternative sources of cash, which lessened the need for interbank borrowing, rather than any collusive effort to suppress Libor.

346.    In a May 16, 2008 Reuters report, JPMorgan made the assertion—which was highly plausible at the time—that the volatility in Libor rates was a reflection of the unfolding financial crisis:

> The Libor interbank rate-setting process is not broken, and recent rate volatility can be blamed largely on reluctance among banks to lend to each other amid the current credit crunch. *    *    *

> Everyone is funding at a similar level, but when credit conditions worsen and we have periods like this of unprecedented turmoil, the reality is there is not a single borrowing rate.

347.     JPMorgan further asserted that differences between Libor and other indices at that time could "largely be explained" by limitations that had existed since the inception of the Libor in 1984, and stated that the "main limitations of Libor are due more to lack of liquidity in the market rather than any bias in the fixing process."  JPMorgan further reported that the composition and "constituents" of the BBA Libor Panel consisted of "some of the best known and best capitalized banks in the world."  And therefore, "[i]n a market where significant credit tiering is evident, it seems plausible the BBA panel banks could enjoy an advantage in credit costs."  The research report further explained the reasons that the "Fed data" differed from Libor was owing to the fact that the BBA trims the highest and lowest quartile and averages the remaining rates, whereas the "Fed data is untrimmed and is likely to contain more outlying observations," thus tending to "pull" the Federal Reserve's daily published rate "above the BBA Libor level."  In that same report, Colin Withers of Citigroup claimed Libor was reliable because its methods were time-tested:  "the measures we are using are historic—up to 30 to 40 years old."  Other Defendants similarly attributed low Libor rates to market forces.  An April 2008 UBS report, for example, noted that "we don't even know if contributing banks are mis-pricing Libor in the first place.  Libor could be simply responding to the rise in other market rates."  A May 2008 Deutsche Bank report suggested that "Libor has developed different sensitivity to fundamental market risks (liquidity and credit) together with [a] separate idiosyncratic component which has not been as strong in the past."

348.     Adding to the confusion was a *Wall Street Journal* article published on May 2, 2008 suggesting that Libor was actually too *high*.  According to the article, Libor "remain[ed] unusually high compared with expected Federal Reserve interest rates, an indication that banks continue to hoard dollars."  The *Wall Street Journal* explained that "Fed officials attribute the

recent Libor rise to European banks' needing to borrow in dollars, because the pressure tends to slacken around midday in the U.S. when the European day ends" and described steps that the Fed was taking to "reduc[e] tensions in the Libor market."[108]

349.    Defendants quickly endorsed the theory that Libor was higher than it should be. For example, Terry Belton of JPMorgan posited that uncertainty surrounding the panel banks' credit losses, "along with balance sheet constraints, [wa]s weighing on Libor, leaving many banks anxious about potential future losses" and driving Libor up.

350.    Defendants continued to make assurances that the panel banks were making accurate submissions.  Belton posited that "the Libor fixing process is not broken; BBA Libor broadly reflects the borrowing costs of top tier large banks. . . . The main limitations of Libor are due more to lack of liquidity rather than any bias in the fixing process."  Mustafa Chowdhury of Deutsche Bank similarly asserted:  "there is little evidence that rate manipulation, if it exists, has been appreciably affecting the LIBOR fixing. . . . Collaboration among a large number of the survey banks to submit non-market-based quotes is also highly unlikely."

351.    On May 29, 2008, the *Wall Street Journal* published an article again raising questions about accuracy of Libor based on data over a short period in early 2008.  That article suggested that one "possibility" might be that some banks had understated their borrowing costs but stopped far short of demonstrating that this was a probability.  Rather, as the article acknowledges, "The Journal's analysis doesn't prove that banks are lying or manipulating Libor," and even if the Libor data that the banks were submitting in the Libor process were in

---

[108] Joellen Perry, Greg Ip & Carrick Mollenkamp, *Central Banks Ponder Dollar-Debt Rate*, Wall Street Journal, May 2, 2008.

"doubt" or "flawed," various other explanations for the observed data, which did not involve wrongdoing, were accepted at the time to be *at least* just as plausible.

352.    One explanation that the *Wall Street Journal* article itself offered for the observed data, which did not involve wrongdoing and which is consistent with explanations expressed by both the U.K.'s FSA and the BBA, is that "since the financial crisis began, banks have all but stopped lending to each other for periods of three months or more, so their estimates of how much it would cost to borrow involve a lot of guesswork."

353.    This explanation, considered plausible at the time, considered the "gap" observed in the *Wall Street Journal* article to be a byproduct of "structural issues in the Libor fixing process interacting with the deteriorating market conditions," rather than being the result of any wrongdoing.[109]   At the time, even the U.K.'s financial regulator held the view (even after the May 29, 2008 publication and consideration of *The Wall Street Journal*'s analysis and other analyses during the April and May 2008 time period), that "[t]he combination of deteriorating market conditions and structural issues in the LIBOR fixing process . . . caused dislocation completely independent of any [wrongdoing]."[110]

354.    As an additional explanation as to why this analysis did not lead one to conclude that "banks [were] lying or manipulating Libor," *The Wall Street Journal* explained that certain banks "have ample deposits and access to loans from the Federal Reserve, meaning they might not need to borrow at higher rates from other banks."[111]

---

[109] *See, e.g.*, FSA, "Internal Audit Report:  A Review of the Extent of Awareness within the FSA of Inappropriate LIBOR Submissions" ¶ 28 (2013), available at http://www.fca.org.uk/static/pubs/other/ia-libor.pdf.

[110] *Id*. ¶ 26.

[111] Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate*, Wall St. J. (May 29, 2008).

355.    The BBA and the panel banks continued their offensive to mislead investors after May 29, 2008.  That same day, a BBA spokesman stated:  "We have every confidence in the integrity of the BBA Libor-setting process and the accuracy of the figures it produces[.]"[112]  As for the panel banks, J.P. Morgan's head of global fixed-income strategy wrote that the *Wall Street Journal*'s "[m]ethodology is based on too high a risk-free rate which produces a large upward bias in the Journal's measure of bank borrowing costs."[113]  Citi falsely stated it continued to "submit [its] Libor rates at levels that accurately reflect [its] perception of the market."[114]  And HBOS likewise asserted its Libor quotes constituted a "genuine and realistic" indication of the bank's borrowing costs.[115]  All of these representations were false, and were designed to prevent investors like Plaintiffs from discovering that Libor was being rigged.

356.    On June 10, 2008, the BBA published a release titled "Understanding the construction and operation of BBA LIBOR—strengthening for the future," which sought to assure the public of Libor's integrity, and to dispel the notion that Libor rates were subject to manipulation.  The BBA claimed that this paper "represent[ed] the views of the Foreign Exchange and Money Markets Committee, many other members of the BBA and incorporates the overwhelming number of informed comments that the BBA has received."  Excerpts of the paper provided:

- "Since its inception in 1985, BBA LIBOR has enjoyed a reputation for accuracy.  However, just as the credit crunch has led to stress in the markets, and the breakdown

---

[112] Gavin Finch & Elliott Gotkine, *Libor Banks Misstated Rates, Bond at Barclays Says*, Bloomberg (May 29, 2008).

[113] *Banks May Be Understating Key Lending rate: Report*, Reuters (May 29, 2008), available at http://www.reuters.com/article/2008/05/29/us-banks-libor-idUSN2930208320080529.

[114] *Id.*

[115] *Id.*

of longstanding correlations in the pricing of assets, as a barometer of these markets, it has also been stressed.  This has led to discussion of some of the BBA LIBOR currency fixes—particularly the Dollar fix—within the financial community.  This proper discussion ***has overflowed into commentary in the media, and the BBA believes that it needs to correct a number of misunderstandings and misperceptions***.” (emphasis added)

- “The dispersion of [Libor] rates input by each bank is reflective of the credit conditions facing each bank on a daily basis.  For several years therefore the spread between the highest and lowest has been tight as the credit environment was benign.  ***An increase in dispersion rates has occurred since August 2007 as a consequence both of the greater credit costs in the bank market since the start of the credit crunch and the lack of liquidity***.” (emphasis added)

- “Credit crunch effects have ebbed and flowed on several occasions during the past months which in turn impact the LIBOR fix as it does other indicators. . . . ***These issues relating directly to the current environment will inevitably result in a volatility*** that is today more than that experienced in benign conditions.” (emphasis added)

- “***The argument is sometimes made that the U.S. Dollar fixing MUST be too low, otherwise there is apparent arbitrage.  This is in fact not correct***.  It is simply that the market is no longer offering a cost free arbitrage between the FX swap and cash transactions.” (emphasis added)

- “Differences between the London Euro Dollar rate and the domestic U.S. Dollar rates are **a reflection of existing market conditions, not necessarily a distortion in benchmarks**.” (emphasis in original)

The BBA also stated that there would be tighter scrutiny of the rates submitted by panel banks, and that any discrepancies in rates would have to be justified.[116]

357.    After conducting an investigation, the BBA declared that Libor had not been manipulated.  On August 5, 2008, the BBA published a “Feedback Statement” on Libor, reasserting that “***BBA LIBOR has been the subject of inaccurate and misconceived***

---

[116] BBA, *Understanding the Construction and Operation of BBA LIBOR—Strengthening for the Future: A Consultative Paper from the BBA* §§ 2.3, 2.4, 5.1, 6.8, 6.9, 7.3, 7.4, 8.7 (June 10, 2008), available at http://www.bba.org.uk/media/article/bba-announces-steps-to-strengthen-libor.

*commentary in some areas of the media and that this needs to be addressed*."[117]  The paper concluded that "contributing banks . . . were confident that their submitted rates were 'truly reflective of their perceived borrowing costs,'" and further that "**all contributing banks are confident that their submissions reflect their perception of their true costs of borrowing, at the time at which they submitted their rates**."[118]

358.    The BBA also publicly announced on April 17, 2008 it would expel any panel bank that deliberately submitted inaccurate Libor quotes.  But it never did so, leading the ordinary person to understand that, during the BBA's review, no bank was found to have been reporting inaccurate Libor rates.  The same day, the *Wall Street Journal* reported the BBA's announcement that it would conduct an "intensive review" of relevant data, but "the BBA doesn't believe banks have submitted false quotes."[119]  Thereafter, in nearly every article during 2008 in which the integrity of Libor was questioned, a BBA spokesperson was quoted stating the benchmark was valid and reliable.

> **3.    As a result of Defendants' conduct, no reasonable counterparty would have known of the probability that it had been injured by Defendants' joint suppression of Libor until June 2012**

359.    Libor's brief rise in September 2008 and the subsequent creation and expansion of liquidity and bailout facilities in the United States and globally made it difficult or impossible to discern signs of manipulation contemporaneously.  Consequently, Libor's movements from September 2008 to at least December 2009 were widely accepted as valid and incorporated into

---

[117] BBA, *Libor Consultation Feedback Statement* § 2.4 (Aug. 5, 2008), available at http://www.bba.org.uk/media/article/bba-libor-review-consultation-feedback-statement/latest-news (emphasis added).

[118] *Id.* § 3.19 (emphasis in original).

[119] Carrick Mollenkamp and Laurence Norman, *British Bankers Group Steps Up Review of Widely Used Libor*, Wall Street Journal (Apr. 17, 2008), available at http://online.wsj.com/news/articles/SB120838284713820833.

government, investor, and academic analyses in reliance on their integrity.  For example, through

at least December 2009 it was widely accepted that the spread between Libor and the OIS during

the Relevant Period was an appropriate index of interbank liquidity risk.

360.    A search of the academic literature on Libor after September 2008

overwhelmingly returns analyses accepting the integrity of Libor during this period.  Almost no

one suspected that Libor had been suppressed after September 2008, let alone by the magnitude

now apparent, and certainly not that it was attributable to the type of collusion that has since

come to light.

361.    Similarly, beginning in October 2008, financial reporting focused extensively on

the fact that Libor was at historic highs.  In light of the fact that Libor was at or near record

highs, a reasonable investor would not have suspected that banks were actively suppressing

Libor.

362.    Even before that period, an academic study in the respected *BIS Quarterly Review*

and published in March 2008 found no evidence of collusion or even manipulation in setting

Libor using data up to January 2008.  A study by Gyntelberg and Wooldridge states:

> If a majority of banks engaged in strategic behaviour, then trimming alone would not
> have mitigated the impact on the fixing.  That said, there is little evidence that this
> was the case.  In the US dollar market, the widening of Sibor and H.15 spreads over
> Libor is consistent with signalling [sic] by Libor contributor banks.  However, many
> of the banks on the US dollar Libor panel are also on the euro Libor panel, and there
> are no signs that signalling [sic] distorted the latter fixing.  Likewise, ***available data
> do not support the hypothesis that contributor banks manipulated their quotes to
> profit from positions based on fixings***.

363.    Instead the academics conclude:  "A deterioration in market liquidity, an increase

in interest rate volatility and differences in the composition of the contributor panels were the

main causes of the divergence."  These academics thus attributed the dislocation in Libor to

market factors peculiar to the financial crisis and idiosyncratic to the particular reporting banks.

364.     In 2009, another academic study published in the *BIS Quarterly Review* also found no evidence of manipulation as late as May 2008.  Notably, this study attempted to "extend" the *Wall Street Journal* study to ascertain whether Libor manipulation was occurring.  Abrantes-Metz *et al.* state:

> On May 29, 2008, the Wall Street Journal (the Journal) printed an article that alleged that several global banks were reporting unjustifiably low borrowing costs for the calculation of the daily Libor benchmark.  Specifically, the writers alleged that the banks were reporting costs that were significantly lower than the rates that were justified by bank-specific cost trend movements in the default insurance market. . . .
>
> In this paper, we extend the Journal's study and perform the following analyses: (a) a comparison of Libor with other rates of short-term borrowing costs, (b) an evaluation of the individual bank quotes that were submitted to the British Banker's Association (BBA), and (c) a comparison of these individual quotes to individual CDS spreads and market cap data.  We do so during the following three periods: 1/1/07 through 8/8/07 (Period 1), 8/9/07 through 4/16/08 (Period 2), and 4/17/08 through 5/30/08 (Period 3).  Furthermore, on April 17, 2008, the Wall Street Journal first published the news that the BBA intended to investigate the composition of these rates.
>
> Individual Libor quotes are analyzed from January 2007 through May 2008, while the level of the Libor itself is studied from 1990 using Bloomberg data sources.  After verifying that the patterns are essentially the same for the one month and three month Libor rates, we generally restrict our attention to the one month Libor.  We also study data on other market indicators, both at aggregate levels and for the individual Libor banks.  A few missing days are filled by linear interpolation. Our primary findings are that, while there are some apparent anomalies within the individual quotes, ***the evidence found is inconsistent with an effective manipulation of the level of the Libor*** [emphasis added].

365.     The upheaval in the markets, the lack of available data on interbank lending, and in particular the bailout facilities made available to the panel banks were widely understood to be the factors causing interest rates to behave anomalously during the Relevant Period, as almost every other economic indicator—from the price of crude oil, to the rate of inflation, to the interest rates on short-term deposits—did during the Relevant Period.  Thus, Libor was understood to be sending meaningful economic signals about the crisis rather than exhibiting signs of tampering.

366.     Because Defendants took affirmative steps to conceal their misconduct, no reasonable counterparty could have discovered facts indicating that Defendants were unlawfully manipulating Libor until, at the earliest, June 2012, when the Barclays settlement was announced.  It was not until the recent revelations from this settlement and others, as well as the news of arrests and indictments, that Defendants' misconduct began to come to light.  These revelations surfaced after a year-and-a-half intensive global probe that involved investigators and regulatory authorities from around the world, something that counterparties like Plaintiffs could not have done on its own.  Even today, the full scope of the conspiracy continues to evolve as investigations uncover additional evidence.

367.     For years after Defendants' and the BBA's denials were issued, there were virtually no indications that Libor manipulation had persisted beyond May 2008.  For example, even when government investigations into rate-setting misconduct first came to light, it was universally reported that the inquiry was focused on this early period.[120]

368.     In October 2008, the International Monetary Fund published a Global Financial Stability Report in which it noted that "[a]lthough the integrity of the U.S. dollar LIBOR fixing process has been questioned by some market participants and the financial press, it appears that U.S. dollar LIBOR remains an accurate measure of a typical creditworthy bank's marginal cost of unsecured U.S. dollar term funding."[121]

369.     Yet between December 2009 and March 2011 no news reports indicated even a suspicion that Libor had experienced continued manipulation.  If counterparties should have

---

[120] Brooke Masters et al. *Big Banks Investigated Over Libor*, Financial Times (Mar. 15, 2011), available at http://www.ft.com/intl/cms/s/0/ab563882-4f08-11e0-9c25-00144feab49a.html.

[121] International Monetary Fund, *Global Financial Stability Report* (Oct. 2008), available at http://www.imf.org/external/pubs/ft/gfsr/2008/02/pdf/chap2.pdf.

recognized signs that Libor was manipulated in late 2008 and 2009, one would expect there to be at least some discussion in the public record.  Instead, virtually no suspicions were aired.

370.    Counterparties could not have detected Defendants' Libor manipulation because the integrity of Defendants' submissions was within their exclusive knowledge:  only Defendants could know whether they were accurately reporting the rates at which they could borrow.

371.    The proof of Defendants' successful concealment of their misconduct is that even though, as discussed above, hundreds if not thousands of state and local governmental entities suffered losses due to the swaps that Wall Street banks pushed on them, none of these entities were aware that Defendants had rigged the key pricing term of these swaps—the Libor term—until recently.  Once these swaps began to go bad, many governmental entities tried to explore their legal options.  But, except in cases like Jefferson County, where there was evidence of overt bribery, those legal options were thought to be very limited.  It is only now that disclosures resulting from governmental investigations have established that Defendants were actively engaged in collusive price fixing, and in breaching the terms of their swap contracts by fraudulently manipulating the floating rate, have viable legal theories emerged for pursuing long-overdue redress for the harm suffered by governmental entities and, ultimately, their citizens.

> **4.    A study examining Defendants' stock prices in relation to questions regarding the accuracy of Libor in April or May 2008 confirms that no reasonable counterparty was on inquiry notice until much later**

372.    As further proof of the fact that no reasonable investor had reason to be on notice that Defendants were  actively suppressing Libor in 2008 or 2009, a study was recently conducted by a consulting expert engaged by class-action plaintiffs to determine whether Libor panel bank members suffered any significant stock losses in response to articles raising questions about Libor's accuracy in April or May 2008.  That study, conducted  in 2013, demonstrates that the articles did not affect stock prices, confirming that these articles were not in any way

sufficient to convey to investors that there was any basis upon which to conclude that panel banks were intentionally suppressing Libor, much less in a collusive manner.

373.    More specifically, the analysis tested the hypothesis that these articles implied to a person of ordinary intelligence, with at least 50% probability, that Libor was being manipulated.  The results of the analysis, as described more fully below, are that despite the possible negative financial consequences to the health of the banks, the markets did not react to the 2008 articles and only reacted slightly at most to the March 15, 2011 disclosure by UBS that it had received subpoenas in connection with a Libor manipulation by punishing Defendants' stock prices.  To the contrary, the only time that the stock prices of the Defendants decreased in a statistically significant way against a baseline index was in June 2012, when Barclays announced its settlement with governmental authorities.  The conclusion to draw from this is that the market, composed of highly sophisticated investors, did not seriously contemplate that the Defendants would have any exposure for Libor manipulation until June 2012 and consequently were not on inquiry notice of such a probability until that time.

374.    The analysis also inquired as to the kind of price reactions that would have occurred if typical market participants thought that Libor was manipulated with 50% or higher likelihood.  In other words, if the average investor were to expect that a bank had committed a fraud with a 50% or higher likelihood, the average investor would also expect this to impose significant costs on the offending banks such that the stock price of those banks would decline substantially to reflect the 50% or higher likelihood of paying significant damages.  Here, the recent settlements of Barclays, UBS, RBS, Rabobank, and Lloyds with regulatory authorities resulted in these defendants collectively paying almost $4 billion for Libor manipulation to government regulators alone.

375.   The *Financial Times* recently estimated that the currently-held Libor linked financial products have about $350 trillion in notional value in 2013.  Given these enormous dollar volumes of Libor-linked financial products, potential exposure to private claimholders could be many multiples greater than the government settlements.  Consequently, if the 2008 articles created an expectation, with at least a 50% likelihood, that banks had engaged in an illegal manipulation scheme with a possible cost of tens of billions of dollars each, the expectation is that each of the banks would suffer substantial stock losses when those articles were published.

376.   The analysis conducted a regression of the stock returns for each of the panel banks on the value-weighted stock market index and indicator variables on the dates of each of the 2008 articles as well as on the announcement of the UBS subpoenas in March 2011 and the Barclays settlement in June 2012.

377.   If the 2008 articles created an expectation of possible manipulation by Defendants for the average investor, the analysis is expected to show substantial stock price declines for each bank on at least some of the dates after controlling for the overall stock market index.  These stock price declines should result in statistically significant negative parameter coefficients for the indicator variables.

378.   The results, which have been publicly reported in detail, demonstrate that none of the 2008 articles are associated with any statistically significant negative stock price reactions for any of the defendant banks for which stock prices are available.  The only exception to this finding is HSBC and Bank of Tokyo on March 16, 2011, when their stock prices declined abnormally at 3% and 4.5% respectively.  However, these are the only banks that declined

statistically significantly on this date, which is approximately when UBS announced that it was being investigated for Libor irregularities.

379.    Further, the largest stock price reaction for the panel banks occurred on June 28, 2012, just after the $453 million Barclays settlement was publicly announced.  In reaction to this announcement, Barclays' stock price suffered a decline of almost 12%, resulting in a market cap decline of about $4.5 billion in a single day.  This stock price drop exceeded the settlement fine by about ten-fold, indicating likely additional future costs for Barclays such as settlements with private claimholders.  RBS also declined by a statistically significant 9.4% on June 28, 2012. The other panel banks collectively suffered a statistically significant 2.97% abnormal stock price decline on this day, thus recognizing some of the implications of the Barclays settlement for the other panel members at this time.

380.    Overall, the evidence that has been objectively reported supports Plaintiffs' assertion that they were not on inquiry notice of their injuries until June 2012 because none of the 2008 articles changed the expectations of the ordinary investor.  Based on this objective statistical evidence, the 2008 articles do not serve as inquiry notice.

> **5.     That the U.S. and U.K. governments continued to rely on Libor in 2008 and beyond further confirms that the 2008 articles did not place reasonable counterparties on inquiry notice**

381.    As further confirmation that the 2008 articles did not place reasonable investors on inquiry notice, both the U.S. and U.K. governments continued to rely on Libor in 2008 and throughout the Relevant Period.

382.    As an example, in July 2008, the U.K. Treasury utilized Libor in connection with its Special Liquidity Program despite evidence that 3-month Libor was declining.  That it continued to do so after articles suggesting suppression indicates that the Treasury had faith in Libor despite sporadic speculation concerning its accuracy.

383.    In late 2008, the U.S. Treasury caused the terms of Treasury-supported Small

Business Administration loans to change from "Prime, a domestic interest rate, to LIBOR."  The

U.S. Treasury also extended billions of dollars of loans on which it received Libor-based interest

payments:

- On December 31, 2008, the U.S. Treasury agreed to lend General Motors Corporation $13.4 billion based on "LIBOR +3%."

- On January 2, 2009, the U.S. Treasury agreed to lend Chrysler Holding LLC $4 billion based on "3% or 8% (if the company is in default of its terms under the agreement) plus the greater of a) three-month LIBOR or b) LIBOR floor (2.00%)."

- On January 16, 2009, the U.S. Treasury agreed to lend General Motors $884 million based on "LIBOR +3%."

- On January 16, 2009, the U.S. Treasury agreed to lend Chrysler Financial $1.5 billion based on "LIBOR + 1% for first year[,] LIBOR + 1.5% for remaining" term.

384.    Beginning in the second quarter of 2009, the FDIC, Federal Reserve and Treasury

agreed to extend Libor-based loans to financial institutions through TARP's Public-Private

Investment Program for Legacy Assets ("PPIP").

385.    During the period 2009-10, the U.K. Treasury issued Libor-based loans to the

Financial Services Compensation Scheme, which was established to repay the depositors of

failed banks.

386.    In her July 2010 Quarterly Report to Congress, the TARP Inspector General

explained that most TALF loans were tied to Libor, "a generally accepted short-term interest rate

standard."

387.    The above examples demonstrate that, given the continuing reliance on Libor by

the U.S. and U.K. governments, a reasonable investor would not have concluded that Libor was

being actively suppressed.

388.     Throughout the Relevant Period, Plaintiffs diligently sought to protect their investment interests, including by analyzing the swaps in question and their performance. Despite the exercise of active and reasonable diligence, however, Plaintiffs could not and did not uncover Defendants' misconduct due to the self-concealing nature of their scheme and their active efforts to hide it from the public.  For these reasons, any statute of limitations affecting or limiting the rights of action by Plaintiffs was equitably tolled.

D.      **The *American Pipe* Doctrine Applies to Plaintiffs' Claims**

389.     Numerous class actions have been filed on behalf of those who purchased financial products tied to Libor, including but not limited to:

- *FTC Capital GmbH v. Credit Suisse AG*, No. 11-cv-2613 (S.D.N.Y. filed April 15, 2011);

- *Carpenters Pension Fund of West Virginia v. Bank of America Corp.*, No. 11-cv-02883 (S.D.N.Y. filed April 27, 2011);

- *City of Dania Beach Police & Firefighters' Retirement System v. Bank of America Corp.*, No. 11-cv-3128 (S.D.N.Y. filed May 9, 2011);

- *Ravan Investments, LLC v. Bank of America Corp.*, No. 11-cv-3249 (S.D.N.Y. filed May 13, 2011);

- *Insulators & Asbestos Workers Local #14 v. Bank of America Corp.*, No. 11-cv-3781 (S.D.N.Y. filed June 3, 2011);

- *Mayor and City Council of Baltimore v. Bank of America Corp.*, No. 11-cv-5450 (S.D.N.Y. filed Aug. 5, 2011);

- *Gelboim v. Credit Suisse Group AG*, No. 12-cv-1025 (S.D.N.Y. filed Feb. 9, 2012);

- *33-35 Green Pond Road Associates, LLC v. Bank of America Corp.*, No. 12-cv-5822 (S.D.N.Y. filed July 30, 2012); and

- *Lieberman v. Credit Suisse Group AG*, No. 12-cv-6056 (S.D.N.Y. filed Aug. 8, 2012).

390.     Many of these complaints, including the *Baltimore* complaint, alleged causes of action for:  (a) violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act; and

(b) unjust enrichment and restitution.  Plaintiffs here likewise brings claims for violations of the Sherman Act, unjust enrichment, and restitution.  In addition, proof of Plaintiffs' other claims will require evidence of the same or similar wrongful acts as would proof of the claims asserted in *Baltimore* and other Libor class actions in the MDL proceeding.

1. Defendants Bank of America Corp., Bank of America, N.A., Barclays Bank plc, Citibank N.A., Citigroup Inc., Credit Suisse Group AG, Deutsche Bank AG, JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., Royal Bank of Canada, and UBS AG are also defendants in the Second Consolidated Amended Complaint filed in the *Baltimore* class action, No. 11-md-2262-NRB (S.D.N.Y. filed Sept. 10, 2013); the First Amended Class Action Complaint filed in the *Gelboim* class action, No. 11-md-2262-NRB (S.D.N.Y. filed April 30, 2012); and the (Corrected) Second Amended Consolidated Class Action Complaint filed in the *FTC Capital* class action, sub nom. *Metzler Investment GmbH v. Credit Suisse Group AG*, No. 11-md-2262-NRB (S.D.N.Y. filed Sept. 30, 2013).

391. Plaintiffs were originally included in the defined class in the class actions in the Libor MDL.

392. The City of Philadelphia and PICA reasonably and justifiably relied on the named plaintiffs in *FTC Capital* and other class actions in the Libor MDL proceeding to protect its rights, and it reasonably and justifiably relied on the class-action doctrines articulated in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and *In re WorldCom Securities Litigation*, 496 F.3d 245, 256 (2d Cir. 2007), and other similarly applicable doctrines, to satisfy the statutes of limitations and repose on its claims.

393.     Under *American Pipe*, all putative class members are treated as if they filed their own individual actions, until they either opt out or a certification decision excludes them. *American Pipe*, 414 U.S. at 255.

394.     Accordingly, the claims here are deemed to have been brought as of the date they or similar claims were brought in the related class actions, and therefore the *Baltimore* action and other Libor class actions tolled Plaintiffs' claims.

### E.     Tolling Under the Clayton Act

395.     In addition, the Clayton Act contains a tolling provision triggered whenever the United States institutes civil or criminal proceedings to prevent, restrain, or punish violations of the antitrust laws.  15 U.S.C. § 16(i).

396.     As noted above, on December 12, 2012, the DOJ filed a complaint charging Tom Hayes, a former trader for Defendants UBS and Citigroup, with a criminal violation of Section 1 of the Sherman Act.  Mr. Hayes' Yen Libor manipulation and Defendants' USD Libor manipulation were part of the same overarching conspiracy, which involved the same panel banks, the same means of submitting false rates, and the same objectives of boosting perceived financial health and profiting from derivative trading.  Because Plaintiffs' claims are "based in whole or in part on any matter complained of" in the December 12, 2012, complaint against Mr. Hayes, the Clayton Act tolls Plaintiffs' claims against Defendants beginning on December 12, 2012 and continuing to the present.

397.     Additionally, on February 5, 2013, the DOJ entered a deferred-prosecution agreement with RBS, in connection with which the DOJ filed a criminal information charging RBS with one count of wire fraud and one count of price-fixing in violation of Section 1 of the Sherman Act.  Because Plaintiffs' claims are "based in whole or in part on any matter

complained of" in the criminal information, the Clayton Act tolls Plaintiffs' claims against

Defendants beginning on February 5, 2013 and continuing to the present.

## FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)
### (BY PLAINTIFF THE CITY OF PHILADELPHIA AGAINST DEFENDANT CITI)

398. Plaintiffs reallege each allegation above as if fully set forth herein.

399. This count is brought by the City of Philadelphia against Defendant Citi.

400. The City entered into an ISDA Master Agreement with Defendant Citi dated

December 5, 2002, which is accompanied by a Schedule, a Credit Support Annex, and Swap

Confirmations as detailed in the Exhibits.

401. As detailed in Exhibit B, these agreements (the "Citi Agreements") collectively

required Citi to calculate and pay the City a Floating Amount determined in good faith and in a

commercially reasonable manner and based on a Libor untainted by manipulation.  Instead, Citi

knowingly paid, and Plaintiff unknowingly received, a Floating Amount that was artificially

suppressed, based on an artificially suppressed Libor that reflected neither the true costs of

borrowing in the London Interbank Market nor the definition of Libor.  The expectation that

Plaintiff would receive an untainted Floating Amount was integral to Plaintiff's decision to enter

into the Citi Agreements in the first place.  Indeed, the City entered into the Citi Agreements,

among other reasons, to receive payments based on a Libor rate set according to the terms of the

Libor definition, as opposed to the artificially suppressed Libor actually paid.

402. Citi knowingly breached and defaulted on the Citi Agreements through its

fraudulent conduct, its failure to disclose its fraudulent conduct and improper collusion with

other Defendants, its intentional misrepresentation and manipulation of Libor, and its making of

underpayments to the City based on the artificially suppressed Libor.

403.     As a direct and proximate result of Citi's breaches of the Citi Agreements, the City has suffered an economic loss and damages in an amount to be determined at trial, and is entitled to be placed in the same situation as if the Citi Agreements had been fully performed. The City seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps, including when it was forced to unwind.  The City has also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect its rights under the Citi Agreements.

### SECOND CAUSE OF ACTION
### (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)
### (BY PLAINTIFF THE CITY OF PHILADELPHIA AGAINST DEFENDANT CITI)

404.     Plaintiffs reallege each allegation above as if fully set forth herein.

405.     This count is brought by the City of Philadelphia against Defendant Citi.

406.     The Citi Agreements contained the provisions described above.  Implied in these agreements was a covenant that the parties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of the agreements.  Also implied was a promise by Citi that Libor would not be manipulated to Citi's benefit and to Plaintiff's detriment.

407.     Citi failed to perform its obligations in good faith under these agreements by knowingly, intentionally, and secretly suppressing Libor to reduce its payments under the swaps to its advantage at the expense of the City, and by negotiating settlement amounts to terminate one swap based on artificially suppressed Libor.  Citi knew that the City had entered into the swaps, and was willing to pay a termination fee for the swap in question, only in reliance on the integrity of Libor.  At the very least, Citi acted with reckless disregard for the interests of Plaintiff.

408.     As Citi knew, however, its manipulation of Libor deprived the City of the benefit of the bargain by causing payments to the City under the swaps to be much lower than they should have been and causing the City to make an inflated termination payment.  As a direct and proximate result of Citi's knowing, intentional, and bad faith violation of the Citi Agreements' implied covenant of good faith and fair dealing, the City has suffered damages in an amount to be determined at trial.  The City seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps, including when the City unwound one of the swaps and made an inflated termination payment.

**THIRD CAUSE OF ACTION**
**(BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**
**(BY PLAINTIFF THE CITY OF PHILADELPHIA AGAINST DEFENDANT**
**JPMORGAN)**

409.     Plaintiffs reallege each allegation above as if fully set forth herein.

410.     This count is brought by the City of Philadelphia against Defendant JPMorgan.

411.     The City entered into an ISDA Master Agreement with Defendant JPMorgan dated January 20, 2006, which is accompanied by a Schedule, a Credit Support Annex (as incorporated by Part 3(6) of the Schedule), and Swap Confirmations as detailed in the Exhibits. These agreements are collectively referred to as the "City-JPMorgan Agreements."

412.     Implied in the City-JPMorgan Agreements was a covenant that the parties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of the agreements.  Also implied was a promise by JPMorgan that Libor would not be manipulated to JPMorgan's benefit and to Plaintiff's detriment.

413.     JPMorgan failed to perform its obligations in good faith under these agreements by knowingly, intentionally, and secretly suppressing Libor and by negotiating settlement amounts to terminate swaps with the City based on artificially suppressed Libor.  JPMorgan

knew that the City was willing to pay a termination fee for the swap in question only in reliance on the integrity of Libor.  At the very least, JPMorgan acted with reckless disregard for the interests of Plaintiff.

414.    As JPMorgan knew, however, its manipulation of Libor deprived the City of the benefit of the bargain by forcing the City to make inflated termination payments.  As a direct and proximate result of JPMorgan's knowing, intentional and bad faith violation of the City-JPMorgan Agreements' implied covenants of good faith and fair dealing, the City has suffered damages in an amount to be determined at trial.  The City seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the bonds, including when the City was forced to unwind.

## FOURTH CAUSE OF ACTION
### (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING) (BY PLAINTIFF THE CITY OF PHILADELPHIA AGAINST DEFENDANT ROYAL BANK OF CANADA)

415.    Plaintiffs reallege each allegation above as if fully set forth herein.

416.    This count is brought by the City of Philadelphia against Defendant RBC.

417.    The City entered into an ISDA Master Agreement with Defendant RBC dated December 6, 2007, which is accompanied by a Schedule, a Credit Support Annex, and a Swap Confirmation as detailed in the Exhibits. These agreements are collectively referred to as the "RBC Agreements."

418.    Implied in the RBC Agreements was a covenant that the parties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of the agreements.  Also implied was a promise by RBC that Libor would not be manipulated to RBC's benefit and to Plaintiff's detriment.

419.     RBC failed to perform its obligations in good faith under these agreements by knowingly, intentionally, and secretly suppressing Libor and by negotiating settlement amounts to (partially) terminate one swap based on artificially suppressed Libor.  RBC knew that the City was willing to pay a termination fee for the swap in question only in reliance on the integrity of Libor.  At the very least, RBC acted with reckless disregard for the interests of Plaintiff.

420.     As RBC knew, however, its manipulation of Libor deprived the City of the benefit of the bargain by forcing the City to make inflated termination payments.  As a direct and proximate result of RBC's knowing, intentional and bad faith violation of the RBC Agreements' implied covenants of good faith and fair dealing, the City has suffered damages in an amount to be determined at trial.  The City seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps, including when the City was forced to (partially) unwind one of the swaps.

### FIFTH CAUSE OF ACTION
### (BREACH OF CONTRACT)
### (BY PLAINTIFF PICA AGAINST DEFENDANT JPMORGAN)

421.     Plaintiffs reallege each allegation above as if fully set forth herein.

422.     This count is brought by PICA against Defendant JPMorgan.

423.     PICA entered into an ISDA Master Agreement with Defendant JPMorgan dated December 6, 2001, which is accompanied by a Schedule, a Credit Support Annex, and Swap Confirmations as detailed in Exhibit E (collectively "PICA-JPMorgan Agreements").

424.     The PICA-JPMorgan Agreements collectively required JPMorgan to calculate a Floating Amount determined in good faith and in a commercially reasonable manner and based on a Libor untainted by manipulation. In some of the PICA-JPMorgan Agreements, JPMorgan paid PICA a floating rate based on Libor, and in the remainder of the Agreements, PICA paid JPMorgan a floating rate based on a formula tied to Libor and SIFMA.

425.     JPMorgan knowingly breached and defaulted on the PICA-JPMorgan Agreements through its fraudulent conduct, its failure to disclose its fraudulent conduct and improper collusion with other Defendants, its intentional misrepresentation and manipulation of Libor, and its collection of overpayments from and making of underpayments to PICA based on the artificially suppressed Libor.  The expectation that Libor would be untainted and unmanipulated was integral to Plaintiff's decision to enter into the PICA-JPMorgan Agreements in the first place.  Indeed, PICA entered into the PICA-JPMorgan Agreements, among other reasons, to receive payments based on a Libor rate set according to the terms of the Libor definition, as opposed to the artificially suppressed Libor actually paid.

426.     As a direct and proximate result of JPMorgan's breaches of the PICA-JPMorgan Agreements, PICA has suffered an economic loss and damages in an amount to be determined at trial, and is entitled to be placed in the same situation as if the PICA-JPMorgan Agreements had been fully performed.  PICA seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the swaps, including when PICA was forced to unwind some of the PICA-JPMorgan Agreements.  PICA has also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect its rights under the PICA-JPMorgan Agreements.

### SIXTH CAUSE OF ACTION
### (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)
### (BY PLAINTIFF PICA AGAINST DEFENDANT JPMORGAN)

427.     Plaintiffs reallege each allegation above as if fully set forth herein.

428.     This count is brought by PICA against Defendant JPMorgan.

429.     The PICA-JPMorgan Agreements contained the provisions described above. Implied in these agreements was a covenant that the parties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of the agreements.

Also implied was a promise by JPMorgan that Libor would not be manipulated to JPMorgan's benefit and to Plaintiff's detriment.

430.    JPMorgan failed to perform its obligations in good faith under these agreements by knowingly, intentionally, and secretly suppressing Libor to reduce its payments and increase PICA's payments under the swaps to its advantage at the expense of PICA, and by negotiating settlement amounts to terminate swaps with PICA based on artificially suppressed Libor. JPMorgan knew that PICA was willing to enter into the swaps, and then terminate at the negotiated amount, only in reliance on the integrity of Libor.  At the very least, JPMorgan acted with reckless disregard for the interests of Plaintiff.

431.    As JPMorgan knew, however, its manipulation of Libor deprived PICA of the benefit of the bargain by causing payments to and from PICA under the swaps that were much lower or higher than they should have been and forcing PICA to make inflated termination payments.  As a direct and proximate result of JPMorgan's knowing, intentional and bad faith violation of the PICA-JPMorgan Agreements' implied covenants of good faith and fair dealing, PICA has suffered damages in an amount to be determined at trial.  PICA seeks all losses caused by Libor suppression, including loss of interest, lost profits, and all losses on the bonds, including when PICA was forced to unwind its swaps.

## SEVENTH CAUSE OF ACTION
## (COMMON-LAW FRAUD)
## (BY PLAINTIFFS AGAINST ALL DEFENDANTS)

432.    Plaintiffs reallege each allegation above as if fully set forth herein.

433.    This count is brought by both Plaintiffs against all Defendants, for joint and several liability for all losses associated with all of the transactions identified in Exhibit A.

434.    Defendants were USD Libor panel banks throughout the Relevant Period and submitted false Libor submissions to the BBA on a daily basis.  The panel banks participated in the fraudulent conduct alleged herein both directly and through their subsidiaries and affiliates.

435.    Defendants made, authorized, or caused the following material misrepresentations and omissions:

a.  Defendants made, authorized, and caused false statements or omissions to be made to Plaintiffs to induce Plaintiffs to enter into the swaps.

b.  Each Defendant also made, authorized, or caused false submissions to be made to the BBA for the purposes of determining Libor.

c.  By their false submissions, each Defendant caused Libor to misrepresent actual panel bank borrowing rates.

d.  Each Defendant had a duty to disclose the manipulation of Libor to its counterparties and the public, including Plaintiffs, but omitted to do so.

e.  By their omissions and affirmative denials, each Defendant participated in concealing the falsity of its submissions and the manipulation of Libor from Plaintiffs and the public.

f.  Defendants misrepresented the basis of payments Plaintiffs would receive under the swaps, and omitted to disclose that the Floating Amounts would be calculated by reference to manipulated Libor.

g.  Defendants misrepresented the amount of the payments owed by Plaintiffs on early termination of the swaps, and omitted to disclose that the inflated amounts were calculated by reference to manipulated Libor.

436.     Defendants made these misrepresentations and omissions knowing that they were false or misleading, or with reckless disregard for their truth, in part to avoid detection and to perpetuate the fraudulent and collusive conduct described in this Complaint.

437.     Defendants had reason to expect that Plaintiffs were among the class of persons who would receive and rely on their misrepresentations, including the statements and omissions passed through the BBA to the investing public.

438.     Defendants had an obligation and a duty to disclose that they were artificially manipulating Libor, which directly and negatively impacted Libor-linked transactions between the Plaintiffs on the one hand, and Defendants on the other.  Such duties were triggered not only by the contractual relationship between the parties, but also by their exclusive knowledge over the true (manipulated) nature of Libor, among other things, submitting Libor bids to the BBA without disclosing they were suppressed and falsely denying any manipulation had taken place.

439.     Defendants knew or recklessly disregarded material facts demonstrating that their misrepresentations and omissions were false and/or misleading at the time they were made. Defendants further knew that they were failing to disclose material facts that they had a duty to disclose.  Defendants made the false and misleading statements with intent to induce the reliance of Plaintiffs and to defraud Plaintiffs.

440.     Defendants also were aware, or should have been aware, that those individuals and/or entities that executed the instructions contained in the Libor-linked securities or other investments involved in the Transactions ("Libor Third Parties")—such as those calculating, and making, the required interest payments to holders of Libor-linked bonds—would likewise rely upon the published Libor rates, and intended the Libor Third Parties to so rely.

441.    At the time these misrepresentations were made and the material facts not disclosed, Plaintiffs were ignorant of the true facts.  If Plaintiffs had known the truth, Plaintiffs would not have entered into the swaps, accepted or made payments calculated based on artificially low Libor, agreed to artificially inflated termination payments, or engaged in any other of the transactions triggered by such calculations.

442.    Plaintiffs and the Libor Third Parties reasonably and justifiably relied on Defendants' false representations and misleading omissions.  This includes the false submissions that each Defendant made on a daily basis, which was a necessary input for calculating Libor. Accordingly, Plaintiffs and the Libor Third Parties relied on *each* Defendant's false submission with respect to *each* swap transaction listed in Exhibit A—including those where another Defendant or a non-panel bank was counterparty.

443.    As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiffs entered into the swaps; traded in financial instruments linked to Libor and to other indices in reliance on Libor's integrity; made inflated payments (or received depressed payments) calculated in reliance on Libor's integrity; and/or entered into termination agreements for inflated consideration in reliance on Libor's integrity.  Again, because each Defendant's submission was a necessary input for calculating Libor, *each* Defendant caused the foregoing harm to Plaintiffs with respect to *each* swap transaction listed in Exhibit A—including those where another Defendant or a non-panel bank was counterparty.

444.    As a result of the foregoing, Plaintiffs have the right to rescissory damages; in the alternative to rescissory damages, Plaintiffs have suffered damages according to proof.  In addition, because Defendants' fraud was willful and wanton, and because, by their acts, they

knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiffs are entitled to recover punitive damages.

### EIGHTH CAUSE OF ACTION
### (AIDING AND ABETTING FRAUD)
### (BY PLAINTIFFS AGAINST ALL DEFENDANTS)

445.     Plaintiffs reallege each allegation above as if fully set forth herein.

446.     This count is brought by both Plaintiffs against all Defendants, for joint and several liability for all losses associated with all of the transactions identified in Exhibit A.

447.     Defendants aided and abetted the fraud and breaches of contract of the other panel banks.

448.     By falsifying its own Libor submissions, each Defendant gave substantial assistance to the other panel banks in their conspiratorial efforts to suppress Libor.

449.     By misrepresenting the integrity of Libor and omitting to disclose its manipulation, each Defendant gave substantial assistance to the other panel banks in their efforts to suppress Libor.Each of the Defendants knew of the fraud perpetrated by the other panel banks, including other Defendants.  Each knew of the representations and omissions made by the others. Each also knew that the representations and omissions made by each of the other Defendants were false and/or misleading at the time they were made.  The statistical evidence of suppression described above, including Libor's consistent failure to track the Fed Eurodollar Rate benchmark, analysis of Defendants' implementation of management directives to stay "in the middle of the pack" of Libor submissions, and Libor's sudden and sharp decline after the collapse of Lehman Brothers, strongly indicates collusion among the panel banks in making their Libor-determining submissions.  Furthermore, since Defendants lend to one another in the London Interbank Market, they should have been aware that each panel bank's Libor

submissions did not reflect the rates at which each panel bank could actually borrow U.S. dollars in that market.

450.    Each Defendant gave substantial assistance to and/or facilitated and encouraged each of the other panel banks in their fraud by colluding to artificially suppress USD Libor. Each Defendant's submission was a necessary input for calculation of the published Libor.  And, because Libor is calculated as an average and excludes outlier submissions, Defendants could not have manipulated Libor as they did without assisting one another.

451.    Plaintiffs reasonably and justifiably relied on Defendants' false representations and misleading omissions when entering into the swaps.

452.    As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiffs entered into the swaps; traded in financial instruments linked to Libor and other instruments in reliance on Libor's integrity; made inflated payments (or received depressed payments) calculated in reliance on Libor's integrity; and entered into termination agreements for inflated consideration in reliance on Libor's integrity.

453.    As a result of the foregoing, Plaintiffs have the right to rescissory damages; in the alternative to rescissory damages, Plaintiffs have suffered damages according to proof.  In addition, because Defendants' fraud was willful and wanton, and because, by their acts, they knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiffs are entitled to recover punitive damages.

### NINTH CAUSE OF ACTION
### (UNJUST ENRICHMENT/RESTITUTION)
### (BY PLAINTIFF THE CITY OF PHILADELPHIA AGAINST DEFENDANTS CITI, JPMORGAN, AND RBC)

454.    Plaintiffs reallege each allegation above as if fully set forth herein.

455.     This is a claim for unjust enrichment/restitution.  This count is brought by the City of Philadelphia against Defendants Citi, JPMorgan, and RBC (collectively, the "Counterparty Defendants") with respect to the role each of the foregoing played in the agreements with the City in which they served as a counterparty.

456.     By their wrongful acts and omissions, the Counterparty Defendants were unjustly enriched at the expense of and to the detriment of the City and have interfered with the City's protected interests.  As described above, the Counterparty Defendants knowingly acted in an unfair, unconscionable, and oppressive manner towards the City by suppressing Libor, and acted in conscious disregard of the City's rights.

457.     Through their unlawful conduct, the Counterparty Defendants knowingly received and retained wrongful financial and other benefits at the City's expense.  As a result of their unlawful conduct, the Counterparty Defendants have realized substantial ill-gotten gains by misreporting their borrowing costs, manipulating Libor, and receiving windfall trading profits.

458.     As a direct and proximate result of the Counterparty Defendants' unlawful and improper conduct, as set forth above, the Counterparty Defendants have been unjustly enriched, at the City's expense, and profited unjustly by receiving the fixed-rate leg of interest rate swaps while making artificially low payments on the floating-rate leg of the same swap due to Defendants' artificial suppression of Libor.  And as discussed above,  Defendants have also been unjustly enriched by receiving termination payments that were artificially inflated, as a result of the suppression of Libor.  As a result, the City has suffered damages.  The Counterparty Defendants' retention of funds under these circumstances constitutes unjust enrichment, as the Counterparty Defendants have no right to the benefits that were obtained through their unlawful conduct.

459.     The financial benefits that the Counterparty Defendants derived from their unlawful manipulation of Libor and other misconduct alleged above rightfully belong to the City.

460.     The City may have no adequate remedy at law for the Counterparty Defendants' misappropriated gains.  The Court should compel the Counterparty Defendants to disgorge to the City all unlawful or inequitable proceeds that the Counterparty Defendants received.  The City is also entitled to rescission of the transactions or rescissory damages with respect to the transactions.

461.     The Counterparty Defendants, along with the remaining Defendants, also acted in concert and entered into a civil conspiracy and corrupt agreement to manipulate and suppress their Libor submissions during the Relevant Period.  Accordingly, each Counterparty Defendant and Defendant is being sued both individually as a primary violator of the law, as stated in this Complaint, and as a co-conspirator, in obtaining the unjust enrichment alleged herein.

462.     The Counterparty Defendants and Defendants each committed numerous overt acts in furtherance of that conspiracy and agreement, as detailed above, including submitting false Libor quotes to the BBA on a daily basis, actively concealing their misconduct, by intentionally making false and misleading statements to the public, and/or directly to the City, about Libor's integrity, or by intentionally failing to disclose the material information that the Counterparty Defendants and Defendants were suppressing Libor.  The Counterparty Defendants and Defendants acted with malice, and intended to injure investors and the City through the actions described herein.

463.     Each Counterparty Defendant and Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it as set forth above.  Because each Counterparty Defendant's submission, and each Defendant's submission, was a necessary input for calculating

Libor, *each* Counterparty Defendant and Defendant caused the foregoing harm to the City with respect to *each* transaction in which the Counterparty Defendants (or a subsidiary or affiliate) served as a counterparty.

**TENTH CAUSE OF ACTION
(UNJUST ENRICHMENT/RESTITUTION)
BY PLAINTIFF PICA AGAINST DEFENDANT JPMORGAN**

464.     Plaintiffs reallege each allegation above as if fully set forth herein.

465.     This is a claim for unjust enrichment/restitution.  This count is brought by PICA against Defendant JPMorgan with respect to the role it played in the PICA-JPMorgan Agreements in which it served as a counterparty.

466.     By its wrongful acts and omissions, JPMorgan was unjustly enriched at the expense of and to the detriment of PICA and has interfered with PICA's protected interests.  As described above, JPMorgan knowingly acted in an unfair, unconscionable, and oppressive manner towards PICA by suppressing Libor, and acted in conscious disregard of PICA's rights.

467.     Through its unlawful conduct, JPMorgan knowingly received and retained wrongful financial and other benefits at PICA's expense.  As a result of its unlawful conduct, JPMorgan has realized substantial ill-gotten gains by misreporting its borrowing costs, manipulating Libor, and receiving windfall trading profits.

468.     As a direct and proximate result of JPMorgan's unlawful and improper conduct, as set forth above, JPMorgan has been unjustly enriched, at PICA's expense, and profited unjustly by receiving the fixed-rate leg of interest rate swaps while making artificially low payments on the floating-rate leg of the same swap due to Defendants' artificial suppression of Libor.  And as discussed above,  Defendants have also been unjustly enriched by receiving termination payments that were artificially inflated, as a result of the suppression of Libor.  As a result, PICA has suffered damages.  JPMorgan's retention of funds under these circumstances

constitutes unjust enrichment, as JPMorgan has no right to the benefits that were obtained through its unlawful conduct.

469.    The financial benefits that JPMorgan derived from its unlawful manipulation of Libor and other misconduct alleged above rightfully belong to PICA.  PICA may have no adequate remedy at law for JPMorgan's misappropriated gains.  The Court should compel JPMorgan to disgorge to PICA all unlawful or inequitable proceeds that the JPMorgan received. PICA is also entitled to rescission of the transactions or rescissory damages with respect to the transactions.

470.    JPMorgan, along with the remaining Defendants, also acted in concert and entered into a civil conspiracy and corrupt agreement to manipulate and suppress their Libor submissions during the Relevant Period.  Accordingly, JPMorgan and Defendants are being sued both individually as a primary violator of the law, as stated in this Complaint, and as a co-conspirator, in obtaining the unjust enrichment alleged herein.

471.    JPMorgan and Defendants each committed numerous overt acts in furtherance of that conspiracy and agreement, as detailed above, including submitting false Libor quotes to the BBA on a daily basis, actively concealing their misconduct, by intentionally making false and misleading statements to the public, and/or directly to PICA, about Libor's integrity, or by intentionally failing to disclose the material information that JPMorgan and Defendants were suppressing Libor.  JPMorgan and Defendants acted with malice, and intended to injure investors and PICA through the actions described herein.

472.    JPMorgan and Defendants were at all relevant times fully aware of the conspiracy and substantially furthered it as set forth above.  Because JPMorgan's submission, and each Defendant's submission, was a necessary input for calculating Libor, *each* of JPMorgan and

Defendants caused the foregoing harm to PICA with respect to *each* transaction in which the JPMorgan (or a subsidiary or affiliate) served as a counterparty

<div align="center">

**ELEVENTH CAUSE OF ACTION**
**(TORTIOUS INTERFERENCE WITH CONTRACT)**
**(BY PLAINTIFFS AGAINST ALL DEFENDANTS)**

</div>

473.    Plaintiffs reallege each allegation above as if fully set forth herein.

474.    This count is brought by both Plaintiffs against all Defendants for their intentional interference with Plaintiffs' contracts and agreements with other Defendants and non-parties as set forth in the Exhibits.

475.    The City of Philadelphia had valid, enforceable contracts with Citi, JPMorgan, RBC, Wachovia, and Merrill Lynch.  PICA had valid, enforceable contracts with JPMorgan.

476.    Each Defendant's fraudulent and unlawful conduct described above, including each Defendant's false Libor submissions, was an intentional interference with Plaintiffs' contracts with other Defendants and non-parties.  Defendants' misconduct interfered with and disrupted Plaintiffs' contracts by causing the securities and other investments Plaintiffs held to yield lower interest and other payments than Plaintiffs had bargained for.  Defendants' manipulation of Libor therefore interfered with Plaintiffs' rights to receive interest and other payments in accordance with their contracts, causing Plaintiffs injury and damage.

477.    As described above, by their regular dealings with Plaintiffs and others who dealt with Plaintiffs, Defendants knew that Plaintiffs had entered into financial instruments that incorporated Libor such as the swaps at issue here.  Defendants acted intentionally and with knowledge that their misconduct and wrongful acts would interfere with the Plaintiffs' contracts.

478.    As described above, Defendants acted solely out of malice and acted solely by dishonest, unfair, and improper means, including fraud or misrepresentation.

479.     Each Defendant's interference with Plaintiffs' contracts and agreements with other Defendants and non-parties injured Plaintiffs.  Because of Defendants' unlawful manipulation of Libor, Plaintiffs received lower payments (or made higher payments) on the swaps than Plaintiffs otherwise would have received and terminated certain swaps by paying inflated termination fees.

480.     As a direct and proximate result of Defendants' misconduct, Plaintiffs have suffered damages.  In addition, because Defendants' fraud was willful and wanton, and because, by their acts, Defendants knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiffs are entitled to recover punitive damages.

481.     Defendants also acted in concert and entered into a civil conspiracy and corrupt agreement to manipulate and suppress their Libor submissions during the Relevant Period. Accordingly, each Defendant is being sued both individually as a primary violator of the law, as stated in this Complaint, and as a co-conspirator, in the intentional interference with Plaintiffs' contracts.

482.     Defendants each committed numerous overt acts in furtherance of that conspiracy and agreement, as detailed above, including submitting false Libor quotes to the BBA on a daily basis, actively concealing their misconduct by intentionally making false and misleading statements to the public, and/or directly to Plaintiffs, about Libor's integrity, or by intentionally failing to disclose the material information that the Defendants were suppressing Libor.  The Defendants acted with malice, and intended to injure investors and Plaintiffs through the actions described herein.

483.     Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it as set forth above.  Because each Defendant's submission was a

necessary input for calculating Libor, *each* Defendant caused the foregoing harm to Plaintiffs with respect to *each* relevant transaction listed in the Exhibits.

### TWELFTH CAUSE OF ACTION
### (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS)
### (BY PLAINTIFFS AGAINST ALL DEFENDANTS)

484.     Plaintiffs reallege each allegation above as if fully set forth herein.

485.     This count is brought by both Plaintiffs against all Defendants for their intentional interference with Plaintiffs' business relations with other Defendants and non-parties as set forth in Exhibit A.  During the Relevant Period, Plaintiffs had business relations with issuers or sellers of Libor-based financial instruments, including Citi, JPMorgan, RBC, Merrill Lynch, and Wachovia.

486.     Defendants' fraudulent and unlawful conduct described above, including Defendants' false Libor submissions and fraudulent demands for payment and/or cash from Plaintiffs, interfered with and disrupted these business relations by defeating Plaintiffs' expectations that Libor would be set honestly and accurately and would provide a fair benchmark for the swaps and other Libor-based financial instruments.

487.     As described above, by their regular dealings with Plaintiffs and others who dealt with Plaintiffs, Defendants knew of Plaintiffs' business relations and acted intentionally and with knowledge that their misconduct and wrongful acts would interfere with and disrupt Plaintiffs' business relations.

488.     As described above, Defendants acted solely out of malice and acted solely by dishonest, unfair, and improper means, including fraud or misrepresentation.

489.     Defendants' misconduct injured Plaintiffs' business relations with other Defendants and non-parties.  Because of Defendants' unlawful manipulation of Libor, Plaintiffs

received lower payments (or made higher payments) on the swaps than Plaintiffs otherwise would have and paid an inflated termination fee on certain swaps.

490.    As a direct and proximate result of Defendants' misconduct, Plaintiffs have suffered damages.  In addition, because Defendants' fraud was willful and wanton, and because, by their acts, Defendants knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiffs are entitled to recover punitive damages.

491.    The Defendants also acted in concert and entered into a civil conspiracy and corrupt agreement to manipulate and suppress their Libor submissions during the Relevant Period.  Accordingly, each Defendant is being sued both individually as a primary violator and as a co-conspirator, in the intentional interference with Plaintiffs' prospective economic relations.

492.    The Defendants each committed numerous overt acts in furtherance of that conspiracy and agreement, as detailed above, including submitting false Libor quotes to the BBA on a daily basis, actively concealing their misconduct, by intentionally making false and misleading statements to the public, and/or directly to Plaintiffs, about Libor's integrity, or by intentionally failing to disclose the material information that the Defendants were suppressing Libor.  The Defendants acted with malice, and intended to injure investors and Plaintiffs through the actions described herein.

493.    Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it as set forth above.  Because each Defendant's submission was a necessary input for calculating Libor, *each* Defendant caused the foregoing harm to Plaintiffs with respect to *each* relevant transaction listed in the Exhibits as well as to any prospective economic relations.

## THIRTEENTH CAUSE OF ACTION
### (CIVIL CONSPIRACY)
### (BY PLAINTIFFS AGAINST ALL DEFENDANTS)

494.     Plaintiffs reallege each allegation above as if fully set forth herein.

495.     This count is for civil conspiracy to commit a fraud on both Plaintiffs and to tortiously interfere with Plaintiffs' contracts and business relations, brought by both Plaintiffs against all Defendants for joint and several liability for all losses associated with all of the transactions identified in Exhibit A.  Accordingly, each Defendant is being sued both individually as a primary violator of the law, as stated in this Complaint, and as a co-conspirator.

496.     Defendants entered into a corrupt agreement to manipulate and suppress their Libor submissions during the Relevant Period.

497.     Defendants each committed numerous overt acts in furtherance of that agreement, as detailed above, including submitting false Libor quotes to the BBA on a daily basis and actively concealing their misconduct, including by making false or misleading public statements about Libor's integrity.

498.     Defendants intentionally took these and other overt acts described above to further the corrupt agreement between Defendants and to carry out a common plan to execute a fraud on Plaintiffs, to tortiously interfere with Plaintiffs' contracts and business relations, and to benefit Defendants.

499.     Defendants acted with malice, and intended to injure Plaintiffs by, among other things, lowering the payments Plaintiffs were entitled to receive under the interest rate swaps and interfering with Plaintiffs' contracts and business relations.

500.     Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it as set forth above.

501.     As a direct and proximate result of Defendants' conspiracy, Plaintiffs entered into the swaps; traded in financial instruments linked to Libor and other instruments in reliance on Libor's integrity; made inflated payments (or received depressed payments) calculated in reliance on Libor's integrity; and entered into termination agreements for inflated consideration in reliance on Libor's integrity.

502.     As a result of Defendants' unlawful conspiracy, Plaintiffs have the right to rescissory damages; in the alternative to rescissory damages, Plaintiffs have suffered damages according to proof.  In addition, because Defendants' fraud was willful and wanton, and because, by their acts, they knowingly affected the general public, including but not limited to all persons with interests in Libor, Plaintiffs are entitled to recover punitive damages.

## FOURTEENTH CAUSE OF ACTION
## (VIOLATION OF SECTION 1 OF THE SHERMAN ACT AND SECTION 4 OF THE CLAYTON ACT)
## (BY PLAINTIFFS AGAINST ALL DEFENDANTS)

503.     Plaintiffs reallege each allegation above as if fully set forth herein.

504.     As set forth above, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to submit false USD Libor rates that were inconsistent with the definition of Libor, below their actual borrowing costs, and to do so in a coordinated fashion.  Defendants' unlawful agreement to suppress Libor from at least August 2007 through the end of 2010.

505.     Defendants' agreement to engage in concerted conduct was *per se* unlawful and an unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act and inflicted antitrust injury on Plaintiffs and other investors.

506.     Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or acted interstate and international commerce.  Defendants'

unlawful conduct was through mutual understandings or agreements by, between and among Defendants and the co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

507.    The contract, combination, or conspiracy has had the following effects:

    a.   Net payments due to Defendants under the swaps, and/or termination amounts paid with respect to the swaps were fixed, maintained, stabilized, and/or otherwise made artificial at higher, non-competitive levels;

    b.   Plaintiffs have been deprived of the benefits of free, open, and unrestricted competition in the market for interest rate swaps; and

    c.   Competition in establishing the net payments made under and termination amounts charged for the interest rate swaps has been unlawfully restrained, suppressed and eliminated.

508.    Defendants' conspiracy, and resulting impact on the market for swaps and other Libor-based instruments, occurred in or affected interstate and foreign commerce.

509.    As a proximate result of Defendants' unlawful conduct, Plaintiffs suffered antitrust injury in that Plaintiffs have made supracompetitive net payments under the swaps, and/or paid supracompetitive termination amounts to unwind the swaps.

510.    Plaintiffs are entitled to treble damages for the violations of the Sherman Act alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs pray for relief as follows:

An award in favor of Plaintiffs against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

a.      That the unlawful conduct alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act;

b.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

c.      Damages as provided under federal antitrust laws, and that a joint and several judgment in favor of the Plaintiffs be entered against Defendants in an amount to be trebled in accordance with such laws;

d.      Damages or other relief permitted by law or equity for Plaintiffs' common law claims, including the monetary losses suffered by Plaintiffs from, among other things, inflated payments to Defendants, reduced payments from Defendants, losses incurred during the termination process, and lost profits in an amount to be determined at trial;

e.      Consequential damages;

f.      Punitive damages;

g.      Attorneys' fees and costs;

h.      Prejudgment interest at the maximum legal rate;

i.      Rescission;

j.      Indemnification; and

k.      Such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: October 6, 2014                              Respectfully submitted,

Steig D. Olson
Daniel L. Brockett
Daniel P. Cunningham
Jacob J. Waldman
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: 212-849-7000
Fax: 212-849-7100
danbrockett@quinnemanuel.com
danielcunningham@quinnemanuel.com
steigolson@quinnemanuel.com
jacobwaldman@quinnemanuel.com
Jeremy D. Andersen
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213-443-3000
Fax: 213-443-3100
jeremyandersen@quinnemanuel.com

Mathieu J. Shapiro (PA 76266)
OBERMAYER REBMANN MAXWELL &
HIPPEL LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
Telephone: (215) 665-3000
Fax: (215) 665-3165
mathieu.shapiro@obermayer.com

Michael J. Boni (PA 52983)
Joshua D. Snyder (PA 88657)
John E. Sindoni (PA 91729)
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA  19004
Telephone: (610) 822-0200
Fax:  (610) 822-0206
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com

*Attorneys for Plaintiffs*

## APPENDIX A

*Figure A-1: Federal Reserve Eurodollar Spread for HSBC Libor Submissions*



*Figure A-2: Federal Reserve Eurodollar Spread for JPMorgan Libor Submissions*



*Figure A-3: Federal Reserve Eurodollar Spread for Barclays Libor Submissions*



*Figure A-4: Federal Reserve Eurodollar Spread for Deutsche Bank Libor Submissions*



*Figure A-5: Federal Reserve Eurodollar Spread for RBS Libor Submissions*





*Figure A-6: Federal Reserve Eurodollar Spread for Citi Libor Submissions*



*Figure A-7: Federal Reserve Eurodollar Spread for Credit Suisse Libor Submissions*



*Figure A-8: Federal Reserve Eurodollar Spread for Bank of America Libor Submissions*



*Figure A-9: Federal Reserve Eurodollar Spread for RBC Libor Submissions*





*Figure A-10: Federal Reserve Eurodollar Spread for UBS Libor Submissions*



*Figure A-11 Federal Reserve Eurodollar Spread for HBOS Libor Submissions*



*Figure A-12 Federal Reserve Eurodollar Spread for Lloyds Libor Submissions*



*Figure A-13 Federal Reserve Eurodollar Spread for WestLB Libor Submissions*



*Figure A-14 Federal Reserve Eurodollar Spread for Rabobank Libor Submissions*



*Figure A-15 Federal Reserve Eurodollar Spread for Bank of Tokyo Libor Submissions*





*Figure A-16 Federal Reserve Eurodollar Spread for Norin Libor Submissions*





*Figure A-17 Federal Reserve Eurodollar Spread for HBOS Libor Submissions*





*Figure A-18 Federal Reserve Eurodollar Spread for Société Générale Libor Submissions*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | 1:11-MD-2262 (NRB)<br><br>ECF Case |
| THIS DOCUMENT RELATES TO:<br><br>JOSEPH AMABILE, et al.,<br>　　　　　　　　Plaintiffs,<br>　　　　　v.<br>BANK OF AMERICA CORPORATION, et al.,<br>　　　　　　　　Defendants.<br><br>BAY AREA TOLL AUTHORITY,<br>　　　　　　　　Plaintiff,<br>　　　　　v.<br>BANK OF AMERICA CORPORATION, et al.,<br>　　　　　　　　Defendants.<br><br>CEMA JOINT VENTURE,<br>　　　　　　　　Plaintiff,<br>　　　　　v.<br>CHARTER ONE BANK, N.A., et al.,<br>　　　　　　　　Defendants.<br><br>THE CHARLES SCHWAB CORPORATION, et al.,<br>　　　　　　　　Plaintiffs,<br>　　　　　v.<br>BANK OF AMERICA CORPORATION, et al.,<br>　　　　　　　　Defendants.<br><br>CITY OF HOUSTON,<br>　　　　　　　　Plaintiff,<br>　　　　　v.<br>BANK OF AMERICA CORPORATION, et al.,<br>　　　　　　　　Defendants.<br><br>CITY OF PHILADELPHIA, et al.,<br>　　　　　　　　Plaintiffs.<br>　　　　　v.<br>BANK OF AMERICA CORPORATION, et al.,<br>　　　　　　　　Defendants.<br><br>CITY OF RICHMOND, et al., | <br><br><br><br>No. 13-cv-01700<br><br><br><br><br><br>No. 14-cv-03094<br><br><br><br><br><br>No. 13-cv-05511<br><br><br><br><br><br><br>No. 13-cv-07005<br><br><br><br><br><br>No. 13-cv-05616<br><br><br><br><br><br>No. 13-cv-06020 |

| | |
|---|---|
| Plaintiffs,<br>v.<br>BANK OF AMERICA CORPORATION, et al.,<br>Defendants. | No. 13-cv-00627 |
| CITY OF RIVERSIDE, et al.,<br>Plaintiffs,<br>v.<br>BANK OF AMERICA CORPORATION, et al.,<br>Defendants. | No. 13-cv-00597 |
| COUNTY OF MENDOCINO,<br>Plaintiff,<br>v.<br>BANK OF AMERICA CORPORATION, et al.,<br>Defendants. | No. 13-cv-08644 |
| COUNTY OF SACRAMENTO,<br>Plaintiff,<br>v.<br>BANK OF AMERICA CORPORATION, et al.,<br>Defendants. | No. 13-cv-05569 |
| COUNTY OF SAN DIEGO,<br>Plaintiff,<br>v.<br>BANK OF AMERICA CORPORATION, et al.,<br>Defendants. | No. 13-cv-00667 |
| COUNTY OF SAN MATEO, et al.,<br>Plaintiffs,<br>v.<br>BANK OF AMERICA CORPORATION, et al.,<br>Defendants. | No. 13-cv-00625 |
| COUNTY OF SONOMA, et al.,<br>Plaintiffs,<br>v.<br>BANK OF AMERICA CORPORATION, et al.,<br>Defendants. | No. 13-cv-05187 |
| DARBY FINANCIAL PRODUCTS, et al.,<br>Plaintiffs,<br>v.<br>BARCLAYS BANK PLC, et al.,<br>Defendants. | No. 13-cv-08799 |

| | |
|---|---|
| EAST BAY MUNICIPAL UTILITY DISTRICT,<br>Plaintiff,<br>v.<br>BANK OF AMERICA CORPORATION, et al.,<br>Defendants. | No. 13-cv-00626 |
| FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for AMCORE BANK, N.A., et al.,<br>Plaintiffs,<br>v.<br>BANK OF AMERICA CORP., et al.,<br>Defendants. | No. 14-cv-01757 |
| THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br>Plaintiff,<br>v.<br>BANK OF AMERICA CORPORATION, et al.,<br>Defendants. | No. 13-cv-03952 |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br>Plaintiff,<br>v.<br>BARCLAYS BANK PLC, et al.,<br>Defendants. | No. 13-cv-03952 |
| GEORGE P. MARAGOS, in his official capacity as the COMPTROLLER OF THE COUNTY OF NASSAU, acting on behalf of the COUNTY OF NASSAU,<br>Plaintiff,<br>v.<br>BANK OF AMERICA CORPORATION, et al.,<br>Defendants. | No. 13-cv-20297 |
| NATIONAL CREDIT UNION ADMINISTRATION BOARD as Liquidating Agent for U.S. Central Federal Credit Union, et al.,<br>Plaintiff,<br>v.<br>CREDIT SUISSE GROUP AG, et al., | No. 13-cv-07394 |

|  |  |
|---|---|
| Defendants. | |
| PRINCIPAL FINANCIAL GROUP, INC., et al.,<br>　　　　　　　Plaintiffs,<br>　　　　v.<br>BANK OF AMERICA CORPORATION, et al.,<br>　　　　　　　Defendants. | No. 13-cv-06014 |
| PRINCIPAL FUNDS, INC., et al.,<br>　　　　　　　Plaintiffs,<br>　　　　v.<br>BANK OF AMERICA CORPORATION, et al.,<br>　　　　　　　Defendants. | No. 13-cv-06013 |
| PRUDENTIAL INVESTMENT PORTFOLIOS 2, et al.,<br>　　　　　　　Plaintiffs,<br>　　　　v.<br>BANK OF AMERICA CORPORATION, et al.,<br>　　　　　　　Defendants. | No. 14-cv-04189 |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br>　　　　　　　Plaintiff,<br>　　　　v.<br>BANK OF AMERICA CORPORATION, et al.,<br>　　　　　　　Defendants. | No. 13-cv-05186 |
| SALIX CAPITAL US INC.,<br>　　　　　　　Plaintiff,<br>　　　　v.<br>BANC OF AMERICA SECURITIES LLC, et al.,<br>　　　　　　　Defendants. | No. 13-cv-04018 |
| SAN DIEGO ASSOCIATION OF GOVERNMENTS,<br>　　　　　　　Plaintiff,<br>　　　　v.<br>BANK OF AMERICA CORPORATION, et al.,<br>　　　　　　　Defendants. | No. 13-cv-05221 |
| TRIAXX PRIME CDO 2006-1 LTD., et al.,<br>　　　　　　　Plaintiffs,<br>　　　　v.<br>BANK OF AMERICA CORPORATION, et al., | No. 14-cv-00146 |

| Defendants. | |
|---|---|

## NOTICE OF DEFENDANTS' MOTION
## TO DISMISS DIRECT ACTION CLAIMS

PLEASE TAKE NOTICE that the undersigned, attorneys for Defendants Banc of America Securities LLC, Bank of America Corporation, Bank of America, N.A., Barclays Bank plc, Barclays Capital Inc., Barclays plc, BBA Enterprises Ltd., BBA Libor Ltd., Bear Stearns Capital Markets, Inc., British Bankers' Association, The Bank of Tokyo-Mitsubishi UFJ, Ltd., Chase Bank USA, N.A., Citi Swapco Inc., Citibank, N.A., Citigroup Financial Products, Inc., Citigroup Funding Inc., Citigroup Global Markets Inc., Citigroup Global Markets Limited, Citigroup, Inc., Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., Credit Suisse (USA) Inc., Credit Suisse AG, Credit Suisse Group AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, Deutsche Bank AG, Deutsche Bank Securities, Inc., HBOS plc, Hongkong and Shanghai Banking Corporation Ltd., HSBC Bank plc, HSBC Bank USA, N.A., HSBC Finance Corp., HSBC Holdings plc, HSBC Securities (USA) Inc., HSBC USA Inc., JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Markets Ltd. f/k/a Bear Stearns International Ltd., J.P. Morgan Securities LLC f/k/a J.P. Morgan Securities Inc., J.P. Morgan Bank Dublin plc f/k/a Bear Stearns Bank plc, Lloyds Bank plc, Lloyds Banking Group plc, Lloyds TSB Bank plc, Merrill Lynch & Co., Inc., Merrill Lynch Capital Services, Inc., Merrill Lynch International Bank Ltd., Merrill Lynch, Pierce, Fenner & Smith Incorporated, The Norinchukin Bank, Portigon AG (f/k/a WestLB AG), Rabobank International, RBC Capital Markets, LLC, RBS Securities Inc. f/k/a Greenwich Capital Markets, Inc., Royal Bank of Canada, The Royal Bank of Scotland Group plc, The Royal Bank of Scotland  plc, Société Générale, UBS AG, UBS Limited, UBS Securities LLC,

and Westdeutsche ImmobilienBank AG, in the above-referenced matter, will move this

Court, before the Honorable Naomi Reice Buchwald, United States District Judge for the

Southern District of New York, 500 Pearl Street, New York, New York, at a date and

time to be determined by this Court, for an order pursuant to Rules 12(b)(2) and 12(b)(6)

of the Federal Rules of Civil Procedure dismissing with prejudice, in whole or in part, the

claims asserted in the Amended and Consolidated Complaints in the above-captioned

actions.

The claims subject to Defendants' motion to dismiss and the relief requested are

summarized in the attached Master Appendix and its accompanying Schedules

(collectively entitled "Summary of Defendants' Motion to Dismiss" and referred to

throughout Defendants' motion papers as "Master Appendix" ).  The grounds for

Defendants' motion to dismiss are set forth in seven memoranda of law referred to in the

Master Appendix:  (1) Joint Memorandum of Law in Support of Defendants' Motion to

Dismiss Direct Action Claims Covered by Prior Rulings ("Prior Rulings Brief"); (2)

Memorandum of Law in Support of Defendants' Motion to Dismiss the Fraud and

Related Claims in the Direct Actions ("Fraud Brief"); (3) Memorandum of Law in

Support of Defendants' Motion to Dismiss the Tortious Interference Claims in the Direct

Actions ("Tortious Interference Brief"); (4) Memorandum of Law in Support of

Defendants' Motion to Dismiss Direct Action Plaintiffs' UCL and GBL Claims

("Consumer Claims Brief"); (5) Memorandum of Law in Support of Defendants' Motion

to Dismiss the Schwab Plaintiffs' Securities Claims with respect to the above-captioned

actions *The Charles Schwab Corporation, et al. v. Bank of America Corporation, et al.*

(13-cv-7005) ("Schwab Securities Brief"); (6) Memorandum of Law in Support of

Defendants' Motion to Dismiss Direct Action Plaintiffs' Requests for Injunctive, Equitable, and Declaratory Relief ("Injunctive Relief Brief"); (7) Joint Memorandum of Law in Support of Defendants' Motion to Dismiss the Direct Actions for Lack of Personal Jurisdiction ("Personal Jurisdiction Brief") and the accompanying Declarations of Christine N. Bannerman, Brent L. Barton, Nicola S. Black, Dr. Frank Borstelmann, Dominique Bourrinet, Allison Cambria, John Connors, Andrew S. Cooper, Ralph DeSena, Thomas Finlan, Gavin A. Francis, John B. Gaffney, Patrick Gonsalves, William Gougherty, Michelle M. Gregory, Alan B. Kaplan, Tamlyn Ludford, Mary M. McCullough, Kevin P. McKendry, Dara Quinn, Douglas Roseman, Dominick R. Sabella, Pierre Schreiber, Sally Scutt, Andrew Sherman, Rebecca K. Smith, Pamela A. Snell, Osamu Takashima, Elaine Williams, and Joseph B. Wollard, all dated November 5, 2014.

Dated:   New York, New York
         November 5, 2014

RESPECTFULLY SUBMITTED,

*/s/* Robert F. Wise, Jr.

Robert F. Wise, Jr.
Arthur J. Burke
Paul S. Mishkin
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
Telephone: (212) 450-4000
Fax: (212) 450-4800
robert.wise@davispolk.com
arthur.burke@davispolk.com
paul.mishkin@davispolk.com

*Attorneys for Defendants Bank of America
Corporation, Bank of America, N.A., Banc of
America Securities LLC, Merrill Lynch & Co.,
Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc.,
Merrill Lynch Capital Services, Inc., and Merrill
Lynch International Bank Ltd.*

*/s/* Daryl A. Libow

Daryl A. Libow
Christopher M. Viapiano
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C.  20006
Telephone: (202) 956-7500
Fax: (202) 956-6973
libowd@sullcrom.com
viapianoc@sullcrom.com

*Attorneys for Defendant The Bank of
Tokyo-Mitsubishi UFJ, Ltd.*

/s/ Jeffrey T. Scott
David H. Braff
Yvonne S. Quinn
Jeffrey T. Scott
Matthew J. Porpora
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
braffd@sullcrom.com
quinny@sullcrom.com
scottj@sullcrom.com
porporam@sullcrom.com

/s/ Jonathan D. Schiller
Jonathan D. Schiller
Leigh M. Nathanson
Amos Friedland
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York  10022
Telephone: (212) 446-2300
jschiller@bsfllp.com
lnathanson@bsfllp.com
afriedland@bsfllp.com

Michael Brille
5301 Wisconsin Avenue NW
Washington, D.C.  20015
Telephone: (202) 237-2727
mbrille@bsfllp.com

*Attorneys for Defendant Barclays Bank plc,
Barclays plc, and Barclays Capital Inc.*

/s/ Andrew A. Ruffino
Andrew A. Ruffino
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York  10018
Telephone: (212) 841-1000
aruffino@cov.com

Alan M. Wiseman
Thomas A. Isaacson
Jonathan Gimblett
1201 Pennsylvania Avenue N.W.
Washington, D.C.  20004
Telephone: (202) 662-6000
awiseman@cov.com
tisaacson@cov.com
jgimblett@cov.com

/s/ Michael R. Lazerwitz
Michael R. Lazerwitz
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York  10006
Telephone: (212) 225-2000
mlazerwitz@cgsh.com

*Attorneys for Defendants Citibank, N.A.,
Citigroup Inc., Citigroup Financial
Products, Inc., Citigroup Funding, Inc.,
Citigroup Global Markets Inc., Citigroup
Global Markets Ltd., and Citi Swapco Inc.*

_/s/_ David R. Gelfand
David R. Gelfand
Sean M. Murphy
MILBANK TWEED HADLEY & McCLOY  LLP
One Chase Manhattan Plaza
New York, New York  10005
Telephone: (212) 530-5000
dgelfand@milbank.com
smurphy@milbank.com

_Attorneys for Defendant Coöperatieve_
_Centrale Raiffeisen-Boerenleenbank B.A._

_/s/_ Herbert S. Washer
Herbert S. Washer
Elai Katz
Joel Kurtzberg
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York  10005
Telephone: (212) 701-3000
hwasher@cahill.com
ekatz@cahill.com
jkurtzberg@cahill.com

_Attorneys for Defendant Credit Suisse_
_Group AG, Credit Suisse International,_
_Credit Suisse AG, Credit Suisse Securities_
_(USA) LLC, Credit Suisse Securities (USA)_
_Inc._

/s/ Moses Silverman
Moses Silverman
Andrew C. Finch
Jessica Brach
Noam Lerer
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3355
Fax: (212) 492-0355
msilverman@paulweiss.com
afinch@paulweiss.com
jbrach@paulweiss.com
nlerer@paulweiss.com

*Attorneys for Defendants Deutsche Bank AG and
Deutsche Bank Securities Inc.*

/s/ Ed DeYoung
Ed DeYoung
Gregory T. Casamento
LOCKE LORD LLP
3 World Financial Center
New York, New York 10281
Telephone:  (212) 812-8325
Fax:  (212) 812-8385
edeyoung@lockelord.com
gcasamento@lockelord.com

Roger B. Cowie
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
Telephone:  (214) 740-8614
Fax:  (214) 740-8800
rcowie@lockelord.com

*Attorneys for Defendants HSBC Holdings
plc, HSBC Bank plc, The Hongkong and
Shanghai Banking Corporation Ltd., HSBC
USA, Inc., HSBC Finance Corporation,
HSBC Securities (USA,) Inc.,  and HSBC
Bank USA, N.A.* (except in *City of Houston
v. Bank of America Corp., et al.*, S.D.N.Y.
Case No. 1:13-cv-05616)

/s/ Donald R. Littlefield
Donald R. Littlefield (*pro hac vice* motion
pending)
Jack D. Ballard (*pro hac vice* motion
pending)
Michael A. Rodriguez (*pro hac vice*
motion pending)
BALLARD & LITTLEFIELD, LLP
3700 Buffalo Speedway, Suite 250
Houston, Texas 77098
Telephone: (713)403-6400
Fax: (713)-403-6410
dlittlefield@ballardlittlefield.com
jballard@ballardlittlefield.com
mrodriguez@ballardlittlefield.com

*Attorneys for Defendants HSBC Holdings
plc and HSBC Bank plc* in *City of Houston*

*v. Bank of America Corp., et al.*, S.D.N.Y.
Case No. 1:13-cv-05616

/s/ Thomas C. Rice
Thomas C. Rice
Paul C. Gluckow
Omari L. Mason
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
Telephone: (212) 455-2000
Fax: (212) 455-2502
trice@stblaw.com
pgluckow@stblaw.com
omason@stblaw.com

*Attorneys for Defendants JPMorgan Chase & Co.,
JPMorgan Chase Bank, N.A., J. P. Morgan
Securities LLC, J. P. Morgan Markets Limited
(f/k/a Bear, Stearns International Limited), J.P.
Morgan Dublin plc (f/k/a JPMorgan Bank Dublin
plc) (f/k/a Bear Stearns Bank plc), Chase Bank
USA, N.A., and Bear Stearns Capital Markets, Inc.*

/s/ Marc J. Gottridge
Marc J. Gottridge
Lisa J. Fried
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York  10022
Telephone: (212) 918-3000
marc.gottridge@hoganlovells.com
lisa.fried@hoganlovells.com

*Attorneys for Defendants Lloyds Banking
Group plc, Lloyds Bank plc (formerly
known as Lloyds TSB Bank plc) and HBOS
plc*

/s/ Andrew W. Stern
Alan M. Unger
Andrew W. Stern
Nicholas P. Crowell
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
Telephone: (212) 839-5300
Fax: (212) 839-5599
aunger@sidley.com
astern@sidley.com
ncrowell@sidley.com

*Attorneys for Defendant The Norinchukin Bank*

/s/ Fraser L. Hunter, Jr.
Fraser L. Hunter, Jr.
David S. Lesser
Alan E. Schoenfeld
WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, New York  10007
Telephone: (212) 230-8800
Fax: (212) 230-8888
fraser.hunter@wilmerhale.com
david.lesser@wilmerhale.com
alan.schoenfeld@wilmerhale.com

/s/ Robert G. Houck
Robert G. Houck
Alejandra de Urioste
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York  10019
Telephone: (212) 878-8000
Fax: (212) 878-8375
robert.houck@cliffordchance.com
alejandra.deurioste@cliffordchance.com

*Attorneys for Defendants The Royal Bank of
Scotland Group plc, The Royal Bank of Scotland
plc, Citizens Bank, N.A. f/k/a Charter One Bank,
N.A., and RBS Securities Inc.*[1]

/s/ Arthur W. Hahn
Arthur W. Hahn
Christian T. Kemnitz
Brian J. Poronsky
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois  60661
Telephone: (312) 902-5200
arthur.hahn@kattenlaw.com
christian.kemnitz@kattenlaw.com
brian.poronsky@kattenlaw.com

*Attorneys for Defendant Royal Bank of
Canada and RBC Capital Markets LLC*

/s/ Steven Wolowitz
Steven Wolowitz
Henninger S. Bullock
Andrew J. Calica
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
Telephone: (212) 506-2500
Fax: (212) 262-1910
swolowitz@mayerbrown.com
hbullock@mayerbrown.com
acalica@mayerbrown.com

*Attorneys for Defendant Société Générale*

---

[1] Wilmer Cutler Pickering Hale and Dorr LLP is counsel for these defendants except as to plaintiffs
Prudential Investment Portfolios 2; Triaxx Prime CDO 2006-2 LTD; Triaxx Prime CDO 2007-1 LTD; Principal

/s/ Peter Sullivan
Peter Sullivan
Lawrence J. Zweifach
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York  10166-0193
Telephone: (212) 351-4000
psullivan@gibsondunn.com
lzweifach@gibsondunn.com

Joel S. Sanders (*admitted pro hac vice*)
555 Mission Street, Suite 3000
San Francisco, California  94105
jsanders@gibsondunn.com

*Attorneys for Defendant UBS AG and UBS Securities LLC*

/s/ Christopher M. Paparella
Christopher M. Paparella
Ethan E. Litwin
Marc A. Weinstein
Morgan J. Feder
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York  10004
Telephone: (212) 837-6000
Fax: (212) 422-4726
Chris.Paparella@hugheshubbard.com
Ethan.Litwin@hugheshubbard.com
Marc.Weinstein@hugheshubbard.com
Morgan.Feder@hugheshubbard.com

*Attorneys for Defendants Portigon AG (f/k/a WestLB AG) and Westdeutsche ImmobilienBank AG*

/s/ Richard D. Owens
Richard D. Owens
Jeff G. Hammel
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
richard.owens@lw.com
jeff.hammel@lw.com

*Attorneys for Defendants British Bankers' Association, BBA Enterprises Ltd., and BBA LIBOR Ltd.*

Funds, Inc.; Principal Capital Interest Only I, LLC;Principal Commercial Funding, LLC; Principal Commercial Funding II, LLC; Principal Financial Group, Inc.; Principal Financial Services, Inc.; Principal Life Insurance Company; Principal Real Estate Investors, LLC; Principal Variable Contracts Funds, Inc.; and Fannie Mae.  Clifford Chance US LLP is counsel for these defendants except as to Plaintiff the Federal Home Loan Mortgage Corporation.

SUSMAN GODFREY L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP

15TH FLOOR

560 LEXINGTON AVENUE

NEW YORK, NEW YORK 10022-6828

(212) 336-8330

FAX (212) 336-8340

WWW.SUSMANGODFREY.COM

———————————

| Suite 5100 | Suite 5100 | Suite 950 | Suite 3800 |
|---|---|---|---|
| 1000 Louisiana Street | 901 Main Street | 1901 Avenue of the Stars | 1201 Third Avenue |
| Houston, Texas 77002-5096 | Dallas, Texas 75202-3775 | Los Angeles, California 90067-6029 | Seattle, Washington 98101-3000 |
| (713) 651-9366 | (214) 754-1900 | (310) 789-3100 | (206) 516-3880 |

William Christopher Carmody
Direct Dial (212) 336-8334

E-Mail BCarmody@susmangodfrey.com

January 28, 2015

BY HAND AND ECF

The Honorable Naomi Reice Buchwald
United States District Court for the Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re:    *In re LIBOR-Based Financial Instruments Antitrust Litigation*, No. 11-md-2262 (NRB)

Dear Judge Buchwald:

    We write as liaison counsel for the pending class action cases with respect to the Supreme Court's January 21, 2015 decision in *Gelboim v. Bank of America*, 574 U.S. __ (2015).   In light of *Gelboim*, several of the plaintiff classes respectfully request that the Court lift the stay in their respective cases for the purpose of entering judgment on their antitrust claims, so that they may join the pending *Gelboim* appeal before the Second Circuit.  We note that this is similar to the request that the OTC and Exchange-Based Classes made last week to grant a request for a partial judgment under Fed. R. Civ. P. 54(b) in light of *Gelboim* (Dkt. No. 996).

    Like the plaintiff in *Gelboim*, the plaintiff classes listed below assert a Federal antitrust cause of action against the defendants, arising from the defendants' alleged collusion with respect to LIBOR.  Those classes listed in category (a) have, like the plaintiffs in *Gelboim*, solely asserted antitrust claims, and thus request that a final judgment pursuant to 28 U.S.C. §1291 be entered. Those classes listed in category (b) request that a partial judgment pursuant to Rule 54(b) be entered, similar to the request made by the OTC and Exchange-Based Classes.

We also write to inform the Court that the Second Circuit has set a briefing schedule in *Gelboim v. Bank of Am. Corp.*  Absent an extension, the brief for

January 28, 2015
Page 2

appellants will be due March 9, 2015 and briefing will be completed by May.  In light of this expedited schedule, we respectfully request that the issues raised in this letter, and the previous letter on Rule 54(b) relief for the OTC and Exchange-Based Classes, be addressed on or before the upcoming February 5, 2015 conference scheduled in this matter.

(a) Classes Requesting Lift of Stay and Entry of Final Judgment Pursuant to 28 U.S.C. §1291

1. *33-35 Green Pond Road Associates, LLC v. Bank of America Corporation, et al.*, No. 12-cv-5822-NRB

2. *Courtyard at Amwell II, LLC et al. v. Bank of America Corporation et al.*, 12-CV-6693-NRB

(b) Classes Requesting Lift of Stay and Entry of Partial Judgment Pursuant to Fed. R. Civ. P. 54(b)

1. *Los Angeles County Employees Retirement Association v. Bank of America Corp., et al.*, No. 13-cv-00398-NRB

2. *County of Riverside v. Bank of America Corp., et al.*, No. 13-cv-01135-NRB

3. *Guaranty Bank v. Credit Suisse et al.*, 13-cv-0346

We thank the Court for its attention to this matter, and are available to answer any questions that the Court may have.

Respectfully submitted,

William Christopher Carmody
SUSMAN GODFREY LLP

January 28, 2015
Page 3


David Kovel
KIRBY MCINERNEY LLP

Cc:  All Counsel (By ECF)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 |
| THIS DOCUMENT RELATES TO: | Master File No. 1:11-md-2262-NRB |
| Case Nos.: | ECF Case |
| 1:11-cv-06409-NRB | |
| 1:11-cv-06411-NRB | |
| 1:11-cv-06412-NRB | |
| SCHWAB SHORT-TERM BOND MARKET FUND, *et al.*, | **NOTICE OF APPEAL** |
| Plaintiffs, | |
| v. | |
| BANK OF AMERICA CORPORATION, *et al.*, | |
| Defendants. | |
| CHARLES SCHWAB BANK, N.A., *et al.*, | |
| Plaintiffs, | |
| v. | |
| BANK OF AMERICA CORPORATION, *et al.*, | |
| Defendants. | |
| SCHWAB MONEY MARKET FUND, *et al.*, | |
| Plaintiffs, | |
| v. | |
| BANK OF AMERICA CORPORATION, *et al.*, | |
| Defendants. | |

1217622.1

**JA1589**

Notice is hereby given that, in accordance with Rules 3 and 4 of the Federal Rules of

Appellate Procedure, Plaintiffs The Charles Schwab Corporation, Charles Schwab Bank, N.A.,

Charles Schwab & Co., Inc., Schwab Money Market Fund, Schwab Value Advantage Money

Fund, Schwab Retirement Advantage Money Fund, Schwab Investor Money Fund, Schwab Cash

Reserves, Schwab Advisor Cash Reserves, Schwab YieldPlus Fund, Schwab YieldPlus Fund

Liquidation Trust, Schwab Short-Term Bond Market Fund, Schwab Total Bond Market Fund,

and Schwab U.S. Dollar Liquid Assets Fund (collectively, the "Schwab Plaintiffs") appeal to the

United States Court of Appeals for the Second Circuit from (1) the judgment entered on August

26, 2013 ("Judgment") in the above-captioned actions following this Court's Memorandum and

Order entered on March 29, 2013 ("March 29, 2013 Order") that dismissed all claims for relief

asserted in those actions—except to the extent this Court (in the March 29, 2013 Order) declined

to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over, and thus dismissed

without prejudice, the Schwab Plaintiffs' state common-law claims for interference with

economic advantage, breach of the implied covenant of good faith and fair dealing, and unjust

enrichment;[1] and (2) all orders and rulings subsumed within the Judgment, except the Court's

declination of supplemental jurisdiction over the Schwab Plaintiffs' state common-law claims (as

stated above).

This Notice of Appeal is being filed in light of the U.S. Supreme Court's recent decision

---

[1] Following its entry of the March 29, 2013 Order, this Court did not direct the clerk to enter judgment in the Schwab Plaintiffs' cases.  Judgment was therefore deemed entered on August 26, 2013 in accordance with Federal Rule of Civil Procedure 58(c)(2)(B) and Federal Rule of Appellate Procedure 4(a)(7)(A)(ii).  *See, e.g., Perez v. AC Roosevelt Food Corp.*, 734 F.3d 175, 177 (2d Cir. 2013) ("Where a separate document is required [for entry of judgment], entry occurs 'when the judgment or order is entered in the civil docket' and either 150 days have passed or 'the judgment or order is set forth on a separate document.'") (quoting Fed. R. App. P. 4(a)(7)(A)(ii)).

1

in *Gelboim v. Bank of America Corp.*, 574 U.S. __, 2015 U.S. LEXIS 756 (2015) ("*Gelboim*"), reversing the Second Circuit's *sua sponte* dismissal of the appeal of plaintiffs Ellen Gelboim and Linda Zacher (the "Gelboim Appeal," No. 13-3565) on October 30, 2013. Because those proceedings bear on the timing of this Notice of Appeal, the Schwab Plaintiffs recount the pertinent procedural history below.

On September 24, 2013, the Schwab Plaintiffs filed an appeal from the Judgment following this Court's March 29, 2013 Order, which dismissed all claims in the three above-captioned, non-class cases brought by the Schwab Plaintiffs based on Defendants' artificial suppression of the London InterBank Offered Rate for U.S. Dollars from August 2007 to May 2010. Defendants did not contest this Court's jurisdiction to hear Schwab's appeal.

On October 30, 2013, however, the Second Circuit *sua sponte* dismissed Schwab's appeal for lack of jurisdiction, reasoning that "a final order has not been issued by the district court as contemplated by 28 U.S.C. § 1291, and the order[] appealed from did not dispose of all claims in the consolidated action." App. Dkt. No. 87 in No. 13-3636 (Oct. 30, 2013 Order ("Appeal Dismissal Order")), at 1.[2] In that Order, the court also dismissed the Gelboim Appeal, which had been consolidated with the Schwab Plaintiffs' appeal. In dismissing the appeals, the court relied on Second Circuit authority directing that "'when there is a judgment in a consolidated case that does not dispose of all claims which have been consolidated, there is a strong presumption that the judgment is not appealable absent Rule 54(b) certification.'" *Houbigant, Inc. v. IMG Fragrance Brands, LLC*, 627 F.3d 497, 498 (2d Cir. 2010) (per curiam)

---

[2] Unless otherwise indicated, all references to "App. Dkt. No. __" are to entries on the docket for appeal No. 13-3636.

1217622.1

(quoting *Hageman v. City Investing Co.*, 851 F.2d 69, 71 (2d Cir. 1988)).[3]

The Schwab Plaintiffs and the Gelboim plaintiffs then moved for reconsideration of the Appeal Dismissal Order and reinstatement of the appeals, which the Second Circuit denied.  On January 13, 2014, the court of appeals issued its mandate to this Court.  *See* App. Dkt. No. 118.  The Gelboim plaintiffs then filed a petition to the U.S. Supreme Court for a writ of *certiorari*, which the Schwab Plaintiffs did not join.  The Supreme Court granted review on June 30, 2014.

On January 21, 2015, the Supreme Court issued its decision in *Gelboim*, reversing the Second Circuit's judgment dismissing the Gelboim Appeal.  The Supreme Court held that despite being consolidated for pretrial purposes with numerous other cases in this MDL, the Gelboim plaintiffs' complaint "retained its independent status for purposes of appellate jurisdiction under §1291."  2015 U.S. LEXIS 756, at *6.  Accordingly, the Court concluded, those plaintiffs' right to appeal "ripened when the District Court dismissed their case, not upon eventual completion of multidistrict proceedings in all of the consolidated cases."  *Id.*  The Court reasoned that "[c]ases consolidated for MDL pretrial proceedings ordinarily retain their separate identities, so an order disposing of one of the discrete cases in its entirety should qualify under §1291 as an appealable final decision."  *Id.* at *13 (footnote omitted).

Similar to the Gelboim plaintiffs' action, this Court's March 29, 2013 Order disposed of the above-captioned Schwab actions in their entirety.  Specifically, the Court dismissed the Schwab Plaintiffs' federal and state antitrust claims, as well as their claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), with prejudice, and declined to exercise supplemental jurisdiction over the Schwab Plaintiffs' state common-law claims, thus dismissing

---

[3] *See also* Appeal Dismissal Order at 1 (citing, *inter alia*, *Houbigant*).

them without prejudice to refiling them in a separate action.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 685-95, 724-34, 735-36 (S.D.N.Y. 2013).[4] Thus, under *Gelboim*'s reasoning, the Schwab Plaintiffs are entitled to an appeal from the Judgment following this Court's March 29, 2013 Order.[5]

Dated:  February 10, 2015          Respectfully submitted,

                                   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

                                   By:___*/s/ Steven E. Fineman*_____
                                          Steven E. Fineman

                                   Steven E. Fineman
                                   Michael J. Miarmi
                                   250 Hudson Street, 8th Floor
                                   New York, NY 10013-1413
                                   Telephone:  (212) 355-9500
                                   Facsimile:  (212) 355-9592
                                   sfineman@lchb.com
                                   mmiarmi@lchb.com

---

[4] The Court determined that "considerations of judicial economy, convenience, fairness, and comity . . . counsel us to decline to exercise supplemental jurisdiction" over the Schwab Plaintiffs' common-law claims, adding that "[i]n light of the early stage of the proceedings, there is no reason why a California court should not decide plaintiffs' California common law claims." *Id.* at 735-36.  Following the Court's ruling, on April 29, 2013 the Schwab Plaintiffs filed a separate action in California state court (the "Schwab California Action"), asserting the claims over which this Court had declined to exercise supplemental jurisdiction, as well as other claims. Defendants subsequently removed that case to the Northern District of California, citing federal jurisdiction under the Edge Act and the Foreign Sovereign Immunities Act, and then moved to transfer the case to this Court.  On October 2, 2013, the Judicial Panel on Multidistrict Litigation granted Defendants' motion, over the Schwab Plaintiffs' objection.  The case was then transferred to this Court and assigned Case No. 13 Civ. 7005 (NRB) (S.D.N.Y.).  On December 27, 2013, the Court denied Plaintiffs' motion to remand.  The Schwab California Action is currently pending in this MDL.  The Schwab Plaintiffs' antitrust and RICO claims are not part of that case.

[5] Additionally, on February 5, 2015, the Court ordered the clerk to enter partial judgment, pursuant to Federal Rule of Civil Procedure 54(b), as to federal antitrust claims asserted by the Over-the-Counter Plaintiffs and the Exchange-Based Plaintiffs, as well as partial or final judgment with respect to federal antitrust claims asserted by plaintiffs in certain other putative class cases included in this MDL.  *See* MDL Dkt. No. 1008.

4

Richard M. Heimann
Eric B. Fastiff
Brendan P. Glackin
Marc A. Pilotin
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
rheimann@lchb.com
efastiff@lchb.com
bglackin@lchb.com
mpilotin@lchb.com

Lowell Haky
*Vice President and Associate General Counsel*
THE CHARLES SCHWAB CORPORATION
211 Main Street
San Francisco, CA 94105
Telephone:  (415) 667-0622
Facsimile:  (415) 667-1638
Lowell.Haky@schwab.com

*Attorneys for Plaintiffs The Charles Schwab Corporation;
Charles Schwab Bank, N.A.; Charles Schwab & Co., Inc.;
Schwab Money Market Fund; Schwab Value Advantage
Money Fund; Schwab Retirement Advantage Money Fund;
Schwab Investor Money Fund; Schwab Cash Reserves;
Schwab Advisor Cash Reserves; Schwab YieldPlus Fund;
Schwab YieldPlus Fund Liquidation Trust; Schwab Short-
Term Bond Market Fund; Schwab Total Bond Market Fund;
and Schwab U.S. Dollar Liquid Assets Fund*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 10, 2015, a true and correct copy of the foregoing

Notice of Appeal was filed electronically through the Court's ECF system.  In accordance with

Local Civil Rule 5.2 of the United States District Courts for the Southern and Eastern Districts of

New York as well as Local Rule 3.1 of the United States Court of Appeals for the Second

Circuit, the Notice of Appeal has thereby been served electronically on counsel for all parties in

these actions.

Dated:   February 10, 2015                    _/s/ Michael J. Miarmi_____
                                              Michael J. Miarmi
                                              LIEFF, CABRASER, HEIMANN
                                               & BERNSTEIN, LLP
                                              250 Hudson Street, 8th Floor
                                              New York, NY 10013-1413
                                              Telephone:  (212) 355-9500
                                              Facsimile:  (212) 355-9592
                                              mmiarmi@lchb.com

6

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____
                                      :
In Re:                                :
                                      :        11-MD-2262
                                      :        12-cv-5822 (NRB)
                                      :
LIBOR-BASED FINANCIAL                 :
INSTRUMENTS LITIGATION                :        **NOTICE OF APPEAL**
                                      :
THIS DOCUMENT RELATES TO              :
Case No. 12-cv-5822                   :
                                      :
                                      :
_____:


_____
                                      :
33-35 Green Pond Associates, LLC,     :
                                      :
            Plaintiff,                :
                                      :
            v.                        :
                                      :
Bank of America Corporation, *et al.*, :
                                      :
            Defendants.               :
_____:

Joseph J. DePalma
Katrina B. Carroll
Steven J. Greenfogel
Jeffrey A. Shooman (JS8207)
**LITE DEPALMA GREENBERG, LLC**
Two Gateway Center – Suite 1201
Newark, NJ 07102
Telephone:    (973) 623-3000
Facsimile:    (973) 623-0585
E-mail:       jdepalma@litedepalma.com
              kcarroll@litedepalma.com
              sgreenfogel@litedepalma.com
              jshooman@litedepalma.com

*Attorneys for Plaintiff and Putative Class*

Notice is hereby given that, in accordance with Federal Rules of Appellate Procedure 3 and 4, and 28 U.S.C. § 1291, that Plaintiff 33-35 Green Pond Associates ("Green Pond") and the putative class hereby appeal from final judgments of the district court entered on March 29, 2013 [Dkt. 286 on the MDL docket; Dkt. 31 on the Green Pond docket] and February 5, 2015 [Dkt. 1008 on the MDL docket; Dkt. 92 on the Green Pond docket], to the United States Court of Appeals for the Second Circuit.

Dated:  February 11, 2015

**LITE DEPALMA GREENBERG, LLC**

/s/ Jeffrey A. Shooman
Joseph J. DePalma
Katrina Carroll
Steven J. Greenfogel
Jeffrey A. Shooman (JS8207)
Two Gateway Center, Suite 1201
Newark, NJ 07102
Telephone: 973-623-3000
Facsimile:  973-623-0858
jdepalma@litedepalma.com
kcarroll@litedepalma.com
sgreenfogel@litedepalma.com
jshooman@litedepalma.com

*Attorneys for Plaintiff and Putative Class*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

IN RE LIBOR-BASED FINANCIAL
INSTRUMENTS ANTITRUST LITIGATION                MDL No. 2262 (NRB)

-----------------------------------------------------------X

THIS DOCUMENT RELATES TO EXCHANGE-
BASED PLAINTIFFS ACTION                         ECF Case

Case No. 11 Civ. 2613 (NRB)

-----------------------------------------------------------X

METZLER INVESTMENT GmbH, FTC                    **NOTICE OF APPEAL IN A**
FUTURES FUND SICAV, and FTC FUTURES             **CIVIL CASE**
FUND PCC LTD., ATLANTIC TRADING USA,
LLC, 303030 TRADING LLC, GARY FRANCIS
and NATHANIEL HAYNES, on behalf of
themselves and all others similarly situated,   11 Civ. 2613 (NRB)

                         Plaintiffs,

              -against-

CREDIT SUISSE GROUP AG, BANK OF
AMERICA CORPORATION, BANK OF
AMERICA, N.A., J.P. MORGAN CHASE & CO.,
J.P. MORGAN CHASE BANK, N.A., HSBC
HOLDINGS PLC, HSBC BANK PLC, HBOS PLC,
BARCLAYS BANK PLC, LLOYDS BANKING
GROUP PLC, LLOYDS TSB BANK PLC,
WESTLB AG, WESTDEUTSCHE
IMMOBILIENBANK AG, UBS AG, ROYAL
BANK OF SCOTLAND GROUP PLC,
DEUTSCHE BANK AG, THE NORINCHUKIN
BANK, ROYAL BANK OF CANADA, THE
BANK OF TOKYO-MITSUBISHI UFJ, LTD.,
COOPERATIVE CENTRAL RAIFFEISEN-
BOERENLEENBANK B.A., SOCIETE
GENERALE S.A., CITIGROUP, INC.,
CITIBANK N.A., and JOHN DOES 1-5,

                         Defendants.

-----------------------------------------------------------X

PLEASE TAKE NOTICE that pursuant to Fed. R. App. P. 4(a)(1)(A), Plaintiffs Metzler Investment GmbH, FTC Futures Fund SICAV, FTC Futures Fund PCC Ltd., Atlantic Trading USA, LLC, 303030 Trading LLC, Gary Francis and Nathaniel Haynes (collectively, "Exchange-Based Plaintiffs"), on behalf of themselves and all others similarly situated, hereby appeal to the United States Court of Appeals for the Second Circuit from: (1) the Judgment of this Court entered on the docket on February 11, 2015 (the "Judgment") (ECF No. 1013) pursuant to this Court's Order entered on the docket on February 5, 2015 (ECF No. 1008), certifying pursuant to Rule 54(b) of the Federal Rules of Civil Procedure that partial judgment is entered dismissing the fifth count of the Exchange-Based Plaintiffs' Corrected Second Amended Consolidated Class Action Complaint (ECF. No. 438) for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) the Memorandum and Order dated March 29, 2013 (ECF No. 286) and the Memorandum and Order dated August 23, 2013 (Doc. No. 389) dismissing the fourth count of the Exchange-Based Plaintiffs' Amended Consolidated Class Action Complaint (ECF No. 134) for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and denying leave to replead that claim  in a proposed amended complaint (ECF No. 332-1); and (3) all rulings subsumed within the Judgment that were adverse to Exchange-Based Plaintiffs in connection with this Court's dismissal of the Exchange-Based Plaintiffs' Sherman Act Section 1 claim and denial of their leave to replead that claim in a proposed amended complaint.

Dated:  New York, New York
      February 12, 2015                 Respectfully submitted,

LOVELL STEWART HALEBIAN            KIRBY McINERNEY LLP
JACOBSON LLP

 /s/  Christopher Lovell             /s/ David Kovel
Christopher Lovell                   David Kovel
61 Broadway, Suite 501             825 Third Avenue, 16th floor
New York, New York 10006          New York, New York 10022

Telephone: (212) 608-1900                    Telephone: (212) 371-6600
Facsimile: (212) 719-4775                     Facsimile: (212) 751-2540
Email:  clovell@lshllp.com                     Email: dkovel@kmllp.com


*Interim Co-Lead Counsel for Exchange-Based Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date a true copy of the foregoing Notice of Appeal has been filed electronically and made available for viewing through and downloading from the Court's Electronic Case Filing System.  Pursuant to District Court Local Civil Rule 5.2 and Local Rule 3.1 of the Court of Appeals for the Second Circuit, the Notice of Appeal has thereby been served electronically upon counsel for all parties in this action.

Dated:  February 12, 2015

_/s/ David E. Kovel_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re: | 11-MD-2262 |
| | Civil Action No. 12-6693 (NRB) |
| LIBOR-BASED FINANCIAL INSTRUMENTS | (ECF CASE) |
| LITIGATION | |
| | **NOTICE OF APPEAL** |
| THIS DOCUMENT RELATES TO: | |
| Case No. 12-cv-6693 | |
| COURTYARD AT AMWELL II, LLC, | C.A. No. 12 CV 6693 |
| GREENWICH COMMONS II, LLC, JILL | |
| COURT ASSOCIATES II, LLC, | |
| MAIDENCREEK VENTURES II LP, | |
| RARITAN COMMONS, LLC, and | |
| LAWRENCE W. GARDNER, on behalf of | |
| themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| BANK OF AMERICA CORPORATION, *et al.*, | |
| Defendants. | |

Notice is hereby given that, in accordance with Federal Rules of Appellate Procedure 3 and 4, and 28 U.S.C. § 1291, that Plaintiffs Courtyard at Amwell II, LLC, Greenwich Commons II, LLC, Jill Court Associates II, LLC, Maidencreek Ventures II LP, Raritan Commons, LLC, and Lawrence W. Gardner ("Courtyard at Amwell II") and the putative class hereby appeal from final judgments of the district court entered on March 29, 2013 (Dkt. 286 on the MDL docket; Dkt. 13 on the *Courtyard at Amwell II* docket) and February 5, 2015 (Dkt. 1008 on the MDL docket; Dkt. 71 on the *Courtyard at Amwell II* docket), to the United States Court of Appeals for the Second Circuit.

Dated:  February 12, 2015.

HAGENS BERMAN SOBOL SHAPIRO LLP


By   /s/ Jason A. Zweig
        Jason A. Zweig (JZ-8107)
555 Fifth Avenue, Ste. 1700
New York, NY  10017-2416
Phone:  212/752-5455
Facsimile:  917/210-3980
jasonz@hbsslaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2015, the foregoing Notice of Appeal was filed electronically. Notification of this filing will be sent to all parties via the Court's CM/ECF system.

*/s/ Jason A. Zweig*
JASON A. ZWEIG

010253-11  758967 V1

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 (NRB) (THK) |
| THIS DOCUMENT RELATES TO:<br><br>MAYOR AND CITY COUNCIL OF BALTIMORE and CITY OF NEW BRITAIN FIREFIGHTERS' AND POLICE BENEFIT FUND, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC on behalf of themselves and all others similarly situated<br><br><div align=center>Plaintiffs,</div><br><div align=center>vs.</div><br>CREDIT SUISSE GROUP AG, CREDIT SUISSE INTERNATIONAL, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., JP MORGAN CHASE & CO., JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, HSBC HOLDINGS PLC, HSBC BANK PLC, BARCLAYS BANK PLC, LLOYDS BANKING GROUP PLC, WESTLB AG, WESTDEUTSCHE IMMOBILIENBANK AG, UBS AG, THE ROYAL BANK OF SCOTLAND GROUP PLC, DEUTSCHE BANK AG, CITIBANK NA, CITIGROUP INC., COÖPERATIEVE CENTRALE RAIFFEISEN BOERENLEENBANK B.A., THE NORINCHUKIN BANK, THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., HBOS PLC, SOCIÉTÉ GÉNÉRALE S.A, and ROYAL BANK OF CANADA,<br><br><div align=center>Defendants.</div> | Index No.  2011 CV 05450 (NRB)<br><br>**NOTICE OF APPEAL** |

3553430v1/012751

**JA1605**

Notice is hereby given, in accordance with Federal Rules of Appellate Procedure 3 and 4, that Plaintiffs Mayor and City Council of Baltimore ("Baltimore"), City of New Britain Firefighters' and Police Benefit Fund ("New Britain"), and Texas Competitive Electric Holdings Company LLC ("TCEH"), on behalf of themselves and the putative class, hereby appeal from the partial final Judgment pursuant to Rule 54(b) entered on February 11, 2015 [Dkt. 1013 on the MDL docket, 11-MD-2262; Dkt. 117 on the Baltimore docket, 11-cv-5450] in the Southern District of New York, as well as all orders and rulings subsumed within the Judgment (including but not limited to Dkt. Nos. 286, 389, and 1008 in 11-MD-2262), to the United States Court of Appeals for the Second Circuit.

Dated:  February 12, 2015

William Christopher Carmody (WC8478)
Arun Subramanian (AS2096)
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, New York 10022
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
Email: bcarmody@susmangodfrey.com
Email: asubramanian@susmangodfrey.com
Email: sard@susmangodfrey.com

Marc Seltzer
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
Email: mseltzer@susmangodfrey.com

Drew D. Hansen
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, W 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
Email: dhansen@susmangodfrey.com

3553430v1/012751

**JA1606**

Barry C. Barnett
SUSMAN GODFREY L.L.P.
901 Main Street, Suite 5100
Dallas, TX 75202
Telephone: (214) 754-1900
Facsimile: (214) 754-1933
Email: bbarnett@susmangodfrey.com

Michael D. Hausfeld
William P. Butterfield
Hilary Scherrer
Nathaniel C. Giddings
HAUSFELD LLP
1700 St. NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com
Email: wbutterfield@hausfeldllp.com
Email: hscherrer@hausfeldllp.com
Email: ngiddings@hausfeldllp.com

***Counsel for Baltimore, New Britain, and TCEH and
Interim Lead Counsel for the Proposed OTC Plaintiff
Class***

Max R. Schwartz (MS2517)
Donald A. Broggi
SCOTT+SCOTT LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: (212) 223-6444
Email: mschwartz@scott-scott.com
Email: dbroggi@scott-scott.com

Christopher M. Burke
SCOTT+SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
Email: cburke@scott-scott.com

***Additional Counsel for Plaintiffs***

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 (NRB) (THK) |
| THIS DOCUMENT RELATES TO: | |
| MAYOR AND CITY COUNCIL OF BALTIMORE and CITY OF NEW BRITAIN FIREFIGHTERS' AND POLICE BENEFIT FUND, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC on behalf of themselves and all others similarly situated | Index No.  2011 CV 05450 (NRB) |
| Plaintiffs, | **AMENDED NOTICE OF APPEAL** |
| vs. | |
| CREDIT SUISSE GROUP AG, CREDIT SUISSE INTERNATIONAL, BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., JP MORGAN CHASE & CO., JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, HSBC HOLDINGS PLC, HSBC BANK PLC, BARCLAYS BANK PLC, LLOYDS BANKING GROUP PLC, WESTLB AG, WESTDEUTSCHE IMMOBILIENBANK AG, UBS AG, THE ROYAL BANK OF SCOTLAND GROUP PLC, DEUTSCHE BANK AG, CITIBANK NA, CITIGROUP INC., COÖPERATIEVE CENTRALE RAIFFEISEN BOERENLEENBANK B.A., THE NORINCHUKIN BANK, THE BANK OF TOKYO-MITSUBISHI UFJ, LTD., HBOS PLC, SOCIÉTÉ GÉNÉRALE S.A, and ROYAL BANK OF CANADA, | |
| Defendants. | |

Notice is hereby given, in accordance with Federal Rules of Appellate Procedure 3 and 4, that Plaintiffs Mayor and City Council of Baltimore ("Baltimore"), City of New Britain Firefighters' and Police Benefit Fund ("New Britain"), and Texas Competitive Electric Holdings Company LLC ("TCEH"), on behalf of themselves and the putative class, hereby appeal from the Corrected Judgment pursuant to Rule 54(b) entered on February 17, 2015 [Dkt. 1024 on the MDL docket, 11-MD-2262; Dkt. 120 on the Baltimore docket, 11-cv-5450] in the Southern District of New York, as well as all orders and rulings subsumed within the Judgment (including but not limited to Dkt. Nos. 286, 389, and 1008 in 11-MD-2262), to the United States Court of Appeals for the Second Circuit.

Dated:  February 20, 2015

_____
William Christopher Carmody (WC8478)
Arun Subramanian (AS2096)
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, New York 10022
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
Email: bcarmody@susmangodfrey.com
Email: asubramanian@susmangodfrey.com

Marc Seltzer
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
Email: mseltzer@susmangodfrey.com

Drew D. Hansen
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, W 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

Email: dhansen@susmangodfrey.com

Barry C. Barnett
SUSMAN GODFREY L.L.P.
901 Main Street, Suite 5100
Dallas, TX 75202
Telephone: (214) 754-1900
Facsimile: (214) 754-1933
Email: bbarnett@susmangodfrey.com

Michael D. Hausfeld
William P. Butterfield
Hilary Scherrer
Nathaniel C. Giddings
HAUSFELD LLP
1700 St. NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mhausfeld@hausfeldllp.com
Email: wbutterfield@hausfeldllp.com
Email: hscherrer@hausfeldllp.com
Email: ngiddings@hausfeldllp.com

***Counsel for Baltimore, New Britain, and TCEH and Interim Lead Counsel for the Proposed OTC Plaintiff Class***

Max R. Schwartz (MS2517)
Donald A. Broggi
SCOTT+SCOTT LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: (212) 223-6444
Email: mschwartz@scott-scott.com
Email: dbroggi@scott-scott.com

Christopher M. Burke
SCOTT+SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
Email: cburke@scott-scott.com

***Additional Counsel for Plaintiffs***

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 (NRB)<br>ECF Case |
| This Document Relates To:<br><br>GUARANTY BANK & TRUST COMPANY, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>    v.<br><br>CREDIT SUISSE GROUP AG; BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; J.P MORGAN CHASE & CO.; JPMORGAN CHASE BANK, NATIONAL ASSOCIATION; HSBC HOLDINGS PLC; HSBC BANK PLC; LLOYDS BANKING GROUP PLC; HBOS PLC; BARCLAYS BANK PLC; WESTLB AG; WESTDEUTSCHE IMMOBILIENBANK AG; UBS AG; THE ROYAL BANK OF SCOTLAND GROUP PLC; DEUTSCHE BANK AG; CITIBANK, N.A.; CITIGROUP INC.; COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A.; THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.; THE NORINCHUKIN BANK; AND ROYAL BANK OF CANADA,<br><br>               Defendants. | Case No. 13-CV-0346<br><br><br>**NOTICE OF APPEAL** |

**PLEASE TAKE NOTICE THAT** Plaintiff Guaranty Bank & Trust Company, on behalf of itself and all others similarly situated and in accordance with Federal Rules of Appellate Procedure 3 and 4, and 28 U.S.C. § 1291, hereby appeals to the United States Court of Appeals for the Second Circuit the District Court's February 17, 2015 corrected judgment granting partial final judgment pursuant to Rule 54(b) [Dkt. 1024 on the MDL docket, No. 11-MD-2262], and all orders and rulings subsumed within the judgment (including Dkt. Nos. 286, 389, and 1008 in No. 11-MD-2262).

Dated: February 20, 2015

Respectfully submitted,

_____

Michael J. Guzman
Andrew C. Shen
KELLOGG, HUBER, HANSEN,
　TODD, EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
mguzman@khhte.com
ashen@khhte.com

Stuart H. McCluer
MCCULLEY MCCLUER PLLC
1223 Jackson Avenue East, Suite 200
Oxford, Mississippi 38655
Telephone:  (662) 550-4511
Facsimile:  (662) 368-1506
smccluer@mcculleymccluer.com

R. Bryant McCulley
MCCULLEY MCCLUER PLLC
2113 Middle Street, Suite 208
Sullivan's Island, SC 29482
Telephone:  (205) 238-6757
Facsimile:  (662) 368-1506
bmcculley@mcculleymccluer.com

W. Percy Badham III
Brannon J. Buck
Richard Dorman
BADHAM & BUCK LLC
2585 Wells Fargo Tower
420 20th Street North
Birmingham, AL 35203
Telephone:  (205) 521-0036
Facsimile:  (205) 521-0037
pbadham@badhambuck.com
bbuck@badhambuck.com
rdorman@badhambuck.com

*Counsel for Guaranty Bank & Trust Company*

2

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of February, 2015, I caused true and correct copies

of the foregoing document to be served electronically on all counsel of record via the Court's

ECF system.

By: _____

Andrew C. Shen

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE:  LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | ) ) ) |
| THIS DOCUMENT RELATES TO: | ) ) |
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of U.S. Central Federal Credit Union, Western Corporate Federal Credit Union, Members United Corporate Federal Credit Union, Southwest Corporate Federal Credit Union, and Constitution Corporate Federal Credit Union | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| CREDIT SUISSE GROUP AG; CREDIT SUISSE GROUP INTERNATIONAL; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; LLOYDS BANKING GROUP PLC; WESTLB AG; WESTDEUTSCHE IMMOBILIENBANK AG; UBS AG; THE ROYAL BANK OF SCOTLAND GROUP PLC; COÖPERATIEVE CENTRALE RAIFFEISEN BOERENLEENBANK B.A.; THE NORINCHUKIN BANK; THE BANK OF TOKYO-MITSUBISHI UFJ, LTD.; HBOS PLC; SOCIÉTÉ GÉNÉRALE S.A; ROYAL BANK OF CANADA; BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; CITIGROUP, INC.; CITIBANK, N.A.; CITIGROUP FINANCIAL PRODUCTS; DEUTSCHE BANK AG; RABOBANK INTERNATIONAL; CITI SWAPCO INC.; HSBC HOLDINGS PLC; HSBC BANK USA, N.A.; JPMORGAN CHASE & CO.; AND JPMORGAN CHASE BANK N.A. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**MDL No. 2262**

Master File No. 1:11-md-2262-NRB

ECF Case

Case No.  13-cv-7394-NRB

**NOTICE OF APPEAL**

    **PLEASE TAKE NOTICE THAT** Plaintiff National Credit Union Administration Board, in accordance with Federal Rules of Appellate Procedure 3 and 4, and 28 U.S.C. § 1291, hereby appeals to the United States Court of Appeals for the Second Circuit the partial final Judgment pursuant to Rule 54(b) entered on February 23, 2015, Dkt. No. 1053 on the MDL docket, No. 11-MD-2262 in the Southern District of New York, as well as all orders and rulings subsumed within the Judgment (including Dkt. Nos. 286, 389, and 1023 in No. 11-MD-2262).

Dated: February 24, 2015

Respectfully submitted,

/s/ David C. Frederick

David C. Frederick
Wan J. Kim
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
dfrederick@khhte.com
wkim@khhte.com
grapawy@khhte.com
ashen@khhte.com

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Tel:  (312) 641-9750
Fax:  (312) 641-9751
gzelcs@koreintillery.com

Stephen M. Tillery
Douglas R. Sprong
Robert L. King
Diane E. Moore
KOREIN TILLERY LLC
505 North Seventh Street, Suite 3600
St. Louis, MO 63101
Tel:  (314) 241-4844
Fax:  (314) 241-3525
stillery@koreintillery.com
dsprong@koreintillery.com
rking@koreintillery.com
dmoore@koreintillery.com

Norman E. Siegel (D. Kan. # 70354)
Rachel E. Schwartz (Kan. # 21782)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel:  (816) 714-7100
Fax:  (816) 714-7101
siegel@stuevesiegel.com
schwartz@stuevesiegel.com

*Attorneys for Plaintiff National Credit Union Administration Board*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of February, 2015, I caused true and correct copies of the foregoing document to be served electronically on all counsel of record via the Court's ECF system.

By:          <u>/s/ David C. Frederick          </u>

David C. Frederick

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>1:13-CV-06020-NRB | Case No. 1:11-md-2262-NRB<br><br>**NOTICE OF APPEAL** |

THE CITY OF PHILADELPHIA and
THE PENNSYLVANIA
INTERGOVERNMENTAL COOPERATION
AUTHORITY,

                    Plaintiffs,

          v.

BANK OF AMERICA CORPORATION,
BANK OF AMERICA, N.A., BARCLAYS
BANK PLC, CITIGROUP INC., CITIBANK,
N.A., CITIGROUP FINANCIAL
PRODUCTS, INC., CREDIT SUISSE
GROUP AG, DEUTSCHE BANK AG, J.P.
MORGAN CHASE & CO., J.P. MORGAN
CHASE BANK, N.A., ROYAL BANK OF
CANADA, ROYAL BANK OF SCOTLAND
PLC, and UBS AG,

                    Defendants.

          NOTICE IS HEREBY GIVEN that Plaintiffs The City of Philadelphia and The

Pennsylvania Intergovernmental Cooperation Authority appeal to the United States Court of

Appeals for the Second Circuit from Partial Judgment entered pursuant to Federal Rule of Civil

Procedure 54(b) on February 23, 2015 [Dkt. No. 1053 on the MDL docket, 11-md-2262;

Dkt. No. 101 on the City of Philadelphia docket, 13-cv-6020], as well as all orders and rulings

subsumed within the Partial Judgment (including but not limited to Dkt. No. 286 on 11-md-

2262), and each and every part thereof.


DATED:   New York, New York           QUINN EMANUEL URQUHART &
         February 24, 2015                SULLIVAN, LLP


                                      By:   /s/ Steig D. Olson
Mathieu J. Shapiro (PA 76266)               Steig D. Olson
OBERMAYER REBMANN                           Daniel L. Brockett
MAXWELL & HIPPEL LLP                        Daniel P. Cunningham
One Penn Center, 19th Floor                 Jacob J. Waldman
1617 John F. Kennedy Boulevard              QUINN EMANUEL URQUHART &
Philadelphia, Pennsylvania 19103            SULLIVAN, LLP
Telephone: (215) 665-3000                   51 Madison Avenue, 22nd Floor
Fax: (215) 665-3165                         New York, New York 10010
mathieu.shapiro@obermayer.com               Telephone: 212-849-7000
                                            Fax: 212-849-7100
Michael J. Boni (PA 52983)                  danbrockett@quinnemanuel.com
Joshua D. Snyder (PA 88657)                 danielcunningham@quinnemanuel.com
John E. Sindoni (PA 91729)                  steigolson@quinnemanuel.com
BONI & ZACK LLC                             jacobwaldman@quinnemanuel.com
15 St. Asaphs Road
Bala Cynwyd, PA  19004                       Jeremy D. Andersen
Telephone: (610) 822-0200                    865 South Figueroa Street, 10th Floor
Fax:  (610) 822-0206                         Los Angeles, California 90017
mboni@bonizack.com                           Telephone: 213-443-3000
jsnyder@bonizack.com                         Fax: 213-443-3100
jsindoni@bonizack.com                        jeremyandersen@quinnemanuel.com

*Attorneys for Plaintiffs*                   *Attorneys for Plaintiffs*

2

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2015, a true and correct copy of the foregoing

Notice of Appeal was filed electronically through the Court's ECF system.  In accordance with

Local Civil Rule 5.2 of the United States District Courts for the Southern and Eastern Districts of

New York as well as Local Rule 3.1 of the United States Court of Appeals for the Second

Circuit, the Notice of Appeal has thereby been served electronically on counsel for all parties in

these actions.

/s/ Jacob J. Waldman
Jacob J. Waldman
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
jacobwaldman@quinnemanuel.com

3

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | Case No. 1:11-md-2262-NRB |
| THIS DOCUMENT RELATES TO: | **NOTICE OF APPEAL** |
| 1:13-CV-08799-NRB | |

DARBY FINANCIAL PRODUCTS and
CAPITAL VENTURES INTERNATIONAL,

<div align="center">Plaintiffs,</div>

<div align="center">-against-</div>

BARCLAYS BANK PLC; DEUTSCHE
BANK AG, JPMORGAN CHASE & CO.;
JPMORGAN CHASE BANK, N.A.; J.P.
MORGAN BANK DUBLIN PLC (f/k/a
BEAR STEARNS BANK PLC); THE
ROYAL BANK OF SCOTLAND PLC; UBS
AG; and UBS LIMITED,

<div align="center">Defendants.</div>

NOTICE IS HEREBY GIVEN that Plaintiffs Darby Financial Products and Capital Ventures International appeal to the United States Court of Appeals for the Second Circuit from Partial Judgment entered pursuant to Federal Rule of Civil Procedure 54(b) on February 23, 2015 [Dkt. No. 1053 on the MDL docket, 11-md-2262; Dkt. No. 74 on the Darby docket, 13-cv-8799], as well as all orders and rulings subsumed within the Partial Judgment (including but not limited to Dkt. No. 286 on 11-md-2262), and each and every part thereof.

JA1622

DATED:  New York, New York          QUINN EMANUEL URQUHART &
        February 24, 2015                 SULLIVAN, LLP


                                    By:  /s/ Daniel L. Brockett
                                         Daniel L. Brockett
                                         Daniel P. Cunningham
                                         Steig D. Olson
                                         Jacob J. Waldman
                                         51 Madison Avenue, 22nd Floor
                                         New York, New York  10010-1601
                                         Telephone:  (212) 849-7000
                                         Fax:  (212) 849-7100
                                         danbrockett@quinnemanuel.com
                                         danielcunningham@quinnemanuel.com
                                         steigolson@quinnemanuel.com
                                         jacobwaldman@quinnemanuel.com

                                         Jeremy D. Andersen (*pro hac vice*)
                                         865 South Figueroa Street, 10th Floor
                                         Los Angeles, California 90017
                                         Telephone:  (213) 443-3000
                                         Fax:  (213) 443-3100
                                         jeremyandersen@quinnemanuel.com

                                         *Attorneys for Plaintiffs Darby Financial Products
                                         and Capital Ventures International*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2015, a true and correct copy of the foregoing

Notice of Appeal was filed electronically through the Court's ECF system.  In accordance with

Local Civil Rule 5.2 of the United States District Courts for the Southern and Eastern Districts of

New York as well as Local Rule 3.1 of the United States Court of Appeals for the Second

Circuit, the Notice of Appeal has thereby been served electronically on counsel for all parties in

these actions.

/s/ Jacob J. Waldman
Jacob J. Waldman
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
jacobwaldman@quinnemanuel.com

3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | Case No. 1:11-md-2262-NRB |
| THIS DOCUMENT RELATES TO: | **NOTICE OF APPEAL** |
| 1:13-CV-04018-NRB | |

---

SALIX CAPITAL US INC.,

                Plaintiff,

        -against-

BANC OF AMERICA SECURITIES LLC, n/k/a MERRILL LYNCH, PIERCE, FENNER & SMITH INC., BANK OF AMERICA CORP., BANK OF AMERICA, N.A., BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., CITIBANK, N.A., CITIGROUP GLOBAL MARKETS INC., CITIGROUP GLOBAL MARKETS LIMITED, CITIGROUP INC., CREDIT SUISSE AG, CREDIT SUISSE GROUP AG, CREDIT SUISSE INTERNATIONAL, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK AG, DEUTSCHE BANK SECURITIES INC., JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, f/k/a J.P. MORGAN SECURITIES INC., THE ROYAL BANK OF SCOTLAND PLC, and UBS AG,

              Defendants.

---

      NOTICE IS HEREBY GIVEN that Plaintiff Salix Capital US Inc. appeals to the United

States Court of Appeals for the Second Circuit from Partial Judgment entered pursuant to Federal

Rule of Civil Procedure 54(b) on February 23, 2015 [Dkt. No. 1053 on the MDL docket, 11-md-

2262; Dkt. No. 98 on the Salix docket, 13-cv-4018], as well as all orders and rulings subsumed

1

within the Partial Judgment (including but not limited to Dkt. No. 286 on 11-md-2262), and each

and every part thereof.


DATED:   New York, New York            QUINN EMANUEL URQUHART &
         February 24, 2015                 SULLIVAN, LLP


                               By:   /s/ Daniel L. Brockett
                                     Daniel L. Brockett
                                     Daniel P. Cunningham
                                     Steig D. Olson
                                     Jacob J. Waldman
                                     51 Madison Avenue, 22nd Floor
                                     New York, New York  10010-1601
                                     Telephone:  (212) 849-7000
                                     Fax:  (212) 849-7100
                                     danbrockett@quinnemanuel.com
                                     danielcunningham@quinnemanuel.com
                                     steigolson@quinnemanuel.com
                                     jacobwaldman@quinnemanuel.com

                                     Jeremy D. Andersen (*pro hac vice*)
                                     865 South Figueroa Street, 10th Floor
                                     Los Angeles, California 90017
                                     Telephone:  (213) 443-3000
                                     Fax:  (213) 443-3100
                                     jeremyandersen@quinnemanuel.com

                                     *Attorneys for Plaintiff Salix Capital US Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2015, a true and correct copy of the foregoing Notice of Appeal was filed electronically through the Court's ECF system. In accordance with Local Civil Rule 5.2 of the United States District Courts for the Southern and Eastern Districts of New York as well as Local Rule 3.1 of the United States Court of Appeals for the Second Circuit, the Notice of Appeal has thereby been served electronically on counsel for all parties in these actions.

/s/ Jacob J. Waldman
Jacob J. Waldman
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
jacobwaldman@quinnemanuel.com

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

IN RE LIBOR-BASED FINANCIAL
INSTRUMENTS ANTITRUST LITIGATION                    MDL No. 2262 (NRB)

-------------------------------------------------------------X

THIS DOCUMENT RELATES TO EXCHANGE-
BASED PLAINTIFFS ACTION                             ECF Case

Case No. 11 Civ. 2613 (NRB)

-------------------------------------------------------------X

METZLER INVESTMENT GmbH, FTC             **AMENDED NOTICE OF**
FUTURES FUND SICAV, and FTC FUTURES      **APPEAL IN A CIVIL CASE**
FUND PCC LTD., ATLANTIC TRADING USA,
LLC, 303030 TRADING LLC, GARY FRANCIS
and NATHANIEL HAYNES, on behalf of
themselves and all others similarly situated,        11 Civ. 2613 (NRB)

                            Plaintiffs,

              -against-

CREDIT SUISSE GROUP AG, BANK OF
AMERICA CORPORATION, BANK OF
AMERICA, N.A., J.P. MORGAN CHASE & CO.,
J.P. MORGAN CHASE BANK, N.A., HSBC
HOLDINGS PLC, HSBC BANK PLC, HBOS PLC,
BARCLAYS BANK PLC, LLOYDS BANKING
GROUP PLC, LLOYDS TSB BANK PLC,
WESTLB AG, WESTDEUTSCHE
IMMOBILIENBANK AG, UBS AG, ROYAL
BANK OF SCOTLAND GROUP PLC,
DEUTSCHE BANK AG, THE NORINCHUKIN
BANK, ROYAL BANK OF CANADA, THE
BANK OF TOKYO-MITSUBISHI UFJ, LTD.,
COOPERATIVE CENTRAL RAIFFEISEN-
BOERENLEENBANK B.A., SOCIETE
GENERALE S.A., CITIGROUP, INC.,
CITIBANK N.A., and JOHN DOES 1-5,

                            Defendants.

-------------------------------------------------------------X

PLEASE TAKE NOTICE that pursuant to Fed. R. App. P. 4(a)(1)(A), Plaintiffs Metzler Investment GmbH, FTC Futures Fund SICAV, FTC Futures Fund PCC Ltd., Atlantic Trading USA, LLC, 303030 Trading LLC, Gary Francis and Nathaniel Haynes (collectively, "Exchange-Based Plaintiffs"), on behalf of themselves and all others similarly situated, hereby appeal to the United States Court of Appeals for the Second Circuit from: (1) this Court's Corrected Judgment pursuant to Rule 54(b) entered on February 17, 2015 (the "Judgment") (ECF No. 1024), dismissing the fifth count of the Exchange-Based Plaintiffs' Second Amended Consolidated Class Action Complaint (ECF. No. 407) for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) the Memorandum and Order of dismissal dated March 29, 2013 (ECF No. 286) and the Memorandum and Order dated August 23, 2013 (Doc. No. 389), denying leave to replead in a proposed amended complaint (ECF No. 332-1); and (3) all rulings subsumed within the Judgment that were adverse to Exchange-Based Plaintiffs in connection with this Court's dismissal of the Exchange-Based Plaintiffs' Sherman Act Section 1 claim and denial of their leave to replead that claim in a proposed amended complaint.

Dated:  New York, New York
     February 26, 2015                 Respectfully submitted,

LOVELL STEWART HALEBIAN          KIRBY McINERNEY LLP
JACOBSON LLP

_ /s/  Christopher Lovell_____       __/s/ David Kovel_____
Christopher Lovell                     David Kovel
61 Broadway, Suite 501             825 Third Avenue, 16th floor
New York, New York 10006          New York, New York 10022
Telephone: (212) 608-1900          Telephone: (212) 371-6600
Facsimile: (212) 719-4775           Facsimile: (212) 751-2540
Email:  clovell@lshllp.com           Email: dkovel@kmllp.com

*Interim Co-Lead Counsel for Exchange-Based Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date a true copy of the foregoing Amended Notice of Appeal has been filed electronically and made available for viewing through and downloading from the Court's Electronic Case Filing System.  Pursuant to District Court Local Civil Rule 5.2 and Local Rule 3.1 of the Court of Appeals for the Second Circuit, the Amended Notice of Appeal has thereby been served electronically upon counsel for all parties in this action.

Dated:  February 26, 2015

_/s/ David E. Kovel_____

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | Case No. 1:11-md-2262-NRB |
| | **NOTICE OF APPEAL** |
| THIS DOCUMENT RELATES TO: | |
| 1:14-CV-04189-NRB | |

PRUDENTIAL INVESTMENT PORTFOLIOS 2, f/k/a DRYDEN CORE INVESTMENT FUND, o/b/o PRUDENTIAL CORE SHORT-TERM BOND FUND and PRUDENTIAL CORE TAXABLE MONEY MARKET FUND,

Plaintiff,

v.

BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., BARCLAYS PLC, CITIBANK, N.A., CITIGROUP FUNDING INC., CITIGROUP GLOBAL MARKETS INC., CITIGROUP INC., CREDIT SUISSE AG, CREDIT SUISSE GROUP AG, CREDIT SUISSE SECURITIES (USA) LLC, CREDIT SUISSE (USA) INC., DEUTSCHE BANK AG, HSBC BANK PLC, HSBC FINANCE CORP., HSBC HOLDINGS PLC, HSBC SECURITIES (USA) INC., HSBC USA INC., JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., J.P. MORGAN SECURITIES LLC, f/k/a J.P. MORGAN SECURITIES INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INC., f/k/a BANC OF AMERICA SECURITIES LLC, ROYAL BANK OF CANADA, RBC CAPITAL MARKETS, LLC, THE ROYAL BANK OF SCOTLAND PLC, RBS SECURITIES INC., f/k/a GREENWICH CAPITAL MARKETS, INC., UBS AG, and UBS SECURITIES LLC,

Defendants.

NOTICE IS HEREBY GIVEN that Plaintiff Prudential Investment Portfolios 2,

f/k/a Dryden Core Investment Fund, on behalf of Prudential Core Short-Term Bond Fund and

Prudential Core Taxable Money Market Fund, appeals to the United States Court of Appeals for

the Second Circuit from Partial Judgment entered pursuant to Federal Rule of Civil Procedure

54(b) on February 23, 2015 [Dkt. No. 1053 on the MDL docket, 11-md-2262; Dkt. No. 73 on the

Prudential docket, 14-cv-4189], as well as all orders and rulings subsumed within the Partial

Judgment (including but not limited to Dkt. No. 286 on 11-md-2262), and each and every part

thereof.

DATED:   New York, New York        QUINN EMANUEL URQUHART &
          February 27, 2015          SULLIVAN, LLP


By:   /s/ Daniel L. Brockett
     Daniel L. Brockett
     Daniel P. Cunningham
     Steig D. Olson
     Jacob J. Waldman
     51 Madison Avenue, 22nd Floor
     New York, New York  10010-1601
     Telephone:  (212) 849-7000
     Fax:  (212) 849-7100
     danbrockett@quinnemanuel.com
     danielcunningham@quinnemanuel.com
     steigolson@quinnemanuel.com
     jacobwaldman@quinnemanuel.com

     Jeremy D. Andersen (*pro hac vice*)
     865 South Figueroa Street, 10th Floor
     Los Angeles, California 90017
     Telephone:  (213) 443-3000
     Fax:  (213) 443-3100
     jeremyandersen@quinnemanuel.com

     *Attorneys for Plaintiff Prudential Investment*
     *Portfolios 2 on behalf of Prudential Core Short-*
     *Term Bond Fund and Prudential Core Taxable*
     *Money Market Fund*

2

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2015, a true and correct copy of the foregoing

Notice of Appeal was filed electronically through the Court's ECF system.  In accordance with

Local Civil Rule 5.2 of the United States District Courts for the Southern and Eastern Districts of

New York as well as Local Rule 3.1 of the United States Court of Appeals for the Second

Circuit, the Notice of Appeal has thereby been served electronically on counsel for all parties in

these actions.

/s/ Jacob J. Waldman
Jacob J. Waldman
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
jacobwaldman@quinnemanuel.com

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re: LIBOR-Based Financial Instruments Antitrust Litigation**<br><br>This document relates to:<br><br>*The Regents of the Univ. of California v. Bank of America Corp., et al.* S.D.N.Y. Case No. 1:13-cv-05186;<br><br>*East Bay Municipal Utility District v. Bank of America Corp., et al.* S.D.N.Y. Case No. 1:13-cv-00626;<br><br>*San Diego Assoc. of Governments v. Bank of America Corp., et al.* S.D.N.Y. Case No. 1:13-cv-05221;<br><br>*City of Richmond, et al. v. Bank of America Corp., et al.* S.D.N.Y. Case No. 1:13-cv-00627;<br><br>*City of Riverside, et al. v. Bank of America Corp., et al.* S.D.N.Y. Case No. 1:13-cv-00597;<br><br>*County of Mendocino v. Bank of America Corp., et al.* S.D.N.Y. Case No. 1:13-cv-08644;<br><br>*County of Sacramento v. Bank of America Corp., et al.* S.D.N.Y. Case No. 1:13-cv-05569;<br><br>*County of San Diego v. Bank of America Corp., et al.* S.D.N.Y. Case No. 1:13-cv-00667;<br><br>*County of San Mateo, et al. v. Bank of America Corp., et al.* S.D.N.Y. Case No. 1:13-cv-00625;<br><br>*County of Sonoma, et al. v. Bank of America Corp., et al.* S.D.N.Y. Case No. 1:13-cv-05187. | **Master File No. 1:11-md-02262-NRB**<br><br>**ECF CASE**<br><br>**NOTICE OF APPEAL** |

NOTICE IS HEREBY GIVEN that California Direct Action Plaintiffs The Regents of the University of California, East Bay Municipal Utility District, San Diego Association of Governments, City of Richmond, The Richmond Joint Powers Financing Authority, Successor Agency to the Richmond Community Redevelopment Agency, City of Riverside, The Riverside Public Financing Authority, County of Mendocino, County of Sacramento, County of San Diego, County of San Mateo, The San Mateo County Joint Powers Financing Authority, County of Sonoma, and David E. Sundstrom, in his official capacity as Treasurer of the County of Sonoma, appeal to the United States Court of Appeals for the Second Circuit from Partial Judgment entered pursuant to Federal Rule of Civil Procedure 54(b) on February 23, 2015 [Docket No. 1053 on the MDL docket, 11-md-2262; Docket No. 157 on The Regents of University of California docket, 1:13-cv-05186; Docket No. 164 on the East Bay Municipal Utility District docket, 1:13-cv-00626; Docket No. 150 on the San Diego Association of Governments docket, 1:13-cv-05221; Docket No. 166 on the City of Richmond, et al. docket, 1:13-cv-00627; Docket No. 166 on the City of Riverside, et al. docket, 1:13-cv-00597; Docket No. 130 on the County of Mendocino docket, 1:13-cv-08644; Docket No. 150 on the County of Sacramento docket, 1:13-cv-05569; Docket No. 165 on the County of San Diego docket, 1:13-cv-00667; Docket No. 165 on the County of San Mateo, et al. docket, 1:13-cv-00625; Docket No. 157 on the County of Sonoma, et al. docket, 1:13-cv-05187], as well as all orders and rulings subsumed within the Partial Judgment (including but not limited to Docket No. 286 on the 11-md-2262 docket), and each and every part thereof.

DATED: March 10, 2015

COTCHETT, PITRE & McCARTHY, LLP

By:     /s/ Nanci E. Nishimura

NANCI E. NISHIMURA
MATTHEW K. EDLING
ALEXANDER E. BARNETT

COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
Email:  nnishimura@cpmlegal.com

*Counsel for Plaintiffs The Regents of the University of California, East Bay Municipal Utility District, San Diego Association of Governments, City of Richmond, The Richmond Joint Powers Financing Authority, Successor Agency to the Richmond Community Redevelopment Agency, City of Riverside, The Riverside Public Financing Authority, County of Mendocino, County of Sacramento, County of San Diego, County of San Mateo, The San Mateo County Joint Powers Financing Authority, County of Sonoma, David E. Sundstrom, in his official capacity as Treasurer of the County of Sonoma.*

2

**CERTIFICATE OF SERVICE**

I hereby certify that on March 10, 2015, a true and correct copy of the foregoing Notice of Appeal was filed electronically through the Court's ECF system.  In accordance with Local Civil Rule 5.2 of the United States District Courts for the Southern and Eastern Districts of New York as well as Local Rule 3.1 of the United States Court of Appeals for the Second Circuit, the Notice of Appeal has thereby been served electronically on counsel for all parties in these actions.

/s/ Nanci E. Nishimura
Nanci E. Nishimura
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA  94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
Email:  nnishimura@cpmlegal.com

3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: LIBOR-Based Financial Instruments Antitrust Litigation | Master File No. 1:11-md-02262-NRB |
| This document relates to: | ECF CASE |
| *City of Houston v. Bank of America Corp., et al.* S.D.N.Y. Case No. 1:13-cv-05616. | NOTICE OF APPEAL |

NOTICE IS HEREBY GIVEN that Texas Direct Action Plaintiff the City of Houston,

Texas appeals to the United States Court of Appeals for the Second Circuit from Partial

Judgment entered pursuant to Federal Rule of Civil Procedure 54(b) on February 23, 2015

[Docket No. 1053 on the MDL docket, 11-md-2262; Docket No. 160 on the City of Houston

docket, 1:13-cv-05616], as well as all orders and rulings subsumed within the Partial Judgment

(including but not limited to Docket No. 286 on the 11-md-2262 docket), and each and every

part thereof.

DATED: March 9, 2015

                        MITHOFF LAW FIRM

                        CITY OF HOUSTON LEGAL DEPARTMENT

                        COTCHETT, PITRE & McCARTHY, LLP

                        THE CHEVALIER LAW FIRM, PLLC

By: _____

                        RICHARD WARREN MITHOFF
                        MITHOFF LAW FIRM
                        One Allen Center
                        Penthouse, Suite 3450
                        500 Dallas Street
                        Houston, TX 77002
                        Telephone:   (713) 654-1122
                        Facsimile:   (713) 739-8085
                        Email: rmithoff@mithofflaw.com

                        NANCI E. NISHIMURA
                        MATTHEW K. EDLING
                        ALEXANDER E. BARNETT
                        COTCHETT, PITRE & McCARTHY, LLP
                        840 Malcolm Road
                        Burlingame, CA  94010
                        Telephone:  (650) 697-6000
                        Facsimile:  (650) 697-0577
                        Email: nnishimura@cpmlegal.com
                                medling@cpmlegal.com
                                abarnett@cpmlegal.com

                        *Counsel for Plaintiff City of Houston.*

1

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2015, a true and correct copy of the foregoing Notice of

Appeal was filed electronically through the Court's ECF system. In accordance with Local Civil

Rule 5.2 of the United States District Courts for the Southern and Eastern Districts of New York

as well as Local Rule 3.1 of the United States Court of Appeals for the Second Circuit, the

Notice of Appeal has thereby been served electronically on counsel for all parties in these

actions.

Richard Warren Mithoff
MITHOFF LAW FIRM
One Allen Center
Penthouse, Suite 3450
500 Dallas Street
Houston, TX 77002
Telephone: (713) 654-1122
Facsimile: (713) 739-8085
Email: rmithoff@mithofflaw.com

2

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | MDL No. 2262 |
| THIS DOCUMENT RELATES TO: | Master File No. 1:11-md-2262-NRB |
| | ECF Case |
| BAY AREA TOLL AUTHORITY, | Case No. 14-cv-3094-NRB |
| Plaintiff, | |
| v. | |
| BANK OF AMERICA CORPORATION, *et al.*, | **NOTICE OF APPEAL** |
| Defendants. | |

Notice is hereby given that, in accordance with Rules 3 and 4 of the Federal Rules of Appellate Procedure, as well as 28 U.S.C. § 1291, Plaintiff Bay Area Toll Authority appeals to the United States Court of Appeals for the Second Circuit from the partial final judgment entered on February 23, 2015 ("Partial Final Judgment") (MDL Dkt. No. 1053, Dkt. No. 117 in Case No. 14-cv-3094-NRB) as to Plaintiff's claim for violation of Section 1 of the Sherman Act (15 U.S.C. § 1), as well as all orders and rulings subsumed within the Partial Final Judgment (including but not limited to MDL Dkt. No. 286).

Dated:  March 13, 2015          Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By:____*/s/ Steven E. Fineman*_____
          Steven E. Fineman

1221825.1

**JA1641**

Steven E. Fineman
Michael J. Miarmi
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Tel.:  (212) 355-9500
Fax:  (212) 355-9592
sfineman@lchb.com
mmiarmi@lchb.com

Richard M. Heimann
Eric B. Fastiff
Brendan P. Glackin
Marc A. Pilotin
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel.:  (415) 956-1000
Fax:  (415) 956-1008
rheimann@lchb.com
efastiff@lchb.com
bglackin@lchb.com
mpilotin@lchb.com

Adrienne D. Weil
*General Counsel*
METROPOLITAN TRANSPORTATION COMMISSION
and BAY AREA TOLL AUTHORITY
101 8th Street
Oakland, CA 94607
Tel.:  (510) 817-5830
aweil@mtc.ca.gov

*Attorneys for Plaintiff Bay Area Toll Authority*

1

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2015, a true and correct copy of the foregoing Notice of Appeal was filed electronically through the Court's ECF system.  In accordance with Local Civil Rule 5.2 of the United States District Courts for the Southern and Eastern Districts of New York, as well as Local Rule 3.1 of the United States Court of Appeals for the Second Circuit, the Notice of Appeal has thereby been served electronically on counsel for all parties in this action.

Dated:  March 13, 2015

/s/ Michael J. Miarmi
Michael J. Miarmi
LIEFF CABRASER HEIMANN
 & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Tel.:  (212) 355-9500
Fax:  (212) 355-9592
mmiarmi@lchb.com

2

1221825.1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re: LIBOR-Based Financial Instruments Antitrust Litigation | Master File No. 1:11-MD-2262-NRB |
|---|---|
| This document relates to:<br><br>*Amabile et al. v. Bank of America Corp.*, et al. | EFF CASE<br>Case No. 1:13-cv-01700-NRB |

**NOTICE OF APPEAL**

**PLEASE TAKE NOTICE**, that Plaintiffs *Amabile et al.* appeal to the United States Court of Appeals for the Second Circuit from the Partial Judgment entered pursuant to Federal Rule of Procedure 54(b) on February 23, 2015 [Dkt. No. 1053 on the MDL docket, 11-md-2262; Dkt. No. 84 on the *Amabile et al.* docket, 13-cv-01700], as well as all orders and rulings subsumed within the Partial Judgment (including but not limited to Dkt. No. 286 on 11-md-2262), and each and every part thereof.

Dated: March 19, 2015

SCHLESINGER LAW OFFICES, P.A.

By:    /s/ Scott P. Schlesinger
       Scott P. Schlesinger
       Jeffrey L. Haberman
       Jonathan R. Gdanski
       SCHLESINGER LAW OFFICES, P.A.
       1212 SE 3rd Avenue
       Ft. Lauderdale, FL 33316
       Tel: 954-320-9507
       Fax: 954-320-9509
       scott@schlesingerlaw.com
       jhaberman@schlesingerlaw.com
       jonathan@schlesingerlaw.com

       *Attorneys for Plaintiffs Amabile, et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2015, a true and correct copy of the foregoing Notice of Appeal was filed electronically through the Court's ECF system. In accordance with local Rule 5.2 of the United States District Court for the Southern District of New York as well as Local Rule 3.1 of the United States Court of Appeal for the Second Circuit, the notice of Appeal has thereby been served electronically on counsel for all parties in these actions.

By:   /s/ Jeffrey L. Haberman
Scott P. Schlesinger
Jeffrey L. Haberman
Jonathan R. Gdanski
SCHLESINGER LAW OFFICES, P.A.
1212 SE 3rd Avenue
Ft. Lauderdale, FL 33316
Tel: 954-320-9507
Fax: 954-320-9509
scott@schlesingerlaw.com
jhaberman@schlesingerlaw.com
jonathan@schlesingerlaw.com