# 13-3565-cv(L)

13-3636-CV(CON), 15-0432-cv(CON), 15-0441-cv(CON), 15-0454-cv(CON), 15-0477-cv(CON),
15-0494-cv(CON), 15-0498-cv(CON), 15-0524-cv(CON), 15-0537-cv(CON), 15-0547-cv(CON),
15-0551-cv(CON), 15-0611-cv(CON), 15-0620-cv(CON), 15-0627-cv(CON), 15-0733-cv(CON),
15-0744-cv(CON), 15-0778-cv(CON), 15-0825-cv(CON), 15-0830-cv(CON)

## United States Court of Appeals
*for the*
## Second Circuit

---

Ellen Gelboim, on behalf of herself and all others similarly situated,

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SPECIAL APPENDIX

KAREN L. MORRIS
PATRICK F. MORRIS
MORRIS AND MORRIS LLC
   COUNSELORS AT LAW
4001 Kennett Pike, Suite 300
Wilmington, Delaware 19807
(302) 426-0400

DAVID H. WEINSTEIN
ROBERT S. KITCHENOFF
WEINSTEIN KITCHENOFF & ASHER LLC
1845 Walnut Street, Suite 1100
Philadelphia, Pennsylvania 19103
(215) 545-7200

THOMAS C. GOLDSTEIN
ERIC F. CITRON
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue, Suite 850
Bethesda, Maryland 20814
(202) 362-0636

*Counsel for Plaintiffs-Appellants Ellen Gelboim
and Linda Zacher in Case No. 13-3565*

*(For Continuation of Appearances See Inside Cover)*

Linda Zacher, Schwab Short-Term Bond Market Fund, Schwab Total Bond
Market Fund, Schwab U.S. Dollar Liquid Assets Fund, Schwab Money Market
Fund, Schwab Value Advantage Money Fund, Schwab Retirement Advantage
Money Fund, Schwab Investor Money Fund, Schwab Cash Reserves, Schwab
Advisor Cash Reserves, Charles Schwab Bank, N.A., Charles Schwab & Co.,
Inc., Charles Schwab Corporation, Schwab YieldPlus Fund, Schwab YieldPlus
Fund Liquidation Trust, 33-35 Green Pond Road Associates, LLC, on behalf of
itself and all others similarly situated, FTC Futures Fund PCC Ltd, on behalf of
themselves and all others similarly situated, FTC Futures Fund SICAV, on behalf
of themselves and all others similarly situated, Metzler Investment GmbH, on
behalf of itself and all others similarly situated, 303030 Trading LLC, Atlantic
Trading USA, LLC, Gary Francis, Nathaniel Haynes, Courtyard at Amwell II,
LLC, Greenwich Commons II, LLC, Jill Court Associates II, LLC, Maidencreek
Ventures II LP, Raritan Commons, LLC, Lawrence W. Gardner, on behalf of
themselves and all others similarly situated, Mayor and City Council of
Baltimore, City of New Britain Firefighters' and Police Benefit Fund, on behalf of
itself and all others similarly situated, Texas Competitive Electric Holdings
Company LLC, Guaranty Bank & Trust Company, Individually and on behalf of
all others similarly situated, National Credit Union Administration Board, as
Liquidating Agent of U.S. Central Federal Credit Union, Western Corporate
Federal Credit Union, Members United Corporate Federal Credit Union,
Southwest Corporate Federal Credit Union, and Constitution Corporate Federal
Credit Union, City of Philadelphia, Pennsylvania Intergovernmental Cooperation
Authority, Darby Financial Products, Capital Ventures International, Salix Capital
US Inc., Prudential Investment Portfolios 2, FKA Dryden Core Investment Fund,
on behalf of Prudential Core Short-Term Bond Fund, Prudential Core Taxable
Money Market Fund, City of Riverside, Riverside Public Financing Authority,
East Bay Municipal Utility District, County of San Mateo, San Mateo County
Joint Powers Financing Authority, City of Richmond, Richmond Joint Powers
Financing Authority, Successor Agency to the Richmond Community
Redevelopment Agency, County of San Diego, County of Sonoma, David E.
Sundstrom, in his official capacity as Treasurer of the county of Sonoma for and
on behalf of the Sonoma County Treasury Pool Investment, Regents of the
University of California, San Diego Association of Governments, County of
Sacramento, The County of Mendocino, City of Houston, Bay Area Toll
Authority, Joseph Amabile, Louie Amabile, individually & on behalf of Lue
Trading, Inc., Norman Byster, Michael Cahill, Richard Deogracias, individually
on behalf of RCD Trading, Inc., Marc Federighi, individually on behalf of MCO
Trading, Scott Federighi, individually on behalf of Katsco, Inc., Robert Furlong,
individually on behalf of XCOP, Inc., David Cough, Brian Haggerty, individually
on behalf of BJH Futures, Inc., David Klusendorf, Ronald Krug, Christopher
Lang, John Monckton, Philip Olson, Brett Pankau, David Vecchione, individually
on behalf of Vecchione & Associates, Randall Williams, John Henderson, 303
Proprietary Trading LLC, Margery Teller, Nicholas Pesa, Eduardo Restani, Vito
Spillone, Prudential Investment Portfolios 2, FKA Dryden Core Investment Fund,
on behalf of Prudential Core Short-Term Bond Fund, Prudential Core Taxable
Money Market Fund, Salix Capital US Inc., Darby Financial Products, Capital
Ventures International, City of Philadelphia, Pennsylvania Intergovernmental
Cooperation Authority, FTC Futures Fund PCC Ltd. on behalf of themselves and
all others similarly situated, FTC Futures Fund SICAV, on behalf of themselves

and all others similarly situated, Metzler Investment GmbH, on behalf of itself and all others similarly situated, 303030 Trading LLC, Atlantic Trading USA, LLC, Gary Francis, Nathaniel Haynes, City of New Britain Firefighters' and Police Benefit Fund, on behalf of itself and all others similarly situated, Mayor and City Council of Baltimore, Texas Competitive Electric Holdings Company LLC, Regents of the University of California, East Bay Municipal Utility District, San Diego Association of Governments, City of Richmond, Richmond Joint Powers Financing Authority, Successor Agency to the Richmond Community Redevelopment Agency, City of Riverside, Riverside Public Financing Authority, County of Sacramento, County of San Diego, County of San Mateo, County of Sonoma, David E. Sundstrom, in his official capacity as Treasurer of the county of Sonoma for and on behalf of Sonoma County Treasury Pool Investment, City of Houston,

*Plaintiffs-Appellants,*

FTC Capital GMBH, on behalf of themselves and all others similarly situated, FTC Futures Fund PCC Ltd, on behalf of themselves and all others similarly situated, FTC Futures Fund SICAV, on behalf of themselves and all others similarly situated, Carpenters Pension Fund of West Virginia, City of Dania Beach Police & Firefighters' Retirement System, Individually and on behalf of all others similarly situated, Ravan Investments, LLC, Mayor and City Council of Baltimore, Richard Hershey, Jeffrey Laydon, on behalf of himself and all others similarly situated, Metzler Investment GmbH, on behalf of itself and all others similarly situated, Roberto E. Calle Gracey, City of New Britain Firefighters' and Police Benefit Fund, on behalf of itself and all others similarly situated, AVP Properties, LLC, 303030 Trading LLC, Atlantic Trading USA, LLC, Community Bank & Trust, Berkshire Bank, Individually and On Behalf of All Others Similarly Situated, 33-35 Green Pond Road Associates, LLC, on behalf of itself and all others similarly situated, Elizabeth Lieberman, on behalf of themselves and all others similarly situated, Todd Augenbaum, on behalf of themselves and all others similarly situated, Gary Francis, Nathaniel Haynes, Courtyard at Amwell II, LLC, Greenwich Commons II, LLC, Jill Court Associates II, LLC, Maidencreek Ventures II LP, Raritan Commons, LLC, Lawrence W. Gardner, on behalf of themselves and all others similarly situated, Annie Bell Adams, on behalf of herself and all others similarly situated, Dennis Paul Fobes, on behalf of himself and all others similarly situated, Leigh E. Fobes, on behalf of herself and all others similarly situated, Margaret Lambert, on behalf of herself and all others similarly situated, Betty L. Gunter, on behalf of herself and all others similarly situated, Government Development Bank for Puerto Rico, Carl A. Payne, individually, and on behalf of other members of the general public similarly situated, Kenneth W. Coker, individually, and on behalf of other members of the general public similarly situated, City of Riverside, Riverside Public Financing Authority, East Bay Municipal Utility District, County of San Mateo, San Mateo County Joint Powers Financing Authority, City of Richmond, Richmond Joint Powers Financing Authority, Successor Agency to the Richmond Community Redevelopment Agency, County of San Diego, Guaranty Bank & Trust Company, Individually and on behalf of all others similarly situated, Heather M. Earle, on behalf of themselves and all others similarly situated, Henryk Malinowski, on behalf of themselves and all others similarly situated, Linda Carr, on behalf of themselves and all others similarly situated, Eric Friedman, on behalf of themselves and all others similarly situated, County of Riverside, Jerry Weglarz, Nathan Weglarz, on behalf of plaintiffs and a class, Directors Financial Group,

individually and on behalf of all others similarly situated, SEIU Pension Plans Master Trust, individually and on behalf of all others similarly situated, Highlander Realty, LLC, Jeffrey D. Buckley, Federal Home Loan Mortgage Corporation, County of Sonoma, David E. Sundstrom, in his official capacity as Treasurer of the county of Sonoma for and on behalf of the Sonoma County Treasury Pool Investment, Regents of the University of California, San Diego Association of Governments, CEMA Joint Venture, County of Sacramento, City of Philadelphia, Pennsylvania Intergovernmental Cooperation Authority, Principal Funds, Inc., PFI Bond & Mortgage Securities Fund, PFI Bond Market Index Fund, PFI Core Plus Bond I Fund, PFI Diversified Real Asset Fund, PFI Equity Income Fund, PFI Global Diversified Income Fund, PFI Government & High Quality Bond Fund, PFI High Yield Fund, PFI High Yield Fund I, PFI Income Fund, PFI Inflation Protection Fund, PFI Short-Term Income Fund, PFI Money Market Fund, PFI Preferred Securities Fund, Principal Variable Contracts Funds, Inc., PVC Asset Allocation Account, PVC Money Market Account, PVC Balanced Account, PVC Bond & Mortgage Securities Account, PVC Equity Income Account, PVC Government & High Quality Bond Account, PVC Income Account, PVC Short-Term Income Account, Principal Financial Group, Inc., Principal Financial Services, Inc., Principal Life Insurance Company, Principal Capital Interest Only I, LLC, Principal Commercial Funding, LLC, Principal Commercial Funding II, LLC, Principal Real Estate Investors, LLC, Texas Competitive Electric Holdings Company LLC, Salix Capital Ltd.,

*Plaintiffs,*

– v. –

Bank of America Corporation, Barclays Bank Plc., Citibank NA, Credit Suisse Group AG, Deutsche Bank AG, HSBC Holdings plc., J.P. Morgan Chase & Co., Norinchukin Bank, UBS AG, WestLB AG, Rabobank Group, Does 1-10, HBOS PLC, Bank of Tokyo-Mitsubishi UFJ, Ltd, Royal Bank of Canada, Societe Generale, Deutsche Bank Financial LLC, Deutsche Bank Securities Inc., Bank of America, N.A., National Association, JPMorgan Chase & Co., HSBC Bank PLC, WestDeutsche Immobilienbank AG, Citigroup Inc., Cooperatieve Centrale RaiffeisenBoerenleenbank B.A., JPMorgan Chase Bank, National Association, JPMorgan Chase Bank, Barclays Bank PLC, Lloyds Banking Group PLS, HSBC Holding plc, Lloyds Banking Group PLS, JPMorgan Chase Bank N.A., Citigroup, Inc., Citibank N.A., Bank of Tokyo-Mitsubishi UFJ, Ltd., Cooperative Centrale-Raiffeisenboernleenbank B.A., JPMorgan Chase Bank N.A., Royal Bank of Scotland, Plc, Stephanie Nagel, British Bankers' Association, BBA Enterprises, Ltd, BBA Libor, Ltd, Portigon AG, John Does #1-#5, Lloyds TSB Bank plc, National Collegiate Trust, Chase Bank USA, N.A., Credit Suisse Group, AG, Citibank, N.A., UBS Securities LLC, J.P. Morgan Clearing Corp., Bank of America Securities LLC, Bank of Tokyo-Mitsubishi UFJ, JPMorgan & Co., Bank of America N.A., Centrale Raiffeisen-Berenleenbank B.A., UBS AG, Royal Bank of Scotland Group PLC, Societe General, Royal Bank of Canada, Bank of Nova Scotia, Bank of Tokyo Mitsubishi UFJ Ltd., Chase Bank USA, NA, Royal Bank of Scotland, JPMorgan Chase Bank National Association, Royal Bank of Scotland Group Plc.,

*Defendants-Appellees,*

Lloyds Banking Group plc, Credit Agricole, S.A., Royal Bank of Scotland Group PLC, Credit Suisse Group, NA, Barclays Capital Inc., Barclays U.S. Funding LLC, Credit Suisse Securities (USA) LLC, Barclays PLC, Citizens Bank of

Massachusetts, agent of RBS Citizens Bank, NA, RBS Citizens, N.A., FKA Citizens Bank of Massachusetts, RBS Citizens, N.A., incorrectly sued as the Charter One Bank NA, BNP Paribas S.A., Sumitomo Mitsui Banking Corp., Citigroup Global Markets Inc., HSBC Securities (USA) Inc.,

*Defendants.*

---

DAVID KOVEL
KIRBY MCINERNEY LLP
825 Third Avenue, 16th Floor
New York, New York 10022
(212) 371-6600

– and –

CHRISTOPHER LOVELL
LOVELL STEWART HALEBIAN
   JACOBSON LLP
61 Broadway, Suite 501
New York, New York 10006
(212) 608-1900

*Interim Co-Lead Counsel for Exchange-*
   *Based Plaintiffs-Appellants and the*
   *Class in Case No. 15-454*

WILLIAM CHRISTOPHER CARMODY
ARUN SUBRAMANIAN
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, New York 10022
(212) 336-8330

– and –

MARC SELTZER
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067
(310) 789-3100

– and –

MICHAEL D. HAUSFELD
WILLIAM P. BUTTERFIELD
HILARY K. SCHERRER
NATHANIEL C. GIDDINGS
HAUSFELD LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 540-7200

*Counsel for Plaintiffs-Appellants*
   *Baltimore, New Britain and TCEH*
   *and Interim Lead Counsel for the*
   *Proposed OTC Plaintiff Class in*
   *Case No. 15-498*

STEVEN E. FINEMAN
MICHAEL J. MIARMI
LIEFF, CABRASER, HEIMANN
   & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013
(212) 355-9500

– and –

BRENDAN P. GLACKIN
LIEFF, CABRASER, HEIMANN &
   BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
(415) 956-100

*Counsel for Plaintiffs-Appellants The
Charles Schwab Corporation, Charles
Schwab Bank, N.A., Charles Schwab
& Co., Inc., Schwab Money Market
Fund, Schwab Value Advantage
Money Fund, Schwab Retirement
Advantage Money Fund, Schwab
Investor Money Fund, Schwab Cash
Reserves, Schwab Advisor Cash
Reserves, Schwab YieldPlus Fund,
Schwab YieldPlus Fund Liquidation
Trust, Schwab Short-Term Bond
Market Fund, Schwab Total Bond
Market Fund and Schwab U.S. Dollar
Liquid Assets Fund in Case No. 15-
432 and for Bay Area Toll Authority in
Case No. 15-778*

NANCI E. NISHIMURA
MATTHEW K. EDLING
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, California 94010
(650) 697-6000

– and –

ALEXANDER E. BARNETT
COTCHETT, PITRE & McCARTHY, LLP
40 Worth Street, 10th Floor
New York, New York 10013
(212) 201-6820

*Counsel for Plaintiffs-Appellants The
Regents of the University of
California, East Bay Municipal
Utility District, San Diego
Association of Governments, City of
Richmond, The Richmond Joint
Powers Financing Authority,
Successor Agency to the Richmond
Community Redevelopment Agency,
City of Riverside, The Riverside
Public Financing Authority, County
of Mendocino, County of
Sacramento, County of San Diego,
County of San Mateo, The San
Mateo County Joint Powers
Financing Authority, County of
Sonoma and David E. Sundstrom, in
his official capacity as Treasurer of
the County of Sonoma in Case No.
15-733*

RICHARD W. MITHOFF
WARNER V. HOCKER
MITHOFF LAW FIRM
One Allen Center
Penthouse, Suite 3450
Houston, Texas 77002
(713) 654-1122

– and –

NANCI E. NISHIMURA
MATTHEW K. EDLING
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road
Burlingame, California 94010
(650) 697-6000

– and –

ALEXANDER E. BARNETT
COTCHETT, PITRE & MCCARTHY, LLP
40 Worth Street, 10th Floor
New York, New York 10013
(212) 201-6820

*Counsel for Plaintiff-Appellant City of
Houston in Case No. 15-744*

STEIG D. OLSON
DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiffs-Appellants
The City of Philadelphia and
The Pennsylvania Intergovernmental
Cooperation Authority in Case No. 15-
547*

DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
STEIG D. OLSON
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiffs-Appellants
Darby Financial Products and
Capital Ventures International in
Case No. 15-551*

DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
STEIG D. OLSON
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiff-Appellant Salix
Capital US Inc. in Case Nos. 15-611
and 15-620*

DANIEL L. BROCKETT
DANIEL P. CUNNINGHAM
STEIG D. OLSON
JACOB J. WALDMAN
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiffs-Appellants
Prudential Investment Portfolios 2
on behalf of Prudential Core Short-
Term Bond Fund and Prudential
Core Taxable Money Market Fund
in Case No. 15-627*

DAVID C. FREDERICK
WAN J. KIM
GREGORY G. RAPAWY
ANDREW C. SHEN
KELLOGG, HUBER, HANSEN, TODD,
    EVANS & FIGEL, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900

*Counsel for Plaintiff-Appellant National
    Credit Union Administration Board in
    Case No. 15-537*

MICHAEL J. GUZMAN
ANDREW C. SHEN
KELLOGG, HUBER, HANSEN, TODD,
    EVANS & FIGEL, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20036
(202) 326-7900

– and –

STUART H. MCCLUER
MCCULLEY MCCLUER PLLC
1223 Jackson Avenue East, Suite 200
Oxford, Mississippi 38655
(662) 550-4511

*Counsel for Plaintiff-Appellant Guaranty
    Bank & Trust Company in Case No.
    15-524*

JEFFREY A. SHOOMAN
LITE DEPALMA GREENBERG, LLC
Two Gateway Center, Suite 1201
Newark, New Jersey 07102
(973) 623-3000

*Counsel for Plaintiff-Appellant 33-35
Green Pond Associates, LLC in Case No.
15-441*

SCOTT P. SCHLESINGER
JEFFREY L. HABERMAN
JONATHAN R. GDANSKI
SCHLESINGER LAW OFFICES, P.A.
1212 SE Third Avenue
Ft. Lauderdale, Florida 33316
(954) 320-9507

*Counsel for Plaintiffs-Appellants
    Amabile, et al. in Case No. 15-825*

JASON A. ZWEIG
HAGENS BERMAN SOBOL SHAPIRO LLP
555 Fifth Avenue, Suite 1700
New York, New York 10017
(212) 752-5455

*Counsel for Plaintiffs-Appellants
    Courtyard At Amwell, LLC,
    Greenwich Commons II, LLC, Jill
    Court Associates II, LLC,
    Maidencreek Ventures II LP,
    Raritan Commons, LLC and
    Lawrence W. Gardner in Case No.
    15-477*

# TABLE OF CONTENTS

|  | **Special Appendix** |
|---|---|
| **Document** | **Page** |

### VOLUME I

March 29, 2013 Order (MDL Dkt. No. 286)
    [Granting MTD as to Sherman Act claims] ............................................................. SPA 1

August 23, 2013 Order (MDL Dkt. No. 389)
    [Denying Leave to Amend] ..................................................................... SPA 162

August 10, 2012 Endorsed Letter (MDL Dkt. No. 199)
    [Denying permission to seek leave to amend re Barclays Materials] ..................... SPA 227

March 6, 2012 Endorsed Letter (MDL Dkt. No. 115)
    [Denying discovery of documents produced to govt. agencies] ............................. SPA 233

August 14, 2012 Order (MDL Dkt. No. 205)
    [Staying Later Filed Actions] .................................................................. SPA 294

February 5, 2015 Order (MDL Dkt. No. 1008)
    [Partial Judgment and 54(b) Judgment] ................................................... SPA 296

February 13, 2015 Order (MDL Dkt. No. 1023)
    [Entering Partial Judgment in 18 cases] .................................................. SPA 299

February 15, 2015 Corrected Judgment (MDL Dkt. No. 1024) ................................... SPA 304

February 23, 2015 Order (MDL Dkt. No. 1053)
    [54(b) judgment] ................................................................................ SPA 307

Sherman Act Section 1, 15 U.S.A. § 1 .......................................................... SPA 311

Clayton Act Section 4, 15 U.S.C. § 15 ......................................................... SPA 312

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
In re:

LIBOR-Based Financial Instruments          **MEMORANDUM AND ORDER**
Antitrust Litigation.
                                           11 MD 2262 (NRB)

THIS DOCUMENT RELATES TO: All Cases

---------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


## I. Introduction

These cases arise out of the alleged manipulation of the London InterBank Offered Rate ("LIBOR"), an interest rate benchmark that has been called "the world's most important number." British Bankers' Ass'n, BBA LIBOR: The World's Most Important Number Now Tweets Daily (May 21, 2009), http://www. bbalibor.com/news-releases/bba-libor-the-worlds-most-important-number-now-tweets-daily. As numerous newspaper articles over the past year have reported, domestic and foreign regulatory agencies have already reached settlements with several banks involved in the LIBOR-setting process, with penalties reaching into the billions of dollars.

The cases presently before us do not involve governmental regulatory action, but rather are private lawsuits by persons who allegedly suffered harm as a result of the suppression of

LIBOR.  Starting in mid-2011, such lawsuits began to be filed in this District and others across the country.  On August 12, 2011, the Judicial Panel on Multidistrict Litigation transferred several such cases from other districts to this Court for "coordinated or consolidated pretrial proceedings."  In re Libor-Based Fin. Instruments Antitrust Litig., 802 F. Supp. 2d 1380, 1381 (J.P.M.L. 2011); see also 28 U.S.C. § 1407 (2006).

On June 29, 2012, defendants filed motions to dismiss. Four categories of cases are subject to defendants' motions to dismiss: cases brought by (1) over-the-counter ("OTC") plaintiffs, (2) exchange-based plaintiffs, (3) bondholder plaintiffs, and (4) Charles Schwab plaintiffs (the "Schwab plaintiffs").  The first three categories each involve purported class actions, and each has a single lead action.  The lead action for the OTC plaintiffs is Mayor and City Council of Baltimore v. Bank of America (11 Civ. 5450); the lead action for the exchange-based plaintiffs is FTC Capital GmbH v. Credit Suisse Group (11 Civ. 2613), and the lead action for the bondholder plaintiffs is Gelboim v. Credit Suisse Group (12 Civ. 1025).  By contrast, the Schwab plaintiffs do not seek to represent a class, but rather have initiated three separate cases: Schwab Short-Term Bond Market Fund v. Bank of America Corp. (11 Civ. 6409), Charles Schwab Bank, N.A. v. Bank of

America Corp. (11 Civ. 6411), and Schwab Money Market Fund v. Bank of America Corp. (11 Civ. 6412).

Subsequent to defendants' filing of their motion to dismiss, several new complaints were filed. It quickly became apparent to us that information relating to this case would continue indefinitely to come to light, that new complaints would continue to be filed, and that waiting for the "dust to settle" would require an unacceptable delay in the proceedings.

Therefore, on August 14, 2012, we issued a Memorandum and Order imposing a stay on all complaints not then subject to defendants' motions to dismiss, pending the present decision. In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MD 2262, 2012 WL 3578149 (S.D.N.Y. Aug. 14, 2012). Although we encouraged the prompt filing of new complaints, see id. at *1 n.2, we determined that the most sensible way to proceed would be to wait on addressing those cases until we had clarified the legal landscape through our decision on defendants' motions.

For the reasons stated below, defendants' motions to dismiss are granted in part and denied in part. With regard to plaintiffs' federal antitrust claim[1] and RICO claim, defendants' motions are granted. With regard to plaintiffs' commodities

---

[1] Because each amended complaint asserts only one federal antitrust claim, we will refer in the singular to plaintiffs' federal antitrust "claim." Similarly, because each of the Schwab amended complaints asserts one RICO claim and one Cartwright Act claim, we will refer in the singular to the Schwab plaintiffs' RICO "claim" and Cartwright Act "claim."

manipulation claims, defendants' motions are granted in part and denied in part. Finally, we dismiss with prejudice the Schwab plaintiffs' Cartwright Act claim and the exchange-based plaintiffs' state-law claim, and we decline to exercise supplemental jurisdiction over the remaining state-law claims.

## II. Background

Despite the legal complexity of this case, the factual allegations are rather straightforward. Essentially, they are as follows: Defendants are members of a panel assembled by a banking trade association to calculate a daily interest rate benchmark. Each business day, defendants submit to the association a rate that is supposed to reflect their expected costs of borrowing U.S. dollars from other banks, and the association computes and publishes the average of these submitted rates. The published average is used as a benchmark interest rate in financial instruments worldwide. According to plaintiffs, defendants conspired to report rates that did not reflect their good-faith estimates of their borrowing costs, and in fact submitted artificial rates over the course of thirty-four months. Because defendants allegedly submitted artificial rates, the final computed average was also artificial. Plaintiffs allege that they suffered injury because they held positions in various financial instruments that were negatively

affected by defendants' alleged fixing of the benchmark interest rate.

As one would expect, the parties' primary factual disagreement concerns whether defendants conspired to submit artificial rates and whether they in fact did so. Plaintiffs have included in their complaints extensive evidence that allegedly supports their allegations on these points, and defendants, were this case to proceed to trial, would surely present evidence to the contrary with equal vigor. However, our present task is not to resolve the parties' factual disagreements, but rather to decide defendants' motions to dismiss. These motions raise numerous issues of law, issues that, although they require serious legal analysis, may be resolved without heavy engagement with the facts. Therefore, we will set out in this section only those factual allegations necessary to provide context for our decision, and will cite further allegations later as appropriate. This section will begin by explaining what LIBOR is and will then discuss defendants' alleged misconduct and how it allegedly injured plaintiffs.

## A. LIBOR

LIBOR is a benchmark interest rate disseminated by the British Bankers' Association (the "BBA"), a "leading trade association for the U.K. banking and financial services sector."

OTC   Am.   Compl.   ¶   42   (quoting   BBA,   <u>About   Us</u>,
http://www.bba.org.uk/about-us (last visited Mar. 29, 2013)).[2]
LIBOR is calculated for ten currencies, including the U.S.
dollar ("USD LIBOR").   <u>Id.</u> ¶ 43.   For each of the currencies,
the BBA has assembled a panel of banks whose interest rate
submissions are considered in calculating the benchmark (a
"Contributor Panel"); each member of the Contributor Panel must
be a bank that "is regulated and authorized to trade on the
London money market."   <u>Id.</u> ¶ 46.   The Contributor Panel for USD
LIBOR, the only rate at issue in this case, consisted at all
relevant times of sixteen banks.   The defendants here, or one of
their affiliates, are each members of that panel.

Each business day, the banks on a given LIBOR Contributor
Panel answer the following question, with regard to the currency
for which the bank sits on the Contributor Panel: "At what rate
could you borrow funds, were you to do so by asking for and then
accepting inter-bank offers in a reasonable market size just
prior to 11 am?"   <u>Id.</u> ¶ 48.   Importantly, this question does not

---

[2] The six amended complaints subject to defendants' motions to dismiss are
essentially identical in their allegations regarding the background of this
case and the misconduct that defendants allegedly committed.   Therefore, in
section A, providing background on LIBOR, and section B, discussing
defendants' alleged misconduct, we will cite exclusively to the OTC Amended
Complaint, with the understanding that parallel allegations are contained in
most or all of the other amended complaints.   By contrast, the primary areas
in which the amended complaints differ are in their allegations of who the
plaintiffs are, how they were allegedly injured, and what claims they are
asserting against defendants.   Accordingly, in Part C, when we discuss
plaintiffs' alleged injury, we will explore the allegations particular to
specific amended complaints.

ask banks to report an interest rate that they actually paid or even an average of interest rates that they actually paid; rather, it inquires at what rate the banks "predict they can borrow unsecured funds from other banks in the London wholesale money market."  Id. ¶ 44.  Each bank will answer this question with regard to fifteen maturities, or tenors, ranging from overnight to one year.  Id.; Settlement Agreement Between Dep't of Justice, Criminal Div., and Barclays (June 26, 2012), Appendix A, ¶ 5, Ex. 3, Scherrer Decl. [hereinafter DOJ Statement].  The banks submit rates in response to this question ("LIBOR quotes" or "LIBOR submissions") each business day by 11:10 AM London time to Thomson Reuters, acting as the BBA's agent.  OTC. Am. Compl. ¶ 47; DOJ Statement ¶ 3.  Each bank "must submit its rate without reference to rate contributed by other Contributor Panel banks."  DOJ Statement ¶ 6.

After receiving quotes from each bank on a given panel, Thomson Reuters determines the LIBOR for that day (the "LIBOR fix") by ranking the quotes for a given maturity in descending order and calculating the arithmetic mean of the middle two quartiles.  OTC Am. Compl. ¶ 48; DOJ Statement ¶ 4.  For example, suppose that on a particular day, the banks on the Contributor Panel for U.S. dollars submitted the following quotes for the three-month maturity ("three-month USD LIBOR"): 4.0%, 3.9%, 3.9%, 3.9%, 3.8%, 3.8%, 3.7%, 3.6%, 3.5%, 3.5%,

3.4%, 3.3%, 3.3%, 3.1%, 3.0%, and 3.0%.  The quotes in the middle two quartiles would be: 3.8%, 3.8%, 3.7%, 3.6%, 3.5%, 3.5%, 3.4%, and 3.3%.  The arithmetic mean of these quotes, 3.575%, would be the LIBOR fix for that day.

Thomson Reuters publishes the new LIBOR fix each business day by approximately 11:30 AM London time.  DOJ Statement ¶ 5.  In addition to publishing the final fix, "Thomson Reuters publishes each Contributor Panel bank's submitted rates along with the names of the banks."  Id.  Therefore, it is a matter of public knowledge not only what the LIBOR fix is on any given business day, but also what quote each bank submitted and how the final fix was calculated.

LIBOR is "the primary benchmark for short term interest rates globally."  OTC Am. Compl. ¶ 44.  For example, market actors "commonly set the interest rate on floating-rate notes [in which the seller of the note pays the buyer a variable rate] as a spread against LIBOR," such as LIBOR plus 2%, and "use LIBOR as a basis to determine the correct rate of return on short-term fixed-rate notes [in which the seller of the note pays the buyer a fixed rate] (by comparing the offered rate to LIBOR)."  In short, LIBOR "affects the pricing of trillions of dollars' worth of financial transactions."  Id. ¶ 45.

## B. Defendants' Alleged Misconduct

According to plaintiffs, "Defendants collusively and systematically suppressed LIBOR during the Class Period," defined as August 2007 to May 2010.   OTC Am. Compl. ¶ 2; see also id. ¶¶ 4-8; Exchange Am. Compl. ¶ 1.   Defendants allegedly did so by each submitting an artificially low LIBOR quotes to Thomson Reuters each business day during the Class Period.   OTC Am. Compl. ¶ 6.

Plaintiffs argue that defendants had two primary motives for suppressing LIBOR.   First, "well aware that the interest rate a bank pays (or expects to pay) on its debt is widely, if not universally, viewed as embodying the market's assessment of the risk associated with that bank, Defendants understated their borrowing costs (thereby suppressing LIBOR) to portray themselves as economically healthier than they actually were." OTC Am. Compl. ¶ 5.   Moreover, "because no one bank would want to stand out as bearing a higher degree of risk than its fellow banks, each Defendant shared a powerful incentive to collude with its co-Defendants to ensure it was not the 'odd man out.'" Id. ¶ 52.   Second, "artificially suppressing LIBOR allowed Defendants to pay lower interest rates on LIBOR-based financial instruments that Defendants sold to investors, including [plaintiffs], during the Class Period." Id. ¶ 5; see also id. ¶ 53.

Plaintiffs devote the bulk of their complaints to amassing evidence that LIBOR was fixed at artificially low levels during the Class Period. For one, plaintiffs offer statistical evidence showing that LIBOR diverged during the Class Period from benchmarks that it would normally track. First, each defendant's LIBOR quotes allegedly diverged over the Class Period from its probabilities of default, as calculated by experts retained by plaintiffs. OTC Am. Compl. ¶¶ 57-66. A bank's probability of default should correlate positively with its cost of borrowing, based on the basic principle that "investors require a higher . . . rate of return as a premium for taking on additional risk exposure." Id. ¶ 59. However, plaintiffs' experts found "a striking negative correlation between USD-LIBOR panel bank's LIBOR quotes and [probabilities of default] during 2007 and 2008." Id. ¶ 66. This suggests that defendants "severely depressed LIBOR during that time." Id.

Second, LIBOR diverged during the Class Period from another comparable benchmark, the Federal Reserve Eurodollar Deposit Rate (the "Fed Eurodollar Rate"). Eurodollars are defined as "U.S. dollars deposited in commercial banks outside the United States." Exchange Am. Compl. ¶ 200 (quoting CME Group, Eurodollar Futures, http://www.cmegroup.com/trading/interest-rates/files/IR148_Eurodollar_Futures_Fact_Card.pdf).

Like LIBOR, the Fed Eurodollar Rate "reflect[s] the rates at which banks in the London Eurodollar money market lend U.S. dollars to one another," OTC Am. Compl. ¶ 68, though because LIBOR is based on the interest rate that banks expect lenders to offer them (an "offered rate"), whereas the Fed Eurodollar Rate is based on what banks are willing to pay to borrow (a "bid rate"), "the Fed's Eurodollar rate should be less than LIBOR." Scott Peng et al., Citigroup, Special Topic: Is LIBOR Broken?, Apr. 10, 2008. However, plaintiffs' experts found that LIBOR was lower than the Fed Eurodollar Rate, and that individual defendants' LIBOR quotes were also lower than the Fed Eurodollar Rate, for most of the Class Period. OTC Am. Compl. ¶¶ 67-88. According to plaintiffs, this finding suggests not only that "suppression of LIBOR occurred during the Class Period," but also that defendants conspired to suppress LIBOR, as "[t]he sustained period during which the [Fed Eurodollar Rate] – LIBOR Spread fell and remained starkly negative . . . is not plausibly achievable absent collusion among Defendants." Id. ¶ 88.

In addition to the above statistical analysis, plaintiffs cite "publicly available analyses by academics and other commentators" which "collectively indicate ILBOR was artificially suppressed during the Class Period." Id. ¶ 89. For instance, plaintiffs discuss studies that found "variance between [banks'] LIBOR quotes and their contemporaneous cost of

buying default insurance . . . on debt they issued during [the Class Period]." Id. ¶ 90; see also id. ¶¶ 90- 103.  Plaintiffs also note commentators' findings that defendants' LIBOR quotes "demonstrated suspicious 'bunching' around the fourth lowest quote submitted by the 16 banks," which "suggests Defendants collectively depressed LIBOR by reporting the lowest possible rates that would not be excluded from the calculation of LIBOR on a given day.  Id. ¶ 105; see also id. ¶¶ 105-13.

Plaintiffs further observe that "during 2008 and 2009 at least some of [defendants'] LIBOR quotes were too low in light of the dire financial circumstances the banks faced."  Id. ¶ 128.  For instance, the LIBOR submissions of Citigroup, RBS, and WestLB were suspiciously low given the financial troubles facing those banks during the Class Period.  Id. ¶¶ 128-38.

Finally, plaintiffs allege that they were not aware of defendants' manipulation "until March 15, 2011, when UBS released its annual report 20-F stating that it had received subpoenas from the Department of Justice, the SEC, the CFTC, as well as an information request from the Japanese Financial Supervisory Agency, all relating to its interest rate submissions to the BBA."  Id. ¶ 205.  UBS had explained that these investigations addressed "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR at certain times."  Plaintiffs

maintain that, even though several news articles had warned as early as spring 2008 that LIBOR was suspiciously low,[3] these warnings did not provide notice of defendants' alleged manipulation of LIBOR because they were counteracted by public statements from the BBA and individual defendants that provided alternative explanations for why LIBOR had failed to track comparable benchmarks.  Id. ¶¶ 192-204.

Following the filing of plaintiffs' amended complaints on April 30, 2012, several governmental agencies disclosed that they had reached settlements with Barclays with regards to Barclays' submission of artificial LIBOR quotes.  Although plaintiffs were not able to incorporate information from these settlements into their amended complaints, they have submitted to the Court, in the course of opposing defendants' motions to dismiss, settlement documents issued by the Criminal Division of the Department of Justice, the Commodities Futures Trading Commission (the "CFTC"), and the United Kingdom Financial Services Authority (the "FSA").  See DOJ Statement; CFTC Settlement Order (June 27, 2012) [hereinafter CFTC Order], Ex. 4, Scherrer Decl.; FSA Final Notice (June 27, 2012), Ex. 5, Scherrer Decl. [hereinafter FSA Notice].

---

[3] These articles will be discussed in detail below in the context of whether plaintiffs' commodities manipulation claims are time-barred.

These agencies found that Barclays had engaged in "wrongful conduct spann[ing] from at least 2005 through at least 2009," at times "on an almost daily basis." CFTC Order 2. Specifically:

> During the period from at least mid-2005 through the fall of 2007, and sporadically thereafter into 2009, Barclays based its LIBOR submissions for U.S. Dollar (and at limited times other currencies) on the requests of Barclays' swaps traders, including former Barclays swaps traders, who were attempting to affect the official published LIBOR, in order to benefit Barclays' derivatives trading positions; those positions included swaps and futures trading positions . . . .

Id. The agencies documented instances in which Barclays' LIBOR submitters had accommodated requests from traders for an artificially high LIBOR quote as well as instances where the LIBOR submitters had accommodated requests for an artificially low LIBOR quote. See, e.g., id. at 7-11. In addition to this manipulation to benefit daily trading positions, leading to either an artificially high or artificially low LIBOR quote, the agencies found that from "late August 2007 through early 2009," Barclays's LIBOR submitters, "[p]ursuant to a directive by certain members of Barclays' senior management," consistently submitted artificially low LIBOR quotes "in order to manage what [Barclays] believed were inaccurate and negative public and media perceptions that Barclays had a liquidity problem." Id. at 3.

### C. Plaintiffs' Alleged Injury

As discussed above, the present motions to dismiss apply to the amended complaints of four groups of plaintiffs: the OTC, bondholder, exchange-based, and Schwab plaintiffs.  Each of these groups alleges that it suffered a distinct injury as a result of defendants' alleged misconduct.  We will address each group in turn.

### 1. OTC Plaintiffs

The lead OTC plaintiffs are the Mayor and City Council of Baltimore ("Baltimore") and the City of New Britain Firefighters' and Police Benefit Fund ("New Britain"). Baltimore "purchased hundreds of millions of dollars in interest rate swaps directly from at least one Defendant in which the rate of return was tied to LIBOR."  OTC Am. Compl. ¶ 12.  New Britain "purchased tens of millions of dollars in interest rate swaps directly from at least one Defendant in which the rate of return was tied to LIBOR."  Id. ¶ 13.  These plaintiffs seek to represent a class of "[a]ll persons or entities . . . that purchased in the United States, directly from a Defendant, a financial instrument that paid interest indexed to LIBOR . . . any time during the [Class Period]."  Id. ¶ 34.  According to plaintiffs, they suffered injury as a result of defendants' alleged misconduct because their financial instruments provided that they would receive payments based on LIBOR, and when

defendants allegedly suppressed LIBOR, plaintiffs received lower payments from defendants.  See id. ¶¶ 8, 219.

## 2. Bondholder Plaintiffs

The lead bondholder plaintiffs are Ellen Gelboim ("Gelboim") and Linda Zacher ("Zacher").  Gelboim "is the sole beneficiary of her Individual Retirement Account that during the Class Period owned a . . . LIBOR-Based Debt Security issued by General Electric Capital Corporation."  Bondholder Am. Compl. ¶ 15.  Similarly, Zacher "is the sole beneficiary of her late husband's Individual Retirement Account that during the Class Period owned a . . . LIBOR-Based Debt Security issued by the State of Israel."  Id. ¶ 16.  These plaintiffs seek to represent the following class:

> [A]ll [persons] who owned (including beneficially in
> 'street name') any U.S. dollar-denominated debt
> security (a) that was assigned a unique identification
> number by the [Committee on Uniform Securities
> Identification Procedures] system; (b) on which
> interest was payable at any time [during the Class
> Period]; and (c) where that interest was payable at a
> rate expressly linked to the U.S. Dollar Libor rate.

Id. ¶ 1; see also id. ¶ 198.  This class excludes holders of debt securities to the extent that their securities were "issued by any Defendant as obligor."  Id.  Plaintiffs allege that they suffered injury as a result of defendants' alleged misconduct because they "receiv[ed] manipulated and artificially depressed

amounts of interest on [the] [d]ebt [s]ecurities they owned during the Class Period."  Id. ¶ 14.

### 3. Exchange-Based Plaintiffs

In order to place the exchange-based plaintiffs' claims in context, we will first provide a brief overview of Eurodollar futures contracts.  We will then summarize who plaintiffs are and how they allege they were injured.

### a. Eurodollar Futures Contracts

A futures contract "is an agreement for the sale of a commodity on a specific date (the 'delivery date')."  In re Amaranth Natural Gas Commodities Litig., 269 F.R.D. 366, 372 (S.D.N.Y. 2010).  The seller of a futures contract, known as the "short," agrees to deliver the commodity specified in the contract to the buyer, known as the "long," on the delivery date.  See id.  However, in most cases, the commodity never actually changes hands; rather, "[m]ost investors close out of their positions before the delivery dates," id., such as by entering into offsetting contracts whereby the commodity delivery requirements cancel out and "[t]he difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss," Exchange Am. Compl. ¶ 208.

Although many futures contracts are based on an underlying commodity that is a physical good, such as copper, others are

not.    One   such   futures   contract   is   a   Eurodollar   futures
contract,  which  is  "the  most  actively  traded  futures  contract[]
in  the  world."   Id. ¶ 201;  see also  DOJ  Statement  4  ("In  2009,
according  to  the  Futures  Industry  Association,  more  than  437
million   Eurodollar   futures   contracts   were   traded . . . .").
Eurodollar  futures  contracts,  traded  on  the  Chicago  Mercantile
Exchange  (the  "CME"),  Exchange  Am.  Compl. ¶ 201,  are  based  on  an
"underlying  instrument"  of  a  "Eurodollar  Time  Deposit  having  a
principal  value  of  USD  $1,000,000  with  a  three-month  maturity."
CME    Group,    Eurodollar    Futures:   Contract    Specifications,
http://www.cmegroup.com/trading/interest-rates/stir/eurodollar_
contract_specifications.html   (last   visited   Mar.   29,   2013).
"Eurodollars   are   U.S.   dollars   deposited   in   commercial   banks
outside   the   United   States."    CME   Group,   Eurodollar   Futures,
http://www.cmegroup.com/trading/interest-rates/files/IR148_
Eurodollar_Futures_Fact_Card.pdf.

      Eurodollar  futures  contracts  do  not  require  the  seller
actually  to  deliver  cash  deposits  to  the  buyer,  but  rather
provide  that  at  the  end  of  the  contract,  the  "settlement  date,"
the  seller  pays  the  buyer  a  specified  price.   The  price  at
settlement  "is  equal  to  100  minus  the  three-month  Eurodollar
interbank  time  deposit  rate,"  which  rate  is  defined  as  the  USD
three-month  LIBOR  fix  on  the  contract's  last  trading  day.   CME
Group,    Eurodollar    Futures    Final    Settlement    Procedure,

http://www.cmegroup.com/trading/interest-rates/files/final-settlement-procedure-eurodollar-futures.pdf.  Like other futures contracts, Eurodollar futures contracts may be traded prior to settlement, and their trading price will reflect "the market's prediction of the [three]-month [USD] LIBOR on [the contract's last trading day]."  DOJ Statement ¶ 9.

Finally, options on Eurodollar futures contracts are also traded on the CME.  Exchange Am. Compl. ¶ 210.  A trader might purchase a "call," which gives him "the right, but not the obligation, to buy the underlying Eurodollar futures contract at a certain price - the strike price."  Id.  A trader could also purchase a "put," giving him "the right, but not the obligation, to sell the underlying Eurodollar futures contract at the strike price."  Id.  The price at which a Eurodollar option trades "is affected by the underlying price of the Eurodollar futures contract, which, in turn, is directly affected by the reported LIBOR."  Id.

### b. Plaintiffs and Their Alleged Injury

There are seven lead exchange-based plaintiffs.  Plaintiff Metzler Investment GmbH ("Metzler") is a German company that launched and managed investment funds which traded Eurodollar futures.  Exchange Am. Compl. ¶ 20.  Plaintiffs FTC Futures Fund SICAV ("FTC SICAV") and FTC Futures Fund PCC Ltd. ("FTC PCC") are each funds, based in Luxembourg and Gibraltar, respectively,

which traded Eurodollar futures.   Id. ¶¶ 21-22.   Plaintiffs
Atlantic Trading USA, LLC ("Atlantic") and 303030 Trading LLC
("303030") are both Illinois limited liability companies with
principal places of business in Illinois and which traded
Eurodollar futures.   Id. ¶¶ 23-24.   Finally, plaintiffs Gary
Francis ("Francis") and Nathanial Haynes ("Haynes") are both
residents of Illinois who traded Eurodollar futures.   Id. ¶¶ 25-
26.   These plaintiffs seek to represent a class of "all persons
. . . that transacted in Eurodollar futures and options on
Eurodollar futures on exchanges such as the CME [during the
Class Period] and were harmed by Defendants' manipulation of
LIBOR."   Id. ¶ 221.

Plaintiffs allege that they suffered injury from
defendants' alleged manipulation of LIBOR.   According to
plaintiffs, defendants' suppression of LIBOR caused Eurodollar
contracts to trade and settle at artificially high prices.   Id.
¶¶ 215-16.   Plaintiffs purchased Eurodollar contracts during the
Class Period, id. ¶ 214, and "the direct and foreseeable effect
of the Defendants' intentional understatements of their LIBOR
rate was to cause Plaintiffs and the Class to pay
supracompetitive prices for [their] CME Eurodollar futures
contracts."   Id. ¶ 217.

### 4. Schwab Plaintiffs

The last group of plaintiffs comprises the Schwab plaintiffs. As discussed above, these plaintiffs do not seek to represent a class, but rather have filed three separate amended complaints. First, the "Schwab Bank" amended complaint has three plaintiffs.[4] Plaintiff The Charles Schwab Corporation is a Delaware corporation with its principal place of business in California. Schwab Bank Am. Compl. ¶ 17. Plaintiff Charles Schwab Bank, N.A., is a national banking association which is a wholly-owned subsidiary of The Charles Schwab Corporation and is organized under the laws of Arizona, with its principal place of business in Nevada. Id. ¶ 18. Finally, Plaintiff Charles Schwab & Co., Inc., is a California corporation and a wholly owned subsidiary of The Charles Schwab Corporation, which through its division Charles Schwab Treasury, manages the investments of Charles Schwab Bank, N.A. Id. ¶ 19. Each of these plaintiffs "purchased or held LIBOR-based financial instruments during the [Class Period]." Id. ¶¶ 17-19.

Second, the "Schwab Bond" amended complaint also has three plaintiffs.[5] Plaintiff Schwab Short-Term Bond Market fund is "a

---

[4] The "Schwab Bank" action is Charles Schwab Bank, N.A. v. Bank of America Corp. (11 Civ. 6411).

[5] The "Schwab Bond" action is Schwab Short-Term Bond Market Fund v. Bank of America Corp. (11 Civ. 6409).

series of Schwab Investments, an open-end, management investment company organized under Massachusetts law." Schwab Bond Am. Compl. ¶ 17. Plaintiff Schwab Total Bond Market Fund "is also a series of Schwab Investments." Id. ¶ 18. Finally, plaintiff Schwab U.S. Dollar Liquid Assets Fund is a fund managed in California and which is "a series of Charles Schwab Worldwide Funds plc, an investment company with variable capital, incorporated in Ireland." Id. ¶ 19. Each of these plaintiffs "purchased or held LIBOR-based financial instruments during the [Class Period]." Id. ¶¶ 17-19.

Third, the "Schwab Money" amended complaint has seven plaintiffs.[6] Plaintiff Schwab Money Market Fund is "a series of The Charles Schwab Family of Funds, an open-end investment management company organized as a Massachusetts business trust." Schwab Money Am. Compl. ¶ 17. Plaintiffs Schwab Value Advantage Money Fund, Schwab Retirement Advantage Money Fund, Schwab Investor Money Fund, Schwab Cash Reserves, and Schwab Advisor Cash Reserves are each also "a series of The Charles Schwab Family of Funds." Id. ¶¶ 18-22. Finally, Plaintiff Schwab YieldPlus Fund is "a series of Schwab Investments, an open-end investment management company organized as a Massachusetts business trust." Id. ¶ 23. "Contingent interests of Schwab

---

[6] The "Schwab Money" action is Schwab Money Market Fund v. Bank of America Corp. (11 Civ. 6412).

YieldPlus Fund have passed to Plaintiff Schwab YieldPlus Fund Liquidation Trust." Id. Each of these plaintiffs "purchased or held LIBOR-based financial instruments during the [Class Period]." Id. ¶¶ 17-23.

Plaintiffs argue that they were injured as a result of defendants' alleged suppression of LIBOR, which "artificially depress[ed] the value of tens of billions of dollars in LIBOR-based financial instruments the [plaintiffs] held or purchased." Id. ¶ 194. These financial instruments included floating-rate instruments paying a rate of return directly based on LIBOR, id. ¶ 195, and fixed-rate instruments which plaintiffs decided to purchase by comparing the instruments' fixed rate of return with LIBOR, id. ¶ 197. Plaintiffs purchased both floating- and fixed-rate instruments directly from defendants, from subsidiaries or other affiliates of defendants, and from third parties. Id. ¶¶ 196, 198-99.

### III. Discussion

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To avoid dismissal, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Where plaintiffs have not "nudged their claims across the line from conceivable to plausible, their

complaint must be dismissed." Id.  In applying this standard, a court must accept as true all well-pleaded factual allegations and must draw all reasonable inferences in favor of the plaintiff.  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam); Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).  The Court may also "properly consider 'matters of which judicial notice may be taken, or documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit.'"  Halebian v. Berv, 644 F.3d 122, 130 n.7 (2d Cir. 2011) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

In the case at bar, defendants have moved to dismiss all of plaintiffs' claims.  Our analysis will proceed in an order roughly based on the structure of the parties' briefing: (1) antitrust claims, (2) exchange-based claims, (3) RICO claim, and (4) state-law claims.

## A. Antitrust Claim

Each amended complaint asserts a cause of action for violation of section 1 of the Sherman Act.  OTC Am. Compl. ¶¶ 220-26; Bondholder Am. Compl. ¶¶ 205-11; Exchange Am. Compl. ¶¶ 245-49; Schwab Bond Am. Compl. ¶¶ 202-08; Schwab Bank Am. Compl. ¶¶ 201-07; Schwab Money Am. Compl. ¶¶ 214-20.  The Schwab plaintiffs have also asserted a cause of action for violation of California's antitrust statute, the Cartwright Act.  Schwab Bond

Am. Compl. ¶¶ 239-45; Schwab Bank Am. Compl. ¶¶ 238-44; Schwab Money Am. Compl. ¶¶ 251-57.  Defendants have moved to dismiss these claims on four grounds: (1) plaintiffs do not adequately plead a contract, combination, or conspiracy, (2) plaintiffs fail to allege a restraint of trade, (3) plaintiffs lack antitrust standing, and (4) indirect purchasers lack standing under Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977). Because we find that the third ground, that plaintiffs lack antitrust standing, is a sufficient reason to dismiss plaintiffs' antitrust claims, we need not reach the remaining grounds.

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1 (2006).  The private right of action to enforce this provision is established in section 4 of the Clayton Act:

> Except as provided in subsection (b) of this section [relating to the amount of damages recoverable by foreign states and instrumentalities of foreign states], any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

Id. § 15.   Here, plaintiffs claim that they were injured by defendants' alleged conspiracy in restraint of trade, in violation of section 1 of the Sherman Act, and accordingly bring suit pursuant to section 4 of the Clayton Act.

To have standing under the Clayton Act, a private plaintiff must demonstrate (1) antitrust injury, and (2) "that he is a proper plaintiff in light of four 'efficient enforcer' factors" derived from the Supreme Court's decision in Associated General Contractors v. California State Council of Carpenters ("AGC"), 459 U.S. 519 (1983).   In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 688 (2d Cir. 2009).   Here, plaintiffs have not plausibly alleged that they suffered antitrust injury, thus, on that basis alone, they lack standing.   We need not reach the AGC "efficient enforcer" factors.

### 1. Antitrust Injury

### a. Antitrust Injury Defined

As articulated by the Supreme Court in Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) ("ARCO"), "antitrust injury" refers to injury "attributable to an anti-competitive aspect of the practice under scrutiny."   Id.; see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts

unlawful.   The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.").[7]   Although conduct in violation of the Sherman Act might reduce, increase, or be neutral with regard to competition, a private plaintiff can recover for such a violation only where "the loss stems from a competition-<u>reducing</u> aspect or effect of the defendant's behavior."   <u>ARCO</u>, 495 U.S. at 344 (emphasis in original).   Moreover, it is not enough that defendant's conduct disrupted or distorted a competitive market: "Although all antitrust violations . . . 'distort' the market, not every loss stemming from a violation counts as antitrust injury."   <u>Id.</u> at 339 n.8.   Therefore, a plaintiff must demonstrate <u>not only</u> that it suffered injury and that the injury resulted from defendants' conduct, <u>but also</u> that the injury resulted from the anticompetitive nature of defendant's conduct. See <u>Nichols v. Mahoney</u>, 608 F. Supp. 2d 526, 543-44 (S.D.N.Y. 2009).   The rationale, of course, is that the Clayton Act's rich bounty of treble damages and attorney's fees should reward only

---

[7] Here, plaintiffs have alleged that defendants violated the Sherman Act through a horizontal price-fixing conspiracy.   The element of defendants' alleged price fixing which makes it unlawful, as with any conduct in violation of the antitrust laws, is its effect of restraining competition. See <u>Arizona v. Maricopa Cnty. Med. Soc'y</u>, 457 U.S. 332, 345 (1982) ("The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition.   The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. . . . Agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints, without the necessity of minute inquiry whether a particular price is reasonable or unreasonable as fixed . . . ."   (quoting <u>United States v. Trenton Potteries Co.</u>, 273 U.S. 392, 397-98 (1927))).

those plaintiffs who further the purposes of the Sherman and Clayton Acts, namely, "protecting competition." Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 251 (1993).

### b. A Per Se Violation of the Sherman Act Does Not Necessarily Establish Antitrust Injury

Critically, even when a plaintiff can successfully allege a per se violation of section 1 of the Sherman Act, such as horizontal price fixing, the plaintiff will not have standing under section 4 of the Clayton Act unless he can separately demonstrate antitrust injury. See ARCO, 495 U.S. at 344 ("[P]roof of a per se violation and of antitrust injury are distinct matters that must be shown independently." (quoting Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 334.2c, p. 330 (1989 Supp.))); see also Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc., 467 F.3d 283, 290 (2d Cir. 2006) ("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." (quoting Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 534 (1983)) (internal quotation marks omitted)). In other words, even though a defendant might have violated the Sherman Act and thus be subject to criminal liability, it is a separate question

whether Congress intended to subject the defendant as well to civil liability, in particular to the plaintiffs suing.

### c. California's Cartwright Act also Requires Antitrust Injury

The antitrust injury requirement also applies to claims pursuant to the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq. (West 2012). See <u>Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.</u>, 198 Cal. App. 4th 1366, 1378, 1380 (App. 2d Dist. 2011) ("[F]ederal case law makes clear that the antitrust injury requirement also applies to other federal antitrust violations [beyond anticompetitive mergers]. California case law holds that the requirement applies to Cartwright Act claims as well. . . . [T]he antitrust injury requirement means that an antitrust plaintiff must show that it was injured by the anticompetitive aspects or effects of the defendant's conduct, as opposed to being injured by the conduct's neutral or even procompetitive aspects."); <u>Morrison v. Viacom, Inc.</u>, 66 Cal. App. 4th 534, 548 (App. 1st Dist. 1998) ("The plaintiff in a Cartwright Act proceeding must show that an antitrust violation was the proximate cause of his injuries. . . . An 'antitrust injury' must be proved; that is, the type of injury the antitrust laws were intended to prevent, and which flows from the invidious conduct which renders defendants' acts unlawful." (alteration in original) (quoting

<u>Kolling v. Dow Jones & Co.</u>, 137 Cal. App. 3d 709, 723 (App. 1st Dist. 1982))); <u>id.</u> ("Appellants failed to allege antitrust injury . . . because they have failed to allege any facts to show they suffered an injury which was caused by restraints on competition."). The common antitrust injury requirement derives from the Cartwright Act's and Sherman Act's common purpose. <u>See</u> <u>Exxon Corp. v. Superior Court</u>, 51 Cal. App. 4th 1672, 1680 (App. 6th Dist. 1997) (citations omitted) ("The Cartwright Act, as the Sherman Antitrust Act, was enacted to promote free market competition and to prevent conspiracies or agreements in restraint or monopolization of trade.").

### 2. Defendants' Alleged Conduct Was Not Anticompetitive

#### a. The LIBOR-Setting Process Was Never Competitive

Here, plaintiffs do not argue that the collaborative LIBOR-setting process itself violates the antitrust laws, but rather that defendants violated the antitrust laws by conspiring to set LIBOR at an artificial level. <u>See, e.g.</u>, OTC Compl. ¶¶ 217-26. According to plaintiffs:

> Defendants' anticompetitive conduct had severe adverse consequences on competition in that [plaintiffs] who traded in LIBOR-Based [financial instruments] during the Class Period were trading at artificially determined prices that were made artificial as a result of Defendants' unlawful conduct. As a consequence thereof, [plaintiffs] suffered financial losses and were, therefore, injured in their business or property.

Id. ¶ 219; see also Tr. 17-18.[8]

Although these allegations might suggest that defendants fixed prices and thereby harmed plaintiffs, they do not suggest that the harm plaintiffs suffered resulted from any anticompetitive aspect of defendants' conduct. As plaintiffs rightly acknowledged at oral argument, the process of setting LIBOR was never intended to be competitive. Tr. 12, 18. Rather, it was a cooperative endeavor wherein otherwise-competing banks agreed to submit estimates of their borrowing costs to the BBA each day to facilitate the BBA's calculation of an interest rate index. Thus, even if we were to credit plaintiffs' allegations that defendants subverted this cooperative process by conspiring to submit artificial estimates instead of estimates made in good faith, it would not follow that plaintiffs have suffered antitrust injury. Plaintiffs' injury would have resulted from defendants' misrepresentation, not from harm to competition.

### b. Plaintiffs Do Not Allege a Restraint on Competition in the Market for LIBOR-Based Financial Instruments

It is of no avail to plaintiffs that defendants were competitors outside the BBA. Tr. 29-30. Although there might have been antitrust injury if defendants had restrained

---

[8] References preceded by "Tr." refer to the transcript of the oral argument held on March 5, 2013.

competition in the market for LIBOR-based financial instruments
or the underlying market for interbank loans, plaintiffs have
not alleged any such restraint on competition.

First, with regard to the market for LIBOR-based financial
instruments, plaintiffs have not alleged that defendants'
alleged fixing of LIBOR caused any harm to competition between
sellers of those instruments or between buyers of those
instruments. Plaintiffs' allegation that the prices of LIBOR-
based financial instruments "were affected by Defendants'
unlawful behavior," such that "Plaintiffs paid more or received
less than they would have in a market free from Defendants'
collusion," Antitrust Opp'n 36, might support an allegation of
price fixing but does not indicate that plaintiffs' injury
resulted from an anticompetitive aspect of defendants' conduct.[9]

---

[9] Contra to plaintiffs' argument, the Ninth Circuit's decision in Knevelbaard
Dairies v. Kraft Foods, Inc., 232 F.3d 979 (9th Cir. 2000), is not to the
contrary. Knevelbaard Dairies involved a claim by plaintiff milk producers
that defendant cheese makers had conspired to fix a low price for bulk
cheese, thereby depressing the price defendants paid plaintiffs for milk
because California regulators used the bulk cheese price to set the minimum
milk price. Plaintiffs had argued that defendants "did not compete," but
rather "collusively manipulate[ed] [bulk cheese] prices to levels lower than
would prevail under conditions of free and open competition." Id. at 984.
The Ninth Circuit held that plaintiffs had adequately alleged antitrust
injury. As quoted by plaintiffs, the Court reasoned:

> Since the plaintiffs allegedly were subjected to artificially
> depressed milk prices, the injury flows "from that which makes
> the conduct unlawful," i.e., from the collusive price
> manipulation itself. . . . When horizontal price fixing causes
> buyers to pay more, or sellers to receive less, than the prices
> that would prevail in a market free of the unlawful trade
> restraint, antitrust injury occurs.

Antitrust Opp'n 37 (quoting Knevelbaard Dairies, 232 F.3d at 987-88).
However, in the context of the claims before it, the Ninth Circuit clearly

In other words, it is not sufficient that plaintiffs paid higher prices because of defendants' collusion; that collusion must have been anticompetitive, involving a failure of defendants to compete where they otherwise would have.  Yet here, undoubtedly as distinguished from most antitrust scenarios, the alleged collusion occurred in an arena in which defendants never did and never were intended to compete.

### c. Plaintiffs Do Not Allege a Restraint on Competition in the Interbank Loan Market

Second, there was similarly no harm to competition in the interbank loan market.  As discussed above, LIBOR is an index intended to convey information about the interest rates prevailing in the London interbank loan market, but it does not necessarily correspond to the interest rate charged for any actual interbank loan.  Plaintiffs have not alleged that defendants fixed prices or otherwise restrained competition in the interbank loan market, and likewise have not alleged that any such restraint on competition caused them injury.

---

intended to refer to collusive price manipulation in place of competition, and its reference to paying more or receiving less than the prices that would prevail in a market free of the unlawful trade restraint clearly contrasted prices in a market with such a restraint to a market operating under free competition.  Moreover, the Ninth Circuit explicitly recognized that "the central purpose of the antitrust laws, state and federal, is to preserve competition, " Knevelbaard Dairies, 232 F.3d at 988, and it quoted a leading antitrust treatise for the proposition that the harm to sellers from a price-fixing conspiracy by buyers "constitutes antitrust injury, for it reflects the rationale for condemning buying cartels - namely, suppression of competition among buyers, reduced upstream and downstream output, and distortion of prices," id. (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 375b at 297 (rev. ed. 1995)) (emphasis added).

Plaintiff's theory is that defendants competed normally in the interbank loan market and then agreed to lie about the interest rates they were paying in that market when they were called upon to truthfully report their expected borrowing costs to the BBA. This theory is one of misrepresentation, and possibly of fraud, but not of failure to compete.

### 3. Plaintiffs Could Have Suffered the Harm Alleged Here Under Normal Circumstances

The above analysis is confirmed by inquiring, as courts previously have in evaluating antitrust injury, whether plaintiff could have suffered the same harm under normal circumstances of free competition. For example, in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977), defendant was a manufacturer of bowling equipment that had purchased financially distressed bowling centers. Plaintiffs, operators of other bowling centers, brought suit against defendant pursuant to the Clayton Act, arguing that they had lost future income because the distressed bowling centers purchased by defendant would otherwise have gone bankrupt. The Supreme Court held that these allegations did not establish antitrust injury. Although defendants' actions might have violated the Sherman Act by bringing "a 'deep pocket' parent into a market of 'pygmies,'" plaintiffs did not suffer antitrust injury because their alleged harm bore "no relationship to the size of either the acquiring

company or its competitors." Id. at 487.   Plaintiffs "would have suffered the identical 'loss' but no compensable injury had the acquired centers instead obtained refinancing or been purchased by 'shallow pocket' parents." Id.   Therefore, even if respondents were injured, "it was not 'by reason of anything forbidden in the antitrust laws': while respondents' loss occurred 'by reason of' the unlawful acquisitions, it did not occur 'by reason of' that which made the acquisitions unlawful." Id. at 488.

In ARCO, the Court reaffirmed this approach in the context of price fixing.   Defendant in that case was an integrated oil company that marketed gasoline both directly through its own stations and indirectly through dealers operating under its brand name.   Facing competition from independent "discount" gas dealers, such as those operated by plaintiff, defendant allegedly conspired with its dealers to implement a vertical, maximum-price-fixing scheme.   ARCO, 495 U.S. at 331-2.   Many independent gas dealers could not compete with the below-market prices established by this scheme, and consequently went out of business.

Despite the harm that defendant's conspiratorial conduct had caused plaintiff, the Supreme Court held that plaintiff had not suffered antitrust injury.   The Court reasoned that a competitor could establish antitrust injury only by

demonstrating predatory pricing, that is, pricing below cost in
order to drive competitors out of business:

> When a firm, or even a group of firms adhering to a
> vertical agreement, lowers prices but maintains them
> above predatory levels, the business lost by rivals
> cannot be viewed as an "anticompetitive" consequence
> of the claimed violation.  A firm complaining about
> the harm it suffers from nonpredatory price
> competition "is really claiming that it [is] unable to
> raise prices." Blair & Harrison, Rethinking Antitrust
> Injury, 42 Vand. L. Rev. 1539, 1554 (1989). This is
> not antitrust injury; indeed, "cutting prices in order
> to increase business often is the very essence of
> competition." [Matsushita Elec. Indus. Co. v. Zenith
> Radio Corp., 475 U.S. 574, 594 (1986)].

Id. at 337-38 (footnote omitted).  In other words, cutting
prices to a level still above cost is not merely consistent with
competition – something that could be expected to occur under
normal circumstances – but indeed is often "the very essence of
competition" – something to be desired.  Because the harm
plaintiffs suffered resulted from competitive, healthy conduct,
it did not constitute antitrust injury.

As with the harm alleged in Brunswick and ARCO, the harm
alleged here could have resulted from normal competitive
conduct.  Specifically, the injury plaintiffs suffered from
defendants' alleged conspiracy to suppress LIBOR is the same as
the injury they would have suffered had each defendant decided
independently to misrepresent its borrowing costs to the BBA.
Even if such independent misreporting would have been
fraudulent, it would not have been anticompetitive, and indeed

would have been consistent with normal commercial incentives facing defendants. Those incentives, of course, are alleged on the face of plaintiffs' complaints: defendants allegedly had incentive (1) "to portray themselves as economically healthier than they actually were" and (2) "to pay lower interest rates on LIBOR-based financial instruments that Defendants sold to investors." OTC Compl. ¶ 5.

In this respect, the present case contrasts with more traditional antitrust conspiracies, such as a conspiracy among sellers to raise prices. Whereas in such a scenario, the sellers' supracompetitive prices could exist only where the sellers conspired not to compete, here, each defendant, acting independently, could rationally have submitted false LIBOR quotes to the BBA. The reason why it would have been sustainable for each defendant individually to submit an artificial LIBOR quote is that, as discussed above, the LIBOR submission process is not competitive. A misreporting bank, therefore, would not have been concerned about being forced out of business by competition from other banks. In other words, precisely because the process of setting LIBOR is not competitive, collusion among defendants would not have allowed them to do anything that they could not have done otherwise.

This analysis would not change if we were to accept plaintiffs' argument that defendants could not, absent

collusion, have submitted the "clustered" rates that they submitted during the Class Period. The question is not whether defendants could have submitted independently the exact quotes that they in fact submitted, but rather whether they could have caused plaintiffs the same injury had they acted independently. As discussed above, the answer is yes: each defendant could have submitted, independently, a LIBOR quote that was artificially low. Further, whether the quotes would have formed a "cluster" or not is irrelevant: plaintiffs' injury resulted not from the clustering of LIBOR quotes, but rather from the quotes' alleged suppression.[10] In short, just as the bowling center operators in Brunswick could have suffered the same injury had the failing bowling centers remained open for legitimate reasons, and just as the gas dealers in ARCO could have suffered the same injury had defendant's prices been set through normal competition, the plaintiffs here could have suffered the same injury had each bank decided independently to submit an artificially low LIBOR quote.

Moreover, Brunswick and ARCO, which each held that plaintiffs did not suffer antitrust injury, involved more harm to competition than was present here. In Brunswick, defendant's

---

[10] Indeed, given that a bank's LIBOR quote represents the bank's expectation of its own costs of borrowing, and that different banks based in different countries could sensibly face significantly different borrowing costs, it would not be surprising for banks to submit LIBOR quotes that differed persistently over the course of several years.

conduct brought "a 'deep pocket' parent into a market of 'pygmies,'" altering the positions of competitors in the bowling center market in a manner that was potentially harmful to competition.  In ARCO, similarly, the prices set by defendants' conspiracy displaced prices set through free competition and thereby gave defendants' dealers a competitive advantage over other dealers in the retail gas market.  Here, by contrast, there is no allegation of harm to competition.  For one, LIBOR was never set through competition, even under normal circumstances.  While it is true that the prices of LIBOR-based financial instruments are set through competition, and that a change in LIBOR may have altered the baseline from which market actors competed to set the price of LIBOR-based instruments, competition proceeded unabated and plaintiffs have alleged no sense in which it was displaced.

Additionally, there is no allegation that defendants' conduct changed their position vis-à-vis their competitors.  At any given time, there is only one LIBOR, used by all actors throughout the relevant market.  Although defendants' alleged manipulation of the level of LIBOR might have had the distributive effect of transferring wealth between the buyers and sellers of LIBOR-based financial instruments, including between defendants and their customers, plaintiffs have not alleged any structural effect wherein defendants improved their

position relative to their competitors. Because <u>Brunswick</u> and
<u>ARCO</u> each involved more harm to competition than was present
here, yet the Supreme Court held in each case that plaintiff had
not suffered antitrust injury, it is even clearer here that
antitrust injury does not exist.

### 4. Plaintiffs' "Proxy" Argument Is Unavailing

At oral argument, plaintiffs contended that LIBOR is a
proxy for competition in the underlying market for interbank
loans, and thus defendants effectively harmed competition by
manipulating LIBOR. According to plaintiffs, when defendants
reported artificial LIBOR quotes to the BBA, they "snuff[ed] out
. . . the proxy for competition" by "interdicting the
competitive forces that set [defendants'] rates" and otherwise
would have affected LIBOR and the price of LIBOR-based
instruments. Tr. 24, 27. This argument was advanced in the
context of Eurodollar futures contracts, which are based on the
underlying market for interbank loans, but it also applies to
other LIBOR-based financial instruments. If LIBOR
"interdict[ed]" competition that would otherwise have affected
the market for Eurodollar futures contracts, it equally
interdicted competition that would have affected the market for
LIBOR-based financial instruments more broadly.

Although there is a sense in which this argument accurately
characterizes the facts, the argument does not demonstrate that

plaintiffs suffered antitrust injury.  It is true that LIBOR is a proxy for the interbank lending market; indeed, it is precisely because LIBOR was thought to accurately represent prevailing interest rates in that market that it was so widely utilized as a benchmark in financial instruments.  It is also true that if LIBOR was set at an artificial level, it no longer reflected competition in the market for interbank loans and its value as a proxy for that competition was diminished, even "snuffed out."  However, the fact remains that competition in the interbank lending market and in the market for LIBOR-based financial instruments proceeded unimpaired.  If LIBOR no longer painted an accurate picture of the interbank lending market, the injury plaintiffs suffered derived from misrepresentation, not from harm to competition.

Contrary to plaintiffs' contention, Tr. 28, their "proxy" argument does not derive support from the line of cases finding an antitrust violation where a defendant manipulated one component of a price, both because those cases do not involve a proxy for competition and because they are distinguishable. Plaintiffs cite Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643 (1980), in which the Supreme Court held that beer wholesalers violated the Sherman Act by conspiring to discontinue a previously common practice of extending short-term interest-free credit to retailers.  However, not only did

*Catalano* not involve a proxy for competition, but it also is plainly distinguishable: whereas the beer wholesalers in *Catalano* had previously competed over the credit terms they offered to retailers, such that the conspiracy to fix credit terms displaced an arena of competition, here there was never competition over LIBOR – a rate that, at any given time, is necessarily uniform throughout the market – and thus defendants' alleged conspiracy to fix LIBOR did not displace competition.

Plaintiffs also cite *In re Yarn Processing Patent Validity Litigation*, 541 F.2d 1127 (5th Cir. 1976), in which the Fifth Circuit considered a scheme whereby a manufacturer of yarn processing machines which also owned the patent in those machines conspired with other manufacturers to split the royalty income the patent holder received equally among all of the manufacturers. The Court held that the scheme violated the antitrust laws because it fixed a portion of the prices that manufacturers received for the machines – prices over which the manufacturers competed. *Id.* Here, by contrast, the LIBOR-based financial instruments that defendants competed to sell had always contained LIBOR, a value uniform throughout the market, and thus defendants' conduct did not displace competition where it normally would have occurred.

Finally, plaintiffs cite *Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*, 665 F. Supp. 869 (E.D. Cal. 1986), which

considered a claim by cantaloupe purchasers that cantaloupe sellers had conspired to fix the cooling and palletizing charge added to the price of cantaloupe. The Court held that the conspiracy violated the antitrust laws, even if cantaloupe sellers continued to compete on the underlying price, because fixing even a component of price is unlawful. Id. at 872. Our case is plainly distinguishable because the price of LIBOR-based financial instruments had always contained a "fixed" component – LIBOR – and thus defendants' alleged conspiracy, as discussed above, did not displace competition.

### 5. Plaintiffs' Remaining Cases Are Distinguishable

The other cases plaintiffs put forward as addressing arguably similar facts are also distinguishable because they involve harm to competition which is not present here. To begin, plaintiffs read Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988), as establishing that "plaintiffs who lost business due to defendants' manipulation of a standard-setting process with persuasive influence on marketplace transactions were entitled to Sherman Act relief." Antitrust Opp'n 37. However, not only did Allied Tube not rule on antitrust injury or liability, addressing instead the single question of whether defendants were immune from antitrust liability under Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); see Allied Tube, 486

U.S. 492, but to whatever extent it might provide persuasive authority regarding antitrust injury, it is distinguishable.  In Allied Tube, a manufacturer of plastic electrical conduit sued a manufacturer of steel conduit that had conspired with other members of a trade association to exclude plastic conduit from the association's safety standard, which standard was widely incorporated into local government regulations.  Allied Tube, 486 U.S. at 495-96.  Like the LIBOR-setting process, the process of forming the safety standard was a cooperative endeavor by otherwise-competing companies under the auspices of a trade association.  Critically, however, whereas the conspiracy in Allied Tube gave defendants a competitive advantage over plaintiff by shutting plaintiff's product out of the industry safety standard, here plaintiffs have not alleged that defendants' suppression of LIBOR gave them an advantage over their competitors.

Each of the other decisions plaintiffs cite involving defendants' failure to provide accurate information also involved a harm to competition beyond what is present here. See F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447 (1986) (dentists agreed not to submit x-rays to dental insurance companies, where dentists would otherwise have competed over their degree of cooperation with insurance companies); Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679 (1978)

(trade association of engineers adopted rule prohibiting the discussion of costs until the client had selected an engineer, thus prohibiting competitive bidding among engineers); <u>Woods Exploration & Producing Co. v. Aluminum Co. of America</u>, 438 F.2d 1286 (5th Cir. 1971) (defendant oil producers submitted artificially low sales forecasts to state regulator in order to lower the total production limit in an oil field in which both plaintiffs and defendants operated, where the regulator's formula for allotting production allowables favored plaintiffs and thus a decrease in the total production limit disproportionately harmed plaintiffs).

Similarly, plaintiffs' "list price" cases are distinguishable. For instance, the Ninth Circuit in <u>Plymouth Dealers' Ass'n of N. Cal. v. United States</u>, 279 F.2d 128 (9th Cir. 1960), considered a conspiracy among Plymouth car dealers to fix the list prices for cars and accessories. The Court held that the conspiracy violated the Sherman Act, despite the fact that dealers were free to bargain down from the list price. <u>Id.</u> Here, plaintiffs would have us follow similar reasoning, but the defect in the comparison is that list prices are a very different sort of benchmark than LIBOR. The Plymouth dealers' conspiracy to fix list prices "established as a matter of actual practice one boundary of 'the range within which . . . sales would be made,'" thus "prevent[ing] the determination of

(market) prices by free competition alone." Id. at 134 (quoting United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222-23 (1940)).  By contrast, the price of LIBOR-based financial instruments can be set at any level above or below LIBOR, and thus defendants' alleged conspiracy to fix LIBOR did not constrain the free and competitive bargaining of actors in the market for LIBOR-based financial instruments.

Finally, plaintiffs' cases involving manipulation of indices are distinguishable for the same reason.  Plaintiffs cite In re Rail Freight Fuel Surcharge Antitrust Litigation, 587 F. Supp. 2d 27, 593 F. Supp. 2d 29 (D.D.C. 2008), which addressed a conspiracy by major railroads to remove fuel costs from a cost escalation index that was published by a trade association and widely used in rail freight transportation contracts, and instead to implement a uniform fuel surcharge. The Court held that plaintiffs had established antitrust injury: "through their allegations identifying defendants' supra-competitive prices, plaintiffs here have alleged an injury to competition itself." 593 F. Supp. 2d at 42.  Importantly, though, the Court clarified that defendants' collaboration in the industry association to publish the new cost escalation index was not necessarily anticompetitive by itself, but rather was anticompetitive when combined with defendants' other actions, notably imposing the uniform fuel surcharge.  587 F.

Supp. 2d at 35.    In our case, although defendants allegedly fixed a benchmark, LIBOR, published by a trade association, the BBA, they did not add a uniform charge, like the fuel surcharge in Rail Freight, to an otherwise competitively determined price. The other decisions cited by plaintiffs that found antitrust injury where defendants manipulated an index are also distinguishable because they each involved a failure of defendants to compete.   See, e.g., Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979 (9th Cir. 2000) (defendants failed to compete in the bulk cheese market and thus manipulated the government-mandated minimum price for milk, which was calculated using a formula that incorporated the price of bulk cheese); Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc., 253 F. Supp. 2d 262 (D. Conn. 2003) (same, except defendants failed to compete in the butter market, which also affected a minimum milk price).

### 6. Conclusion

For these reasons, plaintiffs' allegations do not make out a plausible argument that they suffered an antitrust injury. Plaintiffs, therefore, do not have standing to bring claims pursuant to the Clayton Act or the Cartwright Act.[11] Accordingly, plaintiffs' antitrust claims are dismissed.

---

[11] As discussed below, we assert supplemental jurisdiction over plaintiffs' Cartwright Act claim.

## B. Exchange-Based Claims

The Exchange-Based Plaintiffs have asserted causes of action for manipulation of Eurodollar futures in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1-25 (2006), and vicarious liability for and aiding and abetting such manipulation.  Exchange Am. Compl. ¶¶ 228-44.  Defendants have moved to dismiss these claims on three grounds: (1) the claims involve an impermissible extraterritorial application of the CEA, (2) the claims are time-barred, and (3) plaintiffs fail to state a claim for manipulation under the CEA.  For the reasons stated below, we find that, although plaintiffs' claims do not require an extraterritorial application of the CEA and do not fail to plead commodities manipulation, they are time-barred at least to the extent that they rely on contracts purchased from August 2007, the start of the Class Period, through May 29, 2008, the date by which plaintiffs were clearly on inquiry notice of their injury.

### 1. Extraterritoriality

Defendants first argue that plaintiffs' claims must be dismissed because the CEA does not apply extraterritorially, yet plaintiffs' claims rely exclusively on foreign commodities manipulation.  As discussed below, although we agree that the

CEA does not apply extraterritorially, we find that the alleged manipulation nonetheless falls within the CEA's purview.

### a. Legal Standard

Both sides agree that <u>Morrison v. National Australia Bank Ltd.</u>, 130 S. Ct. 2869 (2010), governs the question of whether plaintiffs' claims involve an impermissibly extraterritorial application of the CEA.   Tr. 35; Exchange MTD 13-17.   In <u>Morrison</u>, the Supreme Court reaffirmed the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."   <u>Morrison</u>, 130 S. Ct. at 2877 (quoting <u>EEOC v. Arabian Am. Oil Co.</u> ("<u>Aramco</u>"), 499 U.S. 244, 248 (1991)) (internal quotation marks omitted). The Court observed that this principle is not a limit on Congress's authority to legislate, but rather "represents a canon of construction . . . [that] rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters."   <u>Id.</u>

The Court established a two-part test for deciding questions of extraterritoriality.   First, "'unless there is the affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect, 'we must presume it is primarily concerned with domestic conditions.'"   <u>Id.</u> (quoting <u>Aramco</u>, 499 U.S. at 248).   "When a statute gives no clear

indication of an extraterritorial application, it has none."
Id. at 2878.   Second, if a statute applies only domestically, a
court must determine which domestic conduct the statute
regulates.   The reason for this inquiry is that "it is a rare
case of prohibited extraterritorial application that lacks all
contact with the territory of the United States," and thus the
presumption against extraterritoriality, to have any meaning,
must limit the statute's application to those domestic
activities that "are the objects of the statute's solicitude,"
that "the statute seeks to 'regulate.'"   Id. at 2884.   To carry
out this analysis, a court must ascertain "the 'focus' of
congressional concern."   Id. (quoting Aramco, 499 U.S. at 255).

Applying this framework to section 9(a) of the CEA, the
provision under which plaintiffs assert their claims, we first
observe that "neither the CEA nor its legislative history
specifically authorizes extraterritorial application of the
statute."   CFTC v. Garofalo, 10 CV 2417, at *11 (N.D. Ill. Dec.
21, 2010) (citing Tamari v. Bache & Co., 730 F.2d 1103, 1107
(7th Cir. 1984)).   Rather, "the statute is silent on this issue
and shows neither a Congressional intent to apply the CEA to
foreign agents nor a wish to restrict the statute to domestic
activities."   Id. (citing Tamari, 730 F.2d at 1107).   Indeed,
there is even less of an indication of extraterritorial
application here than in section 10(b) of the Securities and

Exchange Act of 1934 (the "'34 Act"), 15 U.S.C. §§ 78a-78pp (2006 & Supp. IV 2010), as amended by the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (codified in scattered sections of the U.S. Code), which the <u>Morrison</u> Court held did not apply extraterritorially.   The Court reasoned in <u>Morrison</u> that even though one of section 10(b)'s terms, "interstate commerce," was defined to include foreign commerce, <u>see</u> 15 U.S.C. § 78c(a)(17), "[t]he general reference to foreign commerce in the definition of 'interstate commerce' does not defeat the presumption against extraterritoriality."   <u>Morrison</u>, 130 S. Ct. at 2882.   Here, "interstate commerce," as referenced in section 9(a) of the CEA, 7 U.S.C. § 13(a)(2), does not even include a reference to foreign commerce, <u>id.</u> § 1a(30).   Because section 9(a) of the CEA "gives no clear indication of an extraterritorial application, it has none."   <u>Morrison</u>, 130 S. Ct. at 2878.

    Having concluded that section 9(a) of the CEA applies only domestically, we must still determine which domestic activities "are the objects of the statute's solicitude," which activities "the statute seeks to 'regulate.'"   <u>Id.</u> at 2884.   We therefore must determine "the 'focus' of congressional concern" in enacting section 9(a) of the CEA.   <u>Id.</u> (quoting <u>Aramco</u>, 499 U.S. at 255).

Section 9(a) makes it a crime for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." 7 U.S.C. § 13(a)(2). This provision clearly focuses on commodities in interstate commerce and futures contracts traded on domestic exchanges. Such an interpretation of the statute's focus is consistent with the CEA's statement of purpose, see 7 U.S.C. § 5(b), as well as decisions interpreting the CEA, see, e.g. Tamari v. Bache & Co., 730 F.2d 1103, 1108 (7th Cir. 1984) ("[T]he fundamental purpose of the [CEA] is to ensure the integrity of the domestic commodity markets."); cf. CFTC v. Garofalo, 10 CV 2417, at *12 (ruling that sections 6c(a) and (b) of the CEA, prohibiting certain transactions in commodities future or option contracts, "are concerned with where the underlying options contracts were actually traded"). Accordingly, a claim is within the CEA's domestic application if it involves (1) commodities in interstate commerce or (2) futures contracts traded on domestic exchanges.

### b. The Present Allegations

Here, plaintiffs' claims plainly involve futures contracts traded on domestic exchanges. By manipulating LIBOR, defendants allegedly manipulated the price of Eurodollar futures contracts, which is directly based on LIBOR. Eurodollar futures contracts,

of course, are traded on the Chicago Mercantile Exchange. Indeed, defendants acknowledged at oral argument that Eurodollar futures contracts are within the scope of the CEA's manipulation provision. Tr. 42. Because plaintiffs' claims involve manipulation of the price of domestically traded futures contracts, they are not impermissibly extraterritorial.

According to defendants, plaintiffs "don't allege that the defendants . . . manipulated the futures contract with Chicago," but rather allege only that defendants manipulated the Eurodollar contract's underlying commodity. Id. at 43. Defendants contend that "[t]here are all kinds of things one can do to manipulate futures contracts," but "[n]ot one of those things is alleged here." Id.

We do not concur. LIBOR was directly incorporated into the price of Eurodollar futures contracts, and by allegedly manipulating LIBOR, defendants manipulated the price of those contracts. Moreover, as discussed further below, LIBOR cannot plausibly be understood as the commodity underlying Eurodollar futures contracts; the only plausible way to characterize the components of a Eurodollar contract is that the underlying commodity is a USD 1,000,000 deposit in a foreign commercial bank with a three-month maturity, and the price is settled or traded at a value based on LIBOR. This understanding of Eurodollar futures contracts limits which claims have been

adequately pleaded, but it also forecloses defendants' argument that the only thing plaintiffs have alleged is manipulation of Eurodollar contracts' underlying commodity. In short, plaintiffs' claims clearly involve manipulation of the price of Eurodollar futures contracts, and manipulating the price of futures contracts traded on domestic exchanges is precisely the conduct that the CEA was designed to regulate. Accordingly, plaintiffs' claims fall within the purview of the CEA.

## 2. Statute of Limitations

Defendants next argue that plaintiffs' claims are barred by the CEA's statute of limitations. As discussed below, we find that certain of plaintiffs' claims are barred, certain are not, and others may or may not be, though we will not dismiss them at this stage.

## a. Legal Standard

A claim pursuant to the CEA must be brought "not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c). The CEA does not elaborate, however, on the circumstances that start the running of its statute of limitations. Where a federal statute "is silent on the issue" of when a cause of action accrues, as the CEA is, courts apply a "discovery accrual rule" wherein "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." Koch v. Christie's Int'l PLC, 699 F.3d 141, 148-49 (2d

Cir. 2012) (quoting <u>Rotella v. Wood</u>, 528 U.S. 549, 555 (2000)) (internal quotation marks omitted) (interpreting the statute of limitations for RICO claims, which requires plaintiffs to bring suit no later than "[four] years after the cause of action accrues," 28 U.S.C. § 1658(a)); <u>see also</u> <u>Premium Plus Partners,</u> <u>L.P. v. Goldman, Sachs & Co.</u>, 648 F.3d 533, 536 (7th Cir. 2011) (Easterbrook, C.J.) ("Section 25(c) of the Commodity Exchange Act . . . says that suit must be filed within two years of 'the date the cause of action arises.' We have understood this to mean the date on which the investor discovers that he has been injured.").

Under Second Circuit precedent, courts apply an "inquiry notice" analysis to determine when a plaintiff has discovered his injury:

> Inquiry notice - often called "storm warnings" in the securities context - gives rise to a duty of inquiry "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." In such circumstances, the imputation of knowledge will be timed in one of two ways: (i) "[i]f the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose"; and (ii) if some inquiry is made, "we will impute knowledge of what an investor in the exercise of reasonable diligence[] should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud."

<u>Koch</u>, 699 F.3d at 151 (quoting <u>Lentell v. Merrill Lynch & Co.,</u> 396 F.3d 161, 168 (2d Cir. 2005)); <u>see also</u> <u>id.</u> at 153 ("[O]nce

there are sufficient 'storm warnings' to trigger the duty to inquire, and the duty arises, if a plaintiff does not inquire within the limitations period, the claim will be time-barred."). In short, we first ask at what point the circumstances were such that they "would suggest to [a person] of ordinary intelligence the probability that she has been defrauded." Id. at 151 (internal quotation marks omitted). If plaintiffs do not then inquire within two years, they are deemed to have knowledge of their injury at the point at which the duty to inquire arose, and the period of limitations starts to run on that date. Here, plaintiffs do not allege that they made any inquiry into their injury prior to March 15, 2011. See Exchange Am. Compl. ¶¶ 182-99. Thus, if circumstances would have suggested to a person of ordinary intelligence the probability that he had been defrauded more than two years prior to March 15, 2011, that is, prior to March 15, 2009, then, to the extent plaintiffs' claims are based on Eurodollar contracts purchased through the date of inquiry notice, the claims are barred by the statute of limitations.

Contrary to plaintiffs' contention, the amount of public information necessary to start the period of limitations for commodities manipulation under the CEA is significantly less than the amount necessary to commence the period of limitations for securities fraud under the '34 Act. The two-year limitations period for securities fraud begins to run upon "the

discovery of the facts constituting the violation." 28 U.S.C. § 1658(b)(1) (2006). In Merck & Co., Inc. v. Reynolds, 559 U.S. 633 (2010), the Supreme Court held that "the 'facts constituting the violation' include the fact of scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" Id. at 1790 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976)). The Court reasoned: "[T]his 'fact' of scienter 'constitut[es]' an important and necessary element of a § 10(b) 'violation.' A plaintiff cannot recover without proving that a defendant made a material misstatement with an intent to deceive — not merely innocently or negligently." Id. at 1796 (emphasis omitted). According to the Second Circuit, this analysis indicates that the Court "thought about the requirements for 'discovering' a fact in terms of what was required to adequately plead that fact and survive a motion to dismiss." City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 175 (2d Cir. 2011).

Plaintiffs argue that this pleading-based standard applies here, such that the statute of limitations did not begin to run until they could have adequately pleaded a claim for commodities manipulation. Exchange Opp'n 24-26. In support of this argument, plaintiffs rely on language in City of Pontiac in which the Circuit, considering "the basic purpose of a statute of limitations," reasoned that because the purpose is to prevent

plaintiffs from unfairly surprising defendants by bringing stale claims, and because a claim cannot be stale until it has "accrued," a statute of limitations cannot commence until a claim has "accrued." City of Pontiac, 637 F.3d at 175; see also Exchange Opp'n 25.   Further, "[o]nly after a plaintiff can adequately plead his claim can that claim be said to have accrued." City of Pontiac, 637 F.3d at 175.   Plaintiffs argue that this language applies to statutes of limitations generally, including in the CEA context.

However, despite this general discussion of the purposes of statutes of limitations, the fact remains that City of Pontiac interpreted only the statute of limitations of the '34 Act, which is different on its face than the statute of limitations of the CEA.   In Koch v. Christie's Int'l PLC, 699 F.3d 141 (2d Cir. 2012), the Circuit confirmed that the analysis in Merck, which was the basis for the pleading-based standard established in City of Pontiac, "does not apply outside the realm of the statute that it interpreted." Id. at 150; see also Premium Plus Partners, L.P. v. Goldman, Sachs & Co., 648 F.3d 533, 536 (7th Cir. 2011) (Easterbrook, C.J.) ("The language of [the '34 Act's statute of limitations] . . . is hard to impute to [the CEA's statute of limitations."]).   "It remains the law in this Circuit that a RICO claim accrues upon the discovery of the injury alone." Koch, 699 F.3d at 150.   As discussed above, the CEA,

like RICO, is silent regarding when a cause of action arises. Therefore, the Second Circuit's holding in Koch that the RICO statute of limitations is based on a "discovery of the injury" standard is controlling in the context of the CEA.

Moreover, the pleading-based standard applicable to securities fraud claims is instructive here to the extent that it sets an upper bound on the amount of information necessary to commence the period of limitation for plaintiffs' commodities manipulation claims. As discussed below, a plaintiff seeking damages for commodities manipulation must satisfy the following four elements: "(1) that [defendant] had the ability to influence market prices; (2) that [he] specifically intended to do so; (3) that artificial prices existed; and (4) that the [defendant] caused the artificial prices." DiPlacido v. CFTC, 364 F. App'x 657, 661 (2d Cir. 2009) (quoting In re Cox, No. 75-16, 1987 WL 106879, at *3 (C.F.T.C. July 15, 1987)). In order for the period of limitations to commence, however, a plaintiff need not be able to make such a showing. In particular, plaintiffs here did not need to be able to allege "that Defendants were knowingly colluding to suppress LIBOR." Exchange Am. Compl. ¶ 197 (emphasis omitted). Rather, it was necessary only that "circumstances would [have] suggest[ed] to [a person] of ordinary intelligence the probability that she ha[d] been defrauded." Koch, 699 F.3d at 151 (quoting Lentell

v. Merrill Lynch & Co., Inc., 396 F.3d 161, 168 (2d Cir. 2005)).
Specifically, plaintiffs here would have been on inquiry notice
of their injury if circumstances would have suggested to a
person of ordinary intelligence the probability that the LIBOR
fixes which affected the prices of plaintiffs' Eurodollar
contracts had been manipulated.  If inquiry notice was triggered
on a date prior to March 15, 2009, plaintiffs' claims based on
Eurodollar futures contracts purchased through the date of
inquiry notice are barred.

Finally, we are mindful that "defendants bear a heavy
burden in establishing that the plaintiff was on inquiry notice
as a matter of law."  Newman v. Warnaco Grp., Inc., 335 F.3d
187, 194-95 (2d Cir. 2003) (quoting Nivram Corp. v. Harcourt
Brace Jovanovich, Inc., 840 F. Supp. 243, 249 (S.D.N.Y. 1993)).
Nonetheless, "[d]ismissal is appropriate when the facts from
which knowledge may be imputed are clear from the pleadings and
the public disclosures themselves."  In re Ultrafem Inc. Sec.
Litig., 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000).

### b. Publicly Available Information Relating to LIBOR Manipulation

By May 29, 2008, seven articles published in prominent
national news sources, along with one report referenced in
several of those articles, suggested that LIBOR had been at
artificial levels since August 2007, the start of the Class

Period.   As discussed below, these articles put plaintiffs on
inquiry notice of their claims based on Eurodollar futures
contracts purchased during that period.[12]

On April 10, 2008, Citigroup strategists Scott Peng,
Chintan Gandhi, and Alexander Tyo published a research report
entitled, "Special Topic: Is LIBOR Broken?" (the "Peng Report").
Scott Peng et al., Citigroup, Special Topic: Is LIBOR Broken?,
Apr. 10, 2008.   The Report found that "[three-month] LIBOR
probably understates real interbank lending costs by 20-30
[basis points]."[13]   Id.   To support this determination, the
Report compared LIBOR with the three-month Eurodollar deposit
rate calculated by the Federal Reserve.   "Because the Fed's data
are based on the bid-side rate of interbank borrowing, the Fed's
Eurodollar rate should be less than LIBOR (which, by definition,
is an offered rate)."   Id.   Yet, the Report observed, "the Fed's
bid-side rate is now 29 [basis points] higher than LIBOR's
offered-side rate," and had generally been higher than LIBOR
since August 2007.   Id.   This made "no economic sense."   Id.
The Report concluded that the Federal Reserve Eurodollar deposit

---

[12] Plaintiffs argue in their opposition brief that the Barclays settlement
documents suggest LIBOR manipulation extending as far back as 2005, and that
they should, accordingly, be granted leave to amend their complaint to
include allegations based on information derived from the Barclays
settlements.   Exchange Opp'n 29-30.   As discussed below, we will grant
plaintiffs leave to move to amend their complaints to include such
allegations.

[13] One basis point is one-hundredth of a percentage point.

rate, which seemed reasonable, "may be a better gauge than LIBOR of short-term funding levels."  Id.

The Report also compared one-month LIBOR to the rate at which the Federal Reserve auctioned off collateralized short-term loans to banks under a program known as the Term Auction Facility ("TAF").  TAF loans had recently been auctioned at a rate higher than LIBOR, though "[g]iven that the TAF is a securitized borrowing rate as opposed to LIBOR, which is an unsecuritized lending rate, it seem[ed] counterintuitive for banks to pay a higher interest rate to borrow from the TAF than to borrow from the interbank market."  Id.  Something was off, and because the TAF rate appeared "entirely normal," the Report concluded that "the real issue lies in a much bigger arena – LIBOR."  Id.  The Report observed that a likely explanation for the unusual LIBOR rates was that banks were seeking to bolster the market's perception of their financial health: "[A]ny bank posting a high LIBOR level runs the risk of being perceived as needing funding.  With markets in such a fragile state, this kind of perception could have dangerous consequences."  Id.

According to a Bloomberg article published on May 18, 2009, the Peng Report "brought widespread attention to the possibility [that LIBOR] might be understating actual bank lending costs."  Liz Capo McCormick, Citigroup's Head of Rates Strategy, Scott Peng, Leaves Firm, Bloomberg.com, May 18, 2009.

On April 16, 2008, the <u>Wall Street Journal</u> published an article entitled, "Bankers Cast Doubt on Key Rate amid Crisis." Carrick Mollenkamp, <u>Bankers Cast Doubt on Key Rate amid Crisis</u>, Wall St. J., Apr. 16, 2008.  The article commenced by explicitly observing that LIBOR might be inaccurate: "One of the most important barometers of the world's financial health could be sending false signals.  In a development that has implications for borrowers everywhere, . . . bankers and traders are expressing concerns that the London inter-bank offered rate, known as Libor, is becoming unreliable."  <u>Id.</u>  As evidence that LIBOR was diverging from its "true" level, the article included a graph comparing three-month LIBOR to the three-month Federal Reserve Eurodollar deposit rate, with the heading "Broken Indicator?" and the caption "Since the financial crisis began, the rate on three-month interbank loans has diverged at times from the comparable rate for dollars deposited outside the U.S." <u>Id.</u>  The article also discussed the Peng Report, noting that the Report had "compare[ed] Libor with [the TAF] indicator and others – such as the rate on three-month bank deposits known as the Eurodollar rate" to conclude that "Libor may be understated by 0.2 to 0.3 percentage points."  <u>Id.</u>

The article suggested that banks had several incentives to underreport LIBOR, notably the same incentives now alleged by plaintiffs: "Some banks don't want to report the high rates

they're paying for short-term loans because they don't want to tip off the market that they're desperate for cash," and "banks might have an incentive to provide false rates to profit from derivatives transactions." Id. Finally, the article reported that the BBA was investigating the LIBOR submission process in response to concerns from "bankers and other market participants," and that, "[i]n one sign of increasing concern about Libor, traders and banks are considering using other benchmarks to calculate interest rates." Id.

The next day, on April 17, 2008, the Wall Street Journal published another article raising questions about LIBOR's accuracy. Carrick Mollenkamp & Laurence Norman, British Bankers Group Steps up Review of Widely Used Libor, Wall St. J., Apr. 17, 2008. The article reported that the BBA, "[f]acing increasing questions about the reliability of [LIBOR]," had "fast-tracked an inquiry into the accuracy of the rate" and declared that "if banks are found to have submitted inaccurate figures, they would be removed from the panels that submit rates." Id. According to the article, "the credit crisis," commonly understood to have begun in August 2007, see Peng Report, "ha[d] highlighted gaps between Libor and other interest rates, and it ha[d] raised questions about whether banks are submitting rates that accurately reflect actual borrowing costs," Mollenkamp & Norman, supra. Bankers and traders "ha[d]

expressed concerns that some banks don't want to report the high rate they are paying for fear of creating the impression they are desperate for cash." Id. Significantly, "[t]he problems with Libor ha[d] also been a hot topic among traders in the market for Eurodollar futures." Id.

On April 18, 2008, the Wall Street Journal published its third article in as many days regarding questions over LIBOR. Carrick Mollenkamp, Libor Surges After Scrutiny Does, Too, Wall St. J., Apr. 18, 2008. The article observed that after the BBA announced on April 16, 2008, that it would fast-track its review of the LIBOR submission process, three-month USD LIBOR increased the next day by over eight basis points - "its largest jump since the advent of the credit crisis." Id. The increase, according to the article, might have been "a sign that banks could be responding to increasing concerns that the rate doesn't reflect their actual borrowing costs." Id. The article repeated the observations of the previous two that the BBA's move "came amid concerns among bankers that their rivals were not reporting the high rates they were paying for short-term loans for fear of appearing desperate for cash." Id. Additionally, the article noted the belief of some analysts that LIBOR had still not fully corrected: a strategist at Credit Suisse believed that three-month USD LIBOR was too low by 40 basis points, while the Peng Report had found LIBOR to be low by

up to 30 basis points.  Id.

    On April 21, 2008, the Financial Times published an article entitled, "Doubts over Libor Widen."  Gillian Tett & Michael Mackenzie, Doubts over Libor Widen, Fin. Times, Apr. 21, 2008. The article reported that "the credibility of Libor as a measure [was] declining," though this was "not entirely new: as the Financial Times first revealed [in 2007], bankers ha[d] been questioning the way Libor is compiled ever since the credit turmoil first erupted."  Id.  Regarding why LIBOR "ha[d] started to lag other, traded measures of market stress, such as the funding trends in the dollar deposit market," the article reported that although bankers thought it unlikely that there was collusion to suppress LIBOR, "there [was] a widespread belief that some banks ha[d] an incentive to keep their bids low."  Id.  Indeed, even though LIBOR is inherently a matter of guesswork, especially when interbank lending is at a depressed level, the article quoted an economist's observation that "'[i]t is not surprising that [the LIBOR panel banks] make guesses that avoid unwelcome publicity.'"  Id.

    The next month brought three additional articles on the questions surrounding LIBOR.  On May 16, 2008, Reuters published an article providing background on the issue and summarizing various suggestions regarding how best to move forward. European, U.S. Bankers Work on Libor Problems, Reuters, May 16,

2008.  The article noted that "[t]hreats from the BBA in late April to expel any bank found acting improperly was the trigger for a surge in the daily fix[es] over the next couple of days." Id.  Further, the article reported "worries that some banks were understating how much they had to pay to borrow money in order to avoid being labeled desperate for cash and, as a result, vulnerable to solvency rumors."  Id.

On May 29, 2008, Bloomberg published an article that quoted a Barclays strategist's statement that "[b]anks routinely misstated borrowing costs to the [BBA] to avoid the perception they faced difficulty raising funds as credit markets seized up."  Gavin Finch & Elliott Gotkine, Libor Banks Misstated Rates, Bond at Barclays Says, Bloomberg.com, May 29, 2008.  The article also reported that LIBOR "show[ed] little correlation to banks' cost of insuring debt from default," despite the fact that, because lending rates and the cost of default insurance are both theoretically based on a bank's likelihood of defaulting on its debts, they should be correlated.  Id.  As an example, the article observed that, over the period from July 2, 2007, through April 15, 2008, UBS's default insurance costs rose over 900 percent, while its USD LIBOR quotes "were lower than its rivals on 85 percent of the days during that period."  Id.  Finally, the article noted the unusual jump in three-month USD LIBOR after the BBA's April 16, 2008, announcement, and that

traders had been "resorting to alternative measures for borrowing costs as the BBA struggle[d] to maintain Libor's status." Id. Indeed, trading in Eurodollar futures declined by 7.5 percent from March to April 2008, while trading in alternative future contracts experienced significant increases. Id.

Also on May 29, 2008, the Wall Street Journal reported the findings of a study on LIBOR that the newspaper had conducted. Carrick Mollenkamp & Mark Whitehouse, Study Casts Doubt on Key Rate, Wall St. J., May 29, 2008. The Journal's analysis, based on data from January 23, 2008, through April 16, 2008, "indicate[d] that Citigroup Inc., WestLB, HBOS PLC, J.P. Morgan Chase & Co. and UBS AG [were] among the banks that ha[d] been reporting significantly lower borrowing costs for [LIBOR] than what another market measure suggest[ed] they should [have been]." Id. Over the period analyzed by the study, LIBOR and the cost of bank default insurance had diverged, "with reported Libor rates failing to reflect rising default-insurance costs." Id. Specifically, "the three-month and six-month dollar Libor rates were about a quarter percentage point [i.e. 25 basis points] lower than the borrowing rates suggested by the default-insurance market." Id. The Journal's methodology and findings were reviewed by "three independent academics," each of whom "said the approach was a reasonable way to analyze Libor." Id.

Indeed, one reviewer stated that "the [Journal's] calculations show 'very convincingly' that reported Libor rates are lower than what the market thinks they should be." Id.

The article also suggested that LIBOR was at an artificial level both before and after the study period. At a November 2007 meeting of a Bank of England money-market committee, concerns had emerged that "Libor wasn't high enough." Id. In late April 2008, moreover, after banks had reacted to the BBA's announcement, LIBOR remained 15 basis points too low. Id.

The article included the caveat that "[t]he Journal's analysis doesn't prove that banks are lying or manipulating Libor," given other possible explanations for the observed data, such as the guesswork inherent in calculating LIBOR and the fact that certain banks "have ample customer deposits and access to loans from the Federal Reserve." Id. Nonetheless, the article noted that "[i]f any bank submits a much higher rate than its peers, it risks looking like it's in financial trouble[, s]o banks have an incentive to play it safe by reporting something similar." Id. Indeed, a Stanford finance professor had determined that the observed three-month USD LIBOR quotes were "'far too similar to be believed,'" a conclusion buttressed by the fact that "[a]t times, banks reported similar borrowing rates even when the default-insurance market was drawing big distinctions about their financial health." Id. The article

concluded by observing that some traders had "beg[un] thinking about using other benchmarks," such as "the federal-funds rate – the rate at which banks loan to each other overnight."   <u>Id.</u>

These articles are summarized in Figure 1, below.



**FIGURE 1: ARTICLES TIMELINE**

**August 2007**
Start of Class Period

**April 10, 2008**
Peng Report, "Special Topic: Is LIBOR Broken?"

**April 16, 2008**
WSJ, "Bankers Cast Doubt on Key Rate Amid Crisis"

**April 17, 2008**
WSJ, "British Bankers Group Steps up Review of Widely Used Libor"

**April 18, 2008**
WSJ, "Libor Surges After Scrutiny Does, Too"

**April 21, 2008**
FT, "Doubts over Libor Widen"

**May 16, 2008**
Reuters, "European, U.S. Bankers Work on Libor Problems"

**May 29, 2008**
Bloomberg, "Libor Banks Misstated Rates, Bond at Barclays Says"

WSJ, "Study Casts Doubt on Key Rate"

**March 15, 2009**
Two Years Before Plaintiffs Claim They Were on Inquiry Notice

**May 2010**
End of Class Period

SPA 71

### c. Inquiry Notice

Plaintiffs argue that despite all of these articles, they were not on inquiry notice until March 15, 2011, "when UBS released its annual report 20-F stating that it had received subpoenas from the Department of Justice, the SEC, the CFTC, as well as an information request from the Japanese Financial Supervisory Agency, all relating to its interest rate submissions to the BBA."   OTC Am. Compl. ¶ 205; see also Exchange Am. Compl. ¶¶ 197-98; Exchange Opp'n 24-30.  Plaintiffs offer three reasons for why the articles published in April and May 2008 failed to put them on inquiry notice: the articles "[1] did nothing more than speculate about possible LIBOR discrepancies, [2] did not even suggest that such discrepancies resulted from Defendants' intentional manipulation of their LIBOR submissions, and [3] were accompanied by denials from the BBA that the panel banks['] submissions represented anything other than their true borrowing costs."  Exchange Opp'n 26.

These arguments are unconvincing.  First, although it is accurate that none of the articles definitively established that LIBOR was being manipulated, they did not need to do so to place plaintiffs on inquiry notice.  Rather, they needed only to suggest to a person of ordinary intelligence the probability that LIBOR had been manipulated.  Accepting as true plaintiffs' allegations that they were injured by paying too high a price

for Eurodollar futures contracts and that the price at which Eurodollar contracts trade is affected by existing LIBOR fixes, Exchange Am. Compl. ¶¶ 209-17, it follows that if plaintiffs were on notice that LIBOR had been set at artificial levels, they were also on notice of their injury.  As discussed above, the Peng Report and the seven articles published in the ensuing weeks reported that (1) since August 2007, LIBOR had diverged from benchmarks with which it should have been correlated, (2) independent experts had confirmed this comparative methodology and concluded that LIBOR was too low, (3) the BBA had accelerated its review of the LIBOR submissions process and publicly declared that a bank submitting false rates would be disqualified from the LIBOR panel, (4) LIBOR quotes jumped abnormally on the day following the BBA's announcement, and (5) market actors had begun to shift away from LIBOR-based instruments toward instruments based on alternative benchmarks because of their distrust of recent LIBOR fixes.  Faced with this information, and especially in light of the fact that it was reported by five separate institutions, a person of ordinary intelligence would clearly have been on notice that LIBOR was probably being set at artificial levels and, consequently, that Eurodollar futures contract prices had also been artificial.

Second, contrary to plaintiffs' argument, plaintiffs need not have been aware that the artificiality in LIBOR fixes

"resulted from Defendants' intentional manipulation of their LIBOR submissions." Exchange Opp'n 26. Unlike inquiry notice under the '34 Act, which requires plaintiffs to be able to plead a claim for securities fraud, including scienter, inquiry notice under the CEA requires only that plaintiffs be on inquiry notice of their injury. In other words, plaintiffs need not have known that the artificial LIBOR levels resulted from intentional conduct by defendants; it is sufficient that plaintiffs knew that the LIBOR quotes defendants submitted did not reflect their actual expected borrowing rates, and thus that the prices of plaintiffs' Eurodollar contracts, based on LIBOR, were artificial. For the reasons stated above, plaintiffs clearly had such knowledge.

Finally, the fact that defendants and the BBA consistently denied that LIBOR fixes were artificial does not necessarily defeat inquiry notice. "[R]eassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 155 (2d Cir. 2003); see also In re Ambac Fin. Group, Inc. Sec. Litig., 693 F. Supp. 2d 241, 276 (S.D.N.Y. 2010).

Here, plaintiffs could not have reasonably relied on the reassurances of defendants and the BBA. A person of ordinary

intelligence would have understood that defendants each had a strong incentive to portray themselves as truthful and that the BBA had a strong incentive to maintain market confidence in LIBOR's integrity.  This is not to say that plaintiffs could never have reasonably relied on assurances by defendants and the BBA, but rather that they should have been cautious about accepting such assurances.  As discussed above, repeated news reports provided evidence that LIBOR was being fixed at artificial levels.  Additionally, each defendant's LIBOR quotes, as well as comparable benchmarks, were available every business day, such that plaintiffs could feasibly have investigated LIBOR's accuracy.  Therefore, defendants' and the BBA's assurances that all was well with LIBOR could not have been reasonably relied on by plaintiffs and thus do not excuse plaintiffs' failure to inquire.

The cases cited by plaintiffs are not on point.  First, this case is distinguishable from Staehr v. Hartford Financial Services Group, Inc., 547 F.3d 406 (2d Cir. 2008).  In Staehr, investors sued an insurance company in which they had purchased stock, alleging that they had purchased at inflated prices because they were unaware that the company's strong financial performance was actually the result of paying unlawful kickbacks to insurance brokers.  The Circuit held that the investors were not placed on inquiry notice by newspaper articles which, like

the articles held not to trigger inquiry notice in <u>Lentell v.</u>
<u>Merrill Lynch & Co., Inc.</u>, 396 F.3d 161 (2d Cir. 2005), reported
generally on "structural conflicts in [the insurance] industry"
but did not contain information specific to the company at
issue.  <u>Staehr</u>, 547 F.3d at 429.  Indeed, one article's failure
to provide specific information was "a particularly important
omission, since the writer acknowledged that not all insurers
paid [kickbacks] to get business."  <u>Id.</u> at 419.  The Court
distinguished <u>Shah v. Meeker</u>, 435 F.3d 244 (2d Cir. 2006), which
held that plaintiff was placed on inquiry notice by an article
in <u>Fortune</u> magazine that included a "specific description of the
business practices <u>at the defendant company</u> . . . which served
as the basis of the plaintiff's complaint against <u>that company</u>."
<u>Staehr</u>, 547 F.3d at 430 (citing <u>Shah</u>, 435 F.3d at 251).

    Here, the notice afforded plaintiffs more resembles that in
<u>Shah</u> than it does the notice in <u>Staehr</u> and <u>Lentell</u>.  To start,
<u>Staehr</u> established a "sliding scale in assessing whether inquiry
notice was triggered by information in the public domain: the
more widespread and prominent the public information disclosing
the facts underlying the fraud, the more accessible this
information is to plaintiffs, and the less company-specific the
information must be."  <u>Id.</u> at 432.  Here, the articles providing
evidence that LIBOR was artificial were reported in "widespread
and prominent" sources, such as the <u>Wall Street Journal</u> and the

Financial Times, and were presented in an accessible fashion, explaining their conclusions in clear English that a person of ordinary intelligence, without technical training, could understand.  The required degree of specificity is therefore diminished.

In any event, the Peng Report and ensuing articles are sufficiently specific because they gave notice that plaintiffs had likely paid artificially high prices for their Eurodollar contracts.  The specificity required to trigger inquiry notice is not necessarily specificity with regard to defendant, but rather specificity that notifies a plaintiff that he has been injured.  For instance, the newspaper articles in Staehr failed to provide notice because they did not inform plaintiffs that the particular company plaintiffs had invested in had perpetrated an unlawful kickback scheme, and the articles in Lentell failed to provide notice because they did not inform plaintiffs that the particular research reports that plaintiffs had relied on were fraudulent.  Here, by contrast, even though the Peng Report and ensuing articles mostly focused on LIBOR itself rather than the individual quotes of the panel banks,[14]

---

[14] That said, the May 29, 2008, Wall Street Journal article presenting the Journal's analysis of LIBOR did single out the submissions of individual panel banks.  In its second paragraph, it reported: "The Journal analysis indicates that Citigroup Inc., WestLB, HBOS PLC, J.P. Morgan Chase & Co. and UBS AG are among the banks that have been reporting significantly lower borrowing costs for [LIBOR] than what another market measure suggests they should be."  Mollenkamp & Whitehouse, supra.  Additionally, it included a

plaintiffs were on notice that LIBOR had likely been suppressed and thus that the prices of Eurodollar contracts, including the contracts plaintiffs had purchased, were artificial. Therefore, like in Shah and unlike in Staehr and Lentell, the published articles were sufficient to place plaintiffs on inquiry notice of their injury.

Additionally, to whatever extent plaintiffs needed notice of who was responsible for their injury, such notice existed. It was a matter of public knowledge which banks were on the USD LIBOR panel, what rate those banks submitted to the BBA each day, and how the final LIBOR fix was determined. Plaintiffs, that is, knew which banks affected the final LIBOR fixes and precisely how they affected those fixes.[15]  Especially given that LIBOR is an average of the eight middle quotes, thus insulated to some extent from outlier quotes from individual banks, the fact that LIBOR persisted at a level that was likely artificial

---

chart that presented, for each USD LIBOR panel bank, "[t]he difference between banks' reported borrowing rates [i.e. LIBOR quotes] and rates computed by The Wall Street Journal, using information from the default-insurance market." Id.

[15] Although, on any given day, only the middle eight quotes would be included in the computation to determine the LIBOR fix, all of the submitted quotes "affected" the ultimate fix.  For example, if a bank's "true" LIBOR quote would have been the tenth highest, within the middle eight, but the bank submitted instead an artificially low quote that was the fourteenth highest, outside the middle eight, the bank's quote would not be included in the computation to determine the LIBOR fix.  Nonetheless, the quote would have affected the fix by "bumping up" the quote that would have been in the thirteenth highest spot, excluded from the calculation, into the twelfth highest spot, included in the calculation.  Thus, on any given day, every LIBOR quote had some "effect" on the ultimate LIBOR fix.

should have raised serious doubts about all panel banks'
submissions. Moreover, it would have been feasible to
investigate each bank's submissions: plaintiffs could have
compared the submissions to the bank's cost of default insurance
– a comparison that, to some extent, had already been performed
and published in the May 29, 2008, Wall Street Journal article.
See Mollenkamp & Whitehouse, supra. The notice here is thus
stronger than when articles merely report general structural
issues in an industry or particular unlawful acts by other
companies within defendant's industry. Because the Peng Report
and the articles published in April and May 2008 indicated that
LIBOR was likely artificial, and LIBOR is affected by the
actions of each of the panel banks, plaintiffs had sufficient
notice of who was responsible for their injury, to whatever
extent this is necessary.

For similar reasons, this case is unlike In re Copper
Antitrust Litigation, 436 F.3d 782 (7th Cir. 2006). There, the
Seventh Circuit held, in the antitrust context, that although
copper purchasers were on inquiry notice that they had been
injured by one defendant, a trading company that allegedly fixed
the price of copper, there was insufficient publicly available
information to notify the purchasers that their injury was
attributable as well to another defendant, a bank that had
provided loans to the trading company. In light of the Second

Circuit decisions discussed above, holding that inquiry notice is triggered when the plaintiff discovers his injury, it is not clear that the Second Circuit would follow the Seventh Circuit in finding no inquiry notice with respect to a defendant when a plaintiff had discovered his injury but not that the particular defendant was responsible.  In any event, even if inquiry notice required plaintiffs to know who was responsible for their injury, the requirement would still be satisfied, for the reasons discussed above.

Plaintiffs also cite Anderson v. Dairy Farmers of America, Inc., Civil No. 08-4726 (JRT/FLN), 2010 WL 1286181 (D. Minn. Mar. 29, 2010).  In that case, a trader in milk futures sued a dairy marketing cooperative, alleging that the cooperative had purchased substantial quantities of cheese on the spot market not for normal business purposes, but rather to inflate artificially the price of milk futures, which incorporated the price of cheese.  The Court found that the trader's knowledge of the cooperative's cheese purchases was insufficient to trigger inquiry notice, given that those purchases could have been justified by legitimate commercial reasons.  The cooperative's purchases would constitute manipulation under the CEA only if there was "'something more,' some additional factor that cause[d] the dissemination of false or misleading information." Id. at *6 (quoting In re Amaranth Natural Gas Commodities

Litig., 587 F. Supp. 2d 513, 534 (S.D.N.Y. 2008)) (internal quotation marks omitted).  Under the circumstances, the question of when the trader was on inquiry notice turned on when he "knew or should have known of [the cooperative]'s alleged intent to cause artificial cheddar cheese and [milk] futures prices."  Id.

Anderson is plainly distinguishable.  Whereas the cooperative's cheese purchases might have been legitimate, depending on the purpose they were intended to further, the present defendants' alleged submission of artificial LIBOR quotes was necessarily illegitimate, regardless of defendants' motives.  In other words, although purchasing large quantities of cheese is not inherently improper, submitting artificial LIBOR quotes is.  Therefore, plaintiffs' knowledge that LIBOR was likely artificial was sufficient to place plaintiffs on inquiry notice of their injury.

More broadly, our case is distinguishable from those in which the information necessary to place plaintiffs on inquiry notice of their injury is solely in the control of the defendants.  Here, not only were LIBOR and each bank's LIBOR submission publicly available on a daily basis, but benchmarks of general interest rates and each bank's financial health were also publicly available, and the Peng Report and the Wall Street Journal analysis compared the LIBOR fixes and quotes to these benchmarks to conclude that LIBOR was likely artificial.  In

other words, by May 29, 2008, plaintiffs' investigative work had already been done for them and had been published in the pages of the Wall Street Journal.

Relatedly, we cannot credit plaintiffs' argument that they were not on inquiry notice because their complaint rests on analyses created only after tremendous effort by "world-class financial and statistical experts." Exchange Opp'n 28. As discussed above, by May 29, 2008, several sophisticated analyses comparing LIBOR to relevant benchmarks had already been conducted, and their results were published in a plain-English format accessible to a person of "ordinary intelligence." Moreover, the conclusions of these analyses were supported by other reported evidence, such as the BBA announcement, the subsequent jump in LIBOR, and the decision by market actors to switch from LIBOR-based instruments to instruments based on more reliable indices. Thus, although plaintiffs are correct that the standard is not what would place an expert on notice but rather what would place a person of ordinary intelligence on notice, the fact is that a person of ordinary intelligence reading the information available as of May 29, 2008, would have been on notice of his injury.

Finally, plaintiffs argue that "the statute of limitations cannot bar CEA claims based on the conduct relating to the trading scheme described in Barclays settlements made public on

June 27, 2012 and not alleged in the Exchange Complaint." <u>Id.</u>
29.  The reason, according to plaintiffs, is that, "prior to
June 27, 2012, there was not a single public article or news
report even hinting at this day-to-day opportunistic
manipulation of LIBOR to benefit Barclays' and other banks'
traders, or that this misconduct began as early as 2005." <u>Id.</u>;
<u>see also</u> CFTC Order 2 ("The wrongful conduct spanned from at
least 2005 through at least 2009, and at times occurred on an
almost daily basis."). Plaintiffs request that they "be
permitted to amend the complaint to include these allegations."
Exchange Opp'n 30.

As discussed below, we are inclined to believe that at
least some potential claims based on day-to-day, trading-
motivated manipulation are not time-barred. Therefore, we will
grant plaintiffs leave to move to amend their complaint to
include allegations based on information derived from the
Barclays settlements, such motion to be accompanied by a
proposed second amended complaint. However, if plaintiffs
pursue such a motion, they should respond to the following
concerns.

As we see it, the question of whether plaintiffs' potential
claims based on day-to-day manipulation are time-barred presents
two issues: (1) whether the period of limitations has expired on
potential claims based on contracts purchased <u>prior</u> to August

2007, the start of the Class Period alleged in plaintiffs' amended complaint, and (2) whether the period of limitations has expired on potential claims based on contracts purchased after August 2007, given that the articles discussed above did not suggest the sort of manipulation alleged in the Barclays settlement papers.

With regard to the first issue, we are inclined to believe that plaintiffs' potential claims based on contracts purchased prior to August 2007 are not time-barred. Although the articles discussed above suggested that LIBOR was fixed at artificial levels starting in August 2007, they did not suggest artificiality in LIBOR levels prior to that time. Especially given that August 2007 is commonly recognized as the start of the financial crisis, and that banks' incentive to manipulate LIBOR, as reported in the articles, was related to that crisis, a person of ordinary intelligence could reasonably have thought that LIBOR manipulation started in August 2007, but no earlier. Therefore, it seems that the articles discussed above did not place plaintiffs on inquiry notice of their injury based on contracts purchased prior to August 2007; indeed, plaintiffs might not have been on inquiry notice of their injury until the Barclays settlements were made public on June 27, 2012, after plaintiffs' amended complaint was filed. Consequently, plaintiffs' potential claims based on this conduct are probably

not time-barred. Although we expect that claims based on contracts purchased prior to August 2007 will face even greater challenges with regard to loss causation than plaintiffs' other claims face, plaintiffs should have an opportunity to supplement their complaint with these allegations and to squarely address the issues those allegations raise.

By contrast, with regard to the second issue, we are inclined to think that the articles discussed above placed plaintiffs on inquiry notice of their injury based on any sort of LIBOR manipulation, including both the persistent suppression alleged in plaintiffs' amended complaint and the day-to-day manipulation for trading advantage suggested by the Barclays settlements. As discussed below, plaintiffs can recover for their claims only to the extent that they suffered "actual damages" from defendants' conduct. 7 U.S.C. § 25(a)(1). Plaintiffs could have suffered actual damages only if the price of their Eurodollar contracts decreased over the period during which they owned the contracts; otherwise, plaintiffs would have either broken even or profited. To the extent that defendants are liable for the decrease in the price of plaintiffs' Eurodollar contracts, it must be because LIBOR increased over the time during which plaintiffs owned the contracts and the trading prices of Eurodollar contracts were correlated with the LIBOR fixes. In a basic sense, there are two scenarios in which

LIBOR could have increased over the time period that plaintiffs owned their contracts: (1) it started too low and then increased towards its "true" level, or (2) it started at its "true" level and then increased to an artificially high level. The "persistent LIBOR suppression" theory of plaintiffs' amended complaint is based on the first scenario, and the "day-to-day, up or down, manipulation for trading advantage" theory of the Barclays settlements adds the second scenario, at least for those days on which LIBOR was allegedly manipulated upward.

Critically, although these two scenarios differ in how plaintiffs' injury would be caused, the injury would be the same. Specifically, plaintiffs' injury would be that they lost money because the prices of their Eurodollar contracts decreased over the time that they owned them due to defendants' manipulation of those prices. Further, because plaintiffs were not in a position to know the "true" level of LIBOR, they could not have distinguished between injury caused, on the one hand, by LIBOR starting too low and approaching the "normal" level and, on the other, LIBOR starting at a "normal" level and being manipulated upward. Therefore, notice that the prices of plaintiffs' Eurodollar contracts likely decreased due to defendants' alleged manipulation of LIBOR would have been sufficient for inquiry notice, regardless of whether defendants allegedly caused the injury by setting LIBOR too high or too

low.   Moreover, as discussed above, plaintiffs were on inquiry notice of their injury by May 29, 2008, as the Peng Report and ensuing articles informed plaintiffs that they likely had been injured by defendants' submission of artificial LIBOR quotes starting in August 2007.

For these reasons, we are skeptical that potential claims based on day-to-day manipulation are timely to the extent they involve contracts purchased between August 2007 and May 29, 2008.   In any event, we grant plaintiffs the opportunity to move to amend their complaint to include allegations of day-to-day manipulation, with the expectation that any such motion will address the concerns presented here.

### d. Fraudulent Concealment

Plaintiffs additionally argue that the CEA's statute of limitations should be tolled due to defendants' fraudulent concealment of their unlawful conduct.   Exchange Opp'n 30-32. The statute of limitations may be tolled "if a plaintiff can show fraudulent concealment of the violation by a defendant." In re Natural Gas Commodity Litig. ("Natural Gas"), 337 F. Supp. 2d 498, 512 (S.D.N.Y. 2004).   To demonstrate fraudulent concealment, a plaintiff must plead, with particularity: "(1) that the defendant concealed the existence of the CEA violation; (2) that the plaintiff remained unaware of the violation during the limitations period; and (3) that the plaintiff's continuing

ignorance as to the claim was not a result of a lack of due diligence." Id. at 513; see also id. at 513-14; Fed. R. Civ. P. 9(b).   The first element, the fact of concealment, may be demonstrated "by showing either [1] that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or [2] that the wrong itself was of such a nature as to be self-concealing."   Natural Gas, 337 F. Supp. 2d at 513 (quoting New York v. Hendrickson Bros., 840 F.2d 1065, 1083 (2d Cir. 1988)) (internal quotation marks omitted).

Here, plaintiffs have not adequately alleged fraudulent concealment.   For one, they did not "remain[] unaware of [defendants'] violation during the limitations period," as they were on notice no later than May 29, 2008, that they had likely been injured.   Moreover, because of this, they could not have reasonably relied on defendants' and the BBA's reassurances that LIBOR was accurate.

For the same reason, defendants' alleged manipulation was not self-concealing.   Although plaintiffs cite Natural Gas for the proposition that "report[ing] false trade data to entities that collect that information for public dissemination" is "inherently self-concealing," id. at 513, the false reporting in Natural Gas was distinguishable from the allegedly false reporting here.   In Natural Gas, the reporting was "designed to be concealed from the general public," and there was "no

explanation for how [defendants'] actions, if true, could or should have been discovered by the general public." Id. Here, by contrast, Thomson Reuters published daily both the final LIBOR fix and the quotes from each of the panel banks. A person of ordinary intelligence could have reviewed the submitted quotes along with numerous articles analyzing these quotes and explaining why they were likely artificial. Under these circumstances, plaintiffs have not adequately alleged fraudulent concealment.

### e. Which Claims Are Barred

Having determined that plaintiffs were on inquiry notice of their injury no later than May 29, 2008, we must now determine which claims are barred by the statute of limitations. We will present our conclusions by reference to Figure 2, below.



**FIGURE 2: INQUIRY NOTICE TIMELINE**

As discussed below, we find that some of plaintiffs' claims are barred and some are not, depending on when the contracts that are the basis for those claims were purchased. Specifically, claims based on Eurodollar contracts purchased during Period 1 are barred; claims based on contracts purchased during Period 3 are not barred; and claims based on contracts purchased during Period 2 may or may not be barred, though we will not dismiss them at this stage.

We begin with Period 1, the time from the start of the Class Period, August 2007, to the date of inquiry notice, May 29, 2008.  Plaintiffs have argued that the earliest they had notice of their claims is March 15, 2011, and they do not allege that they inquired into their claims any earlier than that date. Assuming that their inquiry in fact commenced on March 15, 2011, it would have been too late, as it would have been more than two years after the date of inquiry notice.  By May 29, 2008, any plaintiff who had purchased a Eurodollar contract would have been on notice of his injury, as he would have known that he had likely paid an artificial price for the contract.  Accordingly, plaintiffs' claims are barred to the extent that they are based on contracts purchased during Period 1, that is, from the beginning of the Class Period through May 29, 2008.

We next consider Period 3, the time between April 15, 2009, two years prior to the filing of plaintiffs' complaint, and May

2010, the end of the Class Period.  As a general matter, inquiry notice is based on a plaintiff's discovery of his injury, and a plaintiff cannot discover his injury until he has been injured. Here, even if plaintiffs who purchased Eurodollar contracts during Period 3 were aware of the articles published in April and May 2008, they could not have been on inquiry notice of their claims any earlier than the date on which they purchased their contracts.  Therefore, the claims of plaintiffs who purchased Eurodollar contracts on or after April 15, 2009, are not barred because the complaint was filed within two years of the date of inquiry notice.

Finally, Period 2 describes the time between May 30, 2008, the day after inquiry notice was triggered, and April 14, 2009, two years and one day before the filling of plaintiffs' complaint.  Plaintiffs who purchased Eurodollar contracts during this period, like plaintiffs who purchased during Period 3, could have been on inquiry notice no earlier than the date on which they purchased their contracts.  It is not clear, however, precisely when they were on notice.  We cannot necessarily charge these plaintiffs with knowledge of the articles published through May 29, 2008, as they had not purchased their contracts yet and may not have had reason to follow LIBOR-related news. However, other articles may have been published during Period 2 that would have put plaintiffs on notice.  We are aware of one

newspaper article published during this period that focused on
LIBOR, albeit one-month USD LIBOR instead of the three-month
rate on which Eurodollar contracts are based, Carrick
Mollenkamp, Libor's Accuracy Becomes Issue Again, Wall St. J.,
Sept. 24, 2008, and there may be more.  In order to decide
whether claims based on contracts purchased during this period
are barred, we would need to determine (1) when inquiry notice
was triggered, (2) whether plaintiffs actually inquired within
two years of the date of inquiry notice, and, (3) if so, whether
the complaint was filed within two years of the date on which a
person of ordinary intelligence, "in the exercise of reasonable
diligence," would have discovered his injury.  Koch, 699 F.3d at
151 (quoting Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161,
168 (2d Cir. 2005)).  At present, we are not in a position to
address these questions.  Therefore, we cannot conclude that the
statute of limitations bars the claims of plaintiffs who
purchased Eurodollar contracts during Period 2, between May 30,
2008, and April 14, 2009.

    In sum, the CEA's statute of limitations bars plaintiffs'
claims based on contracts entered into during Period 1, between
August 2007 and May 29, 2008, and does not bar claims based on
contracts entered into during Period 3, between April 15, 2009,
and May 2010.  Plaintiffs' claims based on contracts entered
into during Period 2, between May 30, 2008, and April 14, 2009,

may or may not be barred, though we will not dismiss them at this stage.[16]   Finally, plaintiffs may move to amend their complaint to include allegations based on information derived from the Barclays settlements, provided that any such motion addresses the concerns raised herein and is accompanied by a proposed second amended complaint.

### 3. Pleading Commodities Manipulation

Finally, defendants argue that plaintiffs have inadequately pleaded their primary claim for commodities manipulation and their secondary claims for vicarious liability for and aiding and abetting commodities manipulation.   For the reasons discussed below, we disagree.

### a. Legal Standard

Section 9(a) of the CEA makes it a crime for any person "to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or of any swap . . . ."   7 U.S.C. § 13(a)(2).   In DiPlacido v. Commodity Futures Trading Commission, 364 F. App'x 657 (2d Cir. 2009), the Second Circuit established a four-part test for pleading manipulation under the

---

[16] On March 27, 2013, we received from plaintiffs two documents issued by the UK Financial Services Authority (the "FSA"): (1) the "FSA Internal Audit Report: A Review of the Extent of Awareness Within the FSA of Inappropriate LIBOR Submissions," dated March 2013, and (2) the "Management Response" to that report, also dated March 2013.   These documents do not alter our conclusions.

CEA: plaintiff must show "(1) that [defendant] had the ability to influence market prices; (2) that [he] specifically intended to do so; (3) that artificial prices existed; and (4) that [defendant] caused the artificial prices." Id. at 661 (quoting In re Cox, No. 75-16, 1987 WL 106879, at *3 (C.F.T.C. July 15, 1987)); see also In re Platinum & Palladium Commodities Litig., 828 F. Supp. 2d 588, 598 (S.D.N.Y. 2011). "[T]o determine whether an artificial price has occurred, one must look at the aggregate forces of supply and demand and search for those factors which are extraneous to the pricing system, are not a legitimate part of the economic pricing of the commodity, or are extrinsic to that commodity market." In re Sumitomo Copper Litig., 182 F.R.D. 85, 91 (S.D.N.Y. 1998) (quoting In re Indiana Farm Bureau Coop. Ass'n, Inc., No. 75-14, 1982 WL 30249, at *39 n.2 (C.F.T.C. Dec. 17, 1982)) (internal quotation marks and emphasis omitted).

Whether plaintiffs are required to allege commodities manipulation with particularity depends on the facts alleged. As we observed in In re Crude Oil Commodity Litigation ("Crude Oil"), No. 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007), Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." Id. at *5 (quoting Rombach v. Chang, 355 F.3d

164, 171 (2d Cir. 2004)) (internal quotation marks omitted).  In
that case, we held, in the context of a claim for commodities
manipulation, that because "the crux of plaintiffs' allegations
is that defendants misled the market with regard to supply and
demand at Cushing by concealing its capacity and its actions,
resulting in artificial prices," plaintiff's allegations sounded
in fraud and therefore were subject to Rule 9(b).  Id.
Similarly, here the crux of plaintiffs' claim is that they paid
too much for their Eurodollar contracts because their
expectation of the contracts' value was informed by existing
LIBOR fixes, which were artificial as a result of defendants'
submission of artificial quotes to the BBA.  In other words, the
claim is that defendants, by submitting artificial LIBOR quotes,
misled the market with regard to future levels of LIBOR, and by
extension future prices of Eurodollar contracts, and thus caused
Eurodollar contracts to trade at artificial prices.  Like the
allegations in Crude Oil, the present allegations sound in fraud
and thus must be pled with particularity.

However, courts generally relax Rule 9(b)'s requirements in
the context of manipulation claims, as such claims often
"involve facts solely within the defendant's knowledge."  ATSI
Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 102 (2d Cir.
2007).  In the securities context, the Second Circuit has held
that "a manipulation complaint must plead with particularity the

nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." <u>Id.</u>  "This test will be satisfied if the complaint sets forth, to the extent possible, 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" <u>Id.</u> (quoting <u>Baxter v. A.R. Baron & Co., Inc.</u>, No. 94 Civ. 3913 (JGK), 1995 WL 600720, at *6 (S.D.N.Y. Oct. 12, 1995)).  This standard has also been applied in the context of commodities manipulation.  <u>See, e.g.</u>, <u>In re Amaranth Natural Gas Commodities Litig.</u> ("<u>Amaranth I</u>"), 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008).

Finally, the scienter element "may be alleged generally," Fed. R. Civ. P. 9(b), though plaintiffs must still allege facts that "give rise to a <u>strong inference</u> of scienter," <u>In re Amaranth Natural Gas Commodities Litig.</u> ("<u>Amaranth II</u>"), 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009) (quoting <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322-23 (2007)). Plaintiffs may demonstrate scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  <u>Crude Oil</u>, 2007 WL 1946553, at *8 (quoting <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 290-91 (2d Cir. 2006)) (internal quotation marks omitted).  "Sufficient motive

allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Amaranth II, 612 F. Supp. 2d at 383 (quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001)) (internal quotation marks omitted).

In addition to alleging a violation of the CEA, plaintiffs must also show that they have standing to sue. Section 22(a) of the CEA grants a private right of action to any person "who purchased or sold a [futures contract] or swap if the violation constitutes . . . (ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap." 7 U.S.C. § 25(a)(1)(D). The manipulation must cause the plaintiff "actual damages," id. § 25(a)(1), which courts have understood to require a "net loss[]," In re Amaranth Natural Gas Commodities Litig., 269 F.R.D. 366, 379 (S.D.N.Y. 2010).

### b. The Present Allegations

Here, plaintiffs have stated a claim for commodities manipulation. There are two ways that plaintiffs' manipulation claims can be framed: (1) manipulation of the price of Eurodollar futures contracts, and (2) manipulation of the price of the commodity underlying Eurodollar futures contracts. As discussed below, we find that plaintiffs state a claim for the first type of manipulation, but not for the second.

### i. Manipulation of the Price of Eurodollar Futures Contracts

Plaintiffs have stated a claim for commodities manipulation based on manipulation of the price of Eurodollar futures contracts. With regard to the first element of the DiPlacido test, there is no question that defendants had the ability to influence the price of Eurodollar futures contracts. At settlement, the price of Eurodollar contracts is set according to a formula that directly incorporates LIBOR. Prior to settlement, Eurodollar contracts trade "based on what LIBOR is expected to be in the future," and "[t]o the extent that LIBOR is mispriced in the present, expectations of what LIBOR will be in the future will also be skewed." Exchange Am. Compl. ¶ 209. Each defendant, of course, had the ability to influence LIBOR through the quotes it submitted daily to the BBA. Because each defendant had the ability to influence LIBOR and LIBOR affected the price of Eurodollar contracts, each defendant had the ability to influence the price of Eurodollar contracts.

With regard to the second element, plaintiffs' plausibly allege that defendants specifically intended to manipulate the price of Eurodollar futures contracts. Plaintiffs' amended complaint alleges concrete benefits that defendants stood to gain from manipulating Eurodollar futures contract prices. Specifically, plaintiffs allege that "subsidiaries or other

affiliates of Defendants . . . trad[ed] LIBOR-based financial
instruments such as Eurodollar futures contracts at manipulated
prices not reflecting fundamental supply and demand, to the
direct benefit of Defendants."  Id. ¶ 43; see also id. ¶ 218
("Defendants, through their broker-dealer affiliates[,] actively
traded Eurodollar futures and options on those futures during
the Class Period.").

Moreover, the Barclays settlement documents suggest that
Barclays had a concrete economic interest in manipulating the
price of Eurodollar contracts and, indeed, may have manipulated
LIBOR for the express purpose of profiting on Eurodollar
contracts.  See, e.g., CFTC Order 2 ("Barclays based its LIBOR
submissions for U.S. Dollar . . . on the requests of Barclays'
swaps traders, including former Barclays swaps traders, who were
attempting to affect the official published LIBOR, in order to
benefit Barclays' derivatives trading positions; those positions
included swaps and futures trading positions . . . .") (emphasis
added); DOJ Statement ¶ 10 ("Barclays employs derivatives
traders in New York, New York and in London, England who trade
financial instruments tied to LIBOR and EURIBOR, including
interest rate swaps and Eurodollar futures contracts . . . .").
These allegations do not describe merely a generalized interest
in appearing profitable, but rather identify concrete economic

benefits that defendants stood to gain from manipulating the price of Eurodollar futures contracts.

As discussed above, scienter may be established by showing that defendants had both motive and opportunity.  See Crude Oil, No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007).  Here, plaintiffs have adequately pleaded motive by alleging that defendants stood to gain concrete benefits from manipulating the price of Eurodollar futures contracts.  See Amaranth II, 612 F. Supp. 2d 376, 383 (S.D.N.Y. 2009).  Additionally, defendants undeniably had the opportunity to manipulate Eurodollar contract prices by submitting artificial LIBOR quotes.  Therefore, plaintiffs' allegations give rise to a strong inference of scienter.

The remaining two elements are also satisfied.  With regard to the third element, plaintiffs have adequately alleged that artificial Eurodollar futures contract prices existed.  The allegations in plaintiffs' amended complaint, together with the facts reported in the Barclays settlement documents, make plausible that LIBOR was set at an artificial level for significant portions of the Class Period.  As discussed above, if LIBOR was at an artificial level, the prices at which Eurodollar futures contracts traded and settled necessarily were, as well.  Although, as discussed above, LIBOR is set through a cooperative process rather than through supply and

demand, there is no question that the manipulation of LIBOR alleged in the amended complaint would be a factor that was "not a legitimate part" of how LIBOR was fixed or Eurodollar contracts were priced.  In re Sumitomo Copper Litig., 182 F.R.D. 85, 91 (S.D.N.Y. 1998) (quoting In re Indiana Farm Bureau Coop. Ass'n, Inc., No. 75-14, 1982 WL 30249, at *39 n.2 (C.F.T.C. Dec. 17, 1982)) (emphasis omitted).

Finally, with regard to the fourth element, plaintiffs have adequately alleged that defendants' conduct caused Eurodollar futures contracts to trade and settle at artificial prices. There is no question that defendants submitted LIBOR quotes to the BBA each day and these quotes collectively determined where LIBOR was fixed.  As discussed above, plaintiffs have adequately alleged that LIBOR was fixed at artificial levels for substantial parts of the Class Period and that the price of Eurodollar futures contracts is significantly influenced by existing LIBOR fixes.  Therefore, although, as discussed below, there are serious questions regarding whether defendants harmed plaintiffs, plaintiffs have adequately alleged that defendants caused the prices of Eurodollar futures contracts to be artificial.

Moreover, plaintiffs have satisfied Rule 9(b).  They have alleged "what manipulative acts were performed" - submitting artificial LIBOR quotes to the BBA - and "which defendants

performed them" – each defendant.  They have also alleged "when
the manipulative acts were performed": on all or a substantial
number of the business days during the Class Period, from August
2007 to May 2010.  Finally, plaintiffs have adequately alleged
"what effect the scheme had on the market for [Eurodollar
contracts]": LIBOR is directly incorporated into Eurodollar
futures contracts' settlement price and, because of that, also
strongly affects the trading price of Eurodollar contracts prior
to settlement.  In short, by allegedly submitting false LIBOR
quotes, defendants manipulated the price of Eurodollar
contracts.

Although plaintiffs have not identified precisely how each
LIBOR quote from each defendant on each day during the Class
Period was or was not artificial, they could not reasonably be
expected to do so at this stage of the litigation.  It is not a
matter of public knowledge what interest rate each bank
subjectively expected to pay to borrow U.S. dollars in the
London interbank lending market each day during the Class
Period, nor is it publicly known what interest rates each bank
paid in fact.  Because plaintiffs could not have known the
"true" level of any LIBOR quote, they could not have pleaded,
consistent with Rule 11, precisely which quotes were inaccurate
and by how much.  If anyone currently possesses this information
for each day during the Class Period, it is defendants, and in

such a situation, Rule 9(b)'s requirements are relaxed.  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 102 (2d Cir. 2007).

What plaintiffs have provided are, inter alia, graphs showing how LIBOR as well as individual defendants' LIBOR quotes diverged during the Class Period from benchmarks that they should have tracked.  These graphs, of course, are one way of presenting a series of data points that correspond to individual LIBOR quotes and corresponding benchmarks on each day during the Class Period, just as a chart would.  However presented, this information describes, to the degree plaintiffs are able, which LIBOR quotes were likely artificial and by roughly how much.  Moreover, even to the extent that plaintiffs have affirmatively alleged LIBOR manipulation not for each day, but only over a 34-month-long period, this does not necessarily mean that the allegations are insufficiently specific.  See, e.g., In re Natural Gas, 358 F. Supp. 2d 336, 344-45 (S.D.N.Y. 2005) (finding that plaintiffs had adequately pleaded a commodities manipulation claim where they had alleged that defendants engaged in manipulative acts "from June 1999 to February 2001" and "between March 2001 and December 2002").  In light of the limited information publicly available, plaintiffs have adequately alleged that defendants submitted artificial LIBOR

quotes during the Class Period and thereby manipulated the price of Eurodollar futures contracts.

Finally, plaintiffs have adequately demonstrated that they have standing to sue under the CEA.   Plaintiffs have plainly alleged that they purchased Eurodollars futures contracts during the Class Period.   They have also alleged that defendants manipulated the price of Eurodollar futures contracts.

Defendants dispute whether plaintiffs have alleged "actual damages."   7 U.S.C. § 25(a)(1).   The showing plaintiffs must make to demonstrate actual damages, understood, as discussed above, as a net loss, depends on the type of manipulation involved.   Where plaintiffs' injury results from isolated manipulative conduct by defendants, such as artificial stock purchases in the immediate aftermath of an initial public offering in order to drive up price, "allegations of artificial inflation are sufficient to plead loss causation because it is fair to infer that the inflationary effect must inevitably diminish over time."   In re Initial Public Offering Sec. Litig. ("IPO"), 297 F. Supp. 2d 668, 674-75 (S.D.N.Y. 2003).   In such a situation, "[i]t is that dissipation - and not the inflation itself - that caused plaintiffs' loss."   Id. at 675.

By contrast, where plaintiffs' injury results from defendants' dissemination of false information, "an inflated purchase price will not itself constitute or proximately cause

the relevant economic loss." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005). "Once a misstatement or omission infects the pool of available information, it continues to affect the stock price until contradictory information becomes available." IPO, 297 F. Supp. 2d at 674. A plaintiff who purchased at an inflated price might have sold his instrument before the false information had been corrected, thus not suffering a loss at all, or might have sold it at a loss but where the loss was caused by something other than the defendant's misrepresentation. See Dura, 544 U.S. at 342-43; see also Kohen v. Pac. Inv. Mgmt. Co., 571 F.3d 672, 679 (7th Cir. 2009) (interpreting Dura to hold that "an allegation that the plaintiffs had bought securities at 'artificially inflated prices' did not state a claim that the plaintiffs had been injured by the inflation because, for all that appeared, the prices had remained at that level, or even a higher one, or the plaintiffs had sold before the price bubble burst"). In short, if the manipulation alleged here is analogous to isolated artificial stock purchases, we can presume that plaintiffs suffered damages based on an inflated purchase price. If, however, the manipulation is more akin to disseminating inaccurate information, plaintiffs need to show that they sold or settled their Eurodollar contracts at a loss.

In this case, the alleged manipulation is less like isolated manipulative activity and more like disseminating false information. In addressing isolated manipulative activity, courts have justified their conclusion that the plaintiff only needs to show that he paid an inflated purchase price by reasoning that the price will presumably return to its normal level, and thus the plaintiff will presumably have suffered injury. Here, by contrast, plaintiffs have alleged that LIBOR was at an artificial level for the duration of the Class Period, not returning to its "normal" level until after the Class Period had ended. Exchange Am. Compl. ¶ 3 (alleging that defendants "systematically manipulated LIBOR rates . . . during the Class Period"); id. ¶ 13 (alleging that defendants' manipulation persisted "[t]hroughout the Class Period"). This is not to deny that, as plaintiffs allege, the degree of artificiality, or how many basis points LIBOR was "off" by, likely varied. See Tr. 70 ("The degree of artificiality got much worse, particularly after Lehman Brothers [filed for bankruptcy protection, on September 15, 2008], and then had fluctuations, and then . . . , after the subpoenas, disappeared. But it's varied."); Exchange Am. Compl. 22 (showing that the spread between LIBOR and the Federal Reserve Eurodollar Deposit Rate varied over the Class Period). However, because LIBOR never returned to its "normal" level within the Class Period, the mere fact that plaintiffs purchased

their Eurodollar contracts at an inflated price does not show that they suffered a loss on those contracts.

Rather, as in the "false information" scenario, plaintiffs may or may not have suffered a loss caused by defendants' manipulation, depending on what the price was when they sold their contracts and what else might have been responsible for the loss.  Although the manipulation alleged here is not perfectly analogous to disseminating false information, given that LIBOR was fixed anew every day and that the degree of artificiality likely varied, the two types of manipulation are similar in the important respect that the price remained at artificial levels, such that it is not clear that a contract purchased at artificial prices would have been sold at a loss.

In their amended complaint, plaintiffs have not identified each individual Eurodollar futures contract that they purchased, let alone these contracts' purchase price, sale date, and sale price.  Rather, they allege that they purchased Eurodollar contracts during the Class Period at prices that were artificially high as a result of defendants' manipulation of LIBOR, Exchange Am. Compl. ¶¶ 214-220, that the degree of LIBOR artificiality likely varied over the Class Period, id. ¶ 22, and that they "were harmed as a consequence of Defendants' unlawful conduct," id. ¶ 20; see also id. ¶¶ 21-26.  Defendants argue

that these allegations are insufficient to allege actual damages.  Exchange MTD 23.

We disagree.  Although plaintiffs will not be able to recover unless they prove that they sold or settled their contracts at a loss due to defendants' manipulation, they cannot be expected to have alleged with such precision in their amended complaint.  To know which contracts were sold or settled at a loss because of defendants' conduct, plaintiffs would need to compare the spread between LIBOR's "true" level and its actual level at the time the contract was purchased and the time the contract was sold or settled.  Plaintiffs would suffer loss only if the spread changed in a manner that resulted in a lower sale price.  In other words, to have pleaded loss causation in the manner suggested by defendants, plaintiffs would have needed to know the "true" LIBOR level at the time they purchased and sold their contracts.  Although this information might be in the possession of defendants, it could not be known by plaintiffs.[17] The benchmarks referenced by plaintiffs, though generally probative of when LIBOR was at an artificial level, do not indicate precisely at which level LIBOR should have been fixed

---

[17] Indeed, it may be that no one knows what LIBOR's "true" level was for any day during the Class Period.  As discussed above, LIBOR is inherently a theoretical value, derived as it is from quotes that are not based directly on any objective data.  Moreover, the challenge of determining LIBOR's "true" level would be compounded with respect to periods of time, such as the Class Period, during which the volume of actual interbank trading was at a significantly reduced level.

on any given day.   See, e.g., Mollenkamp & Whitehouse, supra (explaining that default insurance prices, though they provide a good long-term picture of "investors' assessment of the financial health of banks," are imperfect indicators when viewed individually because they are "based on dealers' quotes, which can be volatile and vary widely in times of market turmoil"); Peng Report (noting that the Federal Reserve Eurodollar Deposit Rate measures the "bid rate," or rate at which banks are willing to borrow, rather than the "offered rate," or rate at which banks are willing to lend).   Therefore, in contrast to a situation in which the defendant disseminated false information and the plaintiff can allege precisely when the false statements were made and what was false about them, here plaintiffs cannot reasonably be expected to know the spread between LIBOR's "true" value and its actual level on any given day, let alone how this spread changed over time.

In these circumstances, plaintiffs have adequately alleged actual damages by alleging that they purchased their contracts at an inflated price, that the degree of LIBOR artificiality later changed, and that they suffered damages as a result.   That said, in order to recover, plaintiffs will ultimately need to demonstrate that they sold or settled their Eurodollar contracts at a loss and that this loss resulted from defendants' misconduct.   We anticipate that meeting this burden might pose a

serious challenge for plaintiffs, especially with regard to Eurodollar contracts that were both purchased and sold within the Class Period.

In short, although we have doubts about whether plaintiffs will ultimately be able to demonstrate that they sold or settled their Eurodollar contracts at a loss as a result of defendants' conduct, we find that they have adequately alleged that defendants manipulated the price of Eurodollar contracts and that this manipulation caused them actual damages.

### ii. Manipulation of the Price of the Commodity Underlying Eurodollar Futures Contracts

By contrast, plaintiffs do not even have standing to bring suit for commodities manipulation when framed as defendants' manipulation of LIBOR as the commodity underlying Eurodollar futures contracts.[18]   As discussed above, section 22(a) of the CEA grants a private right of action to any person "who purchased or sold a [futures contract] or swap if the violation constitutes . . . (ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap."   7 U.S.C. § 25(a)(1)(D).   A "commodity" is

---

[18]  The implication of this conclusion is that, although plaintiffs will proceed on their commodities manipulation claims, they are precluded from pursuing those claims with regard to defendants' alleged manipulation of LIBOR qua commodity.  In order to recover, therefore, they will need to show that defendants specifically intended to manipulate the price of Eurodollar futures contracts, not merely LIBOR itself.  As a practical matter, we anticipate that this limitation might have significant repercussions for the relief that plaintiffs are ultimately able to recover.

broadly defined to include "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9).

If plaintiffs had a viable claim for manipulation of LIBOR qua commodity, the claim would be that defendants manipulated "the price of the commodity underlying [the] contract or swap" that plaintiffs purchased or sold.  Id. § 25(a)(1)(D)(ii).  The relevant question, therefore, is not whether LIBOR is a "commodity" in some freestanding sense, but rather whether LIBOR is the commodity underlying Eurodollar futures contracts.[19]

As discussed above, a Eurodollar futures contract is a futures contract whose "underlying instrument" is a "Eurodollar Time Deposit having a principal value of USD $1,000,000 with a three-month maturity."  CME Group, Eurodollar Futures: Contract Specifications, http://www.cmegroup.com/trading/interest-rates/ stir/eurodollar_contract_specifications.html (last visited Mar. 29, 2013).  "Eurodollars are U.S. dollars deposited in commercial banks outside the United States."  CME Group, Eurodollar Futures, http://www.cmegroup.com/trading/interest-rates/files/IR148_Eurodollar_Futures_Fact_Card.pdf.        At

---

[19] For this reason, we need not take a position on what degree of deference we owe, if any, to the CFTC statements cited by plaintiffs.  See, e.g., CFTC Order, at 27 ("Barclays' traders and submitters each specifically intended to affect the price at which the daily BBA LIBOR for U.S. Dollar, Sterling, and Yen (for particular tenors), and the EBF Euribor (for particular tenors), all commodities in interstate commerce, would be fixed.").

settlement, the price of a Eurodollar futures contract "is equal to 100 minus the three-month Eurodollar interbank time deposit rate," which rate is defined as the LIBOR fix on the contract's last trading day.  CME Group, Eurodollar Futures Final Settlement Procedure, http://www.cmegroup.com/trading/interest-rates/files/final-settlement-procedure-eurodollar-futures.pdf.  Prior to settlement, "the price of a 3-month Eurodollar futures contract is an indication of the market's prediction of the 3-month Dollar LIBOR on [that] date."  DOJ Statement ¶ 9.

The only plausible way to characterize the components of a Eurodollar contract is that the underlying commodity is a USD 1,000,000 deposit in a foreign commercial bank with a three-month maturity, and the price of the contract is settled or traded at a value based on LIBOR.  In other words, Eurodollar contracts use LIBOR to represent the price of U.S. dollars deposited in commercial banks abroad.  This makes sense because LIBOR, in theory, is an average of the rates at which banks lend U.S. dollars to each other in the London market.

Understood thusly, a Eurodollar futures contract is not fundamentally different from any other futures contract traded on the CME.  For example, in a corn futures contract, the underlying commodity is 5000 bushels of corn of a specified grade.  CME Group, Corn Futures, http://www.cmegroup.com/

trading/agricultural/grain-and-oilseed/corn_contract_
specifications.html (last visited Mar. 29, 2013). Because these
contracts require the "short" to deliver to the "long" the
specified quantity and quality of corn at the end of the
contract (even though traders may in reality enter into
offsetting contracts to avoid actual physical delivery, see Am.
Compl. ¶ 208), see CME Group, CBOT Corn Final Settlement
Procedure, http://www.cmegroup.com/trading/agricultural/files/
final-settlement-procedure-cbot-corn.pdf, the price of the corn
futures contract will track the price of physical corn, that is,
corn in the "spot" or "cash" market. Indeed, as a general
matter, the prices in a given commodity's futures market and
cash market will be closely correlated. See, e.g., Loeb Indus.,
Inc. v. Sumitomo Corp., 306 F.3d 469, 488 (7th Cir. 2002)
(finding that "the prices of cathode and cathode futures 'tend
to move in lockstep'"); Sanner v. Bd. of Trade of City of
Chicago, 62 F.3d 918, 929 (7th Cir. 1995) ("It is clear that
'[w]hen the futures market experiences a significant price
change, the prices of that commodity in the cash market will
usually experience a similar movement.' The reason for this is
obvious: both markets involve the same commodities to be
delivered currently or in the future." (citation omitted)
(quoting I. Philip Johnson & Thomas Hazen, Commodities
Regulation § 104 (2d ed. 1989))).

In the context of Eurodollar futures, even though the "short" is not even nominally required to deliver the underlying cash deposit to the "long," the contract's pricing structure, which is what matters here, is the same as with corn futures. Just as in corn futures contracts, the underlying commodity is corn and the price of the contract tracks the price of corn, so in Eurodollar futures contracts, the underlying commodity is a deposit of U.S. dollars in a foreign commercial bank and the price of the contract is based on LIBOR, which represents the price of (i.e. interest on) that deposit. Indeed, plaintiffs have characterized LIBOR as "the reference price for the [Eurodollar] futures contract just as the physical prices of soybean or silver are the reference price for their respective futures contracts traded on exchanges." Exchange Am. Compl. ¶ 207.

Despite apparently acknowledging that the above understanding of Eurodollar contracts is correct, plaintiffs advance an alternative theory in their opposition brief. Specifically, plaintiffs maintain that the underlying commodity of Eurodollar futures contracts is LIBOR and the price of those contracts is "the level of LIBOR." Exchange Opp'n 10. This characterization strikes us as strained, at best. Indeed, if there is any meaningful distinction between the London Interbank Offered Rate and the "level of" that rate, it eludes us.

Therefore, LIBOR is not the commodity underlying Eurodollar futures contracts, and plaintiffs do not have standing to bring suit against defendants based on the manipulation of LIBOR as a commodity.

### c. Vicarious Liability

Plaintiffs also assert a cause of action for vicarious liability for commodities manipulation. With regard to vicarious liability, section 2(a)(1) of the CEA provides:

> The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

7 U.S.C. § 2(a)(1)(B). "[T]o state a claim for vicarious liability, plaintiffs must allege that the principal manifested an intent to grant the agent authority, the agent agreed, and the principal 'maintain[ed] control over key aspects of the undertaking.'" In re Amaranth Natural Gas Commodities Litig., 587 F. Supp. 2d 513, 546 (S.D.N.Y. 2008) (quoting Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A., 347 F.3d 448, 462 (2d Cir. 2003)).

Defendants argue, in a discussion confined to one footnote, that plaintiffs have failed to state a claim for vicarious liability. According to defendants, "Plaintiffs have neither alleged any facts regarding any agent of any of the Defendants

nor identified any conduct allegedly taken by such agents within the scope of this principal-agent relationship to further the alleged violations of the CEA." Exchange MTD 29 n.27.

Defendants' argument is not convincing. In their amended complaint, plaintiffs have identified several "[i]ndividuals employed by the Defendants and their affiliates who have engaged in the illegal communications and conduct among Defendants to report artificially low LIBOR quotes." Exchange Am. Compl. ¶ 181. For instance, the complaint names Yvan Ducrot, "the Co-head of UBS's rates business," and Holger Seger, "the global head of short-term interest rates trading at UBS." Id. According to an article cited by plaintiffs, these persons were suspended by UBS in connection with investigations into the manipulation of LIBOR. The employees are clearly agents of UBS, and it is plausible that they contributed to the alleged manipulation of LIBOR within the scope of their employment.

Moreover, the Barclays settlement papers indicate that Barclays employees contributed to the manipulation of USD LIBOR within the scope of their employment. See, e.g., DOJ Statement ¶ 50 ("Barclays acknowledges that the wrongful acts taken by the participating employees in furtherance of this misconduct set forth above were within the scope of their employment at Barclays. Barclays acknowledges that the participating employees intended, at least in part, to benefit Barclays

through the actions decried above."). Therefore, although plaintiffs will only be able to recover on this claim with regard to those employees involved in the manipulation of USD LIBOR, not of other indices such as Yen LIBOR or TIBOR, we find that plaintiffs have adequately stated a claim for vicarious liability for commodities manipulation.

### d. Aiding and Abetting

Finally, plaintiffs assert a cause of action for aiding and abetting commodities manipulation. Under section 22(a) of the CEA, plaintiffs may bring suit against "[a]ny person . . . who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter." 7 U.S.C. § 25(a)(1). "[T]o state a claim for aiding and abetting a violation of the CEA, plaintiffs must allege that a defendant, [1] knowing of a principal's intent to manipulate the market and [2] intending to further that manipulation, [3] performed an act in furtherance of the manipulation." In re Amaranth Natural Gas Commodities Litig., 587 F. Supp. 2d 513, 541 (S.D.N.Y. 2008).

Defendants argue that plaintiffs fail to state a claim for aiding and abetting, both because they fail to state a primary violation of the CEA and because they fail to satisfy the elements set out above. Exchange MTD 28-29. At oral argument, defendants elaborated that even if each bank had an incentive to

improve the market's perception of its financial health, this incentive would have given the bank at most an interest in having a low LIBOR quote itself, not in there being a low LIBOR fix.  Tr. 78.  Indeed, defendants argued, each defendant would have wanted "to show [itself] as comparatively healthier than the next bank," and thus would not have had incentive to aid another bank in submitting a low LIBOR quote.  Id.

Although we are skeptical, as discussed below, that plaintiffs' aiding and abetting claim involves separate conduct from plaintiffs' primary claim for commodities manipulation, we find that plaintiffs have adequately stated a claim.  First, as discussed above, plaintiffs have adequately alleged that defendants committed the primary violation of manipulation of the price of Eurodollar futures contracts.  Second, although defendants are correct that no defendant would have had an incentive to make other banks' look financially healthier, this is not sufficient to dismiss plaintiffs' claim.  Given that the London interbank lending market involved lending between defendants, among other banks, it is plausible that each defendant was aware that other defendants' LIBOR quotes did not reflect the rate at which those banks actually expected to borrow.  Moreover, in light of the fact that Eurodollar futures contracts "are the largest and most actively traded futures contracts," Exchange Am. Compl. ¶ 218, each bank likely knew

that other banks had an interest in manipulating the price of Eurodollar contracts.

Additionally, plaintiffs have alleged that the affiliates of all or a substantial number of defendants traded Eurodollar contracts "to the direct benefit of Defendants." Id. ¶ 43; see also id. ¶ 218.  Thus, it is plausible that defendants had a common interest not only in LIBOR's being fixed at an artificial level, but also in the price of Eurodollar contracts being manipulated.  Even beyond this common interest, moreover, the Barclays settlement documents suggest that Barclays cooperated with other banks, including banks on the USD LIBOR panel, in ways that were not necessarily in the mutual interest of all parties involved.  For example:

> From at least approximately August 2005 through at least approximately May 2008, certain Barclays swaps traders communicated with swaps traders at other Contributor Panel banks and other financial institutions about requesting LIBOR and EURIBOR contributions that would be favorable to the trading positions of the Barclays swaps traders and/or their counterparts at other financial institutions.

DOJ Statement ¶ 23.  Although these allegations do not directly implicate specific defendants other than Barclays, they indicate that Barclays cooperated with other panel banks in a manner that each bank might not have if it were acting solely in its own interest.

Finally, it is plausible that each bank, by allegedly submitting artificial LIBOR quotes, furthered other banks' manipulation of the price of Eurodollar futures contracts. For one, as discussed above, each LIBOR quote influenced the final LIBOR fix, whether it was included in the final average or not, and thus influenced the price of Eurodollar futures contracts. Additionally, it is plausible that each defendant furthered other defendants' manipulation by submitting a quote that was roughly in line with ("clustered with") other quotes, thus decreasing the chance of detection. See Tr. 75; see also Mollenkamp & Whitehouse, supra (quoting Stanford finance professor's observation that the USD LIBOR quotes from January 2008 to April 2008 were "'far too similar to be believed'").

In short, plaintiffs have adequately alleged a claim for aiding and abetting defendants' manipulation of the price of Eurodollar futures contracts. That said, we have serious questions about whether this claim would support awarding plaintiffs any damages beyond those awarded based on the underlying manipulation claim. It appears that the only way a defendant could aid or abet another defendants' manipulation is by itself submitting an artificial LIBOR quote. Moreover, because an aiding and abetting claim would require the specific intent to further another defendant's manipulation of the price of Eurodollar futures contracts, it would seem that the scienter

element plaintiffs would need to satisfy for aiding and abetting would be the same as the scienter element for the primary CEA violation. Therefore, it is hard for us to envision a scenario in which we would award plaintiffs any damages based on their aiding and abetting claim beyond what they would be awarded based on their underlying manipulation claim. If, after discovery, it appears that the aiding and abetting claim is wholly duplicative of the primary claim, plaintiffs will not have the benefit of submitting both claims to the factfinder.

## C. RICO Claim

The Schwab plaintiffs assert a single cause of action for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968 (2006 & Supp. III 2009). Defendants have moved to dismiss this claim on six grounds: (1) the claim is barred by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.); (2) the claim seeks an impermissible extraterritorial application of U.S. law; (3) plaintiffs lack standing; (4) plaintiffs fail to plead predicate acts of racketeering; (5) plaintiffs fail to plead a pattern of racketeering activity; and (6) to the extent plaintiffs assert a claim for conspiracy to violate RICO, plaintiffs fail to state a claim. We find that each of the

first two grounds is sufficient to dismiss plaintiffs' RICO claim.

## 1. RICO

Although we do not need to decide whether plaintiffs have adequately pleaded their RICO claim, a brief overview of RICO and its alleged application to the present facts is necessary to provide context to the issues we do need to decide. Under 18 U.S.C. § 1962(c), it is unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The RICO statute grants a private right of action to "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Plaintiffs may recover treble damages and attorney's fees. Id.

One way of pleading an enterprise is to allege an "association in fact," that is, "a group of persons associated together for a common purpose of engaging in a course of conduct." Elsevier Inc. v. W.H.P.R., Inc., 692 F. Supp. 2d 297, 305 (S.D.N.Y. 2010). Under Boyle v. United States, 556 U.S. 938 (2009), "an association in fact enterprise must have a 'structure' exhibiting three features: [1] a purpose, [2]

relationships among the individuals associated with the enterprise, and [3] longevity sufficient to permit the associates to pursue the purpose of the enterprise." Elsevier, 692 F. Supp. 2d at 305-06 (citing Boyle v. United States, 556 U.S. at 946).

Racketeering activity includes, inter alia, wire fraud, mail fraud, and bank fraud. 18 U.S.C. § 1961(1). To state a claim for mail or wire fraud, a plaintiff must allege "(1) the existence of a scheme to defraud, (2) the defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 301 (S.D.N.Y. 2000) (citing S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp., 84 F.3d 629, 633 (2d Cir. 1996)); see also 18 U.S.C. § 1341 (mail fraud); id. § 1343 (wire fraud). To state a claim for bank fraud, a plaintiff must allege that defendant executed or attempted to execute a scheme "to defraud a financial institution" or "to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344.

A pattern of racketeering activity requires "at least two acts of racketeering activity" occurring within ten years of each other.  Id. § 1961(5).  "[T]o establish a 'pattern' of racketeering activity, plaintiffs 'must show [1] that the racketeering predicates are related, and [2] that they amount to or pose a threat of continued criminal activity." Jerome M. Sobel & Co. v. Fleck, No. 03 Civ.1041, 2003 WL 22839799, at *9 (S.D.N.Y. Dec. 1, 2003) (alteration in original) (quoting H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989)). "Predicate acts are related if they have the 'same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Davis Lee Pharmacy, Inc., v. Manhattan Central Capital Corp., 327 F. Supp. 2d 159, 164 (E.D.N.Y. 2004) (quoting H.J. Inc., 492 U.S. at 240 (1989)).  The "continuity" element may be satisfied by, inter alia, "closed-ended" continuity, involving "a closed period of repeated conduct."  H.J. Inc., 492 U.S. at 241.

Under 18 U.S.C. § 1962(d), it is also unlawful "for any person to conspire to violate" section 1962(c).  18 U.S.C. § 1962(d).  "To adequately plead a violation of § 1962(d) in the Second Circuit, a plaintiff need only allege that a 'conspirator intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense."

Gulf Coast Development Group, LLC v. Lebror, No. 02 Civ. 6949, 2003 WL 22871914, at *5 (S.D.N.Y. Dec. 4, 2003) (quoting Baisch v. Gallina, 346 F.3d 366, 376 (2d Cir. 2003)).  Plaintiffs need not show an overt act in order to plead a violation of section 1962(d), though "injury from an overt act is necessary and sufficient to establish civil standing for a RICO conspiracy violation."   Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990).

Here, plaintiffs claim that defendants violated both section 1962(c) and section 1962(d).  With regard to section 1962(c), plaintiffs allege that all of the defendants were part of an association in fact, whose purpose was to "cause the BBA to set LIBOR artificially low" by each defendant's misrepresentation of its expected borrowing costs, and thereby to "allow[] Defendants to increase their net interest revenues by making artificially low payments to investors such as [plaintiffs]."  Schwab Bank Am. Compl. ¶ 219.  This enterprise allegedly lasted "[f]or at least four years before [plaintiffs'] Complaint[s were] filed."  Id. ¶ 220.  The enterprise's affairs, moreover, were allegedly conducted through a pattern of racketeering activity, namely mail fraud, wire fraud, and bank fraud. Id. ¶ 222.  In addition to allegedly committing the above RICO violation, defendants allegedly conspired to violate RICO. According to plaintiffs, "[d]efendants organized and implemented

the scheme, and ensured it continued uninterrupted by concealing their manipulation of LIBOR from investors, including [plaintiffs]." Id. ¶ 232. Plaintiffs allege that they suffered direct and foreseeable injury from defendants' scheme by "unknowingly pa[ying] money to Defendants for LIBOR-based financial instruments that paid interest at a manipulated rate, and in fact collect[ing] less interest than they would have absent the conspiracy." Id. ¶ 234.

## 2. The PSLRA

Plaintiffs' RICO claim is barred by the PSLRA. In a provision that has become known as the "RICO Amendment," the PSLRA amended RICO to provide that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). This provision is interpreted "broadly," Eagletech Commc'ns Inc. v. Citigroup, Inc., No. 07-60668-CIV, 2008 WL 3166533, at *9 (S.D. Fla. June 27, 2008), and bars a RICO claim "even where a plaintiff cannot itself pursue a securities fraud action against the defendant," MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 277 (2d Cir. 2011); see also Gilmore v. Gilmore, No. 09 Civ. 6230, 2011 WL 3874880, at *4 (S.D.N.Y. Sept. 1, 2011). In other words, a plaintiff is prohibited from bringing a RICO claim not only when she, herself, could have brought a securities fraud claim based on

the RICO predicate acts, but also when the SEC could have brought such a claim.  See Eagletech, 2008 WL 3166533, at *14 (holding that "the PSLRA acts as a bar to Plaintiffs' RICO claims" because "the predicate acts are actionable as securities fraud and may be prosecuted by the SEC").  The question here, therefore, is whether the predicate acts of plaintiffs' RICO claim could have been the subject of a securities fraud action brought either by plaintiffs themselves or by the SEC.

### a. Securities Fraud

Under section 10(b) of the '34 Act, the provision criminalizing securities fraud:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange — . . . To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Because the requirements for the SEC to bring suit for securities fraud are less stringent than the requirements for a private plaintiff to bring suit, see SEC v. Boock, No. 09 Civ. 8261, 2011 WL 3792819, at *21 (S.D.N.Y. Aug. 25, 2011), the dispositive inquiry is whether the alleged predicate acts could

form the basis for a securities fraud suit by the SEC, see Eagletech, 2008 WL 3166533, at *14. The SEC may assert a cause of action for securities fraud if it alleges that the defendant: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." Boock, 2011 WL 3792819, at *21 (quoting SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999)) (internal quotation marks omitted); cf. Gilmore, 2011 WL 3874880, at *4 (holding that a private plaintiff asserting a cause of action for securities fraud under section 10(b) would need to prove, in addition to the above three elements: (1) reliance by plaintiff on defendant's misrepresentation or omission, (2) economic loss, and (3) loss causation).

To prove scienter, the SEC must demonstrate the defendant's "intent to deceive, manipulate, or defraud, or knowing misconduct." Boock, 2011 WL 3792819, at *21 (quoting In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000)) (internal quotation marks omitted). To prove that the defendant's material misrepresentation or omission was made "in connection with the purchase or sale of securities," the SEC need only show that "the scheme to defraud and the sale of securities coincide[d]." Seippel v. Jenkens & Gilchrist, P.C., 341 F. Supp. 2d 363, 373 (S.D.N.Y. 2004) (quoting SEC v.

_Zandford_, 535 U.S. 813, 820 (2002)) (internal quotation marks omitted).  The scheme to defraud and the sale of securities "coincide" when they are not "independent events," _id._ at 374 (quoting _Zandford_, 535 U.S. at 820), but rather "are 'less tangentially related,' or more closely dependent on each other," _id._ (quoting _Jacoboni v. KPMG LLP_, 314 F. Supp. 2d 1172, 1179 (M.D. Fla. 2004)).  In other words, although showing that the plaintiff purchased a security in reliance on a misrepresentation or omission by the defendant regarding the security's value would likely be sufficient to satisfy the "in connection with" element, such a showing would not be necessary. See _id._ at 373.  Indeed, the "in connection with" element should be "construed not technically and restrictively, but flexibly to effectuate [the statute's] remedial purposes."  _Id._ at 372 (quoting _Zandford_, 535 U.S. at 819) (internal quotation marks omitted)."

### b. Application of the RICO Amendment

Plaintiffs concede that at least some of the LIBOR-based financial instruments they purchased from defendants were securities.  Schwab Opp'n 5-10.  At least with regard to these instruments, the conduct alleged by plaintiffs could have been the subject of a suit for securities fraud brought by the SEC.

First, defendants allegedly "made a material misrepresentation or a material omission as to which [they] had

a duty to speak." <u>Boock</u>, 2011 WL 3792819, at *21 (quoting <u>SEC v. Monarch Funding Corp.</u>, 192 F.3d 295, 308 (2d Cir. 1999)). In their amended complaint, plaintiffs allege that defendants mailed, in furtherance of their fraudulent scheme, "(i) documents offering for sale LIBOR-based financial instruments and (ii) correspondence regarding offerings of LIBOR-based financial instruments." Schwab Bank Am. Compl. ¶ 223. Defendants also allegedly transmitted by wire, in furtherance of their fraudulent scheme, "documents offering LIBOR-based financial instruments for sale." <u>Id.</u> ¶ 225. Both the mailings and the wires were sent "for the purpose of obtaining money from [holders of LIBOR-based financial instruments] through 'false or fraudulent pretenses, representations, or promises.'" <u>Id.</u> ¶ 224; <u>see also id.</u> ¶ 225.

Plaintiffs argue that, despite these allegations, "the mailings and wire transmissions that actually were directed to Plaintiffs are not alleged to have been false or misleading." Schwab Opp'n 9; <u>see also</u> Tr. 88. Rather, plaintiffs maintain, "Defendants' misrepresentations were directed not at buyers of specific securities, but at the BBA." Schwab Opp'n 9; <u>see also</u> Tr. 88. This argument, however, is in irreconcilable tension with plaintiffs' allegation that defendants sent them mailings and wires for the purpose of obtaining money from them through "false or fraudulent pretenses, representations, or promises."

Schwab Bank Am. Compl. ¶¶ 224-25.  Only through a contorted reading of this allegation could plaintiffs suggest that defendants' "false or fraudulent pretenses, representations, or promises" were made not in the mailings and wires to plaintiffs, but rather in wires to the BBA.  A more plausible reading of plaintiffs' allegations is that the misleading statements were made to plaintiffs in the offering materials they received from defendants.

Indeed, such a reading makes sense.  If the offering materials described how LIBOR was calculated by reference to the "proper" procedures rather than the manipulation that allegedly was occurring, they would contain a material misrepresentation. If they did not describe how LIBOR was calculated, they would still be omitting that LIBOR was being manipulated, surely a material omission.

The allegations in plaintiffs' original complaints confirm our conclusion that the offering materials defendants sent plaintiffs were misleading.  Those complaints asserted a cause of action for securities fraud in violation of section 10(b). See, e.g., Schwab Bank Compl. ¶¶ 138-47 (Aug. 23, 2011).  The securities fraud claim was withdrawn in the amended complaint, a decision that, according to plaintiffs' counsel, was not manipulative, but rather took account of their realization that they would not have been able to prove reliance on defendants'

misrepresentations.   Tr. 86-87.   Frankly, this explanation strikes us as a dubious position adopted in an effort by plaintiffs to disown their original complaint and thereby avoid dismissal of their RICO claim, a claim whose siren song of treble damages apparently proved irresistible.   Nonetheless, for purposes of the present analysis, we need not decide whether plaintiffs amended their complaint in good faith.   Even crediting plaintiffs' withdrawal of their securities fraud claim in their amended complaint, the factual allegations plaintiffs made in support of that claim remain relevant as party admissions.   See Austin v. Ford Models, Inc., 149 F.3d 148, 155 (2d Cir. 1998), abrogated on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) ("The amendment of a pleading does not make it any the less an admission of the party." (quoting Andrews v. Metro N. Commuter R.R. Co., 882 F.2d 705, 707 (2d Cir. 1989)) (internal quotation marks omitted)).

     In their original complaint, plaintiffs clearly alleged that defendants made misleading statements in connection with the sale of securities.   Specifically, plaintiffs alleged that "Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the manipulation of

LIBOR." Schwab Bank Compl. ¶ 141.   Further, defendants' fraudulent conduct included:

> the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary to make Defendants' statements during the Relevant Period — including their representations that the rates of the securities Defendants sold to Plaintiffs were based on LIBOR — in the light of the circumstances under which they were made, not misleading.

Id. ¶ 142.   In sum, defendants' conduct constituted a "deceit upon the purchasers of the subject securities during the Relevant Period, including Plaintiffs."   Id.

While we acknowledge that some of these allegations track statutory provisions, nevertheless, the allegations are of a factual nature and must, of necessity, have been based on factual positions.   Fairly read, these allegations plainly indicate that defendants made misleading statements to plaintiffs, likely in the offering materials themselves but, at any rate, certainly "in connection with" defendants' sale of LIBOR-based securities to plaintiffs.   While it is true that the allegations are not conclusive admissions and thus may be rebutted by plaintiffs, see Tran v. Alphonse Hotel Corp., 281 F.3d 23, 32 (2d Cir. 2002), overruled on other grounds by Slayton v. Am. Express Co., 460 F.3d 215 (2d Cir. 2006), plaintiffs' attempt to rebut them is unconvincing.   Although plaintiffs now assert that the offering materials did not

contain misrepresentations and generally were not misleading, they do not deny that the offering materials omitted the fact that LIBOR was being manipulated. Indeed, for plaintiffs to deny this would be absurd: plaintiffs' argument that they "rel[ied] on the accuracy of LIBOR when [they] entered into the purchases," Tr. 87, requires the conclusion that the offering materials omitted the alleged material fact that LIBOR was being manipulated.

In light of the allegations in plaintiffs' original and amended complaints, it seems clear that the offering materials defendants sent plaintiffs contained either material misrepresentations or material omissions. Moreover, the remaining two elements of securities fraud have also been alleged. Without question, plaintiffs have alleged that defendants acted with scienter, or "intent to deceive, manipulate, or defraud, or knowing misconduct." SEC v. Boock, 2011 WL 3792819, at *21 (S.D.N.Y. Aug. 25, 2011) (quoting In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000)). For instance, the amended complaint alleges that the offering materials were sent "for the purpose of obtaining money from [holders of LIBOR-based financial instruments] through 'false or fraudulent pretenses, representations, or promises.'" Id. ¶ 224; see also id. ¶ 225. Finally, the material misrepresentations or omissions in the offering materials sent

to plaintiffs were clearly made in connection with the purchase or sale of securities.   Therefore, the mailings and wires by which defendants offered LIBOR-based securities to plaintiffs could, at a minimum, have been the subject of a securities fraud action brought by the SEC.

Additionally, all of defendants' misrepresentations to the BBA would likely be grounds for a securities fraud claim by the SEC.   First, plaintiffs allege that among the wire communications sent by defendant in furtherance of their fraudulent scheme were "phony statements about their costs of borrowing."   Schwab Bank Am. Compl. ¶ 225.   These statements, which apparently refer to the wires that defendants sent daily to the BBA, would clearly be material misrepresentations.   See Schwab Opp'n 9; Tr. 88.   Second, plaintiffs have explicitly alleged scienter.   Schwab Bank Am. Compl. ¶ 225.

Finally, defendants' "phony statements" to the BBA, under plaintiffs' own construct, would qualify as having been made "in connection with" the purchase or sale of securities.   Even if plaintiffs did not rely on each defendant's LIBOR quote in deciding to purchase LIBOR-based securities, it is sufficient that "the scheme to defraud and the sale of securities coincide[d]."   Seippel v. Jenkens & Gilchrest P.C., 341 F. Supp. 2d 363, 373 (S.D.N.Y. 2004) (quoting SEC v. Zandford, 535 U.S. 813, 820 (2002)) (internal quotation mark omitted).   Far from

being "independent events," id. at 374 (quoting Zandford, 535
U.S. at 820), defendants' scheme to defraud and their sale of
securities to plaintiffs were "closely dependent on each other,"
id.   Indeed, one of the alleged reasons why defendants
"transmit[ted] phony statements about their costs of borrowing"
to the BBA was in order to "obtain[] money from holders of
LIBOR-based financial instruments through 'false or fraudulent
pretenses, representations, or promises' about LIBOR-based
financial instruments."  Schwab Bank Am. Compl. ¶ 225; see also
id. ¶ 5 (alleging that one of defendants' "primary reasons" for
engaging in their fraudulent scheme was that "artificially
suppressing LIBOR allowed Defendants to pay lower interest rates
on LIBOR-based financial instruments that Defendants sold to
investors, including [plaintiffs], during the Relevant Period").

    Although defendants' misrepresentations to the BBA may have
been intended in part to facilitate defendants' sale of non-
security instruments, it remains the case, given that certain of
the LIBOR-based financial instruments that defendants sought to
sell to plaintiffs were securities, that a significant part of
the alleged reason for all of defendants' misrepresentations to
the BBA was to defraud purchasers of securities.  In short,
because defendants' alleged misrepresentations to the BBA were
allegedly made for the purpose of profiting unfairly from their
sale of securities to plaintiffs, defendants' misrepresentations

to the BBA were made "in connection with" the sale of securities.  Therefore, all of defendants' alleged misrepresentations to the BBA would be grounds for a securities fraud action brought by the SEC.[20]

Plaintiffs argue that even if their RICO claim may not rely on predicate acts that would have been grounds for a securities fraud suit, the claim should survive to the extent it involves predicate acts that would not have been actionable as securities fraud.  Schwab Opp'n 5-7.  Such predicate acts might include communications offering non-security financial instruments.

Plaintiffs' argument is inconsistent with how courts have consistently applied the RICO Amendment.  Specifically, where plaintiffs allege "a single scheme," courts have held that "if any predicate act is barred by the PSLRA it is fatal to the entire RICO claim."  Ling v. Deutsche Bank, No. 04 CV 45662005, 2005 WL 1244689, at *4 (S.D.N.Y. May 26, 2005).

For example, in Gilmore v. Gilmore, No. 09 Civ. 6230, 2011 WL 3874880, at *4 (S.D.N.Y. Sept. 1, 2011), "[plaintiff]'s RICO claims [were] based on his allegations that [defendant] and

---

[20] It is of no avail to plaintiffs that they allege that they "do not base their RICO claim[] on any conduct that would have been actionable as fraud in the purchase or sale of securities."  Schwab Bank Am. Compl. ¶ 227.  First, this is a legal conclusion that we need not accept as true.  Second, regardless of whether plaintiffs are correct that they could not have brought a private action for securities fraud based on the alleged RICO predicate acts, those predicate acts could, as discussed above, have been the basis for a securities fraud action brought by the SEC.  This is sufficient for plaintiffs' RICO claim to be barred under the PSLRA's RICO Amendment.

[defendant's outside financial and investment advisor] engaged in a multi-year scheme to defraud him and his siblings by looting the family companies through self-dealing, fraudulent securities transactions, and overbilling." Id. at *2. The Court held that defendant's alleged plots to loot the family companies "count[ed] as a single scheme." Id. at *6. Therefore, "the securities aspects of the fraud [needed to] be aggregated with the non-securities aspects." Id. In other words, having alleged that defendant's acts "were part of a single fraudulent scheme[,] the [plaintiff] [could not] divide the scheme into its various component parts," as "such surgical presentation . . . would undermine the Congressional purpose" behind the RICO Amendment. Id. (quoting Seippel v. Jenkens & Gilchrest, P.C., 341 F. Supp. 2d 363, 373 (S.D.N.Y. 2004)). Because there was "no genuine dispute that components of Plaintiffs alleged action could have been brought under the securities laws," the Court dismissed plaintiff's RICO claims. Id.

Similarly, in Ling v. Deutsche Bank, 2005 WL 1244689, the Court dismissed RICO claims based on a fraudulent scheme to offer illegitimate tax strategy advice where "[f]or at least some of the[] individual Plaintiffs, the sale of securities was necessary to effectuate the tax strategy." Id. at *6. Because "the Plaintiffs contend[ed] the wrongful acts were committed as

part of a single fraudulent scheme, all of the components [needed to] be considered together for securities fraud purposes." Id. at *4.

Here, the PSLRA bars plaintiffs' RICO claim despite the fact that certain of the alleged predicate acts might not have been actionable as securities fraud. Plaintiffs have unambiguously alleged that defendants' conduct constituted a single fraudulent scheme. See, e.g., Schwab Bank Am. Compl. ¶ 219 (alleging that defendants formed an association-in-fact enterprise with the "common purpose" of "using [their] false quotes to cause the BBA to set LIBOR artificially low, thereby allowing Defendants to increase their net interest revenues by making artificially low payment to investors such as [plaintiffs]"). Because they have done so, and because some of the alleged predicate acts could have been grounds at least for a securities fraud action brought by the SEC, plaintiffs' RICO claim, in its entirety, is barred by the PSLRA.

### 3. Extraterritoriality

Apart from being barred by the PSLRA's RICO Amendment, plaintiffs' RICO claim rests on an impermissible extraterritorial application of the RICO statute. This provides an independent basis for dismissing plaintiffs' RICO claim.

### a. RICO's Reach

As discussed above, <u>Morrison v. National Australia Bank Ltd.</u>, 130 S. Ct. 2869 (2010), establishes a two-part test for deciding extraterritoriality questions.  First, "'unless there is the affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect, 'we must presume it is primarily concerned with domestic conditions.'"  <u>Id.</u> at 2877 (quoting <u>EEOC v. Arabian American Oil Co.</u> ("<u>Aramco</u>"), 499 U.S. 244, 248 (1991)).  "When a statute gives no clear indication of an extraterritorial application, it has none."  <u>Id.</u> at 2878.  With regard to RICO, the Second Circuit has established that "RICO is silent as to any extraterritorial application." <u>Norex Petroleum Ltd. v. Access Indus., Inc.</u>, 631 F.3d 29, 32 (2d Cir. 2010) (citing <u>N.S. Fin. Corp. v. Al-Turki</u>, 100 F.3d 1046, 1051 (2d Cir. 1996)) (internal quotation marks omitted); <u>see also Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.</u>, 871 F. Supp. 2d 933, 937 (N.D. Cal. 2012) ("Since <u>Morrison</u> made it clear that the presumption against extraterritoriality is a canon of construction applicable to any statute, a half-dozen courts have applied its reasoning in the RICO context.  These courts have uniformly held that RICO is silent as to its extraterritorial application and that, under <u>Morrison</u>, it therefore has none.").  Therefore, RICO does not apply extraterritorially.[21]

---

[21] It is irrelevant whether the statutes prohibiting the alleged predicate

Second, if a statute applies only domestically, a court must determine which domestic conduct the statute regulates by reference to "the 'focus' of congressional concern." Morrison, 130 S. Ct. at 2884 (quoting Aramco, 499 U.S. at 255).  With regard to RICO, some courts have found that the statute focuses on the enterprise.  See, e.g. Cedeno v. Intech Group, Inc., 733 F. Supp. 2d 471, 474 (S.D.N.Y. 2010) ("[T]he focus of RICO is on the enterprise as the recipient of, or cover for, a pattern of criminal activity. . . . RICO does not apply where, as here, the alleged enterprise and the impact of the predicate activity upon it are entirely foreign."); see also Mitsui, 871 F. Supp. 2d at 938 ("[C]ourts have broadly agreed that . . . in the RICO context 'it is the "enterprise" that is the object of the statute's solicitude, and the "focus" of the statute.'" (quoting European Cmty. v. RJR Nabisco, Inc., No. 02-CV-5771 (NGG) (VVP), 2011 WL 843957, at *5 (E.D.N.Y. Mar. 8, 2011))).

By contrast, other courts have found that RICO focuses "on the pattern of racketeering activity and its consequences." Chevron Corp. v. Donziger, 871 F. Supp. 2d 229, 245 (S.D.N.Y. 2012); see also id. at 242 (reasoning that "foreign enterprises have been at the heart of precisely the sort of activities —

---

acts apply extraterritorially.  See Norex, 631 F.3d at 33 ("Morrison similarly forecloses [plaintiff]'s argument that because a number of RICO's predicate acts possess an extraterritorial reach, RICO itself possesses an extraterritorial reach.").

committed in the United States — that were exactly what Congress enacted RICO to eradicate," and concluding that Congress probably was concerned with "the conduct of the affairs of foreign enterprises through patterns of racketeering activity, at least if the prohibited activities injured Americans in this country and occurred here, either entirely or in significant part"). The Second Circuit has not decided this issue. See Cedeno v. Castillo, 457 F. App'x 35, 37 (2d Cir. 2012).

We agree with the Court in Cedeno that the focus of RICO is on the enterprise. In any RICO complaint, each of the predicate acts would be actionable independently, criminally and possibly also civilly. See 18 U.S.C. § 1961(1) (defining "racketeering activity"). The additional element that elevates isolated criminal acts to a RICO violation is the involvement of an enterprise, either as a passive victim of racketeering activity or as an active mechanism for perpetrating the racketeering activity. Indeed, the Supreme Court has held that the two primary purposes of RICO are to "protect[] a legitimate 'enterprise' from those who would use unlawful acts to victimize it," Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 164 (2001) (citing United States v. Turkette, 452 U.S. 576, 591 (1981)), and to "protect[] the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful . . .

activity is committed,'" id. (quoting Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 259 (1994)); see also European Cmty., 2011 WL 843957, at *5 (reasoning that RICO "does not punish the predicate acts of racketeering activity . . . but only racketeering activity in connection with an 'enterprise,'" and that the statute "seeks to regulate 'enterprises' by protecting them from being victimized by or conducted through racketeering activity"). As the Cedeno Court reasoned, "RICO is not a recidivist statute designed to punish someone for committing a pattern of multiple criminal acts[, but rather] prohibits the use of such a pattern to impact an enterprise." Cedeno, 733 F. Supp. 2d at 473. Therefore, we conclude that Congress's focus in enacting RICO was the enterprise. Under Morrison, a RICO enterprise must be a "domestic enterprise." European Cmty., 2011 WL 843957, at *5.

### b. The Location of the Alleged RICO Enterprise

To determine where an enterprise is located, courts have employed the "nerve center" test, adopted from the Supreme Court's use of that test in Hertz Corp. v. Friend, 130 S. Ct. 1181 (2010), to locate a corporation's principal place of business for purposes of diversity jurisdiction. See, e.g., European Cmty., 2011 WL 843957, at *5-6; see also Mitsui, 871 F. Supp. 2d at 940 ("The nerve center test provides a familiar, consistent, and administrable method for determining the

territoriality of RICO enterprises in cases such as the one at bar, which blend domestic and foreign elements."). As articulated in Hertz, the "nerve center" of a corporation is "the place where a corporation's officers direct, control, and coordinate the corporation's activities." Hertz, 130 S. Ct. at 1192. In the RICO context, courts have found that although "RICO enterprises . . . may not have a single center of corporate policy," the test is nonetheless useful in focusing on the "brains" of the enterprise – where its decisions are made – as opposed to its "brawn" – where its conduct occurs. European Cmty., 2011 WL 843957, at *6.

Here, for obvious reasons, plaintiffs resist the most natural way to apply RICO to the factual circumstances, namely to identify the BBA as the enterprise and to allege that the BBA's LIBOR-setting process had been corrupted by defendants and used to carry out a pattern of racketeering activity. Because the BBA is plainly a foreign enterprise, such a construct would result in an impermissible extraterritorial application of RICO. Therefore, plaintiffs have alleged that the enterprise is an association in fact whose members are the BBA panel banks, and their affiliates, and whose purpose is to submit artificially low LIBOR quotes to the BBA so that LIBOR is fixed at artificially low levels and the defendants profit on LIBOR-based financial instruments. Tr. 95; Exchange Am. Compl. ¶ 219. This

strikes us as a strained attempt by plaintiffs to plead around an obvious defect in their theory.

Even evaluating plaintiffs' construct of an association-in-fact enterprise on its merits, the enterprise would be foreign. In locating the enterprise, the nerve center test, despite its usefulness in other cases, has little value here. The decisionmaking of the alleged enterprise likely occurred in several different countries, and might even have been located in each of the countries in which a defendant was headquartered. See Schwab Bank Am. Compl. ¶¶ 20-35 (identifying the countries of defendants' headquarters as the United States, England, Japan, the Netherlands, Switzerland, Germany, Canada, and Scotland). Plaintiffs have not alleged that defendants met in any one physical location in furtherance of their fraudulent scheme; rather, they have alleged that "Defendants used the mails and wires in conjunction with reaching their agreement to make false statements about their costs of borrowing, to manipulate LIBOR." Schwab Bank Am. Compl. ¶ 226. Indeed, if plaintiffs are correct that defendants joined together to fix LIBOR over the course of several years, it would seem highly improbable that defendants physically met in one location to discuss the scheme. Therefore, because the decisionmaking in furtherance of the alleged scheme would likely have occurred in

many countries, the "nerve center" test does not point us to a single location.

Given that the location of the enterprise's "brain" is indeterminate, we will consider the location of the enterprise's "brawn," or where the enterprise acted.  The alleged fraudulent scheme essentially comprised two parts: (1) the defendants' submission of artificial LIBOR quotes to the BBA, and (2) each defendant's sale of LIBOR-based financial instruments to its customers.  The first part involves joint action: the defendants allegedly agreed to coordinate their LIBOR submissions such that they would each submit an artificially low quote to the BBA each day.  Indeed, giving the formula for calculating LIBOR, the only way to have a significant effect on the final LIBOR fix is through coordinated, collective action.  The second part, by contrast, is independent: even if all of the defendants had a common interest in a low LIBOR fix, each defendant acted independently in selling LIBOR-based financial instruments to its customers.

In locating a RICO enterprise based on its activities, it makes sense to focus on activities done collectively.  As discussed above, the focus of Congressional concern in enacting RICO was the RICO enterprise; in the context of an association-in-fact enterprise, the focus is not each defendant's independent commission of predicate acts, but rather the

association of defendants together to commit predicate acts. Therefore, based on defendants' collective submission of false LIBOR quotes to the BBA, we find that the alleged RICO enterprise is located in England.   The defendants were each members of the BBA, an entity based in England, and participated in the affairs of the BBA by submitting quotes each day to the BBA.   In other words, the collective action of defendants centered on the BBA.  As the BBA is located in England, the most sensible place to locate the RICO enterprise is England.[22]

Because RICO applies only to domestic enterprises, and because the enterprise alleged here was located abroad, plaintiffs' claim involves an impermissible extraterritorial application of U.S law.  Accordingly, plaintiffs' RICO claim is dismissed.

### D. State-Law Claims

At least one state-law cause of action is asserted in the OTC amended complaint, the Schwab amended complaints, and the exchange-based plaintiffs' amended complaint.   For the reasons

---

[22] Even if we considered the second stage of the alleged fraud - each defendant's sale of LIBOR-based financial instruments to its customers - we would not necessarily locate the enterprise in the United States.   Contrary to plaintiffs' argument, Tr. 97, the fact that only U.S. customers have brought suit pursuant to RICO does not indicate that defendants in fact targeted their sale of LIBOR-based instruments at the U.S.   Because LIBOR is a reference point around the world, id., it seems likely that defendants, which are headquartered around the world, would have sold LIBOR-based financial instruments to plaintiffs around the world.   Consequently, even if we focused on where defendants sold LIBOR-based instruments, our analysis would not necessarily point to the United States.   Furthermore, given that the first stage of the alleged fraud clearly centered on England, the indeterminate location of the second stage reinforces our conclusion that the alleged RICO enterprise was located abroad.

stated below, we decline to exercise supplemental jurisdiction over the state-law claims in the OTC amended complaint and the Schwab amended complaints, with the exception of the Schwab plaintiffs' claim pursuant to the Cartwright Act.   The Cartwright Act claim and the exchange-based plaintiffs' state-law claim are dismissed with prejudice.

### 1. OTC Amended Complaint

The OTC amended complaint asserts a cause of action for unjust enrichment and restitution, without stating which state's common law it seeks to apply.   OTC Am. Compl. ¶¶ 227-30.   The only other cause of action asserted the amended complaint is for violation of section 1 of the Sherman Act, id. ¶¶ 220-26, and, as discussed above, we are dismissing this claim for failure to allege antitrust injury.   Thus, the question before us is whether we should exercise supplemental jurisdiction over the state common law claim in light of the fact that no federal causes of action remain.[23]

---

[23] Although it is conceivable that we could retain jurisdiction over this claim by virtue of diversity of citizenship, we need not consider this ground because plaintiffs have not pled it.   "It is the plaintiff's burden to plead and prove subject matter jurisdiction."   Moses v. Deutche Bank Nat. Trust Co., No. 11-cv-5002 (ENV) (VVP), 2012 WL 2017706, at *1 (E.D.N.Y. June 5, 2012) (citing Standard Chartered Bank Malaysia Holdings v. Lehman Bros. Asia Holdings Ltd., No. 08 CV 8152, 2008 WL 4355355, at *1 (S.D.N.Y. Sept. 22, 2008)).   Here, plaintiffs have not pleaded that this Court has diversity jurisdiction over their state law claim, nor have they alleged facts that would support our exercise of diversity jurisdiction.   Therefore, if we have jurisdiction over plaintiffs' state-law claim, it is not by virtue of diversity of citizenship.

Under 28 U.S.C. § 1367, "district courts may decline to exercise supplemental jurisdiction over a [state law claim] if - . . . (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(2006). In Kolari v. New York-Presbyterian Hosp., 455 F.3d 118 (2d Cir. 2006), the Second Circuit held that "[o]nce a district court's discretion is triggered under [section] 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity' in deciding whether to exercise jurisdiction." Id. at 122 (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)) (internal citation omitted). "In weighing these factors, the district court is aided by the Supreme Court's additional guidance in [Carnegie-Mellon University v. Cohill, 484 U.S. 343,] that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" Kolari, 455 F.3d at 122 (alteration in original) (quoting Cohill, 484 U.S. at 350 n.7). Indeed, as the Supreme Court explained in United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966), superseded by statute, 28 U.S.C. § 1367, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." Id. at 726.

Here, considerations of judicial economy, convenience, fairness, and comity suggest that we should decline to exercise supplemental jurisdiction over plaintiffs' as-yet-unspecified-state-law claim.   First, given that discovery has not yet commenced, it would not significantly compromise judicial economy for another court to start afresh on plaintiffs' state law claim.   Second, in light of the early stage of the proceedings, it would not be particularly inconvenient for plaintiffs to refile their amended complaint in state court. Third, considerations of fairness suggest that plaintiffs' state-law claim would best be decided in state court.   Finally, comity to the States counsels us not to decide unnecessarily a question of state law.   In sum, we find that in this case, as in "the usual case in which all federal-law claims are eliminated before trial," the Cohill factors "point toward declining to exercise jurisdiction over the remaining state-law claims." Kolari, 455 F.3d at 122 (quoting Cohill, 484 U.S. at 350 n.7) (internal quotation mark omitted).   Accordingly, we decline to exercise supplemental jurisdiction over the OTC plaintiffs' state-law claim.

## 2. Schwab Amended Complaints

The Schwab amended complaints assert four causes of action pursuant to California state law: (1) violation of the Cartwright Act, Schwab Bank Am. Compl. ¶¶ 238-44,

(2) interference with economic advantage, id. ¶¶ 245-49, (3) breach of the implied covenant of good faith, id. ¶¶ 250-55, and (4) unjust enrichment, id. ¶¶ 256-63.  With regard to each of these claims other than the Cartwright Act claim, the same considerations of judicial economy, convenience, fairness, and comity that counsel us to decline to exercise supplemental jurisdiction over the OTC plaintiffs' state-law claim also counsel us to decline to exercise supplemental jurisdiction here.[24]  In light of the early stage of the proceedings, there is no reason why a California court should not decide plaintiffs' California common law claims.

With regard to plaintiffs' cause of action for violation of the Cartwright Act, the Cohill factors suggest a different result.  As discussed earlier, California courts interpreting the Cartwright Act have required plaintiffs to satisfy the same antitrust injury requirement that federal courts have applied in the context of the Sherman and Clayton Acts.  See Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc., 198 Cal. App. 4th 1366, 1378, 1380 (App. 2d Dist. 2011) ("[F]ederal case law makes clear that the antitrust injury requirement also

---

[24] Like the OTC plaintiffs, the Schwab plaintiffs do not allege that we have diversity jurisdiction, nor do they allege facts that would support our exercise of diversity jurisdiction. See Schwab Bank Am. Compl. ¶ 14; Schwab Money Am. Compl. ¶ 14; Schwab Bond Am. Compl. ¶ 14. Therefore, we need not consider whether we have jurisdiction over plaintiffs' state-law claims by virtue of diversity.

applies to other federal antitrust violations [beyond anticompetitive mergers]. California case law holds that the requirement applies to Cartwright Act claims as well. . . . [T]he antitrust injury requirement means that an antitrust plaintiff must show that it was injured by the anticompetitive aspects or effects of the defendant's conduct, as opposed to being injured by the conduct's neutral or even procompetitive aspects.").  Therefore, our decision that plaintiffs have failed to allege an antitrust injury applies equally to their Cartwright Act claims.

In these circumstances, considerations of judicial economy, convenience, fairness, and comity suggest that we should exercise supplemental jurisdiction over plaintiffs' Cartwright Act claims.  First, as a matter of judicial economy, because our analysis of antitrust injury in the federal context is also sufficient to dispose of plaintiff's Cartwright Act claims, there is no reason for another court to duplicate our efforts. Second, with regard to the parties' convenience, although it would be easy for plaintiffs to refile their claim in state court, it would also be an unnecessary burden for defendants to relitigate an issue that has already been decided here.  Third, although fairness to the parties often suggests that issues of state law should be decided by courts of that state, there is nothing unfair about our deciding the issue of antitrust injury

in the context of the Cartwright Act given that this requirement is directly based on the federal antitrust injury requirement. Finally, because California has chosen to streamline its Cartwright Act jurisprudence with federal antitrust law to the extent that California courts have endorsed the federal requirement of antitrust injury, there are not strong considerations of comity here in favor of deferring to California courts.

Therefore, we will exercise supplemental jurisdiction over plaintiffs' Cartwright Act claims. As discussed above, plaintiffs must show an antitrust injury to recover under the Cartwright Act, yet here, plaintiffs have failed to do so. Accordingly, plaintiffs' Cartwright Act claims are dismissed.

### 3. Exchange-Based Plaintiffs' Amended Complaint

The exchange-based plaintiffs assert a cause of action pursuant to New York law for "restitution/disgorgement/unjust enrichment." Exchange Am. Compl. ¶¶ 250-53.[25] As discussed above, plaintiffs' CEA claims will, in part, survive defendants' motion to dismiss. Plaintiffs have alleged that their state-law claim is also properly before us pursuant to our diversity jurisdiction and supplemental jurisdiction, and defendants have

---

[25] Although the amended complaint does not specify which state's law the plaintiffs are seeking to apply, the parties have assumed for purposes of briefing that the claim is asserted pursuant to New York common law. Accordingly, we will analyze this claim under New York law.

not disputed this.   Defendants have, however, moved to dismiss plaintiffs' state-law cause of action for failure to state a claim.   Exchange MTD 29-31.

Under New York law, "'[t]he theory of unjust enrichment lies as a quasi-contract claim' and contemplates 'an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.'"   Georgia Malone & Co., Inc. v. Rieder, 19 N.Y.3d 511, 516 (2012) (quoting IDT Corp. v Morgan Stanley Dean Witter & Co., 12 N.Y.3d 132, 142 (2009)). In order to state a claim for unjust enrichment, a plaintiff must allege that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."   Id. (quoting Mandarin Trading Ltd. V. Wildenstein, 16 N.Y.3d 173, 182 (2011) (internal quotation mark omitted).

Given that unjust enrichment is a claim in quasi-contract, it requires some relationship between plaintiff and defendant: "while 'a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment,' there must exist a relationship or connection between the parties that is not 'too attenuated.'"   Id. (quoting Sperry v. Crompton Corp., 8 N.Y.3d 204, 215-16 (2007)).   Where plaintiff and defendant "simply had

no dealings with each other," their relationship is "too attenuated." <u>Georgia Malone</u>, 19 N.Y.3d at 517-518.

Here, the relationship between plaintiffs and defendants, to the extent that there was any relationship, is surely too attenuated to support an unjust enrichment claim. Although plaintiffs have alleged that they "purchased standardized CME Eurodollar futures contracts" and that "Defendants . . . manipulated and directly inflated CME Eurodollar futures contract prices to artificially high levels," Exchange Am. Compl. ¶¶ 214-15, they have not alleged that they purchased Eurodollar contracts from defendants or that they had any other relationship with defendants. In other words, even if plaintiffs are correct that "the direct and foreseeable effect of the Defendants' intentional understatements of their LIBOR rate was to cause Plaintiffs and the Class to pay supra-competitive prices for CME Eurodollar futures contracts," <u>id.</u> ¶ 217; <u>see also</u> Exchange Opp'n 36, this does not establish a relationship, of any sort, between plaintiffs and defendants. <u>Cf.</u> <u>In re Amaranth Natural Gas Commodities Litig.</u>, 587 F. Supp. 2d 513, 547 (S.D.N.Y. 2008) ("Plaintiffs have alleged that their losses were caused by defendants' market manipulations . . . . But they have not alleged any direct relationship, trading or otherwise, between themselves and [defendants]. The alleged link between plaintiffs and defendants - from defendants'

manipulations to the general natural gas futures market to plaintiffs' trades - is too attenuated to support an unjust enrichment claim.").

Because plaintiffs have not alleged any relationship between themselves and defendants, they fail to state a claim for unjust enrichment under New York law. Accordingly, plaintiffs' unjust enrichment claim is dismissed.

### IV. Conclusion

For the reasons stated above, defendants' motions to dismiss are granted in part and denied in part. First, defendants' motion to dismiss plaintiffs' federal antitrust claim is granted. Regardless of whether defendants' conduct constituted a violation of the antitrust laws, plaintiffs may not bring suit unless they have suffered an "antitrust injury." An antitrust injury is an injury that results from an anticompetitive aspect of defendants' conduct. Here, although plaintiffs have alleged that defendants conspired to suppress LIBOR over a nearly three-year-long period and that they were injured as a result, they have not alleged that their injury resulted from any harm to competition. The process by which banks submit LIBOR quotes to the BBA is not itself competitive, and plaintiffs have not alleged that defendants' conduct had an anticompetitive effect in any market in which defendants

compete.    Because  plaintiffs  have  not  alleged  an  antitrust injury, their federal antitrust claim is dismissed.

Second,   defendants'   motion   to   dismiss   plaintiffs' commodities manipulation claims is granted in part and denied in part.    Contrary to defendants' arguments, plaintiffs' claims do not involve an impermissible extraterritorial application of the CEA,   and   plaintiffs   have   adequately   pleaded   their   claims. However,  certain  of  plaintiffs'  claims  are  time-barred  because numerous  articles  published  in  April  and  May  2008  in  prominent national   publications   placed   plaintiffs   on   notice   of   their injury.    Therefore,  plaintiffs'  commodities  manipulation  claims based on contracts entered into between August 2007 and May 29, 2008,  are  time-barred.    However,  plaintiffs'  claims  based  on contracts  entered  into  between  April  15,  2009,  and  May  2010  are not   time-barred,   and   plaintiffs'   claims   based   on   contracts entered  into  between  May  30,  2008,  and  April  14,  2009,  may  or may  not  be  barred,  though  we  will  not  dismiss  them  at  this stage.    Additionally,  because  the  Barclays  settlements  brought to  light  information  that  plaintiffs  might  not  previously  have been  able  to  learn,  we  grant  plaintiffs  leave  to  move  to  amend their   complaint   to   include   allegations   based   on   such information,   provided   that   any   such   motion   addresses   the concerns  raised  herein  and  is  accompanied  by  a  proposed  second amended complaint.

Third, defendants' motion to dismiss plaintiffs' RICO claim is granted.  For one, the PSLRA bars plaintiffs from bringing a RICO claim based on predicate acts that could have been the subject of a securities fraud action.  Here, the predicate acts of mail and wire fraud underlying plaintiffs' RICO claim could have been the subject of a claim for securities fraud.  Additionally, RICO applies only domestically, meaning that the alleged "enterprise" must be a domestic enterprise.  However, the enterprise alleged by plaintiffs is based in England.  For these reasons, plaintiffs' RICO claim is dismissed.

Finally, plaintiffs' state-law claims are all dismissed, some with prejudice and some without.  Plaintiffs' Cartwright Act claim is dismissed with prejudice for lack of antitrust injury.  The exchange-based plaintiffs' New York common law unjust enrichment claim is also dismissed with prejudice, as plaintiffs have not alleged any relationship between them and defendants.  With regard to the remaining state-law claims, we decline to exercise supplemental jurisdiction and therefore dismiss the claims without prejudice.

We recognize that it might be unexpected that we are dismissing a substantial portion of plaintiffs' claims, given that several of the defendants here have already paid penalties to government regulatory agencies reaching into the billions of dollars.  However, these results are not as incongruous as they

might seem.  Under the statutes invoked here, there are many requirements that private plaintiffs must satisfy, but which government agencies need not.  The reason for these differing requirements is that the focuses of public enforcement and private enforcement, even of the same statutes, are not identical.  The broad public interests behind the statutes invoked here, such as integrity of the markets and competition, are being addressed by ongoing governmental enforcement.  While public enforcement is often supplemented by suits brought by private parties acting as "private attorneys general," those private actions which seek damages and attorney's fees must be examined closely to ensure that the plaintiffs who are suing are the ones properly entitled to recover and that the suit is, in fact, serving the public purposes of the laws being invoked.  Therefore, although we are fully cognizant of the settlements that several of the defendants here have entered into with government regulators, we find that only some of the claims that plaintiffs have asserted may properly proceed.

**SO ORDERED.**


Dated:   New York, New York
         March 29, 2013


NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
In re:

LIBOR-Based Financial Instruments          **MEMORANDUM AND ORDER**
Antitrust Litigation.

                                              11 MD 2262 (NRB)

THIS DOCUMENT RELATES TO: All Cases

---------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

### I. Introduction

On March 29, 2013, we issued a Memorandum and Order granting in part and denying in part defendants' motions to dismiss plaintiffs' complaints (the "March 29 Order").  In re LIBOR-Based Fin. Instruments Antitrust Litig. (Mar. 29 Order), No. 11 MD 2262 (NRB), 2013 WL 1285338 (S.D.N.Y. Mar. 29, 2013). Specifically, we dismissed plaintiffs' antitrust and RICO claims in full; we dismissed plaintiffs' commodities manipulation claims to the extent they were based on contracts entered into between August 2007 and May 29, 2008; and, we allowed plaintiffs' commodities manipulation claims to the extent they were based on contracts entered into between May 30, 2008, and May 2010.[1]  Finally, we dismissed with prejudice the exchange-

---

[1] In ruling on plaintiffs' commodities manipulation claims, we trifurcated the Class Period (as defined in the plaintiffs' complaints then before us) into three periods: August 2007 through May 29, 2008 ("Period 1"), May 30, 2008, through April 14, 2009 ("Period 2"), and April 15, 2009, through May 2010

based plaintiffs' state-law claim for unjust enrichment and declined to exercise supplemental jurisdiction over the remaining state-law claims.

Since the issuance of the March 29 Order, the parties have filed a number of motions. First, the exchange-based plaintiffs have moved for certification of the March 29 Order for interlocutory appeal on the question of whether LIBOR is the commodity underlying Eurodollar futures contracts ("plaintiffs' motion for interlocutory appeal"). Second, three defendants, Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BT-MU"), Credit Suisse Group AG ("Credit Suisse"), and Norinchukin Bank ("Norinchukin") have moved for reconsideration of that portion of our Memorandum and Order denying their motion to dismiss the exchange-based plaintiff's commodity manipulation claims ("defendants' motion for reconsideration"). Third, the over-the-counter ("OTC"), bondholder, and exchange-based plaintiffs have each moved for leave to file a second amended complaint to add allegations in response to our ruling that plaintiffs had not plausibly alleged antitrust injury ("plaintiffs' motion to amend their antitrust

---

("Period 3"). Mar. 29 Order, 2013 WL 1285338, at *34-*36. We found that the Commodity Exchange Act ("CEA")'s statute of limitations barred plaintiffs' claims to the extent they were based on contracts entered into during Period 1, but did not bar plaintiffs' claims based on contracts entered into during Period 3. Id. With regard to claims based on contracts purchased during Period 2, we declined to dismiss plaintiffs' claims because we "[were] not in a position to address" the issues bearing on whether those claims were timely. Id. at *35.

claims").[2]  Finally, the exchange-based plaintiffs have moved for leave to file a second amended complaint to add allegations relating to their commodity manipulation claims ("plaintiffs' motion to amend their commodities manipulation claims").

For the reasons stated below, the exchange-based plaintiffs' motion for interlocutory appeal is denied; the OTC, bondholder, and exchange-based plaintiffs' motions to add allegations with respect to antitrust are denied; the exchange-based plaintiffs' motion to add allegations with respect to trader-based manipulation is denied; BT-MU, Credit Suisse, and Norinchukin's motion for reconsideration is denied without prejudice to a similar motion being filed by defendants that addresses the issues raised herein; and, the OTC plaintiffs' motion for leave to reassert their unjust enrichment claim and to add a claim for breach of the implied covenant of good faith and fair dealing is granted.

Because the background of this case has been thoroughly set out in the March 29 Order, we will proceed directly to our consideration of the pending motions.

## II. Discussion

---

[2] The motion to amend filed by the OTC plaintiffs also seeks leave (1) to add an allegation that we have jurisdiction under the Class Action Fairness Act ("CAFA") over the OTC plaintiffs' state-law claims, (2) to reassert the previously pleaded claim for unjust enrichment, which we dismissed without prejudice due to lack of subject matter jurisdiction, and (3) to advance a new claim for breach of contract.

## A. Plaintiffs' Motion for Interlocutory Appeal

Plaintiffs have moved for certification of the March 29 Order for interlocutory appeal on the following question: "Whether LIBOR is the 'commodity underlying' the Eurodollar futures contract within the meaning of Section 22(a)(1)(D) of the Commodity Exchange Act ('CEA')." Letter from Christopher Lovell and David E. Kovel to the Court (Apr. 22, 2013) [hereinafter Pls.' Letter Mot. for Interlocutory Appeal].[3] Under 28 U.S.C. § 1292:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order[.]

---

[3] In a Memorandum filed on May 3, 2013, we noted that we had received a letter from the exchange-based plaintiffs seeking leave to move for certification of our Memorandum and Order of March 29 for interlocutory appeal, as well as a letter from defendants in opposition. In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MD 2262 (NRB), 2013 WL 1947367, at *2 (S.D.N.Y. May 3, 2013). We further observed that, "[b]ased on the submissions to date, this Court could not enter such a certification." Id. Nonetheless, "to give exchange-based plaintiffs a full opportunity to support their position," we permitted plaintiffs to submit a reply submission within two weeks, noting that we would treat plaintiffs' original letter as a letter motion. Plaintiffs submitted their reply on May 20.

28 U.S.C. § 1292(b).[4]  As the Second Circuit has held: "It is a basic tenet of federal law to delay appellate review until a final judgment has been entered.  Section 1292(b)'s legislative history reveals that . . . [this law] is a rare exception to the final judgment rule that generally prohibits piecemeal appeals." Koehler v. Bank of Bermuda Ltd., 101 F.3d 863, 865 (2d Cir. 1996) (citation omitted).  Indeed, "only exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment," Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas, 426 F. Supp. 2d 125, 127 (S.D.N.Y. 2005) (alteration in original) (quoting Klinghoffer v. S.N.C. Achille Lauro, 921 F.2d 21, 25 (2d Cir. 1990)) (internal quotation marks omitted), and district courts must "exercise great care in making a § 1292(b) certification," id. (quoting Westwood Pharm., Inc. v. Nat'l Fuel Gas Distrib. Corp., 964 F.2d 85, 89 (2d Cir. 1992)).

Here, interlocutory appeal is not warranted because there is not "substantial ground for difference of opinion" regarding whether LIBOR is the commodity underlying Eurodollar futures contracts.  As we explained in the March 29 Order, a Eurodollar futures contract is a futures contract whose "underlying instrument" is a "Eurodollar Time Deposit having a principal

---

[4] Although section 1292 also authorizes appeals of interlocutory orders in several other situations, none of those situations is present here.

value of USD $1,000,000 with a three-month maturity." CME Group, Eurodollar Futures: Contract Specifications, http://www.cmegroup.com/trading/interest-rates/stir/eurodollar_contract_specifications.html (last visited August 23, 2013). "Eurodollars are U.S. dollars deposited in commercial banks outside the United States." CME Group, Eurodollar Futures, http://www.cmegroup.com/trading/interest-rates/files/IR148_Eurodollar_Futures_Fact_Card.pdf. At settlement, the price of a Eurodollar futures contract "is equal to 100 minus the three-month Eurodollar interbank time deposit rate," which rate is defined as the LIBOR fix on the contract's last trading day. CME Group, Eurodollar Futures Final Settlement Procedure, http://www.cmegroup.com/trading/interest-rates/files/final-settlement-procedure-eurodollar-futures.pdf. Prior to settlement, "the price of a 3-month Eurodollar futures contract is an indication of the market's prediction of the 3-month Dollar LIBOR on [that] date." Settlement Agreement Between Dep't of Justice, Criminal Div., and Barclays (June 26, 2012), Appendix A, ¶ 9, Ex. B, Porpora Decl.

Plaintiffs argue that LIBOR is the commodity underlying Eurodollar futures contracts for purposes of the CEA. But this position is simply implausible. For one, LIBOR is a price index; it is not a "commodity," which the CEA defines to include "all services, rights, and interests . . . in which contracts

for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9).  Moreover, to call LIBOR a commodity, one would need to be able to articulate a price of LIBOR independent from LIBOR itself.  Plaintiffs have not plausibly done so, and we cannot imagine how they could.

As we reasoned in the March 29 Order, "[t]he only plausible way to characterize the components of a Eurodollar contract is that the underlying commodity is a USD 1,000,000 deposit in a foreign commercial bank with a three-month maturity, and the price of the contract is settled or traded at a value based on LIBOR."[5]  Mar. 29 Order, 2013 WL 1285338, at *43.  Just as the prices of futures contracts based, for example, on gold or copper track the prices of their respective underlying commodities, see Loeb Indus., Inc. v. Sumitomo Corp., 306 F.3d 469, 488 (7th Cir. 2002); Sanner v. Bd. of Trade of City of Chicago, 62 F.3d 918, 929 (7th Cir. 1995), so the prices of Eurodollar futures contracts track (generally) the prices of three-month U.S. dollar time deposits in foreign banks.  In the case of futures based on physical commodities, the correlation of futures contract price with underlying commodity price occurs

---

[5] Given that the commodity underlying Eurodollar futures contracts is a USD 1,000,000 deposit in a foreign commercial bank with a three-month maturity, the price of that commodity would be the interest rate charged for the use of such a time deposit.  LIBOR, of course, does not correspond to any actual interest rate charged for the use of U.S. dollars, but rather is an index based on the LIBOR panel banks' estimates of the rate at which they would be able to borrow funds.

by virtue of the natural operation of the market.  In the case of Eurodollar futures, the correlation occurs because the futures price directly incorporates LIBOR, which is an index intended to represent the average price paid by banks for three-month U.S. dollar time deposits.  If, as plaintiffs allege, defendants submitted false LIBOR quotes to the BBA, it would be inaccurate to say that they manipulated the commodity underlying Eurodollar futures contracts or the price of that commodity, thereby affecting Eurodollar futures prices indirectly.  Rather, the best characterization of what defendants allegedly did would be that they affected Eurodollar futures prices directly by manipulating the index that was directly incorporated into the formula for those prices.

Contrary to plaintiffs' argument, <u>see</u> Pls.' Letter Mot. for Interlocutory Appeal 2, the fact that defendants have described Eurodollar futures contracts as "bets on LIBOR" does not suggest that LIBOR is the commodity underlying those contracts.  Every futures contract is a bet.  Strictly speaking, however, a futures contract is not a bet on the underlying commodity itself (whatever that might mean).  Rather, a futures contract is a bet on which direction the average price for the underlying commodity will move.  So also with Eurodollar futures, which are bets on which direction the average interest rate for three-month U.S. dollar time deposits in foreign banks, represented by

LIBOR, will move.   In short, although it is undoubtedly correct to say that Eurodollar futures contracts are bets on LIBOR, to say this is not to embrace plaintiffs' assertion that LIBOR is a commodity, but rather to acknowledge the obvious fact that LIBOR is a price index.

Plaintiffs also argue that, because Eurodollar futures contracts trade and settle based on LIBOR and do not involve any actual delivery of three-month U.S. dollar time deposits, those contracts can be manipulated only by manipulating LIBOR, not by manipulating the time deposit market.   See Id. at 2-3. According to plaintiffs, "[t]he amounts of phantom dollar deposits that are never delivered have no significance whatsoever for purposes of manipulation of Eurodollar futures prices (except as to supply a multiplication unit by which to measure the degree of loss from such manipulation of LIBOR)." Pls.' Reply Mem. of Law in Supp. of Mot. to Certify the Mar. 29, 2013 Order for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b), at 8 [hereinafter Pls.' Interlocutory Appeal Reply]. In light of this, plaintiffs contend that the CEA's purposes of deterring and remedying manipulation of the commodities futures markets[6] support a finding that LIBOR is the commodity underlying Eurodollar futures contracts.   Id.

---

[6] Further, plaintiffs argue that Congress's specific purpose in adding a cause of action based on manipulation of the price of the commodity underlying futures contracts was to "expand[] the prevention of manipulation and the

Although we appreciate the important functions served by the CEA, we do not agree with plaintiffs that the only way to manipulate Eurodollar futures is to manipulate LIBOR directly. When properly calculated, LIBOR reflects the average interest rate for three-month U.S. dollar loans in the London interbank lending market. By manipulating this market, which is a subset of the broader market for three-month U.S. dollar time deposits in foreign banks, an entity would cause LIBOR, and thereby Eurodollar futures prices, to be artificial. Thus, one could plausibly manipulate the price of Eurodollar futures contracts by manipulating the price of foreign three-month U.S. dollar time deposits; one need not manipulate LIBOR directly.

Finally, not only is plaintiffs' position implausible, but there is no split of authority on this issue which would counsel in favor of certifying our decision for interlocutory appeal. See Consub Del. LLC v. Schahin Engenharia Limitada, 476 F. Supp. 2d 305, 309 (S.D.N.Y. 2007) ("The requirement that such a substantial ground [for a difference of opinion] exist may be met when '(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." (quoting In re Lloyd's Am. Trust Funds Litig., No. 96 Civ. 1262, 1997 WL 458739, at *5 (S.D.N.Y. Aug.

---

protection of the integrity of futures contract prices." Pls.' Interlocutory Appeal Reply 8.

12, 1997)).    The only authority that even arguably supports plaintiffs' claim that LIBOR is the commodity underlying Eurodollar futures contracts consists of a few stray clauses in the Barclays CFTC settlement order stating that LIBOR is "a commodity in interstate commerce" for purposes of sections 9(a)(2) and 6(c) of the CEA.    See CFTC Barclays Settlement Order (June 27, 2012), at 4, 25-26, Ex. A, Porpora Decl.; see also Pls.' Interlocutory Appeal Reply 5-6.    However, these stray references do not convince us that there is a substantial ground for difference of opinion.

    First, even assuming that LIBOR is "a commodity in interstate commerce" for purposes of sections 9(a)(2) and 6(c) of the CEA, it does not necessarily follow that LIBOR is the commodity underlying Eurodollar futures contracts for purposes of section 22(a).    Indeed, section 22(a), the provision of the CEA which establishes a private right of action for any person "who purchased or sold a [futures contract] or swap if the violation constitutes . . . (ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap," 7 U.S.C. § 25(a)(1)(D), is not even referenced in the CFTC settlement order at issue.

    Moreover, to whatever extent the CFTC's "commodity in interstate commerce" language is in tension with our finding that LIBOR is not the commodity underlying Eurodollar futures

contracts, such tension is not substantial enough to warrant interlocutory appeal. Although courts generally "defer to an agency's reasonable interpretation of a statute it is charged with administering," Cuomo v. Clearing House Ass'n, L.L.C., 557 U.S. 519, 525 (2009), such deference is not appropriate when the court is "not reviewing an agency rulemaking or adjudication, but only a settlement agreement," Se. Fed. Power Customers, Inc. v. Geren, 514 F.3d 1316, 1327 (D.C. Cir. 2008) (Silberman, J., concurring).  This is especially so when "the agency itself [was] an interested party to the agreement."  Id. (alteration in original) (quoting Nat'l Fuel Gas Supply Corp. v. FERC, 811 F.2d 1563, 1571 (D.C. Cir. 1987)).  Here, although we would normally afford deference to the CFTC's interpretation of the CEA, see Damato v. Hermanson, 153 F.3d 464, 472 (7th Cir. 1998), we need not defer to statements made in the Barclays settlement order. See Sec. Investor Protection Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 336 (Bkrtcy. S.D.N.Y. 1999) ("The Second Circuit has clearly held that consent judgments . . . are not the result of actual adjudications on the merits . . . ."); cf. In re Platinum and Palladium Commodities Litig., 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011) (prohibiting plaintiffs from relying on a CFTC order to plead the "underlying facts of liability" because, "[a]lthough the CFTC Order included certain factual findings, it nevertheless was the product of a settlement

between the CFTC and the Respondents, not an adjudication of the underlying issues in the CFTC proceeding"). Therefore, we cannot conclude, based on the references to LIBOR as "a commodity in interstate commerce" in the CFTC's Barclays settlement order, that a substantial ground for difference of opinion exists that would justify interlocutory appeal.

For the foregoing reasons, plaintiffs have not even approached satisfying the requirements of 28 U.S.C. § 1292(b), and their motion for certification of the March 29 Order for interlocutory appeal is denied.

## B. Defendants' Motion for Reconsideration

### 1. Background

Defendants BT-MU, Credit Suisse, and Norinchukin (collectively, the "moving defendants") have moved for reconsideration of that portion of our Memorandum and Order denying their motion to dismiss the exchange-based plaintiff's commodity manipulation claims, on the ground that we improperly found that plaintiffs had adequately pleaded scienter. In the March 29 Order, we held that, although the scienter element of a commodities manipulation claim "may be alleged generally," Mar. 29 Order, 2013 WL 1285338, at *37 (quoting Fed. R. Civ. P. 9(b)) (internal quotation marks omitted), plaintiffs must still allege facts that "give rise to a strong inference of scienter," id. (alteration in original) (quoting In re Amaranth Natural Gas

Commodities Litig., 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009)) (internal quotation marks omitted). Plaintiffs may demonstrate scienter by, inter alia, "alleging facts to show that defendants had both motive and opportunity to commit fraud."[7] Id. (quoting In re Crude Oil Commodity Litig., No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007)). "Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Id. (quoting In re Amaranth Natural Gas Commodities Litig., 612 F. Supp. 2d 376, 383 (S.D.N.Y. 2009)) (internal quotation marks omitted). In the case at bar, we found that plaintiffs' allegations of defendants' motive and opportunity were sufficient to demonstrate scienter. Id. at *38.

Our conclusion that plaintiffs had adequately pleaded that "defendants stood to gain concrete benefits from manipulating the price of Eurodollar futures contracts," id., was based on plaintiffs' allegation that "[d]efendants, through their broker-dealer affiliates actively traded Eurodollar futures and options on those futures during the Class Period." Exchange-Based Pls.'

---

[7] Scienter can also be pleaded "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." In re Crude Oil Commodity Litig., No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007) (quoting Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006)) (internal quotation mark omitted). However, plaintiffs cannot satisfy this standard. The only alleged action of defendants that might qualify as "conscious misbehavior or recklessness" is their alleged submission of artificial LIBOR quotes to the BBA. However, as discussed below, merely submitting artificial LIBOR quotes does not by itself indicate an intent to manipulate Eurodollar futures contract prices.

Am. Consol. Class Action Compl. ¶ 218.  Plaintiffs' first amended complaint proceeded to list broker-dealer affiliates of certain of the defendants, including Credit Suisse, but not of others, such as BT-MU or Norinchukin.  <u>Id.</u>  Nonetheless, we understood plaintiffs to be alleging that each defendant, through its broker-dealer affiliate, "actively traded Eurodollar futures and options on those futures during the Class Period." <u>Id.</u>  Whether or not we were correct in our interpretation of the exchange-based plaintiffs' first amended complaint, the exchange-based plaintiffs have since moved for leave to file a second amended complaint that would add, <u>inter alia</u>, explicit allegations that Credit Suisse, BT-MU, and Norinchukin, or their respective affiliates, each held or traded Eurodollar futures contracts during the Class Period.  <u>See</u> Exchange-Based Pls.' Second Am. Consol. Class Action Compl. ¶¶ 459, 467, 479, Ex. A, Revised Kovel Decl. [hereinafter Exchange-Based Pls.' PSAC].  As discussed below, although we will not permit the exchange-based plaintiffs to add all of their proposed new allegations, we do not object to the paragraphs immediately at issue here. Therefore, in addressing the present motion, we understand plaintiffs to have explicitly alleged that each of the moving defendants held or traded Eurodollar futures contracts during the Class Period.

Defendants maintain that such allegations are insufficient to plead scienter.  According to defendants, "plaintiffs do not allege any facts to suggest that each (or any) Movant 'took specific actions which exhibited an actual intent' to manipulate the price of Eurodollar futures contracts or made 'specific communications . . . about any specific plan to cause artificial prices' in that market."  Defs.' Mem. of Law in Supp. of Mot. for Reconsideration or Reargument 3 (alteration in original) (quoting In re Commodity Exchange, Inc., Silver Futures and Options Trading Litig., No. 11 Md. 2213 (RPP), 2012 WL 6700236, at *10-*11 (S.D.N.Y. Dec. 21, 2012)).  Further, defendants argue, "plaintiffs do not allege whether each Movant was long or short -- a fact that is essential to showing that each Movant would have gained 'concrete benefits' from the alleged manipulation of the price of those contracts."  Id.  Finally, although plaintiffs have alleged that defendants held or traded Eurodollar contracts, defendants contend that "[t]he desire to profit from trading such contracts is precisely the kind of general motive possessed by most corporate defendants that is insufficient to adequately allege scienter."  Id. at 4.

Although we have considered defendants' motion carefully, we are not at present prepared to resolve it because several important issues have not been sufficiently briefed.  Thus, we deny defendants' motion for reconsideration without prejudice to

a similar motion being filed, by September 20, 2013, which addresses the following concerns.

## 2. Relevant Authority

In general, courts have held that, to plead scienter, it is insufficient to allege merely "a generalized motive" that could be "imputed to any publicly-owned, for-profit endeavor." Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996). For instance, "[t]he motive to maintain the appearance of corporate profitability, or of the success of an investment, will naturally involve benefit to a corporation, but does not 'entail concrete benefits.'" Id. Also insufficient are a corporation's "desire[ for] its stock to be priced highly by the market," id. at 268 n.5, or its "desire to maintain the company's credit rating," id. at 268 (citing San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc. 75 F.3d 801, 813-14 (2d Cir. 1996)). Further, allegations that individual defendants "were motivated by a desire to maintain or increase executive compensation" or to "achieve the most lucrative acquisition proposal [for their company]" are inadequate to plead motive. Kalnit v. Eichler, 264 F.3d 131, 140-41 (2d Cir. 2001).

With regard to plaintiffs' allegations that defendants were motivated to manipulate Eurodollar futures contract prices because they held positions in that market, the authority cited

by defendants raises a serious question regarding whether plaintiffs' allegations are sufficient.[8]  Specifically, in <u>In re Crude Oil Commodity Litigation</u>, No. 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007), we held that plaintiffs had failed to plead motive to manipulate crude oil prices where they had alleged that "defendants had a large presence in the crude oil market [and] the NYMEX crude oil futures and options market, and also engaged in the purchase and sale of OTC contracts in crude oil."  <u>Id.</u> at *8.  Similarly, in <u>In re Commodity Exchange, Inc., Silver Futures and Options Trading Litig.</u>, No. 11 Md. 2213 (RPP), 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012), the Court found that plaintiffs had failed to plead defendant's motive to manipulate silver futures contract prices by alleging that

---

[8] In their opposition, plaintiffs argue that "[the Court] could have found and held that the allegations of hundreds of manipulative acts by each Movant, accompanied by competent allegations of that Movant's knowledge of thousands of manipulative acts by other Defendants and the circumstance that Eurodollar futures prices were the inverse of LIBOR, sufficed to give rise to a reasonable inference of manipulative intent."  Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Reconsideration or Reargument 6 (citations omitted).  We neither so found nor so held.  We have never, and do not, accept the notion that intentionally submitting false LIBOR quotes is tantamount to intending to manipulate Eurodollar futures contracts.  Indeed, plaintiffs themselves have alleged that one of the primary goals of each defendant in submitting false LIBOR quotes was to protect the market's perception of that defendant's financial health.  Plaintiffs have also alleged that a separate goal was to profit on LIBOR-based trading, which may or may not involve Eurodollar futures contracts.  In short, even accepting plaintiffs' allegations that each defendant submitted false LIBOR quotes over a long period of time and was aware that the other defendants were doing the same, those allegations by themselves do not make plausible that defendants intended to manipulate Eurodollar futures contracts.  Of course, although defendants were likely aware that submitting artificial LIBOR quotes would affect the Eurodollar market, "[m]ere knowledge that certain actions might have an impact on the futures market is not sufficient to state a private claim under the CEA."  <u>In re Rough Rice Commodity Litig.</u>, No. 11 C 618, 2012 WL 473091, at *7 (N.D. Ill. Feb. 9, 2012) (citing <u>Hershey v. Energy Transfer Partners, L.P.</u>, 610 F.3d 239, 249 (5th Cir. 2010)).

defendant was "a large holder of COMEX silver futures contracts, short puts, and options," had engaged in allegedly suspicious trading activity, and made allegedly "'unusual' deliveries of silver between March 2008 and October 2010." Id. at *10-*12.[9] To the extent that these cases are analogous to the facts here, they give rise to serious questions regarding whether plaintiffs have adequately pleaded motive.

### 3. What Plaintiffs Have, and Could Have, Alleged

Complicating the analysis is the fact that, as we were led to understand at oral argument,[10] plaintiffs are operating with significantly limited information. As plaintiffs' counsel informed us, the details of particular trades in Eurodollar futures contracts, including the identity of the transacting parties, are not publicly available. Tr. 20-23.[11] Specifically, according to plaintiffs' counsel, brokers have a fiduciary duty not to disclose the details of their clients' trades, and,

---

[9] The Court in Silver Futures did not specify whether it was applying the "motive and opportunity" standard for scienter or the "strong circumstantial evidence of conscious misbehavior or recklessness" standard. Crude Oil, 2007 WL 1946553, at *8; see also Silver Futures, 2012 WL 6700236, at *10-*12.

[10] Significantly, it was not until oral argument that the issues addressed in this section, involving what information plaintiffs could reasonably be expected to know about defendants' Eurodollar futures contract positions, received any meaningful discussion. Given that we anticipate that this issue will inform whether plaintiffs have adequately pleaded scienter, the minimal and belated attention devoted to the issue contributes to our disinclination to rule on whether reconsideration is warranted until we have received further briefing.

[11] Citations to "Tr." refer to the transcript of the oral argument held on August 8, 2013.

although the CFTC publishes aggregated trading data, it is prohibited from publicly identifying the parties to trades. Id. Thus, it appears that we cannot reasonably expect plaintiffs, prior to discovery, to have identified the particular contracts and transactions on which the moving defendants allegedly sought to profit. Of course, it is well established that pleading requirements are relaxed where proof of a claim "involve[s] facts solely within the defendant's knowledge." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 102 (2d Cir. 2007); see also DGM Investments, Inc. v. N.Y. Futures Exchange, Inc., 265 F. Supp. 2d 254, 264 (S.D.N.Y. 2003) ("Dismissal on the ground that facts within Defendants' knowledge have not yet been proven in the pleading stage is 'particularly inappropriate.'" (quoting Sam Wong & Son, Inc. v. New York Mercantile Exchange, 735 F.2d 653, 678 (2d Cir. 1984)).

Indeed, there is yet another layer of uncertainty impeding plaintiffs' ability to plead with specificity. One way of proving motive is to show that a defendant executed a transaction that yielded a concrete benefit to it as the result of the defendant's manipulative conduct. Here, plaintiffs might have shown that a given defendant exited a position in a Eurodollar futures contract such that the defendant profited as a result of the defendant's manipulation. However, pleading with such specificity appears to be impossible at this stage.

For one, as discussed above, plaintiffs do not know which positions defendants held or when they exited those positions. Further, plaintiffs are not in a position to demonstrate that the degree of LIBOR artificiality changed over the time that defendants held their positions in such a way that defendants profited by exiting when they did.

To elaborate on the latter point: In their Proposed Second Amended Complaint ("PSAC"), plaintiffs allege that LIBOR was artificial to some degree for all or most of the period from August 2007 through May 2010.[12]   Therefore, the mere fact that a defendant exited a position at a time when LIBOR was artificial does not establish that the defendant benefited from manipulation.   Rather, the defendant would profit only if LIBOR's degree of artificiality changed over the time that the defendant held its position in a manner that benefited the defendant.   Regardless of whether plaintiffs will ever be able to show this, we cannot discern how they could allege it with specificity now.   As we reasoned in the March 29 Order, because "[t]he benchmarks referenced by plaintiffs, though generally probative of when LIBOR was at an artificial level, do not

---

[12] Because alleged trader-based manipulation is the basis for plaintiffs' new allegation that the Class Period begins in January 2005 rather than August 2007, and because, for the reasons stated below, we deny the exchange-based plaintiffs leave to add allegations based on such manipulation, we will assume for purposes of the present discussion that the Class Period begins in August 2007.

indicate precisely at which level LIBOR should have been fixed on any given day," plaintiffs "cannot reasonably be expected to know the spread between LIBOR's 'true' value and its actual level on any given day, let alone how this spread changed over time." Mar. 29 Order, 2013 WL 1285338, at *42.  Therefore, although it is possible that, after discovery, plaintiffs will be able to point to particular trades by defendants to show that the defendants stood to reap a concrete benefit from their alleged manipulative conduct, we question whether we can reasonably expect plaintiffs to have alleged that at this stage.

### 4. Important Issues that Have Not Been Adequately Briefed

In light of the above discussion, there are three issues that concern us.  First, putting aside considerations of what information can be reasonably attributed to plaintiffs, have plaintiffs adequately alleged scienter?[13]  Second, if the first question is answered in the negative, do plaintiffs'

---

[13] As we see it, this question involves at least two subparts.  First, as discussed above, there is an issue regarding whether plaintiffs' allegations that defendants held positions in the Eurodollar futures market is sufficient to plead scienter.  Second, in light of the fact that the various groups of plaintiffs have alleged several motives of defendants to manipulate LIBOR other than profiting from Eurodollar futures contracts, namely portraying themselves as economically healthier than they actually were and profiting on particular LIBOR-based financial instruments other than Eurodollar futures, what burden do plaintiffs bear in pleading that defendants' actions were actually motivated, at least in part, by their desire to profit on Eurodollar futures?  In other words, assuming we find at least one of the non-Eurodollar-based motives to manipulate LIBOR plausible, what showing must plaintiffs make to demonstrate that defendants' LIBOR submissions were, in fact, made with the specific intent to manipulate the price of Eurodollar futures?

informational handicaps change the result?  And, third, if both of the previous questions are answered in the negative, can the analysis reasonably be confined to the moving defendants, or is it equally applicable to all defendants?[14]  Because these issues have not been adequately briefed, we think it would be imprudent, especially in a case of this magnitude, to resolve the present motion without further briefing.

Accordingly, defendants' motion for reconsideration is denied without prejudice to defendants' filing, by September 20, 2013, of a similar motion that addresses the concerns raised herein.

### C. Exchange-Based Plaintiffs' Motion to Amend Their Commodities Manipulation Claims

#### 1. Background

In the March 29 Order, we granted the exchange-based plaintiffs leave to move to file a second amended complaint to include allegations based on the day-to-day, trading-based manipulation at issue in the Barclays settlement, that is, manipulation wherein defendants allegedly submitted specific LIBOR quotes in order to benefit particular positions that they

---

[14] At oral argument, defense counsel sought to distinguish the moving defendants from the non-moving defendants by arguing that plaintiffs' allegations of artificial LIBOR submissions are especially weak with respect to the movants and, indeed, that the data cited by plaintiffs actually exculpate them.  See Tr. 10-15.  However, although these arguments might be relevant to whether artificial Eurodollar futures contract prices existed and whether the moving defendants caused those artificial prices, it is unclear how the arguments are relevant to scienter.

held in the Eurodollar futures market.[15]  Mar. 29 Order, 2013 WL
1285338, at *36.  On May 23, plaintiffs filed such a motion, as
well as a proposed second amended complaint.  Defendants have
opposed plaintiffs' motion on the grounds that the proposed
amendments are futile, as they are time-barred and fail to state
a claim under the CEA.  Defs.' Mem. of Law in Opp'n to Exchange-
Based Pls.' Mot. for Leave to Amend as to CEA Claims and File
the Second Am. Consol. Class Action Compl. [hereinafter Defs.'
Opp'n to Mot. to Amend CEA Claims.].  Among defendants'
arguments is that plaintiffs have failed to plead that they
suffered actual damages.  Id. at 24-25.  We agree that
plaintiffs have not adequately alleged that they suffered an
injury as a result of defendants' alleged trader-based conduct,
and thus plaintiffs lack standing under the CEA to pursue such
claims.[16]  This ground being sufficient to deny plaintiffs'
motion to amend, we do not reach defendants' other arguments.

### 2. Legal Standard

Under Rule 15(a) of the Federal Rules of Civil Procedure, a
second amended complaint may be filed "only with the opposing
party's written consent or the court's leave."  Fed. R. Civ. P.

[15] We required that "any such motion address[] the concerns raised [in the
March 29 Order] and [be] accompanied by a proposed second amended complaint."
Mar. 29 Order, 2013 WL 1285338, at *36.

[16] As discussed below, although loss causation is not an element of a
commodities manipulation claim, private plaintiffs must still plead actual
damages in order to have standing to bring suit under the CEA.

15(a)(2).  Although "[t]he court should freely give leave when justice so requires," id., we "ha[ve] discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." Holmes v. Grubman, 568 F.3d 329, 334 (2d Cir. 2009) (quoting McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007)).  "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)." Lucente v. Int'l Business Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002) (citing Dougherty v. N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002)).

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  To avoid dismissal, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Where plaintiffs have not "nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id.  In applying this standard, a court must accept as true all well-pleaded factual allegations and must draw all reasonable inferences in favor of the plaintiff. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam); Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).  The Court may also "properly consider

'matters of which judicial notice may be taken, or documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit.'" Halebian v. Berv, 644 F.3d 122, 130 n.7 (2d Cir. 2011) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

### 3. Analysis

As discussed in the March 29 Order, to avoid dismissal, plaintiffs not only must allege the elements of a commodities manipulation claim, but also must show that they have standing to sue. See Mar. 29 Order, 2013 WL 1285338, at *37. Under section 22(a) of the CEA, a plaintiff has standing to bring a commodities manipulation action only if he has suffered "actual damages" as a result of defendant's manipulation. 7 U.S.C. § 25(a)(1). "The term 'actual damages' has been applied by courts in a straightforward manner to require a showing of actual injury caused by the violation." Ping He (Hai Nam) Co. Ltd. v. NonFerrous Metals (U.S.A.) Inc., 22 F. Supp. 2d 94, 107 (S.D.N.Y. 1998), vacated on other grounds, 187 F.R.D. 121 (S.D.N.Y. 1999) (ruling that, "[e]ven if [defendant] violated every provision of the CEA or the CFTC rules, under the express language of § 22, [plaintiff] is only authorized to bring suit, and can only recover, for those violations that caused [plaintiff] to suffer 'actual damages'" (quoting 7 U.S.C. § 25(a))).

Here, the exchange-based plaintiffs have not adequately pleaded that they suffered actual damages as a result of the newly alleged trader-based conduct.[17]  In contrast to the alleged persistent suppression of LIBOR that was the sole basis for plaintiffs' Amended Consolidated Class Action complaint, the day-to-day, trader-based LIBOR manipulation that is the basis for plaintiffs' new allegations was episodic and varying in direction.  That is, it consists of a number of discrete instances of allegedly false LIBOR submissions, and those submissions were, at times, artificially high and, at other times, artificially low.  See, e.g. Exchange-Based Pls.' PSAC ¶¶ 183-217.  To plead actual damages based on such manipulation, plaintiffs would need to allege that the resulting artificiality in LIBOR caused them injury, in light of their trading of Eurodollar futures contracts.

Plaintiffs have failed to meet this burden.  In the PSAC, plaintiffs do not include any allegations that make plausible (1) that they transacted in Eurodollar futures contracts on days on which Eurodollar futures contract prices were artificial as a result of trader-based manipulation of LIBOR, or (2) that their

---

[17] We would note from the outset that plaintiffs' allegations of trader-based manipulation of three-month USD LIBOR do not implicate every defendant, but rather are essentially confined to Barclays.

positions were such that they were injured.[18]   Cf. In re Energy Transfer Partners Natural Gas Litig., No. 4:07-cv-3349, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009) (requiring plaintiffs, in order to allege actual damages under the CEA, to show an overlap between the time period during which the manipulation occurred and the period during which plaintiffs traded their contracts). Indeed, despite the fact that plaintiffs indisputably have access to their own Eurodollar futures contract trading records, the PSAC is devoid of any references to particular Eurodollar contracts.[19]   See Tr. 38-41, 45.   Rather than plead with such specificity, plaintiffs have simply alleged that each of the named plaintiffs "traded on-exchange based products tied to

---

[18] Although plaintiffs' argument that "[t]he inquiry on a CEA manipulation claim must be on the existence of artificial prices, not whether prices were artificially high or artificially low," Pls.' Reply Mem. of Law in Supp. of Exchange-Based Pls.' Mot. for Leave to Amend as to CEA Claims and File the Second Am. Consol Class Action Compl. 16, is correct with regard to pleading the elements of a commodities manipulation claim,  it is not correct with regard to pleading CEA standing, for which actual damages are required. Whereas a CEA claim brought by the CFTC is focused wholly on defendants' conduct, such that the injury suffered by individual traders is irrelevant, a CEA claim brought by private plaintiffs pursuant to section 22 is focused both on defendants' conduct and on whether that conduct caused plaintiffs' injury.   As seems almost tautological, moreover, the issue of whether plaintiffs were harmed by defendants' alleged manipulative conduct, which caused the price of Eurodollar futures contracts to be either artificially high or artificially low, must turn, at least in part, on whether plaintiffs' positions were such that plaintiffs were benefited by the manipulation or harmed by it.

[19] At oral argument, plaintiffs' counsel stated that, while plaintiffs could have alleged the particular Eurodollar contracts they traded, they did not do so because they did not think it necessary.   Tr. 50.   We are skeptical that plaintiffs' motivation for failing to identify their particular Eurodollar futures contracts was in fact so innocent.   At any rate, for the reasons set forth herein, which we note cannot come as any great surprise to plaintiffs' counsel, we reject the notion that it is unnecessary here to plead the particular contracts on which plaintiffs were allegedly harmed.

LIBOR such as Eurodollar futures" during the Class Period, Exchange-Based Pls.' PSAC ¶¶ 20-27, and that the members of the proposed class "transacted in Eurodollar futures and options on Eurodollar futures on exchanges such as the CME [during the Class Period] and were harmed by Defendants' manipulation of LIBOR," id. ¶ 502.   However, because the alleged trader-based manipulation did not occur on every day of the Class Period, but rather on only a subset of those days -- a subset that plaintiffs can, at least in part, identify -- and because the alleged manipulation on any given day went in a particular direction -- a direction which, again, plaintiffs can, at least in part, identify[20] -- and thus would have harmed only those entities with certain positions, the broad allegations plaintiffs have offered are insufficient to allege actual damages.

To elucidate this point, we can contrast plaintiffs' persistent suppression theory, where we found plaintiffs' pleading sufficient, with their trader-based manipulation theory, where we do not.   In evaluating the persistent suppression allegations in plaintiffs' first amended complaint,

---

[20] Although "plaintiffs could not have known the 'true' level of any LIBOR quote[ and thus] could not have pleaded, consistent with Rule 11, precisely which quotes were inaccurate and by how much," Mar. 29 Order, 2013 WL 1285338, at *39, the Barclays settlements reveal, for at least some of the days on which Barclays' alleged trader-based manipulation occurred, in which direction LIBOR was manipulated (and thus which positions would have been harmed).

we did not require plaintiffs to allege the specific days on which they traded because LIBOR, and consequently Eurodollar futures prices, was allegedly artificial throughout the Class Period.  Here, by contrast, the proposed trader-based claims, even if accepted, would entail only that LIBOR was artificial for certain discrete days during the Class Period, and thus the allegation that plaintiffs traded during the Class Period is insufficient to show that plaintiffs suffered actual damages. With regard to alleging plaintiffs' positions, we relaxed the requirement in the persistent suppression context because plaintiffs could not be expected to know how LIBOR compared to "true LIBOR" on any given day (as opposed to whether LIBOR was artificial on average over a period of time).  In the trader-based manipulation context, however, the Barclays allegations suggest, for at least some of the days on which manipulation occurred, in which direction LIBOR deviated from "true LIBOR." Thus, whereas we could not expect plaintiffs to allege how their specific positions were negatively affected by persistent suppression of LIBOR, we can expect plaintiffs to allege how their positions were negatively affected by trader-based manipulation.

Contrary to plaintiffs' assertion, see Pls.' CEA Reply 17, this analysis does not involve an application of the loss causation principles established in Dura Pharmaceuticals, Inc.

v. Broudo, 544 U.S. 336 (2005).  As we explained in the March 29 Order, Dura established that "where plaintiffs' injury results from defendants' dissemination of false information, 'an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.'"  Mar. 29 Order, 2013 WL 1285338, at *40 (quoting Dura, 544 U.S. at 342). Interpreting the cases decided in the wake of Dura, we concluded:

> [I]f the manipulation alleged here is analogous to isolated artificial stock purchases, we can presume that plaintiffs suffered damages based on an inflated purchase price [because we can presume that the artificiality dissipated soon after plaintiffs' purchase].  If, however, the manipulation is more akin to disseminating inaccurate information, plaintiffs need to show that they sold or settled their Eurodollar contracts at a loss [because we cannot presume that artificiality resulting from inaccurate information will dissipate on its own].

Id.  We found that persistent suppression "is less like isolated manipulative activity and more like disseminating false information."  Id. at *41.  To the extent that they assert claims based on persistent LIBOR suppression, therefore, plaintiffs will be required to show that they sold their Eurodollar contracts at a loss; at the pleading stage, we found their allegations sufficient in light of their limited access to information.  See id. at 41-42.

By contrast, the trader-based conduct described in the Barclays settlement documents falls squarely in the category of

isolated (though repeated) manipulative activity.  As such, we can presume that the effect of the manipulation dissipated, see id. at *40, and plaintiffs need only allege that they engaged in a transaction at a time during which prices were artificial as a result of defendants' alleged trader-based manipulative conduct, and that the artificiality was adverse to their position.  As discussed above, however, plaintiffs have not even alleged this.

Finally, although plaintiffs asserted at oral argument that the trader-based manipulation was sufficiently frequent to render the Eurodollar futures market artificial for the duration of the Class Period, Tr. 27-28, 46-52, this claim is not supported by the facts.  As alleged in the PSAC: "[b]etween January 2005 and May 2009, at least 173 requests for USD-LIBOR submissions were made to Barclays' Submitters."  Exchange-Based Pls.' PSAC ¶ 195.  Of these 173 requests, 111 were made between January 3, 2006, and August 6, 2007.  Id.  The United Kingdom Financial Services Authority ("FSA") found that, of these 111 requests, "on around 70% of those occasions, the submissions were consistent with the traders' request."  Id. ¶ 196. Although plaintiffs have not alleged how frequently the remaining 62 requests affected LIBOR submissions, we can assume the 70% rate here, as well.  Thus, plaintiffs' allegations indicate the following: between January 2005 and May 2009, 121 LIBOR submissions were artificial as a result of trader-based

manipulation; between January 3, 2006, and August 6, 2007, 78 were; and, between August 7, 2007, and May 2009, at most 43 were.

Assuming that there are roughly 250 trading days per year,[21] we can calculate the approximate frequency of trader-based manipulation during the Class Period.  Between January 2005 and May 2009, LIBOR submissions were artificial roughly 11% of the time; in the narrower period between January 3, 2006, and August 6, 2007, submissions were artificial roughly 20% of the time; and, between August 7, 2007, and May 2009, LIBOR was artificial, at most, roughly 10% of the time.  Taking these numbers at face value, we cannot say that the alleged trader-based manipulation was so constant that plaintiffs adequately plead actual damages by alleging merely that they traded during the Class Period. Moreover, there is no indication that the alleged manipulation was evenly spaced throughout the relevant time periods; given the possibility that the manipulation was concentrated in certain weeks or months, it is even less likely that plaintiffs' generalized allegations demonstrate actual damages.

---

[21] In 2013, the CME Group recognized 11 holidays.  CME Group, CME Group Holiday Calendar, http://www.cmegroup.com/tools-information/holiday-calendar/ (last visited Aug. 23, 2013).  Assuming roughly 104 weekend days per year, there are 250 days on which Eurodollars futures contracts could be traded on the CME.  (We recognize that "[o]n CME Group recognized holidays, open outcry trading and CME Globex trading observe different opening and closing times, depending on markets traded," id., and that our calculation of 250 trading days is a simplification.  Nonetheless, it will do for present purposes.)

To whatever extent the foregoing analysis has failed to discredit plaintiffs' pleading of actual damages, a footnote in the FSA's report delivers the coup de grâce. Explaining its methodology for calculating 173 requests between January 2005 and May 2009, the FSA stated:

> If more than one request was contained in the same communication, these have been counted separately. For example, a request for a "high 3 month and low 6 month" would be counted as two requests. A request for a "high 3 month for the next two days" would also be counted as two requests. A request for "high" or "low" submissions which did not specify a particular maturity would be counted as three requests (for one month, three month and six month submissions) unless the context of the communication indicates otherwise.

FSA Barclays Final Notice (June 27, 2012), ¶ 56(i) n.15, Ex. C, Porpora Decl. In other words, although Eurodollar futures contract prices are based solely on 3-month U.S. dollar LIBOR, the FSA included in its analysis requests relating to one-month and six-month LIBOR.[22] Not only does this methodology suggest that the frequencies calculated above might significantly overstate how often three-month LIBOR was artificial, but it also introduces an indefiniteness into plaintiffs' pleading that precludes their argument that Eurodollar futures prices were artificial for essentially all of the Class Period. Deprived of this argument, plaintiffs cannot justify their failure to show

---

[22] With regard to the 111 requests between January 3, 2006, and August 6, 2007, the FSA similarly failed to distinguish among different tenors, referring instead simply to "requests . . . relating to US dollar LIBOR submissions." FSA Final Notice (June 27, 2012), ¶ 71(i).

that their trading in Eurodollar futures was such that they suffered actual damages from defendants' alleged misconduct.[23]

### 4. Conclusion

The exchange-based plaintiffs have not adequately pleaded that they suffered actual damages from defendants' alleged trader-based manipulation of Eurodollar futures contract prices. Therefore, plaintiffs are denied leave to amend their complaint to add allegations of such manipulation. Separately, it appears that the exchange-based plaintiffs are seeking to amend their complaint in other ways relevant to their CEA claims. Among these proposed amendments is their naming of Societe Generale as a defendant, as well as their new allegations stating more explicitly that (almost) every defendant, or its affiliate, traded in Eurodollar futures contracts. These proposed amendments do not appear to be opposed. Accordingly, the exchange-based plaintiffs shall submit, by September 10, 2013, a version of the PSAC that contains only those allegations consistent with the holdings herein.

Finally, we would note that defendants advanced arguments in opposing plaintiffs' motion to amend that appear to be aimed

---

[23] Obviously, we could not expect plaintiffs to connect their trading to instances of manipulative conduct that occurred on dates that are still not publicly available. However, the Barclays settlement documents do identify the dates and circumstances of a number of instances of alleged manipulative conduct. To plead actual damages, plaintiffs would have needed to show that, at least for some of these instances, their Eurodollar futures trading was such that they suffered damages from defendants' conduct.

at seeking reconsideration of our March 29 Order. Specifically,
whereas we had dismissed only those "persistent suppression"
claims based on contracts entered into during "Period 1," from
August 2007 through May 29, 2008, defendants seem to be arguing
now that we should also dismiss "persistent suppression" claims
based on contracts entered into at other times. Whether or not
this was defendants' intention, we are not prepared to dismiss
claims we previously declined to dismiss based on arguments
contained in an opposition to a motion to amend. If defendants
intend to seek reconsideration of our March 29 Order on statute
of limitations grounds, or intend to submit a renewed motion to
dismiss regarding "Period 2" claims, they may move for leave to
file such a motion by September 20, 2013.

### D. Plaintiffs' Motion to Amend Their Antitrust Claims

In the March 29 Order, we dismissed plaintiffs' antitrust
claims because plaintiffs failed to plead antitrust injury and
thus lacked standing to bring claims pursuant to the Clayton
Act. See Mar. 29 Order, 2013 WL 1285338, at *10-*19. In
response, the OTC, exchange-based, and bondholder plaintiffs
have moved to amend their respective complaints, principally to
add allegations addressed to antitrust injury.

As discussed above, although "[t]he court should freely
give leave [to amend] when justice so requires," Fed. R. Civ. P.

15(a)(2), we "ha[ve] discretion to deny leave [to amend] for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." Holmes v. Grubman, 568 F.3d 329, 334 (2d Cir. 2009) (quoting McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007)).  "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)." Lucente v. Int'l Business Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002) (citing Dougherty v. N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002)).

     For the two independent reasons discussed below, plaintiffs' motion for leave to amend is denied.

### 1. Given the Circumstances of this Case, Amendment Would Not Be Proper

     In light of the history and circumstances of this case, justice does not require us to afford plaintiffs yet another opportunity to amend.  Each of plaintiffs' first amended complaints[24] asserted a cause of action for violation of section 1 of the Sherman Act.  These amended complaints, which ranged in length from 211 to 253 paragraphs, resulted from the consolidation of twenty original complaints, and were filed following a fierce competition for appointment as class counsel. Indeed, our decision appointing class counsel reflected that we

---

[24] For purposes of the present analysis, we do not address the complaints filed by the Schwab plaintiffs, who have not sought leave to replead.

had then been persuaded that all of the firms competing to be class counsel "have extensive experience in complex litigation," "have adequate knowledge of the applicable law," "would each devote significant resources to prosecuting plaintiffs' claims," and, finally, "have demonstrated that they have thoroughly investigated the relevant claims." In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MD 2262 (NRB), 2011 WL 5980198, at *3 (S.D.N.Y. Nov. 29, 2011). We appointed Hausfeld and Susman Godfrey as interim class counsel for the OTC plaintiffs and Kirby McInerney and Lovell Stewart as interim class counsel for the exchange-based plaintiffs, id. at *4; the bondholder plaintiffs, who filed later, are represented by Weinstein Kitchenoff & Asher and Morris & Morris. In short, the allegations in the first amended complaints not only drew on the work of twenty sets of plaintiffs and plaintiffs' counsel, but also presumably represented the best efforts of six highly experienced firms to state a viable claim.

At the time that the first amended complaints were filed, it was widely projected that damages in this case might reach billions of dollars. See Mark Gongloff, Libor Scandal May Cost Banks $35 Billion: Study, Huffington Post (July 17, 2012), http://www.huffingtonpost.com/2012/07/17/libor-scandal-cost-banks_n_1680764.html; Halah Touryalai, Libor Lawsuits Are Piling Up and Could Cost Billions, Banks Brace for Another Big Legal

Battle, Forbes (July 12, 2012),
http://www.forbes.com/sites/halahtouryalai/2012/07/12/libor-
lawsuits-are-piling-up-and-could-cost-billions-banks-brace-for-
another-big-legal-battle/; Alistair Osborne, <u>Banks Face</u>
<u>Crippling Libor Litigation Costs: Britain's Banks Face Costs</u>
<u>Running into Tens of Billions of Pounds from the Libor Scandal</u>
<u>if US Litigants Prove They Were the Victims of Four Years of</u>
<u>Mispricing, City Experts Have Warned</u>, Telegraph (June 28, 2012),
http://www.telegraph.co.uk/finance/newsbysector/banksandfinance/
9363260/Banks-face-crippling-Libor-litigation-costs.html; <u>see</u>
<u>also</u> OTC Pls.' Consol. Am. Compl. ¶ 6 ("By acting together and
in concert to knowingly understate their true borrowing costs,
Defendants caused LIBOR to be calculated or suppressed
artificially low, reaping hundreds of millions, if not billions,
of dollars in ill-gotten gains.").

In sum, given the competition to become interim lead
counsel, which revealed the experience of the competitors; the
number of original complaints that had been filed; and, the
obvious motivation to craft sustainable first amended complaints
containing all factual and legal allegations that supported
plaintiffs' claims, the Court was entitled to rely on these
pleadings to contain the strongest possible statement of
plaintiffs' case based on the collective skills of plaintiffs'
counsel.

The subject of plaintiffs' motions to amend, namely antitrust injury, figured prominently in the case after the filing of the first amended complaints, being presented clearly and repeatedly as a flaw in the pleading of plaintiffs' complaints.   In their motion papers filed on June 29, 2012, defendants argued that plaintiffs' amended complaints should be dismissed because, inter alia, they failed to allege antitrust injury.   See Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pls.' Antitrust Claims 26-27.   Although plaintiffs thereafter submitted a letter to the Court on August 1, 2012, seeking leave to amend, primarily on the basis of information contained in the Barclays settlements, there was no indication in plaintiffs' letter that the proposed amendments would bolster plaintiffs' allegations of antitrust injury.   When plaintiffs perfunctorily reiterated their request for leave to amend in their opposition to defendants' motion to dismiss the antitrust claims, they again did not indicate that new allegations would remedy any previous defects regarding antitrust injury.   See Pls.' Joint Mem. of Law in Opp'n to Defs.' Mot. to Dismiss Pls.' Antitrust Claims 36-38, 52-53.   Finally, the issue of antitrust injury featured prominently in the oral argument held on March 5, 2013, and a concession by plaintiffs' counsel that the LIBOR-setting process is not competitive was the topic of significant discussion.   Yet, despite being squarely on notice that the

Court considered antitrust injury a serious and, indeed, threshold issue, plaintiffs did not seek to amend their complaint to strengthen their pleading of antitrust injury until after we issued the 161-page March 29 Order.[25]

Whatever might be the appropriate result in other cases, here, justice does not require us to permit plaintiffs to file a second amended complaint. Indeed, just the opposite. This is surely a case in which "the defendants and the Court were entitled to the plaintiffs' best effort at presenting their claims in response to the objections raised by the defendants." In re Eaton Vance Mut. Funds Fee Litig., 403 F. Supp. 2d 310, 318 (S.D.N.Y. 2005). Further, it would be unacceptable to allow plaintiffs, after failing to seek to amend their complaints with regard to antitrust injury in response to defendants' motion and after tremendous effort was expended by defendants and the Court in considering and ruling on the motions to dismiss, to seek to plug the holes in their complaints identified by the March 29 Order. Plaintiffs "[are] not entitled to an advisory opinion from the Court informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies." Id. (quoting PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 699 (6th Cir. 2004) (internal quotation marks omitted). Indeed, to

---

[25] That decision followed briefing that exceeded 330 pages (exclusive, of course, of complaints and declarations).

permit amendment here might have the perverse effect of turning defense counsel and the Court into plaintiffs' counsel's co-counsel, with plaintiffs waiting to see what objections defendants raise and how the Court rules on those objections and then amending their complaint as necessary based on what they learned in the process.  Especially in a case of this magnitude, with so much at stake and with enormous expenditure of resources by defendants and the Court, that is an unacceptable way to operate a system of justice.  Nor is this a situation, as with pro se parties, where either plaintiffs or their counsel (who will, if they prevail, seek to have their fees paid by defendants) are deserving of any special solicitude.

Finally, it must emphasized that essentially none of the allegations plaintiffs put forward with regard to antitrust injury rest on new facts that plaintiffs could not have pleaded before.  Indeed, after receiving plaintiffs' letter of August 1, 2012, we permitted plaintiffs to rely on the Barclays settlement documents in opposing defendants' motions to dismiss, and, although settlements involving UBS and RBS have since come to light, these settlements do not advance plaintiffs' antitrust injury argument in any way that the Barclays settlement did not. Plaintiffs' new antitrust injury allegations mostly involve reframing previously known facts in an attempt to remedy the

defects we identified on the fundamental issue of antitrust standing.

### 2. Plaintiffs' Proposed Amendments Would Be Futile

Even if we did not find plaintiffs' effort to amend their complaints for a second time with regard to antitrust standing to be wholly unwarranted in these circumstances, we would deny them leave to amend because the proposed amendment would be futile. Specifically, even taking into account plaintiffs' proposed allegations, plaintiffs do not adequately plead antitrust injury.

The issue of antitrust injury was thoroughly examined in the March 29 Order, and we stand by our reasoning in that opinion. As we stated there, antitrust injury is an injury "attributable to an anticompetitive aspect of the practice under scrutiny." Mar. 29 Order, 2013 WL 1285338, at *11 (quoting Atl. Richfield Co. v. USA Petroleum Co. ("ARCO"), 495 U.S. 328, 334 (1990)) (internal quotation marks omitted). The injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation," id. (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)), and it must involve "loss [that] stems from a competition-reducing aspect or effect of the defendant's behavior," id. (quoting ARCO, 495 U.S. at 344).

Here, after careful review of the allegations in plaintiffs' proposed second amended complaints, we conclude that none of plaintiffs' new allegations change the outcome reached in the March 29 Order. Plaintiffs' allegations include new ways of packaging previously known facts, such as arguing that the LIBOR-setting rules themselves give rise to competition, and new theories for how defendants compete, such as that they compete over their creditworthiness, that they compete to offer customers the best interest rate benchmark on financial instruments, or that they compete by "keeping other banks honest" and reporting any improper conduct by them. However, regardless of the creativity they display, none of plaintiffs' allegations make plausible that there was an arena in which competition occurred, that defendants' conduct harmed such competition, and that plaintiffs suffered injury as a result. Even where plaintiffs have identified a market in which defendants are, in fact, competitors, they have not plausibly alleged that each defendant failed to act in its independent individual self-interest. In other words, even if we grant that plaintiffs have alleged a vertical effect -- that they suffered harm as a result of defendants' conduct -- they have not plausibly alleged a horizontal effect -- that the process of competition was harmed because defendants failed to compete with

each other or otherwise interacted in a manner outside the bounds of legitimate competition.

Therefore, both because amendment would not be proper in the circumstances of this case and because plaintiffs' new allegations would be futile, plaintiffs are denied leave to amend their antitrust claims.

### E. State Law Claims

In their first amended complaint, the OTC plaintiffs asserted a single state-law claim for unjust enrichment and restitution. OTC Pls.' Consol. Am. Compl. ¶¶ 227-30. Because we dismissed the OTC plaintiffs' antitrust claim -- their only other asserted claim for relief -- we declined to exercise supplemental jurisdiction over their state-law claim.[26] Mar. 29 Order, 2013 WL 1285338, at *58-*59.

Since the March 29 Order was issued, plaintiffs have taken the position, despite the fact that they had not previously relied on diversity jurisdiction at all, that subject matter jurisdiction based on the Class Action Fairness Act of 2005 ("CAFA"), in fact, exists. Pls.' Mem. of Law in Supp. of Their Mot. for Leave to File Proposed Consol. Second Am. Compl. 14-15.

---

[26] We also noted that, "[a]lthough it [was] conceivable that we could retain jurisdiction over [plaintiffs' state-law] claim by virtue of diversity of citizenship," we did not need to consider this ground for jurisdiction because "plaintiffs ha[d] not pleaded that this Court has diversity jurisdiction over their state law claim, nor ha[d] they alleged facts that would support our exercise of diversity jurisdiction." Mar. 29 Order, 2013 WL 1285338, at *58 n.23.

Defendants agree.  See Defs.' Mem. of Law in Opp'n to OTC Pls.' Request for Leave to Amend State Law Claims 1 [hereinafter Defs.' State Law Opp'n].  As do we: this is a case in which at least one member of the putative class is diverse from at least one defendant, 28 U.S.C. § 1332(d)(2) (2006); the matter in controversy plausibly exceeds the sum of $5,000,000, id.; and, the number of members of the proposed plaintiff class exceeds 100, id. § § 1332(d)(5)(B).  Further, the exceptions to CAFA jurisdiction do not seem to apply.  Therefore, we may assert jurisdiction over the OTC plaintiffs' proposed state-law causes of action.

As discussed above, Rule 15(a) provides that a second amended complaint may be filed "only with the opposing party's written consent or the court's leave," though "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  We "ha[ve] discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  Holmes v. Grubman, 568 F.3d 329, 334 (2d Cir. 2009) (quoting McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007)).

Here, plaintiffs seek to reassert their unjust enrichment claim, Pls.' Second Consol. Am. Compl. ¶¶ 389-92, Ex. A, Pls.' Mem. of Law in Supp. of Their Mot. for Leave to File Proposed Consol. Second Am. Compl. [hereinafter OTC Pls.' PSAC], and to

plead a new claim for breach of contract, based primarily on defendants' alleged breach of the implied duty of good faith and fair dealing, id. ¶¶ 375-88. Defendants argue that we should deny plaintiffs leave to make these amendments because the amendments are futile and because plaintiffs' delay in seeking to amend is inexcusable.

Unlike in the antitrust context, we do not believe that considerations of bad faith, undue delay, or undue prejudice to defendants require us to deny plaintiffs leave to amend regarding their state-law claims.[27]  For the reasons stated below, moreover, we also do not believe that futility mandates that we deny plaintiffs leave to amend, though our decision is without prejudice to a motion by defendants to dismiss any second amended complaint.

Although we grant plaintiffs' motion, we are concerned that plaintiffs failed to include contract claims in their first amended complaint. Our concern was not alleviated during oral argument, as, despite questioning, no adequate explanation was proffered by plaintiffs' counsel. We note further that this failure has the consequence of further delaying the

---

[27] We would note that, in their letter to the Court of August 1, 2012, submitted after defendants filed their motions to dismiss but before plaintiffs filed their opposition papers, plaintiffs requested leave to amend to add, inter alia, new causes of action.  In this respect, plaintiffs' present request to amend is differently situated from their request to add allegations to cure their amended complaint's defects relating to antitrust injury, which plaintiffs did not seek to do, despite being on notice of the issue since at least June 2012, until after we issued the March 29 Order.

determination of the contours of the complaint -- a delay that obviously is not to plaintiffs' advantage.

### 1. Unjust Enrichment

Plaintiffs reassert their claim for unjust enrichment, over which we previously declined to exercise jurisdiction.  In the March 29 Order, we considered the elements of an unjust enrichment claim in the context of addressing the exchange-based plaintiffs state-law claim.  As we stated there: "Under New York law, '[t]he theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.'"  Mar. 29 Order, 2013 WL 1285338, at *60 (quoting Georgia Malone & Co. v. Rieder, 19 N.Y.3d 511, 516 (2012)).  To state a claim for unjust enrichment, a plaintiff must allege that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."  Id. (quoting Georgia Malone, 19 N.Y.3d at 516) (internal quotation mark omitted).

Based on the present record, we cannot conclude that plaintiffs' unjust enrichment claim would be futile.  Plaintiffs have alleged that they purchased financial instruments from defendants wherein they paid defendants fixed sums and received in return a floating amount tied to LIBOR.  OTC Pls.' PSAC

¶¶ 12-13, 35.   Additionally, plaintiffs have alleged that defendants "knowingly understate[d] their true borrowing costs" during the Class Period and thereby "caused LIBOR to be calculated or suppressed artificially low."  Id. ¶ 5.   This conduct allegedly "allowed [defendants] to pay unduly low interest rates to investors, including Baltimore Plaintiffs, on LIBOR-based financial instruments during the Class Period."  Id. ¶ 8.   In short, plaintiffs have alleged that defendants were enriched at their expense by receiving from plaintiffs fixed sums set based on an "accurate" LIBOR, see id. ¶ 336, and paying plaintiffs floating amounts that were artificially low due to defendants' alleged manipulation of LIBOR.   Further, plaintiffs plausibly allege that it would be inequitable to permit defendants to retain the rewards they reaped at plaintiffs' expense.   Although plaintiffs had entered into their swap agreements with the "expectation that the floating payments [they] would receive over the life of the contract would be calculated based on LIBOR submissions that conformed to the LIBOR definition, an accurate measure of interbank borrowing costs," id., defendants allegedly manipulated LIBOR such that it was fixed at a lower level than it would have been at normally, and thereby paid plaintiffs less than they were entitled to receive.   On face, these allegations appear to state a claim for unjust enrichment.

Nonetheless, defendants argue that plaintiffs' claims are barred because their relationships with defendants were governed by contract.  Under New York law, the cause of action of unjust enrichment does not lie "where the parties have entered into a contract that governs the subject matter" at issue.  Pappas v. Tzolis, 20 N.Y.3d 228, 234 (2012) (quoting Cox v NAP Constr. Co., 10 N.Y.3d 592, 607 (2008)) (internal quotation mark omitted).  Here, defendants contend that the contracts between plaintiffs and defendants "govern the consideration for the financial instruments [plaintiffs] purchased, and thus their claim for unjust enrichment fails as a matter of law."  Defs.' Mem. of Law in Opp'n to OTC Pls.' Request for Leave to Amend State Law Claims 4 [hereinafter Defs.' State Law Opp'n].

We are not convinced.  "[T]he predicate for dismissing quasi-contract claims is that the contract at issue 'clearly covers the dispute between the parties.'"  Union Bank, N.A. v. CBS Corp., No. 08 Civ. 8362 (PGG), 2009 WL 1675087, at *7 (S.D.N.Y. June 10, 2009) (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389 (1987)); see also id. at *8 (declining to dismiss unjust enrichment claim where there was a chance that "resolution of th[e] dispute [would] require[] going outside the four corners of the parties' agreements").

Here, although the swap contracts clearly required defendants to pay plaintiffs the prescribed floating rate of

return using the LIBOR reported by the BBA, the contracts did not "clearly cover[]" the subject matter now at issue,[28] namely whether defendants were permitted to manipulate LIBOR itself and thereby depress the amount they were required to pay plaintiffs.[29]   As such, the existence of plaintiffs' swap agreements with defendants does not bar plaintiffs' unjust enrichment claim.

Defendants also argue that plaintiffs' pleading of unjust enrichment is insufficient because plaintiffs' allegations do not show that defendants reaped a "net gain" at the expense of plaintiffs' "net loss."   <u>See</u> Defs.' State Law Opp'n 5-6.   In support of this argument, defendants cite <u>Maryland Casualty Co. v. W.R. Grace and Co.</u>, 218 F.3d 204 (2d Cir. 2000), which involved a dispute among insurers of a manufacturer of asbestos-containing products, in which insurers who had settled with the

---

[28] Defendants surely overreach when they argue that plaintiffs' unjust enrichment claim is barred because the swap contracts govern the subject matter of "the consideration for the financial instruments [plaintiffs] purchased."   Defs.' State Law Opp'n 4.   If a plaintiff could not assert a claim for unjust enrichment based on any conduct by the defendant that affected the "consideration" the plaintiff received under a contract with the defendant, unjust enrichment claims would effectively be barred whenever a contract between the plaintiff and the defendant existed.   Such a result, though possibly to defendants' liking, is not countenanced by New York law.

[29] Importantly, the question we face here is distinct from that we face in deciding whether plaintiffs may add a new claim for breach of the implied duty of good faith and fair dealing.   In evaluating whether plaintiffs may add their contract claim, we ask whether plaintiffs have <u>plausibly</u> alleged that a duty not to manipulate LIBOR was implicit in the swaps contracts.   By contrast, in evaluating whether plaintiffs may reassert their unjust enrichment claim, we ask whether the swaps contracts <u>clearly</u> govern whether defendants are permitted to submit artificial LIBOR quotes to the BBA.   Apart from how we answer the former question, we answer the latter question in the negative.

manufacturer early on sought reimbursement of covered litigation defense costs from insurers who settled subsequently.  Id.  The earlier-settling insurers had argued that the later-settling insurers had been unjustly enriched because they "simply sat back and waited until the early settling insurers paid amounts that settled [the manufacturer]'s claim for defense costs accruing prior to the [early] settlements."  Id. at 212.

The Second Circuit rejected this argument.  Although the early settlements entered into by plaintiffs forced them to cover the insured's then-incurred defense costs, they also absolved plaintiffs of responsibility for later defense costs, which were far greater, and allowed plaintiffs to pay out their indemnity limits before defense costs sharply escalated.  Id. at 213.  Therefore, "it [could not] be determined whether (overall) [plaintiffs] paid more in combined indemnity and defense payments as a result of the non-contribution of [defendants], or whether (overall) [plaintiffs] paid less."  Id.  Combined with the fact that the decision of when to settle was inherently risky and involved some amount of benefit and some amount of harm, the Circuit concluded that defendants had not been unjustly enriched.  Id.

Maryland Casualty is plainly distinguishable.  In that case, the issue was not whether defendants had been unjustly enriched through transactions directly with plaintiffs, but

rather whether defendants had paid less than their fair share to the insured manufacturer and therefore should be compelled to reimburse plaintiffs.  In light of this, the relevant comparison was necessarily between the overall amount plaintiffs paid the insured, in fact, and the overall amount plaintiffs would have paid had defendants settled earlier.  Here, by contrast, plaintiffs entered into swap contracts directly with defendants, and the allegation is that defendants benefited at plaintiffs' expense by paying plaintiffs less on those contracts.  Maryland Casualty is inapposite to these facts.[30]

For the foregoing reasons, we are not convinced that the OTC plaintiffs' requested amendment would be futile.  Thus, although we do not preclude defendants from moving to dismiss any unjust enrichment claim asserted in a second amended complaint, we will permit plaintiffs to make such an amendment.

---

[30] Defendants also argue that plaintiffs have failed to satisfy Rule 9(b)'s requirements of pleading fraud with particularity.  We disagree, for substantially the reasons given in the March 29 Order for why the exchange-based plaintiffs had satisfied Rule 9(b).  See Mar. 29 Order, 2013 WL 1285338, at *39-*40.  With regard to the one requirement of Rule 9(b) that is different between the OTC and the exchange-based claims, alleging the effect that defendants' scheme had on the market at issue, here the OTC plaintiffs have alleged, as discussed above, that the contracts they entered into with defendants paid a floating rate of return based on LIBOR, such that manipulation of LIBOR directly affected defendants' payments on those contracts.

## 2. Breach of the Implied Duty of Good Faith and Fair Dealing

The OTC plaintiffs seek to add a new claim for breach of the implied covenant of good faith and fair dealing.[31]  Under New York law, "a covenant of good faith and fair dealing in the course of contract performance" is "[i]mplicit in all contracts."  <u>Dalton v. Educ. Testing Serv.</u>, 87 N.Y.2d 384, 389 (1995) (citing <u>Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.</u>, 30 N.Y.2d 34, 45 (1972)).  The implied covenant of good faith and fair dealing obligates a promisor to fulfill "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the contract.  <u>Id.</u> (quoting <u>Rowe v Great Atl. & Pac. Tea Co.</u>, 46 N.Y.2d 62, 69 (1978)) (internal quotation marks omitted).  Specifically, implied in every contract is a promise

---

[31] Plaintiffs style this claim: "Breach of Contract and Implied Covenant of Good Faith and Fair Dealing."  OTC Pls.' PSAC, at 157.  Although plaintiffs focus this claim on breach of the implied duty, they also allege that "Defendants' collusion to manipulate the LIBOR rate also breached the contractual term that provided that Plaintiffs would receive payments that were based on the LIBOR definition."  <u>Id.</u> ¶ 387.  However, plaintiffs have not alleged an explicit term in their swap contracts that required the benchmark used to calculate the floating amount to be based on the LIBOR definition.  <u>See</u> Tr. 65, 69-71.  The contracts' provision that the floating rate would be based on "USD-LIBOR-BBA," OTC Pls.' PSAC ¶¶ 377, 379, though it may give rise to an implied duty, is not such an explicit term.  Moreover, given that LIBOR is, by definition, an average of eight banks' submissions to the BBA, no one bank could possibly guarantee that a particular LIBOR fix was determined in a manner that wholly complied with the BBA's rules.  Therefore, plaintiffs cannot state a claim for breach of an explicit contractual provision, and our analysis here will focus instead on whether they can state a claim for breach of the implied covenant of good faith and fair dealing.

that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Id. (quoting Kirke La Shelle Co. v Armstrong Co., 263 N.Y. 79, 87 (1933)) (internal quotation marks omitted); see also LJL 33rd St. Assocs., LLC v. Pitcairn Properties Inc., Nos. 11-5425-cv, 12-1382-cv, 2013 WL 3927615, at *9 (2d Cir. July 31, 2013) ("The implied covenant of good faith and fair dealing bars a party from taking actions 'so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties.'" (quoting Bank of China v. Chan, 937 F.2d 780, 789 (2d Cir. 1991))).  That said, the implied covenant arises "only in connection with the rights or obligations set forth in the terms of the contract," Paul v. Bank of Am. Corp., No. 09-CV-1932 (ENV) (JMA), 2011 WL 684083, at *6 (E.D.N.Y. Feb. 16, 2011); see also Corazzini v. Litton Loan Servicing LLP, No. 1:09-CV-0199 (LEK/RFT), 2010 WL 1132683, at *7 (N.D.N.Y. Mar. 23, 2010) ("[T]he implied obligation is in aid and furtherance of other terms of the agreement of the parties." (quoting Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 304 (1983))), and "cannot create duties that negate explicit rights under a contract," LJL 33rd St. Assocs., 2013 WL 3927615, at *9.

Here, plaintiffs have plausibly alleged that defendants breached the implied covenant good faith and fair dealing.  As

discussed above, plaintiffs allege that they entered into swap contracts with defendants wherein they paid defendants a fixed rate and received in return a floating rate tied to LIBOR.  In entering into these contracts, plaintiffs allege, they expected LIBOR to be set according to its definition, such that it reflected the average interest rate being charged in the London interbank lending market.  Such an expectation would have been integral to the "bet" that is one purpose of entering into a swap: each plaintiff, as the party paying a fixed rate and receiving a floating rate, bet that interest rates would rise over the life of the contract, and each defendant, as the party paying a floating rate and receiving a fixed rate, bet that interest rates would fall.[32]  By allegedly manipulating LIBOR

---

[32] Defendants argue that, for at least some of the plaintiffs, such as the City of Baltimore, the purpose of entering into swap contracts was not to bet on the direction of prevailing interest rates, but rather to hedge against exposure to interest rate fluctuation resulting from other instruments plaintiffs had entered into, with the effect of making plaintiffs floating rate neutral.  Tr. 62-63;  Defs.' State Law Opp'n 6 n.7; Defs.' Mem. of Law in Supp. of Mot. to Dismiss Pls.' Antitrust Claims 32-33.  However, even if this was one of plaintiffs' purposes in entering into the swap contracts, there is no indication that this was any plaintiff's sole purpose; that is, it is not clear that any plaintiff purchased swaps so as to make itself actually floating rate neutral.  There is also no indication that this hedging purpose was held by every plaintiff.  Moreover, even if hedging was any plaintiff's sole purpose in entering into a swap, that does not indicate that the plaintiff sought to be LIBOR-neutral, as opposed to interest-rate-neutral, generally; in other words, the plaintiff's purpose might have been to receive payments tied to prevailing interest rates, as reflected through LIBOR, in order to hedge exposure to both LIBOR and non-LIBOR rates it was paying on other instruments.  Although defendants might be able to establish through discovery that plaintiffs' sole purpose in entering into the swaps was to hedge their exposure to LIBOR, we are not in a position to decide that now.  For present purposes, plaintiffs have sufficiently alleged that one of their purposes in entering into the swaps was to profit from receiving a rate that reflected prevailing interest rates.  See, e.g., OTC Pls.' PSAC ¶ 336 (alleging that the City of Baltimore entered into the swaps with the

downward, such that it was lower than it would have been if set according to its definition, defendants depressed the consideration plaintiffs received pursuant to their contracts and undermined the contractual bargain whereby plaintiffs agreed to pay a certain fixed rate in exchange for receiving a rate that reflected prevailing interest rates.   In other words, plaintiffs have alleged that defendants "injur[ed their right] to receive the fruits of the contract," Dalton, 87 N.Y.2d at 389 (quoting Kirke La Shelle, 263 N.Y. at 87) (internal quotation mark omitted), "so directly . . . impair[ing] the value of the contract for [plaintiffs] that it may be assumed that [defendants' alleged actions] are inconsistent with the intent of the parties." LJL 33rd St. Assocs., 2013 WL 3927615, at *9 (quoting Bank of China, 937 F.2d at 789) (internal quotation marks omitted).   Further, an implied duty not to manipulate LIBOR is "in connection with" plaintiffs' explicit contractual right to receive a LIBOR-based rate, and defendants' obligation to pay such a rate, because manipulation of LIBOR would cause the contractual exchange to depart from what the parties

---

"expectation that the floating payments it would receive over the life of the contract would be calculated based on LIBOR submissions that conformed to the LIBOR definition, an accurate measure of interbank borrowing costs"); id. ¶ 386 (stating that "the purpose of the contracts" was "to make and receive payments based on a LIBOR rate that is set according to the terms of the LIBOR definition").

intended.[33]   Thus, plaintiffs plausibly allege that the duty of
good faith and fair dealing implicit in their contracts with
defendants included a promise by defendants not to manipulate
LIBOR to their benefit and plaintiffs' detriment.

The allegations here are analogous to those in City of New
York v. Coastal Oil New York, Inc., No. 96 Civ. 8667 (RPP), 1999
WL 493355 (S.D.N.Y. July 12, 1999).   In Coastal Oil, the City of
New York had a contract with a fuel oil vendor whereby the City
purchased fuel oil at variable prices adjusted weekly based on
wholesale prices reported in an industry publication.   Id.   The
defendant vendor was one of six companies that submitted prices
to the publication, id. at *3, and, during the life of its
contract with the City, submitted artificially high prices to
the publication which caused the price paid by the City under
the contract to be artificially high.   Id. at *3-*4.   Although
the City's contract with the vendor contained "no explicit
agreement . . . regarding the prices that [the vendor] could
submit to [the industry publication],"[34] id. at *3, the City
brought suit on the theory that the vendor's submission of false

---

[33] Additionally, of course, an implied duty not to manipulate LIBOR does not
"negate explicit rights under [the parties'] contract[s]."   LJL 33rd St.
Assocs., 2013 WL 3927615, at *9.

[34] There also was no "written or oral agreement between [the publication] and
[the vendor] defining the prices [the vendor] could submit to [the
publication]," though the submitted prices were understood to "represent
advertised wholesale asking prices for the date listed in [the publication]
as the effective date."   Coastal Oil, 1999 WL 493355, at *3 & n.4.

wholesale prices constituted a breach of the implied duty of good faith and fair dealing.

The Court held that plaintiffs had raised a genuine issue of material fact precluding summary judgment. Finding that "[t]he purpose of the price adjustment clause . . . [was] to produce a delivered price 'which shall vary with the market . . . according to the method of adjustment," and reasoning that "[t]he delivered price could not vary with market conditions if it was not based on bona fide [published] quotes," the Court concluded that "[t]he artificial manipulation of the [wholesale] price average in [the publication] would prevent the price adjustment clause from accomplishing this essential purpose." Id. at *7. By manipulating the wholesale price it reported to the publication, therefore, the vendor breached its implied duty of good faith and fair dealing.

At oral argument, defendants sought to distinguish Coastal Oil by arguing that, whereas the purpose of the contract there was clearly frustrated by defendant's conduct, here, the purpose of the swap contracts was merely to pay the LIBOR reported by the BBA, which defendants undeniably did. Tr. 61-67. This distinction, however, is not convincing. Although plaintiffs surely expected to be paid at a rate incorporating reported LIBOR, there is no indication that they wanted this merely for its own sake. Rather, as plaintiffs have plausibly alleged,

they expected to be paid at a rate that reflected prevailing interest rates, which LIBOR, as defined, did.  Indeed, as discussed above, one of the purposes of entering into a swap is to bet on the direction prevailing interest rates will move,[35] and this purpose is undermined if the interest rate index incorporated into the contractual payment formula is decoupled from the market through the manipulative conduct of defendants.  Thus, contrary to defendants' arguments, <u>Coastal Oil</u> counsels in favor of granting plaintiffs' motion for leave to amend.

Defendants' additional arguments also fail to convince us that plaintiffs should be denied leave to amend.  Although defendants reprise their contention that plaintiffs have not shown a net loss based on LIBOR suppression in light of their overall exposure to LIBOR, <u>see</u> Defs.' State Law Opp'n 10, this argument is even weaker than it was in the unjust enrichment context, given that, here, our focus is squarely on the individual contracts on which plaintiffs received a floating rate tied to LIBOR and therefore were allegedly harmed when LIBOR was artificially reduced.  Further, even if "the implied covenant of good faith will not be breached without some showing of intent to harm the other contracting party or a reckless

---

[35] For the reasons discussed above, although defendants argue that plaintiffs entered into the swap contracts not to bet on the direction interest rates would move, but rather to hedge their exposure to LIBOR fluctuation, we cannot conclude, on the present record, that this was any plaintiff's sole purpose in entering into the swaps.

disregard of it," Paul v. Bank of Am. Corp., No. 09-CV-1932
(ENV) (JMA), 2011 WL 684083, at *6 (E.D.N.Y. Feb. 16, 2011),
plaintiffs here have plausibly alleged that defendants' alleged
manipulation of LIBOR was at least in reckless disregard of the
detriment to plaintiffs, with whom defendants were in direct
contractual privity.  Finally, despite defendants' argument that
plaintiffs' contract claim is unsuited to class treatment and
that "the implausibility of certification weighs heavily against
permitting the belated addition of a breach of contract claim,"
Defs.' State Law Opp'n 11 (failing to cite any authority for
this proposition), we do not think that class certification
concerns require us to deny the present motion.  Regardless of
whether plaintiffs will ultimately be able to prevail on a class
certification motion, the propriety of class treatment does not
bear on our decision whether to permit plaintiffs to add their
contract claim.

        Defendants have not demonstrated that plaintiffs' proposed
contract claim would be futile.  As with plaintiffs' unjust
enrichment claim, therefore, although we do not preclude
defendants from moving to dismiss any contract claim asserted in
a second amended complaint, we grant plaintiffs leave to add
such a claim.

## F. Stay of Actions Not Subject to the Prior Motions to Dismiss

On August 14, 2012, we issued a Memorandum and Order imposing a stay on all complaints not then subject to defendants' motions to dismiss. In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MD 2262 (NRB), 2012 WL 3578149 (S.D.N.Y. Aug. 14, 2012). On May 3 of this year, we issued a Memorandum in which we stated: "The stay shall remain in place for now with respect to cases that raise issues addressed in our Memorandum and Order [of March 29, 2013]. If there are any complaints that do not raise any such issue, please advise." In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MD 2262 (NRB), 2013 WL 1947367, at *2 (S.D.N.Y. May 3, 2013). In response to that invitation, we have received a number of letters from plaintiffs seeking to lift the stay on their cases. Having reviewed those letters, and in light of the conclusions in the present Memorandum and Order and the fact that the legal landscape of this case, though substantially clarified, is still in somewhat of a state of flux, we think the most prudent course of action is to maintain the stay on all actions previously subject to it. Further, given the magnitude of this multi-district litigation and the fact that the universe of actions encompassed by it continues to expand, we are wary of addressing the individual cases piecemeal rather than

comprehensively.    Therefore,   all   actions   not   subject   to

defendants' previously filed motions to dismiss shall continue

to be stayed, pending further order of the Court.[36]

---

[36] The stay does not apply to the motion to remand in <u>Salix Capital US Inc. v. Banc of America Securities LLC</u>, No. 13 Civ. 4018 (NRB).

### III. Conclusion

For the reasons stated above, the exchange-based plaintiffs' motion for interlocutory appeal is denied; the OTC, bondholder, and exchange-based plaintiffs' motions to add allegations with respect to antitrust are denied; the exchange-based plaintiffs' motion to add allegations with respect to trader-based manipulation is denied; BT-MU, Credit Suisse, and Norinchukin's motion for reconsideration is denied without prejudice to a similar motion being filed by defendants that addresses the issues raised herein; and, the OTC plaintiffs' motion for leave to reassert their unjust enrichment claim and to add a claim for breach of the implied covenant of good faith and fair dealing is granted.

By September 10, 2013, the OTC plaintiffs and the exchange-based plaintiffs shall each file a second amended complaint that conforms with the rulings herein.  If defendants believe that the new complaints are inconsistent with our rulings, they shall inform us by September 20, 2013.  Further, if defendants wish to file a motion for reconsideration on grounds similar to those asserted in BT-MU's, Credit Suisse's, and Norinchukin's motion and which addresses the issues we have raised, they must file such a motion by September 20, 2013.  Finally, if defendants intend to move for reconsideration of the March 29 Order on statute of limitations grounds or to make a renewed motion to

dismiss with regard to "Period 2" claims, they must seek leave to file such a motion by September 20, 2013.

This Memorandum and Order resolves docket entry nos. 296, 316, 327, 330, 333, and 341.

**SO ORDERED.**

Dated:     New York, New York
           August 23, 2013

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/10/2012

ENDORSEMENT

Application denied
for the reasons stated
on the record on
August 8, 2012. See
transcript so Ordered.

Naomi Reice Buchwald
August 1, 2012  USDJ

August 9, 2012

**HAUSFELD**LLP

RECEIVED IN CHAMBERS
OF NAOMI REICE BUCHWALD

AUG - 1 2012

UNITED STATES COURT JUDGE

202.540.7200 p
202.540.7201 f
1700 K Street, NW
Suite 650
Washington, DC 20006

Michael Hausfeld
mhausfeld@hausfeldllp.com

RECEIVED IN CHAMBERS
OF NAOMI REICE BUCHWALD

AUG - 2 2012

UNITED STATES COURT JUDGE

**VIA FACSIMILE:  (212) 805-7927**

The Honorable Naomi Reice Buchwald
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

      RE:   *In re LIBOR-Based Financial Instruments Antitrust Litigation*,
           Master File No. 11-MD-2262 (NRB)

Dear Judge Buchwald:

        In accordance with provision 2.A. of Your Honor's Individual Practices, we write on behalf of the Exchange-Based Plaintiffs, the Over-the-Counter Plaintiffs, the Bondholder Plaintiffs, and the Schwab Plaintiffs (collectively, "Plaintiffs")[1] in these multidistrict proceedings to request that the Court hold a pre-motion conference to address Plaintiffs' intention to move for leave to amend their complaints in light of material new facts regarding Defendants' alleged manipulation of the London InterBankOffered Rate ("LIBOR")—principally relating to U.S.-Dollar LIBOR—that have surfaced throughout the past month and continue to emerge. In connection with their anticipated motion(s) for leave to amend, Plaintiffs will also request that the Court vacate the existing briefing schedule for Defendants' motions to dismiss filed on June 29, 2012, to which Plaintiffs currently must respond by August 28, 2012. As detailed below, granting Plaintiffs' requests would promote the mutual interest of the Court and all parties to efficiently manage this litigation.

        The series of recent and still unfolding disclosures—including internal e-mails and other documents from the British Bankers' Association ("BBA"), the Bank of England, the Federal Reserve Bank of New York ("New York Fed"), and Barclays, as well as testimony before the British Parliament and the U.S. House of Representatives—began on June 27, 2012, only two days before Defendants submitted their motions to dismiss in these proceedings. That day, the U.S. Department of Justice ("DOJ"), the U.S. Commodity Futures Trading Commission ("CFTC"), and Britain's Financial Services Authority ("FSA") announced agreements with Defendant Barclays Bank PLC that collectively obligate Barclays to pay more than $450 million primarily due to making false submissions to the BBA principally in connection with the BBA's setting of U.S.-Dollar LIBOR, as well as the EuroInterbank OfferedRate("EURIBOR"). The agencies' factual findings that accompanied those settlements—including the DOJ's "Statement of Facts," which Barclays expressly admitted—detail misconduct involving Barclays and other members of the panel whose daily LIBOR submissions, or quotes, to the BBA determine LIBOR (collectively, the "LIBOR Panel Banks"). As the Court is aware, U.S.-Dollar LIBOR Panel Banks are Defendants in this litigation.

---

[1] Specifically, the cases are *Metzler Investment GmbH, et al. v. Credit Suisse Group AG, et al.*, No. 11-cv-2613 (asserting claims by the Exchange-Based Plaintiffs); *Mayor and City Council of Baltimore, et al. v. Bank of America Corp., et al.*, No. 11-cv-5450 (asserting claims by the Over-the-Counter Plaintiffs); *Gelboim, et al. v. Credit Suisse Group AG, et al.*, No. 12-cv-1025 (asserting claims by the Bondholder Plaintiffs); *Schwab Short-Term Bond Market Fund, et al. v. Bank of America Corp., et al.*, No. 11-cv-6409; *Charles Schwab Bank, N.A., et al. v. Bank of America Corp., et al.*, No. 11-cv-6411; and *Schwab Money Market Fund, et al. v. Bank of America Corp., et al.*, No. 11-cv-6412.

1049642.2

The Honorable Naomi Reice Buchwald
August 1, 2012
Page 2

    The agencies' findings, as well as emerging evidentiary materials recently released into
the public domain, have revealed two types of misconduct. <u>First</u>, from about 2005 through 2007, and
perhaps continuing into 2009, Barclays personnel submitted false LIBOR and EURIBOR quotes to the
BBA at the behest of traders of interest-rate derivatives at Barclays who stood to benefit if LIBOR or
EURIBOR were set at particular levels, and who on numerous occasions conspired with traders at other
banks about setting those rates. *See, e.g.*, DOJ Statement of Facts ¶ 24 ("The likelihood that the LIBOR
or EURIBOR fix would be affected increased when other Contributor Panel banks also manipulated
their submissions as part of a coordinated effort."). <u>Second</u>, during the "financial crisis period"
beginning around August 2007 and continuing through at least early 2009, Barclays submitted
artificially low U.S.-Dollar LIBOR quotes to keep its submissions in line with the artificially suppressed
U.S.-Dollar LIBOR quotes of its fellow banks so the market would not regard Barclays as financially
worse off than its peers. In doing so, recently released evidentiary materials indicate, Barclays
personnel communicated with other U.S.-Dollar LIBOR Panel Banks and brokers and knew in advance
what quotes other Panel Banks would submit on a given day. *See, e.g.*, FSA Final Notice ¶ 117 (quoting
a November 28, 2007 e-mail from a Barclays rate submitter stating, in part, "LIBORs are not reflecting
the true cost of money. I am going to set 2 and 3 months, 5.13 and 5.12 probably at the top of the range
of rates set by libor contributors, *although brokers tell me that* [Bank Panel 7] *is going to set at 5.15 for
both* (up 8.5 and 10 from yesterday). The true cost of money is anything from 5-15 basis points
higher.") (alteration in original) (emphasis added); FSA Final Notice ¶ 118 (referencing internal
Barclays call where it was discussed in advance of submission that submitting a rate of 5.5 "would have
been 20 basis points above the next highest submission" and would "cause a shit storm"); CFTC Order
at 20 (directive from "Senior Barclays Treasury managers" that submissions "should be within ten basis
points of the submissions by other U.S. Dollar panel banks"). Additionally, during a call with a BBA
representative in or around April 2008, a senior Barclays Treasury manager stated that while Barclays
had not been submitting accurate quotes, it "was not the worst offender of the panel bank members."
CFTC Order at 23.

    Additional information indicating misconduct by LIBOR Panel Banks has streamed out
over the past month and continues to flow. Those revelations include:

    • Admissions to the British Parliament by Barclays' former CEO Robert Diamond
that Barclays staff members consistently reported artificially low U.S.-Dollar LIBOR quotes to the BBA
beginning in September 2007 and continuing for months;

    • Documents released by the New York Fed indicating possible U.S.-Dollar LIBOR
suppression during the financial crisis period; and

    • Numerous media accounts detailing possible additional governmental action
against other banks besides Barclays, including The Royal Bank of Scotland ("RBS"):

    — On July 24, 2012, for example, *The Wall Street Journal* reported on "continuing
criminal and civil scrutiny" that includes "more than a dozen traders *from at least nine banks*, often
allegedly working together in small groups to target different interest rates on separate continents,"
according to people familiar with the probe. (Emphasis added). The *Journal* further reported, "The
emerging details about traders suggest to investigators a widespread conspiracy that continued for
several years and cascaded around the world." Moreover, upon recounting the details of the Barclays
settlements, the *Journal* noted that, according to its sources, "U.S. and U.K. regulators aim to reach
another settlement with a bank this fall." The *Journal* reported the following week that RBS "is
negotiating a settlement with authorities" in connection with the LIBOR scandal, and "a deal, including
fines, could be announced in the next few months, according to people familiar with the matter."

1049642. 2

The Honorable Naomi Reice Buchwald
August 1, 2012
Page 3

      -- On July 26, 2012, *Bloomberg* reported that prosecutors in the U.S. "are preparing to file charges this fall against traders from several banks involved in a bid-rigging scheme to manipulate Libor rates, not just Barclays Plc, according to a person with knowledge of the investigation." The article added that the charges against those individuals, "which would probably be filed by October according to the person," focus on "alleged rate-fixing activity that goes beyond the conduct described in last month's settlement between Barclays and regulators in the U.S. and U.K."

      In short, material facts that further support Plaintiffs' claims have come to light and, Plaintiffs expect, will continue to emerge over the coming months. And while Plaintiffs believe their current allegations satisfy the governing pleading standards, Plaintiffs cannot, of course, predict how the Court will rule on Defendants' motions seeking dismissal of the existing complaints in their entirety. Moreover, Plaintiffs believe that in addition to bolstering the claims they already assert, the emerging facts likely give rise to additional claims (and possibly defendants) and warrant expanding the current Class (or Relevant) Period. Given those potential modifications to the complaints, Plaintiffs wish to save the Court, as well as the parties, from spending valuable time addressing pleadings that do not fully reflect the expanding factual landscape of the LIBOR scandal—which, if the Court were to deem Plaintiffs' allegations partially or wholly deficient as currently pled, Plaintiffs would seek to amend.

      We recently informed defense counsel of Plaintiffs' intention to approach the Court, and counsel responded yesterday that Defendants oppose further amendment of the complaints. Accordingly, and given the approaching deadline to oppose Defendants' existing motions to dismiss, Plaintiffs ask that Your Honor schedule a conference to address their requests that the Court (i) grant them leave to amend their complaints by November 1, 2012, (ii) vacate the existing motion-to-dismiss briefing schedule, and (iii) establish a new schedule for Defendants' answers or responsive motions with respect to the complaints to be filed.

      We appreciate Your Honor's consideration of Plaintiffs' requests, and we are available to discuss these issues at the Court's convenience.

      Respectfully,


Michael D. Hausfeld
HAUSFELD LLP
William C. Carmody
SUSMAN GODFREY L.L.P.
*Interim Co-Lead Counsel for the Over-the-Counter Plaintiffs*

David Kovel
KIRBY MCINERNEY LLP
Christopher Lovell
LOVELL STEWART HALEBIAN JACOBSON LLP
*Interim Co-Lead Counsel for the Exchange-Based Plaintiffs*


David H. Weinstein
WEINSTEIN KITCHENOFF & ASHER LLC
Karen L. Morris
MORRIS AND MORRIS LLC
COUNSELORS AT LAW
*Counsel for the Bondholder Plaintiffs*

Steven E. Fineman
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
*Counsel for the Schwab Plaintiffs*


cc:    All Counsel of Record (by e-mail)

1049642.2

# DAVIS POLK & WARDWELL LLP

450 LEXINGTON AVENUE
NEW YORK, NY 10017
212 450 4000
FAX 212 701 5800

MENLO PARK
WASHINGTON, D.C.
SÃO PAULO
LONDON
PARIS
MADRID
TOKYO
BEIJING
HONG KONG

ROBERT F. WISE, JR
212 450 4512
ROBERT.WISE@DAVISPOLK.COM

August 7, 2012



RECEIVED IN CHAMBERS
OF NAOMI REICE BUCHWALD

AUG - 7 2012

UNITED STATES COURT JUDGE

<u>BY FACSIMILE</u>

Hon. Naomi Reice Buchwald
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

RE:   *LIBOR-Based Financial Instruments Antitrust Litigation,* 11 MD 2262 (NRB)

Dear Judge Buchwald:

    We write as liaison counsel for Defendants in the above-referenced matter in response to Plaintiffs' August 1, 2012 letter requesting a pre-motion conference regarding their proposed motions: (i) to vacate the current briefing schedule governing Defendants' pending motions to dismiss, and (ii) for leave to amend the Amended Complaints by November 1, 2012. Defendants oppose these requests.

    The progress of this action should not be made hostage to investigatory timetables and the vagaries of news media coverage. Plaintiffs' proposed motion effectively seeks to negate this Court's rejection of Plaintiffs' previous request to delay the case substantially to see if government investigations might reveal facts that would support a claim against Defendants. In their submissions in advance of the March 1, 2012 conference, Plaintiffs refused to set a deadline to file amended consolidated complaints and instead sought pre-complaint discovery of materials produced in the investigations. (D.E. 115). The Court rejected that request, recognizing that "[i]t's black letter law that lawsuits are not to be filed in search of lawsuits." (D.E. 117 at 4:24-25). That is, however, exactly what Plaintiffs seek to do now by delaying resolution of the motions to dismiss and seeking nearly three months to amend again the amended Complaints. Indeed, at the March 1, 2012 conference, Plaintiffs' counsel then insisted they needed *two months* to file an amended complaint to address the "news stories coming to light every day." (D.E. 117 at 10:7-10). Plaintiffs now request leave to amend yet again—this time asking for approximately *3 more months* to address anticipated additional news stories—while they

Hon. Naomi Reice Buchwald          2          August 7, 2012

continue to search for information which they believe might enable them to state a viable claim. For example, Plaintiffs' August 1st letter states that facts "will continue to emerge over the coming months" and that further regulatory settlements "could be announced in the next few months." (8/1/12 Letter at 2-3). This wait-and-see approach to pleading contravenes this Court's prior Order "that lawsuits are not to be filed in search of lawsuits." (D.E. 117 at 4:24-25.)

Defendants' pending motions to dismiss, which they spent considerable time and effort preparing, raise fundamental legal defects that will not be remedied by delaying this action another three months to see if Plaintiffs can allege new facts. In addition to challenging Plaintiffs' failure to plead certain claims with the requisite particularity, Defendants' joint motions raise purely legal arguments, for example whether Defendants' alleged conduct has any effect on competition (so as to be actionable under the antitrust laws), whether Plaintiffs have alleged a loss caused by Defendants' alleged manipulation under the Commodity Exchange Act ("CEA"), whether Section 107 of the PSLRA bars the RICO claims, whether the CEA and RICO apply extraterritorially, and whether claims under the CEA are barred by the statute of limitations. Such legal arguments would be unaffected by amendments adding the "new facts" Plaintiffs point to in their pre-motion letter. It is well-settled that leave to amend should be denied where, as here, the amendment would be futile. *See, e.g., Bishop v. Henry Modell & Co., Inc.*, 422 Fed. App'x 3, 4 (2d Cir. 2011) ("For substantially the same reasons set forth in [Judge Buchwald's] thorough and well-reasoned memorandum and order, we conclude that the district court properly . . . denied [plaintiff's] motion to amend as futile."); *Menton v. Experian Corp.*, No. 02 Civ. 4687(NRB), at *3-5 (S.D.N.Y. July 21, 2003) (Buchwald, J.) (denying leave to amend on futility grounds because proposed amendment would not allow plaintiff to state a claim).

Moreover, amendments to the Amended Complaints would also be futile because Plaintiffs' primary purpose for amending is purportedly to add details from Barclays' settlement with the DOJ, CFTC, and FSA (the "Settlement Agreement") announced more than a month ago now. The Settlement Agreement actually bolsters a number of grounds for dismissal. For example, it supports Defendants' argument that Plaintiffs' CEA claims are time-barred because inquiry notice existed more than two years before the first action was filed. FSA Final Notice ¶ 129 (noting a "general perception" by April 2008 that "contributing banks' LIBOR submissions were not reflecting adequately conditions in the London interbank market" because of media articles in the *Wall Street Journal* and other publications); CFTC Consent Order at 23 (noting an April 2008 *Wall Street Journal* article "questioning the integrity of LIBOR"). The Settlement Agreement also contains allegations that Barclays' actions were largely individual actions, and certainly nothing in the Settlement Agreement suggests a conspiracy among all sixteen U.S. Dollar panel banks. Moreover, the Settlement Agreement is largely inconsistent with Plaintiffs' allegations and theory of the case. Although Plaintiffs claim that Defendants artificially *suppressed* LIBOR throughout the relevant period, the Settlement Agreement describes traders allegedly seeking both higher and lower LIBORs depending on individual traders' positions that day. *See, e.g.,* DOJ Statement of Facts ¶ 16 (noting an email request seeking a LIBOR rate "as high as possible").

Davis Polk & Wardwell LLP

Hon. Naomi Reice Buchwald                    3                        August 7, 2012

In any event, Defendants are willing to consent that the Court may consider the Settlement Agreement incorporated into the Amended Complaints for purposes of deciding the pending motions to dismiss, and would agree that Plaintiffs could cite to those materials in their opposition papers currently due on August 28, 2012. Thus, the Court can reach the underlying legal issues raised by Defendants' motion, the resolution of which will be of considerable benefit both in the pending actions as well as any additional actions that might be filed and consolidated in the future. Plaintiffs' proposal would leave everything unresolved and result in only further delay.

Finally, if, notwithstanding Defendants' opposition, the Court permits another round of amendments to the Amended Complaints, a three month delay is needlessly excessive for cases that have been pending for more than a year. The Settlement Agreement has been public for more than a month, and very little time would be needed to incorporate allegations concerning it.

Defendants respectfully submit that Plaintiffs' request to move to vacate the motions to dismiss and for leave to amend should be denied. If the Court nevertheless permits further amendment, Defendants respectfully request that the Court order that: (1) all amendments be filed by August 27, 2012, and no further amendments be permitted after that date; (2) any dismissal of the Amended Complaints after further amendment should be with prejudice given that Plaintiffs are on notice of the defects in the Amended Complaints from the pending motions to dismiss;[1] and (3) any modified briefing schedule should be coordinated to limit the burden on the parties and the Court of briefing and deciding several sets of motions to dismiss.

Respectfully yours,

Robert F. Wise

cc:   All counsel (by e-mail)

---

[1]   A court has discretion to dismiss a claim with prejudice where the plaintiff was put on notice of the deficiencies in the claim and yet failed to cure those defects in an amended complaint. *See Tamar v. Mind C.T.I., Ltd.*, 723 F. Supp.2d 546, 559 (S.D.N.Y. 2010).

Davis Polk & Wardwell LLP

MEMO ENDORSED.

**KIRBY McINERNEY LLP**

DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/6/2012

825 Third Avenue
New York, NY 10022
212.371.6600

Fax. 212.751.2540
WWW.KMLLP.COM

**MEMO ENDORSED**

February 17, 2012

**BY HAND DELIVERY AND FACSIMILE**

RECEIVED IN CHAMBERS
OF NAOMI REICE BUCHWALD

FEB 17 2012

UNITED STATES COURT JUDGE

The Honorable Naomi Reice Buchwald
United States District Judge
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

*Endorsement*
*Application denied for the*
*reasons stated on the record*
*at an in court*

Re:   *In re LIBOR-Based Financial Instruments Antitrust Litigation,* *conference held on March 1, 2012.*
      No. 1:11-MD-2262 (NRB)

*So Ordered.*
*Naomi Reice Buchwald,*
*USDJ*
*3/5/12*

Dear Judge Buchwald:

We represent the Plaintiffs[1] in the above-captioned litigation. We believe that the most efficient way for this litigation to proceed is to require the Defendants to provide Plaintiffs the documents they have already produced to U.S. regulators investigating the alleged manipulation of LIBOR. Although the many complaints filed in these cases have strong substantive allegations, even since their filing more information from government investigations has become available that supports their pleadings. It is a certainty that the investigations will reveal additional information, which could result in the filing of superseding complaints. This information is available in the documents Defendants have already produced to U.S. regulators. Plaintiffs requested Defendants produce these materials, but Defendants prefer a discovery stay and Rule 12 motions.

There are numerous ongoing governmental investigations involving the manipulation of LIBOR.[2] In addition, in July 2011, UBS announced that it had been granted conditional leniency or conditional immunity by the U.S. D.O.J. "in return for its continuing cooperation in an ongoing LIBOR manipulation probe."[3] In Singapore High Court filings, RBS has admitted that

---

[1] This letter is submitted jointly by the Exchange-Based Plaintiffs, the Over-the-Counter Plaintiffs and the Charles Schwab Plaintiffs.

[2] At least a dozen investment-bank defendants have admitted or been publicly identified as receiving (and responding to) either subpoenas or requests for information from the U.S. Department of Justice, the U.S. Commodities Futures Trading Commission, the U.S. Securities and Exchange Commission, the Japanese Financial Supervisory Agency, the U.K.'s Financial Services Authority, the European Commission and the Swiss Competition Commission.

[3] *See* Martin de Sa'Pinto, *UBS Says granted some immunity in Libor probe,* REUTERS (July 26, 2011), http://www.reuters.com/article/2011/07/26/ubs-libor-idUSLDE76P09520110726.

NEW YORK          TEXAS

KIRBY McINERNEY LLP

at least two of its employees attempted to manipulate LIBOR, and RBS is accused there of coordinating the manipulation from its senior ranks.[4] The *Financial Times* reports that "[m]ore than a dozen traders and brokers in London and Asia have been fired, suspended, or put on leave by their employers as a multinational probe into alleged manipulation of crucial global lending rates accelerates."[5] *Bloomberg* reports that "[g]lobal regulators have exposed flaws in banks' internal controls that may have allowed traders to manipulate interest rates around the world, two people with knowledge of the probe said."[6] Notably, *Bloomberg* further reports that investigators "have received e-mail evidence of potential collusion between firms setting [LIBOR]" and that "[r]egulators are focusing on a lack of so-called Chinese walls between traders and employees making interest-rate submissions on behalf of their banks…In some cases, the two groups may have sat close to each other". Today's *Wall Street Journal* reports that in court filings in Canada a reporting bank said that traders and brokers manipulated LIBOR.[7]

In evaluating Plaintiffs' request, the Court must "balance the burden to defendants against the potential prejudice to plaintiffs." *Waldman v. Wachovia Corp.*, 2009 WL 86763 at *2 (S.D.N.Y. Jan. 12, 2009). The limited discovery that Plaintiffs request at this time would cause little burden or expense to Defendants. Plaintiffs seek only the production of the documents produced by Defendants to U.S. government investigators in the *form already produced*.[8] *See, e.g., In re Bank of Am. Corp. Sec., Derivative, & Employment Ret. Income Sec. Act (ERISA) Litig.*, No. 09MDL 2058, 2009 WL 4796169, at *2 (S.D.N.Y. Nov. 16, 2009) ("The burden on the defendants is slight when a defendant has already found, reviewed and organized the documents.") (citations and internal quotation marks omitted).

Yet the obvious benefit of this production is to obviate the need for re-pleading and additional motion practice once the results of the governmental investigations come to light. This is just the problem faced by plaintiffs in *In re Air Cargo Shipping Services Antitrust Litig.*, No. 06-MD-1775 (E.D.N.Y.) ("*Air Cargo*"). There, the Magistrate Judge issued a 36-page report and recommendation granting motions by various defendants based on, *inter alia, Twombly*, seeking to dismiss plaintiffs' complaint alleging a price fixing conspiracy. *See id.*, 2008 WL 5958061 (E.D.N.Y. Sept. 26, 2008). However, in the year following the report and recommendation, the D.O.J. obtained indictments and guilty pleas against many of the defendants, and the court found that the new facts along with the facts already alleged were sufficient allegations of a section 1 conspiracy. *See id.*, 2009 WL 3443405 at *1 (E.D.N.Y. Aug. 21, 2009). In *Air Cargo*, needless court resources were wasted, and the parties incurred the time delay and expenses associated with motions to dismiss, all of which could have been avoided through early document production.

---

[4] *See* Singapore High Court documents filed in *Tan Chi Min v. The Royal Bank of Scotland PLC*, Suit No. 939 of 2011/X, titled Writ of Summons, Defence, and Reply, which Plaintiffs can make available to the Court at its request.

[5] *See* Exhibit A (*Financial Times* article dated 2/8/2012) attached hereto.

[6] *See* Exhibit B (*Bloomberg* article dated 2/14/2012) attached hereto.

[7] *See* Exhibit C (*The Wall Street Journal* article dated 2/17/2012) attached hereto.

[8] Plaintiffs have apprised relevant lawyers for the Department of Justice of their intent to seek this discovery and will be providing them with the letter briefing on this issue in case they wish to take a position.

2

KIRBY McINERNEY LLP

In circumstances akin to those here, defendants have agreed to the early production of documents already produced to the government. *See* Defendant Transitions Optical, Inc.'s Motion for Coordinated Case Management Schedule and Memorandum of Legal Authority in Support Thereof at 6, *In re Photochromatic Lens Antitrust Litig.*, No. 8:10-md-02173, Dkt. No. 81 (M.D. Fla Nov. 5, 2010) ("despite the absence of any agreement among the parties on a case management schedule, Defendants voluntarily produced" FTC Material). Even when the parties do not agree to early production of documents already produced to government agencies, the court often imposes it. *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 899-900 (N.D. Cal. Feb. 14, 2008) (explaining how the Court required production of documents produced to the DOJ well before adjudicating defendants' motions to dismiss). On November 30, 2010 Judge Pauley issued an Order in *In re Platinum and Palladium Commodities Litig.*, No. 10-cv-3617 (WHP) (S.D.N.Y.), Dkt. No. 59, compelling defendants to produce 250,000 pages of documents already produced to the CFTC before the decision on the motion to dismiss. *See also In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*, 09-cv-03690 (N.D. Ill.), Dkt. No. 75 (Mar. 4, 2010, order directing targeted discovery, including materials produced to the CFTC, entered prior to the Rule 26(f) conference, which was entered at Dkt. No. 88). Even in the context of a mandatory stay on litigation under the PSLRA, courts have ordered the production of documents already produced to governmental and public agency investigations.[9]

Defendants' contemplated motions to dismiss cannot excuse them from their discovery obligations. In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court "did not hold, implicitly or otherwise, that discovery in antitrust actions is stayed or abated until after a complaint survives a Rule 12(b)(6) challenge. Such a reading of that opinion is overbroad and unpersuasive." *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2007 U.S. Dist. LEXIS 95869, *24 (N.D. Cal. Jan. 4, 2008). *Accord In re Graphics Processing Units Antitrust Litig.*, No. C06-7417-WHA, 2007 U.S. Dist. LEXIS 57982, at *23 (N.D. Cal. Jul. 24, 2007) ("Defendants' argument upends the Supreme Court's holding; the decision used concerns about the breadth and expense of antitrust discovery to identify pleading standards for complaints, it did not use pleading standard to find a reason to foreclose all discovery."). The slow pace of the global criminal investigation, combined with *Twombly* arguments, allows defendants to prevent civil plaintiffs from proceeding and wastes court resources in addressing premature Rule 12 motions. *See Air Cargo, supra*; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) (granting Rule 12(b)(6) motions with leave to amend), 599 F. Supp. 2d 1179 (N.D. Cal. 2009) (denying Rule 12(b)(6) motions). If, however, Plaintiffs promptly can confirm the already substantive allegations that Defendants have acted unlawfully, they will be able to progress this litigation more quickly and efficiently. Plaintiffs will be able to add even more detail to their amended complaints and the Court will not be required to revisit its decisions after the results of the governmental investigations have become public.

---

[9]  *See. e.g., In re Bank of Am. Corp. Sec.*, 2009 WL 4796169 at *3 (PSLRA stay lifted and defendants ordered to produced documents already produced by defendants in ongoing related matters – including government actions); *In re LaBranche Sec. Litig.*, 333 F. Supp. 2d 178, 180, 183 (S.D.N.Y. 2004). *See also In re Delphi Corp.* No. 05-md-1725, 2007 WL 518626 at *8 (E.D. Mich. Feb. 15, 2007); *In re FirstEnergy Corp. Sec. Litig.*, 229 F.R.D. 541, 545 (N.D. Ohio 2004); *Singer v. Nicor, Inc.*, No. 02-5168, 2003 WL 22013905 at *2 (N.D. Ill. Apr. 23, 2003); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 220 F.R.D. 246, 250 (D. Md. 2004); *In re Enron Corp. Sec., Deriv. & Erisa Litig.*, 2002 U.S. Dist LEXIS 26261 at *31 (S.D. Tex. Aug. 16, 2002).

KIRBY McINERNEY LLP

Respectfully Submitted,

/s/ Michael D. Hausfeld
Michael D. Hausfeld
William P. Butterfield
Ralph J. Bunche
HAUSFELD LLP
1700 K St NW, Suite 650
Washington, DC 20006
Tel: 202-540-7200

/s/ William Christopher Carmody
William Christopher Carmody
Arun Subramanian
SUSMAN GODFREY L.L.P.
560 Lexington Ave, 15th Floor
New York, NY 10022
Tel: 212-336-8330

Marc M. Seltzer
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars
Los Angeles, CA 90067-6029
Tel: 310-789-3100

***Interim Co-Lead Counsel for Over-the-Counter Plaintiffs***

/s/ Steven E. Fineman
Steven E. Fineman
Michael J. Miarmi
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson St., 8th Floor
New York, NY 10013

Richard M. Heimann
Joseph R. Saveri
Eric B. Fastiff
Brendan P. Glackin
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery St. 29th Floor
San Francisco, CA 94111
***Counsel for Plaintiffs in the Schwab Actions***

/s/ Christopher Lovell
Christopher Lovell
Gary Jacobson
Ian T. Stoll
LOVELL STEWART HALEBIAN
JACOBSON LLP
61 Broadway, Suite 501
New York, NY 10006
Tel: 212-608-1900

/s/ David E. Kovel
David E. Kovel
Roger W. Kirby
Daniel Hume
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022
Tel: 212-317-2300

***Interim Co-Lead Counsel for Exchange-Based Plaintiffs***

4

KIRBY McINERNEY LLP

Enclosures

cc: All Defense Counsel in the Referenced Matter c/o Jeffrey T. Scott of Sullivan & Cromwell LLP (via email with encls.)

5

*In re LIBOR-Based Financial Instruments Antitrust Litigation*,
No. 1:11-MD-2262 (NRB)
**Exhibit A**
to Plaintiffs' Letter Dated February 17, 2012

Brokers suspended in Libor inquiry - FT.com                                                    1 of 2

# FINANCIAL TIMES

February 8, 2012 9:31 pm

## Brokers suspended in Libor inquiry

By Caroline Binham, Brooke Masters and Megan Murphy in London



More than a dozen traders and brokers in London and Asia have been fired, suspended or put on leave by their employers as a multinational probe into alleged manipulation of crucial global lending rates accelerates.

Regulators have been investigating US and European banks that help set interbank lending rates in London and Tokyo since late 2010, in an intensive profile inquiry that spans three continents and involves at least nine separate enforcement agencies.

In the last few months, officials have also expanded their enquiries to both hedge funds that place big bets on movements in those rates, and the interdealer brokers that serve as go-betweens with the banks, according to people familiar with the probe.

Icap, the world's largest inter-dealer broker, has suspended one employee and put two more on administrative leave in the past six weeks. Icap, based in London, declined to comment beyond noting that it was "co-operating fully" with authorities and had disclosed the official requests for information late last year.

According to people familiar with the probe, traders have also been suspended, fired or placed on leave in recent months at Deutsche Bank, JPMorgan Chase, Royal Bank of Scotland and Citigroup. All four banks declined to comment.

Regulators are seeking to determine whether banks colluded to set the overnight lending rates known as Libor, Tibor and Euribor, and whether traders within the banks and their clients improperly used information on what future rates would be to place profitable trades. The rates, which serve as a benchmark for $350tn worth of financial products worldwide, are set by a daily poll of a panel of banks in each region.

US and UK regulators have sought information from the three interdealer brokers that dominate the rates market – Icap, Tullett Prebon and RP Martin. People familiar with the matter said they were looking at information-sharing among brokers, hedge funds and banks.

An RP Martin spokesman said the firm was not under investigation and declined to comment on suspensions. A Tullett Prebon spokesman said the firm had not suspended any employees.

Earlier this week, UBS said it had been granted conditional immunity from the Swiss Competition Commission relating to its submissions for certain rates. The Swiss group was granted similar immunity by the US Department of Justice last year because it is co-operating with the probe.

"Derivative traders working for a number of financial institutions might have manipulated these

http://www.ft.com/cms/s/0/7021cdb4-527a-11e1-ae2c-00144feabdc0.html

SPA 239

02/17/2012 16:44 FAX 1 212 699 3004   KIRBY MCINERNEY & SQUIRE   ☑009/017
Case 1:11-md-02262-NRB   Document 115   Filed 03/06/12   Page 8 of 61

Brokers suspended in Libor inquiry - FT.com                                        2 of 2

submissions by co-ordinating their behaviour, thereby influencing these reference rates in their favour," said a statement published by Switzerland's Competition Commission last week. "Moreover, derivative traders might have colluded to manipulate the difference between the ask price and the bid price [spread] of derivatives based on these reference rates to the detriment of their clients,"

Barclays, which is already being investigated over alleged improper communications between traders and back office staff over its rates submissions, declined to comment on whether any employees have been suspended in London.

*With additional reporting by Kara Scannell in New York, Michiyo Nakamoto in Tokyo, and Paul J. Davies in Hong Kong*

**Printed from:** http://www.ft.com/cms/s/0/7021cdb4-527a-11e1-ae2c-00144feabdc0.html

Print a single copy of this article for personal use. Contact us if you wish to print more to distribute to others.

© **THE FINANCIAL TIMES LTD 2012** FT and 'Financial Times' are trademarks of The Financial Times Ltd.

*In re LIBOR-Based Financial Instruments Antitrust Litigation*,
No. 1:11-MD-2262 (NRB)
**Exhibit B**
**to Plaintiffs' Letter Dated February 17, 2012**

# Bloomberg

## Libor Probe Said to Expose Collusion, Lack of Internal Controls

By Lindsay Fortado and Joshua Gallu - Feb 14, 2012

Global regulators have exposed flaws in banks' internal controls that may have allowed traders to manipulate interest rates around the world, two people with knowledge of the probe said.

Investigators also have received e-mail evidence of potential collusion between firms setting the London interbank offered rate, said the people, who declined to be identified because they weren't authorized to speak publicly. Regulators are focusing on a lack of so-called Chinese walls between traders and employees making interest-rate submissions on behalf of their banks, the people said. In some cases, the two groups may have sat close to each other, one person said.

Britain's Financial Services Authority is probing whether banks' proprietary-trading desks exploited information they had about the direction of Libor to trade interest-rate derivatives, potentially defrauding their firms' counterparties, the people said. The investigation may lead to civil fines for the banks and criminal charges for the traders involved, the people said. No penalties are likely from the FSA before year-end, and the case hasn't moved toward criminal charges, one person said.

"The entire story is very embarrassing for the banks," said Tom Kirchmaier, a fellow in the financial-markets group at the London School of Economics. "I don't know how they will eradicate this. The regulators have to rethink the way they set Libor."

The rate, a benchmark for about $360 trillion of financial products worldwide, is derived from a survey of banks conducted daily on behalf of the British Bankers' Association in London.

## Manipulating Rates

The lenders are asked how much it would cost them to borrow from one another for 15 different periods, from overnight to one year, in currencies including dollars, euros, yen and Swiss francs. After a predetermined number of quotes are excluded, those remaining are averaged and published for each currency by the BBA before noon.

Regulators worldwide are investigating whether banks attempted to manipulate the London, Tokyo and euro interbank offered rates, known as Libor, Tibor and Euribor. The U.S. Securities and Exchange Commission, U.S. Commodity Futures Trading Commission, U.S. Department of Justice, and Japan's Financial Supervisory Agency are all involved. The probes are being led separately, with individual regulators sharing some information among themselves, one of the people said.

JPMorgan Chase & Co., Deutsche Bank AG (DBK) and HSBC Holdings Plc are among at least seven firms facing a Canadian probe into whether they participated in a conspiracy to manipulate prices on interest-rate derivatives. The nation's Competition Bureau is investigating the firms' conduct between 2007 and 2010, according to documents it filed with the Ontario Superior Court in May.

02/17/2012 16:46 FAX 212 898 5134   KIRBY McINERNEY & SQUIRE   Case 1:11-md-02262-NRB   Document 115   Filed 03/06/12   Page 11 of 61   ☑012/017

Libor Probe Said to Expose Collusion, Lack of Internal Controls - Bloomberg   2 of 3

## Barclays, UBS

HSBC, Barclays Plc (BARC) and Royal Bank of Scotland Group Plc (RBS) are among banks that have said they've received requests for information from global regulators in recent months. UBS AG (UBSN) said on Feb. 7 it had been given conditional immunity from the Swiss Competition Commission as part of an investigation into manipulation of the Yen Libor, Tibor, and Swiss franc Libor rates. The Zurich-based lender was last year granted similar immunity by the U.S. Department of Justice as part of its probes of Yen Libor and Euroyen Tibor rates.

Charles Schwab Corp. (SCHW), the largest independent brokerage by client assets, sued Bank of America Corp., Citigroup Inc. (C) and other banks in August claiming they manipulated Libor from 2007 in violation of U.S. antitrust law.

Spokesmen for Schwab, HSBC, Barclays and Bank of America declined to comment. An official at RBS couldn't immediately comment. Danielle Romero-Apsilos, a spokeswoman for Citigroup, said in August the Schwab suit is "without merit." She declined to comment further yesterday.

## Price-Fixing

Antitrust authorities are focusing on whether banks might have helped a competitor manipulate one rate in exchange for help moving borrowing costs in a different currency, said another person with knowledge of the investigation. Regulators may view the conduct as a form of price-fixing because it could affect the price of the derivative products, the person said.

The FSA is investigating whether banks' Libor submissions reflected their actual cost of borrowing and is scrutinizing market data for potential anomalies, another person familiar with the investigation said. The watchdog is scanning e-mails between bankers for code words that could be used to manipulate Libor, said the person, who declined to be identified because they weren't authorized to speak publicly.

Officials at the FSA in London declined to comment.

## Competition Watchdog

Switzerland's competition watchdog said Feb. 3 it had opened an investigation into 12 banks, saying derivative traders might have coordinated the submissions that determine Libor and Tibor. Traders might have colluded to manipulate the difference between the ask price and the bid price, or spread, of derivatives based on Libor and Tibor "to the detriment of their clients," the regulator said.

European Union antitrust regulators are also investigating whether banks formed a cartel to manipulate borrowing rates, said two people with knowledge of the probe who declined to be identified because the inquiry isn't public. Barclays, HSBC and RBS have said the European Commission quizzed them last year.

RBS, the U.K.'s largest government-owned lender, has dismissed at least four employees in connection with the probes, two people briefed on the move said last week. New York-based Citigroup and Frankfurt-based Deutsche Bank also have dismissed, put on leave or suspended traders as part of the investigations, according to two more people.

To contact the reporters on this story: Lindsay Fortado in London at lfortado@bloomberg.net; Joshua Gallu in Washington at jgallu@bloomberg.net

To contact the editors responsible for this story: Edward Evans at eevans3@bloomberg.net; Maura Reynolds at mreynolds34@bloomberg.net

©2012 BLOOMBERG L.P. ALL RIGHTS RESERVED.

*In re LIBOR-Based Financial Instruments Antitrust Litigation,*
No. 1:11-MD-2262 (NRB)
**Exhibit C**
**to Plaintiffs' Letter Dated February 17, 2012**

02/17/2012 16:35 FAX 2124092694 NRB    KIRBY MCINERNEY & SQUIRE
Case 1:11-md-02262-NRB   Document 115   Filed 03/06/12   Page 14 of 61    ☑ 015/017

Traders Manipulated Key Rate, Bank Says - WSJ.com                                    1 of 3

# FONTAINEBLEAU MIAMI BEACH

RESERVE

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com

See a sample reprint in PDF format:        Order a reprint of this article now

## THE WALL STREET JOURNAL.
WSJ.com

BUSINESS  |  FEBRUARY 17, 2012

# Traders Manipulated Key Rate, Bank Says

By JEAN EAGLESHAM, PAUL VIEIRA and DAVID ENRICH

A group of traders and brokers successfully managed to manipulate an interest rate that affects loans around the world, one of the banks being investigated has told regulators.

In a court filing in Ottawa, Canada's Competition Bureau said a bank it didn't identify has told the agency's investigators that people involved in the alleged scheme "were able to move" interest rates.

People familiar with the situation said the "cooperating party" is UBS AG.

## Leaning on Libor
Regulators said a bank told them how a key interest rate was manipulated.



Traders discussed with each other what daily yen Libor rate they wanted.



Brokers acting as the banks' go-betweens were asked by the traders to help influence the rate.

Bank employees who submitted the quotes used to work out yen Libor were told by the traders and brokers what rates they should put in.



Submissions from banks to the British Bankers' Association were used to calculate the daily yen Libor rate.

Sources: Canadian Competition Bureau; FactSet Research Systems     The Wall Street Journal

The Swiss bank has said it is assisting regulators in a sprawling interest-rate probe in North America, Europe and Asia, which has led to a score of individuals being fired or suspended by major U.S. and European banks and leading brokers.

No banks or individuals have been charged with wrongdoing.

The benchmark interest rates at the center of the probe are used to price home and auto loans, corporate debt and derivatives totaling more than $350 trillion.

The Canadian court documents, which were reviewed by The Wall Street Journal, name several alleged participants of the scheme, which involved the yen London interbank offered rate, known as yen Libor, between 2007 and June 2010.

The documents said regulators also are looking at alleged attempts to fix the prices of certain derivative financial products linked to Libor.

The Canadian regulator also sets out clearly for the first time how its investigators believe bank employees may have managed to game a system used to set costs for financial products around the world, with the alleged aim of increasing their trading profits.

The yen Libor rate is set daily by a 16-bank panel, organized by the British Bankers' Association. Around 11 a.m. London time every day, each bank submits estimates to the BBA of what rates it would pay to borrow from other banks for different time periods. The top four and bottom four quotes are then discarded, and Libor is calculated

SPA 246

Traders Manipulated Key Rate, Bank Says - WSJ.com

using an average of the middle eight quotes.

The Canadian watchdog said lawyers acting for the cooperating bank had told it that traders at six banks on the yen Libor panel—Citigroup Inc., Deutsche Bank AG, HSBC Holdings PLC, J.P. Morgan Chase & Co., Royal Bank of Scotland Group PLC and UBS—"entered into agreements to submit artificially high or artificially low" quotes, according to the court documents.

The traders used emails and instant messages to tell each other whether they wanted "to see a higher or lower yen Libor [rate] to aid their trading position(s)," according to a court filing. Each of the traders would then "communicate internally" with the person at their bank who was responsible for submitting the Libor quote, before letting each other know if this attempt to influence the quote had worked. "Not all attempts to affect Libor submissions were successful," the regulator said in the court filing.

The Canadian regulator said it is investigating whether the traders also "conspired" with individuals at interdealer broker firms, according to the documents. These brokers act as go-betweens for the different banks, advising them on the interbank borrowing rates on which Libor quotes are based.

The brokers were asked by the traders "to use their influence with yen Libor submitters to affect what rates were submitted by other yen Libor panel banks," including banks that were part of the alleged conspiracy, according to a court filing.

ICAP PLC and RP Martin Holdings Ltd, two of the top three London-based interdealer brokers, are under investigation, the Canadian regulator said in the court documents. It named Darrell Read, an ICAP employee at the time of the alleged manipulation, as one of the individuals its investigators believed were involved. Terry Farr, an employee of RP Martin, also is under investigation, according to people familiar with the matter.

Representatives of ICAP and RP Martin declined to comment. ICAP disclosed last year it had received requests "from some government agencies" related to Libor investigations and said it was cooperating fully.

Mr. Read couldn't be reached for comment. Mr. Farr is on agreed leave from RP Martin and "has been and continues to be cooperative" with investigators, said his attorney, Glenn Colton of law firm SNR Denton. He added that Mr. Farr "is not a target of any U.S. investigation."

The BBA has made some tweaks to how Libor is calculated, such as increasing the size of the U.S. dollar panel, since concerns about the integrity of the system were raised following the financial crisis.

But the fundamental approach of calculating rates based on estimates submitted by banks remains unchanged, despite the intensifying global probe.

A spokesman for the association said it didn't comment on any investigations affecting its member banks.

"We are committed to retaining the reputation and integrity of BBA Libor, which continues to be the authoritative benchmark of the wholesale money market," the spokesman said. The BBA declined to specify whether further changes to the system were planned but said all aspects of the design and operation of Libor are kept under "continual review and scrutiny."

The Journal this week disclosed the Canadian inquiry, adding one more country to probes into alleged manipulation of Libor and other benchmark rates that involve regulators in the U.S., Europe and Japan. The European probes cover some banks not named by the Canadians. The yen Libor rate at the center of many of the probes affects only part of the loans and derivatives linked to different Libor rates.

The regulators are sharing certain information, according to people familiar with the matter. However, it isn't clear the extent to which the probes are being coordinated.

The Canadian court documents, which were filed last year, are affidavits supporting the Competition Bureau's requests to a Canadian court to compel the named firms to produce information related to the investigation. The requests were approved.

SPA 247

In the documents, the Canadian regulator identified several London-based traders it said were participants in the alleged scheme. They include Guillaume Adolph, identified as a Deutsche Bank trader; Peter O'Leary of HSBC; Paul Glands and Stewart Wiley of J.P. Morgan, and Brent Davies and Will Hall of Royal Bank of Scotland.

None of these individuals could be reached for comment Thursday.

All the traders identified by regulators in relation to the various investigations have since left the banks concerned, according to people familiar with the matter and regulatory records.

UBS has suspended two senior Zurich-based traders in relation to the investigation, Yvan Ducrot and Holger Seger, according to a person familiar with the matter. Messrs. Ducrot and Seger didn't respond to requests for comment Thursday. The identities of Messrs. Ducrot and Seger were reported earlier by the Financial Times.

—Deborah Ball contributed to this article.

**Write to** Jean Eaglesham at jean.eaglesham@wsj.com and David Enrich at david.enrich@wsj.com

Copyright 2012 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law.
For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit
www.djreprints.com

SPA 248

February 17, 2012



RECEIVED IN CHAMBERS
OF NAOMI REICE BUCHWALD

FEB 17 2012

UNITED STATES COURT JUDGE

By Facsimile and Hand

The Honorable Naomi Reice Buchwald
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *In re: LIBOR-Based Financial Instruments Antitrust Litigation*, 1:11-MD-2262 (NRB)

Dear Judge Buchwald:

We write on behalf of the bank defendants in advance of the March 1 conference. That conference will address plaintiffs' extraordinary demand—before filing their consolidated amended complaints—for all documents defendants produced to "U.S. and foreign governmental entities in connection with their investigations of alleged manipulation or misreporting of LIBOR." For the reasons below, the Court should deny plaintiffs' request. The Court should instead enter an order requiring the prompt filing of consolidated complaints and a schedule for filing responsive pleadings or dismissal motions. Discovery should proceed only after resolution of the dismissal motions and in the event that any claims survive.

**The Requested Pre-Complaint Discovery Is Extraordinary and Unduly Burdensome**

Nearly three months ago, the Court consolidated all of the class actions and appointed interim lead plaintiffs' counsel. Yet, plaintiffs have refused to set a schedule for the filing of consolidated complaints that set forth the allegations, claims and defendants they intend to pursue in this action. Instead, plaintiffs have demanded discovery to help them draft their consolidated complaints. That demand is extraordinary and not permitted by the Federal Rules of Civil Procedure ("FRCP"). Requests for pre-complaint discovery are disfavored.[1] Rule 26(d)(1), subject to certain exceptions not applicable here, provides that a "party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)." The FRCP also contemplate that a Rule 26(f) conference will not occur until after the operative complaint has been filed, stating the parties must "consider the nature and basis of their claims and defenses" at such a conference. Fed. R. Civ. P. 26(f)(2). Here, the parties cannot engage in a meaningful Rule 26(f) conference because plaintiffs have not yet identified—and have refused to identify—all the allegations, claims or defendants that they intend to include in the consolidated complaints. Because the parties do not yet know the nature and basis of plaintiffs' claims and against which defendants those claims will be made, it makes no sense for the parties to engage in pre-complaint discovery.

---

[1] *See In re Backer*, No. 10 Civ. 0862, 2010 U.S. Dist. LEXIS 71821, at *31-32, n.6 (S.D.N.Y. July 16, 2010) ("[T]here is no right to pre-complaint discovery under the [FRCP]."); *In re Digital Music Antitrust Litig.*, MDL No. 1780, 2007 U.S. Dist. LEXIS 13567, at *9 (S.D.N.Y. Feb. 27, 2007) (noting previous ruling that defendants had no obligation to produce government productions where the consolidated amended complaint had not yet been filed).

The Honorable Naomi Reice Buchwald

    Plaintiffs' demand for "materials already provided to U.S. and foreign governmental entities in connection with their investigations of alleged manipulation or misreporting of LIBOR" seeks material that is irrelevant to their non-specific allegations. The initial complaints allege misconduct concerning only one of the ten different LIBOR rates (*i.e.*, U.S. Dollar), yet plaintiffs demand the production of a massive amount of information concerning other LIBOR rates and similar reference rates.[2] But plaintiffs have not demonstrated to the Court that they can plead a plausible claim with the requisite specificity against each defendant, and they are not entitled to seek discovery merely to see if they can find such a claim in documents produced to regulators. As this Court has recently held, "the law is very clear that you cannot use discovery to find out whether you have a claim."[3] The Court therefore should reject plaintiffs' request to engage in a fishing expedition.

    Plaintiffs' only argument offered to support their extraordinary demand is that it would not be burdensome for defendants to produce documents that already have been produced to the government. That is incorrect. A substantial burden would be imposed on defendants in producing their government productions—even assuming plaintiffs limited their request to documents concerning U.S. Dollar LIBOR. Defendants would need to re-review their entire government productions before producing them for at least the following reasons. First, defendants compete in various markets, and their government productions contain sensitive competitive information. Defendants would need to re-review these documents to ensure that commercially sensitive documents are designated as confidential or highly confidential under a protective order (which has not yet been negotiated and presented to the Court). Second, certain defendants have produced documents to U.S. and foreign governmental authorities in a manner that did not require a review for information protected by the U.K.'s Data Protection Act ("DPA"), the EU Data Protection Directive or other foreign law. These documents now would need to be reviewed to determine if they could be produced to private parties without violating such laws (assuming the entity was even permitted to produce those documents under other applicable law). Otherwise, an order compelling defendants to produce documents potentially subject to the DPA or similar statutes may cause defendants to violate those laws, exposing them to fines, sanctions and breach of privacy claims. Such circumstances would raise complex issues involving foreign law and international comity, and should not be addressed unless and until plaintiffs' claims survive any dismissal motions. Finally, defendants may have produced privileged documents to the government under a non-waiver agreement, and defendants would need to re-review these documents as well. Accordingly, plaintiffs' pre-complaint discovery request would place a tremendous burden on defendants when it is far from clear which, if any, of plaintiffs' claims will survive defendants' dismissal motions.

---

[2] For example, during the meet-and-confer, plaintiffs stated that documents concerning the Tokyo Interbank Offered Rate (which is a reference rate formulated in Japan) would be responsive to their demand.

[3] *Gene Codes Forensics, Inc.* v. *City of N.Y.*, No. 10 Civ. 1641, 2011 U.S. Dist. LEXIS 72130, at *33-34 (S.D.N.Y. June 24, 2011) (Buchwald, J.); *see also Collens* v. *City of N.Y.*, 222 F.R.D. 249, 253 (S.D.N.Y. 2004) ("[C]ourts should not grant discovery requests based on pure speculation that amount to nothing more than a 'fishing expedition' into actions or past wrongdoing not related to the alleged claims or defenses."); *Hughes* v. *LaSalle Bank, N.A.*, No. 02 Civ. 6384 (MBM), 2004 WL 414828, at *1 (S.D.N.Y. Mar. 4, 2004) ("The purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists.").

-2-

The Honorable Naomi Reice Buchwald

## A Discovery Stay Is Appropriate in Antitrust Actions and Required in the PSLRA Cases

Deferring discovery until after resolution of defendants' dispositive motions is particularly appropriate in the context of antitrust litigation. As the Supreme Court noted in *Bell Atlantic Corp. v. Twombly*, "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." 550 U.S. 544, 558 (2007) (internal citation omitted). The *Twombly* Court also held that the "basic deficiency [of a complaint] should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* (internal quotations marks and alterations omitted). Defendants believe they have substantial grounds to dismiss plaintiffs' antitrust claims, and the Court should deny plaintiffs' discovery request and defer discovery, if any, until after defendants' dismissal motions are decided.[4]

Deferral of discovery until after resolution of defendants' dismissal motions is also eminently sensible because the *Charles Schwab* actions are subject to the PSLRA's automatic stay of discovery. 15 U.S.C. § 78u-4(b)(3)(B). In circumstances such as those here—where cases subject to a PSLRA stay have been coordinated with cases not subject to a stay in a multidistrict litigation—district courts have issued a broad stay of discovery. *See, e.g., In re AOL Time Warner, Inc.*, MDL No. 1500, 2003 U.S. Dist. LEXIS 16895 (S.D.N.Y. Sept. 26, 2003). In *AOL Time Warner*, the court denied the PSLRA plaintiffs' request to lift the PSLRA stay, and issued a stay of all non-ERISA-specific discovery in the multidistrict litigation's related ERISA suit. The court noted that, if plaintiffs' claims survived the motion to dismiss, "the entire discovery process [would] likely have to be repeated"—"the exact type of inefficiency that the [JPML] . . . sought to avoid when it consolidated the[ ] cases." *Id.* at *4. The court concluded that "a temporary and finite delay in attaining discovery, when there are no time-sensitive claims at issue" does not "amount[ ] to prejudice" against the non-securities plaintiffs. *Id.* at *5. These considerations support deferral of discovery here until the Court resolves defendants' dismissal motions.

## Consideration of Dispositive Motions Before Discovery Proceeds Will Maximize Efficiency

Defendants respectfully submit that the prompt filing of consolidated complaints followed by any motions to dismiss will maximize the efficiency of this action. The twenty-one consolidated class-action complaints differ in many respects, including the number and identity of defendants, the number and nature of claims, and the duration of class periods. Many of the defendants are barely mentioned in these complaints (if they are mentioned at all), beyond identifying them as defendants. Requiring defendants to produce documents before plaintiffs have filed consolidated complaints would be an expensive and burdensome process, with no guarantee that plaintiffs would eventually set forth any viable claim for relief. The Court should require plaintiffs to file their consolidated complaints, allow defendants to file their dispositive motions, and then rule on those motions—which may end the litigation or narrow the case.

---

[4] *See In re Graphics Processing Units Antitrust Litig.*, No. C 0607417 WHA, 2007 WL 2127577, at *4 (N.D. Cal. July 24, 2007) (granting a discovery stay of documents provided to regulators pending resolution of dismissal motions because "to allow antitrust discovery prior to sustaining a complaint would defeat one of the rationales of *Twombly*" and because "adjudicating the motions to dismiss will shed light on the best course for discovery").

-3-

The Honorable Naomi Reice Buchwald

\*    \*    \*

The foregoing letter is respectfully submitted on behalf of the undersigned bank defendants:

Robert F. Wise, Jr. /ALH
Robert F. Wise, Jr.
Arthur J. Burke
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
*Attorneys for Bank of America Corporation*

Thomas C. Rice /ALH
Thomas C. Rice
Juan A. Arteaga
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
*Attorneys for JPMorgan Chase & Co.*

Herbert S. Washer /ALH
Herbert S. Washer
Richard F. Schwed
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
*Attorneys for Credit Suisse Group AG*

Marc J. Gottridge /ALH
Marc J. Gottridge
Eric J. Stock
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
*Attorneys for Lloyds Banking Group PLC and HBOS plc*

David H. Braff
Jeffrey T. Scott
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
*Attorneys for Barclays Bank PLC*

Andrew Stern /ALH
Andrew Stern
Nicholas P. Crowell
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
*Attorneys for The Norinchukin Bank*

Edwin R. DeYoung /ALH
Edwin R. DeYoung
Roger B. Cowie
Gregory T. Casamento
LOCKE LORD LLP
Three World Financial Center
New York, NY 10281
*Attorneys for HSBC Holdings plc*

Arthur Hahn /MH
Arthur Hahn
Christian Kemnitz
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
*Attorneys for The Royal Bank of Canada*

-4-

The Honorable Naomi Reice Buchwald

_Daryl Libow / MH_

Daryl A. Libow
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
*Attorneys for The Bank of Tokyo-Mitsubishi
UFJ, Ltd.*

_Robert Houck / HH_

Robert Houck
James Miller
CLIFFORD CHANCE LLP
31 West 52nd Street
New York, NY 10019
*Attorneys for The Royal Bank of Scotland
Group plc*

_David Gelfand / MH_

David R. Gelfand
Sean M. Murphy
MILBANK, TWEED, HADLEY &
   MCCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
*Attorneys for Coöperatieve Centrale
Raiffeisen-Boerenleenbank B.A.*

_Steven Wolowitz / MH_

Steven Wolowitz
Richard M. Steuer
John J. Tharp
MAYER BROWN LLP
1675 Broadway
New York, NY 10019
*Attorneys for Société Générale*

_Moses Silverman / MH_

Moses Silverman
Andrew C. Finch
PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
*Attorneys for Deutsche Bank AG*

_Peter Sullivan / HH_

Peter Sullivan
Mark A. Kirsch
Lawrence J. Zweifach
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
*Attorneys for UBS AG*

-5-

The Honorable Naomi Reice Buchwald

*Alan Wiseman /AH*

Alan M. Wiseman
Andrew A. Ruffino
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue N.W.
Washington, D.C. 20004
620 Eighth Avenue
New York, New York 10019

*Ethan Litwin /AH*

Ethan E. Litwin
Christopher M. Paparella
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
*Attorneys for WestLB AG*

Michael R. Lazerwitz
Joon Kim
CLEARY GOTTLIEB STEEN &
 HAMILTON LLP
One Liberty Plaza
New York, NY 10006
*Attorneys for Citibank N.A.*

cc:     David E. Kovel
        Roger W. Kirby
        (Kirby McInerney LLP)

        Christopher Lovell
        Gary Jacobson
        (Lovell Stewart Halebian Jacobson LLP)

        Michael D. Hausfeld
        William P. Butterfield
        (Hausfeld LLP)

        William Christopher Carmody
        Marc M. Seltzer
        (Susman Godfrey LLP)

        Steven E. Fineman
        Richard M. Heimann
        (Lieff Cabraser Heimann & Bernstein, LLP)

-6-



RECEIVED IN CHAMBERS
OF NAOMI REICE BUCHWALD

FEB 2 3 2012

UNITED STATES COURT JUDGE

**HAUSFELD**LLP

202.540.7200 ph
202.540.7201 fax

1700 K Street, NW
Suite 650
Washington, DC 20006

February 23, 2012

### VIA FACSIMILE AND HAND

The Honorable Naomi Reice Buchwald
United States District Judge
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

> Re:  *In re: LIBOR-Based Financial Instruments Antitrust Litigation*,
> No. 1:11-MD-2262 (NRB)

Dear Judge Buchwald:

We write on behalf of Plaintiffs[1] in reply to Defendants' February 17, 2012 letter brief. Characterizing Plaintiffs' request as "extraordinary", Defendants contend that -- even though they have produced documents to regulatory authorities in the United States and elsewhere -- it would be unduly burdensome to provide to Plaintiffs a copy of the materials provided to the United States Department of Justice and other U.S. regulatory authorities. Instead of promoting efficiency by providing Plaintiffs limited discovery so that the inevitable motions to dismiss can be fairly litigated based on the information already in the hands of the Defendants and regulatory authorities, Defendants apparently wish to use their superior access to information for a tactical litigation advantage, sacrificing fairness and efficiency in this case, and placing an unnecessarily heavy burden on Plaintiffs. As discussed below, Defendants have raised no compelling reason or authorities supporting their objection to this plainly non-burdensome discovery.

Defendants are charged with manipulating an interest rate that sets the benchmark for over $360 trillion of securities worldwide and have produced a considerable number of documents to various regulators and governments on *this very issue*.[2] Providing these documents to Plaintiffs is the fairest, most efficient, and cost-effective approach given the circumstances. This approach is far from unprecedented. In their February 17 letter brief,

---

[1] This letter is submitted jointly by the Over-the-Counter Plaintiffs and Exchange-Based Plaintiffs. The Charles Schwab Plaintiffs are responding separately.

[2] *See* Lindsay Fortado et. al, *UBS Turning Whistleblower in Libor Probe Pressures Rivals*, BLOOMBERG, Feb. 21, 2012, http://www.bloomberg.com/news/2012-02-21/ubs-turning-whistleblower-in-libor-probe-pressures-rivals.html

The Honorable Naomi Reice Buchwald
2/23/2012
Page 2

Plaintiffs cited several cases where courts have ordered a defendant at an early stage of a case to produce documents that had already been made available to the government. *See, e.g., In re Platinum and Palladium Commodities Litig.*, 10 Civ. 3617 (WHP), slip op. at 2 (S.D.N.Y. Nov. 30, 2010), Dkt. No. 59 (ordering Defendant's pre-motion to dismiss production of documents already produced to the CFTC). Furthermore, courts have found that such discovery imposes minimal burdens when the documents being produced have already been gathered, reviewed, and organized. *See, e.g., In re Bank of Am. Corp. Sec., Derivative, & Employment Ret. Income Sec. Act (ERISA) Litig.*, No. 09-MDL 2058, 2009 WL 4796169 at *2 (S.D.N.Y. Nov. 16, 2009). These cases provide ample support for Plaintiffs' request.

Defendants' cited authority is unpersuasive. For example, Defendants point to case law that cautions courts against allowing discovery "based on pure speculation that amount[s] to nothing more than a 'fishing expedition' into actions or past wrongdoing not related to alleged claims or defenses." *Callens* v. *City of N.Y.*, 222 F.R.D. 249, 253 (S.D.N.Y. 2004). Plaintiffs' request here is far from a fishing expedition. Instead, Plaintiffs propound a narrowly tailored request: documents *in the form already produced* to U.S. law enforcement authorities, which are necessarily "related to alleged claims or defenses" by virtue of being produced for the government's own probe into Libor manipulation. Defendants also cite authority they claim shows that they are not under a general duty to produce before a consolidated amended complaint is filed. *See In re Digital Music Antitrust Litig.*, MDL No.1780, 2007 U.S. Dist. LEXIS 13567, at *9 (S.D.N.Y. Feb. 27, 2007). That case simply notes that the court denied Plaintiffs request, without establishing a general rule that prohibits discovery before a consolidated amended complaint is filed.

Defendants argue that discovery cannot go forward until after a Rule 26(f) conference. This is easily addressed in a scheduling order and provides no impediment to the requested discovery. Defendants also say that they cannot have a meaningful Rule 26(f) conference because Plaintiffs have not yet identified all of the allegations, claims, and defendants they intend to include in the consolidated amended complaints. This argument also lacks merit. Unlike the typical Rule 26(f) conference, for this limited production the parties need not negotiate custodians, data locations, search terms, production format and the like. Plaintiffs are not asking for Defendants to do anything more than provide copies of documents already produced, and in the same format already produced. Finally, Defendants claim that they would need to re-review their productions to deal with sensitive competitive information and potentially privileged information. Without addressing the issue of whether Defendants' production to the government constitutes a waiver of any privileges that might be asserted, their concerns can be handled by a simple protective order which also includes the protection afforded by Fed. R. Evid. 502(d).

The Honorable Naomi Reice Buchwald
2/23/2012
Page 3

Plaintiffs have narrowly tailored their request for limited discovery to documents Defendants have already collected and produced to U.S. regulators investigating the manipulation of LIBOR.[3] Such material is clearly relevant and discoverable under Rule 26(b)(1). Because Plaintiffs' narrowed request[4] is limited to documents produced to U.S. regulators, it avoids the cross-border data transfer issues raised by Defendants in their letter brief.

The burden of producing this limited set of documents would be very minimal. Defendants have already gone through the most difficult and expensive tasks.[5] Compared to what has already been done, Defendants' task here would involve no substantial burden.

It is worth noting that while production of this limited information would not be burdensome to Defendants, requiring Plaintiffs to file consolidated amended complaints without it would be unfair to Plaintiffs.

The limited discovery sought by plaintiffs is appropriate and furthers the mandate of F.R. Civ. P. 1. If the Court believes some sort of abbreviated discovery stay is appropriate, we believe the Defendants should produce the documents, at a minimum, that they produced to U.S. regulators, all parties should agree to preserve evidence, and a Rule 26 conference should proceed immediately.

---

[3] Based on publically available information, Plaintiffs believe that the U.S. Department of Justice, the U.S. Commodities Futures trading Commission and the U.S. Securities and Exchange Commission are investigating the alleged manipulation of LIBOR.

[4] Although Plaintiffs initially sought a broader production, to avoid issues with relevance and burden, they subsequently narrowed their request to include only documents produced to U.S. regulatory authorities.

[5] To produce to the regulatory authorities, Defendants presumably have already decided the scope of responsive information, investigated which of their document custodians possessed that information, determined where the responsive information resides within their enterprises, designed and employed search protocols to locate that information, collected, reviewed (for responsiveness and privilege), processed and produced the information.

The Honorable Naomi Reice Buchwald
2/23/2012
Page 4

Respectfully submitted,

*/s/ Michael D. Hausfeld*
Michael D. Hausfeld
William P. Butterfield
Ralph J. Bunche
HAUSFELD LLP
1700 K St., NW, Suite 650
Washington, DC 20006
Tel:202-540-7200

*/s/ William Christopher Carmody*
William Christopher Carmody
Arun Subramanian
SUSMAN GODFREY L.L.P.
560 Lexington Ave, 15th Floor
New York, NY 10022
Tel:212-336-8330

Marc M. Seltzer
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars
Los Angeles, CA 90067-6029
Tel: 310-789-3100

***Interim Co-Lead Counsel for Over-the-
Counter Plaintiffs***

*/s/ Christopher Lovell*
Christopher Lovell
Gary Jacobson
Ian T. Stoll
LOVELL STEWART HALEBIAN JACOBSON
LLP
61 Broadway, Suite 501
New York, NY 10006
Tel:212-608-1900

*/s/ David E. Kovel*
David E. Kovel
Roger W. Kirby
Daniel Hume
Surya Palaniappan
KIRBY McINERNEY LLP
825 Third Avenue
New York, NY 10022
Tel: 212-317-2300

***Interim Co-Lead Counsel for Exchange-Based
Plaintiffs***

cc:    All Defense Counsel in the Referenced Matter c/o Jeffrey T. Scott of Sullivan &
Cromwell LLP

**Lieff
Cabraser
Heimann&
Bernstein**
Attorneys at Law

Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
t 415.956.1000
f 415.956.1008

February 23, 2012

Joseph R. Saveri
Partner
jsaveri@lchb.com

**VIA FACSIMILE AND HAND DELIVERY
(212) 805-7927**

Judge Naomi Reice Buchwald
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007



RE:    *In re: LIBOR-Based Financial Instruments Antitrust Litigation,*
       No. 1:11-MD-2262 (NRB)

Your Honor:

Although we join the submission of the Class Plaintiffs, we write separately on behalf of the Charles Schwab Plaintiffs in reply to certain points raised in Defendants' February 17, 2012 letter brief. Defendants seek to frustrate the orderly process of this litigation with a combination of misplaced procedural objections, incorrect legal positions and a failure to exercise common sense.

**Defendants should Produce the Documents Previously Produced to the United States Government without Additional Delay**

**First**, the material Plaintiffs seek is core discovery material, directly relevant to this case. Defendants are charged with manipulating an interest rate that sets the benchmark for over $360 trillion of financial products worldwide. In connection with these charges, Defendants have turned over documents to various regulators and governments on *this very issue*.[1] Defendants suggest no answer to the point that the production of such core discovery information will materially advance the parties' understanding of the facts at issue here. To the extent this limited discovery results in more specific, tailored pleadings, the parties and the Court all stand to reap substantial benefits at a low cost. Defendants do not seek to protect themselves from onerous discovery or frivolous claims; rather they seek the procedural

---

[1] *See* Lindsay Fortado et. al, *UBS Turning Whistleblower in Libor Probe Pressures Rivals*, Bloomberg, Feb. 21, 2012, http://www.bloomberg.com/news/2012-02-21/ubs-turning-whistleblower-in-libor-probe-pressures-rivals.html

San Francisco           New York           Nashville           www.lieffcabraser.com

Judge Naomi Reice Buchwald
February 23, 2012
Page 2

advantage of challenging Plaintiffs' allegations while depriving Plaintiffs of relevant—if not key—facts that only they possess. In many cases where there have been government investigations, early Rule 12 motions have turned out to be empty—but expensive and time consuming—exercises when subsequent guilty pleas brought the true facts to light. *See Air Cargo, supra; In Re: TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) (granting Rule 12(b)(6) motions with leave to amend), 599 F. Supp. 2d 1179 (N.D. Cal. 2009) (denying Rule 12(b)(6) motions).

**Second**, the efficient—indeed most efficient—way to proceed is to provide Plaintiffs with Defendants' productions to United States regulators without delay. As set forth in Plaintiffs' February 17, 2012, submission and in the Class Plaintiffs' reply, courts managing litigation of this kind routinely authorize the production of the material Plaintiffs seek. It is not, as Defendants indicate, unprecedented. It is also not burdensome. There is little or no marginal burden for the Defendants to reproduce material already produced to the United States Government. (Plaintiffs have already narrowed their request to eliminate requests for production to non-United States law enforcement or regulatory agencies.) *See, e.g., In re Bank of Am. Corp. Sec., Derivative, & Employment Ret. Income Sec. Act (ERISA) Litig.*, No. 09-MDL 2058, 2009 U.S. Dist. LEXIS 108322, at *3-4 (S.D.N.Y. Nov. 16, 2009). Defendants' burden claims thus rely on speculation--Defendants offer no information about the volume of these productions or the specific costs they would incur to replicate them to Plaintiffs. Likewise without merit is Defendants' assertion that they will need to re-review every document. If the Defendants turned over the documents to the United States, they waived any privilege. In any event, Plaintiffs would be willing to enter into a stipulation pursuant to FRE 502 or other clawback provisions that would balance Defendants' legitimate rights in protecting privileged or confidential information with Plaintiffs' right to expeditious discovery.

**Third**, Defendants' assertion that there can be no discovery because there has been no Rule 26 conference is specious. There has been no conference because Defendants have refused to hold one, in order to create a roadblock to discovery. Such a conference is unnecessary and would be short: there is no need to address complex ESI issues given the limited nature of what Plaintiffs have requested.

**The PSLRA Automatic Stay Should Not be Applied**

The Court should not apply the PSLRA stay. The PSLRA does not stay discovery if "the court finds ... that particularized discovery is necessary to ... prevent undue prejudice to that party." *Id.* Here, as explained in Plaintiffs' opening letter and above, their request is "particularized": Plaintiffs seek only those documents Defendants have already produced to US regulators investigating the manipulation of LIBOR. Courts in this district have found such requests sufficiently particularized. *See e.g., Bank of America*, 2009 U.S. Dist. LEXIS 108322, at *8 (finding plaintiffs' request for documents defendants had already produced to U.S. and state regulators to be sufficiently particularized); *In re WorldCom, Inc. Securities Litig.*, 234 F. Supp. 2d 301, 306 (S.D.N.Y 2002) (particularity requirement met where plaintiffs sought a

Judge Naomi Reice Buchwald
February 23, 2012
Page 3

"clearly defined universe of documents, specifically documents which WorldCom has already produced in connection with other identified proceedings").

Likewise, production of this information is necessary to "prevent undue prejudice." *Id.* In making this determination, courts in this District "weigh the burden to defendants against the potential prejudice to plaintiffs, focusing on the production costs to defendants and plaintiffs' need for early review of the documents." *Bank of America*, 2009 U.S. Dist. LEXIS 108322, at *5. "The burden on the defendants is slight when"—as here—"a defendant has already found, reviewed and organized the documents." *Id.* (internal quotations omitted). In *Bank of America*, Judge Chin lifted the PSLRA stay to allow plaintiffs access to documents defendants had already produced to various government agencies investigating the same wrongdoing at issue in the plaintiffs' action. *Id.* at *8.[2] Here, in addition, the majority of Schwab Plaintiffs' claims are not subject to the PSLRA. No purpose would be served, and the Schwab Plaintiffs would be unduly prejudiced, if the court stayed discovery by Schwab Plaintiffs while allowing focused discovery to go forward by the class lawyers and other plaintiffs who have not asserted securities claims. Under those circumstances, the Schwab Plaintiffs would be "less able to make informed decisions about litigation strategy," and would fall behind the other cases in MDL 2262. *Id.* Moreover, lifting the stay as to the Schwab Plaintiffs would "not frustrate Congress's purposes in enacting the provision": the narrow discovery sought is not a "fishing expedition" but concerns active criminal investigations of the Defendants *Id.*

Finally, even if the Court stays discovery in the Schwab actions, it should not stay discovery in the other cases in the MDL. The sole case cited by Defendants in support of their argument is distinguishable from the facts of this litigation. *In re AOL Time Warner, Inc. Securities and "ERISA" Litig.*, MDL No. 1500, 2003 U.S. Dist. LEXIS 16895 (S.D.N.Y. Sept. 26, 2003), included a securities fraud class action and an ERISA class action. In *AOL*, the court was concerned about avoiding "duplicative and uncoordinated discovery" in the MDL between two distinct kinds of cases. *Id.* at * 1. Here, all Plaintiffs assert federal antitrust claims and the particularized discovery sought is documents produced by Defendants to, among other agencies, the Department of Justice's Antitrust Division. The limited discovery sought will also bear on the other claims asserted by Plaintiffs. In *AOL*, securities fraud was the dominant legal theory of the litigation; here, the securities claims are asserted only by the Schwab Plaintiffs, who also assert antitrust claims as their primary theories of relief. The gravamen of this litigation is

---

[2] *See, e.g., In re Massey Energy Co. Sec. Litig.*, No. 5:10-cv-0689, 2011 U.S. Dist. LEXIS 111175, at *24 (S.D. W. Va. Sept. 28, 2011); *In re LaBranche Sec. Litig.*, 333 F. Supp. 2d 178, 183-84 (S.D.N.Y. 2004), *WorldCom*, 234 F. Supp. 2d at 304; *In re Royal Ahold N.V. Sec. and ERISA Litig.*, 220 F.R.D. 246, 251-52 (D. Md. 2004); *In re FirstEnergy Corp. Sec. Litig.*, 229 F.R.D. 541, 545 (N.D. Ohio 2004); *In re Enron Corp. Sec and ERISA Litig..*, MDL-1446, 2002 U.S. Dist. LEXIS 26261, at *32 (S.D. Tex. Aug. 15, 2002).

Judge Naomi Reice Buchwald
February 23, 2012
Page 4

predominantly antitrust, not securities fraud, and it would be unwise to invoke the PSLRA to
halt all progress in this MDL.

Respectfully,

Joseph Saveri/86

Joseph R. Saveri

JRS:ls
cc:     Steven E. Fineman
        All Defense and Plaintiff Counsel
964762.1

February 23, 2012

<u>By Facsimile and Hand</u>

The Honorable Naomi Reice Buchwald
United States District Court
Southern District of New York
500 Pearl Street
New York, New York  10007



Re: <u>*In re: LIBOR-Based Financial Instruments Antitrust Litigation*, 1:11-MD-2262 (NRB)</u>

Dear Judge Buchwald:

        We write on behalf of the bank defendants in response to plaintiffs' letter of February 17, 2012, in which plaintiffs seek pre-complaint discovery of all documents defendants have "produced to U.S. regulators investigating the alleged manipulation of LIBOR." Plaintiffs attempt to justify their extraordinary request by arguing that it would impose "little burden" on defendants and would be more efficient to proceed with such discovery. But this argument could be made by nearly every plaintiff in any lawsuit ever brought—and, if adopted, would fundamentally change the rules of civil procedure in federal courts, causing defendants enormous financial and other burdens even before a plaintiff can demonstrate to the court that it has a plausible claim. Plaintiffs' extraordinary request is simply contrary to the Federal Rules of Civil Procedure ("FRCP"). Moreover, plaintiffs have identified no prejudice to them if their request is denied. In contrast, as explained in defendants' February 17 letter, a significant burden and prejudice would be imposed on the defendants if plaintiffs' request were granted. The "efficiencies" plaintiffs claim would be gained by allowing pre-complaint discovery are illusory. They offer no guarantees that, even if the Court granted their extraordinary request, they would forego any future opportunities to further amend any of their claims (if any did survive the defendants' dismissal motions). For the reasons herein and those set forth in the defendants' February 17 letter, the Court should deny plaintiffs' request.

**<u>Plaintiffs' Pre-Complaint Discovery Request Is Procedurally Improper</u>**

        Plaintiffs fail to identify a legal basis that would entitle them to the extraordinary pre-complaint discovery they seek. This is not surprising because, as explained in defendants' February 17 letter, there is no right to pre-complaint discovery under the FRCP. The FRCP specifically prohibits a party from seeking discovery before a Rule 26(f) conference. There is little doubt that plaintiffs' discovery demand—before they have identified the allegations, claims or defendants that they intend to include in the consolidated complaints—is impermissible under the FRCP. Plaintiffs' letter confirms that the undisputed (and improper) purpose of their request is to determine what they should plead in their complaints, not to support a claim that has been properly pled. Indeed, the fact that the news articles purportedly justifying their extraordinary request focus on foreign currency LIBOR and TIBOR, yet their existing complaints only mention U.S. dollar LIBOR, demonstrates that the plaintiffs are on a blatant fishing expedition. This Court should reject plaintiffs' transparent attempt to contravene the FRCP.

The Honorable Naomi Reice Buchwald

## Plaintiffs' Pre-Complaint Discovery Would Be Unduly Burdensome

Plaintiffs contend that their proposed discovery would impose "little burden" on defendants because plaintiffs are only seeking documents "produced to U.S. regulators investigating the alleged manipulation of LIBOR." But plaintiffs' request seeks millions of documents—much of which concern currencies that are not at issue in any of the existing complaints. As explained in defendants' February 17 letter, plaintiffs' request would require the re-review of a huge volume of material for sensitive commercial and personal data, privilege, and relevancy to the present matter (which is impossible as plaintiffs have not yet set forth their claims). Plaintiffs do not address the fact that certain defendants have produced documents to governmental authorities in a manner that did not require a review for information protected by the U.K.'s Data Protection Act or other foreign privacy laws. Contrary to plaintiffs' cavalier suggestion, defendants simply cannot copy their government productions for plaintiffs to review. *See Rio Grande Royalty Co.* v. *Energy Transfer Partners, L.P.*, No. H-08-cv-0857, 2008 U.S. Dist. LEXIS 112721, at *1, *4 (S.D. Tex. Aug. 11, 2008) (staying discovery where plaintiff's request for all documents produced to government regulators is "overly broad" because the documents "relate to time periods and locations that are not within the scope of Plaintiff's complaint" and defendants' "need to review such a large volume of documents [to narrow their scope] prior to producing them would be a significant burden").[1]

Plaintiffs argue that in weighing their request, the Court must "balance the burden to defendants against the potential prejudice to plaintiffs." But here there is nothing to balance. Although defendants have demonstrated the substantial burden on them by plaintiffs' request, plaintiffs have not articulated any prejudice they would suffer if the Court denies their request. Nor could they. In light of the ongoing government investigations, there is no credible risk that the documents will be lost or destroyed and no unique circumstances justify granting plaintiffs' request. Thus, under plaintiffs' own test, their request should be denied.

## It Is More Efficient to Proceed with Resolution of Dispositive Motions Before Discovery

Plaintiffs argue that it would be more efficient to proceed with discovery before the filing of consolidated complaints based on speculation that defendants may resolve government investigations at some unspecified date, and that plaintiffs may then be able to plead claims with sufficient detail to survive a motion to dismiss. Plaintiffs' argument exposes their concern about the viability of their claims: they essentially concede that they have filed complaints without sufficient facts to sustain a claim and are now fishing for support to substantiate their legally deficient claims.

Moreover, plaintiffs' letter fails to demonstrate any potential efficiency that might result from pre-complaint discovery. Plaintiffs merely assume that pre-complaint discovery will eliminate

---

[1] The number of defendants and magnitude of potential productions here distinguishes this case from those cited by plaintiffs where discovery of government productions was ordered before dismissal motions were resolved. *In re Platinum & Palladium Commodities Litigation*, for example, involved fewer defendants, one regulator, the review of only 250,000 pages of documents previously produced, and importantly, did not involve pre-complaint discovery. No. 10 Civ. 3617 (S.D.N.Y. Nov. 30, 2010) (Dkt. No. 59); *see also In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09 Civ. 03690 (N.D. Ill. Mar. 4, 2010) (Dkt. No. 75) (order compelling two defendants and their subsidiaries and agents to produce documents previously provided to CFTC). In contrast, due to the breadth of plaintiffs' request and the huge volume of documents that would need to be re-reviewed, as well as the fact that operative complaints have not yet been filed, the burden here is substantially greater.

-2-

The Honorable Naomi Reice Buchwald

the need for future amended complaints, but common sense suggests otherwise. It is highly likely that if the relevant government investigations result in enforcement actions, plaintiffs will again seek to amend their complaints. Nothing about plaintiffs' proposal leads to more efficient litigation.

## A Stay of Discovery Pending Resolution of Dismissal Motions Is Appropriate

Plaintiffs' letter does nothing to undermine the principles that a stay of discovery is appropriate in antitrust cases and required in PSLRA cases. First, plaintiffs make much of the fact that *Twombly* did not impose an automatic stay in antitrust cases, but defendants never suggested as much. Instead, defendants argue that discovery is disfavored in antitrust actions before the filing of dispositive motions. Moreover, the district court in *Twombly* in fact entered a stay of discovery, which was confirmed as the correct procedure by the Supreme Court, and this precedent has been followed by numerous courts.[2] Furthermore, even in the cases cited by plaintiffs, the courts held that early discovery was not appropriate.[3] The *In re Graphics Processing* court expressly found that "to allow antitrust discovery prior to sustaining a complaint would defeat one of the rationales of *Twombly*." 2007 U.S. Dist. LEXIS 57982, at *24.

Similarly, plaintiffs fail to explain why this Court should award the extraordinary relief of discovery in contravention of the PSLRA's mandatory stay provision. The authorities cited by plaintiffs emphasize that Congress enacted the PSLRA to prevent such fishing expeditions. *See In re LaBranche Sec. Litig.*, 333 F. Supp. 2d 178, 181 (S.D.N.Y. 2004) ("Congress . . . enacted the mandatory stay of discovery to prevent plaintiffs from filing securities fraud lawsuits as a vehicle in order to conduct discovery in the hopes of finding . . . sustainable claims not alleged in the complaint.") (internal quotation marks omitted).[4] Indeed, a later decision in the *Bank of America* litigation referenced by plaintiffs criticized a request to delay amending plaintiffs' complaint until after they received further discovery, noting that "[a]llowing discovery to proceed to gather evidence to frame an allegation undermines the purposes of . . . the PSLRA's statutory stay of discovery." *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, No. 09 MDL 2058, 2010 U.S. Dist. LEXIS 99644, at *12 (S.D.N.Y. Sept. 16, 2010).[5]

---

[2] *See, e.g., In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. MDL 1869 (D.D.C. June 23, 2008) (attached as Ex. A); *Precision Assocs. v. Panalpina World Transp.*, No. CV-08-42 (E.D.N.Y. June 2, 2009) (attached as Ex. B); *In re Digital Music Antitrust Litig.*, No. 06 MDL 1780 (S.D.N.Y. May 28, 2010) (attached as Ex. C); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06 MDL 1775 (E.D.N.Y. July 26, 2007) (attached as Ex. D); *In re LTL Shipping Servs. Antitrust Litig.*, No. 08 MDL 1895 (N.D. Ga. Apr. 22, 2008) (attached as Ex. E).

[3] *See In re Graphics Processing Units Antitrust Litig.*, No. 06-07417, 2007 U.S. Dist. LEXIS 57982, at *27 (N.D. Cal. July 24, 2007) (discovery not appropriate before the filing of dispositive motions); *In re Flash Memory Antitrust Litig.*, No. 07-0086, 2007 U.S. Dist. LEXIS 95869, at *30 (N.D. Cal. Jan. 4, 2008) (discovery not appropriate before the filing of amended consolidated complaints).

[4] Further, in arguing that the PSLRA stay here should be lifted, plaintiffs rely on cases wherein the plaintiffs were seeking recovery against insolvent defendants. *See, e.g., In re Delphi Corp.*, No. 05 MDL 1725, 2007 WL 518626, at *1 (E.D. Mich. Feb. 15, 2007) (defendant filed for bankruptcy). None of the defendants here are insolvent, and thus, these cases are not relevant.

[5] Moreover, courts in this District have consistently determined that mandatory stays under the PSLRA may not be avoided by requests for documents previously produced to the government. *See, e.g., Rampersad v. Deutsche Bank Sec. Inc.*, 381 F. Supp. 2d 131, 133 (S.D.N.Y. 2003) (rejecting plaintiff's contention that "the PSLRA stay of discovery does not apply when the information sought has already been provided to a governmental agency"); *In re Smith Barney Transfer Agent Litig.*, No. 05 Civ. 7583, 2006 WL 1738078, at *3 (S.D.N.Y. June 26, 2006) (deeming irrelevant plaintiffs' argument that defendant could easily produce materials already provided to SEC).

The Honorable Naomi Reice Buchwald

\*     \*     \*

The foregoing letter is respectfully submitted on behalf of the undersigned bank defendants:

*Robert Wise /ALH*

Robert F. Wise, Jr.
Arthur J. Burke
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
*Attorneys for Bank of America Corporation*

*Herbert Washer /ALH*

Herbert S. Washer
Richard F. Schwed
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
*Attorneys for Credit Suisse Group AG*

*Jeffrey T. Scott*

David H. Braff
Jeffrey T. Scott
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
*Attorneys for Barclays Bank PLC*

*Edwin De Young /ALH*

Edwin R. DeYoung
Roger B. Cowie
Gregory T. Casamento
LOCKE LORD LLP
Three World Financial Center
New York, NY 10281
*Attorneys for HSBC Holdings plc*

*Thomas Rice /ALH*

Thomas C. Rice
Juan A. Arteaga
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
*Attorneys for JPMorgan Chase & Co.*

*Marc Gottridge /ALH*

Marc J. Gottridge
Eric J. Stock
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
*Attorneys for Lloyds Banking Group PLC and HBOS plc*

*Andrew Stern /ALH*

Andrew Stern
Nicholas P. Crowell
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
*Attorneys for The Norinchukin Bank*

*Arthur Hahn /ALH*

Arthur Hahn
Christian Kemnitz
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
*Attorneys for The Royal Bank of Canada*

-4-

The Honorable Naomi Reice Buchwald

Daryl Libow / ACH

Daryl A. Libow
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
*Attorneys for The Bank of Tokyo-Mitsubishi*
*UFJ, Ltd.*


David Melfand / ACH

David R. Gelfand
Sean M. Murphy
MILBANK, TWEED, HADLEY &
  MCCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005
*Attorneys for Coöperatieve Centrale Raiffeisen-*
*Boerenleenbank B.A.*


Moses Silverman / ACH

Moses Silverman
Andrew C. Finch
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019
*Attorneys for Deutsche Bank AG*


Robert Houck / ACH

Robert Houck
James Miller
CLIFFORD CHANCE LLP
31 West 52nd Street
New York, NY  10019
*Attorneys for The Royal Bank of Scotland Group*
*plc*


Steven Wolowitz / ACH

Steven Wolowitz
Richard M. Steuer
John J. Tharp
MAYER BROWN LLP
1675 Broadway
New York, NY  10019
*Attorneys for Société Générale*


Peter Sullivan / ACH

Peter Sullivan
Mark A. Kirsch
Lawrence J. Zweifach
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
*Attorneys for UBS AG*


-5-

The Honorable Naomi Reice Buchwald

*Alan Wiseman / ALH*

Alan M. Wiseman
Andrew A. Ruffino
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue N.W.
Washington, D.C. 20004
620 Eighth Avenue
New York, New York 10019

Michael R. Lazerwitz
Joon Kim
CLEARY GOTTLIEB STEEN &
  HAMILTON LLP
One Liberty Plaza
New York, NY 10006
*Attorneys for Citibank N.A.*

*Ethan Litwin / ALH*

Ethan E. Litwin
Christopher M. Paparella
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
*Attorneys for WestLB AG*

cc:     David E. Kovel
        Roger W. Kirby
        (Kirby McInerney LLP)

        Christopher Lovell
        Gary Jacobson
        (Lovell Stewart Halebian Jacobson LLP)

        Michael D. Hausfeld
        William P. Butterfield
        (Hausfeld LLP)

        William Christopher Carmody
        Marc M. Seltzer
        (Susman Godfrey LLP)

        Steven E. Fineman
        Richard M. Heimann
        (Lieff Cabraser Heimann & Bernstein, LLP)

-6-

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION ) ) ) ) | |
| This document relates to: ) ) | MDL Docket No. 1869 Misc. No. 07-489 (PLF) |
| ALL CASES ) ) ) | |

## ORDER

This matter is before the Court on defendants' motion for a protective order and a stay of discovery. Plaintiffs have served upon defendants a request for "documents that the defendants have already compiled and produced to the New Jersey Office of the Attorney General and the Surface Transportation Board." Pls.' Opp. at 1. Defendants "seek a protective order to prevent plaintiffs from taking any discovery until after [defendants'] motions to dismiss are decided, and to defer defendants' obligation under Rule 34 to respond or object to [plaintiffs'] specific document requests . . . .". Defs.' Mot. at 7.

Upon careful consideration of the parties' papers and the circumstances of this case, the Court concludes that it is appropriate to stay all discovery pending resolution of the defendants' motions to dismiss or until further order of this Court. The Court will therefore grant defendants' motion for a protective order. Accordingly, it is hereby

ORDERED that defendants' motion for a protective order and a stay of discovery [102] is GRANTED; it is

FURTHER ORDERED that all discovery in this matter will be stayed pending resolution of the defendants' motions to dismiss or until further order of this Court. Defendants' obligations under Rule 34 to respond or object to plaintiffs' specific document requests will be deferred during the effective period of the stay; and it is

FURTHER ORDERED that, in the event that the Court does not grant defendants' motions to dismiss, defendants shall be prepared to fulfill their discovery obligations with respect to the direct purchaser plaintiffs' first request for production within fifteen (15) days of the Court's ruling.

SO ORDERED.

/s/_____ __ ___ ___ _____
PAUL L. FRIEDMAN
United States District Judge

DATE: June 23, 2008

2

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
PRECISION ASSOCIATES, INC., JAMES BARNES,
and ANYTHING GOES LLC d/b/a MAIL BOXES ETC.,
on behalf of themselves and all others similarly situated,

       Plaintiffs,

       **ORDER**

    - v -

       CV-08-42 (JG)(VVP)

PANALPINA WORLD TRANSPORT (HOLDING)
LTD., et al.,

       Defendants.
--------------------------------------------------------------------x

   Upon the motion by the plaintiffs for the appointment of Interim Co-Lead Counsel, and

in accordance with the agreement of the parties as set forth in the Stipulation and (proposed)

Order filed in the record as docket entry 99, the court enters the following order:

   1.  The law firms of Lovell Stewart Halebian LLP, Lockridge Grindal Nauen P.L.L.P.,

Cotchett, Pitre & McCarthy, and Gustafson Gluek PLLC are appointed to serve as Interim Co-

Lead Counsel to act on behalf of all plaintiffs, with the responsibilites hereinafter described.

   2.  Interim Co-Lead Counsel shall have sole authority over the following matters on

behalf of all plaintiffs: (a) the initiation, response, scheduling, briefing and argument of all

motions; (b) the scope, order and conduct of all discovery proceedings; ©) such work

assignments to other plaintiffs' counsel as they may deem appropriate; (d) the retention of

experts; (e) designation of which attorneys may appear at hearings and conferences with the

Court ; (f) the timing and substance of any settlement negotiations with Defendants; and (g)

other matters concerning the prosecution or resolution of this action.

3.     No motion shall be initiated or filed on behalf of any plaintiff in the case except through Interim Co-Lead Counsel.

4.     Interim Co-Lead Counsel shall have sole authority to communicate with Defendants' counsel and the Court on behalf of all plaintiffs unless that authority is expressly delegated to other counsel.  Dependants' counsel may rely on all agreements made with Interim Co-Lead Counsel.

5.     Interim Co-Lead Counsel will file an Amended Class Action Complaint ("Amended Complaint") in this action within 42 days.  The Defendants need not respond to the existing Complaint.  Defendants shall respond to the Amended Complaint within 42 days after the filing of the Amended Class Action Complaint.  As a premotion conference has already been held, should the Defendants choose to respond by making a motion to dismiss the complaint, they may do so without requesting a further premotion conference with the court.

6.     Service of the Amended Complaint may be made on counsel for each Defendant by any of the following means: (a) hand delivery; (b) overnight courier; (c) email; or (d) facsimile.

7.     Discovery is this action is stayed until the resolution of any motions filed by Defendants in response to the Amended Complaint.

SO ORDERED:

*Viktor V. Pohorelsky*

VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
       June 2, 2009

-2-

# EXHIBIT C

*p.λ.ΣΤΡΑ.Σ,*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/1/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                            :
IN RE: DIGITAL MUSIC ANTITRUST   :   MASTER FILE
LITIGATION                         :   1:06-MD-01780 (LAP)
                            :
This Document Relates To: All Actions   :
                            :
------------------------------------------------------------x

## STIPULATION AND ORDER

      **IT IS HEREBY STIPULATED AND AGREED**, by and between the
undersigned counsel for Defendants and for Plaintiffs, in the above-captioned action, as follows:

      **WHEREAS** pursuant to Order dated May 17, 2010, the Court convened a
conference on May 19, 2010, at which all parties appeared through counsel, to discuss a
procedure and schedule for moving forward with this matter, including the Court's resolution of
certain outstanding issues raised in (1) the pending standalone motions to dismiss filed by the
three Parent Company defendants, namely Time Warner Inc., Bertelsmann, Inc. and Sony
Corporation of America (*see* Docket Nos. 76, 79, 82, 89, 94, 95, 97) and (2) the unresolved
issues raised in Defendants' joint motion to dismiss (*see* Docket Nos. 78, 88, 96) (collectively,
the "Pending Motions"); and

      **WHEREAS** during the above-mentioned conference, the Court directed that it
would resolve all Pending Motions and would address discovery only after resolution of the
same; and

      **WHEREAS** during the above-mentioned conference, the Court stated that it
would accept the submission of supplemental legal authority addressing the issues raised in the
Pending Motions; and

      **WHEREAS** during the above-mentioned conference, the Court stated that it
would receive a motion by Plaintiffs, pursuant to Rule 15(d) of the Federal Rules of Civil
Procedure, seeking leave to file a Third Consolidated Amended Complaint limited to the addition
of new claims brought pursuant to the antitrust laws of the States of New York and Illinois; and

      **WHEREAS** during the above-mentioned conference, the Court directed that any
such submissions by Plaintiffs be made not later than two weeks after the date of the conference.

      **THEREFORE, IT IS STIPULATED AND AGREED THAT**, subject to the
Court's approval:

          1. Defendants agree to Plaintiffs' request for leave to file a Third Consolidated
             Amended Complaint limited to the addition of new claims brought pursuant to
             the antitrust laws of the States of New York and Illinois; and

MAY-26-2010 17:17 From:JACOBSON          9142347176          To:2127194775          P.1/3

2

2.  Plaintiffs' Third Consolidated Amended Complaint, as limited by the above
    paragraph, shall be filed by Plaintiffs on or before June 2, 2010; and

3.  To the extent an Answer is otherwise due from any Defendant, those
    Defendants shall have until June 23, 2010 to answer, respond or otherwise
    move against, including, but not limited to, submission of supplemental legal
    authority, Plaintiffs' Third Consolidated Amended Complaint; and

4.  To the extent any Defendant decides to move against Plaintiffs' Third
    Consolidated Amended Complaint, Plaintiffs' response to any such motion(s)
    shall be due on or before July 23, 2010 and Defendants' reply to any such
    response shall be due on or before August 6, 2010; and

5.  Plaintiffs will submit supplemental legal authority addressing the issues raised
    in the Pending Motions on or before June 2, 2010; and

6.  Defendants will respond to Plaintiffs' supplemental legal authority addressing
    the issues raised in the Pending Motions on or before June 11, 2010; and

7.  Although Defendants do not consent to Plaintiffs' filing a reply to the above
    mentioned response to Plaintiffs' supplemental legal authority, this stipulation
    is without prejudice to Plaintiffs requesting leave to file a reply to the same;
    and

8.  All discovery is stayed in the above-mentioned action until the later of (1)
    resolution of the Pending Motions to dismiss, and (2) resolution of any
    motions to dismiss Plaintiffs' Third Consolidated Amended Complaint; and

9.  This stipulation may be executed in counterparts, including by signature
    transmitted by facsimile.

DATED: May 27, 2010                      LOVELL STEWART HALEBIAN
                                         JACOBSON LLP

                                         By: _____
                                         Christopher Lovell
                                         Gary S. Jacobson
                                         500 Fifth Avenue
                                         New York, New York 10110
                                         Tel.: (212) 608-1900
                                         Fax.: (212) 719-4677

                                         *Attorneys for Plaintiffs*

3

ROBBINS GELLER RUDMAN
& DOWD LLP

By: *Bonny E. Sweeney* BS

John J. Stoia, Jr.
Bonny E. Sweeney
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

*Attorneys for Plaintiffs*


SIMPSON THACHER & BARTLETT LLP

By: _____
Kenneth R. Logan
Jonathan K. Youngwood
425 Lexington Ave.
New York, New York 10017-3954
(212) 455-2000

*Attorneys for Defendant Warner Music
Group Corp.*


MAYER BROWN LLP

By: _____
Richard M. Steuer
Mark E. Cuccaro
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Defendants Capitol Records, Inc.
d/b/a EMI Music North America, EMI Group
North America, Inc., Capitol-EMI Music, Inc.,
and Virgin Records America, Inc.*

3

ROBBINS GELLER RUDMAN
& DOWD LLP

By: _____
John J. Stoia, Jr.
Bonny E. Sweeney
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

*Attorneys for Plaintiffs*


SIMPSON THACHER & BARTLETT LLP

By: *Jonathan K. Youngwood*/sk
Kenneth R. Logan
Jonathan K. Youngwood
425 Lexington Ave.
New York, New York 10017-3954
(212) 455-2000

*Attorneys for Defendant Warner Music
Group Corp.*


MAYER BROWN LLP

By: _____
Richard M. Steuer
Mark E. Cuccaro
1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Defendants Capitol Records, Inc.
d/b/a EMI Music North America, EMI Group
North America, Inc., Capitol-EMI Music, Inc.,
and Virgin Records America, Inc.*

3

ROBBINS GELLER RUDMAN
& DOWD LLP

By: _____
John J. Stoia, Jr.
Bonny E. Sweeney
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

*Attorneys for Plaintiffs*


SIMPSON THACHER & BARTLETT LLP

By: _____
Kenneth R. Logan
Jonathan K. Youngwood
425 Lexington Ave.
New York, New York  10017-3954
(212) 455-2000

*Attorneys for Defendant Warner Music
Group Corp.*


MAYER BROWN LLP

By: _____
Richard M. Steuer
Mark E. Cuccaro
1675 Broadway
New York, New York  10019
(212) 506-2500

*Attorneys for Defendants Capitol Records, Inc.
d/b/a EMI Music North America, EMI Group
North America, Inc., Capitol-EMI Music, Inc.,
and Virgin Records America, Inc.*

4

GIBSON, DUNN & CRUTCHER LLP

By: _____

Scott A. Edelman
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East
Los Angeles, California 90067-3026
(310) 552-8500

Joseph Kattan, PC
Georgia K. Winston
1050 Connecticut Ave., N.W.
Washington, District of Columbia 20036-5306
(202) 955-8500

*Attorneys for Defendants SONY BMG Music
Entertainment and Sony Corporation of
America*

CRAVATH, SWAINE & MOORE LLP

By: _____
Peter T. Barbur
Rachel G. Skaistis
Wes Earnhardt
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

*Attorneys for Defendant Time Warner Inc.*

MUNGER, TOLLES & OLSON LLP

By: _____
Glenn D. Pomerantz
Kelly M. Klaus
Joshua P. Groban
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560
(213) 683-9100

*Attorneys for Defendant UMG Recordings, Inc.*

4

GIBSON, DUNN & CRUTCHER LLP

By: _____

Scott A. Edelman
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East
Los Angeles, California 90067-3026
(310) 552-8500

Joseph Kattan, PC
Georgia K. Winston
1050 Connecticut Ave., N.W.
Washington, District of Columbia 20036-5306
(202) 955-8500

*Attorneys for Defendants SONY BMG Music
Entertainment and Sony Corporation of
America*

CRAVATH, SWAINE & MOORE LLP

By: _____
Peter T. Barbur
Rachel G. Skaistis
Wes Earnhardt
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

*Attorneys for Defendant Time Warner Inc.*

MUNGER, TOLLES & OLSON LLP

By: _____
Glenn D. Pomerantz
Kelly M. Klaus
Joshua P. Groban
355 South Grand Avenue, 35th Floor
Los Angeles, California 90071-1560
(213) 683-9100

*Attorneys for Defendant UMG Recordings, Inc.*

4

GIBSON, DUNN & CRUTCHER LLP

By: _____

Scott A. Edelman
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East
Los Angeles, California  90067-3026
(310) 552-8500

Joseph Kattan, PC
Georgia K. Winston
1050 Connecticut Ave., N.W.
Washington, District of Columbia 20036-5306
(202) 955-8500

*Attorneys for Defendants SONY BMG Music
Entertainment and Sony Corporation of
America*

CRAVATH, SWAINE & MOORE LLP

By: _____
Peter T. Barbur
Rachel G. Skaistis
Wes Earnhardt
Worldwide Plaza
825 Eighth Avenue
New York, New York  10019
(212) 474-1000

*Attorneys for Defendant Time Warner Inc.*

MUNGER, TOLLES & OLSON LLP

By: _____
Glenn D. Pomerantz
Kelly M. Klaus
Joshua P. Groban
355 South Grand Avenue, 35th Floor
Los Angeles, California  90071-1560
(213) 683-9100

*Attorneys for Defendant UMG Recordings, Inc.*

5

HOWREY LLP

By: _Alan Wiseman_

Alan M. Wiseman
Mark C. Schechter
Thomas Isaacson
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2402
(202) 783-0800
*Attorneys for Defendant Bertelsmann, Inc.*

**SO ORDERED**

_Loretta A. Preska_

HONORABLE LORETTA A. PRESKA
UNITED STATES DISTRICT COURT JUDGE

Dated: New York, New York
May 28, 2010

# EXHIBIT D

BEFORE:    VIKTOR V. POHORELSKY         DATE:     7/26/07
              U.S. MAGISTRATE JUDGE     START TIME:  2:30 p.m.
                                          END TIME:   4:15 p.m.

DOCKET NO.    MD–06-1775                 JUDGE:   JG

CASE NAME:    In re Air Cargo Shipping Services Antitrust Litigation

### CIVIL CONFERENCE

PURPOSE OF CONFERENCE:    Hearing on Motion to Stay Discovery and Premotion
                                           Conference

APPEARANCES:    Plaintiff    See Separate Schedules

                Defendant    See Separate Schedules

                Court Reporter  Allan Sherman

SCHEDULING AND RULINGS:

1.    The defendants' motion to stay merits discovery is granted in part for reasons set forth on
the record; the motion will be reconsidered by the court once the briefing of the motions
to dismiss has been completed.

2.    The defendants' motion to stay jurisdictional discovery is granted pending consideration
of the motions to dismiss on jurisdictional grounds. If jurisdictional discovery is needed
to resolve jurisdictional issues, the court will address the scope of discovery to be
provided.

3.    The defendants may move to postpone consideration of the plaintiffs' motion for
preliminary approval of the proposed Lufthansa settlement, but given the court's
substantial concerns about the defendants' standing to make such a motion, the motion
should be made expeditiously because the court will not delay consideration of the
preliminary approval motion pending the filing of the defendants' motion to postpone
given that the court's ruling on the motion for preliminary approval will be made in the
form of a report and recommendation.

4.    The parties are nearing completion of their efforts to reach stipulations concerning
confidentiality and electronically stored documents.

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| IN RE: LTL SHIPPING SERVICES ANTITRUST LITIGATION | MDL DOCKET NO. 1895 ALL CASES |
| | 1:08-MD-1895-WSD |

## ORDER

This matter is before the Court on consideration of the schedule for the processing of this action. The Court has reviewed the parties' April 9, 2008 Joint Submission Regarding the Court's April 15, 2008 Agenda Items and the presentation and the matters presented by counsel at the April 15, 2008 Initial Conference in this action.

Based on representations made to the Court at the April 15, 2008 Initial Conference (the "Initial Conference"), the Court understands that the 53 individual cases in this MDL litigation will be consolidated into single action in this Court. The action will center on the Clayton Act and Sherman Act allegations of price fixing for fuel surcharges.[1] A consolidated amended complaint will simplify and

---

[1] The Plaintiffs in the MDL actions are evaluating whether to include the claims asserted under various laws of the state in which several of these actions were filed. That is, consideration is being given to a consolidated complaint that asserts only federal antitrust allegations.

focus this case.

The Court was advised at the Initial Conference by counsel for the Defendants that, based on the complaints filed in the individual actions in this MDL case and allegations they expect to be included in the consolidated complaint, the Defendants will move to dismiss the consolidated complaint on the grounds that the pleadings do not sufficiently allege an actionable antitrust conspiracy. Thus, the first engagement in this matter will focus on the antitrust price fixing conspiracy allegations in the consolidated amended complaint and Defendants' challenge to the legal sufficiency of these claims.

In light of the matters discussed at the Initial Conference and having further considered the management of this litigation, the Court agrees with counsel that it is appropriate now only to set a schedule to address the filing of the consolidated amended complaint and the Defendants' response to this filing. The Court later will, if necessary, address a schedule for the processing of fact and expert discovery, including specific protocol for components of the discovery process, and the further conduct of the litigation.

Having evaluated counsel's comments regarding the time requested for preparation of the consolidated complaint, the stated scope of Defendants'

2

anticipated motion to dismiss, the requirement of counsel to coordinate among the lawyers representing Plaintiffs and Defendants in this matter, and the Court's commitment to efficiently and fairly manage this litigation,

**IT IS HEREBY ORDERED** that the Court sets the following schedule for the initial matters in this case:

1. The Plaintiffs shall, on or before May 16, 2008, file and serve their consolidated amended complaint in this action.

2. Defendants shall, on or before June 18, 2008, file and serve a single, consolidated answer or a single, consolidated motion to dismiss the consolidated amended complaint. A consolidated motion to dismiss shall not exceed thirty (30) pages and otherwise shall meet the pleading requirements of the Court's local rules.

3. If a consolidated motion to dismiss is filed by the Defendants, Plaintiffs shall, on or before July 23, 2008, file and serve their response to the motion. This filing shall not exceed forty (40) pages and otherwise shall meet the requirements of the Court's local rules.

4. Defendants shall, on or before August 15, 2008, file and serve their reply to Plaintiffs' response to the motion. This filing shall not exceed twenty (20) pages

3

and otherwise shall meet the pleading requirements of the Court's local rules.

    5.  All filings shall be served electronically and shall be deemed received on the date of electronic service.

    **SO ORDERED** this 22nd day of April 2008.


                _____

                WILLIAM S. DUFFEY, JR.

                UNITED STATES DISTRICT JUDGE

4



**U.S. Department of Justice**

_____

*Washington, D.C.  20530*


February 27, 2012


BY HAND

The Honorable Naomi Reice Buchwald
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

> Re:    In re: LIBOR-Based Financial Instruments Antitrust Litigation,
>          No. 1:11-MD-2262 (NRB)

Dear Judge Buchwald:

      The United States Department of Justice, Fraud Section of the Criminal Division and the Antitrust Division (collectively, the "Department of Justice"), write in response to the February 17, 2012 letters submitted by the Plaintiffs and Defendants in the above-referenced case. According to their letters, Plaintiffs are seeking all documents produced by Defendants to "U.S. regulators investigating the alleged manipulation of LIBOR," whereas Defendants argue that discovery should not proceed until after the filing of any consolidated complaints and dismissal motions.

      The Department of Justice is conducting a criminal investigation into alleged manipulation of certain benchmark interest rates, including LIBORs of several currencies. We write to advise the Court that, given the ongoing investigation, we have an interest in aspects of the discovery that Plaintiffs are requesting. Accordingly, if the Court determines that any discovery should proceed at this time, we respectfully request that the Department of Justice be given an opportunity to advise the Court as to its position on the timing and scope of discovery.

The Honorable Naomi Reice Buchwald
February 27, 2012
page 2

      We also advise the Court and the parties that we may request that any further submission
by the Department of Justice be provided on an *ex parte* basis, if necessary, to protect the
confidentiality of details of the investigation.

                                           Respectfully submitted,

                                           Daniel Braun
                                           Deputy Chief
                                           Rebecca Rohr
                                         Trial Attorney
                                         United States Department of Justice
                                         Criminal Division, Fraud Section
                                         1400 New York Ave. N.W.
                                         Washington, DC 20530
                                         (202) 353-7693

                                           Deirdre McEvoy
                                         Chief, New York Office
                                         Elizabeth Prewitt/Richard Powers
                                         Trial Attorneys
                                         United States Department of Justice
                                         Antitrust Division
                                         26 Federal Plaza
                                         New York, NY 10007
                                         (212) 335-8013

cc (via-email):        Counsel for the Over-the Counter Plaintiffs and Exchange-Based Plaintiffs
                      Counsel for the Charles Schwab Plaintiffs
                      Counsel for the Bank Defendants

DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/14/2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
In re:

LIBOR-Based Financial Instruments
Antitrust Litigation.

This Document Applies to: All Cases
------------------------------------------X

**MEMORANDUM AND ORDER**

11 MD 2262 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

For the reasons stated at our August 8, 2012 conference, a stay is hereby imposed on any actions not subject to defendants' pending motion to dismiss, filed on June 29, 2012. The stay applies to the four actions already filed that are not subject to the motion,[1] as well as any new actions filed hereafter that fall within the scope of the multi-district litigation. The stay will remain in place until the pending motion to dismiss is resolved.[2]

**SO ORDERED.**

---

[1] These actions are Community Bank & Trust v. Bank of America Corp., No. 12 Civ. 4205 (S.D.N.Y.), Berkshire Bank v. Bank of America Corp., No. 12 Civ. 5723 (S.D.N.Y.), 33-35 Green Pond Associates, LLC v. Bank of America Corp., No. 12 Civ. 5822 (S.D.N.Y.), and Lieberman v. Credit Suisse Group, No. 12 Civ. 6056 (S.D.N.Y.). The Court's July 12, 2012 Order setting a briefing schedule for the Community Bank & Trust action is therefore vacated.

[2] As we made clear at the August 8, 2012 conference, the stay is not meant to discourage the filing of new complaints. Indeed, we encourage the prompt filing of new complaints so that, following the resolution of the motion, and depending on its outcome, we are well-positioned to evaluate the structure of the case(s) moving forward.

1

Dated:   New York, New York
         August 14, 2012

                                                          NAOMI REICE BUCHWALD
                                                          UNITED STATES DISTRICT JUDGE

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
In re:

LIBOR-Based Financial Instruments
Antitrust Litigation.

O R D E R

11 MDL 2262 (NRB)

----------------------------------------

This document applies to:

CASES LISTED IN APPENDIX

----------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/5/2015

    The   OTC   Plaintiffs,   Exchange-Based   Plaintiffs,   and
plaintiffs  in  five  stayed  cases[1]  have  requested  the  entry  of
partial  judgment  or  final  judgment  in  order  to  allow  them  to
participate  in  the  pending  appeal  from  final  judgment  in  Gelboim
v.  Credit  Suisse  Group  AG,  No.  12-cv-1025.   See  Carmody  Letters,
MDL ECF Nos. 996, 1002.

    For  the  reasons  expressed  in  our  Orders  of  March  29,  2013
(ECF  No.  286),  August  23,  2013  (ECF  No.  389),  and  October  17,
2013  (ECF  No.  490),  and  in  open  court  on  this  date,  these
requests  are  granted  as  to  the  OTC  Plaintiffs,  Exchange-Based
Plaintiffs,  and  plaintiffs  in  33-35  Green  Pond  Road,  Courtyard

---

[1] 33-35 Green Pond Road Assocs., LLC v. Bank of Am. Corp., 12-cv-
5822; Courtyard at Amwell II, LLC v. Bank of Am. Corp., 12-cv-
6693; Guar. Bank & Trust Co. v. Credit Suisse Grp. AG, 13-cv-
346; L.A. Cnty. Emps. Ret. Ass'n v. Bank of Am. Corp., 13-cv-398
("LACERA"); Cnty. of Riverside v. Bank of Am. Corp., 13-cv-1135.

at Amwell II, and Guaranty Bank & Trust.  These requests are denied as to plaintiffs in LACERA and County of Riverside, as those cases do not raise claims under the Sherman Act.  See Compl. ¶¶ 127-133, LACERA, No. 13-cv-398, ECF No. 1; Compl. ¶¶ 128-134, Cnty. of Riverside, No. 13-cv-1135, ECF No. 1.

The Clerk of Court is respectfully requested:

- to enter final judgments against plaintiffs in 33-35 Green Pond and Courtyard at Amwell II, and to close those cases; and

- to enter partial judgments pursuant to Rule 54(b) as to claim 1 of the OTC Plaintiffs' operative complaint, MDL ECF No. 406; claim 5 of the Exchange-Based Plaintiffs' operative complaint, MDL ECF No. 407; and claim 1 of the complaint in Guaranty Bank & Trust, No. 13-cv-346, ECF No. 1.


Dated:   New York, New York
         February 5, 2015

                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

## APPENDIX

This document applies to the following cases:

| CASE NAME | CASE NO. |
|---|---|
| In re Libor-Based Financial Instruments Antitrust Litigation | 11-md-2262 |
| OTC Plaintiff Action | 11-cv-5450 |
| Exchange-Based Plaintiff Action | 11-cv-2613 |
| 33-35 Green Pond Road Assocs., LLC v. Bank of Am. Corp. et al. | 12-cv-5822 |
| Courtyard at Amwell II, LLC v. Bank of Am. Corp. et al. | 12-cv-6693 |
| Guar. Bank & Trust Co. v. Credit Suisse Grp. AG et al. | 13-cv-346 |
| L.A. Cnty. Emps. Ret. Ass'n v. Bank of Am. Corp. et al. | 13-cv-398 |
| Cnty. of Riverside v. Bank of Am. Corp. et al. | 13-cv-1135 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
In re:

LIBOR-Based Financial Instruments
Antitrust Litigation.

----------------------------------------

This document applies to:

CASES LISTED IN APPENDIX

----------------------------------------X

**O R D E R**

11 MDL 2262 (NRB)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/13/2015

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Individual plaintiffs in eighteen cases (see appendix) have requested the entry of partial judgment in order to allow them to participate in the pending appeal from final judgment in Gelboim v. Credit Suisse Group AG, No. 12-cv-1025. See Leveridge Letter, MDL ECF No. 1018.

For the reasons expressed in the Orders of March 29, 2013 (MDL ECF No. 286), August 23, 2013 (MDL ECF No. 389), October 17, 2013 (MDL ECF No. 490), and February 5, 2015 (MDL ECF No. 1008), and in open court on February 5, 2015, these requests are granted.

The Clerk of Court is respectfully requested to enter partial judgments pursuant to Rule 54(b) as to the Sherman Act claims listed in the appendix.


Dated:   New York, New York
         February _13_, 2015


                              NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE

## APPENDIX

This document applies to the following cases and orders judgment as to the following claims:

| CASE NAME | CASE NO. | COMPLAINT/CLAIM |
|-----------|----------|-----------------|
| In re Libor-Based Financial Instruments Antitrust Litigation | 11-md-2262 | — |
| City of Riverside et al. v. Bank of America Corp. et al. | 13-cv-0597 | No. 11-md-2262, ECF No. 684, claim 9 |
| County of San Mateo et al. v. Bank of America Corp. et al. | 13-cv-0625 | No. 11-md-2262, ECF No. 684, claim 9 |
| East Bay Municipal Utility District v. Bank of America Corp. et al. | 13-cv-0626 | No. 11-md-2262, ECF No. 684, claim 9 |
| City of Richmond et al. v. Bank of America Corp. et al. | 13-cv-0627 | No. 11-md-2262, ECF No. 684, claim 9 |
| County of San Diego v. Bank of America Corp. et al. | 13-cv-0667 | No. 11-md-2262, ECF No. 684, claim 9 |
| County of Riverside v. Bank of America Corp. et al. | 13-cv-1135 | No. 11-md-2262, ECF No. 684, claim 9 |

| Amabile et al. v. Bank of America Corp. et al. | 13-cv-1700 | No. 13-cv-1700, ECF No. 12, claim 5 |
| Salix Capital US Inc. et al. v. Banc of America Securities LLC et al. | 13-cv-4018 | No. 13-cv-4018, ECF No. 69, claim 22 |
| Regents of the University of California v. Bank of America Corp. et al. | 13-cv-5186 | No. 11-md-2262, ECF No. 684, claim 9 |
| County of Sonoma et al. v. Bank of America Corp. et al. | 13-cv-5187 | No. 11-md-2262, ECF No. 684, claim 9 |
| San Diego Association of Governments v. Bank of America Corp. et al. | 13-cv-5221 | No. 11-md-2262, ECF No. 684, claim 9 |
| County of Sacramento v. Bank of America Corp. et al. | 13-cv-5569 | No. 11-md-2262, ECF No. 684, claim 9 |
| City of Houston v. Bank of America Corp. et al. | 13-cv-5616 | No. 11-md-2262, ECF No. 685, claim 9 |
| City of Philadelphia v. Bank of America Corp. et al. | 13-cv-6020 | No. 13-cv-6020, ECF No. 42, claim 14 |
| National Credit Union Administration Board v. Credit Suisse Group AG et al. | 13-cv-7394 | No. 11-md-2262, ECF No. 662, claim 1 |

| County of Mendocino v. Bank of America Corp. et al. | 13-cv-8644 | No. 11-md-2262, ECF No. 684, claim 9 |
|---|---|---|
| Darby Financial Products et al. v. Barclays Bank plc et al. | 13-cv-8799 | No. 13-cv-8799, ECF No. 36, claim 13 |
| Bay Area Toll Authority v. Bank of America Corp. et al. | 14-cv-3094 | No. 11-md-2262, ECF No. 673, claim 1 |
| Prudential Investment Portfolios 2 et al. v. Bank of America Corp. et al. | 14-cv-4189 | No. 14-cv-4189, ECF No. 18, claim 11 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------X
In re:

Libor-Based Financial Instruments                    **11 MDL 2262 (NRB)**
Antitrust Litigation.
-----------------------------------------------------X
This document apples to:

                                                     **CORRESCTED JUDGMENT**
CASES LISTED IN APPENDIX
-----------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/17 2015

    Whereas the OTC Plaintiffs, Exchange-Based Plaintiffs, and plaintiffs in five stayed cases

having requested the entry of partial judgment or final judgment in order to allow them to participate

in the pending appeal from final judgment in <u>Gelboim v. Credit Suisse Group AG</u>, No. 12-cv-1025,

and the matter having come before the Honorable Naomi Reice Buchwald, United States District

Judge, and the Court, on February 5, 2015, having rendered its Order granting the requests as to the

OTC Plaintiffs, Exchange-Based Plaintiffs, and plaintiffs in <u>33-35 Green Pond Road</u>, <u>Courtyard at</u>

<u>Amwell II</u>, and <u>Guaranty Bank & Trust</u>, denying the requests as to plaintiffs in <u>LACERA</u> and <u>County</u>

<u>of Riverside</u>, as those cases do not raise claims under the Sherman Act, and requesting the Clerk of

Court: to enter final judgment against plaintiffs in <u>33-35 Green Pond</u> and <u>Courtyard as Amwell II</u>, and

to close those cases; and to enter partial judgments pursuant to Rule 54(b) as to claim I of the OTC

Plaintiffs' operative complaint, MDL ECF No. 406; claim 5 of the Exchange-Based Plaintiffs'

operative complaint, MDL ECF No. 407; and claim 1 of the complaint in <u>Guaranty Bank & Trust</u>,

No. 13-cv-346, ECF No. 1, it is,

    **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Order dated February 5, 2015, the requests as to the OTC Plaintiffs, Exchange-Based

Plaintiffs, and plaintiffs in <u>33-35 Green Pond Road</u>, <u>Courtyard at Amwell II</u>, and <u>Guaranty Bank &</u>

<u>Trust</u> are granted; the requests as to plaintiffs in <u>LACERA</u> and <u>County of Riverside</u>, as those cases

do not raise claims under the Sherman Act, are denied; accordingly, final judgment is entered against

plaintiffs in 33-35 Green Pond and Courtyard as Amwell II, and those cases are closed; there is no just

reason for delay pursuant to Fed. R. Civ. P. 54(b), partial judgment is entered in favor of the

Defendants as to claim I of the OTC Plaintiffs' operative complaint, MDL ECF No. 406; claim 5 of

the Exchange-Based Plaintiffs' operative complaint, MDL ECF No. 407; and claim 1 of the complaint

in Guaranty Bank & Trust, No. 13-cv-346, ECF No. 1.

**Dated:**  New York, New York
February 17, 2015


                                        **RUBY J. KRAJICK**
                                        _____
                                          **Clerk of Court**
                              **BY:**
                                        _____
                                          **Deputy Clerk**


                              THIS DOCUMENT WAS ENTERED
                              ON THE DOCKET ON _____

**APPENDIX**

This document applies to the following cases:

| CASE NAME | CASE NO. |
|---|---|
| In re Libor-Based Financial Instruments Antitrust Litigation | 11-md-2262 |
| OTC Plaintiff Action | 11-cv-5450 |
| Exchange-Based Plaintiff Action | 11-cv-2613 |
| 33-35 Green Pond Road Assocs., LLC v. Bank of Am. Corp. et al. | 12-cv-5822 |
| Courtyard at Amwell II, LLC v. Bank of Am. Corp. et al. | 12-cv-6693 |
| Guar. Bank & Trust Co. v. Credit Suisse Grp. AG et al. | 13-cv-346 |
| L.A. Cnty. Emps. Ret. Ass'n v. Bank of Am. Corp. et al. | 13-cv-398 |
| Cnty. of Riverside v. Bank of Am. Corp. et al. | 13-cv-1135 |

1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
In re:

Libor-Based Financial Instruments        **11 MDL 2262 (NRB)**
Antitrust Litigation.
------------------------------------------------------X
This document apples to:

                                          **PARTIAL JUDGMENT**
CASES LISTED IN APPENDIX
-----------------------------------------------------------X

      Whereas the Individual Plaintiffs in eighteen cases (see appendix) having requested the entry of partial judgment in order to allow them to participate in the pending appeal from final judgment in <u>Gelboim v. Credit Suisse Group AG</u>, No. 12-cv-1025, and the matter having come before the Honorable Loretta A. Preska, United States District Judge, and the Court, on February 13, 2015, having rendered its Order granting the requests, and requesting the Clerk of Court to enter partial judgments pursuant to Rule 54(b) as to the Sherman Act claims listed in the appendix, it is,

      **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Order dated February 13, 2015, the requests are granted; there is no just reason for delay pursuant to Fed. R. Civ. P. 54(b), partial judgment is entered in favor of the Defendants as to the Sherman Act claims listed in the appendix.

**Dated:** New York, New York
      February 23, 2015

                         **RUBY J. KRAJICK**

                                Clerk of Court

      **BY:**

                                Deputy Clerk

                        **THIS DOCUMENT WAS ENTERED**
                        **ON THE DOCKET ON** _____

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/23/2015

**APPENDIX**

This document applies to the following cases and orders judgment
as to the following claims:

| CASE NAME | CASE NO. | COMPLAINT/CLAIM |
|-----------|----------|-----------------|
| In re Libor-Based Financial Instruments Antitrust Litigation | 11-md-2262 | —— |
| City of Riverside et al. v. Bank of America Corp. et al. | 13-cv-0597 | No. 11-md-2262, ECF No. 684, claim 9 |
| County of San Mateo et al. v. Bank of America Corp. et al. | 13-cv-0625 | No. 11-md-2262, ECF No. 684, claim 9 |
| East Bay Municipal Utility District v. Bank of America Corp. et al. | 13-cv-0626 | No. 11-md-2262, ECF No. 684, claim 9 |
| City of Richmond et al. v. Bank of America Corp. et al. | 13-cv-0627 | No. 11-md-2262, ECF No. 684, claim 9 |
| County of San Diego v. Bank of America Corp. et al. | 13-cv-0667 | No. 11-md-2262, ECF No. 684, claim 9 |

1

| | | |
|---|---|---|
| Amabile et al. v. Bank of America Corp. et al. | 13-cv-1700 | No. 13-cv-1700, ECF No. 12, claim 5 |
| Salix Capital US Inc. et al. v. Banc of America Securities LLC et al. | 13-cv-4018 | No. 13-cv-4018, ECF No. 69, claim 22 |
| Regents of the University of California v. Bank of America Corp. et al. | 13-cv-5186 | No. 11-md-2262, ECF No. 684, claim 9 |
| County of Sonoma et al. v. Bank of America Corp. et al. | 13-cv-5187 | No. 11-md-2262, ECF No. 684, claim 9 |
| San Diego Association of Governments v. Bank of America Corp. et al. | 13-cv-5221 | No. 11-md-2262, ECF No. 684, claim 9 |
| County of Sacramento v. Bank of America Corp. et al. | 13-cv-5569 | No. 11-md-2262, ECF No. 684, claim 9 |
| City of Houston v. Bank of America Corp. et al. | 13-cv-5616 | No. 11-md-2262, ECF No. 685, claim 9 |
| City of Philadelphia v. Bank of America Corp. et al. | 13-cv-6020 | No. 13-cv-6020, ECF No. 42, claim 14 |
| National Credit Union Administration Board v. Credit Suisse Group AG et al. | 13-cv-7394 | No. 11-md-2262, ECF No. 662, claim 1 |

| County of Mendocino v. Bank of America Corp. et al. | 13-cv-8644 | No. 11-md-2262, ECF No. 684, claim 9 |
|---|---|---|
| Darby Financial Products et al. v. Barclays Bank plc et al. | 13-cv-8799 | No. 13-cv-8799, ECF No. 36, claim 13 |
| Bay Area Toll Authority v. Bank of America Corp. et al. | 14-cv-3094 | No. 11-md-2262, ECF No. 673, claim 1 |
| Prudential Investment Portfolios 2 et al. v. Bank of America Corp. et al. | 14-cv-4189 | No. 14-cv-4189, ECF No. 18, claim 11 |

3

15 USCS § 1

§ 1. Trusts, etc., in restraint of trade illegal; penalty

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $ 100,000,000 if a corporation, or, if any other person, $ 1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

**History:**

(July 2, 1890, ch 647, § 1, 26 Stat. 209; Aug. 17, 1937, ch 690, Title VIII, § 1, 50 Stat. 693; July 7, 1955, ch 281, 69 Stat. 282; Dec. 21, 1974, P.L. 93-528, § 3, 88 Stat. 1708; Dec. 12, 1975, P.L. 94-145, § 2, 89 Stat. 801; Nov. 16, 1990, P.L. 101-588, § 4(a), 104 Stat. 2880.)
(As amended June 22, 2004, P.L. 108-237, Title II, Subtitle A, § 215(a), 118 Stat. 668.)

## § 15. Suits by persons injured

(a) Amount of recovery; prejudgment interest. Except as provided in subsection (b), any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The court may award under this section, pursuant to a motion by such person promptly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances. In determining whether an award of interest under this section for any period is just in the circumstances, the court shall consider only—

> (1) whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith;

> (2) whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings; and

> (3) whether such person or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof.

(b) Amount of damages payable to foreign states and instrumentalities of foreign states.

(1) Except as provided in paragraph (2), any person who is a foreign state may not recover under subsection (a) an amount in excess of the actual damages sustained by it and the cost of suit, including a reasonable attorney's fee.

(2) Paragraph (1) shall not apply to a foreign state if—

> (A) such foreign state would be denied, under section 1605(a)(2) of title 28 of the United States Code [28 USCS § 1605(a)(2)], immunity in a case in which the action is based upon a commercial activity, or an act, that is the subject matter of its claim under this section;

(B) such foreign state waives all defenses based upon or arising out of its status as a foreign state, to any claims brought against it in the same action;

(C) such foreign state engages primarily in commercial activities; and

(D) such foreign state does not function, with respect to the commercial activity, or the act, that is the subject matter of its claim under this section as a procurement entity for itself or for another foreign state.

(c) Definitions. For purposes of this section—

(1) the term "commercial activity" shall have the meaning given it in section 1603(d) of title 28, United States Code [28 USCS § 1603(d)], and

(2) the term "foreign state" shall have the meaning given it in section 1603(a) of title 28, United States Code [28 USCS § 1603(a)].

History:

(Oct. 15, 1914, ch 323, § 4, 38 Stat. 731; Sept. 12, 1980, P.L. 96-349, § 4(a)(1), 94 Stat. 1156; Dec. 29, 1982, P.L. 97-393, § 1, 96 Stat. 1964.)

15 USCS § 15